1

```
1                UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
2                    ORLANDO DIVISION

3    - - - - - - - - - - - - - - -X
                                  :
4    UNITED STATES OF AMERICA,    :
                                  :
5                                 :  Case No.:
             Plaintiff,           :  6:17-cr-00257-PGB-LRH-1
6                                 :
     vs.                          :
7                                 :  Orlando, Florida
                                  :  April 18, 2019
8    STEVEN MICHAEL MARKS,        :  9:46 a.m.
                                  :
9                                 :
             Defendant.           :
10                                :
                                  :
11   - - - - - - - - - - - - - - -X

12        TRANSCRIPT OF COMPETENCY HEARING (DAY 1 OF 2)
          BEFORE THE HONORABLE LESLIE R. HOFFMAN
13           UNITED STATES MAGISTRATE JUDGE

14

15   APPEARANCES:

16    Counsel for Plaintiff:        Emily C.L. Chang

17    Counsel for Defendant:        Mark J. Mahoney
                                    Todd Alan Foster
18

19

20   Proceedings recorded by mechanical stenography.
     Transcript produced by computer-aided transcription.
21

22   Court Reporter:   Heather Jewett, RPR, FCRR
                       Federal Official Court Reporter
23                     401 West Central Boulevard, Suite 4600
                       Orlando, Florida 32801
24                     e-mail: heatherjewett.focr@gmail.com

25
```

**2**

T A B L E   O F   C O N T E N T S

April 18, 2019

<u>PROCEEDINGS</u>                                                        <u>Page</u>

<u>WITNESSES</u>

For the Government:

  Randy Otto, PhD
        Direct Examination by Ms. Chang          14
        Cross-Examination by Mr. Mahoney          76
        Redirect Examination by Ms. Chang        120
        Recross-Examination by Mr. Mahoney       127

For the Defendant:

  Lynda Geller, PhD
        Direct Examination by Mr. Mahoney        135
        Cross-Examination by Ms. Chang           180


<u>EXHIBITS</u>

For the Government:

  Number 1        Sealed Exhibit                  13
  Number 2.1      Sealed Exhibit                  13
  Number 2.2      Sealed Exhibit                  13
  Number 3        Sealed Exhibit                  13
  Number 4        Sealed Exhibit                  13
  Number 5        Sealed Exhibit                  13
  Number 6        Sealed Exhibit                  13
  Number 7        Sealed Exhibit                  13

3

1

2                        P R O C E E D I N G S

3         (Call to order of the court at 9:46 a.m.)

4              THE COURTROOM DEPUTY:

5    Case No. 6:17-cr-257-Orl-40-LRH, the United States of America

6    v. Steven Michael Marks.

7              Counsel, please state your appearances for the

8    record.

9              MS. CHANG:  Good morning, Your Honor.  Emily Chang

10   on behalf of the United States.  With me is Special Agent

11   Rod Hyre of the FBI.

12             THE COURT:  Good morning.

13             MR. MAHONEY:  Your Honor, Mark Mahoney for

14   Mr. Marks, and with me is Todd Foster.

15             THE COURT:  Good morning.

16             MR. FOSTER:  Good morning.

17             MR. MAHONEY:  And this is Mr. Marks.

18             THE COURT:  Good morning, Mr. Marks.

19             We are here this morning for a competency hearing

20   pursuant to -- I believe it was a joint motion --

21             MR. MAHONEY:  That's correct, Your Honor.

22             THE COURT:  -- filed by both parties.  So the way I

23   thought we would run it today is I'm going to give each side a

24   brief opportunity to make some opening statements or opening

25   argument, and then we'll go ahead and take testimony of

**4**

1   whatever evidence you'd like to submit, and at the end I'll

2   let both sides also do argument as well.

3        I think just -- the microphones should be working

4   fine from the lectern, so I should be able to hear you.

5        If at any point, Mr. Marks, you don't understand

6   anything that I'm saying or that's going on, you can always

7   ask for a break.  You can always have time to talk to your

8   attorneys.  You can always ask me a question.  Do you

9   understand, sir?

10       THE DEFENDANT:  Yes, Your Honor.

11       THE COURT:  Okay.  Great.

12       And then we'll try to take a couple breaks, and

13   we'll take a short lunch break throughout the day.  So we

14   won't make this too onerous.  And if at any time anybody needs

15   to take a break for any reason, just let me know, and we'll do

16   our best to accommodate.

17       So with that being said, Ms. Chang, would you like

18   to make an opening statement for the United States?

19       MS. CHANG:  Yes, Your Honor.  Thank you.

20       Your Honor, this is a little unconventional.  At

21   least I was not anticipating opening remarks, so I'm going to

22   keep it brief --

23       THE COURT:  Sure.

24       MS. CHANG:  -- because the evidence really is going

25   to speak for itself.  I also submitted in advance of the

1   hearing sort of what you can accept as an opening statement as

2   well.  Since we ordinarily do not get the opportunity to do an

3   opening statement -- that's why I did the brief, in order to

4   orient the Court as to the law that applies in this case as

5   well as some of what I consider to be the important facts at

6   issue.

7           And I think what the Court is going to see during

8   the presentation today of evidence from three very experienced

9   experts, frankly -- there's a wealth of experience that's

10  going to appear before the Court today in this room, and

11  you're going to hear a lot of testimony, but I think that,

12  ultimately -- what you're going to hear from the people in

13  that box is important, and it's important to consider, but I

14  actually think that the most powerful evidence that's before

15  the Court is not going to be what you hear from that box

16  today.  The most powerful evidence -- I mean, that's helpful.

17  It's going to be helpful in analyzing and considering and

18  making sense of what you hear, but the most powerful evidence

19  is in Government Exhibits 2.1, 2.2, and 6, which are audio

20  recordings of the defendant himself.

21          The Court is here to evaluate the defendant's

22  competency, not other people's opinions about his competency.

23  Those are helpful, but the Court, ultimately -- your question

24  is is this defendant competent.  And the audio recordings make

25  plain that he is.  And so I -- I kind of -- I don't want to

*6*

1    belabor it.  We have a long day ahead of us.

2              THE COURT:  We do.

3              MS. CHANG:  And so I don't want to repeat just

4    things that I'm going to repeat in the future anyway.  But at

5    any point, obviously, if the Court has questions, I'm happy to

6    address them.

7              THE COURT:  Thank you, Ms. Chang.

8              And, yes, I do want to just say for the record I did

9    receive everybody's submissions both from the United States

10   and from the defendant.  I've read all the briefs and just

11   about every single exhibit that has been submitted under seal

12   at this point.

13             Mr. Mahoney, would you like to say a few words?

14             MR. MAHONEY:  Sure, Judge.  Just one moment.  I just

15   want to check something.  Okay.

16             Good morning, Judge.

17             THE COURT:  Good morning.

18             MR. MAHONEY:  First of all, I hope I didn't hold the

19   Court.  I got here just shortly ago.  I don't know whether --

20   I hope I didn't hold the Court up too much.  I'm sorry if I

21   did because I -- Dr. Geller and I had a little bit of trouble

22   getting over here.

23             I think that you got -- we've given you a massive

24   amount of information at the outset, so there really isn't

25   much for me to say.

7

1          I do think that there is a bit of caution that -- as

2    to the Government's suggestion that the interview of Steven by

3    the police, which is actually prior to his arrest -- it was a

4    month or so before his actual arrest -- that that is as

5    pertinent as is being suggested here because it really --

6    and -- and because -- but because the Government has raised

7    that issue, we're prepared to sort of address a little bit

8    about what can -- we have addressed already in our memorandum

9    a little bit of what can be taken from that original

10   interview.

11          It's really about his competency now at the time of,

12   we anticipate, major proceedings, like considering whether or

13   not to take a plea, considering whether to go to trial, his

14   ability to properly -- which is what the statute says,

15   properly -- it's not just assist, but properly assist in his

16   defense.  So I think that really is what the focus is on.  So

17   no need to belabor all that at this point.

18          THE COURT:  Thank you, Mr. Mahoney.

19          Ms. Chang, would you like to begin?

20          MS. CHANG:  Yes, Your Honor.

21          The United States calls Dr. Randy Otto, who is the

22   Court-appointed expert.

23          THE COURT:  Yes.

24                    RANDY OTTO, PhD,

25   was called as a witness on behalf of the Government and,

1   having been duly sworn, testified as follows:

2          THE WITNESS:  Yes, I do.

3          THE COURTROOM DEPUTY:  Please be seated and state

4   your name for the record.

5          THE WITNESS:  My name is Randy Otto.

6          MS. CHANG:  Your Honor, may I proceed?

7          THE COURT:  Yes.

8          MS. CHANG:  At this time, Your Honor, I'd move to

9   admit Government Exhibits 1, 2.1, 2.2, and 3 through 7 under

10  seal, which were previously provided to the Court, but just

11  for purposes of this hearing, I also would like to have them

12  admitted for this proceeding.

13         THE COURT:  Mr. Mahoney, do you have any objections

14  to that?

15         MR. MAHONEY:  Could she please state the numbers

16  again.

17         MS. CHANG:  1, 2.1, 2.2, 3 through 7.

18         MR. MAHONEY:  3 through 7.

19         THE COURT:  Mr. Mahoney?

20         MR. MAHONEY:  Judge, I think as far as --

21         THE COURT:  Mr. Mahoney, it would help me if you

22  stood up, please.

23         MR. MAHONEY:  Yeah.  I'm just trying to handle this.

24         I think that I'd like to have the relevance, Judge.

25  Maybe we could defer until a time that some witness is

1   actually going to be questioned about 4 and 5.

2           THE COURT:  I don't -- Ms. Chang, I don't have an

3   exhibit list up here with me.  What are Exhibits 4 and 5?

4           MS. CHANG:  Your Honor, I previously provided it to

5   the clerk.  Exhibit 4 is a copy of the Amino chats between the

6   defendant and one of the child victims, and Exhibit 5 is a

7   copy of the Kik chats between the defendant and one of the

8   other child victims.

9           And the reason why these are relevant, Your Honor,

10  is because a lot of what the defense is saying about the

11  defendant's competency is his -- his level of appreciation of

12  the wrongfulness of his conduct.  They make allegations that

13  he couldn't have appreciated how wrong it was and that he has

14  no sexual interest in children, you know, as to the sexual

15  dangerousness.  So this -- his actual --

16          I apologize.  That was my computer, Your Honor,

17  which we're using for audio purposes.

18          THE COURT:  No problem.

19          MS. CHANG:  So I apologize for that.  We turned down

20  the volume because the system wasn't working.

21          Anyways, those chats are relevant because how are --

22  how am I supposed to present to the Court evidence of his

23  appreciation of his wrongfulness if you can't even see what

24  was said, what the conduct is about.

25          Moreover, allegations have been made about his

1  memory and how his lack of working memory affects his ability

2  to assist his attorneys in a meaningful way.  Well, this is

3  the type of case, as set forth in Exhibits 4 and 5, which I

4  think is important to put before the Court -- this is the type

5  of case where the entirety of the offense conduct is in that

6  bench book right there except for the pornographic images.  So

7  that's important because the conduct can be reconstructed.  He

8  can be assisted.  "Hey, remember saying this?  This is you."

9  You know, "What were you thinking when you said that?"  That's

10  an important part of the Court's assessment that you have to

11  make of whether he's competent and able to assist.  Because we

12  don't do it in a vacuum.  It's with all of the evidence we

13  have in this case.

14           THE COURT:  Thank you.

15           And, Mr. Mahoney, is your only issue with those two

16  exhibits' relevancy?

17           MR. MAHONEY:  Yes, but I -- if I could respond to

18  what the Government just said, Judge.

19           THE COURT:  Sure.

20           MR. MAHONEY:  The -- first of all, the argument

21  we've made that Ms. Chang repeats, that Stephen was not

22  culpably aware of the wrongfulness of his conduct because of

23  his social learning disability, was an argument that we've

24  made in discussing with the Government what -- how it should

25  exercise its discretion at this point, and we've pointed the

1    Government to other cases similar to this where the Government

2    has made substantial judgments to the charges in light of the

3    autism disorder.  That really has -- that's not an issue.

4    What -- his knowledge of the wrongfulness or not of the

5    conduct is not an issue in the competency hearing.

6              THE COURT:  Well, Mr. Mahoney, I'm going to

7    interrupt you for a second.  I read your very lengthy brief,

8    and you spend a substantial amount of time in that brief

9    discussing that very issue.  So --

10             MR. MAHONEY:  It's true, Judge, but -- however -- I

11   did because the Government was offering these exhibits, and so

12   to put that in perspective, to show that -- and I -- you know,

13   I think there are a couple reasons why the Government does

14   something like that.  My feeling is I think prosecutors

15   sometimes want to show how guilty a person is so the judge

16   will think, well, what's the relevance of competency if he's

17   really guilty?

18             The second -- but the second point was to put in

19   perspective that as long as the Government is raising this,

20   that in this case, contrary to -- and this is sort of like

21   addressing, sort of, I would say, what the institutional or

22   implicit bias that you might expect on the part of a tribunal

23   like this, that they think, well, what does it matter if he's

24   really guilty?  Whereas, in fact, in this case we have a

25   confluence of this is somebody who, on the one hand, doesn't

*12*

1    have sufficient capacity to understand -- to really assist in

2    his defense and, to a great extent, apply what he knows about

3    charges, but it's also one of those cases where we shouldn't

4    be too concerned about somebody being found not competent

5    because, in fact, he's somebody who very well might be decided

6    that shouldn't be prosecuted or shouldn't be prosecuted for an

7    offense where it would be a mandatory 15 years in prison.

8           So it's -- you know, when the Government raises

9    guilt in its exhibits, it's important for us to say, "Wait a

10   minute.  You know, this isn't so clear."  This isn't a case

11   where, as I think I would say -- I would argue this often

12   needs to be done to suggest to the Court, "Oh, this is a

13   dangerous person.  We don't want to give a break by finding

14   him not competent."  So the Government opened the door to

15   this, and it's just simply qualifying that.  So -- but that

16   doesn't mean that that's something that you take into account

17   in actually deciding the issue which is actually before you,

18   which is the issue of competency.

19          So -- and I -- I don't know whether -- I might be

20   mistaken about this.  I thought that the -- I -- I was

21   probably not careful enough.  I thought that the exhibits that

22   the Government wanted to introduce were the interview, and I

23   didn't know it included these.  Now, it may be just totally my

24   oversight in that regard.

25          So I just think that -- look, you've got a booklet

1   in front of you with all these exhibits anyway, and I think

2   that -- but the question is it becomes sort of a minitrial

3   within this.

4           THE COURT:  Sure.  Mr. Mahoney, I think I understand

5   your argument --

6           MR. MAHONEY:  Yeah.

7           THE COURT:  -- and I do see your point; however, if

8   your only objection, which is -- I'm asking you one last

9   time -- is based on relevancy, I'm going to overrule that

10  objection.  I will be able to determine what's relevant or not

11  for the issue of competency, and I do think Ms. Chang's

12  argument -- that they may have something to do with the issue

13  of memory and recollection, which is an issue that goes to

14  competency -- is valid.  So I'm going to overrule your

15  objection.  I'm going to admit the exhibits that Ms. Chang

16  stated.

17          And let's go ahead and move this along.  We already

18  started late.  I'd like to get this going.  Thank you.

19          Go ahead, Ms. Chang.

20          MS. CHANG:  Thank you, Your Honor.  And just to be

21  clear, may I move them under seal, Your Honor?

22          THE COURT:  Yes, they may remain under seal.

23      (Government's Exhibit Nos. 1, 2.1, 2.2, and 3 through 7

24  were admitted into evidence.)

25          MS. CHANG:  Thank you.

                          DIRECT EXAMINATION

BY MS. CHANG:

Q    Dr. Otto, what do you do for a living?

A    So a couple things.  I'm a full-time tenured professor at
the University of South Florida.  My appointment is in the
department of mental health law and policy with adjunct
appointments in the department of psychology and the
department of criminology.  It's a full-time job.

Q    Okay.

A    In addition to that, I have a practice as a licensed
psychologist that is pretty much limited to evaluating people
who are involved in the legal process in some manner: forensic
psychological evaluations.  So I'm a faculty member at USF.

     Wholly independent of the university, I have a
practice -- a forensic psychology practice.  About 85 percent
of the people -- 80 percent of the people I evaluate are
criminal defendants.  Maybe 20 percent of my work is civil.

Q    Okay.  And how long have you been on the faculty of the
University of South Florida?

A    It'll be 30 years in June.

Q    What are your responsibilities there?  Just go into a
little bit more detail.

A    I teach two courses a semester.  I'm associate chair of
my department, so there's some administrative
responsibilities.  And I have a fair training load.  So as

*Testimony of Randy Otto, PhD*                                    **15**

1   distinguished from teaching, I spend a fair amount of time

2   training mental health professionals around the state of

3   Florida on forensic practice, on evaluating people's

4   competence, criminal responsibility, kids in the juvenile

5   justice system, and just a little bit of that training

6   actually involves training of judges and attorneys too.

7   Q    So what percentage of your time as a whole -- it sounds

8   like you do many things.  What percentage of your time is

9   devoted to research versus examining patients and doing --

10  A    Oh, so -- so I would say that -- that -- that 85 percent

11  of my work is university related -- research, training, and

12  teaching -- and then maybe 15 percent of my efforts or

13  10 percent of my efforts involve -- are devoted to my practice

14  because the university job is full time, although summers are

15  free, and we get a month in the winter.

16  Q    Sure.  Tell us a bit about your educational background

17  and any licensure or certifications that you have.

18  A    Sure.  Bachelor's degree in psychology from the

19  University of Rochester in 1981.  From there, I immediately

20  enrolled at Florida State University in the doctoral program

21  in clinical psychological.  I spent five years working on a

22  master's degree and a PhD degree in clinical psychology.  As

23  part of that, you have to complete a one-year internship, and

24  I did that at the Medical University of South Carolina between

25  1986 and 1987.  So in 1981 I was awarded my bachelor's degree.

1    1985, I earned a master's degree in clinical psychology.

2    1987, I was awarded a PhD in clinical psychology.

3         After that education, I enrolled at the University of

4    Nebraska-Lincoln, and that was a program sponsored by the

5    college of law in the department of psychology.  I did a

6    two-year fellowship there.  I took courses in the law school.

7    I took one or two courses in the psychology department.  And

8    during that time, I earned a master's degree in legal studies.

9    Those are really kind of focused forensic psychology training.

10   And that -- that was in '89, and then I've been at the

11   University of South Florida since that time.  So that's my

12   formal education.  It ended at the University of Nebraska.

13        I've been licensed to practice psychology in the state of

14   Florida for almost 30 years.  It'll be 30 years in the fall.

15        And I'm board-certified.  Much like physicians get

16   board-certified, some psychologists get board-certified.  I'm

17   board-certified in clinical psychology, and I'm

18   board-certified in forensic psychology, the application of

19   psychology to the legal system.

20   Q    What's the difference between forensic psychology and

21   clinical psychology?

22   A    Clinical psychology is focusing on persons and their

23   functioning as it might be impacted by a mental disorder,

24   primarily assessment, treatment, intervention.

25        Forensic psychology -- different people have different

*Testimony of Randy Otto, PhD*                                           **17**

1    definitions, but I think for my purposes and for purposes here

2    today, it'd be kind of the application of clinical psychology

3    in legal contexts.  So my forensic practice is evaluating

4    persons to help maybe judges or lawyers or juries better

5    understand how their emotional, behavioral, or cognitive

6    functioning somehow impacts some issue that's before the Court

7    that's in dispute --

8    Q    Okay.

9    A    -- whether it's their criminal responsibility, their

10   competence, or something like that.

11   Q    Have you published any papers or books on forensic

12   psychological assessment?

13   A    Yeah.  I've published a number of research articles.  I

14   don't keep count.  I would say in excess of 60.  And almost

15   all that work is focused on forensic -- matters of forensic

16   psychology.  I think I've authored or edited perhaps eight or

17   nine books.  The focus of all of those books involve forensic

18   matters.  Some of those volumes, very focused and specific.

19        One book that I coauthored: *Psychological Evaluations for*

20   *the Courts*.  Another book I coauthored on report writing and

21   testifying in court.  Another book I coauthored on assessing

22   competence to proceed.  And I also have published a couple

23   tests, and, of course, they come with books or manuals.

24   Q    Okay.  Have you received any awards for your work that's

25   relevant to competency?

*Testimony of Randy Otto, PhD* **18**

1  A    I've received four rewards for my contributions to the

2  field of forensic psychology generally, and I think part of

3  that is probably for my -- you know, recognition of some of my

4  work I've done in the competency arena.

5  Q    Do you hold any positions in professional organizations?

6  A    Yeah.  Right now I'm continuing education cochair of the

7  American Academy of Forensic Psychology, and I'm executive

8  director of the American Board of Forensic Psychology.

9  Q    At one point were you also the president of the American

10  Board of Professional Psychology?

11  A    Yeah.  The American Board of Professional Psychology is

12  the group that sort of credentials psychologists.  I was

13  president of the board of trustees.  I finished that position

14  about a year or two ago.

15  Q    Had you ever conducted a competency examination of a

16  defendant facing trial in a criminal case?

17  A    Yes.

18  Q    Approximately, how many -- and I know it's approximate,

19  but how many competency evaluations have you done over how

20  many years?

21  A    Yeah.  I haven't kept a master list.  I've been doing

22  this for about 29 years, and I think it's fair to say that I

23  average maybe 70 a year.  I think that's a very conservative

24  estimate.  So 70 times 29 maybe gets you to -- in the

25  neighborhood of 2,000.

*Testimony of Randy Otto, PhD*                                                19

1    Q    Were those in state or federal court?

2    A    I think every competence evaluation I've conducted was in

3    state court.

4    Q    Until this one?

5    A    Until this one.

6    Q    Okay.  Were you retained in those other 2,000 that you've

7    done as the Government's expert, the defendant's expert, or

8    the Court's expert?

9    A    The overwhelming majority of those evaluations were done

10   in the state of Florida, and the way state law works is that

11   almost all the time I'm court appointed or court retained.  So

12   I see myself as neither working for the defense nor the

13   prosecution.  If I identify any client, it would be the Court

14   or the judge.

15   Q    Have you ever found a defendant to be not competent?

16   A    I've recommended they be adjudicated incompetent.

17   Q    And, approximately, what percent of the defendants that

18   you've evaluated have you recommended to be adjudicated

19   incompetent?

20   A    Again, I don't -- I don't keep count, but I would say

21   it's certainly -- well, I would estimate maybe in the

22   neighborhood of 20 percent.

23   Q    Okay.  And, approximately, how many times have you

24   testified in Court as an expert in forensic psychology?

25   A    I actually do have a list of that because the rules of

*Testimony of Randy Otto, PhD*                                          **20**

1    evidence require it.  I think it's somewhere -- and I didn't

2    bring that with me.  I think it's somewhere in the

3    neighborhood of 100 times.  I've offered sworn testimony.

4    Now, that could be in a deposition or at trial.

5    Q    Can you tell us generally about your process for

6    conducting a competency evaluation just so that the Court is

7    oriented as to what you generally do.

8    A    Sure.  So what I do and what we teach in our training is

9    that it's really an assessment of the person's emotional,

10   behavioral, and cognitive functioning.  What do they bring to

11   the table in terms of their abilities to understand and

12   participate?  So, first of all, you have to have a good

13   understanding of how they're functioning.

14        Then, in addition to that, however, you have to assess

15   their understanding of and ability to participate in the legal

16   process and work with counsel and with a focus on

17   understanding how those abilities might be compromised or

18   challenged by any emotional or behavioral or cognitive

19   deficits that you observe.

20        So it's really a combination, a psychological evaluation,

21   of how the person's functioning, maybe identifying deficits or

22   a lack of deficits, the severity of the deficits, and then how

23   capable are they of understanding and participating in the

24   legal process, and, if you do see deficits, identifying to

25   what that might be attributable.  Is it intellectual

*Testimony of Randy Otto, PhD*                                    **21**

1  limitations?  Is it overwhelming depression that makes them

2  not care about their circumstance and not even interested in

3  consulting with their attorney about what should work?  Is it

4  confused thinking?  So they can't focus and attend and

5  concentrate.

6       So that's really the focus of the evaluation at the

7  broadest level, and the questions you ask, the tools you use,

8  the recommendations you make might be informed by the

9  presentation or the condition of the person in front of you,

10  the defendant in front of you.

11  Q    So I imagine that there's an array of tests at your

12  disposal that you could administer; right?

13  A    Hundreds.

14  Q    And so I assume that you don't administer hundreds to

15  every single person.  How do you pick and choose?

16  A    Well, it's what do I know about this person going in?

17  Because, oftentimes, a referral is precipitated by some

18  information that you get before you even make contact with the

19  defendant, what's known about him or her or his or her

20  condition up front.  Once you make contact with the person,

21  you might -- you might have questions or develop concerns, and

22  then you might select a test to kind of guide you or -- or

23  structure -- provide you with information, and then you also

24  might select tests specifically to guide your evaluation of

25  the defendant's understanding of an ability to participate in

*Testimony of Randy Otto, PhD*                                    **22**

1    the legal process.

2         So there may be some tests that I use routinely or some

3    techniques that I use routinely, but when it comes to

4    particular tests, they're going to be selected on a

5    case-by-case basis.

6    Q    Okay.  What are you looking for in your in-person

7    interview with a defendant that you're evaluating?

8    A    Well, certainly, you want to know a little bit about who

9    the person is and their context.  So, you know, I -- and what

10   we recommend in our training is, is that the examiner start

11   with history gathering.  That serves a number of purposes.

12        One is sometimes you're going to uncover really pertinent

13   and relevant information.  Okay?  A defendant tells you, for

14   example, "I never got further than fourth grade, and I was

15   always in special classes, and I can't read."  That's probably

16   relevant to informing your opinions about his ability to

17   understand and participate in the legal process.  Or they say,

18   you know, they experienced a terrible head injury at the age

19   of 10, or they were -- you know, almost drowned and were

20   under- -- you know, underwater for five minutes when a child.

21   All that could be relevant.  Or, on the other hand, maybe the

22   defendant tells you he obtained an MBA.  Okay?  So it's not an

23   intellectual disability.  We know that.  Right?

24        So you want to gather history in order to find out

25   relevant information about the person and their functioning.

1     It also serves to reduce their anxiety.  I think it's

2  fair to say that most defendants, when they undergo these

3  evaluations, they're nervous.  They're anxious.  They should

4  be.  And it's probably easier to talk about where you were

5  born and raised and how far you went in school than the

6  charges you're facing and the possible penalties.

7     If you have independent information about the defendant,

8  you can also compare that to what he tells you or what she

9  tells you and sort of gauge their accuracy, maybe their

10  motivation or how they're participating in the evaluation.

11     And as you're gathering this history, you can also begin

12  to make judgments about their emotional and behavioral and

13  cognitive functioning.  Do they use big words or little words?

14  Did they use big words appropriately?  Did they frequently get

15  off track?  Do they absolutely understand your questions?  Are

16  all of their responses relevant and on point or tangential and

17  out in left field?  And that gives you some preliminary

18  information about their emotional, behavioral, and cognitive

19  functioning as it's relevant to understand their ability to

20  sit in a courtroom and sit next to and sit with their attorney

21  during consultation and participate in the legal process.

22  Q    So what do you do besides history gathering?  Because you

23  mentioned that's one part.  Can you briefly go over your

24  other --

25  A    History -- history gathering.  I'm also going to

1  conduct -- ask some questions that focus on their current

2  emotional, behavioral, and cognitive function; questions about

3  their mood; questions about their behavioral functioning;

4  questions focused on their memory and their retention and

5  concentration; how they're doing generally.

6  Q    And why do you ask those?

7  A    Because competence to proceed is a present mental state

8  evaluation.  How's this person doing now and in the immediate

9  future, when he's in court next week or next month?  So how is

10  he doing now psychologically?

11  Q    So you talked about history gathering, sort of his

12  current emotional stability and functioning.  What else?

13  A    And then a more focused evaluation on his understanding

14  of the legal process and his ability to participate.

15  Q    Okay.  Other than that -- or are those the three main,

16  sort of, chunks --

17  A    I would identify them as the three categories or three

18  main stages of the evaluation.

19  Q    Do you also review case materials?  And, if so, how do

20  those factor in?

21  A    Sure.  Case materials can be very important, but I was

22  talking about the face-to-face evaluation for sure.  A lot of

23  times case materials provide you insight into the person's

24  emotional, behavioral, and cognitive functioning; history of

25  mental health treatment; educational attainment.  All that's

1   relevant -- can be relevant to understanding their functioning

2   as they sit in front of you.

3       The case materials that -- that are related to the

4   charges and the allegations -- for example, if I'm supposed to

5   assess the defendant's understanding of the charges and

6   allegations, I have to have an independent understanding of

7   the charges and allegations; and where I get that is from the

8   charging document, from the arrest report, from investigation

9   records, and things like that.

10      Oftentimes, third parties have helpful information about

11  a person.  So, for example, in this case I spoke with the

12  defendant's father, who was able to supplement information

13  that the defendant provided me about his background and

14  history with -- with his own take.  And, obviously, as a

15  parent, he had information that the defendant would have no

16  independent recollection of.

17  Q    And so given all of these sources of information -- the

18  interview, these case materials, old records of the

19  defendant's as well as third-party information -- how do you

20  come to your overall conclusion?

21  A    Well, really what I try to do is form some -- come to

22  some opinion or judgments about the person's emotional,

23  behavioral, and cognitive functioning.  Are there deficits?

24  challenges? limitations?  That's the first thing.

25      Then the next thing is how capable are they of

1    understanding and participating?  What did they understand

2    about the legal process?  What abilities did they demonstrate

3    they can do or maybe they can't do?  If there are deficits,

4    how significant are they?  To what are they attributable?

5    And, in my opinion, do they rise to the level that a Court

6    might adjudicate or consider them incompetent to proceed?

7         If -- if I were to opine -- if I were to conclude that a

8    Court would -- might adjudicate someone incompetent to

9    proceed, I also would weigh in on whether competence could be

10   restored.  I'd make recommendations for treatment as well:

11   "Judge, if you conclude he's incompetent, this is what you

12   might try to get done in order to get him competent."

13   Q    Okay.  So now I understand what you usually do.  With

14   respect to this particular case, did the Court appoint you to

15   determine the competency of the defendant, Mr. Marks?

16   A    Yes.

17   Q    Do you see Mr. Marks in the courtroom today?

18   A    Yes.

19   Q    Did you follow your -- generally your normal three

20   stages, the ones that you just testified about, in conducting

21   your evaluation of the defendant?

22   A    Yes.

23   Q    And what material did you review before meeting --

24   A    It's referenced in my report, and it's a fairly long

25   list.  And I can -- I can go through the list specifically, or

*Testimony of Randy Otto, PhD*                                    **27**

1    I can talk in generalities.

2    Q    You can just refer to the list is fine.  And the --

3              MS. CHANG:  Dr. Otto's report, Your Honor, is at

4    Government Exhibit 1.

5    BY MS. CHANG:

6    Q    Did you review anything else that's not listed on there

7    that you can recall?

8    A    I don't -- no.  I think the list is comprehensive.  I

9    might have left something off inadvertently, but I think it's

10   a comprehensive list.  And I don't believe I've been provided

11   with anything since I wrote the report.

12   Q    Well, did you get copies of transcripts from your audio?

13   A    Oh, that's -- that is right.  I -- I was provided with

14   transcripts of the -- my interview of the defendant, which I

15   did review -- which I did read and is not reflected here.

16   Q    Okay.  Did you take all of the information that's listed

17   on your report as well as the transcript of your interview --

18   did you take all of that into account in conducting your

19   evaluation in this case?

20   A    Yes.

21   Q    Did you interview the defendant?

22   A    Yes.

23   Q    For how long?

24   A    Four hours, approximately.

25   Q    Would you say that he was conversational?

*Testimony of Randy Otto, PhD*                                    **28**

1   A    Yes.

2   Q    And why -- why would you say that?

3   A    It was easy to talk to the defendant.  I asked him

4   questions, and his responses were consistently relevant and

5   informative.  He did not run off on tangents.  He appeared to

6   understand -- I think he understood almost all questions that

7   I asked to him.  When he didn't understand or -- or when he

8   believed he answered a correct -- an answer -- when he

9   believed he answered a question incorrectly, he corrected

10  himself.  So it was a challenging interview because, I think,

11  of some anxiety on the part of the defendant, but it -- it --

12  I believe you could describe it as conversational.

13  Q    So I just want to make sure I -- that the Court -- that

14  we all understand what you're saying.  You're saying he's

15  conversational, but it was challenging.  Can you go into that

16  a little bit more.  Because when -- you say he's

17  conversational, it was easy to talk to him, but then you say

18  it's challenging.  Can you explain -- those seem to contradict

19  each other.

