1

```
                  UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
                        ORLANDO DIVISION

- - - - - - - - - - - - - - -X
                             :
 UNITED STATES OF AMERICA,    :
                             :
                             :  Case No.:
             Plaintiff,       :  6:17-cr-00257-PGB-LRH-1
                             :
 vs.                          :
                             :  Orlando, Florida
                             :  April 19, 2019
 STEVEN MICHAEL MARKS,        :  9:02 a.m.
                             :
                             :
             Defendant.       :
                             :
                             :
- - - - - - - - - - - - - - -X

        TRANSCRIPT OF COMPETENCY HEARING (DAY 2 OF 2)
         BEFORE THE HONORABLE LESLIE R. HOFFMAN
              UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

 Counsel for Plaintiff:        Emily C.L. Chang

 Counsel for Defendant:        Mark J. Mahoney
                               Todd Alan Foster




Proceedings recorded by mechanical stenography.
Transcript produced by computer-aided transcription.


Court Reporter:  Heather Jewett, RPR, FCRR
                 Federal Official Court Reporter
                 401 West Central Boulevard, Suite 4600
                 Orlando, Florida 32801
                 e-mail: heatherjewett.focr@gmail.com
```

*2*

1                        T A B L E   O F   C O N T E N T S

2                              April 19, 2019

3      PROCEEDINGS                                                    Page

4      WITNESSES

5      For the Defendant:

6        Lynda Geller, PhD
              Cross-Examination (Resumed) by Ms. Chang            3
7              Redirect Examination by Mr. Mahoney                46

8        Jeffrey Danziger, MD
              Direct Examination by Mr. Mahoney                   83
9              Cross-Examination  by Ms. Chang                    111
              Redirect Examination by Mr. Mahoney                135
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Testimony of Lynda Geller, PhD*                                       **3**

1                         P R O C E E D I N G S

2        (Call to order of the court at 9:02 a.m.)

3              THE COURT:  Thank you-all for coming in a little

4    early this morning.  It is the continuation of our competency

5    hearing from Thursday, April 18th, and I believe Dr. Geller

6    was on the stand.

7              And, Ms. Chang, you were doing cross-examination.

8              Dr. Geller, are you ready to proceed?

9              THE WITNESS:  Yes, ma'am.

10             THE COURT:  You can come on up.

11             Good morning.  And, Dr. Geller, you're still under

12   oath from yesterday, so --

13             THE WITNESS:  Yes.

14             THE COURT:  -- just want to make sure you're aware

15   of that.

16             And, Ms. Chang, if you're ready, we can go ahead and

17   start.

18             MS. CHANG:  Thank you, Your Honor.

19                         LYNDA GELLER, PhD,

20   was called as a witness on behalf of Defendant and, having

21   previously been duly sworn, testified as follows:

22                    CROSS-EXAMINATION (RESUMED)

23   BY MS. CHANG:

24   Q    Okay.  Dr. Geller, yesterday you testified that in

25   part -- and I realize you have several bases for your opinion,

*Testimony of Lynda Geller, PhD*                                            **4**

1  but you testified that you believe the defendant is

2  incompetent to proceed to trial in part because he

3  communicates at such a low level.  So, for example, do you

4  recall saying, "Dr. Otto spoke to him like a six-year-old"?

5  Do you recall saying that?

6  A    Yes.

7  Q    Okay.  Let's play Clip 11, which is Government Exhibit 6,

8  at Hour 1 --

9        (Publishing.)

10        MS. CHANG:  Sorry.  I wanted to first announce it's

11  Government Exhibit 6 at Hour 1, Minute 59, and you can read

12  along at Government Exhibit 7 at page 121.

13        THE COURT:  Before you start, can you move the

14  speaker about an inch or two back?  Because we're still

15  getting that feedback.

16        MR. MAHONEY:  What did you say the time was?  I'm

17  sorry.

18        MS. CHANG:  Hour 1, Minute 59.

19        THE WITNESS:  Do you know what page you're on?

20  BY MS. CHANG:

21  Q    121.

22  A    Thank you.

23        MS. CHANG:  Okay.  Go ahead.  Thanks.

24        (Publishing.)

25  BY MS. CHANG:

*Testimony of Lynda Geller, PhD*                                    **5**

1    Q    All right.  So I'm going to ask you a couple questions.

2    Would you agree that was a pretty swift back-and-forth

3    dialogue?

4    A    Well, we are on page 122, so by then, yes.

5    Q    Okay.  All right.  And so what you heard today was a

6    different speed of conversation than what we heard yesterday

7    at great length in the interview with Dr. Otto; correct?

8    A    They have different purposes, so yes.

9    Q    Well, tell me about why different purposes would affect

10   one's ability to communicate.  A six-year-old, even under

11   whatever circumstances, can only communicate at a six-year-old

12   level.  Would you -- is it your opinion that he's

13   communicating in that clip with the police as a six-year-old

14   would?

15   A    I tried to explain this yesterday, which is it isn't as

16   if someone is entirely at that level.  It's that they have

17   impediments that people that age have normally achieved.

18   They're mostly in the area of recognizing other people's

19   intentions, their theory of mind, understanding what's going

20   on.

21   Q    So I understand that because I remember you explaining

22   that at length yesterday, and I totally got that.  The thing

23   is, though, I'm asking you yesterday, when you were talking

24   about his ability to communicate -- so I understand that at

25   some other levels, like computer modeling -- clearly, he's got

*Testimony of Lynda Geller, PhD*                                        **6**

1    skills beyond a six-year-old.  With you there.  But yesterday,

2    with respect to communication, which is critical to

3    competence, you testified that "Well, look, obviously, he had

4    to" -- "people had to talk to him like a six-year-old, and at

5    trial people don't communicate like a six-year-old."  Do you

6    recall saying that?

7    A    Yes.

8    Q    Okay.  So what I'm saying is is it your opinion that he

9    was able to communicate with the police, whether it's a

10   different context or otherwise -- trial is also a different

11   context than a competency evaluation.  Is it your opinion that

12   he communicated beyond the level -- well beyond the level of a

13   six-year-old in his interview with the police?

14   A    No.

15   Q    Would you agree that he gave relevant and informative

16   responses to the police?

17   A    By Hour 2.

18   Q    Okay.  And do you recall how he said that he had asked

19   about 20 times whether these minors would have sexual contact

20   with him when -- if they met in real life?  Do you recall

21   that -- just hearing that a couple minutes ago in the clip?

22        "LEITNER:  How many times did someone ask" -- "Did you

23   ask somebody that, if you met, that they would" --

24        Horner says, "Would have some kind of sexual contact."

25        Marks says, "Yeah."

*Testimony of Lynda Geller, PhD*                                          7

1        And Leitner says, "Ballpark."

2        And then, if you go down a couple lines, Marks says,

3   "About the same with the -- with the selfie game.  So

4   about" -- and then he says "about 20."

5        Do you recall that?

6   A    Oh, yes.  So that's one of the things he normally does.

7   Thank you for reminding me.

8   Q    So is it still your opinion that this defendant

9   demonstrates absolutely no sexual interest in children?

10  A    Oh, absolutely.  And I base that on the sexual interest

11  evaluation by Imhof.

12  Q    Okay.  So you're basing that on -- who retained

13  Dr. Imhof, to your knowledge?

14  A    Probably the defense, I believe.

15  Q    Probably the defense.

16       Now, let's move on to working memory.  You claim that

17  "The defendant has working memory problems that" -- and I'm

18  quoting from your second report at page 11 -- "that severely

19  impair his ability to meaningfully discuss his case with his

20  attorneys."

21       Now, you've had the opportunity to listen to the

22  defendant's interview with Dr. Otto; right?  And you're aware

23  that the defendant was able to give Dr. Otto a pretty detailed

24  education history; right?

25  A    Those are facts, yes.

1   Q    And those were pretty far back in time; right?

2   A    Those are facts, yes.

3   Q    And you would be -- you're aware that he was able to give

4   a pretty detailed description of his living situation with his

5   roommates and his pattern of life at the DAVE School; right?

6   A    Not working memory.  So, yeah, I agree with what you're

7   saying.  Those things are true.

8   Q    And that was in the same time frame as the offenses

9   charged in the indictment?

10  A    Yes.

11  Q    Okay.  And you're aware that he told Dr. Otto about all

12  the places he went between his arrest in Florida and his court

13  appearance in Oklahoma?

14  A    Yes.

15  Q    And that was the time frame immediately after the

16  offenses charged in the indictment; right?

17  A    Yes.

18  Q    And so these are the types of circumstantial -- and I

19  know you classify them as facts, but they're the type of --

20  they're exactly the types of things that the defendant would

21  be able -- would be able to and need to discuss with his

22  attorneys; right?  Like, what was going on at the time?  The

23  facts about what was going on?

24  A    Yes.

25  Q    Okay.  And, in fact, he not only discussed facts of what

*Testimony of Lynda Geller, PhD*                                          **9**

1   happened, I think what you're describing as objective facts,

2   but he was also able to discuss, based on his memory, what he

3   was thinking during the offenses.  Do you recall that from

4   Dr. Otto's interview?

5   A    It would be helpful if you remind me what --

6   Q    Sure.  Of course.  So in Government Exhibit -- it's on

7   page 19 [sic] of Government Exhibit 3.

8       And Dr. Otto says, "What do you want the judge to know?"

9       Marks says, "It -- it wasn't intended that way."

10      Dr. Otto says, "Okay.  It was intended in what way?"

11      Marks says, "I -- I was trying to -- uh, I was trying --

12  I wasn't trying to be sexual.  I was trying to, like, mess

13  with them.  I guess not."

14      Now, in order to answer Dr. Otto's question about what

15  the defendant would want the judge to know about what he was

16  thinking at the time, he would have had to use his working

17  memory, wouldn't he?

18  A    Working memory is problem-solving.  You just -- he's just

19  repeating what he said to the police 50 times, the exact same

20  thing.

21  Q    So the defendant's problem with memory is isolated to a

22  small part related to problem-solving?  Is that what I'm

23  hearing?

24  A    Problem-solving and being able to make predictions about

25  the future to be able to know what consequences will follow

*Testimony of Lynda Geller, PhD*                                    **10**

1   what you say and do now.  That's working memory: to be able to

2   bring many things into your mind at once and work on them.

3   It's not the same thing as reciting facts and incidents.

4   Q    So -- and the defendant is good at citing facts; right?

5   A    He's fine at citing facts.

6   Q    And so when the police asked him questions and he lied,

7   wouldn't that indicate that his working memory is also

8   working?

9   A    I don't see lies but --

10  Q    Well, let me ask you a hypothetical:  If it were true,

11  for example, that the defendant lied -- so just assume for now

12  that it's true that the defendant lied during his interview

13  with the police.  Are you saying that that might demonstrate a

14  very well-functioning working memory?

15  A    Not particularly.

16  Q    No?

17  A    No.

18  Q    I mean, you just said working memory is the ability to

19  look into the future and imagine the consequences.  So if I

20  see the police and I don't know what they know and so I lie in

21  the hopes that they get off my back, isn't that me imagining

22  that if I lie, maybe they will not catch me?

23  A    I think it's -- I think it's an immediate response if it,

24  in fact, happened, which I didn't see, if -- it would be an

25  immediate response to a fear.

**Testimony of Lynda Geller, PhD**                                    **11**

1    Q    So it's an immediate response to lie to the police?

2    That's what you're saying?

3    A    I'm not saying that because I didn't see that happen.

4    Q    Well, I'm just asking you hypothetically.

5    A    Well, I'm not going to do a hypothetical about -- talking

6    about lying about someone who didn't lie.

7    Q    Well, didn't you do lots of hypotheticals on your direct?

8    A    What are you talking about?

9    Q    You were -- you were asked -- you were asked questions

10   about what the defendant could or could not do.

11   A    That's not the same thing.

12   Q    Okay.  The types of questions you heard posed to the

13   defendant in the police interview that you just heard -- those

14   are the types of questions that you would expect that the

15   defendant might be asked by his own attorneys, don't you

16   think?

17   A    Some of them.

18   Q    And those are the types of questions that he'd be asked

19   to -- he'd be asked while on the stand should he choose to

20   testify; right?

21   A    Some of them.

22   Q    And he was able to answer those questions, wasn't he?

23   A    He said the same thing over and over again for hours.

24   Q    He was able to answer those questions, wasn't he?

25   A    It's not a very sophisticated back-and-forth.

*Testimony of Lynda Geller, PhD*                                    **12**

1   Q    Was he able to answer the questions, Dr. Geller?

2   A    He was able to answer some simple questions that were

3   asked over and over again.

4   Q    Do you recall from Dr. Otto's interview that in the first

5   90 minutes he was able to discuss a whole host of topics?  For

6   example, he talked about his health history.  Do you remember

7   that?

8   A    Uh-huh.  Yes.

9   Q    And you talked about his educational history?

10  A    Yes.

11  Q    He talked about organ playing; right?

12  A    (Nods head.)

13  Q    But when the conversation turned to his offense conduct,

14  do you recall that the defendant started responding with long

15  pauses?

16  A    If you say so.

17  Q    Well, you know, I'll play it for you.  It's Government

18  Exhibit 2.2, at Hour 1 exactly.  You can follow along at

19  page 97 of Government Exhibit 3.  It's Clip No. 5.

20  A    I'm sorry.  That's too fast.

21  Q    I'm so sorry.  Page 97 --

22  A    Of what?

23  Q    -- of Government Exhibit 3.

24  A    Okay.  97.

25  Q    And it's Clip No. 5.  Yes.

1       (Publishing.)

2           THE WITNESS:  I don't see it.  I'm sorry.

3   BY MS. CHANG:

4   Q    Okay.  Well, I'll just read it -- I'll read it to you.

5   A    Could you tell me where you are.

6   Q    Sure.  Page 97, line 18.

7   A    Okay.

8   Q    Keep -- so Dr. Otto says, "I don't need to know the

9   charges from you, but what are they saying you did?"

10          And he says, "Uh, uh, talked to minors.  Uh, I had a,

11  uh -- there was one other thing.  I don't remember how they

12  put it, though, but they're -- yeah."

13          And Dr. Otto says, "Are they really accusing you of

14  talking to them, like, on the phone?"

15          And Marks says, "Uh, sexually."

16          And Dr. Otto says, "No.  My question was this:  Are

17  they -- how are they saying you communicated with them?"

18          He says, "Oh, uh, through texting."

19          "DR. OTTO:  Through texting.  Okay.  Through what, uh --

20  what apps or what programs or apps -- or what mechanism did

21  they say you used?"

22          "MARKS:  It was, uh, Amino and Kik.  Those are the two."

23          "DR. OTTO:  Amino and Kiks.  Okay.  And if you had to

24  explain to someone like me who's not very sophisticated about

25  this stuff, how would you describe Amino and Kiks?"

*Testimony of Lynda Geller, PhD*                                      **14**

1     "MARKS:  Uh, that -- that they're just messaging apps."

2     We played this clip yesterday.  Do you remember it now?

3    A    Uh-huh.

4    Q    Okay.  And do you remember at the end -- do you remember

5    at the end -- and now I'm on page 100, line 9.

6     Otto says, "Is it just hard for you to talk about that?"

7     And Marks says, "Yes."

8     Dr. Otto says, "But you were able to acknowledge that

9    that's what it was?"

10     And Marks says, "Yes."  And earlier he had said that he

11    was embarrassed to talk about this stuff.

12     So do you recall now the defendant admitted he didn't

13    like talking about his offense conduct?  You remember that;

14    right?

15    A    Yes.

16    Q    So that doesn't mean he's unable to talk about it; right?

17    A    No.

18    Q    Okay.  And he doesn't have an impaired working memory as

19    to his offense conduct; right?

20    A    That's not the same thing.

21    Q    No.  I'm asking does he have an impaired working memory

22    as to his conduct?

23    A    It doesn't even apply.

24    Q    Okay.  You state on page 11 of your most recent report

25    that "The defendant is incompetent with respect to coming to

*Testimony of Lynda Geller, PhD*                                  **15**

1   logical conclusions with future consequences in mind."

2   Government Exhibit 2.2 at Minute 33, Second 58, and it's

3   page 115 -- you don't have to listen to the recording part

4   because that's -- I do that for the record.  What you're

5   paying attention to is page 115 of Government Exhibit 3.

6   A    Oh, 1- --

7   Q    I just cite the minute for the record.

8   A    115?

9   Q    Yes.  And that's Clip 4.

10       (Publishing.)

11           MS. CHANG:  Pause right there for a second.

12  BY MS. CHANG:

13  Q    So wouldn't you agree that the defendant just came to a

14  logical conclusion with future consequences in mind right

15  there?

16  A    Well, he said, "Guilty?" with a question mark.  He's just

17  guessing because the guy's asking him questions.

18           MS. CHANG:  Okay.  We'll go on.

19       (Publishing.)

20  BY MS. CHANG:

21  Q    Okay.  Now, so didn't the defendant come to more logical

22  conclusions with future consequences in mind right there?

23  A    I -- I don't think so.

24  Q    You don't think so?

25  A    I don't think so.  I think he's asking.  Every single

**Testimony of Lynda Geller, PhD**                                    **16**

1   response he makes has a question mark after it.  It's like,

2   "Is this the best guess, sir?"

3   Q    So you just think he's really good at guessing?

4   A    I think he's being led through this in ways that would

5   not be similar to what would happen on a witness stand.

6   Q    But the police interview that you heard where he

7   interjects the police officer -- he interrupts the police

8   officers to add things that he's missing, where he -- asks

9   their questions in rapid fire -- that wasn't guessing, was it?

10  A    That was police manipulation.

11  Q    I see.  So it's police manipulation, and he's good at

12  guessing.  That's -- that's sort of what this amounts to?

13  A    What it amounts to is he has a very simple mind, and it's

14  not that hard to handle him.

15  Q    And given the clip that we just heard, is it still your

16  opinion that he can't process the flow of conversation, as

17  with Dr. Otto?

18  A    It depends on what it's like.  Yes, Dr. Otto talked in

19  such a way that he could -- did.  Like -- like talking to a

20  six-year-old.

21  Q    So he -- so the defendant was able to process

22  conversation?

23  A    When he talked at that level to him, yes.

24  Q    But when he was speaking -- when the defendant was

25  speaking to the police officers, they did not speak to him

1   like a six-year-old?

2   A    I only have to answer yes and no.  I can't explain that.

3   There's a whole lot in that interview that needs discussion.

4   Q    Because it has to do with context since it's a different

5   environment; is that right?

6   A    And how they led him to say things, yes.

7   Q    They led him to say things?

8   A    Yes.

9   Q    So when they asked him, "How many times have you asked a

10  child if they would touch you sexually," and he answers "20,"

11  they led him to say "20"?

12  A    No.

13  Q    So they led him as to some things but not others?

14  A    Correct.

15  Q    Your second report, which is dated April 8, 2019, so

16  11 days ago, says on page 11, "What he" -- meaning the

17  defendant -- "What he cannot do is understand the social

18  standards and rules underlying the behavior for which he is

19  accused."  Do you remember writing that?  It's on page 11 in

20  the second paragraph.  It's the third sentence.  "What he

21  cannot do is understand the social standards and rules

22  underlying the behavior for which he is accused."  Do you see

23  that?

24  A    Yes.

25           MR. MAHONEY:  Judge, I'd -- I just object.  In terms

*Testimony of Lynda Geller, PhD*                                          **18**

1    of relevancy, now -- not that I object to the area that -- you

2    hearing it, but now the Government is explicitly getting into

3    an entirely different topic, which is, you know, our original

4    argument to the Government that he's -- he doesn't have that

5    kind of blameworthiness that warrants prosecution.  It really

6    doesn't relate to competency.  I don't know why the

7    Government -- and I've been thinking of ways -- a lot of the

8    things the Government's gone into really I don't think relate

9    to competency, but this I think clearly jumps out of the

10   competency question.  It's just a question of timing here.

11            THE COURT:  The question's overruled.

12            You may continue, Ms. Chang.

13            MS. CHANG:  Thank you, Your Honor.

14   BY MS. CHANG:

15   Q    So do you remember writing that --

16   A    Yes.

17   Q    -- Doctor?  Okay.  So let's see if we can agree on a

18   couple things.  We -- and by "we," I mean the community, our

19   society, we have social standards that say it is not okay to

20   ask little kids for naked pictures of themselves.  Do you

21   agree?

22   A    Yes.

23   Q    Okay.  You agree that we have social rules that say that

24   no one should be bullying a nine-year-old into taking a

25   picture of herself masturbating and sending it to you over the

1  Internet.  Agree?

2  A    Yes.

3  Q    Okay.  Agree that we have social rules and standards that

4  say you cannot possess pictures of naked little kids.  Agree?

5  A    Yes.

6  Q    And possessing pictures of naked little kids is part of

7  the behavior that the defendant is accused of; right?

8  A    Yes.

9  Q    Okay.  And asking little kids for naked pictures, not

10  just possessing them, but asking the little kids for naked

11  pictures is also part of the behavior that he's accused of;

12  correct?

13  A    Yes.

14  Q    And so on page 11 what you're saying is that the

15  defendant can't understand those social standards and rules;

16  correct?  When you say, "What he cannot do is understand the

17  social standards and rules underlying the behavior for which

18  he is accused," you're saying he can't understand all those

19  social rules that I just outlined; correct?

20  A    Not quite.  That's not what -- that's not exactly what

21  was meant by that.

22  Q    Well, what exactly did you mean?

23  A    Exactly I did mean is for him to intuit a social rule is

24  difficult for him.  He has inflexible thinking, and in his

25  mind he was playing a -- his selfie game, which was about

1    doing something entirely different.  It had no sexual meaning

2    to him whatsoever.  So he is simply asking whosoever on the

3    other side of the conversation with me, and he does not

4    necessarily know how old they are or who they are, he's

5    asking -- he's asking them to do something outrageous, and the

6    whole goal of the game is to get them to hang up on him.