20  A    Well, what I'm saying is, is I would ask him questions,

21  and his responses were consistently relevant and informative.

22  That's convers- -- that, in my opinion, is conversational.

23  Maybe different people have different opinions.  I will say,

24  however, that Mr. Marks was obviously anxious during the

25  interview.  I get that.  And it's more challenging to

*Testimony of Randy Otto, PhD*                                              **29**

1   interview an anxious person because you want to allay their

2   anxiety because you don't want their anxiety to interfere with

3   your task --

4   Q    And how --

5   A    -- which is to gather information.

6   Q    And how did you observe anxiety?

7   A    So, for example, he frequently twirled his hair.  His leg

8   was shaking.  He sat forward in his chair for most of the

9   evaluation despite my suggestions that he might want to sit

10  back.  I interpret those behaviors as indicative of anxiety.

11  Q    Never- -- nevertheless, was he coherent in his responses?

12  A    Yes.

13  Q    And was that consistent?

14  A    Yes.

15  Q    So overall, did you find that the defendant was able to

16  communicate with you?

17  A    Yes.

18  Q    How -- how was his memory?  And I know you said in your

19  report that no one can really say what he remembers, but based

20  on your evaluation, what did you observe about his memory?

21  A    I thought he did a great job of recounting distant

22  matters, including circumstances of his childhood, growing up,

23  school, his education, his background, his time in Orlando at

24  the DAVE School.  So distant things as well as more recent

25  things.

1    Let's say, for example, his experience in Orlando.  He

2    recounted, for example, with great detail the interviews or

3    interrogations that he underwent with the law enforcement

4    officers who made their first contact with him.  He talked

5    about it in great detail.  He talked about in very good detail

6    the events that occurred after his arrest: his jailing in

7    Orlando -- in Orange County and then his subsequent extended

8    transport to the Midwest.

9    Now, I don't have independent -- I don't have an

10   independent account of that transport, but nothing that he

11   said seemed incredible or unbelievable.  I'll also point out

12   that I did have an independent account of his interview with

13   the -- or interrogation with the officers -- that was the

14   recording that I was able to listen to -- and I didn't see

15   great discrepancies.

16   Q    Would -- did the defendant say -- did he admit to you at

17   times that he didn't remember certain things?  Was he willing

18   to say, "Oh, I don't -- I don't remember"?

19   A    I don't remember if he -- if he -- if there was a time or

20   two that he might have said that.

21   Q    Were there times in the interview when he didn't know the

22   response to an answer, but he educated him, and then he

23   remembered it sometime later during the interview?

24   A    Oh, sure.  So particularly as we talked about the legal

25   process, the defendant would tell me he didn't know that about

1    the legal system generally, or, for example, he didn't know

2    how many charges he was facing.  I provided him with that

3    information, and then sort of as a standard procedure in these

4    evaluations, you go back and sort of query the person as to

5    whether they were able to incorporate and remember that, and

6    he -- he did that very well.

7    Q    Let's switch topics a little bit.  Were there parts of

8    the conversation where he responded to you with great ease but

9    then others where he did not answer with ease?

10   A    Yes.

11   Q    Describe what you mean.

12   A    So it was clear that he was considerably more comfortable

13   and less anxious when we were talking about his life at Aloft

14   Transitions in Idaho, where he's been living for approximately

15   one year.  He was -- easily talked about that and what life

16   was like there, and he easily talked about his background and

17   history: his family, his childhood, and his time at the

18   DAVE School.  It was when we transitioned into a discussion of

19   the charges and allegations that he became noticeably more

20   anxious and reticent.

21   Q    Did you notice a similar pattern in any of the materials

22   that you had reviewed concerning the defendant?

23   A    Yeah.  I -- I -- my take or my -- after I listened to the

24   interrogation or interview, whatever -- however that's to be

25   described, he --

*Testimony of Randy Otto, PhD*                                    **32**

1   Q    Do you mean the interview with the police?

2   A    Interview or interrogation by the police.

3   Q    Okay.

4   A    He appeared very reticent and uncomfortable and really

5   sort of doing a lot to avoid discussing the specific

6   allegations and what he did.  So I did see that consistency

7   both during his time with law enforcement and his time with

8   me.

9   Q    What do you infer from that pattern?

10  A    Two things.  Well, first of all, Mr. -- Mr. Marks is not

11  the first defendant I've evaluated who's been charged with sex

12  offenses.  I would describe these as sex offenses.  And

13  defendants who have none of the problems that Mr. Marks has

14  are oftentimes reticent and embarrassed when it comes to

15  talking about these kinds of allegations.  So that's sort of

16  not uncommon and I don't think tells us anything necessarily

17  about Mr. Marks.  So -- so there's that.

18      I also think that in combination with some of his other

19  comments, I interpret, as reflecting at some level an

20  appreciation of the wrongfulness of what he's accused of doing

21  or the -- the badness or the negative aspects of it.

22      So I think it reflects two things.

23  Q    Okay.  Now, comparing his conversation with the police

24  officers and his conversation with you, how would you compare

25  his abilities to receive and process incoming information?

*Testimony of Randy Otto, PhD*                                          **33**

1    A    I thought he did fine with -- I thought he generally did

2    fine with me.  I thought he generally did fine with the law

3    enforcement officers.

4    Q    And how about as comparing the two interviews?  How were

5    his abilities to express himself in each of those?

6    A    Again, I'm -- I mean, I think he really was highly

7    anxious about this, as many people would be when being

8    interviewed or interrogated by law enforcement officers in

9    such a context, but he was able to -- he was able to answer

10   their questions.

11   Q    Were you able to listen to any recording of interviews

12   that the defendant had with the defense experts in this case,

13   so Dr. Geller or Dr. Danziger?

14   A    No.  I asked for such.

15   Q    Okay.  And what response did you get?

16   A    Well, I didn't get -- I said -- what I communicated to

17   counsel was "If defense experts' evaluations are recorded, I'd

18   appreciate being provided a copy" because, obviously, my

19   evaluation was recorded, and I assumed they were getting

20   copies.

21   Q    Did you get any recording of -- I'm sorry.  Did you

22   receive any response with respect to your request for a

23   recording of the interview with Dr. Geller or Dr. Danziger?

24   A    Just no response, no recording.

25   Q    Who asked you to record your interview?

*Testimony of Randy Otto, PhD*                                    **34**

1  A    Attorneys representing the defendant.

2  Q    What was your overall conclusion?  And we'll get into

3  this in greater detail.  We're heading there.  But just

4  headline, bottom line for the judge, what was your overall

5  conclusion about the defendant's competence to stand trial?

6  A    Well, as a mental health professional, recognizing that

7  competence is ultimately a legal decision, my recommendation

8  is an adjudication of competence to proceed, competence to

9  stand trial.

10 Q    Okay.  Let's take a look at Government Exhibit 1, which

11 is in front of you, and I'll be quoting from it.  So you don't

12 necessarily have to turn there, but you can if you want.  On

13 page 3 you say that "The responses to questions were typically

14 relevant and informative but sometimes delayed; yet at other

15 times Mr. Marks responded quickly to a question and then

16 identified his response as wrong and corrected himself."

17 Why -- why does it matter?

18 A    Well, I think the relevant and informative part of the

19 sentence is obvious, that it suggests that he was able to

20 understand what I relayed to him.  And from that I might infer

21 he's able to understand what I'm saying now; he's able to

22 understand what you say; he's able to understand what the

23 judge says; he's able to understand what his attorneys

24 communicate to him.  So that -- and the understanding is

25 reflected by the relevant and informative response.  So that's

*Testimony of Randy Otto, PhD*                                    **35**

1   important.

2        I think that the delay maybe suggests some communication

3   problems.  That's important.  But that he ultimately provides

4   a response, that's important as well, obviously.

5        And then I think the significance I take from offering a

6   wrong response and correcting himself is reflecting an ability

7   and willingness to do so when interacting with attorneys.

8   "No.  That's the wrong information, Counsel.  That's not

9   right.  It's not like I just said it.  It's a different way."

10  So rather than maybe giving me what he thought was a wrong

11  answer and just letting it pass, he was proactive in terms of

12  him correcting himself, which I think is important to

13  consider.

14  Q    Moving on, you say that "There were no indications that

15  the form or logic of Mr. Marks's thinking was impaired by

16  mental illness."  So I didn't know what this meant.  What's an

17  example of what impairment of form or logic might look like?

18  I know you said he doesn't have it, but what would it look

19  like if he did -- or someone did?

20  A    It -- it might -- it might be reflected by someone

21  providing you with answers and responses that are wholly

22  irrelevant.  So, for example, you -- you might -- you know, I

23  might ask him -- let's say I ask him about "Well, tell me

24  about your time in Oklahoma," and he starts on a discussion of

25  the Oklahoma City basketball team or he takes that to -- he

*Testimony of Randy Otto, PhD*                                    **36**

1   interprets that incorrectly and kind of gives me information

2   in an illogical, unorderly, disorganized way.  So all I mean

3   to say by that is that his thinking, his understanding, and

4   logic was not impaired by mental disorder.

5   Q    Would you describe his logic as rational and orderly?

6   A    His responses reflected logical thinking.  He understood.

7   He consistently understood what I asked him, as reflected by

8   the accuracy and the relevance of his responses.

9   Q    Okay.  You say later that he acknowledged difficulties

10  sometimes understanding the subtleties of language --

11  A    Yes.

12  Q    -- and communication, sometimes taking things too

13  literally.  So does that have a bearing on --

14          MR. MAHONEY:  Objection.  He didn't say "taking too

15  literally," I don't think.

16          MS. CHANG:  Right.  I'm -- I added because --

17          MR. MAHONEY:  Okay.

18          MS. CHANG:  -- I think that's what he's getting

19  at --

20          MR. MAHONEY:  Right.

21          MS. CHANG:  -- is that he takes things too

22  literally.

23          THE COURT:  Mr. Mahoney -- Mr. Mahoney.

24          MR. MAHONEY:  Yes.

25          THE COURT:  I'm going to need you to stand up when

*Testimony of Randy Otto, PhD*                                    37

1    you're speaking to me.

2              MR. MAHONEY:  Sure, Judge.  Glad to.

3              THE COURT:  Thank you very much.

4              And -- okay.  The objection is heard, and go ahead

5    and continue.

6              MS. CHANG:  Yes, Your Honor.

7    BY MS. CHANG:

8    Q    Did that comment or that observation have any bearing on

9    your conclusion about the defendant's competency?

10   A    Well, that I think in -- I think that Mr. Marks is

11   vulnerable or at risk for maybe taking language too

12   concretely, suggest that all of us have to be careful when we

13   communicate with him, and we have to think about that.  I, as

14   the examiner, have to think about that.  His attorneys, who

15   are his advocates, have to think about that.  And maybe you,

16   if and when you cross-examine him, have to think about that

17   too.  Because language, I think, is something different.  It's

18   more of a challenge for Mr. Marks than it is for people

19   without his affliction.

20   Q    And so that challenge -- is it surmountable, or is it not

21   surmountable?

22   A    In my opinion, yes.

23   Q    Why?

24   A    Because I think that those communicating with Mr. Marks

25   can take that into account and do things that will minimize

*Testimony of Randy Otto, PhD*                                    **38**

1    the challenges that he experiences as a result of that

2    disadvantage -- disadvantage that he has.

3    Q    And what would you suggest, for example, for the

4    Government to do in questions?

5    A    Never ask a compound question.

6    Q    Okay.  What else?

7    A    Attorneys are notorious for compound questions.

8         Speak literally.  Try to avoid speaking figuratively.

9    The example I think I use in the report was when -- when he

10   mentioned this, he -- Mr. Marks, I believe, volunteered to me

11   that that was a vulnerability of his or a problem or challenge

12   of his is -- in my attempt to investigate that, I -- I used an

13   example that I remembered encountering with other defendants I

14   evaluate.  I said, "If I asked you how you got to Orlando,

15   what would you assume I was asking you?"  And he said he would

16   assume I was asking about the mode of transportation.

17        When -- I think most people would interpret that as,

18   well, why did you choose Orlando?  Or was it a job or family

19   that ended up you coming to Orlando?  So maybe someone else

20   would have said, "Oh, it was the DAVE School.  You know, I was

21   really interested in digital effects and -- digital and visual

22   effects, and so I came to Orlando for the DAVE School," not "I

23   drove down with my father" or something like that.

24   Q    So you've named a couple of things that can be done:  No

25   compound questions, no -- stick with concrete questions.

*Testimony of Randy Otto, PhD*                                    **39**

1   Anything else?

2   A    Sure.  One is you can get the person to recount for you

3   their understanding of the question.  Right?  Or you could

4   make sure they have -- make sure they understand they have

5   absolute permission to say, "I don't know.  I don't

6   understand.  Can you put it a different way?"  And what you

7   probably don't want to do is say, "Do you understand the

8   question?"  Because oftentimes people say yes when they don't

9   just because that's the polite thing to say and you're worried

10  about getting in trouble.

11  Q    In light of the defendant's willingness, however, to

12  correct himself, would you -- is it your conclusion that he's

13  particularly vulnerable to what you just mentioned about

14  saying, "Oh, I understand," even though I don't?

15          MR. MAHONEY:  I object to the leading.

16          THE COURT:  Ms. Chang, why don't you just restate

17  the question.

18  BY MS. CHANG:

19  Q    In light of that vulnerability that you just discussed of

20  people in general who take things too literally, that they'll

21  just say, "Oh, I understand," do you think that the defendant

22  also shares that vulnerability?

23  A    I think he does.  I'm encouraged by the fact that he

24  corrected himself, but, you know, I think someone like

25  Mr. Marks is an anxious person as a function of his condition,

1  and it may be easier, and it might remove immediate anxiety to

2  say, "Yes, I understand."

3  Q    But this point that you're making is with particular

4  respect to the question "Do you understand?"  Correct?

5  A    Or -- well, yeah.  Yes.  Yes.  In the context of yes/no.

6  Right.  Yes.

7  Q    Can you -- let's move on.  Can you explain to the Court

8  what a -- what an F-I-T, dash, -R, FIT-R, is.

9  A    It's the Fitness Interview Test-Revised.

10  Q    And what is that?

11  A    It's a structured professional judgment tool.  I think

12  it's misnamed.  It's called the Fitness Interview Test.  It's

13  a structured professional judgment tool designed to ensure a

14  comprehensive evaluation and consideration of someone's

15  ability to understand and participate in the legal process.

16  Q    And how does it work?

17  A    It provides the mental health professional who's

18  conducting the competence evaluation with an extensive number

19  of questions to ask and a number of topics to cover or

20  address, the rationale being better that it's laid out in

21  front of you than leaving it to your memory to make sure that

22  you cover the areas that are arguably relevant to competence

23  to proceed or competence to stand trial.

24       It also -- obviously, if different people use it, it

25  probably goes to ensuring more reliable or more consistent

1    evaluations.  If I use it to evaluate Mr. Marks and another

2    mental health professional comes along and uses it,

3    presumably, we'll be asking about the same kinds of things

4    rather than a particular mental health professional's

5    idiosyncratic beliefs about what competence or fitness is.

6    Q    Did you use it in this case?

7    A    Yes.

8    Q    Okay.  And what's the ILK, Inventory of Legal Knowledge?

9    A    The Inventory of Legal Knowledge is a test.  I was one of

10   the two codevelopers of the test, and it's designed to

11   identify people who are feigning, faking, ignorance about the

12   legal process.

13   Q    And how does it work?

14   A    The person's presented with a large number of true-false

15   questions, and we compare how well they do on those true-false

16   questions to a couple things.  One is many, many defendants

17   who've been administered this test and nondefendants, for that

18   matter -- and we also look at how their performance is given

19   what we know about how many items they should simply get right

20   just because -- you know, there's only two answers, so you

21   should get a fair number of these right anyway.  Right?  So if

22   you do very, very poorly -- if you do worse than chance, we're

23   pretty convinced that you were motivated to feign ignorance or

24   limitations in your knowledge about the legal process.

25   Q    Did you find that the defendant was feigning any

*Testimony of Randy Otto, PhD*                                           **42**

1  limitations?

2  A    No.  Mr. -- Mr. Marks's performance on the Inventory of

3  Legal Knowledge suggests that -- that he wasn't trying to

4  portray himself as having a more limited understanding of the

5  legal process than he did, and, in addition to that, his

6  presentation and description of himself suggested no -- no

7  efforts on his part to exaggerate or fabricate symptoms of

8  his -- of his disorder.

9  Q    So you also talk about this Mini-Mental State

10  Examination.

11  A    Another test.

12  Q    Yeah.  What is that?

13  A    It's a -- it's a test that identifies gross impairments

14  in cognitive functioning, things like attention,

15  concentration, and memory.  It's a test that I frequently

16  administer in forensic evaluations just as a way of routinely

17  asking questions to get to things like attention,

18  concentration, and memory.

19  Q    And what impact did his test results have on your

20  conclusion about competency?

21  A    None really.  I mean, I think his performance on the

22  Mini-Mental State Examination reflected some of the things

23  that I knew about him or suspected about him going into the

24  evaluation with him, so it really didn't have much of a

25  bearing.

*Testimony of Randy Otto, PhD*                                   **43**

1   Q    What are some of those things that you already knew on

2   the MMSE --

3   A    So I thought -- for example, one of the things he's asked

4   to do is reproduce a geograph- -- geometric shape, and he did

5   that pretty poorly.  But I knew before I saw Mr. Marks that

6   one of his challenges is with visual-motor coordination.

7   Right?  Kind of -- for example, I knew that he had an

8   accommodation when in school where they tried to allow him to,

9   I think, take some tests or complete assignments with a

10  computer because his handwriting was just so darn poor, and

11  that's because of the visual-motor challenges.

12  Q    Did the --

13  A    And that was reflected in his performance on that test.

14  Q    Did the MMSE also reveal some difficulties in math?

15  A    Math as well, and he had been diagnosed with particular

16  problems with math in prior -- by prior -- previously

17  evaluating mental health professionals, and he had also told

18  me, "Math is a real challenge for me."  So it sort of

19  corroborated or is consistent with things I independently knew

20  about him.

21  Q    Other than problems with visual-motor coordination and

22  serious problems with math, were there any other glaring

23  results from the MMSE that are -- that you'd like to note for

24  the Court?

25  A    No.  But, again, it is a measure -- it's a measure of

1    gross impairment.  Again, I want to be fair about that.

2    Q    The way he described his -- now I'm turning back to your

3    interview away from the tests or the FIT-R.  The way he

4    described his daily living to you in his interview -- so he

5    talked about the walks he goes on and practicing the keyboard,

6    playing video games, cleaning his room, and volunteering.

7    What conclusions did you draw from that part of the history

8    gathering?

9    A    Well, one, he was able to talk in a conversational tone.

10   This was one of those what I consider non-anxiety-arousing

11   topics.  He was able to communicate what he did.  He was able

12   to describe his satisfaction living at that residential

13   program.  He -- I think his words were "pretty awesome."  So I

14   thought he did a good job of communicating his current

15   circumstances and was able to talk about that in some detail.

16   Q    Did the defendant demonstrate an understanding of what he

17   could or could not do as a result of the conditions of his

18   release, like, for example, where he could or could not go?

19   A    Yeah.  So we talked a little bit about that, and one of

20   his -- one of his regrets is that he was unable to go on field

21   trips or maybe he needed special permission to leave the

22   property.  So there were activities that he was not entitled

23   to as a function of, his understanding, of conditions of his

24   release.  He also said, for example, that there were

25   limitations in electronic media access and things like that.

1   So that all made sense to me.  I didn't have an independent

2   knowledge of whether that was the case, but that seemed

3   logical and to make sense given what I know about people who

4   are charged with these kind of offenses.  And so, you know,

5   that -- again, that demonstrated to me his understanding of

6   kind of the Court's jurisdiction and, you know, his obligation

7   to follow the directions, either of the Court or maybe it's a

8   probation officer or something.

9   Q    I'm going to focus on pages 4 through 8 of your report

10  where you discuss the defendant's relevant history, and can

11  you explain what parts of his history informed your conclusion

12  that the defendant is competent to proceed to trial.  Like,

13  what was relevant that popped out to you, if anything?  Maybe

14  you don't --

15  A    Well, I'm -- I'll start by saying this:  Most relevant

16  about the history in terms of his childhood development, his

17  educational history, his social history, and his academic

18  history is you put that all together; and, you know, the

19  diagnosis of autism spectrum disorder as the appropriate

20  diagnosis is clear.  So -- but that in and of itself is not

21  dispositive on the competence question.  That he was able to

22  achieve in school, that he graduated with a diploma with all

23  kinds of supports and special accommodations, that he was able

24  to obtain a high school diploma, that he was able to enter

25  into and get reasonable grades at a -- maybe we'll call it a

1  technical school, that he was able to live independently,

2  although poorly, suggests some abilities, right, that Mr. --

3  Mr. Marks is not someone with autism who is -- who is

4  incapacitated by his autism.  Right?  He -- he is functioning

5  in some reasonable ways despite his autism.  But, again,

6  that's not dispositive when it comes to his competence.

7  What's relevant when it comes to his competence is what can he

8  do, what can he understand, and how can he communicate?

9  That's what's dispositive.

10  Q    Okay.  And we'll get further into that.

11       A couple minor points:  You mentioned that he graduated

12  from high school and then he starts at the technical school in

13  September.  Did you learn from him that he was arrested the

14  following July?

15  A    That's my understanding.  Less than a year.

16  Q    And at the time of his arrest, are you aware that he was

17  still enrolled in school?

18  A    That's my understanding.

19  Q    Okay.  Did he explain to you what sort of things he was

20  learning to do at the DAVE School?

21  A    Yeah.  Well, as best he could.  I'm very unsophisticated

22  about this kind of stuff myself, but I guess it was using

23  computers for different kinds of effects and things like that;

24  and maybe you would use that in entertainment, movies, and

25  that kind of thing.  That's about as much as I could say.

*Testimony of Randy Otto, PhD*                              **47**

1  Q    Let's move on.  How long was your -- you might have

2  answered this before.  I apologize.  How long was your

3  interview?

4  A    The interview was four hours, approximately.

5  Q    How was his attention span as you interviewed him?

6  A    He did well.  I repeatedly asked Mr. Marks -- first of

7  all, I told him, "Anytime you need a break, let me know," and

8  he never asked for a break.  And I -- a couple times I asked

9  him if he wanted a break, and he said, "No.  Let's -- let's

10  forge through."  So I did not find him wandering.  I did not

11  have to bring him back into the evaluation.  He stayed with

12  me, figuratively, for the four hours.

13  Q    And was he -- I mean, I think you kind of touched on

14  this, but I want to make sure it's clear.  Was he able to

15  follow along and communicate with you throughout the four

16  hours that it went nonstop?

17  A    Absolutely.  And, now, you know, I think I did notice

18  that there was a lack of eye contact, but despite that lack of

19  eye contact, that didn't prevent communication.

20  Q    Having done that evaluation and experiencing four hours

21  of nonstop ability to follow you and engage with you, do you

22  have any concerns about the defendant's ability to sit through

23  a trial and pay attention?

24       MR. MAHONEY:  I'd just object, Your Honor, just

25  because it wasn't -- he didn't say it was nonstop, and it

1  wasn't nonstop.

2         THE COURT:  Okay.  Go ahead and continue, Ms. Chang.

3         MS. CHANG:  May I repeat?

4         THE COURT:  You may repeat the question, yes.

5  BY MS. CHANG:

6  Q    Having done your interview, this four-hour interview

7  without breaks, do you have any concerns about the defendant's

8  ability to sit through a trial and pay attention?

9         MR. MAHONEY:  Again, he didn't say there wasn't

10  breaks.  I think that there --

11         THE COURT:  Mr. Mahoney, I believe he did say that

12  he asked Mr. Marks several times if he wanted a break, and he

13  refused each request.

14         MR. MAHONEY:  But that doesn't mean there wasn't a

15  break.  He didn't ask for a break.  There was a break.

16         THE COURT:  All right.  Dr. Otto, did you take any

17  breaks during that four-hour interview, to the best of your

18  memory?

19         THE WITNESS:  I think I went to the bathroom once,

20  or maybe it was afterwards.  I think at one point we stopped

21  talking about his legal circumstance because Mr. Marks heard

22  his roommate out in the hall and expressed concern that he

23  wanted to switch topics, and I turned the recorder off when I

24  administered the tests, but I don't think -- was there --

25  okay.  Maybe there was a minute where we didn't -- maybe I

1  went to the bathroom, but we didn't -- I'll tell you this:

2  There was no five-minute break.  There was no break of five

3  minutes or longer.  I consider it -- as I remember it and

4  think about it, it was four hours.

5  BY MS. CHANG:

6  Q    In light of that, Dr. Otto, do you have any concerns

7  about the defendant's ability to sit through a trial and pay

8  attention?

9  A    No.

10 Q    Let's move on to Dr. Geller's report.  You've reviewed

11 Dr. Geller's report concerning the defendant; correct?

12 A    Yes.

13 Q    What did you find that was helpful from her report?

14 A    Well, I mean, Dr. Geller -- Dr. Geller comes in after a

15 number of other mental health professionals evaluated

16 Mr. Marks, and she puts it all together.  She -- she

17 identifies autism spectrum disorder, and I -- I agree

18 100 percent.  I just -- you know, I don't know -- I don't know

19 what I would have done if I had evaluated Mr. Marks before

20 Dr. Geller had, but I had the benefit of seeing Dr. Geller's

21 work and seeing, you know, her kind of diagnostic formulation.

22 So, you know, I think she did a -- a nice job of catching

23 something that other mental health professionals missed.  The

24 explanation for the constellation of deficits and challenges

25 that the other mental health professionals identified, they

1  just didn't identify, I think, the right cause.  And I think

2  Dr. Geller, you know, makes good argument for -- for that.

3  Q    Okay.  Did you have any disagreements with her -- any of

4  her diagnoses?

5  A    Sure.  I don't believe Mr. Marks suffers from

6  post-traumatic stress disorder.  I don't think he experienced

7  any kind of event in his life that would qualify -- that would

8  justify the diagnosis.  In order to have that diagnosis, there

9  has to be a serious, life-threatening event that you

10 experience or witness in some context; and Mr. Marks did not

11 share that with me, and I saw no reference to any such events

12 in any of the collateral documents I reviewed.  So I disagree

13 with respect to the post-traumatic stress disorder diagnosis.

14 Q    Okay.  Do you think that the defendant has compromised

15 judgment?

16 A    I think his -- yes.  In some -- yeah.  For example, in

17 social circumstances he doesn't do as good a job -- as a

18 function of his autism, he doesn't do as good a job of reading

19 people and understanding maybe what they mean or what the

20 right thing to say or do is.  So that's compromised judgment.

21 Q    Okay.  Do you think he has ability to vary legal

22 decision-making based on circumstances, though, with the

23 evidence before him?

24 A    Yes.

25 Q    Does he have that kind of judgment?

1   A    Yes.  I don't think -- particularly with the assistance

2   of counsel and under their guidance and with their direction,

3   I think Mr. Marks can make decisions in a legal context.

4   Q    But why do you think that?

5   A    Because he demonstrated -- he was able to come to some

6   judgments about some of the things that occurred.  For

7   example, he concluded that the -- it was not a good idea for

8   him to have submitted to an interrogation or interview with

9   the law enforcement officers.  He came to that judgment.

10  Okay?  I think that shows some good assessment.  I think it

11  probably did work to his disadvantage.

12       He stated that, based on his father's representation, he

13  had confidence in his attorneys.  I think that's good

14  judgment.  He said he would look to his attorneys for advice

15  and answer any questions they presented to him.  I think

16  that's good judgment.  But, you know, that doesn't -- that

17  doesn't discount the fact that he has some challenges in the

18  judgment area.

19  Q    In Dr. Geller's report at page 41, she says that "There's

20  incompetence in the defendant's understanding of the charges

21  against him."  Do you agree?

22  A    No.

23  Q    Why not?

24  A    A couple things.  One is, in my opinion most significant,

25  is an understanding of allegations, and it is not uncommon for

**Testimony of Randy Otto, PhD**                                    **52**

1   defendants to understand and know allegations but not know

2   specific charges because it's -- in many cases, it comes off

3   as legal mumbo jumbo and includes words that don't maybe have

4   meaning to laypersons.

5       So Mr. Marks, for example, he said -- when I evaluated

6   him, he said -- he estimated it to be over a year since he had

7   last talked about his charges with his attorneys at least.  He

8   had seen Dr. Danziger previously.  It had been at least a year

9   since he had talked about the specific charges with his

10  attorneys.  He mentioned that.

11      He was able to remember the number of -- he said he

12  didn't know how many charges he was facing.  He was able to

13  remember that and recount it later in the interview when I

14  gave him what I believed the number to be.  But, most

15  significantly -- most significantly, Mr. Marks offered a

16  description of what he's accused of doing.

17  Q    And would you consider those -- I think you've

18  characterized it as allegations versus charges?

19  A    Yeah.  They're the allegations that form the factual

20  basis for the charges.  Yeah.

21  Q    And why is that more important to you?  Why is -- when

22  you say, "Oh, it's so important" --

23  A    Because that's what the defendant has to dispute, if

24  anything; right?  If he wants to say, "No, I didn't do that,"

25  you don't say, "I didn't do the charge," when you're talking

1   to your attorney.  You say, "I didn't do that"; right?

2   "They -- they communicated with me.  I didn't send that text

3   message.  That was someone else.  My phone was missing that

4   day," or "Someone stole my phone or hijacked my account."  A

5   defendant really doesn't challenge or -- a defendant has no

6   use or utility in terms of challenging the charges.

7        His job is to provide facts about what he did or didn't

8   do that are -- that are helpful to the attorney challenging

9   the prosecution's allegations that ultimately would go to

10  disproving the charges.

11  Q    Okay.  Let's talk about Dr. Danziger.  Did you also

12  review Dr. Danziger's report concerning the defendant's

13  competency?

14  A    Yes.

15  Q    What parts did you agree with?

16  A    Well, you know, Dr. Danziger and I both agree that

17  Mr. Marks has a factual understanding of the legal process,

18  and that's considered to be a more rudimentary and more basic

19  understanding.  Where we disagree is -- and I want to -- I

20  hope to characterize Dr. Danziger's opinions adequately.

21  Dr. Danziger expressed concerns about rational understanding,

22  which is factual plus.  It's not only knowing what the

23  allegations are and who the players are and what you're

24  charged with and what you're accused of, but it's really

25  appreciating that and being able to use that information to

**Testimony of Randy Otto, PhD**                                      **54**

1   work with your attorneys and make -- and with the assistance

2   of your attorneys make rational, self-interested decisions.

3       I acknowledge that, as a function of autism spectrum

4   disorder, Mr. Marks has some challenges in that arena; but, in

5   my opinion, despite those challenges, his abilities are

6   enough.  Dr. Danziger, I think it's fair to say, sees it

7   differently.

8   Q    Let's move to a different topic.  On page 11 of your

9   report now -- let's go back to your report -- you talk about

10  how the defendant has ASD without accompanying intellectual

11  impairment with accompanying language impairment.

12  A    Yes.

13  Q    What does that mean?

14  A    So he has autism spectrum disorder, which is really going

15  to manifest in terms of impaired social interactions,

16  typically observed or noticed early on in childhood; and it

17  will be accompanied by things like -- it'll be accompanied by

18  things like maybe a lack of interest in social interactions,

19  maybe difficulty in reading social interactions and social

20  cues.  It might be manifested by a different or odd affect or

21  expressed mood, maybe not doing a good job reading people.  It

22  will also be manifested by -- it can be manifested by things

23  like hypersensitivity to some kinds of stimulus, like sights

24  or sounds.

25  Q    So -- sorry.  I want to ask -- so you agree that he has

*Testimony of Randy Otto, PhD*                                    **55**

1   ASD, but what does it mean, this "without accompanying

2   intellectual disorder"?