7    Q    And that's actually very consistent with what you say in

8    your first report, by the way, on page 37 and 38.  That's your

9    report from last year.  You say on page 37 and 38, quote, that

10   the defendant -- well, the defendant, quote, "was only trying

11   to troll others on the Internet through various chat rooms and

12   interest groups.  It truly never occurred to him that

13   responses might be from underage individuals or that such

14   conversations could have legal consequences."  Sound right?

15   A    Right.  So they're not occurring to him is the issue, the

16   social judgment issue.  It doesn't occur to him to think how

17   other people might be thinking about the thing he was doing.

18   He's only thinking about his intent, which has got nothing to

19   do with sexuality whatsoever.

20   Q    Okay.  And that's sort of where he is today; right?  Your

21   report -- this second report was written 12 -- 11 days ago;

22   right?

23   A    Uh-huh, yeah.

24   Q    Okay.  Let's turn to page 39 of your first report.

25   A    Wait a minute.  Let me find it --

*Testimony of Lynda Geller, PhD*                                      **21**

1    Q    It's -- yeah, you've got it up there.

2         On page 39 of your report, you state that the defendant

3    "now knows" -- this is from last year.  This is your report

4    from 2018.  You stated that the defendant, quote, "now knows

5    that sexual conversation and seeking sexual text pictures from

6    an underaged female is morally wrong and illegal" and

7    because -- end quote.  And because of that, he has, quote,

8    "little to no likelihood of reoffending," end quote?

9    A    Yes.

10   Q    Right?

11   A    Right.

12   Q    Okay.  So it seems to me, Dr. Geller, you are saying two

13   things at once.  In 2018 you say he now knows producing child

14   pornography is morally wrong and illegal, but 11 days ago, in

15   2019, you say that the defendant, present tense, "cannot

16   understand" -- I'm quoting -- "cannot understand the social

17   standards and rules underlying the behavior for which he is

18   accused."  So which is it, Dr. Geller?  X or not X?

19   A    He could not understand when he did it, and the

20   experiences that he's had since then make him understand.

21   Q    That's not --

22   A    That's not something he can intuit easily himself.

23   Q    So on your report on page -- in your report from 11 days

24   ago, did you misstate, then?  Because you state -- and you

25   actually just testified, he's present --

*Testimony of Lynda Geller, PhD* **22**

1  A    No.  He still -- he still does not have that ability, but

2  he has had so much concrete input now about the particulars of

3  this case that he now understands that.  It doesn't mean that

4  his whole ability to intuit social meaning in -- in life

5  changed.  It hasn't.  He understands this now because of what

6  has gone -- he's gone through for the past year.

7  Q    But isn't that a contradiction of what you say in your

8  report from 11 days ago, which is, quote, "he cannot

9  understand the social" -- and we're not talking about social

10 standards in general, we're saying these social standards and

11 rules underlying the behavior for which he is accused.  Isn't

12 that a contradiction?

13 A    No.  It's -- he still has that social deficit.  It's not

14 going away.  He just has learned, by experience of his

15 interviews and what's happened to him, the meaning of this

16 particular one.  I see -- I don't see a contradiction because

17 he still has that social skills deficit.

18 Q    So all at once he does understand but he does not

19 understand?

20 A    Because of the experiences and the conversations and

21 being arrested and all of the things that happened to him in

22 his police interview, he understands that situation and how it

23 was viewed by others.  That doesn't mean he is now cured of

24 being able to understand the social implications of many

25 things.

1   Q    But you didn't say "of many things."  You said "of the

2   behavior underlying his conduct" here on page 11 of your

3   report from 11 days ago.

4   A    Uh-huh.  Well --

5   Q    I'm just asking if it's a contradiction, but if you don't

6   think it is, we'll move on.

7        On page 11 of your second report from 2019, you say,

8   quote, "He cannot explain to his attorneys the subtleties of

9   the social system within which he found himself, nor the

10  reasons for his behavior within them."  So should he ever find

11  himself in a chat room with a nine-year-old again, do you

12  think he'll be able to think for himself and generate

13  autonomous thought and decide, gee, I shouldn't bully this

14  girl into making child pornography again?

15  A    I think that exact situation certainly could never happen

16  again because he's quite aware now what -- how other people

17  view it.  That's the issue.  He's not good at understanding

18  how other people view things.  That's called theory of mind.

19  He's not good at that.  However, this now has been very

20  concretely explained to him, and he's seen the consequences,

21  and he's seen -- he's been told by the police in a very

22  lengthy interview how this was being viewed.  It had not

23  occurred to him before that anyone would view it that way.

24  Q    So your answer is, yes, he can generate autonomous

25  thought in that situation again?

1    A   Yeah.  I don't think that we need to worry about this

2    particular thing happening again.  It doesn't mean he's cured

3    of social ineptitude.

4    Q   In your second report, you say that "He has to generate

5    autonomous thought to meaningfully assist in his own defense,"

6    and you say that's -- an example, his lack of autonomous

7    thought is an example of just the kind of abilities that are

8    significantly compromised for Steven to the extent that a fair

9    and equitable legal result are not possible.  So you're saying

10    he can stop and think for himself and keep himself from

11    producing child pornography again on his own, but he can't

12    think for himself in the legal process here, even with

13    guidance from his attorneys?

14    A   I don't think he can follow things at the level that is

15    necessary to be a witness to help his attorneys, no.  I think

16    he is a concrete thinker, and he understands simple things now

17    that have occurred to him.  That doesn't mean that he's able

18    to follow things.  His -- his ability to follow along with

19    things and process them and respond is -- remains very poor.

20    Q   But if he were to find himself in a chat room with a

21    nine-year-old again, he could follow along what was happening

22    there and generate sufficient autonomous thought to stop

23    himself from doing what he did before?

24    A   I think that the rules of that kind of behavior are now

25    seared in his brain.

*Testimony of Lynda Geller, PhD*                                        **25**

1    Q    So he can understand rules relating to that because

2    they're seared in his brain, but the rules about the legal

3    process cannot be seared in his brain such that he can

4    rationally act according to what he learns?

5    A    That's process; that's not rules.

6    Q    It's illegal to persuade a minor to generate child

7    pornography and send it to someone through a means or facility

8    of interstate commerce; right?

9    A    Yes.

10   Q    And that's an adult legal concept, isn't that?

11   A    Yes.

12   Q    Like, people don't walk around talking like that; right?

13   A    No.

14   Q    Okay.  Is it your opinion today that as of today, the

15   defendant understands that particular legal concept about

16   production of child pornography?

17   A    Because it's been explained, not said in those words,

18   yes.

19   Q    Is that a yes?

20   A    Yes.

21   Q    Okay.  So you say on page 5 of your 2019 report, quote,

22   "In order to assist counsel, Steven must be able to process

23   and follow adult legal concepts," end quote, but you say that

24   "his abilities in those areas are so severely compromised as

25   to render him incompetent."  So are you saying he can grasp

1   the legal concepts around child pornography but he can't grasp

2   the legal concepts around legal rights, for example, that he

3   has in the trial process?

4   A    I think if you read Dr. Otto's report you see it's pretty

5   minimal, and he knows the rule now, and he knows, because it's

6   been demonstrated to him, how he violated the rule

7   inadvertently as far as he's concerned.  And so I do -- I

8   don't see a contradiction saying he has difficulty following

9   anything complicated.  He needs to be talked to like he's a

10  much younger person, and I don't see the conflict here.  He

11  learns -- he has learned the rules.  He has learned now how

12  someone else thought about them, and that doesn't mean he now

13  can have appropriate conversations and make good -- make good

14  choices on things that are kind of complicated, such as a

15  legal process.  And I don't think that he understands very

16  well in the moment what's happening.

17  Q    On page 4 of your most recent report that the -- sorry.

18  So you say on page 4 of your most recent report that the

19  defendant convinced these young kids to produce child

20  pornography online inadvertently because, quote, "others had

21  trolled him in the identical way online and he was mimicking

22  that type of behavior."  We've discussed that already today;

23  right?

24  A    Uh-huh.

25  Q    So let's assume for the moment that you're correct.

*Testimony of Lynda Geller, PhD*                                    **27**

1   Okay?  Let's go back to my hypothetical.  If -- in your

2   opinion if the defendant were ever to find himself in a chat

3   room with a nine-year-old again, would he be able to

4   independently consider alternatives to mimicking that online

5   trolling behavior?

6   A     Now he would.

7   Q     Now he can?

8   A     Now he would because -- now he would.  Now he knows -- he

9   knows about these circumstances.  It's been really branded

10  into him.  I mean, what's gone on the last year and a half has

11  certainly informed his thinking.  And, yeah, I could teach a

12  two-year-old not to, you know, go after fire again because now

13  they've been burned.  That doesn't mean that that person can

14  all of a sudden think about everything at the level of danger

15  and what -- what -- that's -- he can't think about everything

16  that way.  His social skill deficits remain, but he certainly

17  knows very well about the consequences of this kind of

18  behavior and online behavior.

19  Q     So he can independently consider other alternatives in a

20  future situation?

21  A     I think the independently considering it is I won't --

22  I'm not doing it.  I mean, it's not very sophisticated when

23  you realize that what something led to and that it was wrong.

24  Q     But he can't -- he can't independently consider

25  alternatives with respect to the legal process?

*Testimony of Lynda Geller, PhD*                                        **28**

1  A    I think that's a very complicated thinking; so, no, I

2  don't think so.

3  Q    Don't you think you're cherry-picking a little bit,

4  Dr. Geller?  Don't you think you're separating out a narrow

5  scope of conduct and saying, "Oh, well, he's safe on this

6  stuff, but he can't possibly understand the other stuff"?

7  Aren't you doing a little bit of that?

8  A    No, because it's not the same kind of thinking.

9  Q    You say in your 2019 report on page 5 that, quote, "He

10  must be able to imagine the consequences of his decisions,"

11  end quote, but that ability too is so severely compromised

12  that he is incompetent; right?

13      All right.  I'm going to play -- and don't listen for

14  this part, but for the record it's Government Exhibit 6.  This

15  is the police interview at Minute 57, 41 Seconds.

16  A    I'm sorry.  I'd like to follow because I like to be able

17  to read.

18  Q    I know.  I'm getting there.

19  A    Okay.

20  Q    So Government Exhibit 7 for you, page 60.  Okay.  So

21  Clip 9, please, Agent Hyre.

22      (Publishing.)

23          MS. CHANG:  You can stop.

24  BY MS. CHANG:

25  Q    So he wasn't being truthful here, was he?

*Testimony of Lynda Geller, PhD*                                    **29**

1   A    Pardon me?

2   Q    The defendant wasn't truthful here, was he?

3   A    In what part?

4   Q    Well, for example, where the part where he says, "I

5   usually don't chat with people to make total friends, but I'm

6   not going to sit here and lie because everything is there.

7   Everything is there and available."  So he is -- he engages

8   with this girl for 3,000 lines of chat.

9   A    Uh-huh.

10   Q    So isn't he contradicting himself there?  Isn't he

11   minimizing his conduct a little bit?

12   A    "I don't usually chat with people to make total friends."

13   That's a completely true statement.  He doesn't usually do

14   that to make friends.

15   Q    And he says that he would never, quote, "never be stupid

16   to say anything," quote; right?  Do you see that where he

17   says --

18   A    What line are you on?

19   Q    He says, "I'd never be stupid to say anything."

20        Leitner says, "Sure."

21        He says, "Too crazy stupid.  Yeah."

22        Do you see that?

23   A    "Once again, I'm not going to sit here and lie because

24   everything is here," that one?  Can you -- All right.  So what

25   are you asking me?  I'm sorry.

*Testimony of Lynda Geller, PhD*                                    **30**

1    Q    I'm asking you he would never say anything too stupid to

2    the police because he could imagine the consequences of doing

3    so; right?

4          MR. MAHONEY:  I object.  That's -- that's not what

5    it says.

6          MS. CHANG:  I'm asking whether that's how she --

7          THE COURT:  Excuse me, Ms. Chang.

8          MS. CHANG:  I'm sorry.

9          THE COURT:  Direct your responses to me, please.

10          MS. CHANG:  I apologize, Your Honor.

11          THE COURT:  Thank you.  Why don't you just go ahead

12    and reask the question, and we'll just move forward.  Thank

13    you.

14          MS. CHANG:  I apologize, Your Honor.

15          THE COURT:  Thank you.

16    BY MS. CHANG:

17    Q    The -- why do you think he said that he would never be so

18    stupid to say anything to the police?

19    A    I'm afraid I cannot find that.  Page 60, line 17?

20    Q    Page 61, because it --

21    A    Okay.  61.  Okay.  Okay.  Okay.  All right.

22    Q    -- ended on page 60 and went on to page 61.

23    A    All right.  I'm sorry.  Line --

24    Q    Wouldn't you agree that he -- I'm sorry.  I didn't --

25    A    I'm sorry.  What line are you on?  I'm just trying to

1    find it.

2    Q     Line 2.

3    A     Line 2.  Okay.  "I'd never be stupid to say anything."

4    Yeah.  Okay.

5    Q     "Too crazy stupid, yeah."  Line 4.

6    A     Okay.  So what's your question?

7    Q     My question is why do you think he said that to the

8    police?

9    A     I -- I don't really even understand what he means, so I'm

10   afraid I can't figure -- I can't divine why he said that.

11   Q     So you can't divine, for example, that -- do you think

12   it's a possibility that he said that because he could imagine

13   the consequences of saying something to the police?

14   A     He's -- you know, he knows he's in trouble, and he's

15   responding the best he can.

16   Q     But you're saying he can't imagine the consequences of

17   his decisions here?

18   A     Not very well.  He doesn't -- you know, he doesn't want

19   to get in -- be in trouble by lying to the police, so he says,

20   "I'm not going to lie to you."

21   Q     Let's turn to Government Exhibit 5, page 19.  These are

22   the Kik chats between the defendant and his nine-year-old

23   victim.  Page -- I'm sorry.  Line 542.  Remember, orange is

24   the defendant and white is the victim.  I'll try to make it a

25   little bigger for everyone.

1    He says, "Oh, I've done a lot for you.  I've talked to

2    you.  I was here for you, listened to your problems."

3    And she says, "Well, you listened for a little, and then

4    you asked for nudes."

5    He said, "I listened for over three hours."

6    She calls him a liar.

7    Then he says, "Oh, from 8 to 11 I did."

8    And so if we move on, he says, "Well, let's change the

9    subject."  He kisses her, and then he says, "Let's change the

10   subject."

11   And then she talks to him some more, going down the page.

12   And he says, "Let's change the subject.  I'm here for you

13   and no one else."  Next page.  Then he says, "Want me to

14   leave?  Yes or no?"

15   Answer:  And she says, "No."

16   And he says, "Well, then stop being mean to me.  Okay?"

17   And she says, "But I do want you to stop asking for

18   nudes."  And then she says, "Do you really" -- "Do you really

19   love me?"

20   And he says, "Yes."

21   And she says, "Do you really?"

22   And he says, "Yes.  And you've been nothing but mean to

23   me."

24   And then she says, "Then why are you making me do

25   something that I hate?  It makes me feel gross, and I want to

*Testimony of Lynda Geller, PhD*                                      **33**

1   die because of the humiliation."

2       And he says, "Answer yes or no, and then say nothing else

3   after I continue.  Do you want me to block you again?  Yes or

4   no?"  Moving to the next page.  He says, "Listen.  You will do

5   my pictures.  Are we clear?  Yes or no?"

6       And she says, "My life can end now."

7       And he says, "Answer my question."

8       She says, "No.  I don't know why."

9       And he says, "Then I'll block you again."  So it kind of

10  goes on and on.  And he says, "You'll do my pictures.  You

11  don't get it.  Do you want me to block you?  If you don't want

12  me to block you, you will do any picture of" -- I think it

13  means "or" -- "or video that I say."  That was line 630.  Then

14  he tells her on the next page, page 22, "Again, do my videos

15  or I block you."  And he continues, you know, going on, "I'll

16  block you, seriously."

17      Now, you testified yesterday with your video about the

18  triangle and the circle; right?  Do you remember that?

19  A    Yes.

20  Q    And you explained how autistic people are more likely to

21  describe what happened in terms of the shapes literally moving

22  versus ascribing social meaning to the circle and the

23  triangle; right?

24  A    Right.

25  Q    Nothing in these chats that we just went through involves

1   social inferences like attributing meaning to abstract

2   objects, does it?  Like, your abstract -- the circles in that

3   video has -- it's not analogous to these chats, is it?

4   A    These to me are a -- an excellent illustration of his

5   role-playing in a game and not being able to see that there's

6   something else going on.  He doesn't see there's something

7   else going on.  He's -- he's -- this is a fantasy game to him.

8   He is not able to think about, is there some other social

9   meaning that we could attribute to this.

10  Q    And so when she sends him 32 nude pictures of her

11  genitals, some of which include her face, showing that she is

12  nine, where it's, like, face, torso, vagina, you're saying he

13  doesn't understand the social meaning behind that?

14  A    I'm saying -- I'm saying it's a rigid game he's playing

15  where he's -- where it's role-playing, and he believes that

16  people on the other side, they are role-playing too.  So, you

17  know, we -- it's obvious to us to ascribe the social meaning

18  to this.  Obvious to you, obvious to me.  Not obvious to him,

19  who is --

20  Q    So when --

21  A    -- who is completely involved in the idea of this is a --

22  this is a role-play game that we do, and I'm trying to simply

23  get her to -- I'm trying to do something so outrageous that

24  she'll hang up.  That's the goal of the game.

25  Q    You're actually bringing up a good point.  You said that

1    the whole point of the game is to do something so outrageous

2    that she'll hang up.  Who's threatening in these chats to hang

3    up, her or him?

4    A    That's just part of the outrageousness, saying something

5    outrageous.

6    Q    And who told you that?

7    A    I'm divining it from reading that and knowing what the

8    game is.

9    Q    Yeah, who told you what the game was?

10   A    He's told me about the selfie game and I've read about,

11   you know -- I've done research on trolling, and it fits.

12   Q    When she says, "I do want you to stop asking for nudes,

13   and I want to die because of the humiliation," this is not

14   analogous to the visual tracking video that we saw yesterday,

15   is it?

16   A    It's just an example to help illustrate how our brains

17   work differently.

18   Q    But even in your opinion, the defendant, with all of his

19   autistic impairments, he surely could understand that when

20   someone writes to him "I want to die because of the

21   humiliation, I do want you to stop asking for nudes," it's --

22   it's even your opinion -- you'd agree, even you would agree

23   that he can understand what that means, though, don't you?

24   A    You know, I think that if you asked him now he could

25   understand what it means, but in the moment he was playing a

*Testimony of Lynda Geller, PhD*                                    **36**

1   role and just pushing the role.

2   Q    You explained yesterday on direct that the defendant --

3   one of his impairments is he can't explain himself well;

4   right?

5   A    Right.

6   Q    Okay.  Because explaining things requires

7   perspective-taking; right?

8   A    Yes.

9   Q    Don't you think that in these chats he explained what

10  he -- he explained himself, actually, quite well, don't you

11  think?  Explained what he would do if she didn't send

12  pictures?

13  A    It's not explaining.  That's just saying -- those aren't

14  explanations.

15  Q    So you don't think that what he was doing was

16  manipulative?

17  A    That's what trolls do.

18  Q    Do you feel that --

19  A    Yeah.  Yeah.  Yeah, that's -- that's the mimic -- that's

20  the behavior he's mimicking from trolling online.

21  Q    And who told you he was mimicking and trolling online?

22  A    He told me that he was trolling and the game -- the game

23  is just trolling.

24  Q    The defendant told you --

25  A    Yeah.  Other people have trolled him, and I know what

1  trolling is, and it fits with what trolling is and what people

2  do.

3  Q    So that was the defendant's self-report to you?

4  A    It was his self-report to the police too.

5  Q    Okay.  But either way, it was the defendant's

6  self-report; correct?

7  A    Yeah.

8  Q    Now, he told the victim here he -- that "Oh, I listened

9  to you for three hours"; right?  And then he asked for nudes,

10  and then he threatened to block the victim.  And the entire

11  basis of that manipulation is taking the other person -- the

12  other person's perspective, wouldn't you agree?

13  A    I think he's just got a bunch of -- he's got a bunch of

14  behaviors that he's done and he's probably done them to other

15  people too.

16  Q    So you don't think that what he was doing was

17  manipulating and taking that nine-year-old girl's perspective

18  and exploiting it?

19  A    Well, of course I think that and you think that.  The

20  question is does he think that.

21  Q    You don't think that he was doing that?

22  A    No.  I think he was playing a game.

23  Q    So you don't think that he can take someone else's

24  perspective?

25  A    Not very well.

*Testimony of Lynda Geller, PhD*                                    **38**

1    Q    You testified yesterday --

2    A    That is -- that's pathognomonic to autism.  That's what

3    autism means.  Can't take the perspective of other people

4    easily, no.

5    Q    And so the only way he was able to accomplish these 3,000

6    lines of manipulation was by copying someone else?  That's

7    what you're saying?

8    A    He's -- he's in a rigid pattern, and that's what he's

9    doing.

10   Q    That's what he's doing, and, again, that came from the

11   defendant; right?  Right?

12   A    And my knowledge of autism, yes.

13   Q    You testified yesterday that in your opinion, the

14   defendant does not pose a danger to anyone else; correct?

15   A    Correct.

16   Q    And you explained how the empathy deficit -- I think is

17   the phrase you used; right? -- the empathy deficit of an

18   autistic person is different of the empathy deficit of a

19   sociopath; right?

20   A    Yes.

21   Q    All right.  And you said someone who was antisocial was,

22   quote, "clever at picking up social signals."  Do you remember

23   that?

24   A    Uh-huh.

25   Q    All right.  So manipulation of a nine-year-old, that

1  shows cleverness and ability to pick up social signals and

2  exploit them, doesn't it?

3  A    He's -- I think he's copying threatening behavior that

4  he's seen online.

5  Q    Because he told you that; right?

6  A    No, because I have researched online what goes on and

7  I've seen it.

8  Q    But you researched it because he told you he was

9  trolling; right?