3   A    Oh, he's not intellectually disabled.  In the old days,

4   that was mental retardation.

5   Q    Uh-huh.

6   A    Okay?  And I think that the language impairment is there,

7   as we've been talking about.

8   Q    Okay.  How severe is his autism based on your evaluation?

9   A    I say not severe.

10  Q    Why?

11  A    I would describe Mr. Marks as pretty -- pretty high

12  functioning.

13  Q    Why?

14  A    Because of what he's been able to obtain with the

15  assistance -- with this considerable assistance and support.

16  He graduated high school with accommodations, absolutely.  He

17  was living semi-independently -- poorly but

18  semi-independently.  He was able to gain entrance into and

19  perform successfully at -- perform reasonably at a -- let's

20  call it a "technical school."

21       He is able to establish relationships.  He does not have

22  many.  A long-standing difficulty with peers is noted by

23  Mr. Marks, his father; and ongoing difficulties established

24  interacting with peers was reported by staff at the

25  residential program where he currently resides.  But he does

*Testimony of Randy Otto, PhD* **56**

1  form meaningful relationships.  He described himself as bonded

2  with members of his family at a minimum.  His father described

3  himself as emotionally connected to members of his family, and

4  he described at least one -- one meaningful social

5  relationship in his -- in his youth.  But, you know -- but I

6  acknowledge that social relationships are a real challenge for

7  the defendant.

8  Q    In your opinion, is the defendant able to testify at

9  trial if he so chooses?

10 A    Yes.

11 Q    Why do you think that?

12 A    Because he was able to answer my questions.  He was able

13 to talk with me about the very -- some very difficult issues

14 despite his anxiety.

15 Q    And are there ways in which he might struggle if he were

16 to testify beyond the -- beyond the anxiety?

17 A    Well, we talked a little bit about how he might

18 misinterpret questions.  You might want to ask questions that

19 are simple versus compound.  You might want to ask questions

20 that aren't leading.  You might want to ask questions that

21 don't simply ask for a yes or no.

22 Q    In your opinion, will the defendant be able to follow

23 along at trial and assist his attorneys?

24 A    Yeah.  Based on my -- and I infer that from his ability

25 to follow along with me for four hours.

*Testimony of Randy Otto, PhD*                                    **57**

1   Q    Do you think he might experience any limitations with

2   respect to that?

3   A    Well, it's -- it's more challenging for Mr. Marks than

4   defendants without his disability.

5   Q    Do you think it -- the level of challenge to him -- does

6   that rise to the level of recommending incompetence?

7   A    No.  I don't think it precludes his ability to understand

8   and follow.

9   Q    Okay.  You say on page 11 of your report that "Assessing

10  competence to proceed was complicated by the" -- well, "his,"

11  but "the defendant's significant discomfort discussing the

12  allegations against him and his resulting attempts to avoid

13  talking about the matters in much detail, his anxiety about

14  the pending legal process and limitations in his knowledge

15  about some aspects of the legal process."  I assume, given

16  2,000 defendants that you've evaluated before, that you have

17  confronted this very issue, and you've kind of alluded to it

18  before, but I want to go into more detail.  How do you

19  usually --

20            MR. MAHONEY:  I'm sorry.  Where are you on his

21  report?

22            MS. CHANG:  That was page 11, Your Honor.

23            THE COURT:  Yes.

24  BY MS. CHANG:

25  Q    How do you usually deal with this problem of reluctance

1   to discuss offenses?

2   A    So it -- sometimes -- this is not the case with

3   Mr. Marks.  Sometimes defendants naively believe or ignorantly

4   believe that demonstrating a knowledge of the charge is

5   essentially an -- an acknowledgment of the charge.  That

6   wasn't going on with Mr. Marks, and there's a whole way we

7   deal with that, but let's not talk about that.

8        I think that sometimes, when defendants are facing very

9   serious charges or, let's say, embarrassing charges, they get

10  anxious, and they -- it makes them uncomfortable talking about

11  it, acknowledging it.  So you try to get them -- as much as

12  you can, you try to get them to talk about it independently

13  because that's a better reflection of their ability than

14  providing more structure, but it may get to a point where you

15  have to provide more structure when you're dealing with

16  someone who's anxious like Mr. -- Mr. Marks was and who has

17  some of the communication challenges.

18       So what I did with him was -- was he -- he -- he clearly

19  was uncomfortable talking about it and indicated that he'd

20  be -- he would find it easier to discuss the charges if I sort

21  of asked more direct questions, which I did.

22  Q    And did that structured questioning help?

23  A    Yes.

24  Q    How?

25  A    Because in response to my structured questioning, he

1    demonstrated an understanding and appreciation of the

2    allegations.  He was able to say yes -- not only was he able

3    to say yes to the fact that he was accused of using phone apps

4    to communicate with minors, to direct them to send him naked

5    pictures of themselves, and that he was accused of receiving

6    and holding those pictures, he was able to do that with my

7    structured questioning.  He was also able to resist false

8    suggestions that I'd made.

9        So, for example, I asked him if -- I asked him if he

10   asked for pictures of them in their pajamas.  He said no.  I

11   asked if he -- if he was accused of asking for pictures of the

12   kids, I think, in snowsuits, and he said no.  I said, "Were

13   you asked for -- are you accused of asking them to send you

14   naked pictures?"  He said yes.  Right?

15       So not only was he able to eventually get out what he was

16   accused of given the -- how I questioned him, but he was also

17   able to distinguish that from what he wasn't accused of, which

18   was asking for pj pictures or snowsuit pictures, which I think

19   demonstrates good ability on the defendant's part.

20   Q    Moving to a different but related topic, how do you

21   determine in your evaluation whether someone actually

22   understands the charges and allegations against him?

23   A    Well, can they -- can they use their own words to

24   describe it?  Can they agree or disagree with your

25   description?  At some level -- there's that.  And then what

*Testimony of Randy Otto, PhD*                                    **60**

1  kind of emotional response did they show?  So, for example, if

2  someone says, "I'm facing two counts of first-degree murder,"

3  and they laugh, assuming that's not nervous laughter, what

4  does that mean?  I mean, how could you say you're facing two

5  charges of first-degree murder -- how could you say that

6  you're accused of beating your mother and laugh about it;

7  right?  So you look to their emotional expression in part to

8  inform your judgments about whether they truly understand and

9  appreciate what they're accused of, you know, factual versus

10 rational, this kind of "Yes, I can say it," but you're looking

11 for a deeper understanding too.

12 Q    And we'll come back to that.

13      You say on page 12 that the defendant initially, quote,

14 "reported that he had an incomplete understanding of the

15 charges against him, like the number or the names of the

16 specific charges."

17 A    Uh-huh.

18 Q    Did you make an effort to provide him with that

19 information?

20 A    Yes.

21 Q    And was he able to incorporate the information that you

22 provided about the charges?

23 A    I know for sure he was able to remember the specific --

24 the number of the specific charges.  I don't -- I don't

25 recollect as to whether I asked him to recount the names of

1  the specific charges.  But, again, in my -- in my opinion,

2  that is not critical.

3  Q    Did he tell you when he had last considered what the

4  actual exact charges were?

5  A    I believe he told me that it was when he had last

6  communicated with attorneys, which was maybe a year prior or

7  somewhere around a year prior.

8  Q    Was he -- let's -- you've already answered some of these

9  questions.  Was he able to reason through arguments that you

10  posed -- sorry.  Let me break this down.  Compound question.

11       Did you present to him arguments that could be made that

12  he didn't know he was communicating with minors?

13  A    Yes.

14  Q    And was he able to reason through those arguments with

15  you?

16  A    Yes.

17  Q    What sorts of arguments did he reason through?

18  A    So, for example, he was accused of communicating with

19  minors, but, you know, he had no way of verifying that they

20  were minors.  Someone could pose as a minor.

21  Q    Why was his ability to reason through these arguments

22  important to you?

23  A    Because that's the kind of thing that he might do with

24  his attorneys.

25  Q    Were there other ways that he demonstrated an

*Testimony of Randy Otto, PhD*                                    **62**

1   understanding that these charges were serious and the nature

2   of the allegations he was accused of doing?

3   A    Yes.

4   Q    Like what?

5   A    Well -- so, for example, he identified prison as a

6   possibility.  All things being equal, you know, prison

7   reflects some understanding of the appreciation.  I asked him

8   if he was aware of possible sentences specifically.  He said

9   no.  He didn't really remember if he had talked about the

10  length of sentence he was facing with his attorneys, but he --

11  he identified prison as a possibility, and he also identified

12  prison as preferable to probation, which in most cases, I

13  think, is rational.  Sometimes it might be rational to prefer

14  prison to probation.  We don't need to get into that.  I don't

15  think I need to get into that.

16       But maybe most significant was the discomfort that he

17  demonstrated in talking about the charges.  His -- had

18  expressed concern that people know about the charges.  Right?

19  He didn't want people knowing that he was charged.  He

20  indicated that it would be bad if he was convicted and placed

21  on a sex offender registry because that people could look up

22  and find out what he did and think bad things about him.  I

23  think that reflects an appreciation of the seriousness of the

24  charges.

25       And then I think maybe most significantly was some of the

*Testimony of Randy Otto, PhD* 63

1   communications he had with the law enforcement officers who

2   recorded their conversation with him where I think he -- if I

3   remember correctly, he said that people, upon learning of what

4   he was accused of, would consider him a monster.  So at some

5   level that reflects an appreciation or understanding that what

6   he's accused of is bad, wrong --

7   Q    Moving on --

8   A    -- serious.

9   Q    Sure.

10       Moving on, did you assess the defendant's ability to

11  provide counsel with information about his case, including the

12  conduct alleged?

13  A    I didn't really get into that, and in retrospect, I wish

14  I did.  But I was -- he was very anxious and nervous, and

15  maybe I -- you know, that was part of it, but I also was

16  attuned to the fact that I was interviewing him and that the

17  recording or a transcript of this was going to the

18  U.S. Attorney's Office.

19       You know, I am familiar with, you know, constitutional

20  protections that attach as a function of cases like *Estelle*

21  and that, but I was just very uncomfortable, you know, asking

22  him what did you do?  I -- I often ask defendants did you do

23  it?  Why did you do it?  Tell me if you didn't do it.  I

24  didn't do that and -- and -- for those reasons.

25  Q    Okay.  Have you reviewed any documents that could assist

**Testimony of Randy Otto, PhD**                                                    **64**

1   the defendant in the event that he doesn't remember

2   particulars about the offense conduct?

3   A     Certainly.

4   Q     Like what?

5   A     The communications in the -- well, I didn't review the

6   pictures, but I did review the communications.  That's what

7   he's -- in part, he's accused of communicating with minors,

8   trying to procure child pornography, and holding child

9   pornography.  The evidence is there; right?  It's there for

10  his use to stimulate his memory, to stimulate his discussions.

11  It's there for counsel's use.

12  Q     Now, you mentioned before that, when you started talking

13  about the charges themselves, the defendant's demeanor, which

14  had previously been he was more willing to talk about his

15  background and the stuff in the history-gathering section, but

16  then you said, when it came time to talking about the offense

17  conduct alleged, he became more "reticent" is the word you

18  used.  In your opinion, was the defendant's reluctance to

19  discuss his offense conduct indicative of inability to

20  understand the charges?

21  A     No.

22  Q     Was it indicative of inability to convey information?

23  A     No.

24  Q     Would you consider the competency interview with you to

25  be a high-stress environment or a low-stress environment or

1  something in between?  Just where on the spectrum would you --

2  would you --

3  A    In between.  In between.  Right?  It's certainly not his

4  day-to-day life at Aloft Transitions.  I'm more anxious here

5  than I am during the -- I'm more anxious here than I was

6  interviewing him, and I will assume that Mr. Marks is more

7  anxious here in a -- in open court with family members present

8  and many others in a proceeding that will have a significant

9  impact on his case than he was with me.

10  Q    And so given, however, that it was a what you call "in

11  the middle," a medium-stress environment, did he -- did he

12  demonstrate an ability to express himself and communicate with

13  you --

14  A    Yes.

15  Q    -- in the medium-stress environment?

16  A    Yes.

17  Q    Okay.  Again, turning to the spectrum of high stress, low

18  stress, in between, wherever you want to put it, where on the

19  spectrum is his interview with the police, in your opinion?

20  A    Well, medium or high.  Certainly not low, but medium or

21  high.

22  Q    And in that medium- or high-stress environment, did the

23  defendant demonstrate, in your view, an ability to convey

24  information?

25  A    Yes.

**Testimony of Randy Otto, PhD**                                    **66**

1    Q     Did he demonstrate ability to process information that

2    was being said to him?

3    A     Yes.  He answered the questions coherently.

4    Q     And did he demonstrate an ability to communicate?

5    A     Yes.

6    Q     So based on your own direct observations and your review

7    of the case materials, including the chats and the interview

8    with the police, is it your opinion -- what is your opinion as

9    to the defendant's ability to discuss the circumstances of the

10   offenses with his attorney?

11   A     I believe he can.

12   Q     Why?

13   A     Because -- well, I don't -- I don't see any reason why he

14   can't, and his ability to communicate in other venues about

15   other matters is adequate.

16   Q     Let's move on --

17   A     Let me just say this: that I assume that he'll be more

18   aligned with counsel than he is with someone like me, right, a

19   court-appointed examiner.

20   Q     And why is --

21   A     Or someone -- or more than law enforcement officers

22   because Mr. -- Mr. Marks clearly recognizes that his attorneys

23   are his advocates and they're on his side.  So they have that

24   advantage when they communicate with him that I don't and that

25   law enforcement didn't.

*Testimony of Randy Otto, PhD*                                    **67**

1   Q    And why did you think that was important to note for the

2   Court?

3   A    Because he did reasonably well with me and the police.  I

4   assume he'll only do better with his lawyers, who he trusts

5   and sees as his advocates.

6   Q    Okay.  By the end of your interview, was the defendant

7   able to describe some of the possible -- some of the critical

8   possible penalties that he would face if convicted?

9   A    Yes.

10  Q    Did you -- you mentioned probation.  Did the defendant

11  appear to appreciate the difference between probation and

12  prison?

13  A    Yeah.  He clearly understood that he wouldn't go to

14  prison, and he clearly saw that as preferable.

15  Q    And what understanding of the sex offender registry did

16  he demonstrate by the end of your interview?

17  A    Yeah.  He -- he initially -- he mentioned the possibility

18  of registering as a sex offender but didn't really understand,

19  kind of, the implications of that.  I told him about some of

20  the implications.  For example, you know, people can learn

21  about you and your history, your conviction.  They might limit

22  where you can live, for example.  It varies across

23  jurisdictions.  These requirements are very complicated, and I

24  don't know them all.  And he was able to incorporate that and

25  remember it and relay it back to me later in the interview.

*Testimony of Randy Otto, PhD*                                    **68**

1   Q    Let's move on.  Did the defendant demonstrate

2   understanding of the legal process in its operation in the

3   roles of the people involved?

4   A    Generally.  There was some -- some deficits, but those

5   deficits could be remedied.

6   Q    Could you describe his understanding of the role of his

7   defense attorneys.

8   A    So he clearly understood that his defense attorneys were

9   advocating and were working in his interest.  He expressed

10  confidence in them.  He said he'd answer any of their

11  questions.  He said that his dad had hired them.  He

12  identified his two attorneys by name.  He also referenced a

13  third attorney that had briefly represented him when he was

14  first detained in the Midwest.  I saw no questions about

15  Mr. -- I have no questions or concerns about Mr. --

16  Mr. Marks's understanding, appreciation of counsel, and their

17  advocacy role.

18  Q    Can you describe the defendant's understanding of the

19  role of the prosecutor.

20  A    Right.  I think to -- I'll just go over the -- he

21  described the prosecutor as trying to prove him as having

22  committed the offenses with which he was charged, and then I

23  gave him a dichotomy:  Does that mean the attorney's for you

24  or against you?  And he chose against.  So I thought he saw

25  the prosecutor -- considered the prosecutor to be an adversary

1    appropriately.

2    Q    Describe his understanding of evidence.

3    A    Yes.  He was able -- after some discussion, he was able

4    to identify likely evidence to include things like these --

5    the texting or the communications and what he shared with the

6    police who questioned him.

7    Q    Did he identify any other sources of evidence?

8    A    Well, he said that witnesses could say what they saw, and

9    that would be evidence.  That was actually his initial

10   response, I think, to my question about evidence.

11   Q    And speaking of witnesses, describe his understanding of

12   witnesses.

13   A    Oh, witnesses are people who say what they saw.

14   Q    And did he have any understanding as to, like, ideas

15   around perjury or -- well, I guess committing perjury?

16   A    Yeah.  He -- Mr. Marks indicated that witnesses had to

17   take an oath, and that -- that was that they had to tell the

18   truth.  Let me just -- I know I referenced that specifically

19   in my report.  Hold on.

20   Q    Page 13, perhaps.  Second paragraph.

21   A    I know it's in here, but I just can't seem to find it.

22   Q    The fourth line from the bottom of the second paragraph:

23   "Mr. Marks described witnesses as persons who would tell what

24   they saw and first reported that he did not know who might

25   serve as witnesses in his case."

1    A    Yeah.  I thought your question was about perjury.

2    Q    Oh, I'm sorry.

3    A    That's what I'm looking for.  I know I talk about it

4    specifically.

5    Q    Right.  Right.  We'll -- we'll move on from that

6    because --

7    A    But he -- he -- he -- I do want to -- I do want to talk

8    about -- I mean, I think I should answer it because I think it

9    is important.

10             THE COURT:  I believe it's on page 14.

11             THE WITNESS:  14.  Okay.

12             THE COURT:  And it's the last full paragraph --

13   well, second full paragraph from the bottom.

14   BY MS. CHANG:

15   Q    First sentence.

16   A    I'm sorry.  Oh, yeah.  He said -- he -- he talked about

17   watching television, and from that he got -- he got that

18   witnesses took an oath, and that meant that you couldn't lie,

19   himself included, obviously, if he did testify.

20   Q    Can you describe his understanding of juries.

21   A    Well, so, not uncommon, Mr. Marks said that judges offer

22   a verdict and juries offer a verdict, and I knew this was

23   going to -- I knew when I asked him -- you know, he

24   volunteered, "Well, one of the things the judge does is decide

25   a verdict," and I asked him about a jury, and I knew he'd -- I

*Testimony of Randy Otto, PhD*                                              **71**

1   knew he'd be perplexed.  So he recognized the inconsistency of

2   him saying, "Well, judges decide verdicts.  No, juries decide

3   verdicts."  And he -- you know, that's true.  It's at a bench

4   trial or a jury trial, and he was able to incorporate, well,

5   in some cases a jury decides, and in some cases a judge

6   decides.

7        What I really wasn't able to get to was sort of who makes

8   up a jury.  I didn't put a lot of effort into it, but he -- he

9   was focusing on -- apparently, he had a discussion with one of

10  the staff members at the facility who was saying she had been

11  on jury duty and was talking about her specific selection.

12  Mr. Marks was focused on that.  I was interested more in who

13  serves on a jury.  How do you become eligible for a jury?  We

14  didn't get far on that.  I didn't consider it critical or

15  crucial, so I moved on.

16  Q    Can you describe his understanding of the judge.

17  A    Well, he -- he described the judge as offering a verdict.

18  Q    Okay.  Did you detect any limitations in the defendant's

19  ability to understand the legal process, its operation, and

20  the roles of those involved?

21  A    Well, like many defendants, he didn't -- he didn't

22  appreciate the fact that you can change your plea.  Right?  We

23  had talked about pleas.  He said, "Well, I pled not guilty,"

24  and many -- many -- oftentimes you see this with younger

25  defendants.  You know, they don't realize that pretty much

*Testimony of Randy Otto, PhD*                                    **72**

1    everyone pleads not guilty from the get-go and then, as a

2    function of negotiations, the plea might change.  But I think

3    that can be remedied with discussion from counsel.

4    Q    Why do you think that can be remedied with discussion

5    from counsel?

6    A    Because counsel could tell him, you know, we typically

7    enter a not guilty plea for everyone, and it's only after we

8    get a chance to find out more about the case and see kind of

9    where we are strategically that we might think about changing

10   things.  That's just a matter of education.

11   Q    But why do you think that that sort of knowledge gap can

12   be fixed with education?

13   A    Because I fixed his knowledge gaps in other arenas, you

14   know.  So he didn't know the number of charges.  I told him

15   five.  He remembered that.  He thought he could be forced to

16   testify.  He -- not only did he remember and incorporate that

17   he couldn't be forced to testify but that it was choice, he

18   remembered that it was due to his constitutional right to

19   remain silent.  Okay?

20   Q    You say in your report that his ability to consult with

21   counsel and make rational case decisions was, quote, "the area

22   in which Mr. Marks demonstrated the greatest limitations."

23   A    Yeah.  So I think -- I'm sorry.

24   Q    Please explain the limitation --

25   A    So I think sitting down with counsel and figuring out,

*Testimony of Randy Otto, PhD*                                73

1   you know, the weight of the evidence against him and, you

2   know, what's in his best interest to do -- I think that would

3   be most challenging for Mr. Marks, but I don't think it's -- I

4   don't think it's a challenge that can't be overcome despite

5   his disability.

6   Q   Why don't you think it's a challenge that can be

7   overcome?

8   A   Because he can do other things.  He can make other

9   decisions.  He can make other judgments when provided with

10  assistance and direction.

11  Q   Did you pose hypothetical fact patterns to the defendant

12  and ask him what course of action he would choose or recommend

13  under those hypothetical circumstances?

14  A   Yeah.  For example, I asked him what he might do if a

15  witness was lying.

16  Q   And was he able to tell you what he would do?

17  A   He initially said he didn't know what he would do, and I

18  told him that -- again, ignorance.  I educated him, and he was

19  able to incorporate that what he should do in such a case

20  would be to share that information with counsel.

21  Q   Did there come a time in your interview when you posed

22  questions like "Let's say there's a ton of evidence against

23  you.  Would you recommend that the person go to trial?"

24  A   Yeah.  That was a hypothetical and specifically didn't

25  involve the defendant, but a ton of evidence versus a little

*Testimony of Randy Otto, PhD*                                    **74**

1   evidence, and he said, "Well" -- his response was "If there's

2   overwhelming evidence, plead guilty; if there's not a lot of

3   evidence, plead not guilty," recognizing that -- you know, the

4   choice and the tension there.

5   Q    How would you describe his intellectual functioning?

6   A    Well, I didn't assess it, but I believe he's functioning

7   in the average range.

8   Q    In your opinion, does his language impairment affect his

9   ability to rationally understand what's going on?

10  A    It probably has some effects but doesn't preclude him

11  from making these decisions with assistance of counsel.

12  Q    And, in your opinion, does his language impairment affect

13  his ability to assist his attorneys?

14  A    It affects his ability to assist his attorneys, but it

15  doesn't preclude him from assisting and working with counsel.

16          MS. CHANG:  May I have a moment, Your Honor?

17          THE COURT:  Absolutely.

18          MS. CHANG:  I have nothing further, Your Honor.

19          THE COURT:  I think it might be a good time to take

20  a quick break, but before we do so, Dr. Otto, I have one

21  question for you.  Throughout your testimony, you have been

22  talking about structured questioning.  Can you explain to me,

23  in your opinion, why you think that Mr. Marks was not simply

24  parroting back the information you gave him in that structured

25  question and was instead able to understand and digest it and

*Testimony of Randy Otto, PhD*                                    **75**

1   formulate his own answer.

2          THE WITNESS:  In terms of when I provided him

3   information?

4          THE COURT:  Correct.  Like, you keep saying that he

5   didn't understand the difference between a judge and a jury,

6   and when you explained it to him, he was able to then answer

7   the question.  My concern would be is he just repeating what

8   you told him?

9          THE WITNESS:  Yeah.  I don't think he gave it back

10  to me verbatim, Judge, and I think it's a good concern.  But

11  my take was that he did -- was making sense of it, and it

12  wasn't just a verbatim parroting back.  We actually have a

13  transcript of the evaluation where you or I or anyone else can

14  look to that specifically.

15         THE COURT:  Thank you.

16         We're going to take about a ten-minute break, and

17  then, Mr. Mahoney, I'll let you question Dr. Otto.

18         MR. MAHONEY:  Thank you, Your Honor.

19      (Recess at 11:28 a.m. until 11:49 a.m.)

20         THE COURT:  Mr. Mahoney, are you prepared to go

21  forward?

22         MR. MAHONEY:  Yes, Judge.  I think that I'm going to

23  be playing some audio, and it was suggested the use of these.

24  I tried to plug it directly into the system, but for some

25  reason it's not working, so we have to put the microphone next

*Testimony of Randy Otto, PhD*                                    **76**

1    to my computer.  So is it okay with Your Honor if I stay here?

2              THE COURT:  That's fine.  That's fine.  As long

3    as -- can the court reporter hear Mr. Mahoney okay?

4              THE COURT REPORTER:  (Nods head.)

5              THE COURT:  And before we go further, there's just a

6    couple of things, and this is all for the benefit of the court

7    reporter.

8              I ask counsel that, when an objection is made, make

9    the objection to me.  Respond to me.  Don't argue amongst

10   yourselves because it gets a little confusing for the court

11   reporter.

12             And, Dr. Otto, when you are asked a question, let

13   the attorney completely finish.  I know you -- I know, because

14   you probably anticipate what the question is going to be.  And

15   then you can answer, and I will also admonish if the attorney

16   starts to interrupt you to do the same.

17             Okay.  Mr. Mahoney, you can go ahead and proceed.

18             MR. MAHONEY:  Thank you, Judge.

19                       CROSS-EXAMINATION

20   BY MR. MAHONEY:

21   Q    So, Dr. Otto, I'm going to -- I'm not going to ask you

22   about your qualifications or what you've written or the tests

23   that you've produced.  I want to get right into the first

24   thing you started talking about.  You talked about you're

25   looking at emotional, behavioral, and cognitive functioning.

*Testimony of Randy Otto, PhD*                                          77

1   So can you give me an example of what emotional is.

2   A    Things you feel.  Right?  Things you feel.  Emotions are

3   sadness, grief, despair, anger, agitation, irritability.

4   Q    All right.  And is there anything in your understanding

5   of autism that affects his emotional functioning -- somebody's

6   emotional functioning that has autism?

7   A    I'm sorry?

8   Q    Anything about autism that you understand that would

9   affect their emotional functioning?

10  A    It could affect how people -- the job people do in terms

11  of reading and communicating at a social-emotional level, yes.

12  Q    Okay.  And does that also affect how they are able to

13  express their emotions?

14  A    Yes.

15  Q    They may have blank affect, less affect?

16  A    Yes.

17  Q    Do you know why?

18  A    Do I know the mechanism?  No.

19  Q    All right.  Behavioral -- what is covered by behavioral?

20  A    Behaviors.  So it could be how you act.  Behaviors.

21  Q    All right.

22  A    What you say, what you do.

23  Q    All right.  And do you have an understanding of areas of

24  autism that affect that behavioral functioning?  I'm trying to

25  get an idea of your understanding of how autism works --

1   A    Yes.

2   Q    -- for an individual like this.

3        In what way?

4   A    So, for example, sometimes people with autism engage in

5   stereotypic movements, as was reported by the defendant's

6   father in this case.  An example: odd posturing or maybe

7   repetitive behaviors.  Okay?  Oftentimes they show -- they

8   might be described as showing clumsiness or not good

9   coordination.

10  Q    Okay.  Awkwardness?  Some of the behavior may be speech

11  behavior?  Do you --

12  A    The speech is behavior, yes.

13  Q    Okay.  It's -- are you familiar that some people with

14  autism are considered to be too candid?  They say things that

15  are on their mind even though it may be offensive to somebody

16  else.

17  A    Yeah.  I think that's a judgment.  I think we'll

18  attribute that to judgment, but I agree that the speech itself

19  is behavior.

20  Q    All right.

21  A    I think that's a social judgment factor.

22  Q    And is judgment part of cognitive?

23  A    Yes.

24  Q    All right.  What -- what part -- what is -- do you

25  consider somebody's social competence, their ability to, say,

*Testimony of Randy Otto, PhD*                                    79

1   read people, their ability to understand what's going on

2   socially in a social situation -- is that behavior?  Is that

3   cognitive?  Is that emotional?

4   A    I think all three.

5   Q    All right.  So -- and -- and -- so how does somebody --

6   what's your -- what's your view on how somebody develops

7   social competence?

8   A    Largely through experience.

9   Q    All right.

10  A    Through modeling and through interactions and experience

11  with people.

12  Q    Okay.  Social interactions?

13  A    Yes.

14  Q    All right.  And so from infancy on?

15  A    Certainly.

16  Q    Yeah.  And so it's -- the productivity of those social

17  interactions or not are critical to developing that kind of

18  social competence?

19  A    Yes.

20  Q    And what you might call "social intuition"?

21  A    I've never heard that term, but social competence, yes.

22  Q    Okay.  And so -- and did you conduct -- you mentioned

23  something about that you're wondering how somebody's

24  abilities, his abilities, may be impaired by his -- whatever

25  his condition is; correct?

*Testimony of Randy Otto, PhD*                                    **80**

1    A    I mentioned that anytime I do an evaluation, it's how is

2    their ability to understand and participate in the legal

3    process compromised by emotional, behavioral, or cognitive

4    impairments, if there are any.

5    Q    But his social competence,?

6    A    As broadly understood, as we just discussed, you say

7    affects all three of these areas.

8    A    It can manifest in terms of -- it can manifest in terms

9    of how people think, what people think, reading emotions, and

10   also -- and what they say and -- and what they do, yes.

11   Q    And you mentioned engaging the severity of the deficits

12   and what those deficits are attributable to.

13   A    Uh-huh.

14   Q    Did you do any particular testing of the severity of any

15   of Mr. Marks's individual deficits?

16   A    No.

17   Q    You said that you -- you mentioned that Mr. Marks was

18   conversational and that -- and that he understood your

19   questions, and you said he -- I think more than once you

20   mentioned that he corrected himself at points.  Do you

21   remember what exactly it was that he may have said, something

22   that --

23   A    I don't remember exactly, but I could go to the

24   transcript, but I don't remember exactly.  But I remember -- I

25   believe on at least two occasions he gave me a response and

1  said, "No, I don't know why I said that," and then gave me a

2  different response.

3  Q    Okay.  We may come up with one of those.

4       As far as memory, you said -- you said he had some good

5  memory of past events, that he -- he remembered the police

6  interview.  He also -- you said that he didn't remember some

7  things about the legal process but that he did remember them,

8  but that was -- you prompted him.  You gave him some

9  information about the legal process, and he remembered it

10 later on.

11 A    I -- I -- I didn't mean to say that if I said it or wrote

12 it.

13 Q    Okay.

14 A    What I mean -- what I meant was that he professed

15 ignorance, and I provided information.  That's -- professing

16 ignorance is different than "I don't remember."

17 Q    Right.  So -- but -- so I think -- maybe I misunderstood,

18 but you did point out at some point you told him some things

19 about the legal process, and later in the same interview he

20 remembered them.

21 A    That's true, but I hope I didn't preface at all by saying

22 he didn't remember how a judge or a jury could both decide the

23 verdict.

24 Q    Yeah.

25 A    It was he said he didn't know.

*Testimony of Randy Otto, PhD*                                    **82**

1    Q    Right.

2    A    That's ignorance versus "I don't remember that."

3    Q    In thinking about this issue of memory, I mean, there

4    were -- he didn't ever say to you -- I mean, at one point at

5    the end of your examination, you asked him if he would say he

6    had memory problems.  Do you remember that?

7    A    No.

8    Q    All right.  Looking at -- that's at page 144 of the

9    transcript, if you have the transcript there.  But I think I

10   can just play it.  See if I'm right.

11        (Publishing.)

12             MR. MAHONEY:  Oh, that's wrong.

13        (Publishing.)

14   BY MR. MAHONEY:

15   Q    Mr. Marks didn't claim to you that he had amnesia about

16   these events and that was the problem, did he?

17   A    No.

18   Q    And -- but there were areas where -- for example, you

19   asked him at page 12 what the prohibitions were on him under

20   his current conditions, and he's --

21   A    On page 12?

22   Q    Yeah, on page 12 of the interview.

23        All right.  And you -- he said he's not allowed to use

24   the Internet.