10  A    I looked up -- I needed to know more about trolling and

11  found, in fact, the things that he explained about trolling

12  were ones that are out there.

13  Q    When a nine-year-old child says to an 18-year-old who is

14  asking for nude pictures to stop because it makes her want to

15  die and he threatens to block her unless she does as he says,

16  wouldn't you agree that shows a significant empathy deficit?

17  A    Yeah.  Because he's not picking it up, yeah.

18  Q    And you testified yesterday that everyone you've talked

19  to said what a sweet boy the defendant is.  Do you recall

20  saying that?

21  A    Yes.

22  Q    Do you think this is sweet behavior in this -- in these

23  chats?

24  A    No, but I don't think -- I think intentionality is what

25  needs to be considered here.

*Testimony of Lynda Geller, PhD*                                    **40**

1  Q    You testified yesterday that everyone you've talked to

2  said he would never knowingly harm anyone.  Recall?

3  A    Yep.

4  Q    Do you think he would ever knowingly harm anyone?

5  A    Do I think he would?

6  Q    Yeah.

7  A    No.

8  Q    And knowing what you know about what he wrote in these

9  chats, do you still think that he would never knowingly harm

10 anyone?

11 A    Yes.

12 Q    And recalling from the earlier clip, when he admitted he

13 had asked these minors to have sexual contact with him about

14 20 times, you don't think he's a danger to children?

15 A    No.  He has no sexual interest in children.

16 Q    Despite having asked minors 20 times if they would have

17 sex with him if they met in real life -- or have sexual

18 contact with him if they met in real life?

19 A    That's part of the game.

20 Q    Yesterday I asked you whether you had considered whether

21 the defendant might have a personality disorder and autism.

22 Do you recall that?

23 A    Yes.

24 Q    Because you acknowledged that you can -- just because

25 you're autistic doesn't mean that you can't also have some

*Testimony of Lynda Geller, PhD*                                      **41**

1    other problems?

2    A    Mental illness.  You can have --

3    Q    Right?

4    A    You can have other things, yes.

5    Q    Okay.  And when I asked you whether you considered

6    whether the defendant might have both, you said yes.  So can

7    you explain, do you think the defendant has both autism and a

8    personality disorder?

9    A    Not the one you're thinking of.  You're thinking of

10   antisocial; correct?

11   Q    Okay.  Do you think he has any personality disorder?

12   A    I mean, people might diagnose him with dependent

13   personality disorder because he's so passive, but that, again,

14   is a common kind of behavior that people with autism exhibit.

15   But I don't think that it needs to have that diagnosis.

16   That's the only thing that I think fits in any way.

17   Q    Okay.  So just to make sure that I'm understanding you

18   correctly, you think that he -- I know you know -- I know you

19   have diagnosed him with autism and on top of that you think

20   if -- someone -- a reasonable other psychologist might

21   diagnose him with dependent disorder but not necessarily, and

22   it would be reasonable not to diagnose him with that; correct?

23   A    Correct.

24   Q    Are there any other personality disorders that you think

25   a reasonable psychologist could ascribe to him?

*Testimony of Lynda Geller, PhD*                                              **42**

1   A    No.

2   Q    Okay.  So not antisocial disorder?

3   A    No.

4   Q    So not the lacking of -- not having the empathy deficit

5   that -- that a sociopath would have?

6   A    Just the opposite.  No.

7   Q    Okay.  Because you think he was trolling; right?

8   A    Yes.

9   Q    He was just playing a game; right?

10  A    Yes.

11  Q    And you said he got -- he somehow got himself over in his

12  head -- or over his head.  I think you used that phrase

13  several times yesterday?

14  A    Yes.

15  Q    But you agree no one put him there; right?  No one said,

16  "Steven, you must go to the computer and start typing to these

17  children"; right?

18  A    People with autism often spend almost all their lives on

19  the computer because there's nothing else happening in their

20  lives.

21  Q    But of the millions and millions of things to do on the

22  Internet, no one -- it's not your contention nor has he ever

23  claimed to you that someone forced him to do this; right?

24  A    No one forced him to do that, no.

25  Q    And he -- so he's the one who put himself there; right?

1  A    He's -- yes.

2  Q    He didn't find himself in a chat room.  He was in

3  control; right?

4  A    I guess.

5  Q    But he was copying someone else?  That's your claim?

6  A    Yes.

7  Q    All right.  And he didn't know what --

8  A    And he had experienced that himself by others doing it to

9  him.

10  Q    And so he didn't know what it meant; right?

11  A    He didn't know what it meant?

12  Q    Well, he didn't realize the social implications of what

13  he was doing.  He was just copying --

14  A    Right.  He was rather --

15  Q    -- rigid?

16  A    Blinders and rigidity, I'm doing this game and not

17  thinking of other alternatives.

18        THE COURT:  Ms. Chang, we've gone down this line of

19  questioning multiple times, so could we please --

20        MS. CHANG:  Yes, Your Honor.

21        THE COURT:  Thank you.

22        MS. CHANG:  I'm almost done.  Yes.

23        THE COURT:  Thank you very much.

24  BY MS. CHANG:

25  Q    So you've met with Mr. Marks how many times?

*Testimony of Lynda Geller, PhD*                                             **44**

1   A    Three, I think.

2   Q    And for how many hours each time?

3   A    Many.  I don't remember.  I don't know.  Four, something

4   like that.  Five.

5   Q    So a few hours, three times?

6   A    Yeah.

7   Q    Okay.  So about maybe 20 hours max?

8   A    No, no, no, no.  Not five hours each time, no.

9   Q    Okay.  So approximately how many hours total have you

10  spent with Mr. Marks?

11  A    About five.

12  Q    About five.  And so based on those five hours of

13  conversation with Mr. Marks, you are confident in your

14  conclusions about what he was thinking and his abilities?

15  A    Well, that's not the amount of time that was spent on

16  understanding him in the case.  That's 100 hours.  There's --

17  that's not how you investigate someone's entire life, is not

18  just asking them about it.  But everyone who's ever known them

19  and everyone who's ever written about them and everything

20  that's been observed about them from infancy.  That's how I

21  know him, and that's how I know how his brain works.  So, yes,

22  in five hours with him.

23  Q    And so you know how his brain works based your studies

24  and his self-report.  Who retained you, Dr. Geller?

25  A    I'm retained by the defense.

*Testimony of Lynda Geller, PhD*                                    **45**

1  Q    And how much are you getting paid her hour?

2  A    $300.

3  Q    For each of the hundreds of hours that you've spent in

4  this case?

5  A    Well, I don't really charge for all the hours I spend,

6  but yes.

7          MS. CHANG:  I have nothing further, Your Honor.

8          THE COURT:  Thank you, Ms. Chang.

9          Mr. Mahoney, would you have any redirect?

10          MR. MAHONEY:  Yes, Judge.  Thank you.

11          THE COURT:  Thank you.

12          MR. MAHONEY:  At some point, Judge, I was going to

13  finish displaying that -- I think we've got that set up to let

14  you see that -- rest of those slides, that wouldn't take long,

15  but we can do it -- if we have some break, we can get it set

16  up to do it.

17          THE COURT:  Okay.  And did you bring copies of your

18  exhibits today as well?

19          MR. MAHONEY:  Yes.  Yeah, we have that.

20          THE COURT:  Okay.  Very good.  Thank you.

21          Thank you, Mr. Foster.

22          I think what we'll do, Mr. Mahoney, is when you

23  finish redirect -- and, actually, when you finish with

24  Dr. Geller, we'll take a quick five-minute break, and then you

25  can go ahead and get it set up and we can do the video then,

1    unless you needed to ask her questions about it.

2          MR. MAHONEY:  No.  I can -- I can just explain it in

3    the exhibit.  So --

4          THE COURT:  Okay.  Then go ahead with your redirect,

5    please.

6                     REDIRECT EXAMINATION

7    BY MR. MAHONEY:

8    Q    Dr. Geller, let me go back to the initial question to

9    you.  How is autism associated with memory loss?

10   A    Well, as I said yesterday, there are lots of different

11   kinds of memory, and so depending on the type of memory,

12   whether it's complex, whether it's socially based, whether

13   it's just facts, whether it's things we have to remember to do

14   versus things that we have to manipulate in our minds, there's

15   lots of different kinds of memory.  So working memory is one

16   of the commonest problems in people with autism, which is

17   handling -- holding things in your mind and manipulating the

18   thoughts.  Because you can't hold them in your mind, you can't

19   remember enough to manipulate your thoughts properly.

20   Q    And by "manipulate thoughts," are you talking about

21   executive functioning, doing something --

22   A    Yes, we're talking about doing --

23   Q    -- based on taking some action?

24   A    Taking some action based on remembering a whole bunch of

25   things at the same time.  If you can't remember a whole bunch

**Testimony of Lynda Geller, PhD**                                    **47**

1   of things at the same time and keep them in your mind, you

2   can't make logical conclusions.

3   Q    Okay.  And are other kinds of memory affected by the

4   experience of being an autistic person?

5   A    There can be.  A lot of -- there's a lot of memory

6   problems that people with autism have based on the traumas of

7   their life that -- that sort of make holes in their memory for

8   traumatic things that have happened to him.

9   Q    And is there a neurological foundation for that?

10  A    Yeah.  It's when -- when stress levels are so high that

11  we overproduce cortisol in the brain, it burns out memory

12  circuits, and we lose a memory.

13  Q    And why would somebody who has autism be under stress

14  that constantly?

15  A    They're under social stress way more than any of us can

16  imagine all the time because they don't understand, and people

17  bully and pick them out in mean ways.

18  Q    And they -- do they deal day to day with the apprehension

19  of the unexpected happening to them?

20  A    They do.

21  Q    People with autism can have PhDs; right?

22  A    Yes.

23  Q    Is it recognized, first -- for example, first of all, in

24  the diagnostic and statistical manual, that intelligence does

25  not rule out problems with understanding social norms?

*Testimony of Lynda Geller, PhD*                                          **48**

1    A    Not at all.

2    Q    And you -- you were asked -- and as far as not

3    understanding social norms, is that -- how does that -- you

4    were asked a question about "Well, maybe that deficit of not

5    understanding social norms, not having that social intuition,

6    maybe that doesn't affect all people with autism."  Do you

7    remember that question yesterday?

8    A    Right.  I do.

9    Q    But, in fact, you explained what?

10   A    That it's -- that the whole lack of understanding of --

11   of social information is pathognomonic to the diagnosis.  It

12   is -- it is the critical -- it's the critical dimension that

13   defines autism, that you have some lack of social, and it's

14   based on, you know, your genetic makeup and how you have been

15   viewing the world since you were born, whether you were able

16   to make sense out of social input from your infancy through

17   adulthood.  So the two characteristics that define autism

18   are --

19            THE COURT:  Dr. Geller?

20            THE WITNESS:  Yes?

21            THE COURT:  One moment.  The court reporter had a

22   question for you.

23            THE WITNESS:  Yes.  I'm sorry.

24            THE COURT:  Okay.  Go ahead, Dr. Geller, if you want

25   to finish the answer.

1    THE WITNESS:  So I just want to say the two aspects

2  of autism that are diagnostic and definitive of it are the way

3  the brain works in the sort of rigid, repetitive, stereotyped

4  way.  That's one.  And the other one which is common for

5  everyone that has autism is theory of mind deficits, which is

6  being able to take the perspective of others and have true

7  social understanding.

8  BY MR. MAHONEY:

9  Q    And so when -- and you used the term earlier

10  "pathognomonic."  Does that appear in any of the definitive

11  research describing this phenomenon regarding the social

12  perspective?

13  A    Sure.  I mean, we -- I mean, it occurs in research that

14  talks about -- about that aspect being both characteristic but

15  necessary for the diagnosis.  That's what it means.  And so in

16  genetic research being able to identify how that begins to

17  happen is when they use that term.

18  Q    All right.  And so when we saw the video of the --

19  Richard Burton and Elizabeth Taylor and so on, that results of

20  showing that autistic people are going to be looking mainly at

21  the mouth and not looking at the social cues that we look at,

22  that's something that is going to be typical of all people

23  with autism?

24  A    Right.  It's demonstrated in the twin studies that people

25  who have that genetic makeup who are identical twins have the

1   exact same way of looking or not looking at the things that we

2   should look at.  So it's in the literature on -- on the

3   genetic cause of autism, and it's in all literature on the

4   clinical manifestations of autism.

5   Q    As an example of this --

6             MR. MAHONEY:  If I can hand this to the witness,

7   Judge?

8             THE COURT:  Yes, you may.

9             MR. MAHONEY:  I've marked it now as Exhibit L.  And

10  we have copies for the Court, Your Honor.  This research, in

11  2017, was published in *Nature Magazine*.

12            THE WITNESS:  Right.  So --

13  BY MR. MAHONEY:

14  Q    That was authored by -- the lead author was John

15  Constantino.  Are you familiar with him at Washington

16  University in --

17  A    I know him, yes.

18  Q    And then one of the last authors, Ami Klin and Walt- --

19  and Walter Jones?

20  A    Yes, I'm familiar with most of these people.

21  Q    Ami Klin was the person who spoke yesterday in the video.

22  Dr. Klin was the person who wrote the definition of Asperger's

23  for DSM-IV; is that right?

24  A    That's right.  And Dr. Constantino's written measures of

25  social function that we -- that I use all the time.

*Testimony of Lynda Geller, PhD*                                    **51**

1   Q    And they refer to this failure to perceive the social

2   cues in the world as being pathognomonic for autism?

3   A    That's right.  And it's a twin study, so they talk about

4   how identical twins have this identical gene and look at

5   identical things and don't look at the things the rest of us

6   look at, how it's, you know, less so in fraternal twins and

7   less so in other family members.  So in people who have

8   identical genes, they look at identical things and miss

9   identical things, and their developmental trajectory is

10  identical based on the gene makeup.

11  Q    Yeah.  So the thrust of the study is that this not

12  looking at social cues is essentially a genetically controlled

13  thing?

14  A    It's genetically controlled, and it begins the cascade of

15  what we see in children, teens, and adults with autism.

16  Q    Now, could you -- you were asked a question yesterday.  I

17  just want to maybe help clarify this, a question about -- you

18  had originally said something about the process of childhood

19  development involves imitation and that there's something

20  about persons with autism that have difficulty with that --

21  that process as part of child development.  And then later the

22  question came up, well -- and it comes up again today, this

23  process of mimicry.  So let me first ask you about the -- this

24  idea of imitation that you mentioned in terms of child

25  development.

1  A    So there's one theory that posits that one of the reasons

2  that young children don't easily mimic social behavior and

3  learn social behavior is because they have deficits in the

4  mirror neurons.  It is not by any means thought that that's

5  the only reason.  It's just an explanation, that they found in

6  some children with autism mirror neuron deficits, and if you

7  have problems with your mirror neurons, that's what helps you

8  exactly imitate something you see.

9  Q    And so --

10  A    That's a theory that -- that is much more of a theory

11  than the genetic proof.  So it's one -- one contributor.

12  That's --

13  Q    But is -- but is the adverse of that that typically

14  developed children do learn a lot by imitating other children

15  at an early level?

16  A    That's the implication.  That's where that research

17  started, yes.

18  Q    Or mirroring their behavior?

19  A    Mirroring of behavior; right.

20  Q    All right.  So then we get to the question of mimicry,

21  and I guess that my lead into the point of mimicry, because

22  you discussed this yesterday, and let me just sort of -- if I

23  can start with a summary and see if it's accurate.  But

24  because people with autism from infancy are not looking at the

25  social cues in the world, they don't learn interpersonal

1  skills and they don't use how to emotionally reciprocally

2  relate to other people, and they also don't learn social

3  intuition, social norms?

4  A    Yes.

5  Q    All right.  So the question then comes up, if they don't

6  then have that intuitive way of thinking about navigating the

7  social world, how do they do it?  So how do they do that?

8  A    They do it cognitively.  And so it's not -- it's so much

9  easier for us to just survey, just go like this, kind of look

10 around and, like, take in your face and I take in her face,

11 and I take in the -- and I just know information.  I'm not

12 thinking about it; I just know it.  People with autism have to

13 look and say, "Oh, that's an eye like this, and her mouth is

14 looking like that way.  I think that pattern usually means

15 this."  Okay.  So look how long that took versus me just going

16 like that and like that and like that.  So normal people just

17 can take in information, and people with autism have to get at

18 it cognitively.  So it is a cognitive kind of trick that

19 people with autism learn that when I go in a room and I have

20 no idea how to behave, that if I choose a couple of people --

21 and this is all going on cognitively, which is, like, a

22 million times slower than how we do it -- if I pick a couple

23 people and I just do what they do, maybe I can pass.  And so

24 there's an interesting book called *Pretending to Be Normal* in

25 which an adult woman with Asperger's says, you know, "This is

**Testimony of Lynda Geller, PhD**                                    **54**

1   how I functioned for years," and it's so interesting to get

2   behind her head and understand how she does it because people

3   say, "Well, we don't even think you have autism, you're so

4   great."  She says, "I'm not great at all; I'm working like

5   hell to just understand what's going on, and the way I do it

6   is imitating people."

7   Q    And so the idea of mimicry, then, come into play here?

8   A    Yeah.  It does.  It does.  That's sort of a survival

9   skill that people learn.  People who are brighter learn by --

10  just imitate people, then that's a good way to learn how to be

11  social because they can't intuit how to be social themselves.

12  Q    So if they see somebody using a phrase or saying a

13  certain thing or behaving a certain way, they might model on

14  that, hoping that works for them?

15  A    Yes.  You see in little children, you see them take on,

16  you know, like whole phrases out of Disney cartoons and things

17  like that, trying to figure out, well, if I talk like that,

18  then other kids will like me, and then they do it.  And then

19  at a more adult level, it's more like I might go into a room

20  and say, "If I act like these people, maybe that's a good

21  idea," but it's all cognitive instead of intuitive.

22  Q    And so in a way, when -- when you described it, Steven

23  has described how he as a younger person had people asking him

24  for pictures, doing this trolling kind of thing for him that

25  he sees -- he would learn what they would say to him to get

*Testimony of Lynda Geller, PhD*                                                    **55**

1   him to do that?

2   A    Yes.  That's -- that's how he learned it.

3   Q    And -- and that becomes, as you say in a game, that

4   becomes like the rule of the game.  That's his technique.

5   Those are his weapons.  Those are his tools?

6   A    Those are his tools because he's playing a game.  I have

7   to say I was so struck by looking over the police interview

8   last night again and seeing how he -- they asked over and over

9   and over and over again about what he was doing.  He kept

10  saying, "I'm trolling.  I'm playing a game.  This is what I'm

11  doing," over and over and over again as they kept asking him,

12  you know, "We don't think you're a monster.  Just tell us what

13  you were doing and why did you do this?"  And he said, "I'm

14  playing a game," and it took him -- it was, like, I'm up over

15  page 100 before he begins to say, "Oh, do they think something

16  else?  Because they keep saying this to me."  It does not

17  occur to him for 100 pages that this is what other people

18  think.  So, again, it's all cognitive.  You have to -- you

19  have to think of it, and that's -- that's really hard also

20  because their skills in that area can be compromised.

21  Q    So in this -- the other side of this, to get to these --

22  these chats with these girls that we've -- we've heard, so

23  he's playing a game.  Why isn't he -- why isn't he thinking

24  about if she says something like, you know, I hate to send

25  nude pictures, or people keep asking me for nude pictures, or

*Testimony of Lynda Geller, PhD*                                   **56**

1    I hate doing this.  Why isn't he saying, "Oh, I" -- that he

2    feels sorry for her in that?

3    A    Because that's because of the cognitive empathy problem.

4    He doesn't -- he doesn't -- he doesn't get it, so he doesn't,

5    therefore, feel it.

6    Q    But is also part of this that this -- this girl has

7    agreed to engage in role-playing with him?

8    A    That's what he thinks.  He thinks we're playing a game

9    together.  He thinks it's role play.  And he's done it, and

10   he's been on the other side of it.

11   Q    And they were originally from this -- these original

12   chats were in Amino, which doesn't last long, and they ended

13   up switching over to Kik.  And that's where the thousands and

14   thousands of lines of chats were.  So -- so she's agreeing to

15   go along with his process with him?

16   A    Yes.

17   Q    For whatever reasons?

18   A    For whatever reason.

19   Q    And, of course, you -- in our original memorandum that's

20   attached as Exhibit C, which is Exhibit Z to our exhibits, we

21   are -- we related extensively -- and you've seen this about

22   this Internet milieu how children at younger and younger ages

23   are going on the Internet at places exactly like this to seek

24   these kinds of explicit experiences?

25   A    Yes.  It's extremely common.

**Testimony of Lynda Geller, PhD**                                        **57**

1  Q    And for this girl -- I mean, she may be nine years of

2  age, but in -- but he's also -- so he's reacting to that

3  milieu.  He's reacting to what the Internet is like.

4  A    All the things that he -- all the wording and everything

5  he uses are things that are in every one of these chat rooms

6  and can readily be picked up that other people are also saying

7  to other people.

8  Q    Okay.  And -- but in this -- but in terms of his chats

9  with this -- this girl -- and looking at Government's

10  Exhibit 7 -- I'm sorry -- Government's Exhibit 4, which are

11  these images on about the fourth page, he asks her to send her

12  a selfie without any antecedent.

13       And she says, "I have no shirt on."

14       And then he says, "It doesn't matter."  And then he wants

15  her to play the game.

16       And then she says, "Well, I'm" -- "I'm not wearing a

17  shirt or pants."

18       And he says, "That doesn't" -- "Come on.  That doesn't

19  matter."

20       And she asked if you're hitting on me.

21       So from his perspective, she is playing the game?

22  A    From his perspective, yes.

23  Q    And, in fact, she's the one in this -- from these chats

24  that first raises this sort of sexual innuendo a bit because

25  she says, "Well, I'm not wearing anything."  She didn't need

1    to mention she wasn't wearing a top if she wasn't.

2    A    No.  It's -- again, they're both game playing, and it's

3    unfortunate.