25        And "Anything else?"  And he hesitated.  "Anything else

*Testimony of Randy Otto, PhD*                                              83

1   you can think of?"

2        And he said, "No, that's all I could remember."  Right?

3        But then -- because I think that when you were

4   testifying -- well, anyway, you prompted him at that point;

5   right?

6   A    I did.

7   Q    That there was -- you prompted him about cell phones.  He

8   said, "Oh, yeah, cell phones."

9        And then you said, "Being around younger people?"

10       He said, "Oh, no."  He remembered that.  And he said he

11  remembered the judge having said something about that.  So --

12  so he had -- but those were memory issues.

13  A    He didn't -- I believe he truly didn't recall that.

14  Q    Right.

15  A    Right.  Yeah.

16  Q    You're not saying -- he wasn't feigning.  We agree with

17  that; right?

18  A    Yeah.  I just don't know that that's -- he did not recall

19  that.  I believe that's genuine.  I don't know if that

20  reflects a memory problem.

21  Q    Yeah.  No.  I --

22  A    I don't remember the address of the hotel I stayed at

23  last night.  I don't think that reflects a memory problem.

24  Now, I acknowledge the address of the hotel is less

25  significant to me than these conditions to your client.

*Testimony of Randy Otto, PhD*                                      **84**

1   Q    Do you recall he had problems remembering his prior

2   diagnoses and some of his prior symptomatic behaviors?  He's

3   really remembering what his parents had told him about the

4   conditions were and what his -- some of his repetitive

5   behaviors.  He remembered some, like pulling his lip, but

6   other things he didn't remember.

7   A    I don't remember.

8   Q    Okay.

9   A    But can I look to my notes or --

10  Q    Yes.  Page 50 and 51 of the transcript.

11  A    Okay.  So -- I mean, if you want to direct me somewhere.

12  Q    Well, you asked about any kind of behavioral problems,

13  and he said that he didn't have any anger problems.  And you

14  said, "What about when you were a kid?"  And something about

15  attention or deficit or hyperactivity.

16       And he said, "Well" -- you know, he was on medications.

17  He couldn't remember what they were.  But had he ever been

18  diagnosed with ADHD?  He doesn't think so.  "My dad told me

19  they thought I had it, but I" -- he doesn't really remember

20  now.

21  A    Yes, that refreshes my memory.

22  Q    At page 67 --

23  A    I was just -- I was looking at my notes to -- I'm sorry.

24  I was just looking at my notes to maybe add some clarity to my

25  response.  Just give me a second, if you could.  I was trying

*Testimony of Randy Otto, PhD*                                               85

1    to find when he received those medications and when he had

2    that diagnosis.

3    Q    It may have been at a young age.

4    A    Yeah.  So, obviously, if he was younger rather than

5    older, we might just attribute that as not reflecting a memory

6    problem but just reflective of the frailties of memory

7    generally.  And I'm looking to -- I do not see here where I

8    wrote what age he was treated with psychostimulant

9    medications.

10   Q    So turning to page 67, you asked him about any kind of

11   things he did repetitively as a kid.  I mean, you're conscious

12   of his ASD diagnosis, so, naturally, you're asking -- I assume

13   that's one of the reasons why you're asking about that.

14   A    Well, that, plus I had been tipped off by Dr. Geller's

15   report.

16   Q    Exactly.  Sure.

17        So, anyway, he said one of the things is he used to play

18   with his lip, tug on his lip a lot, and then he said that's

19   the only one he could recall.  Now, there are others that I

20   believe are in Dr. Geller's report, but he just himself said,

21   "Well, my dad remembers a lot more than I do."

22        And then we got some -- there's some other -- and the

23   bottom of the page you asked him about super-focused interest.

24   That's characteristic of people with autism, that they can get

25   themselves heavily involved in constricted, narrow,

*Testimony of Randy Otto, PhD*                                    **86**

1    unproductive kind of interests; right?

2    A    I'm sorry.  Yes, that is -- that is typical of some

3    people with autism.

4    Q    Right.  And so you asked him about did he have some real

5    focused -- super-focused interest at page 67, at line 23.

6    A    I did.

7    Q    Okay.  And so he said one of them was drains.  He had a

8    fascination for drains in the floor, drains in tubs, wondering

9    how they worked, and then -- and then -- and then said another

10   one was trucks, or it turns out to be construction vehicles.

11   And you asked whether he collected them and so on.

12        And so then at line 15 on page 69 he says -- he said --

13   it sort of stops.  I don't think that was -- long wind, and

14   there was sort of -- you asked if he got excited when he saw,

15   I guess, certain trucks, and he said --

16             THE COURT:  Mr. Mahoney.

17             MR. MAHONEY:  Yes.

18             THE COURT:  You're doing a lot of reading the

19   transcript into evidence.  I have the entire transcript, and I

20   will have an opportunity to read it.  I've already reviewed

21   some of it.  We only have another three hours and 50 minutes

22   today for this hearing.  I ask that you please put a question

23   to the witness, and let's try to move this along a little bit.

24   I will let you ask whatever you want, but right now all you're

25   doing is reading a transcript into evidence.

1      MR. MAHONEY:  All right.

2   BY MR. MAHONEY:

3   Q    At line 18 on page 69, you prompted him by saying, "Tell

4   me about outer space"; correct?

5   A    I did.

6   Q    And then he said, "Oh, I was interested in that too";

7   correct?

8   A    Yes.

9   Q    And then at line 17 on page 70, you prompted him again

10  for -- for more things, and you said, "As a kid or as an

11  adult," on line 19, and then that prompted him then to

12  remember something else; right?

13  A    Yes.

14  Q    His interest in North Korea?

15  A    I'm sorry.  Is that a question?

16  Q    Yes.

17  A    Yes.

18  Q    So there took some prompting to get -- down on -- I'll

19  just strike that.

20       So then on page 10 -- page 10 --

21  A    We're back on page 10?

22  Q    On page 73 at line 10, you prompted him about --

23  something about mailboxes, yes?

24  A    I'm sorry.  Is that a question?

25  Q    Yes.

*Testimony of Randy Otto, PhD*                                          **88**

1  A    Yes, I did.

2  Q    And -- and he remembered then that was one of his big

3  interests, interest in mailboxes.

4  A    That's true.  That's what he said.

5  Q    So these weren't things about -- that really had anything

6  directly to do with the offense?

7  A    Not in any way.

8  Q    But they were just things that would have been intense

9  interests of his at some point in his life that he was not

10 remembering them when you prompted him -- until you prompted

11 him for some of these.

12 A    I agree, but he did great with the prompts.

13 Q    Yeah.  I mean, it sounded like they weren't there in his

14 memory.

15 A    Right.  He didn't say, "I have no recollection of Tonka

16 trucks or North Korea interests," and I think at some point he

17 volunteered another one, which was the organ more recently

18 developed.

19 Q    You said that he was -- several times you were asked

20 questions about and you talked about Mr. Marks being --

21 talking about -- answering questions, trying to answer

22 questions of yours about what it was he was charged with.

23 A    Yes.

24 Q    All right.  And you said that he was uncomfortable.  You

25 recognized he was uncomfortable talking about what he was

*Testimony of Randy Otto, PhD*                                        **89**

1   accused of doing.

2   A    Yes.

3   Q    Then you said -- you also said he was reticent, and you

4   said he was doing a lot to avoid talking about it.

5   A    Yes.

6   Q    What was -- what do you mean by "doing a lot to avoid

7   talking about it"?

8   A    So I asked a number of questions to get him to get out to

9   me the allegations, and I was not getting meaningful

10  responses, and -- and I interpreted that as making an effort

11  not to talk about it because of his reticence, which I get,

12  and then I eventually adopted another approach.

13  Q    Wasn't he -- he was stammering, sort of, or halting in

14  his response to these questions?

15  A    I'd have to go to the transcript itself.  I know that

16  there was clearly stammering and stuttering during the

17  interview, but where -- exactly in response to what question

18  it was, as you can imagine, I have no specific memory for

19  that.  And I'm happy to look at the transcript.

20  Q    Yeah.  I'm trying to find the spot right now.  Yeah.  I

21  think at page 97.

22  A    I'm there.

23  Q    Okay.  So you asked him -- this was the second time you

24  addressed this.  You got interrupted before.  And you asked

25  him, "What are they saying you did?"

*Testimony of Randy Otto, PhD*                                    **90**

1    And he said -- he was hesitating -- "Talk to minors.

2    There was one thing -- I don't remember how they put it,

3    though, but they" -- "they're -- yeah."

4    And you asked him then, "Are they -- are they really

5    accusing you of talking to them, like, on the phone?"

6    So -- and he said -- and he missed the vehicle of

7    conveyance.  He said, "Uh, sexually," on the next page; right?

8    A    That's what he said.

9    Q    So it really wasn't responsive to your question, but it

10   was responsive to your earlier question of what they say he

11   did.

12   A    Yes.

13   Q    And then he's -- he's responding to all these questions

14   about what he did; right?  Where -- where do you see that it

15   was something he was doing -- that he was doing to avoid your

16   questions?

17   A    Page 99, line 15, in my opinion.  Let's start at line 10.

18   So do you want me to expand --

19   Q    Well --

20   A    -- to -- in response to your question?

21   Q    Sure.  Go -- take me through.

22   A    So I say, "You're" -- line 10, "You're accused of asking

23   them or telling them to send pictures?"

24       "Yes."

25       "Of what?"

*Testimony of Randy Otto, PhD*                                    **91**

His response:  "Themselves."

Well, technically correct, but that's not the problem.

"Okay.  What kinds of pictures?"

"Uh, uh, uh, uh, uh, of them," which was the previous response.  "Uh, uh, uh, uh, of them."

Okay.  Well, going to have to keep pushing.  "Like, of what?"

"Uh, uh."

And my response is "Is it hard for you to say?"

He responds, "Yes."

Q    Okay.  So can we not accept that it simply was hard for him to say?

A    Yes.  Well, I don't think they're mutually exclusive.

Q    But does that mean he's doing something to avoid your answer -- answering your question?  Was he doing something?

A    I think so, but -- but it's not that big a deal to me in terms of my opinions here.

Q    It may be a big deal in terms of how a judge views it if you say he was doing something to avoid answering you when all he was doing was -- you recognize it was hard for him to say.

A    If in any way I communicated that your client was oppositional, difficult, not cooperative, I apologize for that.  He was very cooperative, and he was clearly struggling with the evaluation.  And if I in any way misrepresented him as not cooperating, that is an error on my part.

*Testimony of Randy Otto, PhD*                                      **92**

1   Q    All right.  You --

2   A    I'm sorry.  I was still looking -- did you want more

3   examples?

4   Q    No, no, no.  That's all right.

5        Have you ever -- when you've been appointed by a court or

6   hired by a prosecutor, have you ever gotten a recording of a

7   defense psychological examination?

8   A    I've never gotten a recording of any psychological

9   evaluation in a criminal context, much less defense or

10  prosecution retained or court retained.

11  Q    Okay.  So it's not like you expected that this would have

12  been recorded and Dr. Danziger's would have been --

13  A    Oh, I assumed, since you're recording mine, in terms of

14  best evidence, you might have been recording all of them.  I

15  assumed it was a possibility.  When I didn't get a response to

16  my request, I assumed they hadn't been recorded.

17  Q    Okay.  All right.  And --

18  A    It was a possibility.  This was the only evaluation I've

19  ever conducted that was recorded.  So I thought, well, maybe

20  you're just recording everyone, so I just put out there, "Hey,

21  if there are -- if their evaluations are recorded, I'd

22  appreciate a copy."

23  Q    Okay.  All right.  Yeah.

24       Now, just one thing I wanted to cover initially.  You --

25  so you agreed with -- not only did Dr. -- you agreed with

*Testimony of Randy Otto, PhD*                                      **93**

1   Dr. Geller's diagnosis of autism?

2   A    Yes.

3   Q    And you've learned that the other doctors who previously

4   misdiagnosed him later, after they read her report -- they

5   also came to agree?

6   A    Right.

7   Q    The only one who didn't -- the ones who didn't agree was

8   Drs. Ence and Leventhal.

9   A    I agree with that.

10  Q    Yeah.  And you don't -- you don't agree with the way they

11  evaluated Dr. Geller's report or --

12  A    I don't put much credence or weight on their report and

13  opinions.

14  Q    Okay.  Or their methodology?

15  A    That too.

16  Q    Okay.  What I'd like to do is -- you mentioned in your

17  report that Steven had language processing problems.

18  A    I agree.

19  Q    And are you familiar with the Vineland Adaptive Behavior

20  Scales?

21  A    Yes.

22  Q    Do you ever administer that yourself?

23  A    Yes.

24  Q    All right.  And this is -- there are other adaptive

25  functioning tests, but the Vineland is very well -- very

1  widely used.

2  A    I know historically it has been, but I couldn't tell you

3  whether it's widely used now.  I don't dispute your claim

4  but -- it wouldn't surprise me.

5  Q    It's in a third revision now?

6  A    Right.  And I never administered the third revision, the

7  third version.

8  Q    Are you aware that that was a revision that was somewhat

9  altered to be more sensitive in respect to people with autism?

10  A    No.

11  Q    And in a test of -- this is kind of a test for adaptive

12  functioning, it's important to -- government agencies deciding

13  what kind of help is needed by people developmentally

14  disabled, for example.

15  A    Certainly.

16  Q    They want to know the severity of the deficits of this

17  individual.

18  A    Certainly.

19  Q    Are they strong?  And it measures skills in areas of

20  communication, daily living, and social interaction.

21  A    That sounds right.

22  Q    And in this case Mr. -- and, also, in communication it

23  measures receptive language abilities and expressive language

24  abilities.

25  A    I don't dispute that.

**Testimony of Randy Otto, PhD**                                    **95**

1    Q    Okay.  And then in the area of social, it talks about --

2    it has a scale for -- subscale for interpersonal; correct?

3    A    I haven't seen the third version, but I don't -- so I

4    can't challenge your -- your claims, and I have no reason to

5    think you'd misrepresent that.

6    Q    No.  The scales are -- the scales, I think, are the same,

7    but Dr. -- Dr. Geller's report included a Vineland assessment.

8    She had -- she had done that.

9    A    That's correct.

10   Q    And he -- Steven ended up at the level of his skill

11   level -- it doesn't mean, like, he is a child, but his skill

12   level is that of a small child in those areas; correct?

13   A    That sounds correct.

14   Q    So when you acknowledged difficulty in understanding the

15   subtleties of language -- first of all, what do you mean by

16   subtleties?  What are the subtleties of language as far as

17   you're concerned?

18   A    So, for example, I can be sarcastic with you, and that

19   might be something he'd struggle with; or I could say

20   something figuratively, and he would interpret it literally.

21   Okay?  There's a lot to communication that we get from

22   nonverbals, and there's a lot we get from language tone, and I

23   think those kinds of things are particular challenges for

24   people with autism.

25   Q    Reading between the lines, in other words?

1    A    That's one way to put it.

2    Q    Okay.  So -- but how did you -- do you think -- is it

3    your opinion that that concern can resolve simply by the way

4    people phrase questions to him and the way people talk to him?

5    A    It can be partly addressed, yes.

6    Q    But if he's in Court and trying to pay attention and

7    follow what, say, a witness is saying and -- first of all,

8    is -- the courtroom environment is not a naturalistic social

9    setting, is it?

10   A    Not for any defendant.

11   Q    Right.  And so there's a lot -- might be a lot going on

12   in his head to try to figure out what's happening at that time

13   besides what a witness is saying.

14   A    That's true for every defendant.

15   Q    Do you have a feeling that it's maybe more so for a

16   defendant with autism?

17   A    Yes, and I hope I made that clear in my report.

18   Q    All right.  So -- and part of that, you're aware, with

19   Steven there's also a processing issue?

20   A    Yes.

21   Q    All right.  And processing is a measurement that might

22   come up in intelligence testing, and it can show up in the

23   ability of somebody to process -- the speed at which they

24   process or collect information about what somebody's saying to

25   them?

*Testimony of Randy Otto, PhD*                                    **97**

1    A    Certainly.

2    Q    And so if somebody, like -- like -- if Steven is -- that

3    might result in Steven being -- if this witness says five --

4    if there's five questions, Steven could still be stuck on the

5    first question, processing that in his head.

6    A    Perhaps, yes.

7    Q    And how -- how is that -- and that's just if he's just

8    sitting there; correct?  Just sitting there?

9    A    As distinguished from something else?

10   Q    Yes.  Testifying.

11   A    Oh, I thought -- I thought you predicated on listening to

12   a witness.

13   Q    Okay.  No.  Okay.  Yeah.  So I'll stick to -- back with

14   that.  So that's pretty difficult, then, to control for, isn't

15   it?

16   A    Yeah.  The only thing I can come up with is that an

17   attorney shouldn't offer rapid-fire questions.  You could

18   direct the defendant to -- if he's kind of missing things, to

19   alert an attorney.  "I'm not able to keep up.  Can you -- can

20   you see if you can get things slowed down?"  I don't know as a

21   nonlawyer -- I don't know what accommodations -- all the

22   accommodations that a court could or would be willing to do in

23   that arena.

24   Q    You actually had him sign a form at the beginning of your

25   interview of him.

**Testimony of Randy Otto, PhD**                                    **98**

1   A    I did.

2   Q    And you talked to him about the form but -- what the

3   purpose of the interview was and what the parameters of the

4   interview was, and you had him sign -- read and sign this

5   form.  Did you ask him -- and you asked him whether he

6   understood the form.

7   A    I did.

8   Q    Did you test whether he understood the form?

9   A    I did.

10  Q    How?

11  A    I --

12  Q    Did you ask him to explain to you what the form meant

13  after he read it?

14  A    I don't know if I asked him to explain what the form

15  meant, but what I -- what I -- I can go to the transcript, but

16  I do remember asking him in his own words to tell me his

17  understanding of the evaluation.  Now, whether that was before

18  or after I gave him the form -- because not only did I give

19  him the form, but I made an attempt to talk about that -- to

20  present that verbally.  So I did make an attempt to gauge his

21  understanding.  Again, I'll tell you I don't remember

22  specifically whether it was before or after he received the

23  form.

24  Q    What you're telling us is that the form only contained

25  the same things you already advised him of and found out that

*Testimony of Randy Otto, PhD*                                    99

1   he understood?

2   A    No, I don't think I said that.  Pretty much the same

3   information.

4   Q    All right.

5   A    Yes.

6   Q    And he had also been in special class -- some special

7   classes he talked to you about -- it was at page 23 of the

8   interview -- where they -- he needed to have more time to

9   process what teachers were saying, that they would go more

10  slowly.  Do you recall that?

11  A    Now that I see the transcript, I do.

12  Q    Yep.  So this is a long-standing problem with him as

13  characteristic of his -- of his --

14  A    Oh, yeah.  You know, the autism manifested very early on,

15  and -- and he continues to manifest some of those impairments

16  as an adult.

17  Q    Okay.  Do you remember asking about how he did at the --

18  at the DAVE School?

19  A    Yes.

20  Q    And I'm just going to play for a second about the problem

21  he had with the school or the -- the -- somebody told you.

22  A    Do you know the --

23  Q    Yeah.  This is going to be at page 29.

24       (Publishing.)

25  BY MR. MAHONEY:

*Testimony of Randy Otto, PhD*                                    **100**

1   Q    Okay.  So what -- he wasn't able to complete that class,

2   and he was worried about, if he had to retake it, it would

3   extend his -- he'd have to take it again.

4   A    Well, I didn't see that -- I don't know if you're

5   asserting that or -- I didn't see it there.  And maybe it's in

6   my report.

7   Q    What do you see in his response to that that, see, is --

8   how his autism is working into his difficulty with that class?

9   A    I couldn't tell you.  I can't tell you how his autism

10  explains difficulty with the big final project.

11  Q    Okay.  You asked him at one point about -- it's at

12  page 36 of the transcript.  I'll play this.  I should be

13  telling the time when this is.  Well, if you know page 36, I

14  guess that's enough to identify where it is in the recording.

15       (Publishing.)

16  BY MR. MAHONEY:

17  Q    All right.  Now, Doctor, you were asking him really about

18  the long-term goals; right?

19  A    Yeah.  We're not talking about his short-term goals.

20  We're talking about life goals, and there's an example of I

21  could have been more concrete or I could have been more

22  descript, and I should have followed up.

23  Q    It exhibits his literal thinking, his concrete thinking

24  at least; correct?

25  A    Yes.

*Testimony of Randy Otto, PhD*                                    *101*

1  Q    Here's a little bit more from that same segment.  I'm

2  sorry.  This is -- this would be at -- close by, maybe just --

3  just following that.  So --

4       (Publishing.)

5  BY MR. MAHONEY:

6  Q    Now, that still doesn't really get to the long-term

7  goals, does it?

8  A    Well, better than the first response.

9  Q    Yes.

10 A    Right.  Yeah.  But I have to -- you know, actually, when

11 you -- when you played the first part of the recording, I was

12 a little bothered by the fact that I didn't follow up; but I

13 did, so I'm a little relieved there.  So I just want to see --

14 to see if we got to long-term goals -- other long-term goals.

15 Q    Yeah.

16 A    We got -- you know, it was like pulling teeth.

17 Q    Yeah.

18 A    But we got some other ones, yeah.  For example, going

19 back to school.

20 Q    Did he -- he might go back to school, but this wasn't

21 still looking ten years down the road, as you suggested.

22 A    Yeah, that's probably fair to say.

23 Q    All right.  Is there something about his autism that

24 makes it hard for him to think about the future, to make

25 decisions now that really affect the long-term things that

*Testimony of Randy Otto, PhD*                                        **102**

1   you're talking about?

2   A    No.  I think he's going to be much more focused on here

3   and now and not thinking kind of in that way.  Yeah.  And I

4   think that is a characteristic of his condition.

5   Q    All right.  And -- and does that not relate -- is that

6   difficulty in thinking other than the present -- does that not

7   relate to the ability to make rational decisions about whether

8   to plea or not, what to plea to or not, whether to go to

9   trial, where part of the factors that come into play there are

10  these long-term issues?

11  A    I think it can -- it can -- I think those challenges

12  could impact his decision-making, sure.

13  Q    Do you see in this also problems, as Dr. Geller did, in

14  terms of executive functioning?

15  A    Yeah.  I saw that at different points in the evaluation,

16  yes.

17  Q    Now, at page 49 there was a discussion about him driving,

18  and I'm just going to play --

19       (Publishing.)

20       MR. MAHONEY:  Oops.  Sorry.  Hang on.  Oh, I'm

21  sorry.  I started the wrong recording.

22       (Publishing.)

23  BY MR. MAHONEY:

24  Q    Driving is not -- you've mentioned that his big problems

25  are social.

**Testimony of Randy Otto, PhD**                                      *103*

1    A    Yes.

2    Q    Driving isn't in itself necessarily a social thing,

3    although it's in a social environment.

4    A    No.  I agree with you.

5    Q    Why is he -- why does he panic over driving?

6    A    Because it's pretty stimulating, and there is the

7    possibility of a lot going wrong, and it does take -- you sort

8    of have to juggle a number of balls in terms of operating the

9    car, being alert for other drivers, stoplights, stop signs,

10   pedestrians, et cetera.  It's a lot -- it's a lot to take in,

11   and I can see where it would be challenging for someone like

12   Mr. Marks.

13   Q    Wouldn't being -- the possibility of being a witness for

14   yourself in a criminal case be exponentially more challenging?

15   A    Testifying being more challenging for him than driving a

16   car?  No, I don't think so.  Just answer the questions; right?

17   Sit there.  Listen to the question.  Offer if you don't

18   understand it, and answer the question.

19   Q    Do you think that's what it boils down to?

20   A    Yes.

21   Q    All right.  So what about the need to take perspective --

22   have perspective-taking ability with respect to the examiner,

23   whether it's your own lawyer or the prosecutor, knowing where

24   they're going with the questioning?

25   A    I think you're just supposed to answer the questions.

*Testimony of Randy Otto, PhD*                                    **104**

1   Q    All right.  So it doesn't really matter whether -- what

2   your answers were to the questions before or what the

3   questions were to --

4   A    Well, I guess, if you have a strategy to craft a

5   particular story line and if you see this as sort of a game --

6   a cat and mouse game between the questioner and the witness,

7   then yes.

8   Q    Is it not?

9   A    No, not if you're a legitimate, candid, honest witness.

10  No.

11  Q    What if you have trouble reading other people,

12  understanding where the questioner's coming from?

13  A    That makes it more difficult for you to be a witness than

14  someone who does not have that challenge.  But I'll reiterate,

15  if you're telling the truth and the whole truth and you're --

16  in my opinion, if you're trying to meet your role as a

17  witness, you are answering the question presented and not

18  asking yourself what does he or she have behind it.  That's

19  really shenanigans.

20  Q    But Steven told you he had trouble sometimes saying

21  things the way he intended them.

22  A    Okay.

23  Q    He had trouble with literalness in understanding what

24  people are saying to him.  He had trouble with saying what his

25  true meaning was or not being misinterpreted when he chose to

*Testimony of Randy Otto, PhD*                                    **105**

1   speak.

2   A    I don't dispute any of that, but we got here by you

3   asking me my opinion:  Do you think being a witness is getting

4   a question and providing the correct answer or what you

5   believe to be the correct answer?  My answer is yes, that's

6   it.  But I acknowledge that taking in the question requires

7   you to understand what the person's suggesting, maybe reading

8   their nonverbal, or certainly if you -- I've seen attorneys

9   ask questions sarcastically -- probably shouldn't, but I've

10  seen them do that -- and it'd be important to realize that a

11  question is sarcastic, but that's still listening to the

12  question and answering it.

13  Q    What about the environment of a jury, of strangers,

14  judging him?  Does that add stress?

15  A    To every defendant.

16  Q    Well, is it exceptionally hard for somebody like him who

17  can't read people, who doesn't have social intuition, who

18  doesn't have social --

19  A    Judgment?

20  Q    -- social competence, a lot of which is -- let me give

21  you an example.  When you walk in a room with people, maybe

22  people you don't even know, you can get a sense of the mood of

23  the room.

24  A    Many people -- many people can do that, yes.

25  Q    But somebody like Steven, that's not something he's

*Testimony of Randy Otto, PhD*                                           **106**

1  likely to be capable of.

2  A    Oh, yeah.  He's going to find that much more challenging.

3  Yes.

4  Q    So we can be comfortable even among strangers, those of

5  us who are typically developed, in a situation where we can

6  assess that social situation and assess what's happening with

7  the social skills we have now inherited that were developed

8  over a millennia but -- we have used to develop into the

9  people we are from infancy until the current day.

10 A    You lost me with "millennia."

11 Q    Okay.  Yeah.

12 A    I don't understand the question.

13 Q    Those of us who are typically developed bring social

14 intuition to every -- or social understanding to our social

15 encounters, and that's something we've inherited.

16 A    Right.  There's a genetic component to that.  Yeah, I

17 agree.

18 Q    It was essential to know, early people, whether the

19 person approaching you is a friend or a foe.

20 A    It's good to know that.  Right.

21 Q    We use eye contact and body language to figure those

22 things out.

23 A    Among other things.

24 Q    That didn't -- that's something that's really sort of

25 hardwired in a lot of ways.

*Testimony of Randy Otto, PhD*                                          **107**

1   A    Oh, I think there is -- I think there is an underlying

2   neurologic component there, and that explains you're client's

3   impairment.

4   Q    Because autism is a disruption of that component.

5   A    I agree.

6   Q    So when you asked him if he wanted to testify, do you

7   recall how he responded to that?

8   A    I think his response was no.

9   Q    Let's see if I've got this right.

10      (Publishing.)

11  BY MR. MAHONEY:

12  Q    By the way, his hesitation in answering there was -- that

13  was not a problem of him being reluctant to tell you anything?

14  A    No.  He's searching and trying to process and make sense

15  of this and re- -- you know, why am -- you know, why am I

16  uncomfortable or why don't I want to?  Right.

17  Q    Yeah.  So the next --

18  A    I'm sorry.  I just -- are we -- is this a continuation?

19  Q    Yeah.  I'm going to play a little bit more to the extent

20  that I'm going to ask you -- there's another section where you

21  came back to this about the plea -- or about testifying, and

22  I'll ask you about both of them.

23  A    Can you tell me --

24  Q    The next one is at page 126.

25  A    Thank you.

*Testimony of Randy Otto, PhD*                                           108

1      (Publishing.)

2   BY MR. MAHONEY:

3   Q    Which leads to another question, but the -- is it

4   possible, Doctor, that somebody with -- who has the -- this

5   underlying social learning deficit, underlying lack of social

6   competence, that a situation that we might look at as saying,

7   "Well, it's just answering the question.  It's just balls and

8   strikes," actually is far more complicated as a social

9   challenge for somebody like Steven?

10  A    Oh, I hope in my report I said -- I communicated that it

11  would be more difficult for him to testify than someone

12  without his disorder, and if I failed to communicate that,

13  that's an error on my part.

14  Q    All right.  Thinking about this, I want to play the

15  section we talked about, his literal thinking, and that's the

16  next -- the next one because -- let's play it, and then I'll

17  ask you a question about it afterward.  This is at page 127.

18      (Publishing.)

19  BY MR. MAHONEY:

20  Q    I'm pausing because you asked him to give -- for him to

21  give you an example of "literal."

22      (Publishing.)

23  BY MR. MAHONEY:

24  Q    Now, I'm stopping that for a minute, Doctor, and ask

25  you -- I'm interrupting to ask you did you think that Steven

*Testimony of Randy Otto, PhD*                                    109

1    was going to recognize that -- that you were really asking

2    about their life conditions that brought them to Atlanta?

3    A    No.

4    Q    You -- you knew he'd fall for it?

5    A    I wasn't trying to trick him.

6    Q    No, no.  I'm not suggesting that.  That he would fall

7    into that trap of -- not a trap that you're setting, but fall

8    into that problem that somebody like Steven would fall into,

9    taking it literally and not seeing the big picture?

10   A    How about this:  I believed he would demonstrate literal

11   thinking and not figurative.

12   Q    All right.

13        (Publishing.)

14   BY MR. MAHONEY:

15   Q    All right.  But you demonstrated how -- what "literal"

16   meant by showing that he took things very literally; correct?

17   A    Yes.

18   Q    And -- and, really, you had set this up in a way that you

19   went as far as anybody could go without totally, you know,

20   blowing the -- you know, disclosing explicitly what you were

21   looking for, that you were looking for a broader answer about

22   the larger lifestyle picture.

23   A    That's what I was looking for.  That would be figurative.

24   Q    Right.  And why is he not capable?  Why was he not

25   capable of seeing that despite that lead-in of --

*Testimony of Randy Otto, PhD*                                    **110**

1  A    That's part of the affliction; right?  That is the kind

2  of language/social challenge among the -- among the -- among

3  the challenges he faces with respect to language and social

4  interaction.  It's a manifestation.

5  Q    Now, I want to ask you some questions about -- you asked

6  him several questions about his ability to -- that related to

7  his ability to rationally evaluate his choices, whether to

8  plead guilty or not.

9  A    Yes.

10 Q    All right.  And so looking at page 114 of the transcript,

11 and I'll start with that.

12      (Publishing.)

13 BY MR. MAHONEY:

14 Q    So you ask him, you know, "What would you want to know

15 before making a decision?"  And what he tells you is he would

16 want to know what is the best decision.

17 A    Right.

18 Q    You can't get more concrete than that.

19 A    Yes.

20 Q    And what you're looking for is Steven to understand that

21 making a decision requires evaluating choices, and there may

22 be things that weigh one way or the other, and there may be a

23 risk associated with one choice or another, and there may be

24 long-term effects between any two choices that are vastly

25 different?

*Testimony of Randy Otto, PhD*                                    *111*

1    A    Right.

2    Q    And he had no -- he had no comprehension that that was

3    part of -- going to be part of his decision-making process?

4    A    No.  That's what he relies on counsel for.

5    Q    And so it ends up being that -- that -- when we look at

6    it, it all comes down, essentially, to relying on the

7    attorney; is that right?

8    A    For advice and counsel.

9    Q    But what about -- all right.  Let's listen to it.  Okay?

10   This is -- this is continuing, I believe, on the same page or

11   shortly after that.

12        (Publishing.)

13   BY MR. MAHONEY:

14   Q    All right.  So in these choices you were giving him,

15   there's only one -- really only one variable with the quantity

16   of evidence.