4    Q    And later if -- she expresses concern that she's sending

5    pictures because she thinks she's fattish and he will judge

6    her, and he says no.  She wants to know if he's going to be

7    dating him -- if he wants to online date her; right?

8    A    Uh-huh.  Yes.

9    Q    And as we get toward the end, she's sending him -- and I

10   can't see how many pages in on -- the pages aren't numbered,

11   but I'd say about ten pages in, she's sending him kisses

12   because he's saying that she's naughty and cute because of the

13   pictures she sent him.  She sends kisses a couple of times.

14   She talks about being hairy.  And then later on she makes some

15   very explicit sexual overtures to him that you wouldn't expect

16   a nine-year-old to be saying.  And the last two pages of that

17   exhibit she says, "We can" -- "We can call it secret," and she

18   giggles.  And she talks about something she would do to her

19   tongue with him.  And very explicit stuff later on that she's

20   saying back to him?

21   A    Yes.

22   Q    So this is before these chats, and she's already shown

23   that she's engaging in this -- in this game with him, this

24   role-playing, anyway, and -- so what message does this, if

25   any, send to him?  Is this -- is he -- is somebody like

*Testimony of Lynda Geller, PhD*                                    **59**

1    Steven, if he's not picking up social cues from the world --

2    from the world in general about boundaries such as age

3    difference, age of consent, if he hasn't picked those things

4    up and he lands in these chat rooms like so many of these

5    adolescents, is he going to be picking up boundaries and

6    limits from that environment?

7    A    No.  It's a dangerous environment for anyone.  It's a

8    dangerous environment for children.  It's a dangerous

9    environment to people with childlike mentalities.  And there's

10   certainly no one policing it until after the fact.

11   Q    So -- and he told the police repeatedly it wasn't about

12   sex?

13   A    He told them that repeatedly.

14   Q    And, of course, we -- you have -- Dr. Imhof, his report,

15   which is --

16   A    Which says he has no interest in children whatsoever from

17   a sexual perspective.

18   Q    And he's -- he said that he's basically -- he feels he's

19   gay?

20   A    Yes.  He says he's gay.  He has no interest in females,

21   period.

22   Q    You said you read that through, the police interrogation,

23   again last night?

24   A    I read it last night because I was -- because we started

25   talking about it, I wasn't expecting it, so I wanted to

1   refresh my mind.

2   Q    And that last -- the clip that the Government first

3   played was two hours and 18 minutes into that interview.  This

4   is hours of questioning of him.  How -- what was your

5   impression reading through that interview again last night?

6   A    Well, reading through the interview last night, I was

7   taken by the fact that the police interviewers are the ones

8   that use the word "monster" over and over again, saying, "We

9   want to show you're not a monster, so tell us."  And they used

10  the word "monster" probably 20, 25 times before way later in

11  the interview, which is what was picked out by the prosecutor,

12  that he says, "I'm not a monster."  And she takes that to mean

13  that he's able to intuit social meaning.

14       Well, they've been saying to him over and over again for

15  two hours the word "monster."  They're not -- and he's been

16  saying over and over again, "No, no.  It's a game.  It's role

17  play.  It's not about sex."  He's been saying that over and

18  over.  And they keep saying they can't believe it, and, you

19  know, because it's -- it's kind of startling to hear that from

20  their perspective.  So they keep saying these same things over

21  and over again.  And so it's way into the interview before

22  what we heard yesterday, and he's basically someone who was --

23  over his head with the police too.  I mean, he kept thinking,

24  If I can just explain this is a game, they'll go, "Oh, sorry

25  we bothered you."

*Testimony of Lynda Geller, PhD*                                        **61**

1    Q    So he does become more desperate as time goes on here?

2    A    As they become more -- "If you were a monster, we would

3    put you in handcuffs, so tell us why you're not a monster."

4    Q    Did it appear to you they ever understood what this game

5    was?

6    A    I don't think -- I don't think they believed it because

7    of the graphic nature of the conversations they had seen.

8    They can't believe that.  Just -- one of the problems with

9    theory of mind -- and it is an autistic deficit.  We have it

10   too for them.  We can't believe they think this because we

11   can't get into their shoes, just like they can't get into

12   ours.  So --

13   Q    So there's a logic that an autistic person might have,

14   and it's something like this --

15   A    It's a logic.  It's a complete logic that he had, and

16   then also the inflexible way of thinking that he -- it just

17   doesn't occur to him that anyone would think it's any

18   different than what he thinks.  Can't make his mind wrap

19   around that other people's states of mind are different.  And

20   it goes on for hours where he's not getting it.  And they

21   finally convince him, "Just tell us," and -- because they

22   think in the end they're going to get him to say, "Oh, sorry.

23   I was really, you know, trying to do sex with girls."  He

24   wasn't.  He was trying to play this ridiculous game that he

25   invented based on what had been done to him and the things

1    he'd seen in these -- in these online chat rooms.

2    Q    And, of course, is it the case that those of us who are

3    typically developed, our understanding of the world is so

4    intuitive and so automatic that we don't even know it and so

5    it's very, very hard for us to understand what it might be

6    like to live with that -- without that ability we have to

7    understand the social world around us?

8    A    That's the problem, and it is something that I talk to

9    in -- you know, in presentations I give all the time, is that

10   we have -- they have -- yeah, theory of mind's a problem for

11   them, but it's just as big a problem is that we don't have it

12   for them either because we can't imagine what it's like not to

13   intuit.  It's just -- it is, you know, an element of --

14   definitive of the human condition, so how could it not be

15   here?  Well, it can't be here because they're lacking the gene

16   that starts the whole cascade of how to do it.  They don't get

17   it.  And, you know, any -- anybody who adapts well enough to

18   go to school or have a job or have a life has done it at huge

19   effort, and it's all cognitively based, so that -- you know,

20   patients of mine would say, "When I come home from my day, I

21   have to sleep for hours because my brain is just exhausted,"

22   because, again, we're not thinking of it.  We're just doing

23   our stuff and talking to people, and every single thing they

24   say and do and act out is 100 times harder and all cognitively

25   based, none of it intuitive.

*Testimony of Lynda Geller, PhD*                                    **63**

1  Q    You said that his -- this discussion about in this police

2  interview whether he was performing at a level or use -- I

3  think the fair question would be, was he using skills beyond

4  what a six-year-old might have accessible to them?

5  A    You know, I think he was acting, again, like, you know,

6  the same kind of young child behavior that -- young child

7  understanding.  He has young child understanding of all of

8  these things because he just doesn't have the intuitive basis

9  that you would expect of someone his age.  He doesn't have it,

10 and he -- that's how he interacts with the world.

11 Q    And, actually -- I mean, he -- in the interview with

12 Dr. Otto where the -- the idea is has he -- where Dr. Otto

13 recognizes he has difficulty talking about what he actually is

14 accused of doing, in a way actually six-year-olds might have a

15 hard time when they know they've been caught doing something

16 wrong of expressing it?

17 A    It's very similar.  It's not, like -- you know, not an

18 adult way of thinking.  It's childish.

19 Q    Because an adult would say, "Oh, I want to make it" -- "I

20 want to talk about this so that it doesn't look like I'm so

21 worried about it, or I want to show that I'm capable" or

22 something of that nature.

23 A    His --

24 Q    He's not thinking about -- when he's hesitating, he's not

25 thinking about what Dr. Otto is thinking about him.

*Testimony of Lynda Geller, PhD*                                                64

1   A    Not much.  Very little.  I mean, he just really doesn't

2   have that ability to do that intuitively.  I mean, it's the

3   reason that Dr. Otto takes on the persona of talking like he's

4   talking to a little child because Dr. Otto intuited his vast

5   skill of doing this for so many years, he intuited what kind

6   of person was in front of him and modified -- he certainly

7   wouldn't interview me that way, the way he chose to interview

8   Steven.  He could see he needed to do that to have these

9   conversations.

10  Q    Well, he had your report.  He had the Vineland results,

11  for example?

12  A    Yeah, he was prepped for it, yeah.

13  Q    So you were -- you heard again today Dr. Otto testing

14  Steven on his ability to make a decision, and he said -- and

15  he gave -- and played where Dr. Otto said, "Okay.  So now if

16  you're going to want to decide what to do, what are you going

17  to" -- "what are you going to" -- "what are you going to --

18  "what do you want to know?"  In other words, what do you want

19  to know from your attorney.  And Steven says, "I want to know

20  what the best decision is."

21  A    Right.

22  Q    Now, the Government was just suggesting that shows he's

23  logical because he wants to know what the best decision is?

24  A    He wants someone to tell him what to do.  That's why --

25  that's why I mentioned that if he could have any personality

*Testimony of Lynda Geller, PhD*                                    **65**

1    disorder it would kind of be dependent personality disorder

2    because he's passive independent and he wants people to tell

3    him what to do because he knows he doesn't have good judgment.

4    Q    As Dr. Otto acknowledged, the right answer to that

5    question is "Wait, tell me more"?

6    A    Uh-huh.

7    Q    And Dr. Otto agreed that just the, quote, "quantum of

8    evidence" is not a way to make a rational decision.

9    A    No.

10   Q    So when Steven, despite the suggestion of the

11   Government's question by Steven saying, "Well, that's what I

12   would do," does that show he's making logical decisions?

13   A    No.  He wants to be told what to do by someone he trusts.

14   That's -- he's not able to assist.

15   Q    And, of course, the -- you know, do you -- even though

16   you're not an attorney and forensic work is not your thing, do

17   you imagine that -- and I think you hinted at this.  Does that

18   in any way replicate, do you think, the kinds of factors an

19   attorney would tell a client to take into account in deciding

20   what to do as far as taking a plea or not?

21   A    Well, you know, I think an attorney wants to know that

22   the client has made an informed choice based on what's -- what

23   the factors and choices are.  So those are the kinds of

24   decisions that would be ethical for you to want him to choose

25   because whatever he chooses, there will be ramifications.  So

*Testimony of Lynda Geller, PhD*                                    **66**

1    he has to choose those things.

2    Q    So -- and if I were to give Steven or Todd Foster or I

3    were to give Steven a choice that here's the Government's plea

4    offer and here are the reasons why you might do it, here are

5    the reasons why you might not do it, and maybe some of those

6    reasons have some quality to them where they would involve

7    risk or not, and maybe it had to do with what the judge might

8    do in sentencing or what kind of conditions there might be of

9    supervision or -- or as I suggested yesterday, whether or not

10   we would be able to preserve an issue for appeal, and Dr. Otto

11   said, "Well, those are confusing to me too."  Is there a

12   difference between the way Dr. Otto would still handle that if

13   he were the defendant as opposed to the way Steven would

14   handle that?

15   A    Well, presumably, Dr. Otto would be able to ask questions

16   that might not occur to Steven because he can't -- he doesn't

17   have -- he doesn't have much personal agency because he's not

18   used to having personal agency because it doesn't get him

19   anywhere.  So there's -- there's a difference in how do you

20   competently make any choices that you have to make, no matter

21   how easily -- no matter how simply people put them, you still

22   have to be able to reason through and to -- and to project

23   consequences from what you're hearing now, which is, you

24   know -- which is, again, part of executive function, part

25   of -- part of working memory that is critically affected in

1  people with autism and Steven in particular.

2  Q    So when Steven gave that answer that what he would want

3  to know before making a decision is what was the best

4  decision, and Dr. Otto on the tape says, "Okay," and then

5  moved on --

6  A    Yeah, well.

7  Q    -- is that okay?

8  A    No, that was not okay because what Steven says, "What's

9  the best decision," is he wants him to tell him what's the

10  best decision.

11  Q    And in the choices that -- do you feel -- was it -- what

12  was your impression when Dr. Otto's giving those choices,

13  "Well, there's a lot of evidence, so what are you going to

14  do," was he telegraphing to Steven, you know, what would seem

15  to be the rational answer?

16  A    Well, so I'm not autistic, so I was able to discern in

17  his voice tone -- in Steven's voice tone that every answer he

18  gave went up at the end as a question.  Oh, the da da?  Da da?

19  He's making responses with -- that are a question.  He's

20  not -- he's not choosing even.  He's saying, "Is this what you

21  want me to say?  Could this be right?"  So, you know, he's

22  not -- it's not as if he has -- he's able to form these

23  opinions based on putting all this evidence together and then,

24  you know, extrapolating to the future what that means and

25  weighing the risks.  These are all things he cannot do.

*Testimony of Lynda Geller, PhD*                                    **68**

1  Q    Okay.  Now, you were asked a number of questions about

2  the difference between Steven's ability to intuit -- related

3  to Steven's ability to intuit social rules, which, of course,

4  is that problem of being autistic and his ability to

5  understand rules once they're explained to them -- to him.

6  A    Yes.

7  Q    Are those very clear to you, the difference between

8  that -- between those two?

9  A    Right.  And it's actually what any autistic person will

10 tell you is, like, I just want to know the rules in this so

11 that I know what to do, because they don't intuit them well.

12 And the reason they want to know them is so that they will

13 know how to behave because they don't automatically know how

14 to behave by just sort of intuiting social information the way

15 the rest of us figure out how to behave.

16 Q    And how do the rules have to be -- what do they have to

17 learn about the rules to truly understand them and now

18 understand that's a rule that they -- they will not break?

19 A    Well, they have to be presented very clearly, and then if

20 I were teaching someone with autism a rule, I would want them

21 to then tell it back to me, and then I would want to practice

22 the application of that rule in -- in talking to them.

23 Q    And with part of that being -- saying, "Look, you got to

24 understand how that girl is too young to decide these things."

25 Even though she's on this website, even though she's doing

*Testimony of Lynda Geller, PhD*                                    **69**

1   this and behaving like everybody else, given this Internet

2   milieu, which, by the way, the police officer talked about the

3   Internet -- the Internet environment, didn't they --

4   A    Yes.

5   Q    -- in questioning him?

6   A    Yes.

7   Q    So even though they're in this Internet milieu where

8   everybody is sort of equal, everybody's volunteering to be

9   there?

10  A    And people don't know how old or who anyone really is.

11  Q    People lie about their age and put, you know, different

12  pictures up.  And, by the way, is there a problem with

13  autistic people in discerning age from photographs?

14  A    Oh, yes, because that's part of facial recognition.

15  That's how we tell how old people are, by looking at their

16  faces.  So if you have very impaired facial recognition

17  skills, which is -- you know, that's another, you know,

18  characteristic of people with autism.  They have poor facial

19  recognition.  If you do a -- if you do the eyes test with them

20  where you're supposed to, you know, recognize expressions from

21  looking at people's eyes, they're terrible at it.  If you do

22  recognition of people, unless they see them where they know

23  them, they often don't recognize them.  And they don't

24  recognize people's ages and what -- you know, and

25  characteristics by their faces.

1   Q    Does some of the research show that they have difficulty
2   telling gender from faces?
3   A    Oftentimes, yes.
4   Q    So part of this would be --
5   A    In addition for Steven, he was looking at it on a little
6   teeny phone.
7   Q    Right.  So part of the way that these rules are taught
8   too is to say, "Here's what that other person feels like or
9   that other person's experience.  She's too young.  They're too
10  young," or if it were a child pornography case and learning
11  those rules, say, "Those are children that would be victims of
12  crime, and, you know, these are" -- "that they're being hurt
13  by doing this."  Something that from just looking at the
14  pictures, somebody with autism may not get?
15  A    That's correct.
16  Q    So is there any kind of problem at this point with -- as
17  far as you're concerned with Steven on the Internet looking at
18  underage images, chatting with underage people, exchanging
19  photographs of people he doesn't know on the Internet, or,
20  frankly, socializing on the Internet at all?
21  A    Do you think I think that there's a danger for him to do
22  it again?  Is that what you're asking me?
23  Q    Yeah, yeah.
24  A    I mean, I don't think there's a danger for him doing it
25  again because it's -- how much more dramatic than this can you

*Testimony of Lynda Geller, PhD*                                    **71**

1  get as a learning experience.  So I don't -- you know, since

2  we know that he doesn't actually have a sexual interest in

3  young girls but that he's unable maybe to discern that that's

4  who that was or that that person was -- could have been a

5  50-year-old man from England playing a game with him, for all

6  he knew.

7  Q    Or that it doesn't matter.  She is playing her game --

8  A    It's a game.

9  Q    She's playing a game.

10  A    It's part of the game.

11         THE COURT:  Dr. Geller?

12         THE WITNESS:  I'm sorry.  Yeah?

13         THE COURT:  Please let the attorney finish asking

14  the question --

15         THE WITNESS:  Okay.  I'm sorry.  I'm sorry.

16         THE COURT:  -- because it's going to be really hard

17  to --

18         THE WITNESS:  I'm sorry.  I'm not forensic, you see.

19         THE COURT:  That's no problem.  It's for the court

20  reporter --

21         THE WITNESS:  I know.  Okay.  Okay.

22         THE COURT:  -- so we have a record.

23         MR. MAHONEY:  It's my fault.  I jumped in too.  So

24  I'm sorry.

25         THE WITNESS:  I'm sorry.

*Testimony of Lynda Geller, PhD*                                    72

1    BY MR. MAHONEY:

2    Q    And so is there a difference between learning a rule like

3    age of consent, age of -- age differences between people

4    romantically and so on and something else we call a rule,

5    which might be a procedure in court, it might be a legal rule

6    about what punishments apply, what sentences apply, and what

7    happens in a courtroom.  Is there a difference between those?

8    A    Yes, because one is something that you socially intuit

9    and that is sort of the social rule that everybody knows, that

10   we think everybody knows, that is, and others are written-down

11   types of laws and rules.  So what I'm saying is -- do you want

12   me to --

13   Q    Oh, no.  Go ahead.  I'm sorry.

14         THE COURT:  No.  You're fine.

15         THE WITNESS:  So what I'm saying is that he has

16   trouble intuiting the things, but now everyone in the world

17   has told him now.  Now he could probably -- now he can tell us

18   back what he should and shouldn't do, and now he has had

19   concrete ramifications of what that -- of what that was and at

20   the time it was a misunderstanding on his part and now he's

21   been told, and so he's able to see what's the other side of

22   it.  It's what other people thought differently than he

23   thought about his behavior.

24   BY MR. MAHONEY:

25   Q    And so he understands that this is a rule involving the

*Testimony of Lynda Geller, PhD*                                   *73*

1    judgment of society about that behavior?

2    A    Now he does.

3    Q    And that it's wrong?

4    A    Now he does.

5    Q    He knows why it's wrong, and he knows it hurt somebody

6    else?

7    A    Yes.

8    Q    All right.  Now, the legal rules here, the procedures

9    that involve, you know, what he has to know to be competent,

10   you know, to understand the nature of the proceedings and so

11   on --

12        (Reporter clarification.)

13   BY MR. MAHONEY:

14   Q    I'm sorry.  I was slurring.  He needs to understand the

15   nature of the proceedings.  Those aren't moral rules.  Those

16   are rules that involve the judgment of the world on a certain

17   kind of behavior; correct?

18   A    No.  Those are rules.

19   Q    And that -- so the fact that he has the ability to

20   understand those rules, does that mean he has the

21   understanding to apply whatever the rules are in the forum in

22   order to make a decision about what to do with his life in

23   this case?

24   A    So I think that he doesn't have the ability to put those

25   kind of complex thoughts together and intuit the results, and

**Testimony of Lynda Geller, PhD**                                    **74**

1   I think I would like a defendant who's making -- who's

2   competent to make his own choices to know his -- where his

3   choices would lead, and I don't think he can do that.

4   Q    Now --

5   A    He will do what he needs to do to comply.

6   Q    The -- there was a question about when Steven was -- you

7   know, the object of the selfie game was to get people to block

8   him?

9   A    Yes.

10  Q    But in some of these chats he's saying, "Well, I'll block

11  you if you don't do what I want"?

12  A    Yes.

13  Q    All right?  But what he wanted was to get her to keep

14  going, so this is just a tool of his in the game?

15  A    It's to get her to keep going and then eventually block

16  him.  That's, yeah.  The idea is to keep the game going, but

17  then the ultimate end of the game is when the person -- and,

18  you know, most people did it right away, blocked him right

19  away.

20  Q    And there's -- so -- and is he -- at the time he's -- why

21  at the time that he's doing that she says, "Well, you know" --

22  and there's another one later saying, "I've got a knife in the

23  closet," and this girl's saying, "Well, you know, I" -- "I

24  hate it when this is being" -- "when people do this to me."

25  Why is he not thinking about that?  Why does that not register

*Testimony of Lynda Geller, PhD*                                    **75**

1  with him?  Because she is saying, expressly saying something

2  that seems emotional, but is it because it's part of the game?

3  Is it because he's just not thinking about her feelings?

4  A    Well, I think the rigid way he's thinking is this is

5  about the game.  I don't -- you know, he has a very hard time

6  thinking about anyone else's feelings, and, I mean,

7  understanding anyone else's feelings.  So I don't think that

8  he is really -- he's thinking she's just -- here comes another

9  tool she's doing.  She's a game player.  She's saying this and

10  I'm supposed to say that, and she says this and I say that,

11  and it goes somewhere.  I don't -- you know, the sexual

12  implications or the life implications on her -- she's just a

13  game player, and he's a game player.

14  Q    I don't know whether you read enough of the thousands of

15  lines of chats to answer these questions or not, but if I

16  suggested that the majority of these lines of chat were normal

17  conversations, not sexual, do you have an impression about

18  that?

19  A    Yeah, I saw lots and lots of just back-and-forth

20  chitchat, yeah.

21  Q    Now, it might be -- you were asked some questions about a

22  personality disorder.  And -- often the case that somebody

23  with -- who later is diagnosed with autism may be diagnosed as

24  having a personality disorder before that; correct?

25  A    Sometimes that happens.

*Testimony of Lynda Geller, PhD*                                    *76*

1    Q     Dependent personality disorder?

2    A     Dependent is the most common one, yes.

3    Q     Avoidant personality disorder?

4    A     Avoidant is common, yep.

5    Q     Rarely antisocial.  It would be very difficult for

6    somebody to examine a person typically?