17   A    Yes.

18   Q    There was nothing -- you didn't say anything about, say,

19   the quality of evidence.

20   A    Yeah, I did not mention quality of evidence.

21   Q    So there could be a ton of evidence against somebody but

22   one very small piece of evidence, a little piece of paper,

23   that wins the day for them.

24   A    Sure.

25   Q    You didn't ask him about whether or not guilt or belief

*Testimony of Randy Otto, PhD*                                    **112**

1    in your guilt would come into the picture.

2    A    That's right.

3    Q    So he sort of followed your lead on the really implicit

4    suggestion that he's following sort of what you're implying,

5    that there's a lot of evidence.  He gets the idea that maybe

6    the person would plead guilty.

7    A    I don't see it as leading.  We disagree, but okay.

8    Q    Well, the thing is do you think that Steven saw it as

9    leading?  Do you think that Steven in answering your question

10   was exercising some sort of autonomous judgment, or was he --

11   do you think he was figuring out what you were suggesting the

12   answer should be?

13   A    He could have been, but I don't have reason to think

14   that.

15   Q    Well, wasn't it -- doesn't your question implicitly posit

16   that the quantum of evidence is -- is a sufficient factor on

17   which to make your decision?

18   A    If -- if you infer from me asking this question that I

19   believe the only factor a defendant should consider when

20   making a plea decision is volume of evidence, that's not what

21   I believe; however, I don't know, when we're trying to manage

22   this with a defendant, how we can reasonably offer a

23   hypothetical that contemplates all the potential variables,

24   for example, your criminal record, your point score, the

25   likelihood that witnesses will show up, who might be

1   testifying against you, whether you're guilty or not, what the

2   potential offers are.  I don't know how I could ask a

3   hypothetical that includes all of the potential contributors

4   that might affect a particular defendant in a particular case

5   with Mr. -- with Mr. Marks or anyone else.

6   Q    Well, but then the answer from Mr. Marks should have

7   been, "Well, I can't decide that based on that information

8   alone."

9   A    That would have been one response.  I don't think the

10  response of -- not that I said this, but all other things

11  aside, what do you think this -- this type of information --

12  how should it lead you?  Wouldn't it have been telling if he

13  said, "A lot of evidence?  Well, then you have to plead not

14  guilty."  That -- right?  We would -- we would have been

15  talking here about how confused he was.  Right?  He said,

16  "When there's a lot of evidence, you plead not guilty, and

17  when there's a little evidence, that's when you plead guilty."

18  Right?  That would have been very telling.

19          THE COURT:  Mr. Mahoney, I need you to put a

20  question to the witness, please.

21          MR. MAHONEY:  Yeah.  I'm just trying to find a

22  page -- the transcript page that corresponds to this, Judge.

23  I'm sorry.

24          THE COURT:  Okay.  And can you give me just for

25  scheduling purposes -- and I'm not trying to rush you.  You

*Testimony of Randy Otto, PhD*                                    **114**

1   can ask all your questions -- about how much longer you have

2   for cross-examination because we're already past the lunch

3   hour, and we only have less than three hours today.

4        MR. MAHONEY:  Okay.  I only plan to spend about 15

5   or 20 more minutes with the witness.

6        THE COURT:  Okay.  I'll give you -- it's 1:05.  I'm

7   going to give you until 1:25, and then I'm going to ask that

8   you wrap it up, if possible, so that we can take a break.  I

9   think a lot of people here, including your client, would

10  probably like to take a little bit of a break.

11       MR. MAHONEY:  Let me see if I can -- well, I'll

12  start this and see if we can find out where it is in the

13  transcript, Judge.  This is further discussion about how he

14  would decide.

15       (Publishing.)

16       MR. MAHONEY:  Page 121.

17       (Publishing.)

18  BY MR. MAHONEY:

19  Q    He would still follow what his attorney says even if he

20  disagreed with him.

21  A    Oh, I -- I didn't take that as responsive to that

22  question.

23  Q    But there's -- there's -- if giving him an example about

24  models of plea choices, lots of evidence, little evidence --

25  so -- and you've already agreed that that would never be

*Testimony of Randy Otto, PhD*                                        **115**

1   enough for somebody to make a decision.

2   A    Well, I think that I -- in my opinion, a defendant should

3   consider more than simply that.

4   Q    But he -- he didn't see a problem with giving an answer

5   that, yes, he would -- if there's a lot of evidence, he would

6   plea guilty; if there's a little evidence, then not plea

7   guilty.

8   A    I'll say this:  I've used such a hypothetical many times

9   with many defendants, some of whom are impaired by mental

10  illness, some who ended up not being impaired.  Rarely has

11  someone said, "Wait, Doc.  We need to add some information to

12  the hypothetical here."  So I think his failure to say, "Hey,

13  I really need more information," is not necessarily reflective

14  of a competence deficit.

15  Q    But the prior individuals you examined are really not the

16  best judges of the adequacy of your methodology, are they?

17  A    I don't understand your question.

18  Q    Well, the fact that other witnesses also gave an answer

19  to that question doesn't necessarily mean that it -- it's a

20  valid test of his ability to autonomously decide whether or

21  not to take a guilty plea, does it?

22  A    Can you restate the question.

23  Q    Is it a valid test of his ability to navigate in a proper

24  way, to properly assist in his defense, the kind of plea

25  choices somebody might have that he answered those questions

*Testimony of Randy Otto, PhD*                                              **116**

1  that you gave?

2  A    In and of itself, no.

3  Q    All right.  What else did you ask him that tested his

4  ability to understand what factors need to be considered?  And

5  especially a multivariable kind of situation, as it always is.

6  What other questions did you ask him which had demonstrated

7  his ability to autonomously make that decision?

8  A    I don't think I did.

9  Q    Just one other thing, Doctor.

10 A    Well, maybe -- I'm sorry.  Maybe -- I don't know if this

11 is getting at what you're asking about specifically, but if

12 you -- if you go to my question on page 124, maybe this

13 partially gets to what you're asking, but maybe not, and just

14 say no if not.  Page 11, I say, "If your lawyer was able to

15 get you a plea bargain where he'd say, 'Hey, no prison or

16 probation,' would you feel good about that or bad about that?"

17 He said he'd feel good about that.  Maybe that's more

18 appreciation of outcomes than plea agreements, but maybe that

19 indirectly gets to what you're asking.  But I acknowledge I

20 gave him no multivariate problem or hypothetical.

21 Q    But, for example, you asked him why would a lawyer -- at

22 some point you asked him, "Why would a lawyer advise you --

23 somebody not to plea guilty?"

24 A    I did ask that.

25 Q    And I think the answer is "Well, if there was no

1  evidence."

2  A    I don't remember if that was the response.

3  Q    What if the lawyer said, "Well, you're innocent"?

4  A    That -- that would be a good response too.

5  Q    Steven didn't have that in mind?

6  A    He didn't say it.

7  Q    What if -- what if in a case -- first of all, you

8  understand that as charged Steven is facing a mandatory

9  minimum of 15 years in prison?

10  A    I didn't know that until I came into the courtroom today.

11  Q    Okay.  So what if the choice for Steven was to take a

12  plea, which there would be -- the Government would be agreeing

13  to acceptance of responsibility, so the guideline range would

14  be a little bit lower.  It may be still higher than the

15  15-year mandatory minimum, but that -- but we make a motion to

16  have the district court judge question the Government's

17  refusal to modify their plea position in light of his

18  disabilities, as I think might be required under the Americans

19  with Disabilities Act or Rehabilitation Act, and to make an

20  inquiry of them as to whether or not they've properly

21  performed their function as a governmental agency, which is

22  bound by those statutes.  And then the -- and the judge denies

23  that.

24       So, well, what about how do we preserve his right to

25  appeal that?  The Government's not going to agree to let us

1    appeal to it.  So the only way to appeal that is if he goes to

2    trial, and if he goes to trial, he might lose the three points

3    of acceptance of responsibility.  So his guidelines would be

4    higher, creating a risk that the judge may go above the

5    15-year mandatory minimum in imposing sentence.

6         Is Steven in any way capable of autonomously deciding

7    with all the advice that we're able to give him what to do in

8    that situation?

9    A    Let me say this:  You've confused me.  I think I'm

10   competent to stand trial.  The realities are there are just

11   some legal machinations that are beyond the understanding of

12   any defendant, and that's in part the responsibility of

13   defense attorneys to manage that and communicate it.  Okay?  I

14   agree that your client is at a disadvantage compared to other

15   defendants without his affliction, but to -- to suggest that

16   you would expect him to understand, if I -- if I'm remembering

17   and understanding correctly, how his case might be compromised

18   and he might seek relief by way of the ADA as it might -- as

19   it might play in with competence issues -- I spend a lot of

20   time writing and reading in the competence arena.  I myself

21   haven't seen a lot of that discussion or argument, and I'm

22   having trouble comprehending.  I think to suggest that your

23   client might not be able to do that really doesn't get to the

24   issue of competence.

25   Q    Well, but for any defendant this is -- this is going to

*Testimony of Randy Otto, PhD*                                      **119**

1   be complicated, but at least they're asking the questions:

2   Well, what weight do I assign to this?  What's the probability

3   that -- what circuit are we in in terms of deciding by the

4   appeals courts?  What's their attitude?  At least they'd be

5   able to -- in terms of mentally calculating risk, advantages,

6   benefits, and have these as separate ideas in their mind to

7   make a decision because it affects the long-term future, is

8   there anything that Steven showed you in your interview

9   showing that he has the capability of thinking in that way,

10  about weighing all sorts of options to make a choice that's

11  going to -- because it's going to have an effect on him

12  somewhere in the future?

13  A    I would say I didn't test that.

14            MR. MAHONEY:  All right.  That's all I have.

15            THE COURT:  Thank you.

16            Ms. Chang, do you have any questions you'd like to

17  ask on redirect?

18            MS. CHANG:  I do.  They're not lengthy.

19            THE COURT:  That's fine if you -- do you think you

20  can do it in 15 minutes?

21            MS. CHANG:  Yeah.  For sure.

22            THE COURT:  Okay.  Good.  Why don't you go ahead.

23            Is that okay with you, Dr. Otto?  Another 15?

24            THE WITNESS:  Oh, sure.  Yes.

25            THE COURT:  Great.

*Testimony of Randy Otto, PhD*                                    **120**

1          THE WITNESS:  I could even go longer, if need be.

2          MS. CHANG:  I won't go longer.

3                    REDIRECT EXAMINATION

4     BY MS. CHANG:

5     Q    There was -- I want to clean up something.  On direct you

6     had said that the defendant was reticent to talk to you about

7     the offense conduct and that he did a lot to avoid answering

8     the police.

9     A    Yes.

10    Q    Right?  So I just want to clarify.  That's your

11    testimony; right?

12    A    That's my testimony.  He --

13    Q    So --

14    A    He was very reluctant to talk about what he did with me

15    and the police or what he's accused of doing.

16    Q    But then you got a lot of questions on cross about he did

17    a lot to avoid answering.  That was with respect to the police

18    and not you; right?

19          MR. MAHONEY:  She's leading him -- she's leading him

20    now, Judge.  I object.

21          THE COURT:  It is redirect, and it's relating to

22    questions here, and this is a competency hearing.  I'll be

23    making the determination, so I'll let this question go

24    forward.

25          Go ahead, Ms. Chang.

*Testimony of Randy Otto, PhD*                                   *121*

1    BY MS. CHANG:

2    Q    You got a lot of questions on cross about how the --

3    about your testimony on direct that the defendant did a lot to

4    avoid answering questions, and then you were playing some

5    clips and asked questions; is that right?

6    A    That's my memory.

7    Q    Okay.  And -- but I want to clarify for the record:  Is

8    it -- was it your testimony on direct that the defendant did a

9    lot to avoid answering questions to the police?

10   A    Yes.

11   Q    Okay.  You talked about these deficiencies that the

12   defendant has with understanding people's tone, so, like, the

13   sarcasm and understanding nonverbal language; right?

14   A    I -- I -- I'm describing that as maybe characteristic of

15   autism, people with autism generally, yeah.

16   Q    Do you --

17   A    Some of the difficulties he might experience.

18   Q    Okay.  Are those issues that -- that a capable defense

19   attorney should be able to overcome in working with a client?

20   A    Yes.  At least if he or she has an understanding of the

21   condition.  I think it could be challenging for your naive

22   defense attorney to manage that.  But, you know, some attorney

23   who has more experience with people experiencing -- you know,

24   who have the condition that Mr. Marks has would do a much

25   better job.

*Testimony of Randy Otto, PhD*                                    **122**

1   Q    On cross you were asked about a lot of things.  I'm not

2   going to name them all, but one of the things was processing

3   issues and language impairment, things of that nature.  Given

4   all of the things that you were asked about on cross, do you

5   have any change to your opinion as to the defendant's -- as to

6   your recommendation as to what the Court should find as to the

7   defendant's competency?

8   A    No.

9   Q    It was raised to you that, in your interview with the

10  defendant, he had trouble articulating long-term goals.  Do

11  you -- do you remember that?

12  A    I remember that.

13  Q    Okay.  And -- and you followed up on those questions, but

14  then you were asked, you know, do you have concerns that he

15  can't think about the future.

16       Do you recall how old the defendant is?

17  A    Twenty.

18  Q    Okay.  Do you attribute his inability or -- or supposed

19  inability to foresee or picture consequences in the future to

20  only his autism diagnosis?  Or are there, like, other

21  20-year-olds perhaps who struggle with the same thing simply

22  because of age?

23  A    I'll say this: that, yeah, I think the older we get, the

24  more likely we are to be future-focused, and, certainly, there

25  are some older adolescents who appear more like younger

1    adolescents in terms of their future focus.  So there might be

2    some of that going on, but that doesn't minimize the role that

3    his autism plays in that thinking.  I wouldn't want that to

4    minimize the role that his autism plays in that thinking or

5    perspective.

6    Q    You -- we heard a clip about the defendant and his

7    struggles with driving, and then you were asked, "Well, don't

8    you think that testifying in court at one's own trial would be

9    more challenging than driving?"  And you said no, but can you

10   expand on that because I wasn't really clear on what your

11   reasoning was.

12   A    Well, because I think I described driving as juggling a

13   lot of balls in terms of operating the car -- right? -- being

14   alert to your surroundings and making sure you're following

15   the rules and don't do anything wrong, get in an accident, run

16   a red light, run a stop sign, or something like that.  I

17   really see testifying as listening to the question and

18   answering honestly.

19        I guess I disagree with defense counsel that it's not

20   anticipating what the next question is so you can craft your

21   answer.  I describe that as witness shenanigans.  That may be

22   more common among expert witnesses, by the way, who have some

23   more experience, but I really think it's listening to the

24   question and providing the answer to the best of your ability.

25        Now, I don't mean to suggest that -- and that's easy.

*Testimony of Randy Otto, PhD*                                          **124**

1   Yes, you have to understand the question, the context.  Maybe

2   the tone of the examiner.  Sure.  But it's a more focused,

3   simple task, in my opinion, than driving.

4   Q    And in your four-hour interview with the defendant, did

5   he demonstrate ability to listen to questions and provide

6   relevant and informative answers?

7   A    Yes.

8   Q    And how does your experience in those four hours

9   contribute to your conclusion that he would be able to testify

10  competently?

11  A    I think he'd be able to -- with good questions, he could

12  answer them.  I think he could vol- -- particularly if

13  reinforced or reminded to do so, he could communicate when he

14  didn't understand questions, and I think any attorney who had

15  concerns about the other attorney asking potentially leading

16  or misleading questions that presumably as a nonlawyer -- that

17  could presumably be addressed by cross-examination or redirect

18  examination or something.

19  Q    You were asked on direct about -- a lot of questions

20  about -- that I think assumed the defendant's lack of

21  social -- what keeps on being referred to as "social

22  competence," and one of the phrases that I recall is that he's

23  unable to divine whether someone is a friend or a foe.  Do you

24  recall that?

25  A    I think it was in -- I think it was maybe in the

*Testimony of Randy Otto, PhD*                                      **125**

1   abstract, talking about -- I think I -- my memory is defense
2   counsel said something like it's important to be able to make
3   a judgment about whether someone's -- has -- you know, a
4   friend or a foe, but it was in the hypothetical or in the
5   abstract, not with respect to the defendant.
6   Q    Now, you listened to the police interview; right?
7   A    Yes.
8   Q    And you just reminded us all that it was your testimony
9   on direct that the defendant, in your view, did a lot to avoid
10  answering questions to the police about what exactly he did;
11  right?
12  A    Yes.
13  Q    Okay.  Wouldn't that demonstrate his ability to divine
14  that the police who were interviewing him were foes rather
15  than friends?
16  A    Well, it could be that, but it also could be the
17  discomfort and embarrassment or some combination of the two.
18  Q    When you do your competence evaluation, are you -- are
19  you evaluating a defendant with an eye towards "Okay.  If I'm
20  going to -- if I'm going to recommend this person is found
21  competent, it's because I'm going to send him out to represent
22  himself pro se"?
23  A    No.  That's a different evaluation.
24  Q    Okay.  So that's not the evaluation you did here; right?
25  A    Correct.

*Testimony of Randy Otto, PhD*                                    **126**

1  Q    So would the evaluation you did here, you -- your

2  conclusion assumes that he has able counsel who are working

3  with him; correct?

4  A    Motivated and competent counsel.

5  Q    And do -- based on -- did you base your conclusion in

6  part on the -- either the finding or the assumption -- you can

7  tell me which -- that he does have able and willing and

8  motivated counsel?

9  A    My opinion about defense counsel?

10 Q    Well, what was part -- what was baked into your

11 conclusion?  What did you assume?

12 A    Oh, I think as an examiner I should just assume by

13 default motivated and competent counsel.  I will say I saw

14 evidence of motivated and competent counsel, but I would

15 assume that.  Who am I, you know, to -- to raise questions

16 about what defense attorneys do?  I'm not an attorney.

17 Q    I guess the point I'm trying to make is that, in

18 recommending that the Court find the defendant competent, you

19 are assuming that -- well, in concluding that the Court should

20 find the defendant competent, you -- you aren't evaluating his

21 ability to navigate the whole legal procedure on his own;

22 right?

23 A    Of course not.

24 Q    Okay.  And so -- so he doesn't -- in evaluating

25 competence, you're not deciding -- you're not determining, oh,

*Testimony of Randy Otto, PhD*                                    **127**

1  given this individual and who he is -- you're really looking

2  at whether with the assistance of counsel he can participate;

3  right?

4  A    Of course.  That's actually part of the federal standard.

5  Q    And do you believe that he can participate with his

6  counsel?

7  A    Yes.

8         MS. CHANG:  May I have a moment, Your Honor?

9         THE COURT:  Yes.

10         MS. CHANG:  I have nothing further, Your Honor.

11         THE COURT:  Thank you.

12         Mr. Mahoney, do you have any questions?

13         MR. MAHONEY:  Just three additional questions,

14  Judge.

15         THE COURT:  Okay.  You get three questions.  Sure.

16                    RECROSS-EXAMINATION

17  BY MR. MAHONEY:

18  Q    First of all, the question about driving being easier

19  than testifying or harder than testifying, those of us who are

20  typically developed, we handle social situations a lot

21  differently than those who have a severe social learning

22  deficit like Steven.

23  A    I agree.

24  Q    And we don't even pay attention to the myriad social cues

25  that come to us in our daily life.

*Testimony of Randy Otto, PhD*                                    **128**

1   A    Yeah.  For example, driving is a good example.

2   Q    It becomes intuitive.

3   A    Yeah.

4   Q    And, otherwise, people have to practice at it, but it's

5   intuitive just because we've done it so many times.  Somebody

6   who's been socially isolated, as Steven would be, many people

7   who are socially isolated because they've been rejected,

8   bullied by society, and they are much better -- happier being

9   by themselves, as he told you; correct?

10  A    Yeah.  He doesn't have a strong need for -- for a lot of

11  peer contact or friendships, yeah.

12  Q    No matter what you say about just answering questions,

13  he's going to be feeling different things on the witness stand

14  than you or I?

15  A    Well, I would agree insofar as he would be feeling things

16  maybe more than me -- I'll speak for myself.  He'll be more

17  anxious than me.  He'll find it more challenging in terms of

18  trying to understand the question than me.  Right.  Testifying

19  will be much more difficult for him than a defendant without

20  autism spectrum disorder.  Yes, I agree with that.

21  Q    Understanding the police are your foes, as put by the

22  prosecutor, it's not something that depends on social skills,

23  does it?  Police are iconic, and they have a role in society.

24  A    Well, this is the challenge; right?  We're -- we're --

25  many of us are educated for the longest time that the police

1    are our friends.

2    Q    When they -- yeah.  Okay.  All right.  I'll drop that.

3         Is it enough to find somebody competent if they have able

4    counsel and they are resigned to do whatever the lawyer tells

5    them, or does the defendant not have to be able -- and I'll

6    use the word "autonomously" -- to weigh his choices and make

7    his own decision?

8    A    I think the defendant has to be able to make a decision

9    himself or herself.  That's my opinion on the legal competence

10   requirement.

11        MR. MAHONEY:  All right.  That's all I have.

12        THE COURT:  Okay.  We're going to take a short lunch

13   break.  Let me ask the attorneys:  How much time do you think

14   you would like for break?  Twenty --

15        MR. MAHONEY:  How close is there something, Judge,

16   to --

17        THE COURT:  Mr. Mahoney, give me one second.  I was

18   speaking to Ms. Chang.

19        MS. CHANG:  I would say about 20 minutes.

20        THE COURT:  How about 30 minutes?  Would that be

21   enough for everybody to just get -- get a quick snack --

22        MS. CHANG:  Yes, Your Honor.

23        THE COURT:  -- give your client, Mr. Mahoney, a

24   chance to stretch his legs?  And I know the people in the back

25   have been sitting very patiently on uncomfortable benches who

1   would probably like to stretch their legs as well.

2          And then let me ask this other question.  I know we

3   have two more witnesses.  Is that correct, Ms. Chang?

4          MS. CHANG:  Yeah.  I'll be done.  I have Agent Hyre,

5   who is able to testify as to the nature of the pornographic

6   images if that becomes an issue, but Dr. Otto is the only

7   expert that the Government was planning to present.

8          THE COURT:  Okay.  So then Dr. Geller and

9   Dr. Danziger was going to be called by you, Mr. Mahoney?

10          MR. MAHONEY:  Yes, Judge.

11          THE COURT:  Mr. Mahoney, I'm going to tell you for

12   the last time, when you're talking to me, if you're not using

13   that laptop, you need to stand up.  Do you understand me, sir?

14          MR. MAHONEY:  Yeah.  I do, Judge.

15          THE COURT:  Ms. Chang is standing up as well.

16          So you have two witnesses that you're going to call?

17          MR. MAHONEY:  Yes.

18          THE COURT:  Okay.  And about how long will you take?

19   I'm just trying to figure out if there's some way I can eat a

20   little bit more time out this afternoon for you.  If not,

21   we're going to have to go into tomorrow morning.  So about how

22   long?  And I promise I will not hold you to it with a

23   stopwatch.

24          MR. MAHONEY:  No.  We'll be done, Judge.  I think

25   we have till -- what time, you said?

1      THE COURT:  We're going to start back at 2:00.

2      MR. MAHONEY:  Yep.

3      THE COURT:  And right now we're looking at stopping

4  at 4:00.  And I understand tomorrow is Good Friday.  It's also

5  Passover.  So I would like to be respectful of everybody's

6  schedules.

7      MR. MAHONEY:  Right.

8      THE COURT:  But I am available tomorrow morning at

9  9:30 to continue this, if necessary.  I want you to get all of

10 your evidence in that you want and all of your witness

11 testimony.  This is an important issue, so I will not rush you

12 from that perspective.  I'm just trying to get an idea if I'm

13 going to try to talk to the court security officer about

14 staying a few minutes later today to try to get in as much as

15 we can.

16     MR. MAHONEY:  No.  We'll be done, Judge.

17     THE COURT:  You'll be done by 4:00 today?

18     MR. MAHONEY:  Yeah.

19     THE COURT:  Okay.  Ms. Chang?

20     MS. CHANG:  I will add, though, however, that my

21 cross is rather lengthy for both experts.  And like -- I think

22 that the audio evidence is actually really important,

23 Your Honor.  And I'll try to trim down a little bit, but until

24 you tell me to stop, I'm going to ask for the Court's

25 indulgence because I think it's really critical, especially on

1   cross since -- I mean, this is Dr. Otto's own examination.  So

2   using audio on his is a little different than me presenting it

3   with perhaps experts who haven't heard it before or I want to

4   confront aspects of it.  But I'll look for the Court's signal,

5   obviously, on that, but I will try to trim it down a little

6   bit.

7         THE COURT:  And I appreciate that.  I want to make

8   this very clear:  I'm simply doing this more so for the

9   courtesy of the court staff.

10         MS. CHANG:  Of course.

11         THE COURT:  I'm available until we get all the

12   evidence in.  I gave Mr. Mahoney great leeway on all of the

13   audio.  I never once told him not to play it, even though it

14   was Mr. Otto's own testimony.  So I will do the same for you

15   as long as we don't get excessively repetitive.

16         MS. CHANG:  Yes, Your Honor.

17         THE COURT:  Then we'll go ahead -- I'm going to see

18   if I can get us to go a little bit past 4:00 today.  The

19   latest we could possibly go is 4:30, and then we'll just start

20   back up at 9:30 tomorrow morning.

21         Okay.  Yes, Dr. Otto?

22         THE WITNESS:  I'm sorry.  I don't know who I ask

23   this question to, but I came with the understanding that I

24   would could come and testify and leave, and then maybe I heard

25   something about me being -- there being a request for me to

1  remain.  I don't -- I don't -- so I'm looking for some

2  direction.

3         THE COURT:  I don't know anything about that,

4  Dr. Otto.

5         Ms. Chang, is the witness going to be released?

6         MS. CHANG:  I plan on releasing him.  I received an

7  e-mail yesterday from the defense suggesting that perhaps he

8  should stay for theirs.  I take no position on that.  I

9  release him.  But I said that they could articulate that to

10  the Court if that's what they wanted.

11         THE COURT:  Mr. Mahoney, do you want Dr. Otto to

12  remain for the duration of this hearing?

13         MR. MAHONEY:  No, Judge.  No.  And that wasn't our

14  intent.

15         THE COURT:  Okay.  Well, then, Dr. Otto, thank you

16  very much for your time today.  You are excused.

17         And we'll be in recess until 2:05.

18     (Recess at 1:33 p.m. until 2:13 p.m.)

19         THE COURT:  Mr. Mahoney, would you like to call your

20  first witness, please?

21         MR. MAHONEY:  Yes, sir.  Judge, I may need to -- I'm

22  just silencing my phone here, Judge.  I may need to display

23  some video, and I'd -- when we broke, I didn't have a chance

24  to ask if we could set up a VGA cable between me and the

25  docking station here.  We won't get to it right away but --

*134*

1     THE COURT:  Can you tell me what the video is,

2 because here's my concern:  You should have come in before

3 9:30 to get all this set up, and you didn't, and then you came

4 in late, and we're already way behind schedule.  So unless

5 it's something that's absolutely critical that I can observe

6 myself after this and you can submit it into evidence, I'm not

7 inclined to delay this proceeding any more to get cable set

8 up.

9     MR. MAHONEY:  I don't know how much delay it would

10 take, Judge.  The point of it is it would actually save some

11 time --

12     THE COURT:  Okay.

13     MR. MAHONEY:  -- something that -- which Dr. Geller

14 would otherwise have to describe.  So I do think it's

15 something that might save a few -- more than a few minutes.

16     THE COURT:  Mr. Jackson, do we have a cable easily

17 available?  Okay.

18     MR. MAHONEY:  Okay.  Dr. Geller.

19          LYNDA GELLER, PhD,

20 was called as a witness on behalf of Defendant and, having

21 been duly sworn, testified as follows:

22     THE WITNESS:  I do.

23     THE COURTROOM DEPUTY:  Please be seated, and state

24 your name for the record.

25     THE WITNESS:  Lynda Geller.

1                           DIRECT EXAMINATION

2     BY MR. MAHONEY:

3     Q     Doctor, could you tell -- tell the judge a bit about your

4     educational background.

5     A     Yes.  I have a bachelor's and a PhD in psychology, and I

6     have worked in the field of developmental disabilities for

7     over 45 years and autism in particular for about 37 years.

8     The majority of my career was as a professor at university

9     medical schools, during which time I trained psychologists and

10    social workers, psychiatrists and pediatricians, and social

11    workers and other professionals about developmental

12    disabilities in autism.  And I developed clinics at Georgetown

13    and Stony Brook University and NYU to particularly deal with

14    the difficulties people have who are on the autism spectrum.

15    Q     And are you licensed as a -- can you -- can you tell the

16    judge about your private practice for -- apart from the

17    medical school work.

18    A     After -- after I left medical schools, I did sub out ten

19    years ago in pursuit of a private practice because there were

20    so few resources available even in New York City, which is

21    where I was at the time.  Even in New York City, so few

22    resources were available for adults and so little

23    understanding of adults with autism spectrum disorders, and

24    there are very particular types of difficulties in how you

25    treat them and how you diagnose them.

*Testimony of Lynda Geller, PhD*                                    **136**

1    So I started a group, which continues now, which has
2    people from multiple disciplines, all who have expertise in
3    autism and who look at someone with autism from various
4    perspectives, from psychology to psychiatry to speech and
5    language to coaching to social work to -- to legal issues.  So
6    there's a group of us who deal with very particular problems
7    that adults have.
8         And many times people say they know all about autism, but
9    what they know about is children with autism, and
10   understanding adults with autism is a much more complex issue,
11   especially if they have not received a diagnosis in their
12   childhood, which is extremely common for people who are on the
13   higher end of the autism spectrum.
14   Q    Right.
15   A    Oh, I'm sorry.  I'm licensed in New York.  I've been
16   licensed in Maryland and D.C. as well.
17   Q    I want to ask you about autism.  Let's start out with
18   what autism is not.
19   A    All right.  Autism is not a mental illness.  It's a
20   developmental disorder, and other -- another developmental
21   disorder is mental retardation.  So we understand that mental
22   retardation is something that affects someone from birth and
23   that they are -- they continue to be affected their entire
24   life.
25        Well, the same is true with autism.  People are affected

1  from birth, and they're affected throughout their entire

2  lives.  Depending on many variables, they may be affected to a

3  greater or lesser extent over the course of their life.  So

4  what autism isn't is something that can come or go.  It's not

5  like depression or anxiety or things that are considered to be

6  mental illnesses.  It's a completely separate kind of

7  disorder, and it's based on neurobiological deficits and

8  differences that we believe are primarily genetically caused;

9  and so although you can provide treatment and help someone's

10 life go in a more successful way, you can never completely

11 ameliorate the factors that affect people's lives forever.

12 Q    Are -- are there some features of autism or traits that

13 can be confused with personality disorders?

14 A    Well --

15 Q    Is autism a personality disorder?

16 A    Autism is not a personality disorder.  In fact, people

17 with autism can sometimes have personality disorders.

18      Personality disorders are really -- they're sort of

19 between a mental illness and a developmental disorder because

20 a personality disorder are aspects of personality that we

21 develop over our lifetime, and it becomes a disorder if it

22 affects our life in such a way as to make it unsuccessful.  So

23 that's a personality disorder.  And in -- sometimes that can

24 be very extreme, like antisocial personality disorder.  You

25 know, that's not -- you know, that's something that people

1   have that, you know, kind of makes them do things that are

2   against the law or against our morals or against -- that's a

3   personality disorder, and it's not -- it's very difficult to

4   treat because there's no pill for it, and therapy for it is

5   difficult.

6        But it's different than a developmental disorder, which

7   is something that is neurobiologically caused, that there are

8   deficits you learn how -- you learn your life with those

9   deficits, and your life is different than people who do not

10  have those deficits.  So a personality disorder is a kind of

11  way of being that can be normal, but then, when it veers out

12  beyond normalcy -- beyond normalcy, we call it a "personality

13  disorder," but that's not what autism is.  Autism is a

14  neurobiological disorder.

15  Q    On the neurological end of it, has there been research in

16  the past 19, 20 years that helps explain the neurological

17  basis for autism?

18  A    Well, there's a lot of both genetic and brain research

19  that's happened in those last two decades that help us

20  understand autism a lot better than we used to.  I mean, when

21  I started college, they were still teaching that autism was

22  your mother's fault, how she raised you.  So there's been a

23  huge explosion of knowledge within my career time.