7    A     It's -- I've not seen it, that that's a past diagnosis of

8    anyone I'm evaluating.

9    Q     And this is because sometimes a regular clinical

10   psychologist might administer some of these personality

11   screening tests.  One is called Millon -- M-i-l-l-o-n -- or

12   the MMPI, and they may register high on some of these scales

13   because the instrument is responding to their, essentially,

14   autistic features?

15   A     That's correct.  They're not -- they're not performed on

16   people with autism, and yet people use them with -- on people

17   with autism, especially if they don't know they have autism

18   yet.

19   Q     And so things like -- also, for example, OCD, those

20   things might -- those features might be in autism, but Dr.  --

21   I think it was Dr. Otto used the word "parsimonious," that

22   autism was the parsimonious explanation for all these

23   behaviors?

24   A     He took that out of my report.  I said that.

25   Q     But he agreed with you?

*Testimony of Lynda Geller, PhD*                                        77

1    A    He agreed with me, yes.

2    Q    And later the doctors -- Dr. Grundy agreed with you;

3    correct?

4    A    Yes.  Yes.  The two reports that had previously missed

5    autism, after they read my report wrote back and said, "You're

6    right.  We agree with you."  Yes.

7    Q    And Dr. Harvey later -- he indicated he agreed with you,

8    and he referred to your report and your conclusions --

9            MR. MAHONEY:  This is -- this is going to be

10   Defendant's Exhibit M, Your Honor.

11   BY MR. MAHONEY:

12   Q    He also agreed with your conclusions when you -- after

13   you issued your report regarding this -- you have this report?

14           MS. CHANG:  Yeah.

15   BY MR. MAHONEY:

16   Q    -- regarding Steven's autism and his competency?

17   A    Yes.

18   Q    Does Steven have a personality disorder in addition to

19   his autism?

20   A    Not to my way of thinking.

21   Q    Is he a person who presents a threat -- physical threat

22   to other people or to the serious property damage of other

23   people?

24   A    Oh, absolutely not.

25   Q    Is he somebody who is a sexually dangerous person?

*Testimony of Lynda Geller, PhD*                                        **78**

1    A    No.

2    Q    How does -- how does Steven's -- how does the problem or

3    the issue -- problems with executive functioning apply to

4    Steven persisting in the selfie game, this contract of his,

5    despite what we would see as social implications of the tools

6    or whatever, say this girl is saying back to him, well, she

7    might hurt herself?

8    A    Okay.  So one -- one aspect of executive function is

9    flexibility of thought and not and -- you know, lack of

10    inflexibility, in other words.  So that's -- that was one of

11    the key reasons for this is that he started doing it and

12    thought of no deviation from the original thought.  So

13    flexibility of thought is I can think of multiple ways to

14    solve this problem, but people who have inflexibility of

15    thought have a way and stay in this rutway forever and never

16    think I should do something different.  So that's what he

17    was -- that's one way.  It never occurred to him that there

18    are other explanations, that he should be thinking of other

19    things.  He's playing a game.  That's all he thinks.  So

20    that's one ramification of executive function disorder in that

21    behavior.  Other ones are not being able to imagine potential

22    consequences for what you're doing other than the simple one

23    is, you know, they -- they turned me off.  And that's the --

24    that's the role of the game, and I start over again and play

25    it with someone else.

**Testimony of Lynda Geller, PhD**                                    **79**

1   Q    And so rather than the social world, online video games

2   are a real model for this kind of behavior?

3   A    Right.  Yes.

4   Q    Following the rules?

5   A    Yes.

6   Q    Play the game, these are my tools, and let somebody else

7   see what they can do to go against me?

8   A    It's modeled on -- it's modeled on video games and what

9   happens online.

10  Q    Apart from your five hours with -- by the way, even if --

11  if Steven hadn't been involved in a selfie game and he would

12  have been, you know, actually for sexual interest or, you

13  know, because he wanted to see sexual pictures primarily from

14  these kids, it -- this could happen also with an autistic

15  person just because, again, they don't understand age

16  difference, they don't understand age of consent, they

17  don't -- they see another person willingly on the Internet

18  engaging in exchanges and chats.  That would still be a very

19  big challenge for somebody with autism to understand the

20  wrongfulness of that?

21  A    It is a challenge, yes.  And it's something that we need

22  to be -- it's a -- it's a -- it's something that I do is give

23  talks to families to have them understand the dangers of the

24  Internet for their sons because people of my generation don't

25  understand the dangers and are not educating their children.

*Testimony of Lynda Geller, PhD*                                          **80**

1   So this is one of -- this is something that I do to try to

2   make this stuff stop.

3   Q    All right.  And, by the way, another issue -- another --

4   is it true that another reason why you aren't concerned about

5   Steven engaging in this behavior in the future is because he

6   is never going to be independent?

7   A    It's highly unlikely that he's going to be independent.

8   He will need to be under some kind of supervision.

9   Q    He's going to be surrounded by his family as long as

10  they're around to be there?

11  A    Yes.

12          MR. MAHONEY:  All right.  I think that's all I have,

13  Judge.

14          THE COURT:  Thank you, Mr. Mahoney.

15          MR. MAHONEY:  I'm not finished, Judge, but as far as

16  playing that -- when we have a break and we get a chance to

17  set that up, let's just --

18          THE COURT:  That sounds good.  Yes.  I'll let you

19  know when we're going to take a break.

20          Ms. Chang, I'm assuming you have some recross or --

21          MS. CHANG:  No, Your Honor.  I'm fine.  Thank you.

22          THE COURT:  Great.

23          Dr. Geller, thank you very much.  You can step down.

24  Thank you.

25          Why don't we go ahead and do this.  We've been going

1    almost two hours.  Mr. Mahoney, we're going to take a very

2    short break, five minutes.  Will that give you enough time to

3    set it up?

4              MR. MAHONEY:  Absolutely, Judge.  Yes.

5              THE COURT:  All right.  We're going to take five

6    minutes, and then we have, I think, Dr. Danziger is the last

7    witness; is that correct, Mr. Mahoney?

8              MR. MAHONEY:  Yes, Judge, that's right.

9              THE COURT:  All right.  I'm going to ask you to do

10   one thing for me.  At this point, I have given both sides

11   extraordinary leeway on questioning.  We have gotten into some

12   areas where there is some questionable relevance, and we have

13   gotten extraordinarily repetitive.  So I'm going to ask when

14   Dr. Danziger's on the stand that you limit it to testimony

15   that's not repetitive, and I am going to keep both sides on

16   very strict constraints on this.  We don't need five hours of

17   the exact same testimony again.  Do both sides understand?

18             MR. MAHONEY:  Agree.  Yes.

19             MS. CHANG:  Yes, Your Honor.

20             THE COURT:  Thank you very much.  We'll be in

21   recess.

22        (Recess at 10:49 a.m. until 10:58 a.m.)

23             THE COURT:  Okay.  Mr. Mahoney, did you want me to

24   show that video real quick?

25             MR. MAHONEY:  Yes, Judge.  Please.  And this is --

1   we've provided -- this is on a CD for the Court, Judge, but

2   the instructions to the people to take -- look at this is just

3   to see what comes to mind as you look at it.

4           THE COURT:  Okay.

5           MR. MAHONEY:  And that's it, Judge, for that, and

6   then we have the slides you see with the reactions of

7   typically developed individuals and then --

8           THE COURT:  Yes.

9           MR. MAHONEY:  -- autistic boys.  The only thing

10  informationally on that -- this other slide is that

11  38-year-old adults with autism would have the same kind of

12  reaction because it doesn't change neurologically.  And then

13  the last thing on here was just a bit of information that the

14  autistic individuals that took that test in that article, the

15  research article, describes them as having taken the Vineland

16  adaptive skills evaluation and how they're -- their

17  interpersonal relationship scores were about one quarter of

18  their chronological age.  So that's the average people with

19  autism.  So just to put in perspective the whole issue of the

20  Vineland scores.  So that's it, Judge.

21          THE COURT:  Thank you, Mr. Mahoney.  Would you like

22  to call your next witness, please?

23          MR. MAHONEY:  Yes.  Dr. Jeffrey -- Jeff Danziger.

24                  JEFFREY DANZIGER, MD,

25  was called as a witness on behalf of Defendant and, having

*Testimony of Jeffrey Danziger, MD*                                    **83**

1    been duly sworn, testified as follows:

2              THE WITNESS:  I do.

3              THE COURTROOM DEPUTY:  Please be seated and state

4    your name for the record.

5              THE WITNESS:  My name is Jeffrey Danziger,

6    D-a-n-z-i-g-e-r.

7                        DIRECT EXAMINATION

8    BY MR. MAHONEY:

9    Q    Dr. Danziger, you've appeared many times as a witness in

10   this district court?

11   A    Yes.

12   Q    Tell the judge, please, about your educational

13   background.

14   A    After graduating from high school in North Miami Beach I

15   attended Harvard College, Cambridge, Mass., graduating 1978

16   with a bachelor's degree in biology.  I then went to the

17   University of Miami School of Medicine, receiving my MD in

18   1982.  After graduating medical school, I went to Washington

19   University, St. Louis, where I did my internship and residency

20   in psychiatry, completing that in 1986.  After spending one

21   year on the faculty, I came back to my home state of Florida

22   in 1987, and I've been here in Central Florida for 32 years.

23   I have an office practice in Maitland, right by Exit 90 with

24   all the construction.  I continue to see patients there, but

25   much of what I do is as a forensic psychiatrist.  I've

*Testimony of Jeffrey Danziger, MD*                                    **84**

1    testified in state, circuit, and county courts from -- well,

2    Miami to Pensacola.  I've testified in this courthouse -- my

3    first time before you, Your Honor --

4            THE COURT:  Yes.

5            THE WITNESS:  -- and in other federal courts around

6    the state.  I am board-certified, and the new rules are that

7    I'm maintaining my certification in psychiatry, forensic

8    psychiatry, addiction psychiatry, and geriatric psychiatry.

9            THE COURT:  Thank you.

10   BY MR. MAHONEY:

11   Q    And so would you have just taken -- redone your boards

12   recently for this forensic?

13   A    Let's see.  The forensic boards I redid in 2013.

14   Q    Oh, okay.

15   A    That's my third go-round.  And in the old days it was

16   that you would take the boards and you're good for ten years.

17   Now every three years there's certain requirements you have to

18   fulfill with continuing education, and I've been diligent in

19   keeping up with all of those.  So the American Board of

20   Psychiatry and Neurology will say my -- I'm maintaining

21   certification.

22   Q    Yeah.  And do you have an estimate as to how many times

23   you have appeared as an expert witness in criminal cases on

24   psychiatric or psychological issues?

25   A    Actually, sitting on a stand, such as today, 800, 900

*Testimony of Jeffrey Danziger, MD*                                    **85**

1    times over the past 30 years.  My first appearance in a

2    courtroom in Florida -- it was circuit court in Orlando -- was

3    December 1988.

4    Q    And you've appeared as a witness both as a -- an expert

5    appointed by the Court?

6    A    Many times in criminal cases.  Roughly 50 percent of the

7    time where I've done a competency evaluation, it's a judge

8    that appoints me.  Perhaps 40 -- 45 percent of the time it's

9    an attorney who appoints me, either a public defender, your

10   federal public defenders or state public defenders in

11   different circuits, or private defense attorneys, but I have

12   also been an expert for the prosecution and for the attorney

13   general's office and everything up to capital murder cases and

14   capital appeals.

15   Q    Doctor, would you -- did you evaluate Steven Marks?

16   A    Yes, I did.

17   Q    Would you tell the Court -- walk through what you did to

18   prepare for your evaluation.

19   A    The first thing that I did was look at data I had

20   available to me before meeting Steven.  So I was familiar with

21   what Dr. Geller had done.  I had reviewed the report of

22   Drs. Leventhal and Ence, reports from Quinten Harvey, reports

23   from Dr. Imhof, your office, Mr. Mahoney had authored in

24   July 2018 a memorandum to Assistant U.S. Attorney Ms. Chang,

25   and I also spoke by telephone with Dr. Geller.  So I had this

*Testimony of Jeffrey Danziger, MD*                                          **86**

1   database of information before going to Idaho.  So on arriving

2   at Idaho, the first thing I did was I met with the personnel

3   at Aloft Transitions, and that was the clinical director,

4   Mr. Jason Wood -- I'm sorry.  He's the founder.  And then

5   Ms. Angela Baird-Hepworth is the clinical director.  These are

6   the people who had daily contact with Steven over the past

7   14 months.  And I spent about an hour talking to them about

8   their observations of Steven's behavior, what he had been

9   like, explaining to me he'd been perfectly compliant, had

10  everything with the electronic monitoring, not using the

11  Internet, following all the rules.  But their belief was that

12  he was not able to manage his own affairs, that he could not

13  adult, and they gave me an interesting example because I asked

14  them, "What do you mean?"  They said, "Steven has a tendency

15  to wear the same clothes every day.  They get dirty."  They

16  insist he change them and wash them.  So one day they said to

17  him, "Bring us your laundry basket."  So what did he do?  He

18  brought them the empty laundry basket, and they had to say,

19  "No, go back and take those dirty clothes off and give us your

20  dirty clothes because you need to wash them."  And that was

21  illustrative of his thinking.

22       After speaking with them for an hour, then I sat down

23  alone in a room with Steven, and the first thing I did was try

24  to explain who I was and why I was there and discussed

25  confidentiality, explained I'm not here to treat you, I'm not

*Testimony of Jeffrey Danziger, MD*                                    **87**

1   here to be your doctor, but your lawyer sent me to see -- to

2   do an evaluation.  And whatever we talk about today is not a

3   secret.  I'm going to talk to your lawyers.  I might do a

4   written report.  This is going only to your lawyers.  It's

5   possible the judge might see this, the prosecutor might see

6   this.  It's possible I'm going to testify in court about this,

7   but for now it just goes to your lawyers.  And then I tried to

8   explain to Steven what was meant by competency.  He didn't get

9   it.  He -- I explained it at least five different times

10  throughout the interview, what competency means, why I was

11  there.  All he could say was you understand your surroundings.

12  I kept trying to explain it to him, see if he understood the

13  concept, and he did not, despite multiple explanations

14  throughout my time with him.

15        Now, this was the case where I had extensive records.  So

16  I had a great deal of information already from the report of

17  Dr. Geller and others who contained information, other family

18  members.  I didn't spend a lot of time going over his past

19  history, his work history, his education.  I had that data.

20  And I went right into the issue of competency, and I was

21  trying to assess not only factual understandings -- do you

22  know what a judge does?  Do you know what a prosecutor does?

23  What's a plea deal? -- but, in addition, trying to get a sense

24  of do you understand these concepts?  And, of course, I was

25  concerned he couldn't grasp the idea of competency even when I

*Testimony of Jeffrey Danziger, MD*                                88

1   did my best to explain it in very simple terms.

2       I had a somewhat different approach from Dr. Otto.  I did

3   not see my role as remediation, that if you don't know an

4   answer, I'm going to tell you the answer and please say it

5   back to me.

6               THE COURT:  Uh-huh.

7               THE WITNESS:  I have concerns about that.  Is

8   somebody just parroting back an answer, or if I tell them five

9   or seven different things they don't know, maybe they can

10  repeat the answer to me a minute later, but will they remember

11  it a day later?  A month later?  Six months later when they're

12  here in the courtroom trying to figure out what's going on

13  around them?  So I don't do a lot of remediation.  One minor

14  thing, perhaps, as Dr. Otto said, if someone's confused about

15  who decides guilt, judge or jury, sometimes people get that.

16  It's clear they have a general understanding.

17          Steven, as I met with him, did not possess what I

18  would consider an acceptable factual understanding.  Of

19  course, it's -- being competent is more than just factual

20  understanding.  Steven, for example, knew he was charged with

21  production of child pornography, but he didn't know other

22  charges against him.  Possible penalties -- my dad said

23  15 years in a prison, but anything else?  He said, "Register

24  as a sex offender," but he could not tell me anything that

25  would be involved in that or the limits.  He did not know what

1   would be involved in probation.  He had a very limited

2   understanding of a plea deal.  He understood you might get

3   less time, but he could not say why you might reject a plea

4   offer, which goes more to rational understanding.  So he

5   couldn't say if you reject the offer maybe you'll get a better

6   deal, maybe you'll be found innocent at trial, maybe the offer

7   is too high.

8           One of the things that was relevant to me, if

9   competency means your ability to understand the nature and

10  consequences or the proceedings against you, I learned Steven

11  had been twice in front of judges.  So he told me that -- I

12  learned that here in Florida he was in front of a judge.

13  Apparently, as I figured out, something to do with could he go

14  to Idaho.  That's my understanding.  I said, "Steven, what

15  happened in front of that judge in Florida?"

16          "I don't know."

17          Mr. Wood and Ms. Baird-Hepworth said he had been in

18  front of a judge in Idaho, probably something to do with his

19  continued stay there.  I didn't know what the details were,

20  but they said he'd been in front of a federal judge in Idaho,

21  and Mr. Wood said Steven was allowed to stay here.  I said,

22  "Steven, what happened with that hearing in front of the judge

23  in Idaho?  Do you remember going there?"

24          "Yes."

25          "What happened?"

1          "I don't know."

2          "What did the judge decide?"

3          "I don't know."

4     So this goes to beyond does he know what a

5   prosecutor does or does he know what the word "guilty" means,

6   which were things he struggled with, but he sat in a

7   courtroom.

8          "Well, what did the judge decide?"

9          "I don't know."

10    He did not grasp what was essential to the nature

11  and consequences of the proceedings against him, which is more

12  fundamental.  He can sit in a courtroom and didn't understand

13  it beyond that.  So all of this, as I met with Steven, he

14  demonstrated features totally consistent with autism spectrum

15  disorder.  I had the benefit of Dr. Geller's report and

16  understood her concerns, but in terms of his eye contact, the

17  lack of spontaneity, the concreteness of his responses, the

18  way he took things literally, his obsessive focus on things,

19  he -- I like to think had I not had the benefit of

20  Dr. Geller's report I would have come up with that, but I

21  already had that information.  But certainly everything I saw

22  was completely consistent with autism spectrum.  So then my

23  thinking was we have a mental defect.  If autism spectrum

24  disorder is not a mental illness for these purposes here, it's

25  a mental defect.  And then my thinking was, because of that,

1   was he able to understand the nature and consequences of the

2   proceedings against him, and could he consult with his

3   attorneys in a reasonable way, meaningfully assist in his

4   defense?  And after getting back home to Florida, looking over

5   the data that I had, thinking about the interview and the data

6   I had, my opinion was that not only were there factual

7   deficits but a lack of rational understanding of the

8   proceedings against him and an inability to understand what's

9   going on in the courtroom, in part due to his inability to put

10  himself into the mind of others, and in large part his

11  deficits in language and understanding.

12          Further, could he meaningfully consult with counsel?

13  Now, I know Dr. Otto -- friend of mine.  I've been on the same

14  team with Dr. Otto in other cases before -- thought, yes, that

15  he could consult with counsel.  But my concern and my opinion

16  is that Steven's thinking is, well, I'll ask my lawyer what to

17  do.  Now, I'm not a lawyer, but I've been around enough cases.

18  I understand there's a discussion between lawyers and their

19  clients.  Do you take this plea?  Do we go to trial?  Do we do

20  this strategy?  And lawyers can advise, but ultimately there

21  has to be some autonomy on the part of the client and some

22  ability to weigh risk.  They may weigh it foolishly, they may

23  make a good or bad decision, but could Steven hold in his

24  mind, does he have mental wherewithal to weigh out risk and

25  make an autonomous decision?  My opinion:  No.  He would

*Testimony of Jeffrey Danziger, MD*                                          **92**

1   simply say, "Mr. Mahoney, Mr. Foster, what should I do?"
2   Which goes beyond you're a layperson in the courtroom.  I'm
3   asking my lawyer's advice because this what they do.  My
4   opinion is he lacks that autonomy and he lacks a reasonable
5   ability to consult with his attorney, meaningfully assist in
6   his defense further.  Could he testify relevantly?  This was
7   another issue for Dr. Otto.  Can he answer very simple and
8   basic questions?  Sure.  Could he withstand a difficult
9   cross-examination from someone as skilled as Ms. Chang or
10  another U.S. attorney?  I don't think so.  Could he comprehend
11  if there was a question with clauses or some -- what he
12  said -- was it exactly what he said or slightly different, or
13  what was the inference?  Could he handle a complex cross?
14  Could he testify relevantly, or would he be helpless up here?
15  I believe he would be helpless up here at anything but the
16  most basic and elementary questions.  So my overall opinion is
17  he is not competent.
18          One thing I did, Your Honor, was a real-time
19  experiment.  We were in court for seven hours yesterday.
20  We -- Dr. Otto testified.  Dr. Geller testified.  And I asked
21  Steven last night, "Well, what happened today?"
22          "They talked about competency."
23          "What does competency mean?"
24          "That I can understand."
25          "Well, understand what?"

*Testimony of Jeffrey Danziger, MD*                                          **93**

1          "I don't know."

2          "Is there anything else that you have to do in

3    competency?"

4          "I don't know."

5          "The man who is up here, Dr. Otto who talked, what

6    did he say?"

7          "He said I can testify."

8          "Is there anything else Dr. Otto said?"

9          "I don't know."

10         "How about the lady, Dr. Geller?"

11         "She said I can testify."

12         "Anything else?"

13         "She talked about my autism."

14         "Did she say anything else?"

15         "I don't know."

16         "Did she give any opinions?"

17         "I don't know."

18         "What did the judge" -- "What will the judge

19    decide?"

20         "If I have to stand trial."

21         "Okay.  Well, what happens if you go to trial?"

22         "I have to answer questions."

23         "Anything else about trial?"

24         "I don't know."

25         That, to me, was a real-time experiment.  We were in

1    court seven hours yesterday.  He's sitting over there at the

2    defense table.  Did he grasp what's going on?  My opinion:

3    No.  Does he understand the consequences of this proceeding?

4    What will happen here?  What will happen going forward?  What

5    the experts up here were talking about -- did he grasp it?