24       In the last 20 years, our understanding of genetics and

25  the genetic components of autism has increased but is not --

1    is still not full.  However, we do know for sure very many of

2    the deficits that people with autism displayed -- display have

3    a neurobiological basis that you can see if you're looking for

4    it at young ages and that how you then turn out is based on

5    what those deficits were, the experiences you had, which can

6    be very different than a typical child because often these

7    children are not accepted by their peer group and don't have

8    the experiences that typical children have.  So they have the

9    neurobiological difficulty, the experience deficits that they

10   have just because they're different and other people don't

11   like them often, and then, if they're not recognized and

12   receive no treatment, it's sort of a third whammy on them.  I

13   mean, it's -- they have neurobiological problems, they have

14   experience lacks, and then they also often were not treated

15   properly if they, in fact, were not diagnosed, which is very

16   common in adults that we're now diagnosing with autism

17   spectrum disorder.  It's very common that they weren't

18   discovered in their childhood if their cognitive skills were

19   in the normal range.

20   Q    Okay.  So -- and, of course, that's Steven's situation as

21   well.

22   A    Yes.

23   Q    He wasn't diagnosed early on.

24   A    He wasn't.

25   Q    All right.  And it's common for people and it's been

*Testimony of Lynda Geller, PhD*                              **140**

1   observed here that Steven has difficulty making productive eye

2   contact.

3   A    That's -- well, that's one of -- that's one of the early

4   things that we watch for in small children is are they making

5   eye contact and are they doing visual referencing, which is,

6   Judge, if I were to look at you and talk about that woman over

7   there, I'd look at her, and then you might look at her too,

8   and then we're jointly looking at her together.  That's

9   something that cute little kids with autism don't do at all,

10  don't have any idea how to do; and, therefore, they lose all

11  the social knowledge that everybody else is getting starting

12  at one and two and three years of age.

13  Q    All right.  So I'd like to -- are you familiar with some

14  studies done using eye tracking technology to see what

15  autistic people actually look at?

16  A    Yeah.  So --

17       MR. MAHONEY:  I could -- at this point I can display

18  it and then have Dr. Geller talk about it.

19       THE COURT:  Okay.  That's fine.

20       MS. CHANG:  Your Honor, if I may ask, is this going

21  to be an exhibit?  I've not --

22       MR. MAHONEY:  I'm sorry.  Yes, Judge.  I haven't got

23  it with me now, but I'll put everything I have here and put it

24  on a CD and provide it to the Court.

25       THE COURT:  Mr. Mahoney, I have an issue with that

*Testimony of Lynda Geller, PhD*                                    *141*

1    because you were supposed to bring all of your exhibits with

2    you to this hearing.  I'm not inclined to let you bring

3    something in that's not ready to be admitted as an exhibit

4    right now.  So what's the problem?

5             MR. MAHONEY:  The problem is I didn't have a chance

6    to burn a CD of it, Judge.

7             THE COURT:  So you just have it on your laptop?

8             MR. MAHONEY:  Yeah.

9             THE COURT:  I have some serious concerns about that.

10   I think maybe the better way to do it is let you file

11   something supplemental because, otherwise, I don't have an

12   exhibit, and you're just showing something.

13            I mean, Ms. Chang, what do you have to say about

14   this?

15            MS. CHANG:  Well, I just didn't know what it was

16   because I have not received it in advance.  I mean, I did

17   receive, obviously, the exhibits that the defense filed with

18   the Court.  They sent me a courtesy copy.  But I don't recall

19   a video being among them.

20            MR. MAHONEY:  These are -- it's not actually a

21   video.  Well, part is a video.  These are things, actually,

22   the Government has seen before.  It was part of our

23   presentation to them earlier.

24            THE COURT:  Okay.  Why don't we try it this way

25   because I want to make sure that your client gets all the

1    information in.  Can you give me a description in detail as to

2    what it is, and then I'll ask Ms. Chang what her position is

3    on this.

4         MR. MAHONEY:  Sure.  In detail, these are some

5    slides that reflect the contents -- the results of research

6    done at the Yale Child Study Center, 2000, and then later some

7    other research from 2002.  The first was eye tracking studies,

8    watching what autistic people look at in naturalistic kind of

9    scenes, and the other was some studies to show the relative

10   lack of ability of people with autism to see the mental

11   aspects of the world around them.

12        THE COURT:  Okay.  Ms. Chang, do you have any issues

13   with Mr. Mahoney showing them in this court?

14        And, Mr. Mahoney, let me say, unless you submit it

15   as an exhibit later -- and I'm going to ask Ms. Chang if she's

16   okay with that as well -- other than it being shown in here,

17   it's just going to be part of testimony, and I'm not going to

18   look at it later on.

19        So, Ms. Chang, do you have a problem with him

20   showing those slides?

21        MS. CHANG:  No, Your Honor, now that I know what it

22   is.  Thank you.

23        THE COURT:  Okay.  Mr. Mahoney, then I'm going to

24   let you show them, but let me also say this:  I'm going to

25   give you -- because I do want to turn around an order in this

1    case fairly soon, so do you think you can get a CD submitted

2    to the Court -- today's Thursday -- by next Tuesday?

3            MR. MAHONEY:  I think so, Judge.  That would be

4    overnight.  I might even be able to have Mr. Foster burn it

5    locally.

6            THE COURT:  Okay.  Ms. Chang, will you have any

7    issues with that?  Because I know by you not having the CD

8    it's kind of impairing your ability to object to it as an

9    exhibit if you were going to.

10           MS. CHANG:  No.  I'm okay now, Judge, because, as

11   defense counsel said, we have seen it before.  Now that he's

12   described it, I know exactly what he's talking about.

13           THE COURT:  Okay.  Then that's what we'll do, and

14   we'll just make sure you get it in before close of business on

15   Tuesday at the latest, and I believe that's the 23rd of April.

16           So -- okay.  You can go ahead and play it.

17           MR. MAHONEY:  Yeah.  Okay.  Okay.  We're ready to

18   go, Judge.

19           THE COURTROOM DEPUTY:  It's up to you.

20           MR. MAHONEY:  Is it not --

21           THE COURTROOM DEPUTY:  Do you see anything on the

22   screen -- on the screen in front of you?

23           MR. MAHONEY:  No.

24           THE COURTROOM DEPUTY:  Okay.  Then it's not working.

25       (Court at ease.)

1    THE COURT:  Why don't we do this -- well, what I was

2  going to say is I'm happy to take a five-minute recess to try

3  to get this up and running because I'm going on your

4  representation that this will speed the process along.  So I

5  don't want to lose that benefit.

6    So, Mr. Jackson, do you think five minutes would be

7  okay to try to get this straightened out?

8    THE COURTROOM DEPUTY:  Yes.

9    THE COURT:  All right.  So let's take a five-minute

10  recess, and I'll be back on.

11    (Recess at 2:31 p.m. until 2:31 p.m.)

12    THE COURT:  All right.  We'll go ahead and get

13  started.  Maybe I just needed to get up off the chair.

14  You-all can be seated.

15    All right.  Mr. Mahoney, why don't you go ahead.

16    MR. MAHONEY:  Thank you, Judge.

17    As I said, Judge, this is research that was done at

18  Yale in 2000, and what you'll see is a still clip that was

19  shown to an audience that had autistic people and people who

20  are not autistic.

21  BY MR. MAHONEY:

22  Q    Dr. Geller, the -- this slide shows the scene that began

23  with -- and with George Segal making a pointing gesture.  What

24  were the -- the next slide shows the results -- part of the

25  results.  What is this telling us?

*Testimony of Lynda Geller, PhD*                                    **145**

1  A    So what this is -- what this is illustrating is that --

2  the green lines are people with autism, and the yellow lines

3  are people with typically developing viewing.  Just like I

4  mentioned to you, Judge, before like how you might look at me

5  and then we might look at her together, that's sort of visual

6  referencing.

7       So somebody with autism, which is the green, just kind of

8  looks around.  He doesn't look at the eyes of the people who

9  are talking, and he just kind of looks around, whereas the

10  person who's typically developing looks at the eyes of each

11  speaker because that's where we get our meaning.  Looks at the

12  eyes of the speaker and then what they're visually

13  referencing.  So people with autism are looking at very

14  different things.  They're not looking at eyes, and they're

15  not -- and they don't get the meaning of our -- most of our

16  facial expression comes through eyes, and they don't get that

17  meaning.  And this is a neurological --

18  Q    Let me stop you.  Let me stop you.  We'll go to the next

19  slide.

20  A    Sorry.  I won't talk too much.

21  Q    So there are a couple more slides that illustrate these

22  results, which I'll -- separating them.

23       And then this scene, similar thing, but a different kind

24  of scene.

25  A    Are you playing it or --

*Testimony of Lynda Geller, PhD*                                    **146**

1   Q    No.  There's nothing to play.  So --

2   A    So the green again is a person with autism, and the

3   yellow is a person typically developing.  So you or I might do

4   this.  You might look at these two people who are talking and

5   then look and see what his response was to these two flirting,

6   whereas the person with autism looks at this guy's mouth, kind

7   of looks around at his shoulder a little bit, and then looks

8   down at her chest.  There's no meaning to be found there.

9        So they don't understand where to search for social

10  meaning from infancy.  They never learn, and so all the things

11  that we just take for granted and that are so easy for us to

12  know and that we know automatically -- and that's why people

13  can't quite believe how impaired someone is that can't get

14  that information -- is illustrated by this -- this particular

15  study.

16  Q    Okay.  And there's, again, two more slides that

17  illustrate the difference in where the person is looking,

18  Dr. Geller?

19  A    Right.  So, again, the yellow is regular -- is typical,

20  and so they're looking at eyes because that's where you look

21  for your meaning, and people with autism are just kind of --

22  kind of looking around and focusing on things other than the

23  eyes, which is just the very earliest thing that little

24  children learn, and then everything builds on that.  So if you

25  have no underlying building blocks of understanding social

1   input, then all of it is just this sort of mysterious

2   gobbledygook, and you don't understand things that we

3   understand so incredibly easily.  It's just part of the social

4   being.

5   Q    There was further -- lots of other people did research

6   using eye tracking studies afterward; is that right?

7   A    Yes.  We've been -- yes, we've been looking at eye

8   tracking studies for a long time, and part of -- part of the

9   other thing that we've been looking at are mirror neurons,

10   which is the ability of children to -- there are mirror

11   neurons in the brain, and those neurons have something to do

12   with how we copy behavior.  So on top of not being able to pay

13   attention to the social aspects of behavior, we often -- kids

14   with autism often can't copy the social things people are

15   doing and don't understand how to learn those things either.

16        So these are all neurobiological things.  They're not

17   because they don't want to or not because they're bad people.

18   It's because they have a neurological deficit that doesn't

19   allow them to learn.

20   Q    Now, you mentioned earlier about infants.  So was there a

21   study done as to whether this same feature was present with

22   infants?

23   A    It's present within the first few days of life that

24   children without -- children without autism automatically look

25   at the -- look at a facial form, and children with autism

1    don't particularly gravitate to that.  So while we are looking

2    to our mothers for food and sustenance when we're just born

3    because we're automatically programmed to do that, they are

4    already not making that social connection.

5              MR. MAHONEY:  Okay.  So this is a picture,

6    Your Honor, of Dr. Klin.  I misspelled that.  I'm sorry.  He's

7    one of four of the researchers in the prior study.  This is a

8    short TED Talk that he did that helps explain this process in

9    infants.

10       (Publishing.)

11   BY MR. MAHONEY:

12   Q    So, Doctor, one last question here.  This gaze pattern

13   that we saw on this research -- is that something that is --

14   is the person deciding to do this?  Is it deliberate?

15   A    No.  He's made quite the point that it's completely

16   neurological, neurobiologically based.  It's not a choice.  It

17   is something that is sort of programmed into us and why we are

18   the social beings that we are.

19   Q    And is the brain actually different?

20   A    Well, yeah, the brain is actually different.  It's more

21   disorganized and less focused, and I'm sure there's things in

22   the visual cortex that are somewhat different because of this,

23   but it's a different brain than somebody who is typical.  So

24   it's not -- again, not a choice of how you want to be.  It's

25   not personality.  It's not a mental illness.  It's something

1   that's in the brain that is always there and that your

2   development is going like this with -- against typical people,

3   and then it goes like this and like this and like this, and

4   the older you get and the fewer experiences that you have that

5   we are all having, the more divergent you get from typical

6   people.

7   Q    All right.  Now, did Dr. Klin do some additional research

8   showing one of the effects of this on autistic people?

9   A    So this is -- this is a figural representation of a

10  little story, and the point of it is -- are you showing it?

11  Q    Yes.

12  A    The point of it is how you would see it or I would see it

13  and how someone with autism sees it.

14  Q    And so what the total people see what comes to mind in

15  watching this.  Let me go to the next one.  Sorry.  It just

16  takes a minute, if I can get it going.

17  A    This is called a "social attribution task" because,

18  obviously, there's no people in here, but we're going to

19  attribute social meaning to it.

20          MR. MAHONEY:  Here we go.  It's not -- for some

21  reason it's not working on mine either, Judge.  I don't

22  understand this.

23          THE COURT:  Do you think Dr. Geller could explain

24  it?

25          THE WITNESS:  It's more dramatic if you see it, but

*Testimony of Lynda Geller, PhD*                                    **150**

1  I can explain it.

2  BY MR. MAHONEY:

3  Q    Yeah.  Go ahead and explain it, and I'll show the

4  following slide.

5          THE COURT:  And, like I said, I'm almost positive

6  we're going to go back into tomorrow morning, Mr. Mahoney.  So

7  if you get it fixed, you can always show it in the morning as

8  well.

9          Why don't you go ahead, Dr. Geller.

10         THE WITNESS:  So this is a little story that happens

11  where a triangle and some other little figures are kind of

12  running around, and they appear to interact, at least to me,

13  probably to you.  And the question is, well, what does that

14  interaction mean?  And you or I, or the typical people, can

15  say, "Oh, look at that.  That's a -- that's somebody on his

16  own, and now he's being bullied, and now he's deciding to --

17  you know, to join this one or that one."

18         And when someone with autism sees it, what they --

19  the kinds of things they often say are "There's a triangle in

20  a box and then another -- a circle that goes around and around

21  and around," and they don't make social attribution.

22  BY MR. MAHONEY:

23  Q    Okay.  So I'll show the results.  It's a -- 1 minute,

24  52 seconds, and there are two other characters that came to a

25  small circle and small triangle.  And this is a typically

1   developed boy?

2   A    Right.  This person makes a social attribution to the

3   meaning of a nonsocial visualization.

4   Q    And then the next slide is the response of a typical

5   young boy with autism.  So, Dr. Geller, we see that --

6   A    Notice the IQ of that person: 115.  So it's not a very --

7   it's not a cognitively very delayed person.  It's a -- an

8   autistic very affected person, which is different.  So that's

9   an extremely important point.  I mean, we all know autistic

10  people that are very, very well functioning, and that's when

11  we think of people -- that's what most people think of as

12  autism.  But when you meet people who have IQs like this and,

13  you know, look normal in many other ways, it's hard for us to

14  understand just how well functioning they are in these kind of

15  social -- socially important tasks.

16  Q    So what are the -- first of all -- so you did an

17  evaluation of Steven and diagnosed him with autism, and there

18  are a couple things that -- I'd just like you to maybe

19  summarize your findings for Steven.

20  A    So, of course, I looked at things from the earliest times

21  that the parents began looking for some understanding of their

22  child because it isn't as if they were not concerned from the

23  very beginning, and they kept getting -- because of his normal

24  IQ, people kept missing that this was autism because everyone

25  has this sort of idea in their mind that someone with autism

1    is retarded and goes like this all day and that's it; and

2    that's, of course, not at all like people who have normal IQs

3    are like.

4         So what are people with normal IQs like?  And what I'm

5    trying to describe in my rather lengthy report, talking about

6    the things that he is particularly deficient at, which is

7    recognizing social meaning, which -- and as you -- actually,

8    my second report -- my second report goes more into how this

9    happens, which I think is probably a very important thing.

10   How it happens is you -- is that -- Steven was identified with

11   various neurobiological problems very young -- very young in

12   life, and those -- those neurological problems including being

13   able to process information well and a lot of sort of mild

14   motor problems and -- and spatial and memory problems.  So

15   those things were all noticed when he was very, very little.

16        So the question is, if you already have those

17   neurobiological problems, how do you turn out?  And we all go

18   through the same developmental steps, and those are sort of

19   beginning to have a self-voice that -- you know how we all

20   talk to ourselves about something?  "Shall I do this?  Shall I

21   not do that?"  That's kind of missing in people with autism

22   because they don't have that sort of social voice, and that's

23   a problem that he also has, that he doesn't have a way to sort

24   of think about things in self-talk.  That is a social skill to

25   have self-talk, to understand that you're having a

1   conversation with yourself.

2        Now, Steven always had a lot of academic problems because

3   he has a number of learning disabilities as well as autism.

4   Sometimes people with autism have them, and sometimes they

5   don't, but he does.  And then, additionally, if I go to the

6   very -- typical -- all the typical qualifications that would

7   give you this diagnosis is the very poor social skills that he

8   has always had, his inability to really recognize the

9   nonverbals.  He had, for example, a little boy in his

10  neighborhood who would invite him over all the time

11  specifically to tease and bully him, and he never stopped

12  going to his house.  He would just continue to go because he

13  couldn't socially learn, well, this is not somebody who likes

14  me.  So his -- his social attribution is very poor.

15       His social interaction skills are also very limited.

16  That doesn't make him not a nice person, because he always

17  wished to please.  He just didn't understand how because he

18  didn't understand the social cues that he would be getting

19  from people.  So he's always tried to interact with other

20  children all through school, but his -- but what happened back

21  to him was being bullied, being -- being rejected, being

22  occasionally even pushed and shoved out of the way, and he

23  really never had a normal social experience that we all expect

24  to have growing up as children and learning how on the

25  playground to interact, and that's the basis of how we

1    interact as adults.

2         So one of the other important things is what we call

3    "imagination."  In small children with autism, imagination

4    manifests itself in not being able to make-believe play, but

5    in adults lack of imagination is not being able to picture

6    yourself in the future, which means I can say, for example,

7    "If I do this, I know these things will happen.  I will know

8    what my consequences will be."  But you have to be able to

9    picture yourself in the future, which takes imagination.

10   That's a very problematic deficit for people, and I think it

11   also really, really feeds into the idea of competency.  "If I

12   make this decision now, what might happen?  If I say this now,

13   what might happen?"  So that's something that he's always had

14   difficulty with.

15        He has a lot of sensory difficulties.  The main one is

16   how quickly he processes auditory information, and all through

17   his life, well, I'm -- if you're talking to him, he's focusing

18   on what you said early on, and now you've made all this other

19   progress in what you're saying to him.  And he's still paying

20   attention to this means he's not getting all of that.  So a

21   lifetime of that happening to you means that you figure out

22   how to say, "Oh, yeah.  Oh, yes, yes," pretending to

23   understand.  You figure out "I just -- I'm not going to get

24   most things."

25        So one thing that he did because of that problem was

1  simply stand back and not interact and just try to watch and

2  see what happens and imitate people.  Because, if you don't

3  understand kind of what's going on auditorily and it doesn't

4  come into you, then you try to figure out, well, what do I do

5  in life?  I guess I'll just watch people and do what they do,

6  and maybe that won't be wrong, and maybe I won't be rejected

7  if I do that.

8      So he has a lot of sensory differences besides that.  He

9  has -- you know, he has trouble with hearing too many noises,

10  not being able to manage when there's a lot of commotion and

11  people.

12      And one of -- to me, the most important thing -- and I

13  consider autism to be an executive function deficit disorder

14  because it interferes with the development of executive

15  function.  So, in other words, it doesn't necessarily

16  interfere with the -- with him achieving a normal IQ, but it

17  interferes with his ability to utilize that IQ in ways that

18  are typical.  So while he can -- while he has a normal IQ, he

19  can't utilize it normally because he's missing so much, and

20  he's not able to sort of control things in his brain and

21  direct his brain.

22      So we are social animals, and the reason why we have this

23  giant frontal lobe compared to other animals is because this

24  is where our executive functions reside, and this is the very

25  aspect of our brain development for social learning.

1    Okay.  He, of course, has always had this sort of
2  perseverative interest.  That's what he had as a little child
3  when he liked trucks too much and things like that and learned
4  to love facts.  How he might introduce himself to another
5  child would be, say, "Do you -- do you know what a dump truck
6  is?"  And another child would look at him, like, what?  That's
7  strange.  And leave.  So he's very interested in facts and is
8  very interested in sort of specific interests: North Korea.
9  He's had a number of them over time.  But he gets himself in
10  an inflexible thought pattern and has trouble breaking away
11  and doing something different.
12    Okay.  So all of these things, of course, affect not only
13  social development but eventual independence.  The reason that
14  I used the Vineland to look at his skills is because they are
15  so credibly -- the skills are so incredibly different than his
16  IQ, and if you look at this -- this -- Vineland, it's
17  interesting.  First -- first, we get age equivalence.  It's
18  very low.
19         THE WITNESS:  You looked at this already; right?
20         THE COURT:  Mr. Mahoney, do you have a copy of
21  Dr. Geller's report to submit as an exhibit if you would like
22  the Court to look at it?
23         MR. MAHONEY:  It was attached to our memo to the
24  Court prior to --
25         THE WITNESS:  Okay.  I just -- I'm sorry.  I thought

*Testimony of Lynda Geller, PhD*                                    **157**

1    you'd -- I don't know how much to explain.

2          MR. MAHONEY:  So -- I don't know if I should offer

3    those exhibits at this time, Judge.  I could be more

4    particular about it.  I didn't -- it's Exhibit A -- or

5    Exhibit --

6          THE COURT:  I have the memo, and I can pull it up

7    here, but --

8          MR. MAHONEY:  For purposes of the hearing --

9          THE COURT:  -- I'm going to -- I'm going to give you

10   a piece of advice since we're going to start back tomorrow

11   morning:  You need to come in with your witness lists and your

12   exhibit lists and copies of your exhibits.  That was in my

13   order from several weeks ago, and I really need you to have

14   everything with you tomorrow morning.  I'm trying not to -- to

15   be too strict on you, but there's several rules you've already

16   violated today, and I really need you to get everything

17   straightened up so that I can make sure I give the best

18   possible report and recommendation for your client.  So I

19   strongly suggest you have everything ready for me tomorrow

20   morning.

21         MR. MAHONEY:  Okay, Judge.

22         THE COURT:  And I will pull up -- if you'd just give

23   me one minute because I would like to follow along with you,

24   Dr. Geller.  Give me a minute to pull up the e-mail and get to

25   your report.

1          Mr. Mahoney, you said it's Exhibit A to your

2    memorandum; is that correct?  Exhibit A to the memorandum to

3    the United States is what I meant.

4          MR. MAHONEY:  No.  We're talking the exhibit that

5    was attached to our prehearing memorandum, Judge, that we

6    just --

7          THE COURT:  Okay.  Are we talking about the

8    December 2017 report, or are we talking about the supplemental

9    report?

10          MR. MAHONEY:  It's the supplemental report, Judge.

11          THE COURT:  Okay.  Thank you.  All right.  I do have

12    that here.

13          Okay, Dr. Geller.  I'm sorry for the interruption.

14    Go ahead.

15          THE WITNESS:  It's in both of them.  So --

16          THE COURT:  Okay.  What page are you on?

17          THE WITNESS:  This is on page 8.

18          THE COURT:  Page 8.

19          THE WITNESS:  Okay.  So the reason that I like to

20    look at people through these eyes is because it looks at sort

21    of functional aspects of behavior and not just academic.  So,

22    as you know, Steven's a high school graduate.  He had a lot of

23    support and a lot of help, but he did graduate.  So -- but

24    these are the other aspects of life that are so important to

25    somebody with autism.

*Testimony of Lynda Geller, PhD*                                    **159**

1          One is the ability to have interpersonal relations

2     and socialize, to play and cope and get along with people on a

3     social sphere, and the age equivalence, as you see, are very

4     childlike, as are his communication skills and his daily

5     living skills, which is how you just take care of yourself in

6     life.  He's still very childlike.  So he's not -- he's not

7     adult in any way.

8          And if you look at these standard scores down here,

9     these correspond.  These are like IQ scores.  So his IQ is,

10    like, 100-plus, but look how low all of these are.  Like,

11    pretty much half the level.  So very impaired.  That's a very

12    typical result for someone with autism, and that's a very

13    atypical result for other kinds of people with different kinds

14    of disorders.

15          All right.  So -- and what Ami Klin was saying,

16    which I think is so incredibly important to understand, is

17    that we all have, you know, like, a certain -- certain -- a

18    brain that we're born with and -- but that's not our result

19    later an an adult.  We take that brain, and we learn through

20    our experiences and together experience in your native

21    abilities -- come together to form the skills you can do as an

22    adult.

23          For somebody with autism and for -- and for Steven

24    in particular, there's so many deficits to begin with; but

25    then, on top of that, what possible exposure do you get in the

*Testimony of Lynda Geller, PhD*                                              **160**

1   realm of social skills when you are constantly rejected by

2   your peers, when you've never had a friend, when you basically

3   stand back because you can't participate, when you don't

4   recognize somebody wants to interact with you, when you don't

5   understand the social meaning of what's going on around you?

6   So on top of basic deficits that are there, there's also the

7   whole learning curve that they have failed to experience, so

8   they get farther and farther apart.  Boy, by -- by middle

9   school, it's like this.

10          So that's the point of my description of how

11   somebody -- somebody's executive functions, which are our

12   control mechanisms of life, how they develop.  They develop

13   from our basic brain skills, and then through our experiences

14   we learn how to handle ourselves in various aspects.  And

15   problematically for Steven, he's not learned how to handle

16   himself in social aspects.  He's not learned how to take care

17   of himself.

18          I think the -- the whole driving the car thing is

19   one thing.  He could learn the physical act of driving a car,

20   but he's petrified of the world around him and what could

21   happen, and how would he handle anything, and how would he

22   cope, and that's why he's frozen and won't drive.  So there's

23   a lot of his life that's frozen like that that he's afraid to

24   do and doesn't know how to handle, and it really is because of

25   his -- what has happened to his brain over time and how it's

*Testimony of Lynda Geller, PhD*                                      *161*

1   developed versus somebody who has typical experiences and can

2   learn from those typical experiences.

3   BY MR. MAHONEY:

4   Q    Okay.  So let's take that forward into, let's say, to

5   make it a little more concrete.  Let's take, for example, the

6   discussion that -- we played some recordings with Dr. Otto.

7   One was where he was discussing his difficulty with his last

8   class and the project at the DAVE School.  And, you know, I

9   asked Dr. Otto, "Well, why -- why did he have that?  Why

10  couldn't he do that?  And what was the problem there?"  And is

11  it obvious to you what the problem is with him?

12  A    It's obvious to me that, you know, if someone does not

13  know how to interact with others, they cannot do a group

14  project.  This is always a big problem for adults with autism

15  when they go into the work world.  They may learn skills.

16  They may even get degrees.  But they can't function in a world

17  of people that have to cooperate because they don't understand

18  those aspects of cooperation.

19  Q    They may know facts; they may have information.

20  A    He -- he knows lots of facts, but he has trouble putting

21  them together or using them in a way -- in a cooperative way,

22  in a social way.

23  Q    And what is it like for him to -- to look forward to that

24  kind of experience of working in a group like that?

25  A    Well, it's very frightening to him, and, in fact,

1   oftentimes he avoids things that are too frightening for him

2   because he doesn't know how to handle them.  So it's -- it's

3   something that he -- you know, he can learn a lot of the basic

4   skills being -- being taught to him in computers, but then the

5   whole point of the kind of thing he was trying to learn is you

6   do projects with people about advertisements and movies and

7   television and stuff like that, and that's something that he

8   was realizing, that he wouldn't be able to do the ultimate

9   product of that -- of that training.

10  Q    What about the discussion about when Dr. Otto asked him

11  about what his goals were?  And -- and I asked Dr. Otto, "Why

12  couldn't he think about these goals?"  Why can't Steven think

13  beyond the ten-year time period like Dr. Otto anticipated?

14  A    Well, I mean, we have a nickname for that called

15  "temporal myopia."  It means you can't really think about the

16  future very well.  Certainly, his parents will tell me that he

17  really lives in the present, and that -- that was my

18  experiences with him as well is that he has difficulty

19  imagining the future.  So if you can't imagine the future, you

20  can't imagine -- like, what would it be like if you did A, B,

21  or C?  Like, well, I can't put myself in that shoe because I

22  can't -- I can't -- I don't have the imagination to figure out

23  what it would be like, something that hasn't -- that hasn't

24  actually happened yet.

25  Q    Why is it so easy for typically developed people to think

1   about -- I mean, there's a question about, well, he's only

2   20 years old, but even 19- and 20-year-olds have the capacity

3   to think instrumentally toward what I do today might affect me

4   later on.  Maybe it's not retirement planning, but it would be

5   something big.

6   A    No.  But, I mean, you know, even young people have the

7   ability to think about it.  They might not decide it.  They

8   might not have a resolution of what they want to do yet.

9   They're still confused, but they can at least picture

10  themselves doing something.  What would it be like if I was a

11  truck driver or a professor?  You know, would I enjoy being

12  married?  Would I enjoy, you know, working in a foreign

13  country?  I mean, they can imagine those things to help make

14  those choices, and what I'm saying about Steven is he has

15  difficulty imagining things.

16       And I thought that was very obvious in Dr. Otto's

17  interviews of him because it was necessary for the entire

18  interview for Dr. Otto to speak to him as if he were a

19  six-year-old.  Now, I mean, that was -- it really struck me

20  how that interview went, that Dr. Otto had read my report,

21  knew he had autism, and immediately went to a very simple way

22  of talking, which is not how we -- how he experiences the

23  world.  No one speaks to him in such a simple way normally.

24  So he's missing so much.  It's why he did a relatively good

25  job answering factual questions that Dr. Otto posed to him,

1  because they were very simply put.

2  Q    What about this fear of driving?  Does that relate

3  forward to -- I mean, do you agree that his fear of driving

4  would -- is -- is more warranted than his fear of being --

5  thinking -- conceptualizing himself as a witness in his own

6  defense?

7  A    Well, I mean, there -- that's a matter of opinion.

8  Driving has -- there's a lot of aspects of driving and things

9  that can happen to you, but being a witness has a lot of

10  things that can happen to you too, and many of them can also

11  be surprising.

12      What he cannot tolerate and what makes him so scared of

13  driving is fear of unknown or unanticipated things happening

14  to him.  That's why he's afraid of driving.  That is

15  clearly -- I mean, it's happening to me right now.  I don't

16  know what question somebody's going to ask me, so I have to

17  not be afraid of the unknown.  He, on the other hand, avoids

18  driving because of his -- he knows he's unable to cope

19  quickly, he can't process quickly, and he can't -- if he

20  doesn't know what's going to happen exactly, he knows he will

21  have trouble handling it.  And it's true.  He does.

22  Q    He's afraid of the unexpected?

23  A    He's afraid of the unexpected, and that's why people with

24  autism love rules, love to know exactly what's expected of

25  them, because they can't intuit it from the social meaning of

*Testimony of Lynda Geller, PhD*                                    **165**

1    the world, and they can't process it quickly enough to handle

2    it in real time the way the rest of us can.

3    Q    One of the -- because it was one of the things that --

4    I'll -- I'll come back to this.

5         What about this discussion with Dr. Otto regarding

6    Steven's being sort of more or less apoplectic about the

7    prospect of testifying, and how does his autism play into the

8    problem of him thinking about that, which would also have to

9    do with the choice but also engaging in that experience?

10   A    Well, I mean, anybody's anxious about testifying.  I

11   mean, that's -- if that -- let's have that be the baseline.

12   The reason that he is anxious about anything like that, not

13   only testifying but even giving a paper or doing all kinds of

14   things -- that's just an example.  The reason he's anxious is

15   because he knows that, one, he can't process quickly.  He

16   specifically told Dr. Otto he was in a class where everything

17   would be presented more slowly because he cannot process

18   quickly, and by "quickly," I mean normally like we do.  So he

19   can't do that.