6    Does he understand the nature and consequences of proceedings

7    against him, and that's in real time.  My opinion is he did

8    not.  So my overall opinion, Your Honor, is by virtue of the

9    autism spectrum disorder, his very substantial deficits in

10   language and comprehension and limited ability to understand

11   what's happening around him, put himself in the mind of

12   others, inability to assist counsel, my opinion, Steven Marks

13   is not competent to proceed.

14   BY MR. MAHONEY:

15   Q    Now, Doctor, you've -- basically, you've summarized these

16   conclusions in your report?

17   A    Correct.

18   Q    And I just want to ask you one thing:  You know, in -- I

19   was just thinking about when Dr. Geller was being questioned

20   about "Well, what did Steven say on this occasion to the

21   police, and what was the meaning of that?  What did he mean at

22   that time?" and so on.  Is that the kind of questioning that

23   Steven would be able to handle?

24   A    He could handle very factual questions.  If he's asked,

25   you know, "Where were you born?"  "How old are you?"  "Where

*Testimony of Jeffrey Danziger, MD*                                    **95**

1   do you live now?"  "What's your" -- "Is that your father

2   sitting over there?"  Factual things, he could answer.

3   Questions involving meaning, intent, what your thoughts were,

4   he would struggle with.  And anything that was a complex

5   question with multiple clauses or involving analysis or

6   thought would be beyond his capacities, in my opinion.

7   Q    So suppose that lawyers are very careful and they pared

8   it down and asked, you know, simpler questions.  Is it still

9   the case for a witness that it's simply a question of, like,

10  as Dr. Otto said, just answering the questions?

11  A    No.  And the reason I respectfully disagree with

12  Dr. Otto, when I'm on a witness stand, yes, I have an

13  obligation to tell the truth and answer the question, but the

14  questions are not always straightforward.  Sometimes the

15  question has four clauses in it, two of which I agree with,

16  one slightly misstates what I said before, and the fourth

17  clause is something completely out of nowhere that maybe the

18  evidence doesn't show.  So before answering the question, I

19  have to think about is it a proper question?  Are they asking

20  me a question that's right, or is it in some way misleading?

21  Even when I'm asked, "Yes or no, Doctor," well, some questions

22  can be answered that way.  Other questions may be much more

23  complex, and I may need to say, "Yes, but I need to explain."

24  And sometimes, when I'm on a stand, I need to think different

25  from Dr. Otto, I didn't expect that question, my -- when I

**Testimony of Jeffrey Danziger, MD**                                                    **96**

1  answer this, where is it -- where is this likely to go?  What

2  are they going to ask me about for the next three questions,

3  and I need to be very careful in dealing with a skilled

4  lawyer.  So, yes, there is an obligation to tell the truth,

5  but I don't think it's shenanigans as Dr. Otto said to have to

6  carefully think of what question am I being asked?  Does it in

7  any way misrepresent things or diverting or does it lead

8  somewhere and anticipate that in my answers?  Could

9  Steven Marks do that?  No.  Could he be easily misled?  Could

10  he answer questions that have premises that may not be

11  entirely accurate?  He could easily be misled.

12  Q    And so there's a -- there's -- is it high-level social

13  skills that come into play in that kind of questioning and

14  answer?

15  A    Yeah.  Cross-examination on anything but the simplest

16  level.  Now, there's differences.  If the cross-examination is

17  merely you were standing on the corner.  Was the light red or

18  green when the car ran through the light?  That's a different

19  level than asking -- reconstructing somebody's mental state at

20  the time an alleged offense occurred.  That is much more

21  difficult, especially when the stakes are very high for

22  someone.

23  Q    And so Dr. Geller on the stand was -- some of the

24  questioning involved her having to clarify what she had said

25  previously or to avoid -- or to deal with a question that

*Testimony of Jeffrey Danziger, MD*                                    **97**

1   seemed to have confused or conflated concepts she had earlier,

2   so she had to have her prior testimony in mind while she's

3   hearing the questions so she can decide how to answer that

4   question.

5   A    Yes, and Dr. Geller has a doctorate and has been on

6   witness stands before and has undoubtedly a very high

7   intelligence and verbal skills and is not autistic, and even

8   then, sometimes there were questions that she struggled with.

9   That's the nature of cross-examination.  Could Steven Marks

10  sit up here and do that?  My opinion:  No.

11  Q    And a questioner may, by their tone of voice or

12  inflection, signal that this is an answer where it's a really

13  an important question to me and if I get the answer I want,

14  then I'm going to be happy.  And -- which some witness might

15  listen to that and pay very careful attention to how she has

16  worded her question to see if he'd really accept that wording?

17  A    Correct.  And could someone with autism spectrum disorder

18  who interprets things in the most literal sense, who when

19  asked, "How did you get to Atlanta" -- or "What brought you to

20  Tampa?"

21       "I took the bus."

22       "Bring me your laundry basket."  Did not get "Your

23  clothes are filthy, and they need to be washed."  Brought an

24  empty laundry basket.  Somebody with that level of concrete

25  thinking, no, they would not be able to understand inflection,

**Testimony of Jeffrey Danziger, MD**                                          **98**

1   tone, whether there was some sort of sarcasm or zing to the

2   question.  They would be oblivious to these things.

3   Q    And a witness who is typically developed person who maybe

4   answered the question in a way that wasn't careful might be

5   able to say, "Oh, wait a minute.  I don't think I understood

6   that question.  I want to change my answer."  Or three

7   questions down the road where the examiner's branched off into

8   something relying on this misinterpretation of them, they

9   would need to work very hard to try and straighten out the

10  course.

11  A    Yes.  And that certainly happens where people testifying

12  backtrack and say, "Wait a minute.  I didn't really mean

13  that."  That happens all the time in testimony.  I've seen it.

14  I've probably done it.  Could Steven Marks do that?  No.  He

15  would be oblivious.

16  Q    I'd like to ask you about -- first of all, you mentioned

17  Dr. Imhof.  The report by Dr. Imhof.  Do you know Dr. Imhof?

18  A    I mean, I'm not friends with him, but I do know him.  I

19  personally have done over 450 psychosexual evaluations using

20  tools such as the Abel Assessment, so I have seen Dr. Imhof

21  and seen his reports.  I know him professionally, not

22  personally.

23  Q    Do you credit the results of the Abel Assessment?

24  A    The Abel Assessment is a good test, and it's one I use.

25  And it is designed to show by having people view

*Testimony of Jeffrey Danziger, MD*                                    **99**

1    nonpornographic images of men and women, boys and girls of

2    different ages in a manner beyond their conscious awareness

3    whether they demonstrate sexual interest in those images.  So

4    it relies on visual reaction time that someone may say, "I'm

5    not interested in little children" but they linger over the

6    images of little girls in dresses or bathing suits.  And

7    through that it can demonstrate whatever their self-report,

8    whether there's interest in men, women, boys, girls, adult

9    men, adult women.  There's other instruments that you can use

10   to measure sexual interest, but the Abel is a commonly used

11   one.  Dr. Imhof, to my knowledge, is a very experienced

12   individual.  His opinion was that Steven Marks did not have

13   sexual interest in children.  That was Dr. Imhof's opinion,

14   and, yes, that stands in contrast to the text messages, but

15   the explanation is the autism spectrum disorder, the behavior

16   where he could not understand the distress or harm it was

17   causing to a nine-year-old or an eleven-year-old and how he

18   engaged in that behavior despite a lack of sexual interest in

19   minor children.

20   Q    Earlier you mentioned Dr. Leventhal and Ence, that they

21   wrote a report and Dr. Otto commented on that yesterday.  Do

22   you -- what do you think of Dr. Leventhal's evaluation?

23   A    The key issue was the lack of a direct examination.  Now,

24   there's nothing wrong with doing a record review.  I have done

25   record reviews before.  And sometimes you can examine someone

*Testimony of Jeffrey Danziger, MD*                              **100**

1    in a will contest.  The contester may be deceased, or if it's

2    a suicide case, a wrongful death, the person who committed

3    suicide, they're gone.  You can't evaluate them.  But -- and

4    it's fine to look at records in other reports.  You can

5    question the methodology of someone.  Did they follow standard

6    practice?  Did they correct -- did they use the right test?

7    Did they do an appropriate interview?  That's fine.  But when

8    you say, "To a reasonable degree of medical certainty, the

9    person has this diagnosis" and when you say, "They possessed

10   criminal responsibility by the federal standard without an

11   examination," my opinion, that is a step too far, and this was

12   Steven Marks is someone who is alive, available to be

13   examined, and for them -- for Drs. Leventhal and Ence to give

14   such definitive opinions -- he doesn't have autism and he's

15   criminally responsible without evaluating him -- my opinion as

16   a forensic psychiatrist, a step too far and not proper.

17   Q    Now, I'd like to ask you about Dr. Otto's methodology.

18   Dr. Otto acknowledged that, for example, in seeing -- in

19   testing Steven's ability to, say, make a decision about

20   whether to plea or not, gave the example of, very generally, a

21   person who has a ton of evidence against them, what should

22   they do?  In your view, is that a fair test of whether or not

23   Steven in the real world, in a case like this, has the ability

24   to understand the factors that might bear on what course of

25   action to take, to evaluate which weigh more, and decide for

*Testimony of Jeffrey Danziger, MD*                                101

1   himself how much risk he's willing to take on one course or

2   another?

3   A    It was a simplistic scenario.  There's a ton of evidence

4   against you.  Guilty or not guilty?  So, essentially, a

5   forced-choice question.  Pick from two options.  Steven

6   thought about it, and as Dr. Geller said, he said, "Guilty,"

7   with a rising inflection, like a question mark:  Am I right?

8   So -- and not a realistic real-world situation, although given

9   the choice of picking one of the two answers, he picked the

10  correct one.  Obviously, his situation is a more complicated

11  one in real life.

12  Q    Does that scenario that Dr. Otto went through give you

13  any confidence that you -- or any thought that you might be

14  mistaken about Steven's ability to handle the decision-making

15  process here?

16  A    Dr. Otto and I agree on some issues.  For example, I'm

17  looking at the last full paragraph of Dr. Otto's report where

18  he acknowledges he shares my concerns about Steven Marks's

19  limitations, saying that "associated with his

20  neurodevelopmental disorder limit Mr. Marks's ability to

21  understand and participate in the legal process and work with

22  counsel."  So Dr. Otto acknowledges -- I suppose I have a

23  point.  He doesn't entirely disagree with me.  He recognizes

24  there are limitations.  Now, Dr. Otto's opinion is that he's

25  not up here.  If the bar on competency is here, Steven's down

*Testimony of Jeffrey Danziger, MD*                                    **102**

1    lower.  He's got problems, but he clears the bar.  I'm

2    paraphrasing, but that's how I interpret what Dr. Otto says.

3    Yes, there's problems.  I think he's got enough to figure it

4    out.  I agree with Dr. Otto on diagnosis, and I agree with

5    Dr. Otto that there's problems.  The difference we have is my

6    opinion is Steven falls below the bar based on a fundamental

7    inability to comprehend the proceedings, an inability to

8    testify, and an inability to meaningfully work and consult

9    with you.  He is going to say, "Tell me what to do,

10   Mr. Mahoney and Mr. Foster," or "Dad, tell me what to do."

11   And the decision may not be so clear or obvious.  There may be

12   factors to -- to weigh out of risk.  Can he autonomously make

13   that decision, comprehend what's going on and the proceedings

14   against him and with your advice and counsel, his father, his

15   two lawyers, decide what to do?  My opinion:  No.  He'll say,

16   "Tell me."  And that lack of autonomy is one of the

17   disagreements I have on Dr. Otto's analysis.  Dr. Otto says,

18   "I think he's got enough to do that."  My observations of

19   Steven is he cannot.

20   Q    I think Dr. Otto said that he would listen to counsel.

21   A    And my difference with that is -- well, a good client

22   should listen to the lawyers he hires, but it's beyond listen

23   to counsel.  My opinion is he'd say, "I don't get it.  Tell me

24   what to do."  And, as I said, just with yesterday's

25   proceedings, Steven doesn't get it.  He didn't get it when he

*Testimony of Jeffrey Danziger, MD*                                    **103**

1   was in front of the judge in Idaho.

2       "What happened?"

3       "I don't know."

4       "What did the judge decide?"

5       "I don't know."

6       Well, it was a fairly simple decision.  My understanding,

7   it was you can stay in Idaho.  You don't have to go back --

8   you don't have to go elsewhere.  So he doesn't get it.  He

9   can't follow, and he would simply say either, "Dad, tell me

10  what to do," "Mr. Mahoney, Mr. Foster, tell me what to do.

11  What do you think?"  That's the -- that's the key difference I

12  have with Dr. Otto's analysis.  My opinion is it falls below

13  an acceptable threshold of understanding and reasoning and

14  ability to make decisions, especially about something as

15  critical as this to his life.

16  Q    My impression from Dr. Otto's report and his testimony

17  was that the only question he actually asked Steven what he

18  would do was would he testify, and Steven basically was sort

19  of apoplectic over that possibility.

20  A    And, of course, for a defendant to testify as a -- it's a

21  risky strategy.  You don't have to testify.  You open yourself

22  up to cross-examination.  Sometimes it's a good decision.

23  Sometimes it isn't.  Could Steven make that decision on his

24  own?  Could he weigh out the risks of sitting up here on the

25  stand?  You could advise him, "Say yes or no," but could he

*Testimony of Jeffrey Danziger, MD*                                    **104**

1    independently make that decision?  My opinion:  No.

2    Q    Actually, Dr. Otto in talking about Steven having, you

3    know, some judgment fastened on the fact that much after the

4    fact Steven thought that it was bad that he talked to the

5    police.  Of course, it doesn't address his failure to invoke

6    his right to silence -- remain silent at the time he talked to

7    the police.  But, as a matter of fact -- this may lead to a

8    question -- Dr. Geller several times was able to tell the

9    Government in response to questions, "Well, Steven told that

10   to the police also.  Steven gave his defense to the police.

11   He said, 'This is a selfie game.  This is not about sex.  I

12   didn't mean to hurt anybody, and I was just playing this

13   game'" insistently.  So without that, Steven would be in a

14   worse position than he -- than he would be otherwise.

15   A    Perhaps, and I can understand why skeptical law

16   enforcement officers wouldn't believe that.  I can -- I can

17   understand their skepticism, but in essence, Steven was, in my

18   opinion, reporting truthfully.

19   Q    And so it wasn't -- there was, in fact -- the fact is

20   there was no judgment on Steven's part in talking to the

21   police.

22   A    Well --

23   Q    It turns out, in fact, I think he's better off, but do

24   you think he actually exercised judgment on whether or not to

25   talk to the police?

*Testimony of Jeffrey Danziger, MD*                                    **105**

1   A    Do I think he could -- do I think he has good judgment

2   overall?  No, he does not, not in the social arena, not in

3   other arenas.  So overall there's deficits in judgment, which

4   are a manifestation of the autism spectrum disorder.  The

5   wisdom of agreeing to speak to police and knowingly and

6   intelligently waiving his rights -- that's a very high-stakes

7   matter.

8   Q    Doctor, do you see -- having commented frequently on the

9   connection between Steven's autism condition and these

10  deficits that affect his competency, can you tell the judge

11  what your feeling is about whether or not it would be

12  reasonable to think that his -- he -- with some period of

13  hospitalization he could be habilitated to the point where he

14  would be competent in the ways that you say he's not competent

15  now?

16  A    My opinion:  Steven, with training, repetition, could

17  eventually be able to say what competency is, what the roles

18  of the officers of the courts are, what a plea deal is.  With

19  enough training and education and drilling and repetition, he

20  can learn those things.  He has an incomplete understanding of

21  them.  For example, he's learned some things.  When I met with

22  him in December, he didn't know what a prosecutor was.  Now he

23  knows that the prosecutor wants to send him to prison.  So

24  he's -- he's capable of learning these things.  So can he

25  demonstrate a factual understanding of the mechanics of the

*Testimony of Jeffrey Danziger, MD*                                    **106**

1  legal process?  My opinion:  Yes.  Can he rationally

2  comprehend the proceedings against him?  Can he meaningfully

3  assist in his defense?  Can he make judgments, such as

4  weighing out the risks of whether to accept a plea offer, go

5  to trial, whether to testify or not?  Can he understand what

6  witnesses are saying on the stand and what to tell his lawyer

7  about how that affects him or if they're not saying something

8  accurate, could he ever testify and handle a complex

9  cross-examination?  Those rational abilities and rational

10 understanding of the legal process and ability to work with

11 counsel, in my opinion, those deficits are permanent and

12 beyond his abilities.  There is no cure.  This is not a

13 schizophrenic patient where I can send them to the facility at

14 Butner and they're placed on a medication like risperidone for

15 six months and the psychosis goes away.  This is a lifelong

16 neurodevelopmental disorder that will not get better, and

17 while we can teach him facts, we can't teach him understanding

18 and reasoning.

19 Q    And I'd like to ask you also about -- Dr. Geller sort of

20 asked questions which sort of implicated that, well, because

21 Steven's autism is not going to go away, that he, you know --

22 he'll be a danger to people in the future.  Do you see any

23 prospect of that?

24 A    I think it extremely unlikely.  This is not someone with

25 a history of personal violence.  This is not someone with a

*Testimony of Jeffrey Danziger, MD*                                  **107**

1   history of prior legal offenses, and this is not someone with

2   a history of antisocial personality disorder.  He would not

3   meet the criteria for ASPD as defined in our diagnostic and

4   statistical manual, fifth edition, that requires before the

5   age of 15 a conduct disorder characterized by such things as

6   initiating fights, bullying others, tormenting animals,

7   fire-setting, stealing from stores, stealing by breaking into

8   homes or cars, stealing by confronting victims, vandalism,

9   truancy, running away from home.  He has none of these.  As an

10  adult you have to have this before the age of 15 to have

11  antisocial personality disorder.  As an adult, if you have

12  antisocial personality disorder, you have things like an

13  illegal occupation, you're a drug dealer, you're a pimp.  You

14  have a history of personal violence.  You have financial

15  irresponsibility, irresponsibility in relationships, frequent

16  physical violence and fights, multiple felony convictions.  He

17  does not have antisocial personality disorder by -- even

18  remotely close by DSM-5 criteria.  He has been at Aloft

19  Transitions now for -- at this point it's what?

20  Eighteen months?  My understanding, there -- he follows the

21  rules.  He keeps his ankle monitor on.  He doesn't leave the

22  grounds.  He does everything that he's told.  He hasn't tried

23  to inappropriately access any Internet or smartphone.  He has

24  followed the rules and been an absolutely compliant person.

25  There's no previous history of sexually aberrant behavior, no

1   subsequent history, and as Dr. Geller said, when he engaged in

2   this behavior that brought him to the attention of law

3   enforcement, he didn't -- he -- because of his autism spectrum

4   disorder, he lacked an understanding of the impact this would

5   have on the others.  He can't put himself in the mind of

6   others.  Now he knows the rules.  You can teach a child the

7   rules.  You can teach a five-year-old don't hit your little

8   brother.  You'll get in trouble.  If they do hit their little

9   brother, you don't take them to circuit court or juvenile

10  court and find them competent and prosecute them.  He gets

11  rules.  So my opinion, the risk of future aberrant behavior or

12  future law-breaking behavior is low.  He does not have an

13  antisocial temperament, a predilection towards antisocial or

14  criminal behavior.  He behaves well in structured settings,

15  and this is not someone who can live independently.  And this

16  is someone who -- if we take Dr. Imhof's report and the

17  results of testing -- does not have a psychosexual disorder or

18  sexual paraphilia in spite of the nature of the offenses

19  against him, which is explained by the autism spectrum

20  disorder, not by sexual paraphilia.

21  Q    And his -- the rules, you said, you know, even a child

22  knows not to hit somebody else, there are certain things that

23  we might call overlearned rules that we have, not -- don't

24  steal, don't hurt, don't hit people.  The problem that Steven

25  would have was these implicit rules that are not taught, not

*Testimony of Jeffrey Danziger, MD*                                    **109**

1   written down except by accident -- somebody might stumble

2   across them but -- so that's where somebody like Steven falls

3   into the problem?

4   A    And especially things that involve interactions with

5   others.  The people I've seen with autism spectrum disorder

6   who violated the law, they do things like they stalk people.

7   Well, why are they stalking?  They're in college.  A girl at

8   school was actually kind to them.  She likes me, so they

9   follow -- he follows them around and talks to them all the

10  time.  They don't get that the other person doesn't want the

11  contact with them and that it's unwelcome.  They can't put

12  themselves in the mind of others, and they don't understand

13  the distress they're causing to someone.  Similarly with

14  sexual offenses.  And I've given opinions in this courthouse

15  people with autism spectrum disorder who've gotten into legal

16  trouble with pornography issues, and I've given opinions in

17  circuit courts around the state on child pornography charges,

18  traveling to meet a minor charges, other sexually related

19  charges.  They cannot appreciate the impact or harm it causes

20  to the other person.  They fail to comprehend, whereas a

21  neurotypical person understands this is a boundary violation.

22  I can't do this.  So they frequently get themselves into --

23  they violate legal standards because they can't put themself

24  in the mindset of others.  They don't understand that this is

25  distressing to the other person.

*Testimony of Jeffrey Danziger, MD*                                    **110**

1    Q    So they may engage in behavior, which looks antisocial,

2    but without the mentality that normally goes with antisocial

3    actions?

4    A    Yes, their inability to assess social situations, their

5    inability to appreciate the views of others often leads them

6    into forbidden territory and violations of the law, but they

7    don't get it or understand the harm it's causing to another.

8    Q    Does -- is there any other personality disorder you think

9    Steven might have?

10   A    I don't.  What I have seen in some individuals ultimately

11   diagnosed with autism spectrum disorder is someone calls them

12   avoidant personality disorder, which is a DSM diagnosis.