20        So if you can't do that, how do you want all this

21   questioning and information to come at you without being

22   petrified?  It's not just that we're all -- anyone testifying

23   is anxious.  It's that, on top of being anxious about

24   testifying, you can't process what people are asking you, and

25   you may say something -- as he told Dr. Otto, "I sometimes say

*Testimony of Lynda Geller, PhD*                                    *166*

1  things that are -- were not my intention to say," and the

2  reason is, again, if you are talking to someone and you're

3  just listening to what I -- if you can't listen to what I'm

4  saying now because you're still processing what I said a

5  minute ago, then how do you make an accurate response?  You

6  don't.

7       You take a piece of it -- and this is what they all tell

8  me they do.  Adults with autism all tell me they do this.

9  They take a piece they think they understand and respond to

10  that.  Okay.  Well, that's okay, I guess, in social

11  conversation, but when it's something important, like court

12  testimony, when your life is on the line, when you -- it's

13  something that's really important, that's more than normal

14  anxiety, that I'm just going to hear a piece of something,

15  respond to that.  It may not be what I want.  In fact, someone

16  may then cross-examine me and decide it was wrong.  It was a

17  lie.  I mean -- and I misunderstood something.  So there's a

18  lot to why he's afraid of it that's way beyond normal fear and

19  anxiety of the situation.

20  Q    Why can't they resolve it by just slowing it down, make

21  the lawyers use unambiguous terms and simple language and not

22  complex questions and give him time --

23  A    Well, you can do that when you're preparing him just by

24  yourself, but we cannot make the legal process take place at a

25  six-year-old level.  The prosecuting people, the interactions

1   of the questions, the witnesses, the judge's questions --

2   these cannot -- these cannot all take place at a six-year-old

3   level, and we cannot expect that someone who needs to be

4   obviously talked to like they're a six-year-old, the way

5   Dr. Otto's entire interview was -- that's how he talked to

6   him -- that's not the way court functions.  It's not the way

7   life functions either.  No one else talks to him that way.

8   Q    What kinds of memory are you concerned with in talking

9   about Steven's -- does Steven have amnesia?

10  A    No, no, no, no.  Steven has had memory problems his

11  entire life.  They've been noted in past evaluations.  The

12  most obvious one is working memory.

13       The definition of working memory is keeping things in

14  your mind long enough to manipulate them.  So, for example,

15  five plus two plus three, when you had to keep five and two in

16  your mind before you got to the three.  Well, the same thing

17  about information.  I have to keep -- you're asking me a

18  question, so I probably need to remember the beginning of the

19  sentence as well as the end of the sentence, and if I don't

20  remember them and if I can't keep them in my mind, I can't

21  respond accurately.  So working memory is the ability to keep

22  something in your mind long enough to solve the problem, cope

23  with it, or have an answer.  That's working memory.  And he's

24  been -- he's been noted to have poor working memory from the

25  get-go from young evaluations.

*Testimony of Lynda Geller, PhD*                                    **168**

1    Then there's declarative memory.  That's facts.  He's

2    fabulous at facts.  In fact, he loves facts because facts have

3    no social meaning, and he's perfectly smart at remembering

4    facts and learning them, and which is why he was perfectly --

5    perfectly able to have Dr. Otto tell him things and then ask

6    him later because those are facts.

7    Q    And the judge asked that question is he just parroting

8    things back.

9    A    Yeah.  That was a good question because, yeah, he's

10   learned them, and he can tell you them because he just learned

11   them.

12   Q    Does he know how to use them?

13   A    Well, that was -- see, that would be working memory.

14   Then you'd have to take the -- take facts and sort of

15   manipulate them in your mind to solve a problem or to answer a

16   question.  That's where he's poor.  He's not bad at -- and he

17   can tell you if -- like, a million facts on North Korea, if

18   you'd care to ask him.  But I'm not sure he'd be good at

19   telling you, you know, like, what did you do and why was that,

20   and what happened next, and what did you think that meant?

21   Those are the kind of things that require you holding more in

22   your mind than he can hold in his mind at once.

23       The other one that -- the other thing that he's actually

24   rather poor at is prospective memory, and prospective memory

25   is something -- I call it -- when I'm doing therapy with these

*Testimony of Lynda Geller, PhD*                                    **169**

1    clients, I call it the "sin of" -- the "sin of nonoccurrence."

2    What that means is it just didn't occur to you, so you didn't

3    remember it.  So, like, oh, I was supposed to brush my teeth

4    or, oh, I was supposed to buy milk today or whatever.  That

5    didn't occur to you.  That's a memory deficit, but it isn't --

6    like, wasn't a memorization thing.  It was an occurrence

7    thing.

8         So that's prospective memory, and he's very poor at that,

9    which is why he can't manage his life, why he doesn't think to

10   change his clothes, or why he doesn't, you know -- that it

11   doesn't occur to him to plan and get something ready that he

12   needs to do or to change his shoes and not wear ones with

13   holes in them.  These things don't occur to him, and that's a

14   very serious kind of memory as well.  But, again, it's

15   confusing when he can tell you every single thing about the

16   history of North Korea.

17   Q    Well, does that feature for people with autism, where

18   they have some spiked areas, where they have special

19   capabilities in certain -- like memorizing skills?

20   A    Yeah.  No.  I mean, that's -- that's the whole -- that's

21   part of the whole issue of autism is that they're much more

22   diverse in their skills.  So most of us, our skills look kind

23   of like this.  We're a little good at that, a little bad at

24   that, but we're about the same; whereas they're like this, and

25   it's really hard to have that kind of brain.  It's like you

*Testimony of Lynda Geller, PhD*                              **170**

1  know so much about North Korea or you're so -- he's bad at

2  math, but some people are fabulous at math.  He's pretty good

3  at certain computer things, but not planful things.  He's got

4  some other what -- decently developed skills, and then he's

5  got some that are really like a very little child.

6      Now, how would we like to be that way?  You know, what

7  would we feel like if we functioned like a five-year-old?

8  That's something, in our stage of life, would drive us crazy.

9  So that's the really difficult thing.  And, you know, I've

10  given lots of talks to parents of try to understand your

11  child.  They seem smart at this, but then they have this

12  deficit that's so profound that it influences how they can be

13  in life no matter how smart they are at reading or whatever it

14  is they're smart at.  They're so -- their brains are so much

15  different than ours.  Ours are kind of like this, and theirs

16  are like this, and this is a really, really hard way to be.

17  Very difficult.

18  Q   So given that -- as you say, somebody could have severe

19  deficits and yet be intelligent or have other skills.  Does it

20  make sense, this -- the question given by -- to Dr. Otto

21  about, well, does he have severe autism or not?

22  A   Well, I always think "severe autism" is kind of a silly

23  term because autism has effects that are mild and severe

24  within the same person.  So does he have severe autism?  Well,

25  if I think of someone with severe autism, I kind of think of

*Testimony of Lynda Geller, PhD*                                171

1   someone who can't talk and is really low, but that's -- that

2   doesn't mean that somebody who has those skills that are okay

3   isn't severely affected by some other aspect of autism.

4        So there's the aspect of intellect.  He doesn't have

5   severe problems in intellect.  Then there's the -- then

6   there's the aspect of social understanding, and I think he

7   does have severe problems in that type of understanding.

8   Part -- you know, he's learned over -- because he has --

9   because his intellect is not uniformly low, he's figured out

10  ways to get along.  Ways to get along are -- are to imitate

11  what you see other people doing, and some of the time that

12  will be right.

13  Q    Now, I asked Dr. Otto about his -- his method of testing

14  Steven's ability to make a decision in his case was these

15  hypotheticals of somebody as to whom there is a ton of

16  evidence and very little evidence, and he agreed there was

17  only one factor being taken into account.  Now -- but even

18  that in there, Dr. Otto said, "Well, yes.  Steven didn't say,

19  'Well, I can't make a decision on that basis,' but nobody else

20  did either."  What's the problem with -- why doesn't Steven

21  recognize that's not enough information to make -- to make a

22  decision on?

23  A    Well, I mean, he's not familiar with what skills you

24  would have to have to be a witness, and Dr. Otto is.  So I

25  don't really know why Steven should have to come up with that.

*Testimony of Lynda Geller, PhD*                                      **172**

1    Q    I'm thinking about taking a plea or not.

2    A    Yeah.  Well, I mean, those kinds of things involve

3    working memory, where you have to keep a lot in your memory at

4    the same time to make a decision, and I think he's quite poor

5    at that.

6         So, now, Dr. Otto seems to believe that, if only his

7    lawyer could make everything simplistic enough, it would be

8    fine, but what you have is somebody who can't make their own

9    decision about anything because they can't imagine the future

10   consequences of even a simple decision.  So if you can't

11   imagine future consequences, it can be -- your lawyer can be

12   the very best person in the world talking about -- knowing

13   what autism is and saying everything really simply, but at

14   some point, to have -- to have the ability to stand trial, the

15   ability to assist your lawyer in their own defense, you have

16   to be able to imagine the consequence of what may or may not

17   happen.  You have to be able to explain things, and that's

18   another area that he's very poor at, explaining things.

19        It's -- it's -- in order to explain things, you need to

20   have the social perspective of others.  So you need to explain

21   something differently to you or to me or to them.  I mean, we

22   don't have the same backgrounds and everything.  Maybe you

23   know all about model trains, and so I -- you know, I could

24   tell you something really short about it, and you'd know right

25   away, and that person never heard of them, and I'd have to

*Testimony of Lynda Geller, PhD*                                    173

1   tell them a lot.  So explaining and explaining to your

2   attorney -- explaining to people requires a certain level of

3   perspective-taking, and people with autism, and particularly

4   Steven, don't have good perspective-taking abilities.

5       They don't know -- they'll tell you too much.  They'll

6   tell you everything.  That's what he used to do on the

7   playground.  He'd just walk up to a kid and tell him

8   everything he knew.  Well, that didn't get him very far

9   because that's not the way we interact with people, and it

10  isn't effective communication.

11  Q    For Steven -- for somebody like Steven, is it fair to --

12  to characterize being a witness for that person as just simply

13  answering questions?

14  A    Not to me because -- because he -- he told him himself

15  that "Things come out of me that I don't intend."  So why does

16  that happen?  Because I'm not processing the whole -- I mean,

17  he -- he wasn't able to explain exactly why that happens, but

18  it's because he's not processing well, so sometimes he's

19  answering a piece that wasn't the complete piece or wasn't the

20  piece they really wanted to ask.  So saying that he can assist

21  or understand those things is a big jump, and I was surprised

22  that I saw that jump at the end of the report after I'm going

23  through the whole report, seeing him talk like a six-year-old

24  to Steven, and then -- and then jump into saying, well, he was

25  fine to go ahead.  I was very surprised with that from reading

*Testimony of Lynda Geller, PhD*                                    **174**

1    the report.

2    Q    All right.  Is there -- what are -- what are the -- what

3    are the real social challenges of being a witness other than

4    just answering questions?

5    A    Keeping in mind the topic we're on, I mean, saying what

6    you mean, recognizing -- recognizing at some level the social

7    meaning of what -- of what's being asked, remembering --

8    remembering things well that are not just factual.  Like, what

9    was your intent?  Well, that's not a fact, and so that might

10   be hard to explain.  Explaining things, understanding how you

11   need to explain something to someone.  I mean, a lawyer can

12   help you, but they can't make you have skills you don't have.

13   Q    Is -- what kind of tasks are involved in -- let's

14   suppose -- you know, I gave the example -- a realistic example

15   to Dr. Otto of a kind of choice that somebody like Steven

16   might have to make, and Dr. Otto said, well, that was

17   confusing to him too.  What's the difference between his

18   confusion and Steven's confusion?  What's the difference

19   between Dr. Otto's ability to nevertheless weigh those choices

20   and Steven's ability?

21   A    Well, I'm going to presume Dr. Otto and most of us can

22   imagine a future consequence, and I don't even mean a future

23   big life consequence.  I mean a future consequence of what's

24   the next question going to be based on answering this one.  So

25   he can't imagine future occurrences even in the short term.

1    I'm not just talking about big, huge life choices ones.

2    Q    Is Steven able to live independently?

3    A    He hasn't been, and the level of support that went into

4    the one little experiment of him living on his own was

5    everything was -- everything was taken care of him.

6    Financially was taken care of him.  The car was taken care.

7    As Steven said, he didn't even buy his own -- he didn't even

8    buy gas.  He didn't really know how to do that.  He could go

9    to class and learn about computers, to some extent, and come

10   home.  He had -- he had roommates with whom he was not friends

11   but who he was not enemies, who they just were people in

12   there, and they lived together.  He bought the same exact food

13   every single week, went to the exact same store at the exact

14   same time because that's all he could manage.  Were he to be

15   taking medication, unlikely that he could manage to take it on

16   a regular schedule.

17        One of the most dramatic things is his feet were bleeding

18   when his father visited him once because his shoes were worn

19   out and he didn't have the wherewithal to choose another pair

20   in his closet and put them on instead of have his feet bleed

21   because these ones had holes.  I mean, this is somebody who is

22   not capable of living on his own and may never be, who needs

23   the structure.  Why he's so happy at the program he's at is

24   because it's totally structured and there are no questions

25   about what you do.

*Testimony of Lynda Geller, PhD*                                    *176*

1   Q    What -- why -- why did you reference PTSD in your report?

2   A    I referenced PTSD because it's a common occurrence in

3   adults that I've treated that have been severely bullied as

4   Steven was, and what is -- PTSD does not have to be about you

5   being in war or potentially raped.  It can also be about

6   having experiences that accumulate that you are unable to

7   escape.  All right?

8        If you're a child and you're beaten up on the bus or

9   teased and -- or teased -- I mean, Steven had to sit next to

10  the bus driver for self-protection every day going to school.

11  Okay?  So he's -- so that, to me, is the definition of

12  something you can't escape, you have to do, and it's horribly,

13  horribly damaging to you.

14  Q    There's trauma in that.

15  A    There's trauma in that.  So, you know, he's traumatized.

16  And then people who are traumatized in their youth have an

17  easier time being traumatized later.  So his whole being

18  transported across the country, you know, in shackles, not

19  knowing where he was going -- that also was a traumatic event.

20  And there are aspects of that that he remembers and has

21  flashbacks about, and there are aspects he doesn't remember at

22  all.

23       So the reason that I think he has PTSD -- and he doesn't

24  have it in the same way that, you know, the Vietnam veterans

25  had it or people like that or a woman who has been -- or

1    attempted murder victim or something like that, but he had it

2    in a way that his life as a child -- inescapable trauma that

3    he had no power over -- that's really the definition of PTSD.

4    You have no power over it.  Something bad is happening, and

5    you have no power over it.  Like, you can have PTSD if you

6    watch your child be killed.  You're not being hurt, but you

7    don't have power over the event, and it's terrible.

8         So I -- I believe that he has PTSD, and it's why in my

9    practice, where, you know, we have people from all different

10   fields, I specifically recruited someone who was a PTSD

11   expert.  It's so common in autism.

12   Q    Is Steven somebody who's -- represents a danger to other

13   people, danger of causing serious injury to somebody else, or

14   injury to property?

15   A    I don't believe that, and I think that it's really

16   important to understand the difference between what we call

17   the empathy deficit in autism and the empathy deficit in

18   sociopaths.

19        The empathy deficit in autism is I look around for the

20   meaning, and I don't get it; so, therefore, I can't respond to

21   you properly because I don't get it.  But if someone says to

22   me, "Oh, her mother just died.  That's why she's sad," then he

23   immediately would say, "I'm so sorry.  That's awful."

24        Somebody who's a sociopath is the opposite.  They're very

25   clever at picking up social signals and manipulating people,

1    and when -- and when they've manipulated someone into doing

2    something, they don't care that they're hurt or that there

3    were bad consequences for them.

4         So sociopaths and people with autism are the opposite of

5    each other.  One gets it and uses it and doesn't care.  The

6    other one doesn't get it so sometimes makes stupid social

7    mistakes but basically cares about others.  And anyone who's

8    ever known Steven would say that he's a sweet boy who would

9    never knowingly harm anyone and, you know, is basically a good

10   person.

11   Q    And Dr. Otto agreed he has no antisocial features.

12   A    Dr. Otto agreed -- everyone who's looked at him agrees he

13   has no antisocial features.

14             MR. MAHONEY:  Okay.  That's all I have, Judge.

15             THE COURT:  Thank you, Mr. Mahoney.

16             If I may, Ms. Chang.  I just have one question of

17   you, Dr. Geller.  I have to say this it's incredibly helpful

18   and incredibly informative.  Are you saying that anyone with

19   autism would not be competent to go to trial, or are you

20   saying based on your reviews that the defendant, Mr. Marks

21   himself, based on his degree of autism would not be competent

22   to go to trial?

23             THE WITNESS:  No.  I agree with Dr. Otto there.  The

24   diagnosis does not make you incompetent.

25             THE COURT:  Okay.

1    THE WITNESS:  However, it alerts you to look at the

2    elements of the person that might be incompetent.  So there's

3    people that have, for example, different levels of ability to

4    process information.  And I have certainly, you know, been

5    on -- worked for a number of lawyers on cases where that --

6    where we didn't raise that because it wasn't relevant, but

7    it's not uncommonly relevant.  I mean, I would say a good

8    percentage of people aren't because of the very factors that

9    I've been talking about.  Those are common factors in autism.

10   But not everybody is like that, and so, no, autism doesn't

11   make you incompetent.

12       THE COURT:  Thank you.

13   BY MR. MAHONEY:

14   Q   Maybe I'll just -- one last question.  I asked the same

15   question of Dr. Otto.  Is Steven capable of autonomously

16   rendering a decision about, for example, whether to plead

17   guilty no matter how much information is given to him by

18   lawyers, by me?  Is he capable of autonomously making that

19   decision himself, which has several variables?

20   A   I don't believe so, and I believe that he may be told by

21   his family that he should pay attention to his lawyer, but

22   that is not him making a decision.  It's him trusting that you

23   mean well for him, and that's not the same thing at all.

24       MR. MAHONEY:  Okay.  Thank you.

25       THE COURT:  Dr. Geller, are you okay to proceed

1    through cross-examination, or do you want to take a few

2    minutes?  We've got one hour left before the end of the day.

3    It's totally up to you.  I don't want to inconvenience you.

4              THE WITNESS:  Do you mind if I take five minutes and

5    get a little drink of water?

6              THE COURT:  That's not a problem.  We can take five

7    minutes.

8              And then, Ms. Chang, you can do your

9    cross-examination.

10       (Recess at 3:30 p.m. until 3:37 p.m.)

11             THE COURT:  Ms. Chang.

12             MS. CHANG:  Thank you, Your Honor.

13                       CROSS-EXAMINATION

14   BY MS. CHANG:

15   Q    Good afternoon, Dr. Geller.

16   A    Hello.

17   Q    I'm going to be going through a variety of topics today,

18   and I might skip around a little bit, but I'll try to keep us

19   on track.

20       The first thing I want to do is to see if you and I can

21   agree on some things about autism.  So would you agree it's

22   not a mental illness?

23   A    I agree.

24   Q    And it doesn't cause memory loss?

25   A    Well, all right.  So that's -- that requires a very

1    sophisticated understanding of causation.  So is autism the

2    cause or the effect?  So what we define as autism is the

3    effect of various neurobiological brain deficits.  They're not

4    always the exact same in every person whose outcome is autism.

5    So autism itself is the outcome, not -- it's not a -- it's not

6    an identifiable disease.

7    Q    Right.  So autism doesn't cause memory loss; right?

8    A    No.  But memory loss can be part of the cause of autism.

9    I mean, what causes memory loss that -- whatever that brain

10   deficit that is involved in memory may be contributing to the

11   things that result in someone having an autistic disorder.

12   Q    So I get that, but, again, autism does not cause memory

13   loss, does it?

14   A    That's not a sensible sentence.

15   Q    Does autism cause memory loss?

16   A    The aspects of what cause autism may also cause memory

17   loss or they may not.

18            MS. CHANG:  Your Honor, I believe these -- that's

19   not a responsive answer to my question, Your Honor.  I'd

20   object to --

21            THE COURT:  Go ahead and finish.

22            MS. CHANG:  I object as being nonresponsive.  I

23   literally did ask a yes-or-no question.

24            THE COURT:  You did, and I do believe the witness

25   has now -- not this particular response, but the prior she did

*Testimony of Lynda Geller, PhD*                                    **182**

1  give a yes or no, and she gave a further explanation.  So I

2  would say go ahead and go forward.

3  BY MS. CHANG:

4  Q    Would you agree that autism is not a learning disability?

5  A    Again, it's sort of semantics because almost -- almost no

6  one with autism doesn't have a learning disability.  It's -- a

7  learning disability is not a -- is not a diagnosis.  It's a --

8  it's an educational classification.

9         THE COURT:  Dr. Geller, I am going to ask -- and I

10 understand what Ms. Chang's point here is.  This is

11 cross-examination, so to make this move along more smoothly,

12 if you would give her a yes or no, and then you can explain

13 your answer further.

14        THE WITNESS:  Okay.

15        THE COURT:  But they are yes-or-no questions, and I

16 will let you have an opportunity to explain it.

17        THE WITNESS:  All right.  Fine.  Say it again,

18 please.

19 BY MS. CHANG:

20 Q    Is autism a learning disability?

21 A    No.

22 Q    And there's a whole host of people in the world who have

23 autism; right?

24 A    Yes.

25 Q    It's a spectrum?

1    A    Uh-huh.  Yes.

2    Q    There are people who are high on the spectrum; right?

3    And then there are people who are low on the spectrum; right?

4    Is that right?

5    A    Sort of.

6    Q    Okay.  What do you mean by that?

7    A    Because you can be high in some things and low in others.

8    Q    Okay.

9    A    Is my definition of you high or low?  I mean --

10   Q    I understand.  That goes to the point that you were

11   making is that people with autism can be strong in some areas

12   and not strong in others.

13   A    Right.  So then what's their overall -- would you call

14   them severe or mild or -- you know, it would be a silly thing

15   to say.

16   Q    I understand.

17       But a sizable portion of the people who have autism have

18   graduated from high school; right?

19   A    Yes.

20   Q    And some have even gone on to postsecondary education;

21   right?

22   A    Yes.

23   Q    They've lived independently on their own?

24   A    Yes.

25   Q    Would you agree that autism is not degenerative?

**Testimony of Lynda Geller, PhD**                                    **184**

1   A    No, it's not degenerative.

2   Q    And it doesn't come and go, as you said; correct?

3   A    No, it doesn't come and go.

4   Q    If anything, with age and behavioral treatment, symptoms

5   of autism often improve with time; right?

6   A    They can.

7   Q    Okay.  And, in fact, there are remedies for many

8   deficiencies associated with autism.

9   A    My entire career is dedicated to that.

10  Q    So that's a yes?

11  A    Yes.

12  Q    Okay.  And there are remedies, actually, in the form of

13  specific interventions that can address deficiencies that are

14  caused by autism; right?

15  A    If, in fact, you're identified as needing them, yes.

16  Q    Now, you're not the first person to evaluate the

17  defendant following his arrest in this case; right?

18  A    No.

19  Q    You're aware that other people examined him and met him

20  in person?

21  A    Yes.

22  Q    You're aware that someone named Curtis Grundy did an

23  evaluation concerning the defendant?

24  A    Yes.

25  Q    And you actually reviewed Dr. Grundy's report dated

*Testimony of Lynda Geller, PhD*                                      **185**

1    October 4, 2017; right?

2    A    Uh-huh.  Yes.

3    Q    And Dr. Grundy's report was written before you evaluated

4    the defendant?

5    A    That's right.

6    Q    And you evaluated the defendant two months later, in

7    December 2017.  Does that sound right?

8    A    Yep.

9    Q    And Dr. Grundy did not diagnose the defendant with autism

10   in October 2017; right?

11   A    Correct.

12   Q    And so are you aware that it's only one year later, in

13   December of 2018, that Dr. Grundy issued a report stating that

14   he agreed with your diagnosis of autism?

15   A    He did after he read my report, yes.

16   Q    Okay.  And your report devotes many pages to -- I'm

17   talking about your first report from 2018.  That report

18   devotes many pages to the defendant's childhood and

19   educational experience.  But you were the very first person to

20   diagnosis him with autism; right?

21   A    That's correct.

22   Q    And that was after his arrest; right?

23   A    Yes.

24   Q    All right.  There are people who are on the autism

25   spectrum who are professors; right?  I believe you mentioned

1    that on -- in one of your reports.

2    A    That's right.

3    Q    They can perform so well in -- again, maybe in some

4    areas, their intellectual functioning is very high --

5    A    That's right.

6    Q    -- so they can be professors; right?

7         And some can be physicists in some cases as well; right?

8    A    Yes.

9    Q    So it's hard to generalize across the board and say that

10   in all cases autism affects all these people in one way;

11   right?

12   A    It affects all those people in the social dimension.

13   That's the definition of autism.

14   Q    Okay.  But not all people struggle to create an

15   independent adult life; right?

16   A    No, no, no.

17   Q    And not all people on the autism spectrum, as wide as it,

18   is struggle to create or obtain or keep work?  Not create,

19   just -- they don't all struggle to obtain and keep work?

20   A    It's one of the most serious problems in adult autism is

21   maintaining work.

22   Q    But not all of them struggle with it; right?

23   A    Most, but not all.

24   Q    So the answer's no?

25   A    Most but not all, yes.  The answer's no.

*Testimony of Lynda Geller, PhD*                                          **187**

1  Q    And not all people on the spectrum struggle with managing

2  their finances or having a rich social life; right?

3  A    I would say the vast majority struggle with having a rich

4  social life.

5  Q    But not all of them?

6  A    But not everybody.

7  Q    Okay.  Have you ever thought otherwise?

8  A    Otherwise that --

9  Q    Otherwise --

10 A    -- not everyone.

11 Q    Yeah.  So for the last four questions that I asked you,

12 have you ever thought -- you said no today.  Have you ever

13 thought otherwise before?

14 A    Maybe when I was very young.

15 Q    Okay.

16 A    Not experienced.

17 Q    Not within the last ten years; right?

18 A    I don't think so.

19 Q    Okay.  So in your 2018 report, which isn't -- which isn't

20 dated, but I received it last year.  On page 4 of your

21 report --

22 A    Wait a minute.  You mean this one?

23 Q    I mean --

24 A    The big fat one?

25 Q    The big fat one.  Correct.  Yes.

1   A    Okay.

2   Q    You say in the last full paragraph, Sentence 2, quote,

3   "After high school, when many young people are creating

4   independent lives, those on the autism spectrum struggle to

5   create an independent adult life, especially in the areas of

6   obtaining and keeping work, managing finances, and having a

7   rich social life."  Did you overstate your position there?

8   You didn't qualify it.

9   A    I said "struggle."  That doesn't mean nobody achieves.

10  It means everyone struggles.

11  Q    But about two minutes ago, when I asked you whether all

12  of them struggle, did you say no?

13  A    No.  You asked me if they do have trouble.

14  Q    I said -- okay.  I said would you agree that not all

15  people on the spectrum struggle to create an independent adult

16  life, and you said no.

17  A    I don't think you used the word "struggle," but maybe you

18  did and I didn't notice.

19  Q    So you're saying that in the last four questions, when I

20  used the word "struggle," that you misheard me?

21          MR. MAHONEY:  It's argumentative, Your Honor.

22          THE COURT:  Sustained.

23          THE WITNESS:  Yes.  I didn't -- I didn't --

24          THE COURT:  Dr. Geller, I sustained the objection.

25  You don't have to answer that question.

*Testimony of Lynda Geller, PhD*                                      **189**

1      THE WITNESS:  Okay.

2    BY MS. CHANG:

3    Q   Okay.  You -- your report notes that, because the

4    defendant struggles with in-person interactions, he resorted

5    to spending a lot of time online.  Did you come to learn what

6    he was doing online?

7    A   In -- at what point in time?

8    Q   When he was at the DAVE School.

9    A   So what do you want me to answer?  Yes or no?  Is that a

10   yes-or-no question?

11   Q   Yeah.  Did you come to learn what he was doing online?

12   A   Yes.

13   Q   Did you learn that he was, like, watching movies online

14   and playing games online?

15   A   Yes.

16   Q   And did you also become aware that he was engaging other

17   people with -- engaging other people in conversations on the

18   Internet?

19   A   Yes.

20   Q   And you're aware that many of those conversations

21   occurred through typing rather than speaking; right?

22   A   Yes.

23   Q   And you've been given a copy of those text messages that

24   the defendant exchanged with his victims in this case?

25   A   Yes.

*Testimony of Lynda Geller, PhD*                                    **190**

1   Q    Okay.  Turning to Government Exhibit 5, which is in front

2   of you, this is a copy of Kik chats between --

3   A    Is it in front of me?

4   Q    Yeah.  It's in -- it should be in the binder.

5   A    No.

6   Q    I was not aware the binder was moved.  I apologize.

7   A    Okay.

8   Q    So it's in Government Exhibit 5 in the binder in front of

9   you.

10  A    Okay.

11  Q    And if you look at Government Exhibit 5, it's 103 pages

12  long and --

13  A    I'm sorry.  You want me to go to Tab 5?

14  Q    Yes.  Yes, ma'am.  So -- and I'll direct your attention

15  to a specific place if I need you there, but for now do you

16  see that Tab 5 is about 102 pages long, the text?

17  A    Yes.

18  Q    All right.  And each line is numbered, and it ends at

19  line 3,043; right?

20  A    Yes.

21  Q    And are you aware that this conversation via Kik thus

22  includes more than 3,000 lines of chat between the defendant

23  and one of the victims?

24  A    I presume that's correct because you're saying it's

25  correct.

*Testimony of Lynda Geller, PhD*                                          **191**

1   Q    Yes, ma'am.  The orange is the defendant, and white is

2   the victim.

3   A    Okay.  Uh-huh.

4   Q    So your report -- the big fat report at page 17 says,

5   "Steven does not really read because his vision and perceptual

6   deficits make the process arduous."  In view of 3,000-plus

7   chats between the defendant and a victim, isn't it kind of an

8   overstatement to say that he doesn't really read?

9   A    By "reading" what I meant was how you and I would read

10  books, read -- you know, read -- read things, not being able

11  to read a line.  So what I meant by "read" was what we -- how

12  we think of adults reading is what I meant by that.

13  Q    Okay.  In your report on page 39 you say, "Steven shows

14  no signs of sexual interest in children."

15       Now, you reviewed a number of documents in connection

16  with this case; right?

17  A    Uh-huh.  Yeah.

18  Q    And one of those is the Rogers County District Attorney

19  Office report dated June 19, 2017; right?  That's listed on

20  page 2 of your big fat report.  So -- we can look at it

21  together if you really want to.

22  A    Are we talking about 2.1?

23  Q    No, no.  I'm just -- I'm just saying -- I'm pointing out

24  that there's a specific document listed on page 2 of your

25  report that you --

*Testimony of Lynda Geller, PhD*                                    **192**

1    A    Oh, oh, oh, oh, oh.

2    Q    Yeah.

3    A    Okay.  That I read because it's listed on my report.

4    Q    Yes.

5         So you were aware from that report that the police found

6    certain evidence from the defendant's cell phone, including a

7    series of chats with someone called the minecraft user; right?

8    A    Yes.

9    Q    And excerpts from the chat were included in the report;

10   right?

11   A    Yes.

12   Q    Now, we're going to look together, and I'll put it on the

13   screen so we can all look at it together.

14        MS. CHANG:  Edward, may I please -- Mr. Jackson, may

15   I please have the screen?

16        THE COURTROOM DEPUTY:  I think you can pull it from

17   your end.

18        MS. CHANG:  Got it.  Hopefully it'll come up here.

19   BY MS. CHANG:

20   Q    And we're going to turn to lines 1,534 to 1,602 on

21   Government Exhibit 5.

22   A    Are you putting it somewhere, or do you want me to follow

23   along in here?

24   Q    You can either follow along on your screen, if you wish,

25   if that's easier for you, or you can look at it right in front

*Testimony of Lynda Geller, PhD*                                      **193**

1    of you.

2    A    Okay.  15- what, please?

3    Q    It is 1,534.

4    A    All right.

5    Q    Now, in this excerpt orange is the defendant, and white

6    is the victim.

7    A    Uh-huh.

8    Q    And here the defendant says, "Mm, baby.  Who is a naughty

9    nine-year-old?"  And the victim says, "Me."  And he -- you see

10   that; right?