13   These are people who are afraid of social settings, fear

14   rejection, tend to isolate themselves, be extremely

15   introverted.  So the social avoidance and lack of friendships

16   people with autism spectrum disorder have -- sometimes they're

17   what I would call misdiagnosed as avoidant personality

18   disorder.  But I wouldn't diagnose that.  That inability to

19   participate in social situations would be a facet of the

20   autism spectrum disorder, not avoidant personality disorder.

21   Q    Thank you, Doctor, is there anything I've left out that's

22   important to your diagnosis and evaluation of Mr. Marks at

23   this point?

24   A    Simply my opinion he suffers from a mental defect, autism

25   spectrum disorder, has only an incomplete factual

*Testimony of Jeffrey Danziger, MD*                                    *111*

1   understanding of the legal process, lacks a rational

2   understanding of the legal process, is not able to comprehend

3   the nature and consequences of the proceedings against him,

4   and, in my opinion, cannot meaningfully assist in his defense.

5               MR. MAHONEY:  Thank you, Doctor.

6               THE COURT:  Ms. Chang?

7               MS. CHANG:  Thank you, Your Honor.

8               THE WITNESS:  Good morning, Ms. Chang.

9                          CROSS-EXAMINATION

10  BY MS. CHANG:

11  Q    Good morning, Doctor.  How are you?

12  A    I'm fine this morning.

13  Q    Good.

14       In reviewing -- you listed the materials that you

15  reviewed in preparing your report, and I noticed that the

16  three-hour interview with the police department wasn't on

17  there, and, obviously, Dr. Otto's interview hadn't been

18  created at that time.  Have you since reviewed them, just so I

19  know?

20  A    I haven't reviewed the -- I haven't listened to the full

21  police report.

22  BY MS. CHANG:

23  Q    Okay.

24  A    I have reviewed some but not all of the texts.  One of

25  the things that I did, there was a report from a police

*Testimony of Jeffrey Danziger, MD*                                      **112**

1    officer in Orlando who contained some of the text messages.

2    So those -- so to me, that's certainly not a complete review,

3    but it's illustrative of the nature of the allegations against

4    him.

5    Q    Sure.  And you've been sitting throughout this entire

6    proceeding, so all the recordings that we've played of

7    Dr. Otto's interview and the snips that we played from the

8    police interview you've heard?

9    A    Oh, yes.

10   Q    Okay.  So I'll just reference them rather than playing

11   them again.

12   A    And I don't have the State -- I'm sorry -- the

13   Government's exhibits here, if there's something you

14   specifically want me to refer to.

15   Q    Okay.  If we get there, I'll make sure you have a copy.

16   A    Thank you.

17   Q    Okay.  So listening to the police interview, did that

18   change your opinions at all?

19   A    It did not.

20   Q    So they didn't change your opinions as to his ability to

21   process language, for example?

22   A    He can speak.  This is not -- some individuals with

23   autism develop no language and require lifetime

24   institutionalization.  Steven is certainly functioning above

25   that level, but both Dr. Otto and myself diagnosed autism

*Testimony of Jeffrey Danziger, MD*                                    **113**

1   spectrum disorder with accompanying language impairment.  So

2   while he can understand questions and respond to them, can he

3   understand the deeper meaning?  Can he understand what the

4   person is trying to say, what they're trying to get to?  My

5   opinion:  No.  His language skills are rudimentary.  I note

6   when Dr. Geller did the Vineland testing, receptive and

7   expressive language was at the level of a four-year-old.  So

8   that was testing which showed that, yes, he can talk.  He can

9   communicate.  He can answer questions, but his ability to

10  intuit the deeper meaning is greatly limited.

11  Q    I'll come back to that.  For now I want to turn to your

12  report, and I'll -- I'll read quotes from them.  In your

13  report -- actually, you said on direct that you didn't view

14  your interview of the defendant as, like, an education

15  exercise; right?

16  A    No.  And typically in doing competency evaluations

17  there's the issue of do you remediate people?  If someone

18  doesn't -- says, "I don't know what guilty means," I give them

19  the answer, and they parrot it back to me.  Does that mean

20  they really have an understanding of it they'll retain a day

21  later, a week later, three months later when they're at trial?

22  So I'm unlike some examiners, I'm generally not in the

23  business of well, let me give you the answer so you can tell

24  it to me.  So that's generally my style in doing these.  Now,

25  one minor issue, no.  I notice Dr. Otto, for example, on

*Testimony of Jeffrey Danziger, MD*                                 **114**

1    perhaps seven or eight occasions -- his report says things

2    like "After some discussion," "After I explained it to him, he

3    came to understand" -- there was seven or eight of these in

4    Dr. Otto's report suggesting that could Steven retain these

5    seven or eight things down the road?  Questionable.  But my

6    role is not to do a lot of remediation but to see what do you

7    know and what do you understand.

8    Q    So just -- I really am trying to just understand what you

9    did in your interview.  Did you try to remediate in your

10   interview with him?

11   A    No.

12   Q    Okay.  So on paragraph 47 in your report when you say --

13   you said that "He didn't know how an attorney might help him";

14   right?

15   A    Correct.

16   Q    So you didn't try to educate him as to things that an

17   attorney might do to assist; correct?

18   A    No, but I asked him a second question.  I tried to phrase

19   it differently.  What are the kind of things an attorney might

20   do to help you?  So I gave him time to think about it, and he

21   could not come up with one, and that goes to rational ability

22   to work with attorney.

23   Q    Your report indicates at Photograph 54 that "The

24   defendant didn't know what the prosecutor's job was"; correct?

25   A    Correct.

1   Q    And you didn't try to educate him as to that?

2   A    No.

3   Q    And he didn't know -- this is paragraph 55 -- that the

4   defendant didn't know the meaning of beyond a reasonable

5   doubt; right?

6   A    Correct.

7   Q    Okay.  Are you aware that in Dr. Otto's interview with

8   him, Dr. Otto did not educate the defendant as to what a

9   prosecutor does?  Are you aware of that?

10  A    Well, let me see exactly what he said.  He correctly

11  predicted the prosecutor would ask him challenging questions

12  designed to prove he was guilty.

13  Q    So --

14  A    And let me -- he may have said something else.  Let me

15  see if he says anything else about the prosecutor.  Oh, here.

16  Page 13, first full paragraph.  "He understood the prosecutor

17  tried to prove him responsible for the charged offenses."

18  Now, I don't know -- I'd have to look at Dr. Otto's interview

19  how he asked the question.  Did Steven come up with that

20  de novo, or did he give him choices there?  I don't know.

21  Q    So you're not aware, then, that Dr. Otto did not educate

22  the defendant as to the roles of the prosecutor and Mr. Marks

23  was able to generate that himself.  You're not aware of that,

24  are you?

25  A    I won't dispute that if that's what the transcript

1  literally shows.

2  Q    And you're also not aware that the transcript of the

3  interview with Dr. Otto will show that Mr. Marks on his own

4  was able to explain what beyond a reasonable doubt meant?

5  A    He may have learned that between the time I saw him and

6  the time Dr. Otto met with him.  As I said on direct, I have

7  no doubt he can learn factual concepts and they are taught.

8  Q    But part of your report is based on -- I mean, you devote

9  areas of your report to say that he has these partial deficits

10  in his understanding, so that's why I'm addressing that, but

11  you wouldn't dispute what I just said; right?

12  A    No.  It speaks for itself.  My concerns with competency

13  are rational ability to comprehend the process, ability in

14  real time to understand the nature and consequences of

15  proceedings, and ability to assist in his defense.  Those are

16  more -- those are deeper and more fundamental than the factual

17  knowledge of what your role is, Ms. Chang.

18  Q    Would you agree -- you say in your report that the

19  defendant struggles with processing -- he has language

20  deficits.  Do you recall that?

21  A    Yes.

22  Q    His -- paragraph 76, "He presents with deficits and

23  understanding in producing language."  He didn't demonstrate

24  deficits in understanding or producing -- understanding or

25  producing language in his interview with Dr. Otto, did he?

*Testimony of Jeffrey Danziger, MD*                                    *117*

1   A    Dr. Otto used simple language, explained things, but,

2   yes, could Steven generally respond to most of the questions?

3   He did.

4   Q    And the defendant didn't present with deficits in

5   understanding or producing language in his interview with the

6   police, which was significantly more rapid, more complicated,

7   and more high pressure, wouldn't you agree?

8   A    It was more rapid.  It was more high pressure.  He

9   responded to questions, yes.

10  Q    In terms of his -- in terms of the defendant's rational

11  understanding of what's going on, do you recall -- I mean,

12  it's been discussed at such length in this hearing -- the

13  interplay between Dr. Otto and the defendant where Dr. Otto

14  poses a series of hypotheticals and says, "All right.  Let's

15  say there's a ton of evidence.  What would you decide?  What

16  would you recommend if there's a little bit of evidence?"

17  Remember that?  So don't you think that demonstrates that the

18  defendant can rationally predict a likely outcome based on,

19  for example, a quantum of evidence?

20  A    A, it's a simplistic question.  B, you have someone who's

21  examining him who's giving him time, letting him think about

22  it, posing the questions in a certain way.  That's different

23  from Steven Marks sitting here now trying to understand what's

24  going on in a trial around him in real time and how it

25  pertains to him.  So, yes, an experienced evaluator like

*Testimony of Jeffrey Danziger, MD*                              **118**

1   Dr. Otto, who's used to evaluating people at different levels

2   of intelligence and language through his career, can do an

3   interview aimed at his level.  And it was successful.  Does

4   that equate to ability to handle cross-examination, real-time

5   understand what's going on in a courtroom?  Different

6   scenarios.

7   Q    And how about -- so I understand that the courtroom is a

8   different scenario.  It moves at a certain pace.  Understand

9   that.  But how about ability to consult with one's attorneys?

10  There's no time limit as to that; correct?

11  A    Correct but --

12  Q    And wouldn't you also --

13  A    You didn't let me finish.

14  Q    Well, go ahead.

15  A    Yes.  There's no time limit with attorneys, but the issue

16  is can he weigh out risks, comprehend, and make judgments

17  based on his serious predicament?  Yes, his attorneys can take

18  all the time they need to meet with him and do their best to

19  explain things, but does he get it?  Can he weigh out risks

20  and make an autonomous decision?  That, to me, is the heart of

21  it and something Steven lacks.

22  Q    And so sort of a common thread that I'm hearing is that

23  the defendant's good at facts.  I keep hearing that, like, oh,

24  well, those were facts, so he's good at facts, but -- but

25  doing something with the facts is what he struggles with;

*Testimony of Jeffrey Danziger, MD*                                      **119**

1    correct?  That's the deeper understanding?

2    A    And it's important because the Dusky standard requires a

3    rational and factual understanding of the proceedings against

4    him.  It's not enough just to know my lawyer's the good guy.

5    The prosecutor's trying to put me away.  The judge is going to

6    decide my fate.  You need to know more than that.  So that's

7    why this difference between facts and understanding is so

8    critical in competency because it's rational and factual

9    understanding.

10   Q    I understand, Dr. Danziger.

11        I'm going to show you Government Exhibit 4, and I'll just

12   show it to you on here, so -- okay.  For some reason it turned

13   off.

14        MS. CHANG:  Am I supposed to press any other

15   buttons?  Oh, thank you.

16        I'm showing you --

17        Thank you so much, Mr. Jackson.

18   BY MS. CHANG:

19   Q    So I'm showing you Government Exhibit 4, and this is a

20   chat between the defendant and his ten-year-old victim.  Blue

21   texts on the right are the defendant's, and white texts in --

22   are the victim's.  Now, you see here at the outset he seeks

23   her out and says, "Heya," and she says, "Hi," and he says,

24   "Hey, how are you?"  And he asks her on page 2, "How old are

25   you?" and she says, "Ten."

*Testimony of Jeffrey Danziger, MD*                                    **120**

1    I'm flipping a couple pages to page -- you're -- well,

2   the pages aren't numbered, but it would be 6, and she says,

3   "How old are you?"

4    And the defendant says, "14."

5    Now, my question to you is the defendant wasn't 14 at the

6   time, was he?

7   A    He would have been 18.

8   Q    He would have been 18 at the time.  So if the defendant's

9   specialty is facts and he doesn't understand deeper meaning in

10  the facts, wouldn't that mean that he doesn't deal in lies

11  either?

12  A    That is a lie.  Little children tell lies.  Mine did when

13  they were little.  He knows to lie.  That's what that means.

14  He told a mistruth.

15  Q    And doesn't that reflect an understanding of a deeper

16  understanding of the situation that he's in and reflect

17  ability to rationally understand not only what's going on in

18  his chat with this young child but that translates over to his

19  ability to rationally understand what happens in a courtroom?

20  A    I think there's a gigantic leap between telling a lie

21  about your age and being able to meaningfully participate in a

22  hearing where your liberty is at risk.  I think there's a

23  giant chasm between those two.

24  Q    Okay.  I would just want to make sure I -- we're on the

25  same page.  Going back to communication, you do agree that the

1  defendant is able to communicate with his counsel about his

2  offense conduct?

3  A    With the assistance of counsel and with these texts and

4  materials, yes, he probably can go over it with his attorney.

5  He probably can do that functional task.

6  Q    Okay.  Turning to page 56 on Government Exhibit 5, I'm

7  going to turn to line 1632.  Orange is the defendant, and

8  white is the victim.  This victim's nine.  He tells her to do

9  these -- we've talked about this before.  He's telling her to

10 create these pornographic videos.  And then at line 1639 he

11 says, "Also delete the videos and pics that you took.  Okay?"

12 Now, wouldn't you agree with me the defendant just told the

13 victim to delete pictures that were evidence of a crime?

14 A    Well, he certainly told her to delete images, yes, and

15 were they evidence of a crime?  Yes.

16 Q    And so wouldn't that -- wouldn't that -- we've seen him

17 lie about his age, we've seen him tell the victim to delete

18 pictures that are evidence of a crime -- doesn't that reflect

19 a level of rational understanding as to his actions?

20 A    Well, you're asking me about culpability now, not

21 competency.

22 Q    But --

23 A    And --

24 Q    -- aren't they related?  Isn't his ability to rationally

25 understand -- isn't what we just saw -- I mean, it's the same

*Testimony of Jeffrey Danziger, MD*                                    **122**

1   person that we're talking about, so doesn't that reflect his

2   ability to rationally understand beyond just simple facts?

3   A    And the argument -- my response to that would be twofold.

4   First, you're asking essentially about culpability and

5   knowledge of wrongfulness, and he is saying to delete this,

6   but a teen or young adult with autism who has child

7   pornographic images, they -- nondisordered individuals may be

8   similarly curious, but common sense and knowledge of social

9   and legal codes prevents them from following this.  He has

10  autism.  He has no social or legal filter.  He cannot

11  comprehend the mindset of a nine- or ten-year-old that doing

12  this is harmful to them, that it can cause them distress or

13  pain.  They cannot put themself in the mind of someone else.

14  So this goes to issues which we're not discussing today of

15  whether you want to call it diminished capacity, downward

16  departure, mitigation, whatever the proper phrase is.  That's

17  not why I'm here on the stand today, but that's how I would

18  view this.  Now, once again, a little child can know, you

19  know, who threw a baseball through a window, you know?  Well,

20  I didn't do it.  It's not my baseball.  They know enough to

21  lie.  But does that mean they can meaningfully withstand

22  cross-examination and go through a hearing and comprehend the

23  legal process?  There's a giant gap, a gulf between those

24  concepts.

25  Q    So despite the chats that we've read through and looked

*Testimony of Jeffrey Danziger, MD*                                    **123**

1    at together in court, it's still your opinion that his level

2    of sophistication and abilities are that of a young child?

3    A    In some manifestations, his ability, his social abilities

4    are extraordinarily limited.  His ability to understand the

5    mind-set of others, his language abilities, his executive

6    functions and decision-making abilities.  Everything that

7    Dr. Geller testified to and that her testing revealed, yes,

8    even though he's in the body of a 20-year-old.

9    Q    Back to the facts and sort of his sophistication and

10   rational understanding of what's going on, are you aware that

11   he lied to the police when they asked him whether he had

12   ever -- whether he had ever asked a child to send a picture of

13   a child masturbating?

14   A    From listening yesterday, yes, he told a lie.

15   Q    And you know that's false because of the chats; right?

16   Which make it clear that he did do that?

17   A    I don't dispute that.

18   Q    And that lie shows a rational -- shows his ability to not

19   just deal in facts; correct?

20   A    It shows at a very simple level there's police talking to

21   me, I'm in trouble, and he told a lie.  Later -- later my

22   understanding is he gave lengthy confessions about what he

23   did.  But did he -- did he have enough wherewithal to tell a

24   lie?  Yes.  Can very small children tell lies?  Yes.  Does

25   that reflect the sophistication to work with counsel and make

*Testimony of Jeffrey Danziger, MD*                                    **124**

1    decisions about a legal case?  Those are, as I have said

2    before -- it's a giant gulf between that level of reasoning.

3    Those are entirely different issues.

4    Q    Do you recall during the cross of Dr. Geller this morning

5    that Mr. Marks told the -- told the police, "I'd never be

6    stupid to say anything.  Too crazy stupid, yeah."  That's --

7    that sort of demonstrates also rational understanding of his

8    situation with the police; right?  When they were asking him

9    questions?

10   A    I'm not sure I understand your question or the context,

11   if you could repeat it for me.

12   Q    Sure.  I'm just trying not to retread too much of what we

13   did earlier.  But on cross of Dr. Geller I played an excerpt

14   of the interview with the police where they're asking him

15   questions, and Mr. Marks says, "I'd never be stupid to say

16   anything.  Too crazy stupid." Do you remember that?

17   A    Okay.  Yes.

18   Q    Doesn't -- doesn't then that show, again, sophistication

19   on the defendant's part?

20   A    Not much in the way of sophistication.  I would disagree.

21   Q    Do you remember in -- on page 10 of your report -- do you

22   recall that the defendant told you he was worried about seeing

23   you?

24   A    Yes.

25   Q    And do you remember why he was worried?

*Testimony of Jeffrey Danziger, MD*                              **125**

1   A    He said his father told him if the meeting didn't go

2   perfect, I'm screwed, but -- pardon the vulgarity -- but then

3   when I asked him what that word means, he didn't know.

4   Q    He told you he didn't know; right?

5   A    He told -- right.  He said, "This is what my father said

6   to me," and I don't know if his father really said that or

7   not.

8        But I asked him the second-level question, "Well, what

9   does that mean?"

10       "I don't know."

11       But I guess he figured out his father was worried about

12  it, so he was -- or if the meeting didn't go perfect.  But he

13  couldn't define that vulgarity.

14  Q    Just a couple more questions.  So I know you said before

15  that you didn't see or view -- you didn't see your role as

16  remediating, so you had asked him questions about, like, the

17  roles of various people, and he would say he didn't know.  And

18  that's documented in your report.  So if you didn't try to

19  educate him as to the facts, how could you assess his ability

20  to rationally understand facts that he didn't know?

21  A    Because my opinion, as stated on direct and in the

22  report, is that I have no doubt he can learn the facts with

23  drilling and education.  So I know in the state system we send

24  people to Chattahoochee, the Florida State Hospital in the

25  federal system, Butner, where people go through competency and

*Testimony of Jeffrey Danziger, MD*                                    *126*

1  remediation classes and they're taught these things.  Steven

2  can learn facts but -- so I'm not really concerned about that

3  as part of competency.  The issue is the deeper and more

4  fundamental issues with language, rational understanding,

5  autonomy, and ability to comprehend in real time the legal

6  process.  That goes beyond knowing what a prosecutor does or

7  knowing what beyond reasonable doubt means.

8  Q    That wasn't my question, though.  My question is if you

9  didn't educate him as to what the facts were, how could you

10 assess his ability to rationally understand those facts?

11 A    Because facts and rationality are different.  They are

12 entirely -- they are different issues.

13 Q    So you didn't actually test his ability to rationally

14 understand facts concerning the legal process because you

15 didn't educate him as to what those facts were?

16 A    No.  Your question doesn't make sense to me.  When I ask

17 him things like "How much does a lawyer help you?"  "What is

18 the lawyer going to do?" and when I go into things like, to

19 me, "You were in front of a federal judge in Idaho" -- he was

20 there in the courtroom.  "What happened?"

21      "I don't know."

22      That, to me, whatever that judge decided, whatever the

23 consequences were -- he couldn't grasp it, and that, to me,

24 when I asked him yesterday, "What happened in court?" his

25 answers were very concrete.  He doesn't understand the

*Testimony of Jeffrey Danziger, MD*                                    **127**

1    importance and true meaning of what's happening here right

2    now.  And that goes far beyond basic factual understanding.

3    That's real-time lack of comprehending the nature and

4    consequences of the proceedings against him.

5    Q    So when you asked him in your real-time experiment what

6    happened, isn't that a rather expansive question?

7    A    Well, but I broke it down.

8    Q    Okay.  How did you break it down?

9    A    "What happened today?"

10        "They talked about competency."

11        "What does competency mean?"

12        "That I can understand."

13        "Well, understand what?"

14        "I don't know."

15        "Is there anything else involved in competency?"

16        "I don't know."

17        "The man, Dr. Otto, what did he say?"

18        "He said I can testify."

19        "Is there anything else Dr. Otto said?"

20        "I don't know.  The lady, Dr. Geller, she said I can

21    testify."

22        "What else did she talk about?"

23        "She talked about my autism."

24        "Did she give any opinions?  What was she trying -- did

25    she give an opinion?"

*Testimony of Jeffrey Danziger, MD*                                    **128**

1     "Well, I don't know.  What will the judge decide if I

2  stand trial?"

3     Okay.  Not a bad answer.  "Well, what does it mean if you

4  have to stand trial?"

5     "Well, I have to answer questions."

6     "Well, maybe it will, maybe it won't.  Is there anything

7  else if you stand trial?"

8     "I don't know."

9     To me, that reflects a fundamental failure to fully

10 comprehend what's happening in real time.

11 Q    Okay.  Now, that dialogue that you had with the defendant

12 yesterday with your real-time experiment, wouldn't you agree

13 that the way in which he answered your questions were quite

14 different from the way that he answered the questions of the

15 police?