11   A    Yes.

12   Q    Now, do you see in the next line he directs her to take

13   various videos of herself with her panting loudly and

14   recording herself masturbating.  Do you see that?

15   A    I do.

16   Q    And you can't see what she sent because it's child

17   pornography, but do you see that she sends two files after

18   that?

19   A    Is that what that means?  Okay.

20   Q    In 1,537 and 1,538, do you see that?

21   A    Yes.

22   Q    Okay.  And do you see that in response, in line 1,539,

23   the defendant says, "Now make sure to slobber all over your

24   fingers.  Make the saliva drip from your fingers as you pant

25   like a dog.  Drool all over your fingers and slobber on them.

**Testimony of Lynda Geller, PhD**                                     **194**

1    Make the video long."  Do you see that?

2    A    Yes.

3    Q    And do you see, as we turn to the next page -- we're

4    picking up here on line 15- -- 1,543.  "Make the video long."

5    Do you see where he tells her at line 1,547, "Tell me who you

6    love doing videos for, but say it on camera while fingering

7    yourself."  Do you see that?

8    A    Yes.

9    Q    And then do you see he also asks her on page 53 at

10   line 1,582, "If we met in real life, would you suck my penis?"

11   A    Yes.

12   Q    And do you see all these hearts over here in the orange

13   where he sends her these hearts as he gives her further

14   instructions on the images he wants her to send?

15   A    Yes.

16   Q    Okay.  Now, you also reviewed a report from the Lawrence

17   Police Department dated April 20, 2017; correct?

18   A    Yes.

19   Q    And you were aware from that report that the police found

20   certain evidence showing that the defendant engaged in an

21   entirely separate chat in an application where his username

22   was FNAF2828; right?

23   A    Yes.

24   Q    Now, he engaged in an online conversation with another

25   child victim who's described in that report; correct?

1    A    I guess.

2    Q    I'm showing you Government Exhibit 4.  This is a copy of

3    those chats with the other victim, and I want to turn to

4    page 6.  Here the blue is the defendant, and the white is the

5    victim.  Do you see where the victim says, "How old are you?"

6    Oops.  Here.  "How old are you?"

7         And the defendant says, "14."

8         She responds, "I'm 10.  I have a Hello Kitty bra.  Don't

9    judge.  Please don't judge."

10        And he says, "I won't.  Send me a picture of 2," which I

11   think means send me a picture of you.

12        And she sends a picture of her face on page 8.  Do you

13   see that?

14   A    Yes.

15   Q    And then following that conversation, do you see on

16   page 11 she -- she [sic] says, "Hehe.  Now do a naughty selfie

17   of yourself," and then on page 12, do you see "So naughty.

18   Now do one with no bra on.  Okay?"  Do you see that?

19   A    Yes.

20   Q    Then she sends him a picture, which we have redacted

21   because it's child pornography, and then he -- he tells her,

22   "Now do a picture of your vagina.  Okay?"  He tells -- and

23   then he says "Now do a picture of your vagina.  Okay, babe?"

24   And then "Kisses you deeply."  Do you see that?

25   A    Yes.

*Testimony of Lynda Geller, PhD*                                    **196**

1    Q    And then do you see on page 15 he says, "Turn on your

2    light.  Just keep your door locked.  Okay?"

3         Now -- I'm sorry.  One more, and then I'm going to -- and

4    then, at the very end, he says, "If we met in real life, would

5    you suck my penis?"

6         All right.  So going back to page 39 where you say,

7    "Steven shows no signs of sexual interest in children," in

8    view of even the brief snippets of chats that we just reviewed

9    together, wouldn't you say that's an overstatement?

10   A    I think that's role-playing.

11   Q    Okay.

12   A    And I think that's mimicking things he's read online.

13   Q    Ah.  I'm glad you raised that because on direct you said

14   that "Due to the defendant's autism, he cannot copy the things

15   that other people do."  Do you recall saying that?

16   A    I said that he uses mimicry as his defense to when he

17   doesn't know what to do.

18   Q    In an entirely separate -- okay.  All right.

19   A    That's how -- how very young children learn social

20   skills.  That's what -- that's what I was referring to there.

21   Q    But in -- but in a different part of your testimony, you

22   said that "Due to autism, the defendant can't copy things that

23   other people do and that he is unable to learn because of

24   that.  He's unable to learn because he can't copy."

25   A    I'd need to see what I said.  I don't recall saying that.

*Testimony of Lynda Geller, PhD*                                197

1   Q    Okay.  Well, I guess let me put it to you this way:  If

2   the -- I'm not saying that it does, but if the record were to

3   show that you said that, would you disagree with that

4   statement, that he cannot --

5   A    I think that what I -- I think what I was talking about

6   was people in general with autism, and that's something that

7   very young children have difficulty with mirror neurons and

8   learning initial imitation skills at a very basic level.  I

9   think that's what I was referring to.

10  Q    So if that's the case, then, is it then your testimony

11  that in -- in the area -- because I know you've said before

12  that just because you're -- just because you have autism

13  doesn't mean you're -- you're impaired on all of the levels;

14  right?  Like, for some you might be really -- you might

15  perform at 100, and some you perform at 10; right?  So on the

16  copying level, would you -- is it your testimony that he's

17  actually very good at copying, then, that that's not an area

18  in which he has deficits?

19  A    I'm trying to clarify what I mean in case I've misspoken.

20  What I mean is that in general very young kids with autism,

21  like little babies and one- to two-year-olds have deficient

22  ability to copy social interplay and so they don't learn it.

23  Then later, in a separate -- in a separate discussion I'm

24  having, I'm saying he has learned over the years that, when he

25  doesn't know what to do, if he steps back and watches

*Testimony of Lynda Geller, PhD*                                   **198**

1  people -- watches other people and copies them, that works for

2  him.  So that's --

3  Q    I understand.

4  A    -- the context.

5  Q    I understand.  Okay.

6       Now, you say in your first report at page 41 that "There

7  is incompetence in his" -- the defendant's -- "understanding

8  of the charges against him."  What's your basis for saying

9  that?

10 A    I think that my basis for saying that a year ago was that

11 after the very if dramatic interaction with the police that he

12 had that he called his father and said -- and told him what

13 happened and said, "But don't worry.  They just misunderstand

14 me.  I don't -- you know, that's not what I meant, and so

15 it'll be okay."  So, to me, it was pretty obvious what they

16 were charging him and what they were asking him about and that

17 he didn't really think that that was going to go where it

18 went.  So I think he had trouble understanding that.

19 Q    I really didn't follow that.  So you're saying -- your

20 basis for saying he has incompetence in understanding his

21 charges is that the police misunderstood him?

22 A    That's what he believed.  He just believed there was a

23 misunderstanding.  He didn't really take -- he didn't really

24 take it in the full meaning of what was being asked of him.

25      If you look at my -- my second report is really about his

*Testimony of Lynda Geller, PhD*                                                        **199**

1   ability to assist his lawyer.  I think that over the long time

2   that this has been going on, I think I would say that he does

3   understand now what is being said that he did.

4   Q    So now your opinion's different as to his understanding

5   of the charges?

6   A    Probably, because this is written more than a year ago.

7   Q    I understand.  And a lot of things have happened since

8   this.  This case has evolved since then; correct?

9   A    That's correct.

10  Q    So now sitting here today your opinion is different;

11  correct?

12  A    I think -- no.  I think he's different.  I think he has

13  taken in what's happening.

14  Q    Okay.  So would you say now that he is competent in his

15  understanding of the charges against him?

16  A    If by "competent" you mean can say them and knows what

17  they are.  Manipulating ideas about them is another matter,

18  but he knows what they are now.

19  Q    Okay.  And you think he can be taught facts anyway?

20  A    I think he can be taught facts anyway.

21  Q    You said as much in your second report.

22  A    Yes.

23  Q    "Steven is capable of fact-based learning and can learn

24  the various roles and functions of the system"; right?

25  A    Yes.

1  Q    And the evidence actually bears this out; right?

2  A    Yes.

3  Q    He graduated from high school with his class; right?

4  Right?

5  A    Yes.

6  Q    Okay.  And he successfully worked in his first job right

7  out of school as a janitor?

8  A    I don't know too much about that job.

9  Q    I'm referencing page 10 of your first report.

10  A    I know he had job experience and a summer job experience

11  in school, but I -- you know, I'm not sure -- well, I'm not

12  sure what his responsibilities were and how you might

13  conceptualize that as a job.  You know, he had a job, but

14  that's really all I know about it.

15  Q    Okay.  And from there he went on to the DAVE School;

16  right?

17  A    Yes.

18  Q    And he did relatively well in some of his classes?

19  A    Some of them.

20  Q    And you had a chance to listen to Dr. Otto's recorded

21  interview; right?

22  A    Yes.

23  Q    And you recall that at the outset he didn't appear to

24  have a super great grasp of the charges he was facing?

25  A    Yes.

*Testimony of Lynda Geller, PhD*                                    **201**

1    Q    And he didn't have a very solid understanding of all the

2    details surrounding his possible sanctions?

3    A    Yes.

4    Q    But, again, he said he wasn't sure if his attorney had

5    gone over all of that; right?  Do you recall that?

6    A    I don't recall that but --

7    Q    Okay.  And do you recall whether the defendant said he

8    hadn't spoken with his attorney in over a year?  Do you recall

9    that?

10   A    To who?  To Dr. Otto?

11   Q    Uh-huh.

12   A    Said that to Dr. Otto?  Possibly.  I'm sorry.  I don't

13   recall that particular detail.

14   Q    Competence is not about testing memory, is it?

15   A    Memory is a little piece of it, but it's not about

16   testing memory.

17   Q    Okay.  And do you recall from Dr. Otto's interview that

18   he educated the defendant about kind of a whole bunch of

19   things, like what a jury does?  Do you recall that?

20   A    He -- he gave him facts, tool information, and he

21   regurgitated it.

22   Q    Right.  And so Dr. Otto taught the defendant about the

23   rights that the defendant has, for example.  Do you remember

24   that?

25   A    He told him -- he told him facts about it, and Steven

**Testimony of Lynda Geller, PhD**                                    **202**

1   repeated the facts a short time later.

2   Q    And so by the end of the interview, the defendant

3   demonstrated that he had retained that information; right?

4   A    He has retained facts.

5   Q    So he demonstrated to Dr. Otto an ability to retain -- to

6   learn and retain information; correct?

7   A    Yes.  And I didn't say differently.

8   Q    And in your -- so moving on, in your opinion, the

9   defendant suffers from some slow processing as a result of his

10  autism; correct?

11  A    Yes.

12  Q    And that affects his ability to keep up with subtle cues

13  in social communication?

14  A    That's one thing does, yes.

15  Q    And those subtle cues come in the form of nonverbal

16  communication; right?

17  A    Not necessarily.  They could be your voice intonation,

18  you know, and it could be specifically what you say, how you

19  say it.

20  Q    Okay.  Well, all right.  In a face-to-face interaction

21  which involves tone of voice, which involves sort of the words

22  coming from my mouth and my facial expressions, maybe my

23  gestures, maybe the way I'm standing as I'm talking to you,

24  maybe the way my eyes are looking, for example -- right?

25  There's all these other cues, maybe how I'm winking at someone

*Testimony of Lynda Geller, PhD*                                          **203**

1    else as I kind of smirk; right?  Those are the sort of, like,

2    subtle cues in communication that would assist and that

3    neurotypical people don't struggle with; correct?

4    A    Right.

5    Q    But someone with autism very well would likely struggle

6    with something like that; correct?

7    A    Correct.

8    Q    And so in a face-to-face interaction, this -- going back

9    to this defendant, he -- it's your opinion that he has

10   difficulty perceiving the emotional states of others?  I think

11   that was part of the empathy deficit that you were talking

12   about.

13   A    And his own often, yeah.  Yes.

14   Q    Okay.  But it's not that he doesn't understand what

15   emotion is; right?  Like, he understands what anger is, for

16   example; right?

17   A    He could probably define it for you, yeah.

18   Q    Okay.  It's just that, if someone's wearing emotion on

19   their face, he might have trouble discerning what that emotion

20   is.

21   A    Yes.

22   Q    Okay.  But if someone actually articulated what they were

23   feeling, like just said plain out, "I am mad" -- like, "I am

24   mad at you, Mr. Marks," would -- is it your testimony that his

25   autism would interfere with his ability to understand even

*Testimony of Lynda Geller, PhD*                                      **204**

1  that basic literal verbal and direct articulation, concrete

2  articulation?

3  A    I would say it depends on the context.

4  Q    Okay.  And what if he was told in writing?  Would that

5  help?

6  A    It would depend on the context.

7  Q    Would you agree that when you're writing you don't have

8  these other social cues at play?  Right?  You don't have the

9  facial expressions.  You don't have the gestures.  You don't

10  have the stance and the posture.  You literally have the black

11  and white; correct?  Correct?

12  A    Correct.

13  Q    And you said before that his IQ is actually rather

14  average; correct?

15  A    Yeah.  And this all depends on context.

16  Q    All right.  Let's go back to Government Exhibit 5

17  starting with line -- this is on page 15.  I'll show it on the

18  screen.  Page 15, line 422.  Starting here.  So -- and we're

19  going to go all the way to page 16, line 455.  So here he

20  says, "What?  Who are you losing?"

21      And she says, "You."

22      "Do you want to lose me?  Then do my videos.  Okay?"

23      And she says, "I want to stop losing my friends."

24      And he says, "Well, then you'll do my videos.  Okay?"

25      And she says -- well, it's kind of a continuation because

*Testimony of Lynda Geller, PhD*                                      **205**

1   they're talking over each other.  She says, "I want to stop

2   losing my friends and making porn for people," and as she

3   keeps saying -- she says, "It's porn, and I hate making it.

4   It makes me feel dirty and gross, and it make makes me want to

5   die."

6        He at the same time keeps going, "Do you want to lose me?

7   Yes or no?  Do you?  Yes or no?  Do you want to lose me?"  And

8   then he says, "If you want to keep me, just do them.  Okay?"

9   And then he tells her, "Now do a video of your breasts.  Okay?

10  Do a video of your breasts.  Okay?  Just do it."

11       And she goes on to say, "I hate doing porn for people

12  that, quote, 'love me,' and if you actually loved me, you

13  would understand that and not ask."

14       And he says, "Well, I do love you.  I do.  But if you

15  don't want to lose me, do it because it's all I ask."

16       And she says, "Stop threatening me."

17       Is it your view that the defendant's autism interfered

18  with his ability to understand what this little girl was

19  really saying to him?

20  A    Yes.

21  Q    And, in your view, that can't be remedied?

22  A    What do you mean "that"?

23  Q    Well, you said -- I asked you is it your contention -- is

24  it your opinion that the defendant's autism interfered with

25  his ability to understand, that making porn made her feel

1    gross and she wanted to die?

2    A    So I can answer these things yes or no if you want me to,

3    but there's so much context and other parts of autism that

4    need to be explained to understand that particular interplay

5    that saying yes or no is not going to represent what I think.

6    Q    Why don't you tell me what you think.

7    A    Okay.  All right.  So, one, these behaviors are part of

8    a, quote, "game" that was devised by Steven in which the idea

9    is to troll people, and when people with autism get in a

10   pattern of behavior, the inflexibility of their thinking

11   process makes it difficult for them to see alternatives to

12   that -- to what they've decided to do.

13        So this is a game, and they're players in a game, and

14   it's role-play.  And it's about -- it's about getting

15   people -- I wrote a very long part about -- I wrote a very

16   long part in my report about what trolling is, which is trying

17   to very cleverly make a splash on some kind of -- on a site or

18   some kind of role-play place or in talking to people online.

19   It's trying to make them -- it's trying to get their attention

20   and make them do something, and it's a skill sort of like

21   being a jester -- a jester in court.  Okay?  So it's a skill.

22        All right.  So he's thinking that's what he's doing.  She

23   may be thinking something different, and he's unable to read

24   that she thinks something different than he does.

25   Q    So what she says -- well, what she says next, actually,

*Testimony of Lynda Geller, PhD*                                    **207**

1  while we're on the subject is "There's a knife in my closet

2  10 feet away from me."  Are you aware she actually pulled that

3  knife out?  Are you aware of that?

4  A    Where at?

5  Q    Oh, I'm sorry.  I'm at line 487.

6  A    Uh-huh.

7  Q    "There's a knife in my closet 10 feet away from me, and I

8  won't hesitate."

9        Okay.  So I guess my -- my question, Dr. Geller, is does

10  this -- in your view, does the defendant's autism interfere

11  with his ability to understand what she is saying?  There's

12  no -- there's no -- there's no facial expressions here.

13  There's no gestures here.  It's literally just text.

14             THE COURT:  Excuse me one second, Ms. Chang.

15             Yes, Mr. Foster?

16             MR. FOSTER:  His ankle bracelet is going off because

17  the battery is low.

18             THE COURT:  Okay.

19             MR. FOSTER:  It's going to start getting repetitive

20  and louder, but his dad has an extra battery.

21             THE COURT:  Okay.

22             MR. FOSTER:  So how would you like us to proceed?

23             THE COURT:  If it's all right with -- you can go

24  ahead and fix it.

25             But while we're off that, Dr. Danziger, you're

1  making some comments and facial expressions back there that I

2  just saw you making in response to questions.  The witness can

3  see you.  I can see you.  You're going to have an opportunity

4  to testify.  I ask that you please refrain from doing so.

5  Thank you.

6            MR. FOSTER:  We got it.

7            THE COURT:  Okay.  Great.

8            Ms. Chang, you can go ahead and continue.  And just

9  so you know, we've got 17 minutes left today.  When you get to

10  a good stopping point, that's fine, and then we can pick up

11  tomorrow morning, and we'll talk about when we'll start in the

12  morning.

13            MS. CHANG:  Yes, Your Honor.

14            THE COURT:  Thank you.

15            MS. CHANG:  I think I just posed a question.  If

16  it's all right, I'll repeat it.

17            THE COURT:  Absolutely.

18  BY MS. CHANG:

19  Q    So, Dr. Geller, is it your contention that the

20  defendant's autism interfered with his ability to understand

21  the text of what was being communicated?

22  A    Yes.  Yes, that is my contention.

23  Q    Okay.  And so my next question is given that it's your

24  opinion that the autism interfered with his ability to

25  understand really what was being said in the text, is that

*Testimony of Lynda Geller, PhD*                                    **209**

1   impairment able to be remedied?

2   A    I think it's part of inflexible thinking, which is very

3   difficult to remedy.

4   Q    Okay.  So I'll come back to this later, but doesn't that

5   make him a dangerous person?

6   A    Dangerous in what way?

7   Q    Well, dangerous in the way that when a nine-year-old

8   child tells him, "I have a knife in my closet, and I won't

9   hesitate," that he doesn't understand what that means and

10  keeps egging her on.  Doesn't that make him dangerous?

11  A    I think that -- I think -- I'm sorry.  I'm being

12  distracted.

13  Q    I understand.

14  A    I think it means that that's something he needs rules

15  about because he's not able to make flexible -- not able to

16  have flexible thinking about it, that in --

17        MR. FOSTER:  Judge, may the father come forward and

18  try to fix this?

19        THE COURT:  Yeah.

20        I'm sorry, Dr. Geller.  Let's just stop for one

21  second.

22        And I'm sorry, Ms. Chang.  Let's see if we can get

23  that because it's distracting to me as well.  See if we can

24  get the battery fixed.

25        (Court at ease.)

*Testimony of Lynda Geller, PhD*                                          **210**

1          MR. FOSTER:  Thank you, Judge.

2          THE COURT:  Okay.  Thank you.  All right.  I'm just

3    going to go ahead and just for -- to move this along a little

4    bit.  Dr. Geller, the last question that Ms. Chang said is,

5    well, dangerous in the way that when a nine-year-old tells

6    him, "I have a knife in my closet, and I won't hesitate," that

7    he doesn't understand what that means and keeps egging her on.

8    Doesn't that make him dangerous?

9          THE WITNESS:  So my opinion on that is that he is in

10   a situation -- he was in a situation over his head of

11   understanding and that we should figure out a way that that

12   cannot happen to him again.  So, in other words, is it

13   dangerous?  Not if he has the rule that he should never do

14   that again because he's a very rule-bound person, but at the

15   time my belief is that he doesn't truly appreciate what you

16   and I read when we read this, that it was -- he could -- had a

17   different experience in reading that than you and I do, that

18   you and I -- the meaning that you and I take from it.  I take

19   the same meaning out of it that you do.  Believe me.

20   BY MS. CHANG:

21   Q    Okay.  So I want to go back to Government Exhibit 4 based

22   on something you just said.  I'm on page 9 of Government

23   Exhibit 4.  So this is the chat.  Just as a reminder for

24   everyone, this is the Amino chat between the defendant and the

25   ten-year-old victim.  And you're saying that the defendant

*Testimony of Lynda Geller, PhD*                                              **211**

1   didn't really have an appreciation at the time of what he was

2   doing or that it was wrong and -- but he's rule bound, so if

3   you teach him the rules, he'll be okay.  Right?

4       So here the victim says, "My parents will catch me."  And

5   we just went over this a few minutes ago, but, as a reminder,

6   he's telling her, like, "Hey, send me a selfie of yourself.

7   Take off your shirt.  Take off your bra."  Like, "now do your

8   vagina."

9       And the victim says, "My parents will catch me, and you

10  might say I'm fat."

11      And he says, "Oh, come on.  Just lock your doors."

12      So doesn't that show an appreciation of the wrongfulness

13  of what he was doing?

14  A   To me it's a demonstration of the inflexible thinking and

15  extremely poor problem-solving skills that he has, that he's

16  in a situation that's clearly over his head of understanding,

17  that he is acting the way you act when you're -- when you're

18  playing video games and you're -- odd things that we would

19  never do in life happen on video games.  I think that he's in

20  that mind set and that he didn't intend those things -- he

21  didn't intend the things that you and I might intend if we

22  said that.

23  Q   But are you basing that on his autism or something he

24  told you?

25  A   Both.  Both.  My understanding of how his brain works and

**Testimony of Lynda Geller, PhD**                                          **212**

1    his saying that he had invented this selfie game where he's

2    just trying to get people to hang up on him, and that's --

3    that is the goal.

4    Q    Okay.  So some of this is really coming from the

5    defendant's self-report?  Some of it?

6    A    Some of it is what he told me he was doing, the selfie

7    game.

8    Q    Okay.

9    A    And the rest of it is coming from my understanding of his

10   brain.

11   Q    And let me ask you this:  It's certainly not your opinion

12   or your understanding that you can't be -- sorry.  That's a

13   really awful question.  Let me -- let me rephrase it.

14       Would you agree that it is possible to be autistic and

15   have a personality disorder?

16   A    It's possible.

17   Q    Okay.  Have you considered whether this defendant might

18   have both?

19   A    Yes.

20   Q    You say that the defendant's struggle is with, as you put

21   it on page 14 of your report, understanding subtle input,

22   unspoken meaning, and inference, and on page 15 you say he

23   cannot process the flow of conversation.  Can you describe

24   what made you conclude that.

25   A    I'm looking for the word "process."  Where are you on

*Testimony of Lynda Geller, PhD*                                    **213**

1   page 15?

2   Q     Top -- third line from the top.  "He frequently retires

3   to simply listening as he cannot" -- it's actually "He cannot

4   process the flow of conversation, and he had little to

5   contribute."

6   A     Yeah.

7   Q     Did you have trouble communicating with him?

8   A     Did I have trouble communicating with him?

9   Q     Did you, yeah, when you've met with him.

10  A     Well, like Dr. Otto, I know how to talk to people at

11  various levels.

12  Q     Okay.  Have you had the opportunity to listen to the

13  defendant's interview at the Lawrence, Kansas, police

14  department?

15  A     I can't remember if I read it or listened, I'm afraid.  I

16  just don't remember.  It's a year ago.

17              MS. CHANG:  Okay.  If we could play a clip.

18              I apologize, Your Honor.  The computer was sitting

19  here so long it fell asleep.  So I just have to put in my

20  password, and we'll be ready to go.

21              THE COURT:  Not a problem.

22              MS. CHANG:  If we could play Clip 12.  This is --

23  for the record, this is Government Exhibit 6, Hour 2,

24  Minute 19, 7 seconds, and the text is at Government Exhibit 7

25  at 140 to 143.  Oh, and we need to turn up the volume before

*Testimony of Lynda Geller, PhD*                          **214**

1    we start.

2         (Publishing.)

3    BY MS. CHANG:

4    Q    So the first question -- we'll go back and have --

5    A    I have trouble following that orally.

6    Q    I'm sorry?

7    A    I'm really having trouble.

8    Q    Were you able to follow in the transcript?  When I --

9    yeah, I guess.

10   Q    Oh, okay.  I provided the page number.  I can provide it

11   again.

12   A    Oh, I'm sorry.

13   Q    It's Government Exhibit 7 at page 140.

14   Q    But even -- I won't ask you a content question.

15   A    Uh-huh.

16   Q    I apologize?  Oh, okay.  Sorry.  I'm hearing things.

17        I won't ask you a content question, so it's okay that you

18   didn't follow the exact content.  For now I just want to ask:

19   Were you sitting in the courtroom this morning when we heard

20   clips from the Dr. Otto interview?

21   A    Yes.

22   Q    Would you say that the defendant here sounds very

23   different than he did in the Otto interview?

24   A    I can't -- I'm sorry.  I couldn't hear this well enough

25   to make that conclusion.

*Testimony of Lynda Geller, PhD*                                    **215**

1  Q    But even just in the manner of talking -- I mean, forget

2  about what exactly is being said.  Do you hear the tone of the

3  voices, the speed of the speech, the sort of -- the rapid

4  back-and-forth?  Do you hear that?  We can play some more, and

5  I can ask again.

6  A    It's a different situation.  The police are interviewing

7  you versus a kindly gentleman that comes to talk to you.

8         MS. CHANG:  Okay.  Let's -- let's try to pull the

9  speaker a little bit back from the mic.  It's fuzzy.  And

10 let's try resuming.  Thanks, Agent Hyre.

11     (Publishing.)

12     (Speaking over audio.)

13     (Reporter clarification.)

14        MS. CHANG:  I'm sorry.  I was reminding her that we

15 could following along at page 140.

16        I'm sorry.  Please go on.

17     (Publishing.)

18        MS. CHANG:  You can pause here and just go closer to

19 the end.  We'll skip -- we'll cut off about half of what's

20 left.  There you go.

21        MR. HYRE:  Next?

22        MS. CHANG:  Yeah, you can play it.  I just want it

23 closer to the end -- pick up closer to the end.

24        MR. HYRE:  It reset itself.  There you go.

25        MS. CHANG:  Okay.  I wanted a little bit more than

*Testimony of Lynda Geller, PhD*                                216

1    that.

2    BY MS. CHANG:

3    Q    But, in any event, do you remember that now?

4    A    Yeah.  Yes.

5    Q    Okay.  So now let me ask you, now that you've had an

6    opportunity to read along and listen to a little bit more,

7    does the defendant sound a little different here than in the

8    Dr. Otto interview?

9    A    What do you mean "different"?  The tone, the --

10   Q    Exactly.

11   A    Yeah, he does.  He sounds different.

12   Q    Uh-huh.  And --

13   A    But not -- not in -- not the content of it, just the

14   voice tone.

15   Q    Well, is it your -- is it still your opinion, even after

16   listening to this interview, that he can't process the flow of

17   conversation?

18   A    The flow of conversation and processing it are -- and

19   this is a man who's sitting -- the police is asking him pretty

20   simple questions about butts and stuff.  I don't -- it doesn't

21   seem that he doesn't understand what's being asked, but he

22   can't explain why the -- what the policeman thinks isn't what

23   he thought.

24   Q    Say that again.

25   A    He can't explain to the policeman who's asking him these

*Testimony of Lynda Geller, PhD*                                           **217**

1    specific questions with something in his mind -- he can't

2    explain to the policeman how he thinks about it differently.

3    Q    But they're not asking about that.  They're --

4    A    They're just asking facts.

5    Q    Exactly.

6    A    And he can answer facts.

7    Q    And so would you agree that, as illustrated in this

8    excerpt, he was able to process the flow of conversation?

9    A    He was able to process questions about facts, yeah.

10   Q    Okay.  And do you recall stating in your -- page 25 of

11   your report that the defendant has the interpersonal

12   understanding and sophistication of a three-year-old?

13   A    Yes.

14   Q    And do you remember today referencing page 8 of your

15   second report -- I don't know why the age difference, but now,

16   you know, his communication skills are that of a

17   four-year-old.  Do you recall that?

18   A    Well, you have it right in front of you.  So, yes, I

19   guess so.

20   Q    So having listened to this audio interview, is it still

21   your opinion that he has the interpersonal social skills of a

22   three-year-old?

23   A    So I want to explain to you what the Vineland scores

24   actually mean because they don't mean it the way you're saying

25   it.  What they mean is that he has not mastered skills that a

1   three-year-old can master.  It doesn't mean -- I mean, he's

2   not three.  He's 20 now.  So he doesn't manifest low-level

3   skills in the way that a three-year-old manifests low-level

4   skills.  So there's things that you expect three-year-olds to

5   know socially that he doesn't know, and that's what that age

6   thing means on that particular test.

7        It doesn't mean that he acts like a three-year-old, talks

8   like a three-year-old in every dimension.  It means there are

9   a number of dimensions that three-year-olds would typically be

10  able to master, and those are generally sort of the looking at

11  social stuff and figuring out what that actually means.

12  That's what that age means.  It doesn't mean he is a

13  three-year-old.  He's not, and he has many skills that are

14  better than a three-year-old.

15  Q    I understand that, but I'm -- I believe I am tailoring my

16  question to you.  You said, "His interpersonal understanding

17  and sophistication are equivalent that to a three-year-old."

18  Is it your testimony that that audio excerpt that we just

19  listened to is consistent with the notion that his

20  interpersonal understanding and sophistication are equivalent

21  to that of a three-year-old?  Is that -- are they consistent?

22  A    If you want to be -- if you want to hold me to three

23  years -- I mean, it's obviously childish, but the meaning of

24  where you get the three-year-old is from the -- this --

25  this -- the test score.  Then, when you start talking about

1    it, it's not -- it's more complicated than that, than just a

2    score.  Way more complicated.  So he doesn't have some skills

3    that are necessary -- that are -- that are typically mastered

4    at three, and that's what that age is about.

5       The fact that he -- the content is something a

6    three-year-old wouldn't talk about, of course.  That's true.

7    And he's answering questions about that content.

8            MS. CHANG:  Your Honor, at this point it seems like

9    a reasonable stopping point.  I do have additional questions,

10   but I know we're being mindful of the time.

11           THE COURT:  I appreciate that Ms. Chang, and

12   absolutely.

13           What I thought we would do -- because, again, I'm

14   aware tomorrow is Good Friday, Passover, and I also looked at

15   the weather, and there's some horrible storm coming through

16   starting in the late afternoon.

17           And I'm assuming, Mr. Mahoney, you may be flying

18   back.

19           And, Dr. Geller, you may be flying back tomorrow.

20           So why don't we start -- instead of at 9:30, let's

21   start at 9:00, and we'll just power through with just a 10- or

22   15-minute break.  And I know you have cross-examination.  I'm

23   sure you have redirect and maybe some recross, and then

24   Dr. Danziger who --

25           I appreciate you sitting here all day patiently.

**220**

1    We'll get your testimony in.

2           And then I've also given some more thought again.

3    Just to speed this along, unless counsel has some objection,

4    I'm going to reverse my statement from this morning.  We're

5    not going to have argument at the end, and I'm going to let

6    you file some briefing instead.  Does anybody have an issue or

7    an objection with that just because of the time factor?

8           MR. MAHONEY:  No.  I think that's a good idea,

9    Judge.

10          MS. CHANG:  That's fine, Your Honor.

11          THE COURT:  Okay.  Then that's what we will do, and

12   we'll be in recess until 9:00 tomorrow morning.  Thank you.

13       (Proceedings concluded at 4:31 p.m.)

14

15                          -    -    -

16

17                  CERTIFICATE OF REPORTER

18   I certify that the foregoing is a correct transcript of the
     record of proceedings in the above-entitled matter.

19

20

21    /s/ Heather Jewett_____        04/27/2019
      Heather Jewett, RPR, FCRR           Date

22    Federal Official Court Reporter

23

24

25