16 A    Well, I'm not trying to implicate him in a crime or

17 extract a confession.  I'm obviously answering different

18 questions, and I'm not saying, "I'm trying to see if you're a

19 monster or not."  I'm inquiring, "What happened today?  Do you

20 understand what happened?"  It's very different than what the

21 police did.

22 Q    But wouldn't you agree that his responses to the police

23 were much more detailed than yours?  Than his responses to

24 your questions is what I mean?

25 A    I'm thinking about that.  His answers were longer,

*Testimony of Jeffrey Danziger, MD*                              **129**

1    perhaps, to the police, but we're asking very different

2    things.

3    Q    Wouldn't you agree that he volunteered more information

4    to the police than he volunteered to you yesterday?

5    A    Well, the police spoke with him for several hours.  My

6    conversation with him was briefer, but I'm asking -- I'm not

7    going over and over and over the same ground as the police did

8    over a three-hour interview.  I'm trying to ask him, "Do you

9    understand what happened today?"  So entirely different

10   issues.

11   Q    You said that he, the defendant, will not be able to

12   handle a complex cross-examination, although he will be able

13   to report truthfully; correct?

14   A    Can he understand the obligation to tell the truth?

15   Probably.  Could he withstand a cross-examination from someone

16   as formidable as you?  That would -- doubtful.

17   Q    Well, let me put it to you -- let me break it down a

18   little bit.  When he answered Dr. Otto's questions and the

19   police officers' questions, his answers were relevant, were

20   they not?

21   A    For the most part, yes.

22   Q    His answers --

23   A    Now, even Dr. -- I believe even Dr. Otto said sometimes

24   he had to redirect him a bit, if I remember Dr. Otto's

25   testimony yesterday.  But for the most part, yes, they were

*Testimony of Jeffrey Danziger, MD*                                    **130**

1   relevant.

2   Q    And his answers were informative, were they not?

3   A    Did he answer Dr. Otto's questions?  Yes.

4   Q    And he appeared at least -- well, you just said he's

5   capable of telling the truth.  So what else do you need beyond

6   that to testify competently as a witness in a federal criminal

7   case, provide relative, informative, truthful responses?  What

8   else is necessary?

9   A    If competency to testify, his obligation to tell the

10  truth, understand questions, recall information from the past,

11  and give reasonable responses?  Can he understand the

12  underlining meaning of questions designed to implicate him in

13  a crime or worsen his situation?  Do I think he can -- can he

14  understand straightforward, simple questions on the level of a

15  six- or seven-year-old?  Yes.  Abstract questioning, questions

16  that have a hidden intent to implicate him, make his position

17  seem worse to jurors, would he be able to understand that

18  context?  He would not.  It would be like having a child

19  witness lacking an understanding of how the meaning of your

20  questions and how jurors would interpret his questions.  It's

21  those subtleties that, in my opinion, render him on a witness

22  stand dangerous to himself, so to speak.

23  Q    And would it be dangerous to himself because he would

24  give Answer A because he is the way that he is, but he would

25  give Answer B if he understood the subtleties?

*Testimony of Jeffrey Danziger, MD*                              *131*

1  A    He's likely to say things that a jury would interpret

2  badly.  And do I think he could handle complex questioning?

3  No.  Everything would have to be very simple, and his

4  responses would not -- would unlikely to be helpful to him.

5  Q    But the questions that a defendant would be asked on

6  cross-examination would be questions such as what were you

7  thinking at the time; right?

8  A    That might be a question.

9  Q    Okay.  It might also be in the realm of why did you do

10  it; right?

11  A    That could be a question.

12  Q    Or what does this mean?  Like, look at these texts.  What

13  does this mean?  Right?

14  A    Could he give with his mind-blindness reasonable

15  responses to that?  I don't think so.

16  Q    Well, didn't he do those exact -- didn't he answer those

17  exact questions when he talked to Dr. Geller, which is why

18  Dr. Geller was able to tell us, oh, well, he did all this

19  thinking that he was trolling and mimicking others.  He

20  answered exactly those questions.  Is that not right?

21  A    He did answer Dr. Geller's questions, who was not a

22  hostile cross-examiner.

23           MS. CHANG:  May I have a moment, Your Honor?

24           THE COURT:  Yes.

25  BY MS. CHANG:

*Testimony of Jeffrey Danziger, MD*                                    **132**

1   Q    Dr. Danziger, since you were asked about dangerousness on

2   direct, I'm going to ask you as well:  Is it your opinion that

3   the defendant has no sexual attraction to children?

4   A    Based on Dr. Imhof's testing, I did not do psychosexual

5   testing of my own since that had already been done, so I would

6   rely on the findings of, A, Dr. Imhof, which did not show

7   pedophilic disorder or other sexual paraphilia, the lack of an

8   antisocial temperament, the lack of a conduct disorder, the

9   lack of violent behavior, the lack of prior criminal conduct,

10  his good conduct in the 14 months the Court has allowed him to

11  be at liberty in the Aloft facility in Idaho, given those

12  factors and his ability to understand what rules are, that

13  this should not be done again, my opinion, the risk of future

14  misconduct and dangerousness is extremely low.  You can never

15  say zero because I can never predict the future with absolute

16  certainty.  I would see him as very low risk.

17  Q    My question was as to sexual attraction?

18  A    Well, as I said, I did not do the psychosexual

19  evaluation.  I do them.  I did not do them here based on the

20  finding of Dr. Imhof, someone I know and respect.  My opinion:

21  There is not a -- based on -- based on that data, he does not

22  have pedophilic disorder or a sexual paraphilia.  Pedophilic

23  disorder is defined as sexual attraction to prepubescent

24  children.

25  Q    And how about based on the chats in this case?

1    A    Once again, if you take the chats concretely,

2    literally -- which is the irony here -- yes, it suggests

3    sexual attraction to children; however, testing does not show

4    sexual attraction to children.  And the issue is, as

5    Dr. Geller says, this is role-playing in a context he does not

6    understand, and while he views this as some sort of game to be

7    played, he lacks the mindfulness to comprehend that engaging

8    in these conversations or asking nine-, ten-, and

9    eleven-year-olds to do these things, he cannot comprehend and

10   put themselves in their mind-set that this is harmful to them

11   and it can cause them distress.  He is mind-blind to this.  He

12   completely doesn't get it.  So even though taking these

13   concretely and literally, yes, they're disturbing.  Yes, law

14   enforcement would be horrified.  Yes, prosecutors and FBI

15   agents would say, "This is awful.  We should prosecute this."

16   But as I view this -- and this is testimony I've given in this

17   courtroom in other settings -- they cannot place themself in

18   the mindset of minors and understand the harm that it causes

19   to them, the distress it can cause to them.  They view this as

20   some sort of game.  Blindness to the realization of the impact

21   that it has.

22   Q    So, Dr. Danziger, am I correct in my understanding, then,

23   that you're saying -- well, as Dr. Otto and Dr. Geller and you

24   have all agreed, this defendant is very concrete in his

25   thinking.  So concrete, in fact, that he requires concrete

*Testimony of Jeffrey Danziger, MD*                                134

1    questions at trial; correct?

2    A    Yes.

3    Q    Okay.  So he takes everything else concretely but not the

4    chats in this case?  That's what you're saying?

5    A    I view these as pretty concrete.  The language is simple.

6    There's a few simple emojis.  This is not Shakespearean prose.

7    And he is asking for things, but, again, I don't view this as

8    very sophisticated.  The key issue here, because you're asking

9    about moral culpability and pedophilic disorder and sexual

10   attraction to children, the testing doesn't show sexual

11   attraction to children, which stands at odds with these texts.

12   And the explanation is by virtue of the autism spectrum

13   disorder, he does not understand the wrongfulness that he's

14   doing.  He's doing this as some sort of a game and cannot put

15   himself in the mind-set of a distressed child, which led to

16   the inappropriate behavior, the actus reus, which is why we're

17   here in court today.

18   Q    Who retained you, Dr. Danziger?

19   A    The defense did.

20   Q    How much are you being paid per hour?

21   A    $600 per hour.

22           MS. CHANG:  I have nothing further, Your Honor.

23           THE COURT:  Thank you, Ms. Chang.

24           Mr. Mahoney -- and you're going to be able to ask as

25   much as you'd like.  How much redirect do you think you have?

1          MR. MAHONEY:  Just -- less than ten minutes, Judge.

2          THE COURT:  Perfect.  Go ahead.

3                        REDIRECT EXAMINATION

4     BY MR. MAHONEY:

5     Q    Do you give better opinions with the more money you get,

6     Doctor?

7     A    No.

8     Q    Doctor, a couple of things.  I just wanted to -- first of

9     all, in terms of working with counsel it was suggested, well,

10    there's no time limits on that, but there can -- may be

11    decisions being made in the courtroom about what to do.

12    A    Sure.  And it might be there's a ten-minute recess, and

13    we need to make a decision.  So there would be a time limit

14    there.  So if you're having a meeting with your client in the

15    evening, yes, you can go as long as need be, but in real time

16    in the courtroom, strategic decisions maybe need to be made.

17    Q    So you were shown these chats, and Ms. Chang said that

18    Steven puts this signal out, heya, and that he was seeking her

19    out.  This isn't a chat site.  She decides to join, somebody

20    she just -- she joined the conversation.  Now, looking at her

21    name, Sam, female, single, ten, crush, shadow, and then -- and

22    shadow -- this is a -- I don't know how much this is part of

23    the site itself, but she identifies herself as single.  She's

24    ten years old.  Is there a signal there?  Now, Steven may not

25    pick that up at all, but she's coming onto a chat site where

*Testimony of Jeffrey Danziger, MD*                                    **136**

1   it's commonly used for role-playing?

2   A    Yes.

3   Q    She is later the one who -- and, by the way, nobody's

4   using their real name.  Is it a lie?  Are they lying?

5   A    Again, I'm not an expert on chat room etiquette, but it

6   is rare for people to use their own name.  There's usually

7   some alias or nom de plume they use.

8   Q    And can we now all assume that people don't always

9   present themselves honestly in these chat sites?

10  A    Correct.

11  Q    She is the one who initially tells him, I have -- I -- he

12  wants her to send a picture, and she says, "I have no shirt

13  on."  She didn't have to say that.  He couldn't see her.  So

14  this is a milieu where do you think it's easy or hard for

15  Steven with this game in mind to -- to see that there's some

16  boundaries here or some limits on what somebody can say and

17  do?

18  A    And, again, a neurotypical individual might think, ten

19  years old, I need to get out of here.  This crosses

20  boundaries.  Someone with autism spectrum disorder is heedless

21  of these boundaries, does not understand the social

22  obligations and responsibilities or the potential harm done to

23  the mind of another person, and they may proceed into

24  forbidden territory.

25  Q    The -- one question was, to you, about -- looking at one

*Testimony of Jeffrey Danziger, MD*                                      **137**

1   of the lines of the chats where he suggested that this -- this

2   correspondent delete some pictures.  Now, you weren't shown

3   the context of that, you know, what happened before, what

4   happened after, but you -- but it was described as being

5   pictures of a crime.  Do you have any reason to believe that

6   Steven thought that these were pictures related to a crime?

7   A    His ability to understand wrongfulness -- again, I'm

8   testifying on competency today, not mitigation or downward

9   departure or diminished capacity.  My opinion by virtue of his

10  autism disorder:  His capacity to appreciate the wrongfulness

11  of this contact is substantially impaired.  Now, I don't know

12  what's in his pictures, whether they're -- and I don't want to

13  see them certainly -- I don't know if they would be considered

14  child pornography or not.  But Steven does not intuit and

15  fully appreciate the dangerous territory he's getting himself

16  into.

17  Q    Do you have a sense of how old a child has to be before

18  they are able to lie?

19  A    I'm thinking of my own children.  They were little when

20  they first started telling fibs.  I didn't hit my little

21  brother.  I didn't -- I didn't break the window.  Their lies

22  were usually pretty transparent and easy to determine, but

23  they start fibbing when -- kids start fibbing when they're

24  young -- and my kids grew up to be responsible adults, not

25  criminals.

*Testimony of Jeffrey Danziger, MD*                                    **138**

1   Q    And to just say no, to not deny something when somebody

2   is suggesting you've done something wrong and that you're in

3   trouble, does that involve competence?  Does that involve

4   thinking about what might happen if you said one thing or

5   another later on, or is this something quite different?

6   A    Lying -- the ability to tell a lie is something that

7   comes early in childhood, and to extrapolate from that that

8   someone is competent for a criminal trial is much too large a

9   leap.

10  Q    Steven told you that he -- he was interpreting -- he was

11  relaying to you what he says his father said about if it

12  doesn't go well, he's screwed.  Well, first of all, we don't

13  know what his dad said, but is there any indication to you

14  that Steven was then malingering in some way or faking it

15  somehow or exaggerating his symptoms in some way?

16  A    No, he did not report to me, for example, I'm hearing

17  voices, I'm seeing pink elephants flying around the room, I

18  don't understand anything, I don't know who I am, I don't know

19  where we are.  So there's certainly no gross measures of, you

20  know, rather obvious crude attempts to fake, and, of course, I

21  had the benefit of previous data from other examiners, the

22  observations of clinical staff who at that point had been with

23  him for 14 months.  Steven is someone uncomfortable in social

24  settings, uncomfortable when you ask questions.  I did not see

25  anything clinically suggestive of exaggeration or feigning,

*Testimony of Jeffrey Danziger, MD*                                    **139**

1   and, again, Dr. Otto -- his testing, especially the ILK he

2   developed, also did not reveal an attempt to feign or

3   exaggerate a lack of knowledge.

4   Q    Did you have any impression at all that Steven was even

5   part of the decision-making process to raise the issue of

6   competency?

7   A    He didn't even know what competency was, and even when I

8   explained it to him and tried to use simple language and

9   explain it in different ways, his ability to grasp the

10  concept, at least during my time with him, that was probably

11  the only thing I tried to remediate him on, why I was there,

12  five explanations, he didn't get it.

13  Q     Is any -- is there any hint you got in talking to him

14  that he was trying to gain this process in any way, or do you

15  think he has the capacity to?

16  A    With his autism, he lacks guile, sophistication.  Could

17  he gain somebody as experienced as Dr. Otto or as

18  knowledgeable about autism spectrum disorder as Dr. Geller?

19  No.

20  Q    Okay.  Do you understand what might be meant by Steven

21  saying, "I'd never be stupid to say anything"?  That's it.

22  That's what he said.  That's what was in the transcript read

23  to you by Ms. Chang.  Does that phrase mean anything to you?

24  A    It seems like a double negative.  I'm confused by it.

25  I'm not sure what he meant.

*Testimony of Jeffrey Danziger, MD*                                    **140**

1    Q     Anyway, so, but questions -- we talk about questions

2    being concrete or not.  What about a question like "Well,

3    there was a meeting" -- "You said this on one occasion, but

4    you said this on another occasion.  And so how do you

5    reconcile them?"  Now, Dr. Geller got those questions, and

6    Steven has -- he's talked to you.  He's talked to Dr. Otto.

7    He's talked to the police.  He's had these chats.  So -- and

8    the Government, it seems, is in love with the chats, and

9    they'll be a big part of a trial.  So what kind of challenge

10   is that where somebody has to compare two questions and -- and

11   figure out, well, number one, like, which one really expresses

12   your views or evaluate the context in which each statement was

13   made, the way Dr. Geller was able to do.  Is this something

14   Steven is remotely capable of doing?

15   A     My opinion:  No.

16             MR. MAHONEY:  Thank you.  That's all I have.

17             THE COURT:  Thank you, Mr. Mahoney.

18             Ms. Chang?

19             MS. CHANG:  Nothing further, Your Honor.

20             THE COURT:  Dr. Danziger, thank you very much for

21   your time, Dr. Danziger.  You may step down.

22             THE WITNESS:  Thank you, Your Honor.

23             MR. MAHONEY:  Judge, I haven't -- as the Government

24   did, I now would like to move in with the exhibits, which we

25   have marked, we've provided to the Court.  The exhibits

1   include -- exhibits were previously attached to the

2   memorandum, which we provided to the Court as our prehearing

3   memorandum, plus the exhibits today of two additional discs,

4   exhibits that Dr. Geller identified.  There was Dr. Danziger's

5   report, Dr. Geller's most recent report, and, of course, the

6   slide presentation.

7           THE COURT:  Ms. Chang, does the United States have

8   any objection -- well, let me ask you this:  Have you seen all

9   of those exhibits?

10          MS. CHANG:  In some form or fashion, yes, I believe

11  so, and we don't have any objection.

12          THE COURT:  Okay.  Then those exhibits will be moved

13  into evidence.

14          Do you have copies of all those to present to my

15  courtroom deputy today?

16          MR. MAHONEY:  He has them, Judge.

17          THE COURT:  Okay.  Great.

18          THE COURTROOM DEPUTY:  I don't.

19          MR. FOSTER:  Actually, I have them.

20          MR. MAHONEY:  Oh, Mr. Foster has them.  Yes.

21          THE COURT:  Okay.  Well, then when we conclude this

22  proceeding, just make sure you get everything to Mr. Jackson

23  so he can properly admit it.

24          I believe -- is there any other evidence or

25  testimony, Mr. Mahoney, on behalf of the defendant?

*142*

1        MR. MAHONEY:  No, Judge.

2        THE COURT:  Anything else on behalf of the United

3   States, Ms. Chang?

4        MS. CHANG:  No, Your Honor.

5        THE COURT:  Okay.  Then what I think we'll do, like

6   I mentioned yesterday, and just because I've been kind of

7   checking the weather for a little bit and it's getting pretty

8   bad out there, we're going to go ahead and conclude the

9   hearing now.  I'm going to afford each side the opportunity to

10  do supplemental briefing.  I want very short briefing, so

11  15 pages.  There will be no extension of pages.  And how much

12  time would the parties like?  I'm thinking a short turnaround

13  because my concern is I believe your client waived speedy

14  trial through June 30th.  Obviously, he could do that again if

15  he so choose, but I'm sure everybody would like this case to

16  move along.

17       So, Ms. Chang, how long would the United States like

18  for briefing?

19       MS. CHANG:  I'll go with whatever the defense

20  requests.

21       THE COURT:  Okay.

22       MR. MAHONEY:  Mr. Foster and I both are very

23  interested in getting a transcript, Judge, and we can get an

24  expedited basis.  If we could have two weeks after getting the

25  transcript.

*143*

1     THE COURT:  Okay.  I'll ask the court reporter about

2   how long would you need for the transcript?

3     THE REPORTER:  It's just whatever they would like to

4   order.  So --

5     THE COURT:  Okay.  Well, then -- I'm sorry.  I

6   interrupted you.

7     If you're willing to pay for an expedited

8   transcript, then our court reporter can take care of that.  So

9   why don't we do this:  I'll let you-all work out those

10  arrangements and report back to my courtroom deputy this

11  afternoon as to what that arrangement's going to be, so I need

12  you to make that decision before you leave this courtroom, and

13  then I'll go ahead and do a short order setting up the

14  briefing schedule.  So, again, it'll be 15 pages in length.

15  We have all the exhibits, so it is to be argument only, and I

16  would ask -- you can, of course, put whatever you want in

17  there, but I would ask that the briefing be focused as much as

18  possible on the standard of legal competency, which is the

19  issue that I need to -- need to address in this case.

20    And, also, you did mention in your brief,

21  Mr. Mahoney, this request that I ignore 18 U.S.C.,

22  Section 4241, and not -- if I find the defendant incompetent

23  at this point, to recommend to Judge Byron that he not refer

24  the defendant to a -- to the attorney general's custody.  I am

25  not aware of any case law that allows me to do that.  If you

1   are, I suggest you put that in your brief because you're

2   asking me to violate a federal statute or at least recommend

3   to Judge Byron that I do so.

4        MR. MAHONEY:  I think, Judge, we cited two dockets

5   where judges did exactly that.  We've given you our

6   interpretation of the language of that statute.  So -- that

7   would allow it and especially the Supreme Court decision that

8   preceded that statute.  So --

9        THE COURT:  Well, if that's the argument you want to

10  rest on, that's fine.  You don't have to repeat it in the

11  supplemental briefing because it's just that, but I also know

12  that's not something that the United States has brought up,

13  and so I wanted to raise that here since that was an issue

14  that was raised.  If there is any law on that beyond what

15  you've given me, I would ask for it.  Otherwise, I'll let you

16  decide on your own what to put in that briefing.  But, again,

17  no additional exhibits.  I think we have everything at this

18  point.

19        Is there anything else on either side that you'd

20  like to take up before we adjourn?

21        MS. CHANG:  Well, just one quick question,

22  Your Honor.  So I actually addressed the mandatory remand

23  issue in my opening brief.

24        THE COURT:  Yes.

25        MS. CHANG:  Can I dispense with repeating that in

1   the --

2           THE COURT:  Absolutely.

3           MS. CHANG:  Okay.  So I'll just stick with being as

4   not repetitive as possible.

5           THE COURT:  I appreciate that, yes.  Now, I have

6   looked at every word of both of your briefs, and I have not

7   listened to every minute of the hearing so far, but I read the

8   transcript, so there's no need --  if it's in your initial

9   briefing, I will absolutely consider it.  This is just in lieu

10  of closing argument here just to wrap up today's proceeding.

11          So okay.  There's nothing else, then.  I thank

12  you-all, and I thank you very much, Dr. Geller and Dr

13  Danziger, for your patience for being here all day yesterday

14  and today, and it was extremely helpful.

15          So you-all have a very good holiday weekend, and

16  we'll be in recess.

17      (Proceedings concluded at 12:34 p.m.)

18                      -    -    -

19

20              <u>CERTIFICATE OF REPORTER</u>

21  I certify that the foregoing is a correct transcript of the
    record of proceedings in the above-entitled matter.

22

23

24   /s/ Heather Jewett_____        04/27/2019
    Heather Jewett, RPR, FCRR            Date

25  Federal Official Court Reporter