<pre>
 1                  UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                       ORLANDO DIVISION
                                         :
 3   UNITED STATES OF AMERICA,           :
                                         :       Case No.:
 4        Plaintiff,                     :       6:17-cr-00257-PGB-LRH-1
                                         :
 5   v.                                  :       Orlando, Florida
                                         :       December 15, 2021
 6                                       :       9:35 A.M. - 5:15 P.M.
                                         :
 7   STEVEN MICHAEL MARKS,               :
                                         :
 8        Defendant.                     :
                                         :
 9
            TRANSCRIPT OF COMPETENCY HEARING (DAY 1)
10          BEFORE THE HONORABLE LESLIE R. HOFFMAN
               UNITED STATES MAGISTRATE JUDGE
11
     APPEARANCES:
12
     For the Plaintiff:          Emily C.L. Chang
13                               U.S. Attorney's Office
                                 400 West Washington Street
14                               Suite 3100
                                 Orlando, Florida 32801
15
     For the Defendant:          Mark J. Mahoney
16                               Harrington & Mahoney
                                 70 Niagara Street
17                               Third Floor
                                 Buffalo, New York 14202
18
                                 Matthieu S. Goddeyne
19                               Barnett Kirkwood Koche Long
                                 & Foster, P.A.
20                               601 Bayshore Boulevard
                                 Suite 700
21                               Tampa, Florida 33606

22   Proceedings recorded by realtime mechanical stenography.
     Transcript produced by computer-aided transcription.
23
                          Reported by:
24          Heather Suarez, RPR, FCRR, CRR
                 U.S. Official Court Reporter
25          (407) 744-1567 | heathersuarez.usocr@gmail.com
     401 West Central Boulevard, Suite 4600, Orlando, Florida 32801
</pre>

2

1

**T A B L E   O F   C O N T E N T S**

2

**December 15, 2021**

3

WITNESS FOR THE GOVERNMENT:

4
      ASHLEY JENKINS, PsyD, LP (via Zoom)
      Direct Examination By Ms. Chang         7

5
      Cross-Examination By Mr. Mahoney      113

6

GOVERNMENT RESTS      211

7

WITNESSES FOR THE DEFENDANT:

8
      GRETCHEN BENNETT, MA CCC-SLP (via Zoom)
      Direct Examination By Mr. Mahoney      211

9

10

**E X H I B I T S**

11

FOR THE GOVERNMENT:

12

Numbers 1 through 7, 8.1 through 8.20, and 10      210
through 16

13

14

15

16

17

18

19

20

21

22

23

24

25

1         **P R O C E E D I N G S**

2         (Call to order of the court at 9:35 A.M.)

3              **THE COURTROOM DEPUTY:**  Case No. 6:17-cr-257, the

4    United States of America v. Steven Michael Marks.

5              Counsel, please state your appearances for the record.

6              **MS. CHANG:**  Good morning, Your Honor.  Emily Chang on

7    behalf of the United States.  With me is Special Agent Rod Hyre

8    of the FBI.

9              **THE COURT:**  Good morning.

10             **MR. MAHONEY:**  Good morning, Judge.  Mark Mahoney for

11   Mr. Marks together with Todd -- or Matt Goddeyne.

12             **MR. GODDEYNE:**  Good morning, Your Honor.

13             **THE COURT:**  Good morning.

14             **MR. MAHONEY:**  And Mr. Marks is to my left.

15             **THE COURT:**  Good morning.

16             Good morning, Mr. Marks.

17             **THE DEFENDANT:**  Good morning.

18             **THE COURT:**  Thank you.  You may be seated.

19             **MR. MAHONEY:**  Judge, may I just say one thing at the

20   outset?

21             **THE COURT:**  Sure.

22             **MR. MAHONEY:**  Judge Byron wrote a decision on a matter

23   that I had asked for review of.  It was very critical of me in

24   what the judge perceived as my tone or approach to your order,

25   but I think also he talked to you, and I just wanted to say

1    that I have nothing but the highest respect for you.  I think

2    advocates need to be as direct as they can about what they

3    perceive as being the problems, let the judges know that.

4         I'm sorry if I was intemperate.  I certainly apologize

5    if there was anything in that that you perceived as a personal

6    offense, and I regret that -- if you felt that way, I regret

7    that deeply.

8         **THE COURT:**  I appreciate you saying that very much.  I

9    don't take anything attorneys write in -- in motion papers

10   personally, but I appreciate you saying that very much, and

11   it's water under the bridge, and we'll move forward.

12        **MR. MAHONEY:**  Thank you, Judge.

13        **THE COURT:**  Thank you very much.

14        So, with that, we're here today for a second

15   competency hearing pursuant to 18 U.S.C., Section 4241(a) and

16   4247 I think (b), possibly (d).

17        But, in any event, I believe we've had ample time for

18   expert reports.  I have several expert reports from both sides,

19   and I know we have at least one witness at the moment,

20   Dr. Jenkins, I believe, appearing via Zoom, and we'll have

21   other witnesses throughout this proceeding appearing via Zoom.

22        So, with that, is the United States prepared to

23   proceed?

24        **MS. CHANG:**  We are, Your Honor.

25        **THE COURT:**  Okay.  And, Mr. Mahoney, is the defense

1    prepared to proceed?

2         **MR. MAHONEY:**  Yes, Judge.

3         **THE COURT:**  Okay.  So, Ms. Chang, is there any

4    preliminary matters we need to take up, or are you ready to

5    proceed with your first witness?

6         **MS. CHANG:**  Ready to proceed, Your Honor.

7         **THE COURT:**  All right.  Mr. Mahoney, are there any

8    other preliminary matters we need to take up on behalf of

9    Mr. Marks before we proceed?

10        **MR. MAHONEY:**  No, Judge.

11        **THE COURT:**  And, Mr. Mahoney, I'm just going to remind

12   you, because I remind everybody -- it's in our local rules --

13   when you address the Court, I just need you to stand up.

14        **MR. MAHONEY:**  So sorry, Judge.

15        **THE COURT:**  All right.  Ms. Chang, you may call your

16   first witness.

17        **MS. CHANG:**  The United States calls

18   Dr. Ashley Jenkins.

19      (Witness sworn.)

20        **THE COURTROOM DEPUTY:**  Please state your name for the

21   record.

22        **THE WITNESS:**  My name is Dr. Ashley Jenkins.

23        **MS. CHANG:**  May I proceed, Your Honor?

24        **THE COURT:**  Yes.  And, Ms. Chang, I'll ask you to do

25   me one favor.  I have a banker's box and two giant binders up

1   here, so when you are talking with exhibits, would you just

2   give me a little bit of guidance so I can find it a little bit

3   quickly.

4           **MS. CHANG:**  Yes, Your Honor.  Two, actually.  One

5   thing on that.  The only exhibit I believe I intend to address

6   with Dr. Jenkins on direct is her third amended report, which

7   is Government Exhibit 16.  So you can just pull that out.  And

8   I will be referencing things by page number, and I'll be

9   announcing those page numbers as I go along.

10          **THE COURT:**  So it's the third addendum that is dated

11  November 16, 2021?

12          **MS. CHANG:**  It's -- yeah, it's Government Exhibit 16.

13          **THE COURT:**  Okay.  Very good.

14          **MS. CHANG:**  And then may I proceed without my mask

15  while I'm at the podium?

16          **THE COURT:**  Yes.  I was going to say -- I know we

17  still have our COVID protocols.  While you're at the podium,

18  feel free to take your mask off, and when a witness is

19  testifying, I'm fine with the witness taking the mask off.

20  It'll be easier for the court reporter and for me, and we'll

21  just proceed that way.  Otherwise, all other COVID protocols as

22  required by Chief Judge Corrigan remain in effect.

23          **MS. CHANG:**  Thank you, Your Honor.

24          **THE COURT:**  Thank you very much.  Go ahead.

25                          **DIRECT EXAMINATION**

*JENKINS - DIRECT*                                                     7

1    **BY MS. CHANG:**

2    **Q.**  Good morning, Dr. Jenkins.

3    **A.**  Good morning.

4    **Q.**  Where do you work?

5    **A.**  I currently work at the Metropolitan Detention Center in

6    Brooklyn, New York.

7    **Q.**  Is that MDC?

8    **A.**  Yes.  It's also known as MDC Brooklyn.

9    **Q.**  What do you do there?

10   **A.**  I'm a forensic psychologist.

11   **Q.**  What do you do as a forensic psychologist?

12   **A.**  My main goal is to perform court-ordered evaluations that

13   come from the federal court system.

14   **Q.**  What is a forensic psychological evaluation?

15   **A.**  It is a psychological evaluation thats main component is to

16   answer the Court's questions.  So it's within the legal arena.

17   **Q.**  And what kind of questions do you get from the Court?

18   **A.**  The ones we get most frequently are competency to stand

19   trial and criminal responsibility evaluations.

20   **Q.**  And where do you primarily practice right now?

21   **A.**  At MDC Brooklyn currently.

22   **Q.**  How long have you been at the MDC in Brooklyn?

23   **A.**  I actually worked at MDC Brooklyn from 2016 to 2018, and

24   then we just transferred back to MDC Brooklyn.  We ended

25   October this year.

*JENKINS - DIRECT*                                                    8

1    **Q.**  So where did you practice between your two stints at MDC

2    Brooklyn?

3    **A.**  Yeah.  So from 2018 to October of this year, I was at the

4    Metropolitan Correctional Center in New York, also known as MCC

5    New York.

6    **Q.**  Are the MDC and MCC both run by the Bureau of Prisons, or

7    BOP?

8    **A.**  Yes, they are.

9    **Q.**  What kinds of facilities are the MDC and MCC?

10   **A.**  They're detention centers.

11   **Q.**  Are they also places where psychologists like yourself do

12   court-ordered evaluations?

13   **A.**  That's correct.  Typically, it was just MCC New York, but

14   MCC has been deactivated, and the forensic program has moved to

15   MDC Brooklyn.

16   **Q.**  How long have you been a forensic psychologist for BOP?

17   **A.**  Since 2018.

18   **Q.**  And since 2018 what percentage of your time has been

19   devoted to conducting forensic evaluations?

20   **A.**  On average, 85 to 100 percent of the time since 2018.

21   **Q.**  What -- when it's 85 percent, what's the other 15 percent?

22   **A.**  It's typically if there's crises work.  If the other

23   psychologists that are not forensic psychologists are not at

24   work and a crisis happens, we're expected to perform.

25   **Q.**  Explain your relevant educational background.

*JENKINS - DIRECT*

9

1    **A.**   I have a doctorate in clinical psychology from Carlos

2    Albizu University in Miami, Florida, and a concentration in

3    forensics.

4    **Q.**   What's the difference between clinical psychology and

5    forensic psychology?

6    **A.**   Clinical psychology is kind of the overarching umbrella of

7    any type of assessment, treatment for diagnosis of mental

8    illness; and forensic psychology is when clinical psychology is

9    within the legal arena.  So when it has to do with courts or

10   anything involving the legal system, that is when it becomes

11   forensic psychology.

12   **Q.**   And you're not a psychiatrist, are you?

13   **A.**   No, I'm not.

14   **Q.**   What's the difference between a psychiatrist and what you

15   do?

16   **A.**   A psychiatrist is a medical doctor, so they have a medical

17   degree, and they mainly prescribe medication.

18   **Q.**   Are you a licensed psychologist?

19   **A.**   I am.

20   **Q.**   How long ago did you obtain your license?

21   **A.**   In 2017.

22   **Q.**   Before you -- before you obtained your doctorate in

23   clinical psychology, did you also obtain two master's degrees?

24   **A.**   I did.

25   **Q.**   What were those in?

*JENKINS - DIRECT*                                                    10

1    **A.**  I have a master's in rehabilitation counseling and

2    psychology from the University of North Carolina in Chapel

3    Hill, and I have a master's in clinical psychology also from

4    Carlos Albizu University in Miami, Florida.

5    **Q.**  During your master's programs, did you have any other

6    relevant training or educational experiences that are relevant

7    to the work you did in this case?

8    **A.**  Yes.  The most relevant would be while I was obtaining my

9    master's from UNC Chapel Hill in North Carolina.  I was also a

10   practicum student at the Federal Medical Center Butner, which

11   is in Butner, North Carolina, and there I was able to observe,

12   shadow, and assist in the treatment of individuals that were

13   found not competent to stand trial, and I assisted with

14   competency restoration there.

15   **Q.**  How long was that practicum?

16   **A.**  It was approximately six months.

17   **Q.**  Did you also complete a forensic internship at some point?

18   **A.**  I did.

19   **Q.**  When?

20   **A.**  I completed my forensic internship in 2016.

21   **Q.**  What did that involve?

22   **A.**  It was at the federal medical center in Lexington,

23   Kentucky, and that is where I was training to do competency and

24   criminal responsibility evaluations that were all federal court

25   ordered.

*JENKINS - DIRECT*                                             11

1    **Q.**  How long was your forensic internship?

2    **A.**  It was a year long, which is standard for ANPA.

3    **Q.**  Do you participate in any other ongoing training now?

4    **A.**  Yes.  We have various ongoing trainings within the Bureau

5    of Prisons and specifically within psychology within the Bureau

6    of Prisons that we do annually.  We also do various CEUs, which

7    are additional learning credits that you have to complete in

8    order to renew your license.

9    **Q.**  And do you complete those as required?

10   **A.**  I do.

11   **Q.**  Have you ever been an instructor or trainer when it comes

12   to forensic evaluations?

13   **A.**  Yes.  I'm actually the co-coordinator and supervisor of the

14   forensic doctoral program at MDC Brooklyn.  We obtain

15   doctoral-level students annually that are with us for a year,

16   and we train them on how to conduct the court-ordered

17   evaluations.

18       In addition, I just accepted a position at John Jay where

19   I'll be teaching -- I'll be an adjunct professor in the

20   forensic program, and I also do presentations and speak at

21   different colleges on behalf of forensic psychology.

22   **Q.**  Have you received any awards for your work that are

23   relevant here?

24   **A.**  Yes.  Specifically with the Bureau of Prisons, I received

25   one to three awards over the last five years for outstanding

*JENKINS - DIRECT*                                                          12

1    evaluations.

2    **Q.**  When you say "one to three awards," is that per year or

3    total over five years?

4    **A.**  Per year.

5    **Q.**  Okay.  And sorry.  What were those awards for?

6    **A.**  They were for outstanding evaluations.

7    **Q.**  Do you have any specialized training with people with

8    autism spectrum disorder, or ASD?

9    **A.**  I have various trainings, and I've taken various classes on

10   developmental disorders, which includes autism spectrum

11   disorder.

12   **Q.**  Okay.  And approximately how many courses have you taken

13   that covered parts of ASD?

14   **A.**  If I had to take a guess, I would say five to seven

15   courses.

16   **Q.**  And in your training, education, and work experience, do

17   you have experience with people with ASD?

18   **A.**  I do.

19   **Q.**  Can you describe that.

20   **A.**  Sure.  I've had work experience with individuals on the

21   spectrum, ASD.  I've also had to treat and evaluate individuals

22   on the spectrum.

23   **Q.**  Have you ever diagnosed someone with ASD or confirmed their

24   diagnosis with ASD?

25   **A.**  I have.

*JENKINS - DIRECT*                                                   13

1    **Q.**  Approximately how many times?

2    **A.**  I would say approximately 5 to 15 times.

3    **Q.**  Approximately how many of your forensic evaluations have

4    involved defendants with ASD?

5    **A.**  Approximately 5 to 10.

6    **Q.**  Have you ever conducted a competency evaluation of a

7    defendant who is facing trial in a criminal case?

8    **A.**  Yes.

9    **Q.**  And approximately how many such competency evaluations have

10   you done?

11   **A.**  Approximately 50 to 70.

12   **Q.**  Since when?

13   **A.**  Since 2015.

14   **Q.**  And were the people you evaluated defendants in federal or

15   state court or both?

16   **A.**  They were in federal.

17   **Q.**  Have you ever testified in court as an expert in forensic

18   psychology?

19   **A.**  I have.

20   **Q.**  Approximately how many times?

21   **A.**  Approximately five times.

22          **MS. CHANG:**  Your Honor, at this time the United States

23   tenders Dr. Jenkins as an expert in forensic psychology.

24          **THE COURT:**  Mr. Mahoney?

25          **MR. MAHONEY:**  That's okay with me, Judge.

*JENKINS - DIRECT*                                                14

1              **THE COURT:**  I'm sorry.  I couldn't hear you.

2              **MR. MAHONEY:**  That's okay with me.

3              **THE COURT:**  All right.  So no objection.  So

4    designated.

5              **MS. CHANG:**  Thank you, Your Honor.

6    BY MS. CHANG:

7    **Q.**  Dr. Jenkins, how does the task of performing a forensic

8    competency evaluation come to you?

9    **A.**  It actually comes through our designation facility.  So the

10   court asks the BOP to do certain evaluations.  And there's

11   about 12 sites out of the 122 institutions in the BOP that do

12   them.  And we just get e-mail court orders that a defendant has

13   been assigned to us.

14   **Q.**  So you work for BOP, which is part of the federal

15   government; right?

16   **A.**  That's correct.

17   **Q.**  Are your evaluations designed to particularly assist the

18   Government, the defense, or otherwise?

19   **A.**  Yeah, I'm glad you asked that.  Although we work for the

20   Government, we're kind of seen as doing a service to the court.

21   So we don't have a side.  We like to say we don't have a dog in

22   the fight.  We're not for the prosecution or the defense.  Our

23   job is just to answer the Court's question in an objective

24   manner, and most of the time we don't even know the results or

25   the outcome of the hearing or trial.

**Q.**  Have you ever concluded, after a forensic evaluation, that a defendant was not competent?

**A.**  Yes.

**Q.**  Approximately how often?

**A.**  I would say probably 10 percent of my cases, I found not competent to stand trial.

**Q.**  And if you concluded that a defendant was competent, would any part of your job change, whether it's your salary or whether you get -- whether you get future referrals from the court?

**A.**  No.  Our salary doesn't change.  It really has no impact on us.  We -- again, we don't even know the result at the end of -- once we turn in the report.

**Q.**  Can you tell us generally about your process for conducting competency evaluations at BOP just at a high level.  Like, what are the steps you go through?

**A.**  Sure.  So once you receive the court order, we have to wait for the actual client to come to the BOP, and that can take a while sometimes.  They come in various states.

Once the individual does get to our facility, we typically do an intake within 24 hours, and that's just to make sure that the individual is stable; if there's any medications they were on, we want to make sure that the health services department is aware of it so they can continue them; and overall just check in with the individual, let them know why they're here if they

1    don't know, explain to them the process of being here, who

2    their assigned forensic psychologist is, and how they can

3    basically get their needs met while in our facility.

4        Then throughout the evaluation we meet with them various

5    times.  We conduct various interviews.  We obtain as much

6    collateral data as we can.  We typically always reach out to

7    both the prosecutor and the defense for any additional

8    information.  We definitely want to know who brought up the

9    question of competency if that is the question so that we know

10   how to gear our evaluation.

11       We ask the individual if there's any collateral sources on

12   the outside.  So, for example, if they've had treatment or if

13   they've been hospitalized, we ask for them to sign releases;

14   and if they're willing to, we request those records.  We also

15   ask if there's a spouse or a parent or even a sibling, someone

16   close to them, that can provide additional information; and if

17   they grant that to us, we will call that person.

18       In addition to being at the facility, we have a lot of

19   data.  So we talk to the unit officers who are there 24 hours,

20   seven days a week, plenty observational data, see how the

21   person is getting along in the unit with other peers.  We also

22   have access to the monitored phone calls as well as the

23   monitored e-mails.

24       We also conduct psychological assessments as needed, and so

25   we bring all of that information together in order to form an

1     opinion and provide the court with a report.

2         Excuse me.

3     **Q.**   Are there any benefits to conducting a custodial

4     evaluation, such as the one you did with Mr. Marks here?

5     **A.**   Yes.  I think there's a great benefit to having someone in

6     a facility where you can pretty much monitor them at any time.

7     You have access to those things I talked about, like the unit

8     officer or even the unit team, who see the individual for even

9     longer amounts of time than we do.  A lot of times they have

10    insight in what happened at night or on the weekends when we're

11    not around.  Are they making phone calls?  Are they getting

12    along with their peers?  Are there any issues?  Is there odd

13    behavior being observed?

14        So it gives us a lot of really great information that I

15    don't think we would have access to if the individual was not

16    in our custody in addition to, of course, the phone calls and

17    the e-mails that are all monitored.  That's also a great source

18    of data because it allows us to see how the individual presents

19    or acts when we're not around.  So I think there's a great

20    benefit to having the individual in the facility for a certain

21    amount of time.

22    **Q.**   How do you decide what kinds of psychological tests to

23    administer?

24    **A.**   Yeah.  Every individual is different.  So we cater the

25    assessments based on what we're seeing, any information that we

*JENKINS - DIRECT*                                                      18

1   gathered about the individual, if there's any questions or

2   especially if the attorneys had any issues specifically with

3   maybe memory or if they think that they're hearing voices.  So

4   we cater the assessments to the individual and what problems or

5   issues have -- may have arose during their going to court.  But

6   we do have standard personality tests and intellectual tests

7   that we like to give everyone, if it's necessary.

8   **Q.**  What if the person has gone through a competency evaluation

9   before, as is the case here?  Does that change how you approach

10  an evaluation?

11  **A.**  No, not necessarily.  Because competency is here and now

12  when the individual is in front of us, we perform our

13  evaluation the way we would normally do if we had no other

14  assessments or no other evaluations.  The evaluations that were

15  previously done are considered collateral information.  So we

16  will, of course, review them for anything pertinent; but,

17  ultimately, we have to make our opinion based on how the

18  individual is presenting at the time when they are in front of

19  us.

20  **Q.**  Is there any concern over repeating certain tests within a

21  certain time frame?

22  **A.**  Yes.  You have to be mindful of that.  There are some tests

23  that have some limitations that they should not be given within

24  a certain time frame.  So that is something else that we'll

25  check for when we're looking at other past evaluations.

*JENKINS - DIRECT*                                                    19

1   **Q.**   Let's talk about this evaluation now.  So with regard to

2   this particular case, did the Court appoint you to determine

3   the competency of Steven Michael Marks?

4   **A.**   Yes.  I received the referral.

5   **Q.**   And did you follow your normal procedures, that is, the

6   ones you just testified about in conducting your competency

7   evaluation of Mr. Marks?

8   **A.**   Yes, I did.

9   **Q.**   Did you have a student helping you?

10  **A.**   Yes, I did.

11  **Q.**   What are his qualifications?

12  **A.**   He's one of our doctoral-level students that we receive

13  that we train.

14  **Q.**   And does that mean he's a doctoral student in an accredited

15  program for psychology?

16  **A.**   That's correct.

17  **Q.**   And why did you have a student helping you?

18  **A.**   That's the way psychology works.  That's how we've all come

19  up, is that you have to gain experience and learn by doing it,

20  and so that's how I learned, and we're lucky to be able to

21  afford the students in the New York/New Jersey area those same

22  opportunities.

23  **Q.**   To what extent did your student participate or have a role

24  in Mr. Marks's forensic evaluation?

25  **A.**   Everything that my student does is supervised by me.  He or

*JENKINS - DIRECT*                                              20

1    she -- in this case it was he -- was -- every time they met

2    with Mr. Marks, I was present.  We discussed what we were going

3    to do before we met with him.  We discussed what we did after

4    we met with him.  So everything was under my supervision.  The

5    student does not have the autonomy to do anything without it

6    being supervised and approved by me as I'm the licensed

7    psychologist.

8    **Q.**  And did your student follow the required procedures?

9    **A.**  Yes, he did.

10   **Q.**  At any time did you fully rely on the student's work

11   instead of your own in formulating your opinion concerning the

12   defendant's competency?

13   **A.**  No.

14   **Q.**  Did you consult with anyone else in working on this

15   competency evaluation?

16   **A.**  Yes.  All of our evaluations are reviewed by our chief

17   psychologist at the time, which is Dr. Elissa Miller.

18   **Q.**  Are you familiar with Government Exhibits 7 and 16?

19   **A.**  Yes.  I believe those are in the binder you sent me.

20   **Q.**  Yeah.  Is Government Exhibit 7 your second amended report,

21   and Government Exhibit 16 is your third amended report?

22   **A.**  If I can just check the binder to be sure.  Yes.  7 is the

23   second amendment, and the 16 is the third amendment.  That's

24   correct.

25   **Q.**  And are any other previous amendments also contained in

1    these exhibits?

2    **A.**   There was also a first amendment.  I'm not sure what number

3    it's titled.

4    **Q.**   Well, what I'm saying is any content within the first

5    amended report, that would be in your third amended report too;

6    right?

7    **A.**   Yes, that's correct.

8    **Q.**   All right.  Why did you amend your reports?

9    **A.**   Yeah.  So there were three amendments.  One was because I

10   received a lot of discovery information, and after consulting

11   with you, the AUSA, and I heard Mr. -- I think Mr. Mahoney had

12   sent some records, it was brought to my attention that you guys

13   wanted me to review everything.  Typically, when we do

14   competency, we don't look at a lot of discovery information

15   because that's more in the realm of criminal responsibility,

16   but I did, per your request, make sure to review them; and so,

17   therefore, I updated the first amendment to make sure that it

18   entailed all of the records that I received from both parties.

19       The second amendment, I believe, is -- and I hope I'm doing

20   these in order -- is there was a typo on one of the

21   intellectual assessments, and so I put that Mr. Marks obtained

22   an FSIQ of 83, which was correct, but the percentile was

23   incorrect.  It said it was the first percentile.  It actually

24   was the 13.  So in order to clarify that for the Court, I

25   amended it.

1     And, lastly, the third amendment was because the TOMM,

2     which is the Test of Memory Malingering, although the results

3     of the TOMM were included in the full report, the narrative

4     that specifically explained all of the details of the TOMM was

5     not; and so, again, for clarity of the Court, I wanted to make

6     sure that that was fully included so the Court had all of the

7     information.

8     **Q.**  So now we're going to refer to Government Exhibit 16.  At

9     page 21 of your report, you state that the defendant was polite

10    and cooperative, unescorted, and groomed and dressed

11    adequately, and you noted that he responded to all questions

12    and appeared to put forth his best effort.  So why were these

13    important to note?  That's pages 21 and 22.

14    **A.**  Thank you.

15        Yeah.  Those were important to note.  It's part of our

16    standard mental status.  We're trying to give the reader an

17    idea of what it's like to be in the room with the client, in

18    this case Mr. Marks, and so it was important to note that he

19    was unescorted -- once he was able to come to the psychology

20    department, he did so unescorted without assistance.  That's

21    really important because there are some defendants that are not

22    able to make their way to the psychology department, meaning

23    navigating the facility, and so we always note if the person is

24    able to follow directions and get to the office without any

25    assistance.

1          As far as him being groomed and dressed adequately, that

2     speaks to his ADLs, which are activities of daily living.  So

3     it's important to note that he appeared to take care of himself

4     and to be following the prison protocols as far as dress.

5          Being polite and cooperative are also really important.

6     This is not always the case.  We don't always have defendants

7     that are cooperative and pleasant to work with, and Mr. Marks

8     was.  He was consistently cooperative and pleasant and

9     respectful, and he did appear to put forth his best effort,

10    which is also important.  We always look to see if the

11    defendant is putting forth effort or maybe not motivated to

12    participate and complete the evaluation, but Mr. Marks appeared

13    to be so.  So that's why we note those things.

14    **Q.**  Are there times when you've had other defendants who came

15    to you not groomed or dressed adequately?

16    **A.**  Yes.

17    **Q.**  And so how is that allowed to happen in BOP?

18    **A.**  Well, it's a prison facility, and so for the most part, the

19    inmates take care of themselves.  If an inmate is not taking

20    care of themselves, typically, that results in referral to

21    psychology because the staff want to know if there's something

22    going on with that individual that they need to know about or

23    if there's any interventions that need to be put in place.  So

24    that's typically what happens.

25    **Q.**  And if defendants don't -- well, let's say if a defendant

*JENKINS - DIRECT*                                              24

1    doesn't or can't take care of himself, does someone at BOP

2    eventually take over and groom and dress them such that by the

3    time they appear to you at your interview, they look groomed

4    and dressed but it's not because they did it themselves?

5    **A.**   No.   Unfortunately, especially in the detention center, we

6    don't have that type of assistance.   That would be something

7    more seen in, like, a medical center where there's chronic

8    issues and there's things in place to assist inmates.   At the

9    detention center, it's pretty much every inmate for themself;

10   and so, no, there's no type of assistance like that.

11   **Q.**   And maybe just to give the Court an idea, like, what are

12   some of the standards that count as adequate dressing and

13   grooming within BOP?   Are there rules as to, like, exactly how

14   you have to present yourself?

15   **A.**   Yes.   And I'm not an officer, so I won't pretend to know

16   all of them, but, yes, there are certain wears.   So the inmates

17   have dress down, like sweatpants that they can wear on the

18   unit, but when they go to see staff specifically, they have to

19   be in the proper uniform.   It has to be buttoned.   The shirt is

20   tucked in.   There's a specific shoe that they're allowed to

21   wear off the unit.   So all of those things have to be followed

22   in addition to, I'm sure, other prison regulations.

23   **Q.**   Did you ever get notification of any sort that this

24   defendant was unable to take care of any of his activities of

25   daily living?

1    **A.**   No.

2    **Q.**   Would the staff have notified you if he was unable to care

3    for any of his activities of daily living?

4    **A.**   Yes.  That's typically how it happens, especially because

5    Mr. Marks was assigned a status of study, which is what all

6    defendants get when they're forensic cases.  So when

7    individuals come to us to get an evaluation, typically, they're

8    not from New York.  That's not their district.  So they spend a

9    limited time with us.  The unit team and staff and officers are

10   pretty much aware that there are studies, and they know that

11   they're here for a short amount of time and they're undergoing

12   an evaluation, and that alerts them even more to let us know if

13   there's any unusual behavior, observations we need to know.  So

14   everyone kind of knows they're being evaluated.

15   **Q.**   At the outset, when you warned the defendant that any

16   information he provided was not confidential and could be

17   reported to the Court, did you think he understood that?

18   **A.**   I do.

19   **Q.**   What gave you the impression that he understood?

20   **A.**   Mr. Marks shared that he had done this several times, so he

21   wasn't new to being evaluated.  He also was able to tell us

22   back what we had told him, so the warnings we had given him in

23   his own words.  We were able to discuss it briefly, and then we

24   talked about it several other times when we met to make sure

25   that he was able to retain the information, and he appeared to

1    do so.

2    **Q.**  So when you say he put it in his own words, did he repeat

3    it verbatim or using different words?

4    **A.**  No.  We ask them to rephrase it in their own words, and,

5    typically, that's their own combination of words, not what's

6    repeated from us.

7    **Q.**  And is that your phone going off, Dr. Jenkins, with the

8    sound?

9    **A.**  No.  My phone's off.  I think it might be my computer since

10   we're on the computer.  I apologize.  I'm trying to turn it

11   off, but I don't know if that'll mess up the sound that we

12   have.

13   **Q.**  Are there defendants you encounter who do not understand

14   this warning at the beginning that information is not

15   confidential?

16   **A.**  Yes.

17   **Q.**  And what makes you think that they don't understand?

18   **A.**  Those defendants that I felt in the past did not

19   understand, they might have had active psychosis, and so they

20   were engaging in internal stimuli.  They were looking around

21   the room.  They weren't able to give me attention.  They

22   weren't able to repeat the warning in their own words.  They

23   weren't able to retain the information.  They appeared lost

24   throughout the whole communication.  And so it was just really

25   evident that they were not understanding, retaining, and

1    definitely not able to reverberate the information that I was

2    giving them.

3    **Q.**   How do you conduct interviews for forensic competency

4    evaluations?

5    **A.**   We have a lot of different interviews that we do over the

6    time period, and the person is pretty much always getting

7    assessed by us.  Specifically competency, I have an interview

8    system that I use that asks specific questions about the court,

9    how they work with their attorney, and what their understanding

10   of the court process is, and so we use that as our standard

11   competency questionnaire.

12   **Q.**   Do you also do a history interview?

13   **A.**   Yes.  We do a history interview, we do diagnostic

14   interviews, and we do diagnostic, history, competency, and then

15   just various interviews over time.  So as things arise, if we

16   want to talk about something more in depth or if we have

17   additional questions, then we'll just blend those into the

18   interview process.  So there's not a standard "These are the

19   questions for every case."  It kind of changes and adapts to

20   the defendant as they're all individual.

21   **Q.**   So let's take one of them.  What are you looking for in a

22   history interview?

23   **A.**   So the history interview is really helpful in giving us

24   background information, especially when it comes to mental

25   illnesses or mental defects.  For the Court it's good to see

1    how long this person may have had these issues.  It also just

2    helps us kind of build rapport and get to know the person in

3    front of us as well.  So we start off from childhood, and we go

4    into adulthood into the current -- whatever age they currently

5    are.

6        So we talk about education.  We talk about their family,

7    medical issues, any mental health issues, any past treatment,

8    anything you can think of, even hobbies.  I think it's just

9    important to get a good idea of who this individual is to

10   better understand them and to work with them.

11   **Q.**  Before your history interview with the defendant, did you

12   give him a history questionnaire to complete?

13   **A.**  Yes.  That's one of my individual practices.  I have a very

14   detailed history questionnaire that we give.  We have them fill

15   it out alone by themselves to the best of their ability, and

16   then we go over all of the questions in person.

17   **Q.**  So what's the purpose of that written questionnaire if

18   you're just going to go over it anyway in -- you know, orally?

19   **A.**  Yeah.  I mean, it's really helpful because it shows what

20   the individual can do.  We're looking to see what can they

21   remember, you know, how detailed do they get, what kind of

22   information do they provide to us.

23       I'm sorry.  I'm going to try to look to see how to stop

24   that.

25       We're looking to see what they remember, how they write, do

*JENKINS - DIRECT*                                                    29

1    they spell things correctly, do they understand the questions

2    that are being asked.

3         It's really helpful in seeing what they're willing to tell

4    us as well.  Some individuals have gone through a lot.  They

5    might have had traumatic pasts, and so sometimes it's easier

6    for someone to write what they've been through versus having to

7    say it in person, and so the history questionnaire really gives

8    us a lot of great information and a place to start before we

9    actually proceed with the oral history interview.

10   **Q.**  What did you learn from the way the defendant responded to

11   his written questionnaire?

12   **A.**  It told us that Mr. Marks was able to read.  He was able to

13   understand a lot of what was asked.  He provided information.

14   He didn't -- he didn't give a lot of details, so he gave very

15   simplified information, which I also thought was helpful and

16   telling of future interviews with him.  But, overall, it

17   appeared he was willing to provide the information that he felt

18   comfortable doing so, and he did it.

19   **Q.**  Did he ask you any questions in the process, like, "Oh, I

20   don't understand this question.  What is it asking?" that sort

21   of thing.

22   **A.**  I don't remember that exactly.  We always tell them to try

23   their best, and we let them know we're going to go over it

24   anyway.  So that kind of limits the questions because they're

25   allowed to skip if there's something they're not sure of

1    because they know we're going to go over it anyway.

2    **Q.**  Did he express any difficulty with reading or understanding

3    the questionnaire?

4    **A.**  No, he didn't.  He acknowledged that he wore glasses, and

5    he had them with him.  But he had no -- he didn't express not

6    understanding anything.

7                **MR. MAHONEY:**  Judge, can we just take a second so I

8    can talk to my client?

9                **THE COURT:**  Mr. Mahoney, we're in the middle of direct

10   examination.  We'll take a break, and you can talk to your

11   client at that time, unless this is something unrelated.  Is

12   there an issue?

13               **MR. MAHONEY:**  No.  I just --

14               **THE COURT:**  Mr. Mahoney.

15               **MR. MAHONEY:**  I just want to see if he's following

16   what's going on.  That's all.

17               **THE COURT:**  No, Mr. Mahoney.

18               Go ahead, ma'am.

19               And while we're stopped, Dr. Jenkins, would you do me

20   a favor and go onto your computer and see if you can close out

21   every other program, because that sounds like it might be

22   e-mail notifications.

23               **THE WITNESS:**  Yes, ma'am.  Thank you.

24               I closed them, Ms. Chang, but I will make sure, when

25   we have a break, to go over anything else that might be open.

1          **THE COURT:**  Thank you very much, Dr. Jenkins.

2          Ms. Chang, you can go ahead and continue.

3    **BY MS. CHANG:**

4    **Q.**  So we're still talking about the written history

5    questionnaire.  Did he respond in a way that demonstrated that

6    he had difficulty with reading or understanding it?

7    **A.**  No, I don't believe so.

8    **Q.**  And so after the questionnaire, you did a history

9    interview; right?

10   **A.**  Yes, that's right.

11   **Q.**  And approximately how long was that history interview?

12   **A.**  If I had to guess, probably about two hours.

13   **Q.**  What kinds of topics did you cover?

14   **A.**  Everything that's listed in the history questionnaire and

15   then any -- any type of conversational things that expanded

16   from there.  So, again, education, family history, any work

17   history, any legal history, medical, mental health.

18   Specifically, those are the main targets.  And then, of course,

19   as things come up, it becomes conversational after that.

20   **Q.**  And did you summarize some of those -- some of the

21   information you learned in your report?

22   **A.**  Yes.  That's in the psychosocial clinical history, in the

23   beginning of the report.

24   **Q.**  Did the defendant demonstrate any difficulty understanding

25   you during the history interview?

*JENKINS - DIRECT*                                                   32

1    **A.**   No.

2    **Q.**   In your report at page 8 -- again, this is Government

3    Exhibit 16, which is the same report I'm going to reference

4    throughout -- you note that the defendant went to sleep-away

5    camp during the summer.  Why did you find that notable?

6    **A.**   That was something that Mr. Marks shared with us.  I felt

7    like it was notable because in order for someone to go to a

8    sleep-away camp and have some of the deficits that he was

9    reported to have, it would be interesting to know what he was

10   able to do independently, and so that's what we talked about

11   when he discussed going away to camp.

12   **Q.**   And based on what he told you, was he able to take care of

13   himself while at sleep-away camp?

14   **A.**   Based on what he told me, yes.  He said he didn't have

15   issues with showering or eating.  He didn't have any major

16   issues with the other peers there.  Overall, it appeared he

17   enjoyed his experiences at sleep-away camp.

18   **Q.**   Why did you note, I believe on the same page, that he

19   obtained his driver's license at age 16 and --

20   **A.**   Yeah.

21   **Q.**   -- and that he passed it on the first attempt?  Why did you

22   note those things?

23   **A.**   Sorry.

24        Mr. Marks was really proud to say that, to share that with

25   us.  And so part of, you know, the history is also putting in

*JENKINS - DIRECT*                                                33

1    some of their achievements and things that they're proud of.

2    And so Mr. Marks was proud that he got his driver's license.

3    He -- he actually specified that he got it on the first try.

4    We didn't ask.  But I did think it was notable because, again,

5    when someone -- having a developmental disability, it's

6    important to see what they're able to achieve and maybe how

7    long it takes them to achieve it and if they had any supports

8    to achieve certain things.  And so the fact that he

9    acknowledged that he obtained his license and it was on the

10   first try -- one, it was important for him to share; and, two,

11   it showed us that he was able to obtain his license, which a

12   lot of people are not able to do.  So it shows an ability he

13   has to be able to follow the regulations of driving in a street

14   with other people around.

15   **Q.**  What did you make of the fact that he graduated from high

16   school on time?

17   **A.**  It -- I think it showed that he -- despite any issues he

18   might have had, he was able to achieve graduating from high

19   school.  He did it on time.  Some individuals that have

20   developmental disabilities have up until 21 to graduate from

21   high school because they need additional assistance or they're

22   in specialized classes; and so, again, that was another

23   achievement that he did, that he was proud of, and it showed us

24   that he -- whatever limitations he did have, he was able to

25   achieve those things as other students -- other students maybe

*JENKINS - DIRECT*                                                     34

1    without disabilities are able to do.

2    **Q.**  Did he express to you having any difficulty with learning?

3    **A.**  Yes.  Mr. Marks said specifically he had a weakness in

4    math.  He -- he identified math as being one of his worst

5    subjects and something he still struggles with.

6    **Q.**  You stated on page 7 of your report that he appeared to be

7    a good historian to the best of his ability.  Why did you draw

8    that conclusion?

9    **A.**  Yeah.  Well, I think it's important to note to the best of

10   his ability and that's what it felt like.  It felt like

11   Mr. Marks was able and willing to share as much information

12   with us as he could, and it seemed like good information.  The

13   collateral information that I did get, a lot of it was

14   congruent with what he said, and so that's why I classified him

15   as a good historian to the best of his ability because I

16   believe he did so.

17   **Q.**  So you're saying you compared some -- the information with

18   collateral sources.  Which collateral sources did you use?

19   **A.**  Yeah.  It was specifically the evaluations from his

20   childhood and then, of course, the interviews with his parents.

21   **Q.**  Your interviews with his parents?

22   **A.**  Yes.

23   **Q.**  Are you aware that after you issued your report, the

24   defendant's parents had pointed out that there are certain

25   facts that the defendant got wrong?  Like, he apparently told

*JENKINS - DIRECT*                                                        35

1    you he went to a Jewish summer camp from preschool until high

2    school, and he described it as a sleep-away camp, but his mom

3    says he actually went to sleep-away camp only for a

4    couple years when he was older.  Are you aware of that?

5    **A.**  Yes, I am.

6    **Q.**  Okay.  So do such discrepancies change your conclusion that

7    he appeared to be a good historian to the best of his ability?

8    **A.**  No, because I think, again, the caveat is to the best of

9    his ability, and my interpretation or my perception of

10   Mr. Marks was that he was intending to be truthful and he was

11   intending to give as much good information and accurate

12   information as he could.

13   **Q.**  What do you draw from the fact that he got it -- like,

14   assuming that the parents are right, what do you make of the

15   fact that he got it so wrong?

16   **A.**  Well, especially about the sleep-away camp, it's possible

17   that he went to camp every year but it wasn't sleep-away at

18   that young age.  So that could just be a mistake in speaking.

19   It sounds like the parents were saying he went to sleep-away

20   camp when he was maybe within his high school years versus

21   since preschool.  But perhaps he did go to a camp every single

22   year.  So that's one hypothesis, is that he kind of just mixed

23   up differentiating camp from sleep-away camp.

24        But, overall, it's not uncommon for me to receive different

25   information from the defendant and then from the collateral

1    sources they provide me.  It actually happens quite often.

2        I also think it's because, when you have to remember your

3    childhood, it's hard for, I think, anybody to remember their

4    childhood exact and that mistakes do happen, and it's not

5    necessarily intentional.  And at the end of the day, you know,

6    it was his camp experience.  It wasn't something related to

7    my -- my opinion of his competency or even his diagnosis.  It

8    was a detail from his past that he got wrong if, again, like

9    you say, the parents are correct, and so I didn't put much

10   weight into that.

11   **Q.**  On page 8 you state that after the defendant graduated high

12   school, he moved to Orlando, and he denied having any issues

13   with daily living skills, such as bathing, dressing, or

14   brushing his teeth.  But on page 9 you noted that the

15   defendant's father said that the defendant can, quote, "make

16   his own bed and cook, but if we didn't remind him, he wouldn't

17   do anything."  So what do you make of these statements in light

18   of what you observed of the defendant at BOP?

19   **A.**  Yeah.  So especially with individuals with developmental

20   disabilities, it's really important to see what type of ADLs,

21   which are activities of daily living skills, that they're able

22   to do independent.  And so Mr. Marks denied having any issues

23   when he was in Orlando with his ADLs.  He also denied having

24   any issues at the facility when he was with us with his ADLs,

25   and that's also what was reported and observed by myself and by

*JENKINS - DIRECT*                                                   37

1    other staff.

2         So, again, when we're looking at ADLs, activities of daily

3    living -- showering, brushing your teeth, getting yourself

4    dressed, tying your shoe, making your bed, things like that are

5    what we consider ADLs.  And so if Mr. Marks had any issues with

6    those at the facility, staff more than likely would have

7    reported it to me.  I would have observed it myself.  So,

8    again, that's why it's so important when we did the mental

9    status to describe him as being unescorted, as being

10   appropriately dressed, because that's showing that he was able

11   to keep up with his ADLs.

12        Also, no staff member, through the entire time he was

13   there, came to me with any concerns about him not eating or not

14   showering.  Those things are often reported.  A lot of times

15   with other inmates -- because most inmates don't want to cell

16   with someone who is not taking showers because they don't find

17   that to be hygienic and, of course, would be malodorous over

18   time.  So those things weren't reported to me, and they weren't

19   observed to me.  So what I saw was consistent with what

20   Mr. Marks reported.

21   Q.  Since the father specifically talked about the fact that

22   the defendant can make his own bed, but if he wasn't reminded,

23   he wouldn't do anything, let's just talk about making your bed.

24   Did the MCC require every inmate, including Mr. Marks, to keep

25   his cell tidy?

*JENKINS - DIRECT*                                                          38

1   **A.**  Yes.  So that's one of the rules at the facility, is that

2   you have to make your bed.  You have to keep yourself tidy.

3   And if you don't, it could result in a warning and eventually

4   with an incident report.

5   **Q.**  So if an inmate fails to make his bed, like, once --

6   okay? -- is that automatically a write-up, or does the inmate

7   get instructed to do it?

8   **A.**  You know what?  It really depends on the officer.  It

9   depends who is there at the time.  There are some officers that

10  are more lenient.  There are others that are more strict.  And

11  so I don't think it would be atypical for someone to receive a

12  warning after not having their bed tidy one time, but I do

13  think if they continue to happen, that it would result in an

14  incident report.  And that is something that we also check,

15  especially with having them in our custody, and Mr. Marks did

16  not receive an incident report for that.

17  **Q.**  And are all these rules that you're just discussing -- are

18  they true in the special housing unit as well as in the general

19  population?

20  **A.**  Yes, that's correct.

21  **Q.**  Did the defendant demonstrate independence while in

22  custody?

23  **A.**  Yes, I think he did.  When I met Mr. Marks, which was

24  actually day one, when his father dropped him off, I met him in

25  R&D, which is receiving and discharge.  I was already told that

*JENKINS - DIRECT*                                                           39

1    there was someone coming, that may have some disability or some

2    deficit.  So I met him right away just to check on him and to

3    see how he was doing, and he was nervous, and he did talk to

4    me.  And he told me that he was uncomfortable with going to

5    general population.

6        I tried to explain to him that because of COVID, there's a

7    quarantine process and that he would be quarantined for at

8    least 14 days and tested for COVID in and out of that

9    quarantine so that he didn't have to worry about being in

10   general population or on an open unit or around a lot of other

11   inmates.  And then after that quarantine process, we can

12   discuss maybe what unit would be most appropriate for him.

13       And, initially, he agreed, but then the next day I came to

14   work, I found that he actually did check himself into SHU,

15   which is what we call it, which is a special housing unit, also

16   known as SHU.  So he advocated for himself to go to SHU because

17   he did not feel comfortable going to the unit.

18   **Q.**  How about the end of his stay at BOP?  Did he advocate for

19   himself once again?

20   **A.**  Yeah.  So my understanding is there was some confusion on

21   how he would be released or -- yeah, pretty much let to leave

22   because most of the time defendants are going back to another

23   jail, and Mr. Marks was not.  So it was kind of uncommon for

24   our procedures for him to leave.  And so Mr. Marks was really

25   instrumental in maintaining contact with his family.  I think

*JENKINS - DIRECT*                                                      40

1    he might have also made contact with his lawyers.  And then I

2    do know he also spoke to the unit team, which is who I advised

3    him to speak to in order to help with this move.

4        Unfortunately, it's not part of my duties, and I have no

5    say on when someone can leave the facility.  I just let the

6    appropriate department know that their evaluation is over.  And

7    being that Mr. Marks was not being moved right away, he took it

8    upon himself to talk to unit team and advocate for himself and

9    talk to his parents and make sure that whatever court order or

10   appropriate documentation was needed to facilitate his

11   release -- he assisted with that.

12   **Q.**  And was that just one day or multiple times over the course

13   of multiple days?

14   **A.**  No.  I believe it was multiple days because he even would

15   come and check with me and kind of let me know his progress and

16   who he spoke to and when the day he was hoping to be released

17   was coming.

18   **Q.**  On page 28 of her report, which is Defense Exhibit 18 --

19   but I'll just read it to you.  It's on page 28 of that.

20   Dr. Negrón stated that Dr. --

21        **MS. CHANG:**  Sorry.  Should I give you a moment?  I'm

22   sorry, Your Honor.

23        **THE COURT:**  I'm going to go off script and use the

24   copies that I've been annotating.  So just give me one second.

25   Page 28?

1          **MS. CHANG:**  Yes, Your Honor.

2          **THE COURT:**  Thank you.

3          **MS. CHANG:**  Sorry.  I forgot some of these.  I did go

4    off of Government Exhibit 16.

5          **THE COURT:**  Not a problem.

6          Go ahead.

7    **BY MS. CHANG:**

8    **Q.**  So this is the second-to-last paragraph on page 28.

9    Dr. Negrón stated, quote, "Dr. Jenkins has endeavored to

10   portray Steven's autism as diluted in adulthood or even

11   improving with time.  She asserts that his autism spectrum

12   disorder symptoms do not appear to have impacted his activities

13   of daily living.  This is objectively without support and, in

14   fact, contradicted in a variety of ways and by a variety of

15   sources of information that was before Dr. Jenkins, and that

16   was deliberately overlooked by Dr. Jenkins in her failure to

17   interview Aloft personnel who have supervised Steven daily

18   for four years," end quote.  What's your response to that?

19         **THE COURT:**  Dr. Jenkins, you're muted.

20         **THE WITNESS:**  I'm sorry.  I'm trying to make sure

21   there's not a lot of noise.

22         **THE COURT:**  No problem.

23         **THE WITNESS:**  Thank you for asking me that, Ms. Chang.

24   I would like to explain that.  So I was told by Mr. Marks's

25   attorneys that he was at Aloft for a certain amount of time,

1    and once I found that out, I had Mr. Marks fill out a release

2    of information, and I sent it to Aloft.  I also reached out to

3    them to request a meeting with their therapist or their

4    clinician.

5            I was told by the owner -- I believe his name was

6    Jason -- that they do not do individual talks or interviews or

7    meetings with people, and I tried to explain to him that due to

8    HIPAA and what's typical of my practice and within the clinical

9    psychology rung is that we talk to -- clinician to clinician.

10   He was very much opposed to that.  He told me I couldn't speak

11   to the counselor by herself and that they always talk together.

12   I tried to really explain to him that this is very unusual and

13   this is not -- not our practice.  Ultimately, they were pretty

14   steadfast in how they felt, and so I did set up a meeting

15   despite it not being the way I would like it to be.

16           And, unfortunately, the day that I had a scheduled

17   meeting, we had a body alarm, which is also called an

18   "institutional emergency."  And so within our institution, it

19   doesn't matter if you're an officer, a psychologist, a

20   secretary, you have to respond to emergencies, and so I did.

21           Once the emergency was resolved or under control, I

22   ran back to my office.  I realized I was about 15 to 20 minutes

23   late for this -- this call that we had set up.  I called right

24   away.  Mr. Jason picked up, and he was quite upset with me for

25   calling late.  I tried to explain to him that I work in a

1    prison.  These things come up.  It wasn't intentional.  I'm

2    happy and willing to talk with them.  And he basically told me

3    he was with the family or he was in another meeting and he

4    could not talk to me.  I asked if the counselor was available.

5    He said no.  I asked him if they could at least send me the

6    medical records since I had sent signed requests weeks prior.

7    He told me they were not a hospital; they don't have medical

8    records.  I explained to him that being that Mr. Marks was

9    receiving treatment there by a therapist, there should be some

10   type of progress notes or a goal or a treatment plan.  There

11   should be something that -- that they can send to me that would

12   be helpful.

13           And so the -- I believe we were supposed to

14   reschedule.  I don't believe that ever happened.  And then a

15   few weeks later, I finally did receive the progress notes.

16           And so that's my response to it.  I really did try to

17   speak to Aloft.  I didn't think it was appropriate to speak to

18   the owner, especially because he did not identify himself as

19   having any clinical expertise or background, and I am really

20   serious about following HIPAA and following our clinical and

21   ethical standards.  But, ultimately, I was able to receive the

22   medical records, so I did get some information of his time

23   there at Aloft.

24   **BY MS. CHANG:**

25   **Q.**  Let's move on.  When did you conduct your diagnostic

1    interview of the defendant?

2    **A.**   Yeah.  So the diagnostic interview was ongoing.  I mean,

3    it's every time we interact with him, we're gaining more

4    information.  We're seeing new things.  Once we have, like, a

5    few hypotheses of what diagnosis we think he might meet

6    criteria for -- sometimes we do have, like, a set day where we

7    will ask specific criteria questions, but the diagnostic

8    process is ongoing.

9    **Q.**   And what types of topics do you cover during these

10   diagnostic parts of your interviews?

11   **A.**   Yeah, sure.  So we're looking to see what major issues, if

12   any, the person has.  Specifically, since we knew that

13   Mr. Marks was coming with background information of having a

14   developmental disability, we really focus on the ADLs, so

15   activities of daily living, what he's able to by himself, his

16   intellectual issues, if any, which is why we did some IQ

17   testing.  We also look into mood and anxiety, if there's any

18   symptoms that someone is experiencing and what the severity of

19   them are.  We were able to rule out psychosis pretty early in

20   the evaluation.  So we focus on those things.

21   **Q.**   How well did the defendant communicate with you during

22   these diagnostic portions of your interviews?

23   **A.**   I think he communicated fine.  We were able to get the

24   information we needed from him.

25   **Q.**   We'll get to his competency interview later.  Altogether,

*JENKINS - DIRECT*                                                    45

1    how many times did you interview the defendant during his stay

2    of approximately 30 days at the MCC?

3    **A.**   If I can refer to my report, because I don't know that off

4    top hand.

5    **Q.**   Bottom of page --

6    **A.**   I'm sorry.  I have it.  There were six, like, official

7    sessions that we had with Mr. Marks.

8    **Q.**   And how many hours total?

9    **A.**   It took about ten hours in total.

10   **Q.**   What were you doing in those ten hours?

11   **A.**   Those ten hours are the interviews and then any testing

12   that we have to do face-to-face with Mr. Marks.

13   **Q.**   Does it include the time you took to score the tests?

14   **A.**   No.  Scoring, interpreting, writing the report, even

15   reviewing collateral information -- none of that is included in

16   the ten hours.  The ten hours is the face-to-face time with

17   Mr. Marks.

18   **Q.**   And did those occur all in one week or across time?

19   **A.**   It was across time.  It looks like it was from May into

20   June of this year.

21   **Q.**   So why does he have to stay at BOP for 30 days if you only

22   interview him for ten hours?

23   **A.**   Yeah.  Well -- well, one, that's the statute.  That's what

24   we're permitted to have, and then we can request an extension

25   if needed.  In this case we did not.  But those 30 days also

1    include holidays.  They include weekends.  And so most of us

2    work five days a week, and so although it appears that it's

3    30 days, it's actually a lot less when you take into account

4    weekends and holidays, also when you take into account that you

5    have multiple defendants, multiple people that we're evaluating

6    at the same time.

7        We don't have whatever's remainder of those 30 days

8    specifically with one person, and so it's helpful to have the

9    individual there because even if we're not meeting with him on

10   a certain day, it doesn't mean I'm not getting really helpful

11   information on him that day.  So if I don't see Mr. Marks, I

12   might call the unit and ask the officer, "Hey, how was he

13   today?  Did you observe anything?  Any issues?"  So we're still

14   obtaining information even if we're not seeing the individual

15   every single day.

16   **Q.**  Did the defendant's response style or his content of his

17   responses vary across the ten hours and across the 30 days with

18   you?

19   **A.**  No, not really.  Mr. Marks presented as pretty stable and

20   consistent.  I will say the first meeting with him, I believe

21   he was more nervous, and I -- I would say that's because it was

22   his first time in prison.  He didn't know me yet.  He was newer

23   to the facility.  He didn't know where he would be sleeping.

24   So I would imagine, like most people, he was nervous and

25   uncomfortable.

1    But definitely, as time went on, we built rapport.  He

2  seemed more comfortable with us.  He reported being more

3  comfortable.  And once he got comfortable, he was pretty

4  consistent until the end.

5  **Q.**  Did you receive a request from defense counsel to record

6  your interactions with the defendant?

7  **A.**  Yes.  I believe it was preferred to record.

8  **Q.**  Why didn't you record it?

9  **A.**  Because it's not BOP regulation.  We're actually not

10  allowed to record anything within the BOP, and that's just not

11  our standard practice.

12  **Q.**  Over the ten hours of your interviews with the defendant,

13  was he coherent?

14  **A.**  Yes.

15  **Q.**  Was he conversational?

16  **A.**  Yes.  Minimally at times, but yes.

17  **Q.**  Were there topics that he was able to converse, you know,

18  freely about?

19  **A.**  Yeah.  I mean, he -- Mr. Marks was kind of like anyone

20  else.  If you hit a topic that he was interested in or he

21  liked, he -- he was -- he would talk more.  He was more verbose

22  versus, of course, things specific to the court or his charges,

23  he wasn't as detailed about.  But, yeah, he was conversational,

24  especially if he hit a topic that he really liked or felt

25  comfortable with.

1   **Q.**  And what were some of those topics that he liked or felt

2   more comfortable with?

3   **A.**  Well, again, like when we talked about some of his

4   achievements with passing the driver's test on the first time

5   and he -- he talked about using an ATM and how it was pretty

6   much easy for him.  We talked about some of his career

7   aspirations.  We talked about some of his romantic experiences.

8   So for things that he was comfortable with, he definitely spoke

9   more about.

10  **Q.**  Were his responses to your questions relevant?

11  **A.**  Yes, they were.

12  **Q.**  Were they logical?

13  **A.**  Yes.

14  **Q.**  And how does all of this inform your opinion about the

15  defendant's competency?

16  **A.**  Well, part of what we look for is if the defendant has a

17  mental illness or defect that would impair them from

18  understanding -- having a rational understanding of what's

19  going on in the court or having a factual understanding, being

20  able to work with their attorney.  So the fact that Mr. Marks

21  was able to consistently have coherent, logical conversations

22  with us, he was attentive, he didn't appear to be in distress

23  or having any severe mental illnesses or defects hindering him

24  from communicating with us was very telling, and it was an

25  example of how he should interact with his attorney and how he

1   should present in court.

2   **Q.**  You noted on page 28 of your report, first paragraph, that

3   Mr. Mahoney expressed concern that the defendant cannot give a

4   narrative.  Was that consistent with your observation of the

5   defendant?

6   **A.**  No, it wasn't consistent.  Again, when Mr. Marks was

7   comfortable and when he was talking about something that he

8   liked or enjoyed, he was able to have a narrative.  He wasn't

9   ooververbose.  He wasn't overtalkative.  But he was able to have

10  a narrative.

11  **Q.**  And you mentioned this before.  He talked about his future

12  goals.  Can you tell us a little bit more about some of the

13  future goals that he discussed with you.

14  **A.**  Sure.  Being that Mr. Marks is so young, you know, we do

15  talk about what he wants to do when he gets older and once he's

16  able to put some of the challenges behind him, and so he

17  discussed that he did go to school for -- I believe it was

18  visual arts or computer, something to that -- something to that

19  effect.  But he talked about -- he acknowledged that depending

20  on the outcome of his current charges, he may or may not have

21  to change fields.  He was aware that having computers and

22  Internet could be -- could lead to restrictions based on what

23  happens with court, and so he talked about what -- what other

24  things he might be interested in doing or just acknowledging

25  that he might have to change his goals and his life dreams

*JENKINS - DIRECT*                                                    50

1    because of his current situation.

2    **Q.**  Was this important to you?

3    **A.**  Yeah, it was important because it showed an awareness of

4    the consequences or the potential consequences of his current

5    legal situation.  It also showed that he was future oriented

6    and that he was trying to be positive for the future.  He also

7    talked about relationships and hoping in the future to one day

8    have a relationship that he's comfortable with.  So it just

9    gave us some good insight on what he's able to understand and

10   what his hopes are for the future.

11   **Q.**  You noted on page 22 of your report that the defendant's

12   thinking appeared organized, rational, and goal oriented.  Why

13   was that important for you to note?

14   **A.**  Yeah.  I mean, I think this is still part of the mental

15   status.  It is.  It's important to note because, you know, we

16   did, for example, give Mr. Marks major depressive disorder in

17   remission, and so one of the things that you are looking for

18   when someone has depression or a history of depression is are

19   they future oriented, mostly because you're looking to see if

20   they're possibly suicidal or if they have hope for the future.

21   So it was important to note that he was future oriented and

22   that he was able to think ahead about what his future might

23   hold.

24   **Q.**  Did the defendant use eye contact in his communication with

25   you?

*JENKINS - DIRECT*

1   **A.**   He used eye contact.   It was sporadic.   He did tend to look

2   down a lot, but he would look back up to acknowledge that we

3   were talking and engaging in a conversation.

4   **Q.**   Did he respond appropriately with other nonverbal cues?

5   **A.**   Yes, he did.

6   **Q.**   Like what?

7   **A.**   For example, if something funny came up or something silly

8   came up or talking about something enjoyable, he was observed

9   to smile or chuckle appropriately, evidencing that it was

10   something that was positive to him, especially when you talked

11   about, like, his family.   He was very close to his family.   So

12   thinking back to some of those memories made him happy, and he

13   appropriately smiled.

14   **Q.**   To what extent did you ask questions about his offense

15   conduct?   Not the charges, but the conduct itself.

16   **A.**   Yeah.   So for us, in the Federal Bureau of Prisons, when we

17   do a competency evaluation, we don't go into specific details

18   about the charges because then that's going into the realm of

19   criminal responsibility.   So we made sure to ask Mr. Marks what

20   he was charged with, what those charges meant, possible

21   consequences, things like that that are very surface but making

22   sure he has, like, a basic knowledge of why he's in this

23   situation.   But we did not go into much further detail than

24   that.

25   **Q.**   Now, some of the things you're talking about today are not

1    in your report.  Does your report include every single aspect

2    of your competency evaluation, like every single thing you

3    discussed with him?

4    **A.**   No.  I think that would be impossible to have every single

5    thing included.  We summarize everything, and we answer the

6    court's question to the best of our ability.  But being that we

7    have so much time with Mr. Marks, there's a lot of things that

8    I'm sure are missing, but the important information that shows

9    how he presented, answers the court's question, gives an

10   accurate diagnosis -- we make sure to include all of those

11   parts.

12   **Q.**   Did the defendant ever ask you any questions?

13   **A.**   Yeah.  So at the beginning and end of every session, I

14   always open the door to see if he has any questions.  I do that

15   for all of my clients.  He didn't have a lot of questions.  I

16   think he might have asked about the books, and I told him that

17   education provides certain reading books, because I know he

18   likes to read.

19       Definitely toward the end, he would ask questions like how

20   much longer I thought he had there, how many more times we

21   would meet.  So he was pretty much focused on leaving and being

22   done as soon as possible.  There may have been some other

23   questions throughout the course that I don't remember, but I

24   always gave him that opportunity if he had any questions.

25   **Q.**   I want to go back to his request to be put in the special

*JENKINS - DIRECT*                                               53

1    housing unit.  Did he ever explain to you why he wanted to be

2    in the special housing unit, or SHU?

3    **A.**   Yeah.  So he did explain it to me, and he also talked to a

4    staff member, who came back and also told me his concerns, and

5    it was around his charges and how they would appear to other

6    inmates.  Mr. Marks appeared to have an awareness that charges

7    that are sexual in nature are not very welcomed or accepted in

8    prison, especially amongst other inmates, and so he was

9    concerned that he would be a target.

10   **Q.**   Did he say that to you or you just inferred that?

11   **A.**   He told me that he was concerned about his charges.  We

12   talked about them being sexual in nature.  He admitted that to

13   me, and he said he was concerned about having problems with the

14   other inmates.

15   **Q.**   And was it clear to you that he was talking -- that he

16   meant to say that the problems related to the nature of the

17   charges, or that's just an inference you made?

18   **A.**   It was pretty obvious that he was talking about being

19   charged with a sex offense and being a target and that he

20   believed he would be a target because he was charged with a sex

21   offense.

22   **Q.**   Did the defendant demonstrate any difficulty in keeping up

23   with you in your conversations and interviews with him?

24   **A.**   No, I don't believe so.  Because we knew that he had -- he

25   had come with this report of having a developmental disability,

1    we meet our clients where they're at.  So we made sure to talk

2    and simplify language, and that worked really well with

3    Mr. Marks.  We were able to have a conversation.  I only did

4    tell him that if I said anything that he did not understand or

5    if there was a word that I used that was confusing to him, to

6    let me know and that we had no problem rephrasing or asking it

7    in a different way.  But once we kind of knew we had to speak

8    in a simplified language, it's not uncommon to do that.  We

9    have defendants of various abilities.  We didn't have any

10   problem communicating with him.

11   **Q.**  So other defendants whom you have examined for competency

12   who do struggle with receiving and processing incoming

13   information?

14   **A.**  Yes.  There are some in the past.

15   **Q.**  And what do you see in them?  How do they present?

16   **A.**  You can see that the person is having to think really hard

17   about what you're saying, and a lot of times their responses

18   aren't fully relevant, and it's kind of understood because they

19   are not receiving the information correctly.  And so even when

20   you rephrase it or try it a different way, sometimes they still

21   struggle.  So when you see someone having, like, a receptive

22   problem, a lot of times it can be from just them having other

23   things going on in their head, whether it's anxiety or voices.

24   You can kind of see it.  You can see it in their behavior.  You

25   can see that their attention is limited.  And then it

1    definitely becomes even more pronounced when you see what

2    they're saying back because it doesn't match up.

3    **Q.**  In your opinion, does this defendant struggle with

4    receiving and processing incoming information?

5    **A.**  We did not observe Mr. Marks to have those difficulties.

6    **Q.**  Do you ever -- do you ever do forensic psychology

7    evaluations of someone who is not an adult, so a minor?

8    **A.**  No.  All of our defendants are adults in federal custody.

9    **Q.**  Did you significantly adjust your evaluation style to

10   accommodate this defendant?

11   **A.**  Significantly, no.  Again, we have -- we have -- it's not

12   uncommon to have individuals that maybe have low IQ or limited

13   educational background.  And so we adjust our -- our language

14   to them and talk more simplified, and that's pretty successful.

15   So no major adjustments with Mr. Marks.

16   **Q.**  Have you reviewed the defendant's 2017 interview with the

17   police?

18   **A.**  Yes.

19   **Q.**  And how would you describe the way he communicated with the

20   police there?

21   **A.**  My perception of that interview was that Mr. Marks may have

22   been somewhat caught off guard.  He was speaking very fluidly,

23   very confidently.  He didn't really hesitate to answer

24   questions, and it wasn't until maybe halfway through the

25   interview it kind of appeared that he was realizing "Okay.

1   There might be a problem here.  I might be getting in trouble.

2   There's something wrong."  And then he kind of started to

3   hesitate in some of his responses or think or do a little bit,

4   but it -- it really presented normally, at least initially, as,

5   like, a casual conversation with no major issues.  I don't

6   think -- it appeared that he didn't really understand why the

7   police was there initially and was just speaking very

8   authentically.

9   **Q.**  How is the defendant's conversation style with you compared

10  to that?

11  **A.**  I think when we talked about topics that were not

12  threatening to Mr. Marks, so maybe, like, not about the court

13  or his charges, he spoke more fluidly, similarly like he did to

14  the police.  But I think the nature of being in the prison,

15  being evaluated so many times -- he had been through this a

16  lot.  You know, I think he was more nervous, and that showed

17  because he was very much aware of the situation and what was

18  going on and especially being in the prison.  So he did present

19  as more anxious or nervous than he did during that police

20  interview.

21  **Q.**  Have you reviewed Dr. Otto's competency interview of the

22  defendant?

23  **A.**  I did.

24  **Q.**  And how is the defendant's conversation style with you

25  compared to that?

1   **A.**  I think it was pretty similar.  It was pretty similar to

2   his interview with Dr. Otto.  He -- he was asked questions.  He

3   answered questions.  It didn't seem like there were any major

4   communication issues.  I would say it was pretty similar.

5   **Q.**  Have you reviewed Dr. Negrón's three interviews of the

6   defendant?

7   **A.**  Yes, I have.

8   **Q.**  And how is the defendant's conversation style with you

9   compared to those?

10  **A.**  Again, it really felt similar, especially since she asked a

11  lot of the questions that I asked.  So it felt very similar.

12  He was asked questions.  He answered them mostly correctly.

13  Not overdetailed, but correct answers, a little nervous, pretty

14  similar to how he presented with us as well.

15  **Q.**  So if the defendant presented one way to the police and

16  another way to you and Dr. Otto and Dr. Negrón, do you think

17  he's malingering?

18  **A.**  In my clinical opinion, Mr. Marks was not malingering

19  during my evaluation.

20  **Q.**  Okay.  So what's your opinion on why there's such a

21  difference?

22  **A.**  I think, kind of like I mentioned, I think with the police

23  he was kind of caught off guard.  I don't think he realized he

24  was either in trouble or about to get in trouble.  And so if

25  you're not concerned about what you're talking about, I would

*JENKINS - DIRECT*                                                58

1   imagine you would talk more openly and fluidly and

2   authentically and maybe even put your foot in your mouth, if

3   you want to use that term, because you're not really -- you're

4   not really understanding that this is a serious thing or that

5   it has the potential to cause -- to become something serious.

6        So it just seemed like he was just speaking very freely

7   before all of this ever happened with Dr. Otto and Dr. Negrón

8   and with me.  By then he has been years into this situation.

9   So this has kind of been his life, and he knows that he's going

10  to court and that he has these charges, and he knows that it's

11  serious.  So I think we -- we're getting a different Mr. Marks

12  because of the situation.

13  **Q.**  On page 12 of your report, you discuss videos of

14  conversations between the defendant and his attorneys.  Did you

15  watch all 30 hours of the video between the defendant and his

16  attorneys?

17  **A.**  I did not.

18  **Q.**  Okay.  How much of it did you watch?

19  **A.**  I made sure to watch a portion of every session that was

20  sent to me, but -- but I could not watch the whole 30 hours.

21  **Q.**  And you -- you actually reference 18 hours.  Why did you

22  say 18 instead of, I think, closer to 30?

23  **A.**  I'm not sure, actually.  I'm -- I'm not sure if it was 18

24  or 30.  I know it was very, very long, and I did not get to

25  watch it in its entirety.

1    **Q.**   Okay.  Why did you only watch portions of it?

2    **A.**   Well, number one, like I state in the beginning, our

3    competency evaluation is based on the here and now.  It's how

4    Mr. Marks is in front of me, what I'm observing, and that's

5    what's really paramount to me, because competency can be fluid

6    and it can change, and so I cannot base my competency

7    evaluation or come up with my opinion based on someone else's

8    research or work or one single form of data.

9         And so although I think it's very helpful to get a lot of

10   resources and a lot of information -- and that's why I made

11   sure to at least review it -- ultimately, I have to make my

12   opinion off what I see, and that's what I did.

13   **Q.**   You state on page 12 of your report that the defendant

14   presented as timid, anxious, and forgetful during the

15   interviews with the defendant -- I'm sorry -- with his

16   attorneys and that he, quote, "appeared to display difficulty

17   recalling various details around his case" and that he

18   "repeatedly confused legal terminology and had difficulties

19   recalling what was discussed the day prior with his attorneys."

20        That was your description of what you saw in the attorney

21   videos.  So was that different compared to how he conversed

22   with you or based on what you observed?

23   **A.**   Was it -- was what I saw in those videos different than how

24   he presented with me?  Is that what you're asking?

25   **Q.**   Yeah.

1    **A.**   Yeah.  Mr. Marks did not appear as nervous as he did in

2    those videos.  He appeared very overwhelmed in those videos.  I

3    don't know how long they were kind of going at it, but, you

4    know, we made sure to check in with him and to give him breaks,

5    and -- and we only saw him maybe two to three hours at a time.

6    And so I don't know the time parameters of those videos, but he

7    seemed very overwhelmed.  He seemed very nervous.  And the more

8    that we spoke with Mr. Marks, he became more comfortable, and I

9    think rapport was built really easily with him over time.  So

10   he did present differently with us than what I observed in the

11   videos with his attorneys.

12   **Q.**   You also note on page 12, with respect to the attorney

13   videos, that, quote, "Based on the interviews with his

14   attorneys, Mr. Marks appeared to present with memory and

15   cognitive deficits during these interviews."

16       Did he appear to present memory and cognitive deficits

17   during his interviews with you?

18   **A.**   No.

19   **Q.**   You also note on page 12 that in the police interview, he

20   did not appear to have memory or cognitive deficits and seemed

21   to understand the behaviors the officers were discussing with

22   him.  Why did you say that?

23   **A.**   Yeah.  Because he was able to remember certain details like

24   the usernames, if I recall correctly.  The officers would give

25   him some information, and he right away felt -- right away

1    seemed to remember it or acknowledge what the officers were

2    talking about and was able to kind of continue the conversation

3    based off the information he was given, and he didn't seem to

4    have any memory issues.  They weren't -- I don't even remember

5    if he said, "I don't remember," like, that actual term.  It

6    seemed like it was just a casual conversation.  I didn't notice

7    any deficits in that interview.

8    **Q.**  So what do you make of this drastic difference?

9              **MR. MAHONEY:**  I object to "drastic," Judge.

10             **THE COURT:**  The objection's overruled.  Go ahead.

11             **THE WITNESS:**  Can you be more specific, Ms. Chang?

12   **BY MS. CHANG:**

13   **Q.**  What do you make of the difference with -- I mean, you just

14   testified that he didn't present with memory and cognitive

15   deficits with you nor did he with the police, but he did based

16   on the attorney videos.  So what do you make of that

17   difference?

18   **A.**  Yeah.  Thank you.  I mean, again, I don't know how long his

19   attorneys were kind of trying to teach him or get him to

20   understand what they were trying to explain to him, but he just

21   seemed overwhelmed.  It was -- it was across, I think, Zoom as

22   well and maybe some other type of technology.  So I don't know

23   the situation of where Mr. Marks was and how he was feeling,

24   but he just seemed very overwhelmed on those videos.  He seemed

25   like he was kind of being hammered with a lot of information

*JENKINS - DIRECT*                                                      62

1   and was having a difficult time giving his attorneys what they

2   wanted to hear back, and so I just think it's a very different

3   situation.  Being that I wasn't there and I don't know how long

4   they were going at it -- it seemed like it was several days at

5   a time.  I don't know how many breaks were given.  It just --

6   that's what the appearance was.  He seemed very overwhelmed in

7   those videos and kind of nervous and uncomfortable.

8   **Q.**  If the attorney videos were all you had, would that raise

9   concerns for you regarding the defendant's competency?

10  **A.**  I want to say I would never give a formal opinion based off

11  of a video that I was not a part of, but if that was the sole

12  piece of data that I had as far -- about Mr. Marks, then, yes,

13  I think I would be more concerned about his functioning looking

14  at that video.

15  **Q.**  In light of having completed your evaluation, including

16  everything you've reviewed as of today, do the attorney videos

17  still raise -- well, do they raise concerns for you regarding

18  his competency?

19  **A.**  I base my opinion off my evaluation.  Again, the attorneys'

20  videos are a piece of information.  They don't -- they don't

21  raise any concern for me about Mr. Marks's competency since I

22  was able to conduct a comprehensive evaluation myself.

23          **THE COURT:**  Ms. Chang -- or do you think we're getting

24  to a good stopping break?  We could take a short comfort break.

25          **MS. CHANG:**  Any time, Your Honor.

1    **THE COURT:**  Why don't we go ahead and do that.  We'll

2    take a ten-minute break.

3         And, Mr. Mahoney, if you want to talk to Mr. Marks and

4    if there's any issues you want to raise, we can raise them when

5    I come back on the bench.  And we'll be in recess for

6    ten minutes.  Thank you.

7         (Recess at 10:59 A.M. until 11:12 A.M.)

8    **THE COURT:**  Mr. Mahoney, are there any issues we

9    needed to discuss?

10   **MR. MAHONEY:**  No, Judge.  I mean, I think -- I just

11   want to point out that Steven does have problems learning and

12   understanding, and I wanted to be able to just touch base with

13   him on making sure -- I see him try to make some notes and that

14   sort of thing.  So this is all coming in very quickly is all.

15   **THE COURT:**  Well, Mr. Mahoney, this is a competency

16   hearing.  This is how it's going to be.  And I've been paying

17   attention, and I notice you-all have been communicating

18   adequately from my position via notes.  If there's an issue

19   with Mr. Marks's comfort or he has some other issue, then you

20   can, of course, interrupt.  But, otherwise, we have a lot of

21   witnesses and a lot of testimony to get through this week, and

22   so I'd like to go ahead and just continue on as much as we can.

23   **MR. MAHONEY:**  Okay, Judge.

24   **THE COURT:**  So your comments are noted for the record.

25        Go ahead, Ms. Chang.

*JENKINS - DIRECT*                                              64

1        **MS. CHANG:**  Thank you, Your Honor.  And before we get

2   started, I was advised by Mr. Jackson that perhaps I could

3   address Dr. Jenkins regarding the sounds that keep repeating.

4        Dr. Jenkins, do you happen to have a device or, like,

5   a Mac -- I don't know what devices you have, but is there a way

6   to turn off, like, all notifications?  Is that possible?

7        **THE WITNESS:**  Yes.  I think I figured it out over the

8   break.  So I think we're good.  Sorry about that.

9        **MS. CHANG:**  No.  Thanks for doing that.

10       I'm going to go proceed now, Your Honor, if that's

11  okay.

12       **THE COURT:**  Please do.

13  **BY MS. CHANG:**

14  **Q.**  Did you conduct a test on malingering?

15  **A.**  I gave him the TOMM, which is the Test of Memory

16  Malingering.

17  **Q.**  And did you add the results to your third addendum?

18  **A.**  I did.

19  **Q.**  And what were the results?

20  **A.**  The results were on Trial 1, a 40.  Trial 2, I believe, was

21  a 42.  And I'm going to my report just to make sure that I'm

22  saying the exact thing.  And Trial 3, which is also the

23  retention, I believe, a 45.

24       Do you have the page, Ms. Chang?

25  **Q.**  Page 21 of your report.

1    **A.**   Thank you.

2         So, yes, that's correct.  On Trial 1, a 40; on Trial 2, a

3    42; and on retention, a 45.

4    **Q.**   So how do you interpret those results?

5    **A.**   So, typically, the way the TOMM is done is chance alone.

6    There's 50 pictures.  So chance is 25, which is half of 50.  So

7    you're looking to see that someone gets well above chance in

8    recalling the picture that they were shown.  And so Mr. Marks

9    scoring a 40 on Trial 1 was fine, but on Trial 2 he did score 3

10   below what some -- would be indicative of malingering.  But

11   then he scored a 45 on retention, which, again, is a good

12   score, and it showed motivation and that he was intentionally

13   trying to get them correct.

14        And so one of the three scores was indicative of possibly

15   malingering.  The other two were not.  And so overall you have

16   to look at everything: observations, collateral information,

17   other assessments.  Overall, I indicated he was not

18   malingering, even though he did have a questionable mark on

19   Trial 2.

20   **Q.**   Okay.  On page 18 of Dr. Negrón's report, which is Defense

21   Exhibit 18, did she also set forth her calculation of the

22   defendant's score on your administration of the TOMM?

23   **A.**   Yes, she did.

24   **Q.**   Were her calculations correct?  Sorry --

25   **A.**   No.  I believe --

JENKINS - DIRECT                                                    66

1    **Q.**  Sorry.  Page 17 of her report.

2    **A.**  No.  I believe on Trial 1 she gave him a score of 38, and

3    that was incorrect.

4    **Q.**  Let's talk about memory.  What is working memory versus

5    long-term memory?

6    **A.**  Working memory is the ability to understand information,

7    use it, manipulate it, and then ultimately use it however you

8    need.  Long-term memory is the ability to obtain information,

9    have your brain categorize it so it can then be utilized at a

10   later time, hence long term.  So working memory is how we're

11   conversing right now.  It's how we do things when we're in

12   action.  And then long-term memory is our ability to then be

13   able to go back in our mind and obtain information that we had

14   previously been taught.

15   **Q.**  So is long-term memory, like, an hour from now, or it has

16   to be a week from now?

17   **A.**  It varies.  It really varies.  Working memory is what's

18   happening right now, and long-term is anything where time has

19   passed.

20   **Q.**  How is the defendant's working memory?

21   **A.**  I thought his working memory was pretty good.  I believe he

22   got in the low average on the WASI, which does have some memory

23   assessments attached to it.  So he's not the best, but he's not

24   severely deficit.  That's pretty much what low average means.

25   **Q.**  Now, you're referencing the WASI test, which may have an

*JENKINS - DIRECT*                                                    67

1    opinion, but how about your observation?  How is his working

2    memory based on your conversations with him and his -- your

3    observation?

4    **A.**   Yeah.  Pretty much similar.  I would say, again, low

5    average if I had to actually, like, give a descriptor.  But

6    Mr. Marks was able to understand information.  He was able to

7    use it and then retain it.

8         So, for example, when it came to making phone calls, I

9    explained to him that within the BOP your unit team and

10   specifically your counselor is someone that you have to talk to

11   in order to make the phone calls to your family or whoever or a

12   legal call, and so I gave him the information.  He was able to

13   kind of recite it back.

14        "Okay.  When I go back to the unit, I speak to this

15   person."

16        "Yes.  This is your identified counselor.  That's the

17   person that can help you."

18        And then I later found out that he did that.  So he was

19   able to obtain the information, use it to work for himself, and

20   then he retained it.

21        And, I guess, if you want an example for long-term

22   memory -- because when it was time for him to leave the

23   facility, that's the same staff member or group of staff

24   members that he had to talk to to facilitate that move, which

25   would be an example of the long-term memory.  He was able to

1    get the information, keep it, and then use it when he needed it

2    at a later date.

3    **Q.**   Did the defendant demonstrate any clear indications of

4    memory impairment?

5    **A.**   Not that I observed.

6    **Q.**   Why -- okay.  What did you do to verify that the things he

7    was telling you were accurate?

8    **A.**   So, again, because we do interview the parents and because

9    we did have some collateral information, there was some things

10   we were able to easily see if they were congruent or if they

11   were different from what we were being told by other sources.

12   But other than that, we took a lot of what Mr. Marks said as

13   face value because he is a defendant.  He was the subject of

14   the report.  And because he is an adult, we don't fact check

15   everything that he says.  We kind of listen to him and report

16   back his self-report.

17   **Q.**   You state at page 28 of your report that Mr. Mahoney

18   expressed concerns about the defendant's minimal remote memory

19   and that, quote, "noting goes into long-term memory."  Did you

20   observe this in the defendant?

21   **A.**   No, I did not.

22   **Q.**   How would someone with minimal remote memory present?

23   **A.**   They would have issues with retaining information, whether

24   it was short term or long term, and a lot of the things that

25   Mr. Marks -- a lot of the questions, especially specific to

1    competency that we did not educate him on, he had to have

2    learned somewhere.

3         And we would ask him, you know, "Is this something that

4    your attorney spoke to you about, or is this something -- you

5    know, how did you get this information?"

6         He, a lot of times, said, "Yeah, this is something my

7    attorney taught me or we spoke about."

8         And so that in itself is showing that he was able to learn

9    some things from his attorney.  He was able to learn some of

10   the information and commit it to memory, and then he reproduced

11   it to us at a later time, which shows that he was able -- he

12   didn't have any major deficits when it came to memory.

13   **Q.**  Let's talk about your intellectual testing.  How did you

14   determine what tests to administer?

15   **A.**  Well, the Wechsler's a very well known, accepted assessment

16   within the psychology world and within the forensic psychology

17   world, and so those are typically the assessments that we use.

18   And that's what we chose to do with Mr. Marks.

19   **Q.**  Is that Wechsler, W-e-c-h-s-l-e-r?

20   **A.**  The Wechsler Abbreviated Scale of Intelligence, Second

21   Edition, also known as the WASI-II -- that is the intellectual

22   or cognitive measure that we gave to Mr. Marks.

23   **Q.**  Where did you administer the tests?

24   **A.**  So because Mr. Marks did have himself placed in SHU, I had

25   to have him removed from his cell in SHU, and then I requested

*JENKINS - DIRECT*                                                    70

1    to have a room outside of the SHU area where it would be the

2    most quiet, and we administered it there.  So we were in a room

3    by ourselves -- the student, myself, and Mr. Marks -- when we

4    administered these assessments away from the SHU area.

5    **Q.**  Why did you note that the testing area was noisy?

6    **A.**  Because SHU overall can be very noisy, and so there were

7    times during the tests or interviews where you might hear

8    what's happening behind the doors where SHU is located, and

9    it's just ethical clinical practice.  It's -- it's good

10   practice to explain the testing environment when you give an --

11   when you administer an assessment.  And so that's why we share

12   that it was noisy at times.

13   **Q.**  Did you consider whether the noisy testing environment may

14   have skewed the results of his tests?

15   **A.**  Yes, of course.  And that's one of the reasons why we're

16   transparent about it.  But, also, as we administer it, that's

17   what I check for.  Is he getting distracted?  Do we have to

18   repeat ourselves?  Is it so, like, noisy -- I'm sorry -- that

19   we have to speak louder than normal?  And those kind of things

20   weren't observed.  So it wasn't an ongoing, consistent loud

21   noise, but every now and then you might hear something, which

22   is why I thought it was important to share that information.

23   But I did not feel, in my clinical opinion, that it skewed

24   Mr. Marks's testing results.

25   **Q.**  What does the Shipley-2 measure?

*JENKINS - DIRECT*

1    **A.**   The Shipley-2 is kind of, like, a quick measure of

2    cognitive functioning too.  It's a quick assessment that can be

3    done individual.  So the WASI is something that we have to

4    administer.  There's different parts of the test.  It's a

5    collaborative effort.  The Shipley is something you can give

6    someone and they can fill it out on their own and then return

7    it to you for scoring.

8    **Q.**   And what were the results?  I think this is page 20.

9    **A.**   Yeah.  So on the Shipley-2, Mr. Marks -- let's see.  His

10   crystallized abilities, which would be knowledge that he's

11   gained as a result for education and experience, were -- it

12   fell within the average range of intelligence, so he got 101.

13        And then his fluid cognitive ability, which are -- he's

14   using logic and skills, acquiring new information, kind of like

15   that working memory you talked about, he received a 93, which

16   is in the average range.

17   **Q.**   And were those results generally consistent with what you

18   personally observed during your personal interactions with the

19   defendant?

20   **A.**   These results on the Shipley were a little bit higher than

21   expected.  He did a little bit better, which is why we then

22   went in and gave him the WASI, which is a more comprehensive

23   measure, to make sure that we were getting accurate results.

24   And on the WASI he did a little bit -- a little bit poorer but

25   still was in the average range, but he was in the low average

1  specific range.  And it was consistent with our interviews,

2  with our presentations of him, our observations.  He did -- I

3  feel would be accurately classified in the low average with

4  some strengths that might be in the average range, but,

5  overall, low average, I think, is the best way to describe him.

6  **Q.**  In your opinion, how does the defendant's low average

7  intellectual ability impact his competency?

8  **A.**  Well, it's kind of like things that we've said before.  So

9  I think it's important to talk to him in simplified language

10  because he does have that low average.  So it means he's not at

11  the top of his class.  He's not at the top tier.  But he is

12  smart.  He does have a good understanding of most things, but

13  there also might be things that he has some issues with or

14  might struggle with, which is why accommodating him with

15  simplified language or -- for example, I believe he shared --

16  he used to get more time on his tests in order to complete

17  them.  Some minor accommodations like that, I think, would help

18  him be really successful.

19  **Q.**  In your training and experience and education, would

20  someone with severe ASD be able to score in the low average

21  range for intellect as Mr. Marks did?

22  **A.**  Absolutely not.  Someone with severe ASD would not perform

23  that well on any of these measures.

24  **Q.**  Were there any other tests that you administered that you

25  think the Court should hear about?

1    **A.**  I think we spoke about most of them.  I also gave him the

2    VIP, which is the Validity Indicator Profile, and that just

3    measures motivation.  It showed that he did give a strong

4    effort to answer questions correctly.

5         I also gave him the MMPI-2-RF, which is the Minnesota

6    Multiphasic Personality Inventory.  It's a personality measure.

7    And it did mention that Mr. Marks tended to have some symptoms

8    of depression at some point and is really trustworthy of others

9    but emotionally restricted, and that was pretty -- pretty

10   consistent with what we saw with him or someone that might have

11   high-functioning autism with definitely a history of

12   depression.  So everything else was pretty consistent and we've

13   talked about already.

14   **Q.**  On page 12 of your report, under employment history -- and

15   you kind of touched on this before, but you mentioned that the

16   defendant described having to use an ATM once to take out money

17   to buy another school ID.  He stated he had no issues going to

18   the ATM and taking out the money, calling the process, quote,

19   "pretty straightforward."  Did the defendant actually describe

20   the process to you?

21   **A.**  He did.  He said he -- he went to the ATM.  He found it.

22   He talked about putting in the correct numbers, requesting the

23   amount of money he wanted, and then that the machine provided

24   him with the money he requested.  So he didn't get more

25   detailed beyond that description, but, again, he said it was

1    pretty straightforward and that he had no major concern.

2    **Q.**  Why did you include that in your report?

3    **A.**  I included it because it speaks to his independence.  It

4    speaks to his ability to do things, be successful in the world,

5    do things independently.  Again, individuals with

6    disabilities -- it's really important to highlight their

7    strength as well as understand some of their weaknesses, and so

8    for him to be able to utilize an ATM independently is

9    definitely a strength, and it shows a sense of knowledge -- of

10   real-world knowledge that he's able to do, and it speaks to his

11   independence.

12   **Q.**  At pages 22 to 24 of your report, you diagnosed the

13   defendant with ASD by history without accompanying intellectual

14   impairment.  Explain the different parts of that diagnosis.

15   **A.**  Sure.  So autism spectrum disorder, individuals that have

16   autism -- they usually have social deficits.  They're not able

17   to really process social cues or they have issues with their

18   independence.  They need accommodations.  They need assistance.

19   And then some individuals will have intellectual impairments on

20   top of their autism spectrum diagnosis.

21       And so in this case I gave Mr. Marks without accompanying

22   intellectual impairment because he had a low average IQ, and

23   that's okay.  Not everyone is going to be at the top tier.  But

24   because nothing was severely deficit when it came to his IQ

25   testing, in even our observations and our communication with

him, I did not feel that he met the criteria for having an

intellectual impairment.

And the "by history" is something that we do in the

clinical world when someone comes with a diagnosis already, and

we might see some evidence of why this diagnosis is

appropriate, but there also may be some things we don't see.

And so by history is kind of a caveat we give by saying, yes,

we do believe this is the diagnosis that most appropriately

fits this person, but maybe we didn't see all the criteria

that's listed in other -- other forms of information or data.

It was also unusual because most individuals this day and

age are diagnosed with autism a lot earlier, some as young as

three.  I believe Mr. Marks wasn't diagnosed until he was 19,

although his parents did get him diagnosed or get -- or got him

evaluated throughout his life.  And so I think that speaks to

the high functioning.  That speaks to the -- the lack of having

an intellectual impairment, that he was kind of able to go

through the motions so much that these other professionals that

saw him throughout his childhood couldn't quite pin that maybe

he was on the spectrum.  And so that is why we gave him these

specifiers and this diagnosis, and that's what we saw.

Overall, conceptually, Mr. Marks appears to have

high-functioning autism, which years ago would have been called

Asperger's syndrome, which no longer exists per the DSM-5.  So

now it's just autism spectrum disorder.

*JENKINS - DIRECT*

76

1    **Q.**  You indicated at page 23 that "No cognitive deficits were

2    observed, reported, or revealed through testing; however,

3    cognitive deficits were verified on previous evaluations."  How

4    do you explain that difference?

5    **A.**  Yeah.  That's because we got a lot of information.  There

6    was a lot of other evaluations.  There was IEPs.  There was

7    neurological evaluations that were all saying he had these

8    cognitive deficits, or in some of the testing that they gave

9    him, he might have -- it might have showed deficits or mild

10   issues.  And so he had documentation that supported having some

11   cognitive deficits; however, the testing that we gave him, in

12   our interactions and our observations of him, we did not find

13   anything severe, which is why we decided to go with the ASD by

14   history without accompanying intellectual impairment.

15   **Q.**  How severe is the defendant's ASD, in your opinion?

16   **A.**  So part of the DSM-5, they have Levels 1, 2, and 3.

17   Level 1 is without having -- needing major supports.  That is

18   what I would classify Mr. Marks.  So there are some deficits.

19   There are some limitations.  But he's not at all severe.

20       Years ago the categories were mild, moderate, severe,

21   profound.  If we were using that system, I would have given him

22   mild.

23   **Q.**  So why do you conclude that he's only mild or Level 1

24   without requiring major support?

25   **A.**  Because Mr. Marks is, in my opinion, a smart young man.  He

1    was insightful at times.  He had a lot of independence.  He was

2    able to show independence and was able to advocate for himself

3    at times when needed.  He didn't have any issues with ADL that

4    he reported or that was seen or observed throughout his time

5    with us, and that's, you know, again, over a 30-day-plus

6    period.  So for us to have someone who is able to fit in, able

7    to get their needs met, able to take care of themselves, able

8    to communicate, and then, in addition, testing is not showing

9    any severe deficit, that is where I form my opinion of someone

10   as being -- having mild issues or being a category of Level 1,

11   because he did not have any assistance while he was at our

12   facility and he was able to take care of himself and follow

13   rules.

14       And someone who had severe deficits would have stood out,

15   would have been referred to us, would have had some issues, and

16   we would have known about it and should have been able to

17   observe if it was severe.

18   **Q.**  And just to be clear, when you said "ADL", you mean

19   activities of daily living?

20   **A.**  That's correct.  I'm sorry.  ADLs, yes.

21   **Q.**  All right.  So page 26, you diagnosed the defendant with

22   major depressive disorder in full remission.  Why did you

23   determine that he was in full remission?

24   **A.**  Yes.  So when Mr. Marks was telling us his depressive

25   symptoms, he was speaking of past depressive symptoms.  He

1    denied any current depressive symptoms.  He denied having

2    issues with eating or sleeping, any discrepancies there, any

3    concerns with memory.  He didn't appear to have any attentional

4    issues.  He wasn't suicidal.  He was future oriented.  He was

5    ready to go home, ready to go forward with his legal process.

6        He did not report any feelings of depression to us.  They

7    were not reported to us by staff who observed him.  When we

8    listened to the monitored phone calls, he was happy.  He

9    appeared happy.  He discussed feeling comfortable with us.  He

10   told his parents that this place wasn't so bad, which was nice

11   to hear, and he appeared to overall be doing okay.

12       And so although he had this history of depression, he did

13   not currently appear or present as depressed.  So that is why I

14   gave him major depressive disorder, or MDD, in full remission,

15   so meaning he fit criteria for MDD, major depressive disorder,

16   in the past, but currently he was not experiencing any

17   symptoms, thus in remission.

18   **Q.**  You list a couple other diagnoses in your report, like

19   specific learning disorder with impairment in math and social

20   anxiety disorder.  Do you believe any of these other diagnoses

21   affect the defendant's competency?

22   **A.**  I don't believe any of these disorders affect his

23   competency or him being able to proceed, no.

24   **Q.**  Why not?

25   **A.**  Because, for the most part, they weren't severe or they

1    weren't relevant.  So, for example, specific learning disorder

2    in math -- that's okay that he has struggles with math.  It's

3    okay that that's a weakness to him.  That is not going to

4    directly impact his competency.  And with social anxiety, of

5    course, being social or having issues with socialness and --

6    that can be hindering to someone, but what we saw is Mr. Marks

7    is able to move past that, get his needs met, especially if he

8    has good rapport.  He's been working with his attorneys

9    for years now.  He said he was very comfortable with them.

10       So despite him having some social anxiety, they weren't

11   so -- so severe or his symptoms weren't currently so severe

12   that it was going to stop him from working with his attorney or

13   getting his needs met, taking care of himself, and so that's

14   why I feel like though he has these disorders and they're

15   important to mention, they do not impact his competency at the

16   time of my evaluation.

17   **Q.**  On pages 2 to 3 and 5 to 7 of your report, you list a

18   series of collateral sources.  So you list the chat

19   transcripts.  Are those Government Exhibits 1 and 2 and 4?

20   **A.**  Yes, I believe so.

21   **Q.**  All right.  What did you make of those chat transcripts,

22   and what did they tell you about the defendant?

23   **A.**  Yeah.  So, again, we -- we don't use a lot of discovery

24   with competency, but it was helpful to see that at this point

25   in time, years ago, Mr. Marks was able to communicate

1    appearingly independently with others.  It showed that he had

2    the capability of being manipulative with some of the people

3    that he spoke to.  It showed -- it didn't show any deficits of

4    communication.  The conversation sometimes appeared to last

5    for hours.  They were ongoing.  They were reciprocated.  And so

6    it just seemed like it was someone having conversations, though

7    obviously inappropriate, but able to have conversation with

8    others.  I didn't notice any severe deficits during those --

9    those chats.

10   **Q.**  What did you glean from the Aloft records?

11   **A.**  From Aloft it appeared that Mr. Marks had some social

12   things he was working on.  It seemed like he was spending a lot

13   of his time busy with the other residents and with animals.  He

14   even expressed to me having certain jobs of taking care of the

15   animals.  Nothing huge stood out.  It seemed like he was in a

16   normal residential center, getting some support, and kind of

17   just in a safe environment.

18   **Q.**  How about all the defendant's old records from childhood

19   through high school?  What did you use those for?

20   **A.**  Those were used primarily to look for diagnostic

21   information.  And so, again, it was odd that he wasn't

22   diagnosed with autism until he was 19.  It looks like they

23   initially thought he might have had ADHD, and so a lot of the

24   records actually say that his verbal abilities were his

25   strengths, and so he -- I could see how a clinician at the time

*JENKINS - DIRECT*

1    wasn't very concerned about him having extreme deficits.  He

2    had these issues with his eyes.  He had this weakness in math.

3    But it didn't seem like he was severely deficit intellectually

4    or even fully socially in a lot of these evaluations.

5    **Q.**  What did you glean from Dr. Geller's reports?

6    **A.**  Dr. Geller's report was pretty much just helpful in

7    supporting the autism diagnosis.

8    **Q.**  On page 16 of your report, you note that Dr. Geller stated

9    that the defendant's, quote, "social communication levels are

10   like that of a young child."  Do you agree?

11   **A.**  No, I do not.

12   **Q.**  Why not?

13   **A.**  I didn't perceive Mr. Marks as a young child.  I perceived

14   him as a young adult.  I did not believe he was so deficit or

15   so impaired that he needed to be treated as a child or spoke to

16   as a child.  That just was not my -- my perspective of him at

17   all.  I treated him as a young adult with possibly some

18   learning issues, which is why we simplified information, and we

19   were very successful in working with him.

20   **Q.**  Dr. Geller also stated in her report that there is

21   incompetence in his understanding of the charges against him.

22   Do you agree with that?

23   **A.**  No.

24   **Q.**  Why not?

25   **A.**  In my opinion, and during my evaluation, Mr. Marks knew

*JENKINS - DIRECT*

82

1    what he was charged with.  He knew the legal terms.  He knew

2    what they meant.  He knew possible consequences.  He knew that

3    they were sex offense charges.  He knew that these were charges

4    not to be proud of and -- and even to be fearful of in a

5    correctional environment.  All of that to me speaks of

6    competence of understanding his charges.  So I did not see what

7    Dr. Geller saw.

8    **Q.**  Dr. Geller also stated in her report that, quote, "It is

9    not possible that the defendant can meaningfully assist in his

10   own defense and assist his attorney in preparing."  Do you

11   agree with that?

12   **A.**  No.

13   **Q.**  Why not?

14   **A.**  I don't agree with it because it appears that Mr. Marks has

15   a really good relationship with his attorneys.  He -- I'm

16   sorry.

17   **Q.**  No.  Go on.

18   **A.**  I thought I heard something.  I'm sorry.

19       I felt like he had a really good relationship with them.

20   They seemed to really care about him.  He trusts them.  He

21   leans on their guidance.  He was able to articulate to me

22   information that I needed, and so I am assuming he could do

23   that with them, especially since they have been working with

24   him for so much longer.  He -- he expressed a motivation to

25   work with them and to get the best outcome possible, and he

1   even discussed understanding that they had their own strategies

2   and maybe why they were doing certain things, and he trusted

3   that it was for his benefit.

4   **Q.**  At pages 18 and 19 of your report, you discuss behavioral

5   observations.  What types of things are you looking for in

6   terms of behavior when you're evaluating competency?

7   **A.**  Yeah.  So kind of like some of the things we spoke about,

8   like how is he with me and then how is he without me?  Because

9   that's really important.  Sometimes, when defendants know that

10  they're being evaluated, they present very differently with us,

11  knowing that we're the clinicians -- we're the people writing

12  the report -- than they do with other staff members that might

13  seem more benign or less impactful on them.  And so, again, you

14  know, Mr. Marks didn't get in trouble.  He was never referred

15  to psychology for having unusual behavior.  He appeared to get

16  along with his peers.  He actually made a friend in SHU.  He

17  was really happy and comfortable with the cellmate that he was

18  assigned in SHU with.

19      Behavioral observations are just super important because

20  one can present in front of you very differently than they can

21  when you're not there, and because you're in a facility that's

22  24 hours, seven days a week, it's very hard to keep up a facade

23  for that long unless it's, you know, your authentic

24  presentation, and Mr. Marks was pretty consistent amongst the

25  whole time there.  The reports from other staff were very

1    consistent with what I observed.  And so behavior observations

2    is a place within the report that we explain any concerns like

3    that, if he got in trouble, anything relevant, and so it's

4    really important to include, and that's why we include it.

5    **Q.**  You mentioned several times that he didn't get in trouble.

6    So why is that important to you?

7    **A.**  Because someone that has a lack of understanding of rules

8    or is defiant or is intentionally malicious or maybe just

9    oblivious of things can easily get in trouble in the

10   correctional environment because there are many rules, rules

11   that are amongst the inmate population that are unofficial and

12   rules amongst the staff and what the procedures are.  And so

13   it's really important to see how someone can fit in because

14   it's a very difficult environment, and for someone to be there

15   and not have any issues or concerns, it's very telling of how

16   they're able to adapt and how they're able to follow rules.

17   And that's why -- that's why I mention it, and that's why it

18   was important to note in the report.

19   **Q.**  And how did you know he made a friend in SHU?

20   **A.**  He told me.  He actually told me that he made a friend in

21   SHU, and then the officers also confirmed that he was really

22   comfortable with his cellmate and was happy with him, didn't

23   want to be moved to another cell.  So from his report and from

24   staff report.

25   **Q.**  You also noted in your report that the defendant was,

1    quote, "capable of managing his personal care needs."  Was that

2    true from the defendant's entire time at the BOP?

3    **A.**  My observations, that was true and consistent.

4    **Q.**  Did you have observations -- I'm sorry -- did you have

5    opportunities to observe the defendant in person all the way

6    until the very day he left the facility?

7    **A.**  I'm not sure the exact day he left.  I know I saw him

8    within a few days of him leaving, but I saw him from the

9    beginning to the end.  I just don't know if it was a day or two

10   before he actually left the facility because, by that time, the

11   evaluation was completed, and so we check on him as needed but

12   not every day anymore.

13   **Q.**  Did he ever appear unkempt?

14   **A.**  No.

15   **Q.**  Was he ever malodorous?

16   **A.**  No.

17   **Q.**  Did he ever have matted hair?

18   **A.**  No.

19   **Q.**  You observed him in the videos with Dr. Negrón; correct?

20   **A.**  Yes.

21   **Q.**  Is that visually more or less how he appeared to you?

22   **A.**  Yeah.  Mr. Marks had curly hair that was kind of long.  He

23   had glasses.  And, yeah, he looked pretty similar on those

24   videos like he did with us.  I think he even mentioned liking

25   that he was able to grow out his hair.  So, no, no issues or

*JENKINS - DIRECT*                                                    86

1    concerns were noted there.

2    **Q.**   Other than placing himself in the SHU initially, did the

3    defendant take any other notable steps to protect himself while

4    in custody, like when he was interviewing with you, for

5    example?

6    **A.**   Yeah.  So whenever we did talk about the charges and the

7    charges were brought up, he was very careful to look at his

8    surroundings, make sure there was no one else present so they

9    couldn't hear what he was charged with, even initially when he

10   was speaking to us.  And he may not have known, but we're

11   always very cognizant to not ask someone what their charges are

12   with anyone around, but the fact that he took it upon himself

13   to also look at his surroundings was very telling.

14       And when he did say them, he actually would say them very

15   low.  He would say them very low just to kind of protect,

16   making sure no one else heard that shouldn't have heard.

17       So, yeah, he did take some protective measures when it came

18   to that.

19   **Q.**   And why do you say that's telling?

20   **A.**   It's telling because someone who lacks, you know, the

21   social awareness of their situation or is so intellectually

22   impaired that they're not able to understand the magnitude of

23   what those charges -- the consequences those charges can have

24   or what it can lead to socially in the prison environment, you

25   know, that -- that would be -- that would be somewhat dangerous

*JENKINS - DIRECT*                                                          87

1    for someone to just kind of obliviously be, like, I'm charged

2    with A, B, and C and not be aware who is around or who can

3    hear.  So the fact that he was able to do that kind of showed

4    us that he had some prison knowledge, if you will.  He was able

5    to adapt.  He had an awareness that these were not things to

6    share, they were not things to openly talk about, and you have

7    to be really careful who you did tell, if anyone.  And that was

8    a big protective factor, I believe.

9    **Q.**  Let's switch gears.  Are you familiar with Government

10   Exhibits 8.1 through 8.20?

11   **A.**  I'm pulling it up in -- yes, I see it here.  The advice to

12   Steven; right?

13   **Q.**  No.  Government Exhibits 8.1 through 8.20.  It's on a disk.

14   **A.**  Oh, it's on a disk.  Okay.  I don't have it pulled up, but,

15   yes, I reviewed it.

16   **Q.**  Are those the jail calls that you reviewed?

17   **A.**  Yes.

18   **Q.**  Who are they between?

19   **A.**  It was Mr. Marks calling his family mostly, I believe just

20   his mom and his dad.

21   **Q.**  What did you glean from those?

22   **A.**  Mr. Marks was really happy to speak to his family.  He

23   reported pretty much all positive things to them.  He -- I

24   remember him telling them that he was -- he was fine.  He was

25   okay.  And it seemed like he kind of just didn't want them to

1    worry.  He wanted them to know that he was okay; he was safe.

2    He talked about our facility being better than another

3    facility.  I don't know what other facility he was comparing us

4    to, but it was nice to hear that he was comfortable with us.  I

5    believe he said, like, it wasn't that bad here.  He referenced

6    me a few times as the psychologist, and he checked in with his

7    sisters.  He was definitely concerned about, like, how his

8    sisters were doing.

9         They all seemed like really positive calls.  I know at the

10   end, when it was time to leave, there were some issues with him

11   leaving, and so there was some complaints about that.  But,

12   overall, he appeared very happy to talk to his family and to be

13   in good spirits.

14   **Q.**  Did he demonstrate any sort of memory of things that were

15   happening at BOP?

16   **A.**  Yes.  He was able to explain to his family, I guess as much

17   as he wanted, what was going on.  And he knew "Oh, I'm supposed

18   to meet with Dr. Jenkins," let's say, "next Wednesday."  So he

19   was able to recall when I told him we would meet again and when

20   I perceived or thought we would be done with the evaluation.

21   He was able to relay that information to his family.

22   **Q.**  Why is that important to you?

23   **A.**  It's important, one, because when we're talking about,

24   like, someone who has a history of depression, we want to see

25   is he just keeping it together in front of me or is he really

*JENKINS - DIRECT*                                               89

1    doing okay?  So it really supported that he was doing okay.  He

2    didn't seem depressed.  He didn't seem sad.  He was able to

3    even kind of laugh and enjoy talking to his family.  It speaks

4    to his rationalness and being grounded in reality.  He was

5    aware of the dates.  He was aware of how much time he had left.

6    He was aware of why he was here and that he would be leaving

7    soon.  So it was -- it was really telling.  It was good to see

8    him in another environment, if you will, in speaking openly to

9    his family.

10   **Q.**  At page 28 of your report, you note that Mr. Mahoney

11   expressed concern that the defendant has, quote, "zero

12   executive functioning."

13       What is executive functioning?

14   **A.**  Executive functioning is the mind's ability to plan and

15   organize, pretty much, behavior.  It's how the mind functions.

16   It's how we know what we're going to do and how we do it.

17   **Q.**  To what extent can the lack of executive functioning affect

18   a defendant's competency?

19   **A.**  Yeah.  I mean, someone who had severe executive functioning

20   deficits would have a hard time with organizing, planning,

21   maybe speaking, communicating, physically functioning, moving,

22   relating to people.  Someone with no executive -- I mean, I

23   don't even know if that's a term even used, "no executive

24   functioning."  I don't think that's possible.  But people who

25   have very limited executive functioning or executive

*JENKINS - DIRECT*                                                    90

1   functioning deficits have issues with their everyday ADLs in

2   addition to just managing their bodies and their minds.  They

3   have severe functioning issues.

4   **Q.**   Throughout your evaluation of the defendant, what level of

5   executive functioning did he demonstrate?

6   **A.**   I mean, it's hard to put a level, but I didn't feel like --

7   I didn't feel like he had severe deficits in executive

8   functioning at all.

9   **Q.**   On page 14 of your report, you note that the defendant's

10  dad said that he has significant disabilities and, quote, "no

11  idea how to make a decision."  Is that consistent with your

12  observation?

13  **A.**   No, it's not.

14  **Q.**   Why not?

15  **A.**   I feel like Mr. Marks was able to make decisions.  I mean,

16  he made the decision right off the bat to go to SHU.  That was

17  despite speaking to me, despite me explaining to him the

18  process and that he would be safe and alone for those 14 days

19  in quarantine.  He still made a decision that he felt

20  comfortable with, to put himself in SHU for his own protection.

21  I think that's one really big example of him making a decision.

22  So, no, I think he is able to make decisions.  I think he leans

23  on the people he cares about and the people he trusts to help

24  guide him, but, ultimately, he is able to make a decision if he

25  has to.

*JENKINS - DIRECT*

1  **Q.**  Did the defendant demonstrate ability to rationally apply

2  knowledge?

3  **A.**  Yes, I think so.  Anything that he learned within the

4  facility, he was able to utilize, so, for example, like I

5  talked about identifying who his unit team was, his counselor,

6  his case manager, and what needs he can get met from them.

7  Once he had that information, he was then able to utilize it.

8  He found them.  He was able to get his phone system hooked up.

9  He was able to talk to his counselor when it was time to leave

10  on what information needed to be sent or received to allow him

11  to leave.  So that's just one example of him being able to

12  learn something and then utilize it.

13  **Q.**  Did he demonstrate ability to vary his decision-making

14  based on changes in facts or circumstances?

15  **A.**  Yeah, I think so.  One -- one decision-making example

16  that's really significant is I asked Mr. Marks -- because, you

17  know, he did share with me that he loves and he trusts his

18  father, and he listens to his father and he also trusts his

19  attorney, Mr. Mahoney.  And I asked him, you know, "What if

20  your father and Mr. Mahoney give you different advice?  Then

21  what do you do?"

22      And he very clearly stated that he loves his father and he

23  knows his father has his best interests but that he would lean

24  on Mr. Mahoney's guidance because he's a lawyer and he

25  practices law, so he would be more knowledgeable when it comes

*JENKINS - DIRECT*                                         92

1    to giving him guidance.

2         To me that was very significant because then he's making a

3    decision between two people that he trusts, but he's making a

4    rational decision to go with the person that has more

5    experience.  I think that was a huge example of how he can make

6    a decision.

7    **Q.**  Let's talk about your competency interview.  How many times

8    did you do a competency interview with the defendant?

9    **A.**  Oh, man.  We -- we -- it's kind of ongoing as well.  I

10   mean, we meet with him.  If there's things that we think he's

11   struggling with or if we have to educate him on something,

12   we'll ask him again.  So throughout my evaluation, you'll see

13   that something was asked and then it might have been asked

14   again 7 days later, and then 13 days later, and then maybe even

15   21 days later; and that was our way of showing he was able to

16   retain information, he was able to express it over time, that

17   he wasn't just parroting as, you know, it was said in one of

18   the other reports, that he wasn't just saying back to me what I

19   told him.  He was able to retain it over weeks at a time and

20   still discuss it rationally.

21        So the competency -- it's hard to say how many interviews

22   or when they were.  It was kind of ongoing once we start that

23   process, but we make sure if there's anything at all that we're

24   questioning about whether he understands that we keep going

25   back to it until we're confident that he -- he gets it or at

*JENKINS - DIRECT*

1   least he knows enough to move forward.

2   **Q.**  Do you have --

3           **THE COURT:**  Ms. Chang, let me have one second.  It's

4   noon.  I'm just trying to factor in when we can break for

5   lunch.  About how much more questioning do you have?  And you

6   can take as long as you need.

7           **MS. CHANG:**  I appreciate that, Your Honor.  I have

8   been cutting things out along the way just as my own decision.

9   I have about 70 more questions.

10          **THE COURT:**  Okay.  Then why don't we do this.  Is this

11  an okay stopping point for you?  It's not going to cut off your

12  questioning?

13          **MS. CHANG:**  Not at all, Your Honor.

14          **THE COURT:**  Let's take our lunch break now.  I think

15  it's exactly -- well, according to my clock, it's exactly noon.

16  So we'll take a one-hour break.  We'll come back at 1:00 P.M.

17  sharp.

18          What I would ask, Dr. Jenkins and Ms. Bennett, if you

19  would please log on about five or ten minutes early just so we

20  can make sure that the Zoom connection is still working so we

21  can start promptly at 1:00, and then we'll go ahead and finish

22  Dr. Jenkins's direct, and then we'll get into

23  cross-examination.  We're going to go to 5:00 today, until we

24  get to a good breaking point, and just keep moving along.

25          So, with that, we'll be in recess.  Thank you.

*JENKINS - DIRECT*                                           94

1          (Recess at 12:00 P.M. until 1:02 P.M.)

2              **THE COURT:**  Anything we need to take up, Ms. Chang,

3     before we proceed?

4              **MS. CHANG:**  No, Your Honor.

5              **THE COURT:**  Mr. Mahoney, anything we need to take up

6     before we proceed?

7              **MR. MAHONEY:**  Thank you, Judge.  No.

8              **THE COURT:**  All right.  Very good.  Go ahead,

9     Ms. Chang.

10    **BY MS. CHANG:**

11    **Q.**  Dr. Jenkins, if you could unmute.  Thank you.

12         We were talking about your competency interview.  Do you

13    have a set list of questions that you ask?

14    **A.**  Yes.  We have a standard set of questions that we ask

15    related to competency.

16    **Q.**  And who drafted that list of questions?

17    **A.**  To be honest, I'm not sure.  When I got hired, they

18    existed, and then we each kind of tweak them to our liking.  So

19    mine has definitely been adopted by me and changed over

20    the years, but the initial person, I'm not sure.

21    **Q.**  Did you go through the entire list of questions every time

22    you conducted a competency interview with Mr. Marks?

23    **A.**  No.

24    **Q.**  How long were your interviews each time?

25    **A.**  I think I said before the interviews with Mr. Marks was

*JENKINS - DIRECT*                                              95

1    from one to three hours each session.

2    **Q.**  And was the defendant able to maintain concentration during

3    these competency interviews?

4    **A.**  Yes.

5    **Q.**  Did he require any breaks?

6    **A.**  We offered breaks.  He didn't request any.  But if we did

7    any psychological evaluations, we might have given him a

8    few minutes if he needed to use the bathroom or something like

9    that.  But for the most part, he kind of just wanted to power

10   through.

11   **Q.**  Did you get the sense that he was following along?

12   **A.**  Yes.

13   **Q.**  How did you -- why?  Why did you have that sense?

14   **A.**  He was attentive.  He was receptive to what we were saying.

15   He was able to engage in meaningful back-and-forth

16   conversation.  At no time did he seem not oriented or to not

17   understand what we were doing or even why we were doing it.  He

18   just seemed like he was there.  He was there, he was present,

19   and he seemed to understand what was going on.  And he also has

20   had a lot of experience with it.  This is -- this is one of

21   many evaluations he's had over the last few years.

22   **Q.**  I think you alluded to this before, but I just want to make

23   sure we cover it.  At some point did you ask about the

24   defendant's charges?

25   **A.**  Yes.

1    **Q.**   What did he say his charges were?

2    **A.**   I don't remember verbatim.  It's probably in my report, but

3    I know he said that there was a production charge, I think a

4    possession charge, maybe a distribution.  There was three

5    different charges, and they were all sex offense related, and

6    he was able to provide the full name of the charges when asked.

7    **Q.**   Okay.  So looking at page 28 of your report, third full

8    paragraph, when asked what he's currently charged with, he

9    responded "production charge, possession of child pornography,

10   and receipt."  Those were in quotes.  Is that accurate?

11   **A.**   Yes.  If it's in quotes, it's accurate.  It's been a while

12   since I've done the evaluations, so yes, the quotes would be

13   accurate.

14   **Q.**   And was there anything behaviorally that he did during that

15   particular exchange?

16   **A.**   Yes.  He was aware of his surroundings.  Mr. Marks made

17   sure to look around, that there was no other person present

18   that could overhear what he was saying.  When he did finally

19   verbalize the charges, he did so in a lower manner than he had

20   been normally talking, which to me was indicative of someone

21   trying to be protective so no one could hear what was being

22   said.  And then I also acknowledged that I understood why he

23   was speaking low, and he shook his head in agreement, and I

24   told him I appreciated him being careful and that we would also

25   be careful with that information.

*JENKINS - DIRECT*

97

1   **Q.**  Were there any other points in his interviews that you

2   recall where he similarly looked around to check his

3   surroundings or spoke in a lower voice?

4   **A.**  No.  He only presented that way when talking about the sex

5   offense charges.

6   **Q.**  Was he able to explain what production, possession, and

7   receipt meant?

8   **A.**  Yes.  In his own terms -- for example, receipt -- when we

9   asked him, "What does that mean?" he said, "Well, I got them

10  from people."  So he knew what receipt meant, to receive the

11  pictures.

12      When asked, you know, "What was child porn?  What is that?"

13  he was able to describe it as being pictures of children

14  underage.  When asked what kind of pictures, he was able to

15  specify that they were, like, naked or sexual in nature.  So

16  when, like, kind of pushed to explain it more, he was able to

17  do so and suffice, and that's why we didn't go any deeper.

18  **Q.**  In your opinion, does the defendant understand the severity

19  of his charges?

20  **A.**  Yes, I think so.

21  **Q.**  Why do you believe that?

22  **A.**  Because Mr. Marks understood that they were serious.  He

23  identified them as serious.  I'm trying to remember the exact

24  amount of time.  I know at one point he said up to 40 years.  I

25  think he also had said at one point 10 to 30 years were the

1    possible consequences.  So he knew that there was a substantial

2    amount of prison time he could get if found guilty.

3        He also knew -- and I think I discussed this earlier, that

4    there could be restrictions on his ability to use computers or

5    Internet moving forward due to the nature of his crimes.  In

6    fact, at the facility I explained to him that he needed to

7    speak to his unit team in order to be able to set up his phone

8    so that he could speak to his family, and he was very hesitant

9    at first.  You know, he said, "I'm not allowed -- I'm not

10   supposed to be on the computer."  So he knew -- he was aware

11   that these charges were impacting him even now and would in the

12   future.

13       And so I explained to him that he's not the only inmate at

14   the facility with charges sexual in nature, and that even with

15   that he's still permitted to be able to remain in contact with

16   his family, and he would just have to talk to his unit team to

17   get it set up so he could speak to them, and eventually he did.

18   **Q.**  On pages 28 through 30 of your report, you set forth a lot

19   of the defendant's responses to your competency-related

20   questions.  And I'm not going to go over them one by one

21   because they're in your report, but what is your overall

22   assessment of the defendant's factual understanding of the

23   proceedings against him based on his responses?

24   **A.**  Yeah.  Based on his responses, I felt like he had a factual

25   understanding of most legal terms and the court process.  A lot

1  of the information, he knew already.  There were a few terms

2  that we might have had to educate him on, and it then appeared

3  that he understood the definition but maybe just didn't

4  remember the term.  But, yeah, it was in -- it was my opinion

5  that he had a factual understanding.  He was able to talk about

6  them, provide accurate definitions when asked multiple times.

7  The definitions were consistent.  He was able to rephrase it in

8  his own words when he did need education, and he was able to

9  retain that information.

10      And then when I did review some of the other competency

11  evaluations, he answered similar questions in a similar nature,

12  showing that he understood the factualness of those -- those

13  terms.

14  **Q.**  Did he get everything correct?

15  **A.**  No.

16  **Q.**  And why is it your opinion that he's competent?

17  **A.**  Yeah.  So one can be found competent and not get everything

18  correct.  In fact, there are many people that are found

19  competent that don't get everything correct.  He knew enough to

20  be found competent, and the things he did not know, he was able

21  to demonstrate a learning and understanding and retention of,

22  which sufficed in his competency.  So he -- he was deemed -- I

23  found him competent because he knew enough to move forward and

24  the things he didn't know, he was able to learn, retain, and

25  then utilize.

1    **Q.**  Did you consider the fact that maybe he didn't understand

2    and maybe he was just parroting things that he had heard

3    before?

4    **A.**  Yeah, sure.  I mean, we always have to keep that in mind,

5    and that's why we ask for him to rephrase it in his own words

6    so that way he's not just saying back verbatim what I or what

7    my student might have explained him -- explained to him a

8    definition to be.  And so that's one really good way to

9    determine he's not parroting, because he's saying in his own

10   words different from how he heard them, able to retain it, and

11   then reiterate it at a later time.

12   **Q.**  So based on the fact that you considered that, is it your

13   opinion that the defendant just parroted back the responses

14   that are set forth in your report at pages 28 through 30?

15   **A.**  I'm sorry.  Can you ask that question again.

16   **Q.**  Sure.  In light of the fact that you considered the

17   possibility of parroting and you addressed it, is it your

18   opinion that the defendant merely parroted back the responses

19   that are set forth in your report at pages 28 through 30?

20   **A.**  No, I do not believe he was parroting his responses.

21   **Q.**  You stated -- okay.  Were there times when the defendant

22   said he didn't know the answer?

23   **A.**  Yes.  I believe there were times where he wasn't sure or he

24   didn't remember, and that's when education came in.

25   **Q.**  And did he successfully remain educated thereafter?

1    **A.**  Yes.  For the majority of things, he did.

2    **Q.**  Did he appear to put forth competent -- I'm sorry -- effort

3    in your -- did he appear to put forth effort in your competency

4    interview?

5    **A.**  Yes, I believe so.  He was attentive.  He was respectful.

6    He was cooperative.  He answered everything that was asked of

7    him.  He didn't present as frustrated or overwhelmed.  I

8    believe he put forth good effort and consistent effort.

9    **Q.**  Was he ever hesitant in answering questions?

10   **A.**  Yeah.  There were a few times he was a little hesitant,

11   and, you know, it's hard to differentiate if he was just

12   nervous talking about certain things or just nervous about the

13   situation.  But, again, over time he definitely became more

14   comfortable, and he reported being more comfortable.  But I do

15   think that's part of, you know, the social issues or the

16   social, like, anxiety that I diagnosed him with.  He does

17   present sometimes as, like, a hesitant or nervous person.

18   **Q.**  Given your evaluation of him, is it your opinion that he's

19   hesitant because he doesn't understand what's going on?

20   **A.**  That wasn't my opinion.  I felt like Mr. Marks -- again, I

21   said this -- is very smart.  I think he is aware of what's

22   going on.  I think he's nervous and scared because it's a --

23   it's a legal situation.  There's severe consequences.  So I

24   think he's rightfully nervous.  I think there's a sense of lack

25   of confidence he seems to have.  You know, he's been evaluated

1    a lot.  He's -- he's been hearing people tell him and talk

2    about him having deficits and not understanding things, and I

3    think that also hinders his confidence.  But it was my

4    impression that Mr. Marks understood most of what was going on

5    and knew what was going on.

6    **Q.**  In reviewing Dr. Negrón's three video-recorded interviews

7    with the defendant, did there come a time when you noticed

8    something about the questions she was using in her competency

9    interview?

10   **A.**  Yes.  I was really surprised that her questions -- I

11   believe it was the first video -- were almost verbatim to my

12   competency interview.  Once I started hearing the questions and

13   I realize I knew what the next question was going to be, I

14   looked at my competency interview, and almost verbatim, almost

15   in the exact same order were all of my competency interview

16   questions, which is very odd to me.  And then in the report

17   there was no mention of the usage of my competency interview or

18   even the questions from my competency interview that she

19   utilized.  So that was really surprising to me.

20   **Q.**  And your questions that you use, you usually use those for

21   adults that you evaluate; correct?

22   **A.**  That's correct.  I only evaluate adults for competency and

23   criminal responsibility.

24   **Q.**  How would you compare the defendant's responses to

25   Dr. Negrón versus his responses to you with respect to these,

1    you know, similar or identical competency questions?

2    **A.**   Yeah.  I mean, it was very similar.  He answered very

3    similarly like he did with us, which, you know, the questions

4    were obviously familiar to him because he had just been asked

5    during our evaluation, but he presented very similarly.  He got

6    most of them correct.  Again, his nature is not to be overly

7    detailed or overly verbose, but he got the answers correct.

8    **Q.**   At page 29 you say that the defendant said, quote, "he

9    would decide whether to testify 'if my attorney thought I

10   should.  I would take his advice.'"  What did that mean to you?

11   **A.**   This is -- it wasn't unusual.  It was very standard.  Most

12   of the clients that I evaluate have that same stance.  I mean,

13   that's the whole purpose of having an attorney is having

14   someone who is well versed in the legal system, that hopefully

15   they're able to form a trusting relationship with and,

16   ultimately, they lean on to make the decisions for them because

17   most laypeople are not well versed in the law and are not

18   lawyers.  And so this was not unusual at all.  I hear it a lot.

19   I thought it was very rational of him, and I think it speaks to

20   the trust that he has with his attorney.

21   **Q.**   You said, you know, a lot of these people lean on attorneys

22   for making decisions for them.  Did you get the impression that

23   the defendant believes -- this defendant believes that his

24   attorneys should be making decisions for him?

25   **A.**   Well, I've spoken to Mr. Marks about that, and so he was

1    aware that the decision is his.  Like, he acknowledged that the

2    decision comes down to him as an individual, as a man, as a

3    human being, and as an adult, but that he would -- he made it

4    clear that he does rely on his family, specifically his dad,

5    and his attorney to help guide him or tell him what decision

6    they think is best for him.  So he made that really clear.

7    **Q.**  So in evaluating defendants for competency, wouldn't it be

8    concerning if a defendant just did whatever his attorney told

9    him to do without making a decision for himself?

10   **A.**  I mean, I really think that comes down to perspective

11   because, in my clinical opinion, that's a decision in itself.

12   It's a decision to decide to rely on someone for information or

13   for guidance.  It's a decision to trust an attorney to know the

14   law and to want what's best for you and to be honest with you.

15      There are a lot of defendants that I work with that don't

16   trust their attorney or don't want to work with an attorney or

17   want to be pro se.  So it's interesting that, you know, the

18   decision-making is a big question here because, in my opinion,

19   again, that is a decision, the fact that he's saying "I trust

20   my attorney.  My attorney knows the law.  I trust that my

21   attorney knows what's best for me or can guide me to the best

22   outcome, and so I acknowledge I don't know the law, and I am

23   going to ultimately use that as guidance."  To me that is a

24   decision that he made.

25   **Q.**  Do you think the defendant could testify at trial in an

1    intelligent manner?

2    **A.**   I think he could.

3    **Q.**   Why?

4    **A.**   I think -- yeah, I mean, because Mr. Marks can communicate.

5    He has a story.  He knows his story.  He's aware of his

6    situation.  He's been going through this for years now.  He

7    knows what's going on.  I think with anyone, you know, they

8    would be prepped, I'm sure with his attorney, and they would

9    discuss whatever strategies they're going to have and what's

10   important to them.  But I think Mr. Marks could speak on his

11   behalf if needed to.

12   **Q.**   Do you think he'll be able to follow along at trial and

13   assist his attorneys?

14   **A.**   I do think he can assist his attorneys.  Following along

15   with trial, I believe he can do also, but I did put

16   recommendations in my report that the language should be

17   simplified.  So I think when the attorneys have breaks or when

18   they're prepping or talking to him about things, I think it's

19   important that they utilize language that would be appropriate

20   for Mr. Marks, which would be as simplified as possible.  I

21   also put that I think it's important for him to maybe have

22   breaks or to be checked in on just to make sure that he doesn't

23   get overwhelmed and that he can keep up with what's going on.

24   So do I think it would be an easy task?  No.  But I do think he

25   can do it, and I think with those recommendations, if they're

*JENKINS - DIRECT*

1    received, that it would help assist in that process.

2    **Q.**  So when you say you're recommending that, you know, that

3    everyone take breaks to see if he can follow along, is that

4    because you have doubt as to whether he can follow along?

5    **A.**  No.  I don't think you have to take breaks to see if he can

6    follow along.  I think breaks are helpful, and his attorney

7    saying, "Okay.  This is what the last two hours -- this is what

8    we covered.  Any questions?" kind of just checking in with him.

9        I do think he could become overwhelmed if he's not given a

10   break in an eight-hour period, but I think most people get

11   breaks -- we've even had a break today.  So I just think it's

12   important during these breaks that the attorneys check in with

13   him and make sure that the most pertinent information, he's

14   understanding and retaining, and give him a chance to

15   participate.

16   **Q.**  At page 30 you state that the defendant told you that he

17   talks to the attorneys, but he doesn't know what they're

18   talking about.  You stated that, quote, "Through further

19   discussion, it appears the attorneys' sophisticated words and

20   legal jargon is what Mr. Marks found confusing."  Explain the

21   further discussion that led you to that conclusion.

22   **A.**  Yeah.  I mean, it was just as simple as asking Mr. Marks,

23   "Okay.  You know, when do you get confused?" and "What do you

24   think is the most confusing?" and just really trying to get him

25   to explain his experience with the attorneys and -- and with

1   this whole legal system, and that's what came from him.  You

2   know, he acknowledged that sometimes there are words or phrases

3   that are utilized that he doesn't fully understand and that

4   that's what leads to some of his confusion.  So that came

5   straight from him, and that's why I found it to be a good

6   recommendation that things be simplified and that they check in

7   with him to make sure that he is getting it -- getting the

8   information he needs to understand.

9   **Q.**   Did you sense that he was getting overwhelmed and confused

10  when he talked to you in your competency interviews?

11  **A.**   No, I didn't, and I really just think it's because we came

12  in it having some information, knowing that there might be some

13  limitations there and, again, simplifying how we spoke to him

14  and just being aware.  I mean, that's why I said the sessions

15  were from one to three hours.  I made sure to not pack in too

16  much information at once and to -- to kind of be thoughtful in

17  what we discussed or not doing too many tests on the same day

18  because I didn't want to overwhelm him.  And that's just

19  experience that we have with working with various individuals

20  is that sometimes we just plan things out that way, and,

21  luckily, it was successful with Mr. Marks.

22  **Q.**   You later note at page 30 that the defendant was able --

23  that he was able to explain multiple aspects of his case.  Can

24  you elaborate on that.

25  **A.**   Yeah.  I mean, that just relates to he knew, again, what

1    his charges were.  He knew what he was accused of doing.  He

2    knew possible consequences.  He knew that he had gone through

3    numerous evaluations.  He knew what competency was.  He knew

4    that his competency had been in question.  I don't think he

5    necessarily enjoyed going to all of the evaluations, but he

6    understood that this was for his benefit and to make sure he

7    knew what was going on.  And so he just -- you know, all these

8    major aspects of the case and why he was there and what was

9    going on, he was able to explain to me in his own way, and it

10   demonstrated an understanding.

11   **Q.**  You also stated that the defendant was able to relay his

12   attorneys' strategies to defend him.  Without revealing what

13   those strategies are -- I don't want to know what the

14   strategies are.  But without revealing that, explain at least

15   whether the strategies, as conveyed to you, made sense.

16   **A.**  Sure.  Yes, without revealing, they did make sense.  He

17   understood that these evaluations were -- the hope was that

18   they would be hopeful in his progression with his case.

19   **Q.**  All right.  How do you square the defendant's ability to

20   relay his attorneys' strategies against his statement to you

21   that he didn't understand what his attorneys were saying?

22   Aren't those contradictory?

23   **A.**  I don't think so because when he said he didn't understand

24   what his attorneys were saying, he didn't mean -- I didn't

25   interpret it to mean -- I definitely didn't mean it to come up

1    this way in the report, that he never understood what his

2    attorneys were ever saying to him.  That was specifically when

3    he -- when we asked him what was causing the confusion or what

4    challenges were -- was he having with them.  That's when he

5    discussed, you know, "Sometimes there's language used that I

6    just don't understand."

7         So it's not contradictory to me because he's talking about

8    points in time where he gets confused versus his overall

9    relationship with his attorneys, and I think the fact that he

10   was able to briefly discuss some of the strategies that he

11   understood them to be shows an understanding that his attorneys

12   were working for him, that they wanted his -- they have his

13   best interests, and that there was almost a light at the end of

14   the tunnel; right?  He wasn't going through all of this for

15   nothing, that it was goal oriented in some way.

16   Q.   At page 17 of your report, you note that Dr. Geller said,

17   "It is not sufficient that a client be merely compliant and

18   look to attorneys to be told what to do."  And you've already

19   talked about your opinion on the defendant to make -- you know,

20   and his ability to make decisions.  Did it appear to you that

21   the defendant is comfortable making independent decisions?

22   A.   That's a good question.  I don't think he's necessarily

23   comfortable because, as I kind of discussed a little bit

24   before, he seems to lack a confidence in doing so.  My

25   understanding is Mr. Marks had great parents that have put a

1    lot of resources in his education and his well-being, and so,

2    you know, he hasn't had to do many things independently before.

3    And I think this whole legal situation is definitely out of his

4    comfort zone, and so I don't think it's his norm to have to

5    make big, life-changing decisions or have to think about being

6    completely independent depending on the outcome.  So, no, I

7    don't think he's comfortable with it, but I think he can do it,

8    but I do think it takes him out of his comfort zone, which I

9    think is why we tend to see some of the anxiety and hesitation

10   and kind of just overall lack of confidence when he has to do

11   so.

12   **Q.**  Explain your statement that the defendant, quote, "has not

13   had to make decisions on his own and that he is employing the

14   same decision-making tactic he has used his whole life."

15   **A.**  Sure.  That comes from my observations, Mr. -- Mr. Marks's

16   report, and even his parents' report.  His parents shared with

17   me that they -- you know, they call it "scaffolding."  That's a

18   term that's normally used.  And that's almost, like, parents

19   that are doing everything in their power to protect their

20   children and to make sure their children are taken care of, and

21   sometimes, in doing so, the children lack the ability to be

22   independent or make their own decisions because they've always

23   had good parents to lean on, and that's what happens when you

24   have really supportive parents.

25        And Mr. Marks himself, you know, kind of explained that

1    he's -- he's always had support, and that's what I observed

2    too, is that he's always been supported.  He's always been in a

3    comfortable environment.  Even with being at Aloft, he was in a

4    safe environment.  He wasn't in jail these last few years.  And

5    so when I think someone is protected like that, it limits them

6    from maybe coming out on their own.

7         In addition, he's very young.  He's only, I think, 23 now,

8    and so he's -- he's not that -- he hasn't been an adult that

9    long, and I just think he hasn't had all of the experiences

10   that would warrant him being fully independent and fully

11   confident.

12   **Q.**  So is your statement intended to be a criticism of the

13   defendant's parents?

14   **A.**  No, not at all.  I -- I think they've done a great job.  I

15   think they tried their best with him.  I don't think it's a

16   criticism at all, and I hope it wasn't taken that way.

17   **Q.**  Why do you think he has a good understanding of what his

18   decisions mean?

19   **A.**  Can you rephrase the question.

20   **Q.**  Yeah.  Well, do you think he has a good understanding of

21   what his decisions mean?

22   **A.**  If we're talking specifically to the legal case, I think --

23   I think he has a basic understanding.  I mean, he explained to

24   me, "If I take a plea, I get less time."  He understands that

25   his consequence -- that the consequences of being found guilty

*JENKINS - DIRECT*                                                           112

1    would lead to prison time.  So I think he has a basic

2    understanding of, like, what would happen and how life changing

3    the results of this case would be for him.

4    **Q.**  Do you think he's able to weigh the merits of various

5    defenses?

6    **A.**  I think if they're explained to him in a simplified way, he

7    can.  For example, he understood some of the advantages of

8    taking a plea.  He also understood some of the disadvantages.

9    He knew if he took a plea, he would not have to go to trial.

10   But he also knew that that meant he couldn't appeal because he

11   took a deal, which is what we call it too in the prison system.

12   So I do think he has a basic understanding of how to weigh

13   these options and what they mean.

14            **MS. CHANG:**  I have nothing further, Your Honor.

15            **THE COURT:**  Thank you, Ms. Chang.

16            Before we continue, I want to take just a two-minute

17   tech break.  Mr. Jackson, could you see if we can get the

18   realtime back up and running.  I don't know if it's something

19   the court reporter can handle.

20       (Court at ease.)

21            **THE COURT:**  Okay.  Thank you for your patience.

22            Just to make sure we're clear, I know -- Mr. Goddeyne,

23   I see you up on Zoom, and I know you're going to present some

24   videos, but I want to make sure everybody understanding that

25   only one attorney questions the witness.  So you may be doing

 1    video or whatever, but you're not going to be cross-examining

 2    Dr. Jenkins; is that right?

 3           **MR. GODDEYNE:**  Yes, Your Honor.  That was my -- I

 4    wasn't planning on asking any questions.

 5           **THE COURT:**  Okay.  Perfect.

 6           Go ahead, Mr. Mahoney.  You're up.

 7           **MR. MAHONEY:**  Thank you, Judge.

 8                         **CROSS-EXAMINATION**

 9    **BY MR. MAHONEY:**

10    **Q.**  Good afternoon, Dr. Jenkins.

11    **A.**  Good afternoon.

12    **Q.**  I'm Mark Mahoney.

13           In -- excuse me.  In your undergraduate work, did you take

14    any courses having to do with developmental disabilities or

15    autism specifically?

16    **A.**  My undergraduate work, I majored in psychology and criminal

17    justice, so part of the psychology degree goes over various

18    diagnoses, but there's not a specific course only on autism.

19    **Q.**  All right.

20           **THE COURT:**  Mr. Mahoney, would you move that

21    microphone a little bit closer up to you.  Thank you very much,

22    sir.

23    **BY MR. MAHONEY:**

24    **Q.**  Do you know if there were at Elon University?  Were there

25    courses on autism or developmental disabilities?

1    **A.**  I'm not sure.  I was a psych major, so all of the major

2    psych courses, which would include autism, I had to take.

3    **Q.**  Well, did they include autism?

4    **A.**  They talked about developmental disabilities, which autism

5    falls under.

6             **THE COURT:**  Mr. Mahoney, I'm going to need you to pose

7    a question, sir.

8    **BY MR. MAHONEY:**

9    **Q.**  Do you remember the name of that course?

10   **A.**  From my undergraduate school?  No.

11   **Q.**  Okay.  At Chapel Hill did you take any courses involving

12   autism?

13   **A.**  We took courses that went over developmental disabilities,

14   various ones, which, again, autism falls under.

15   **Q.**  Do you remember any particular -- that that course talked

16   about autism specifically?  Do you remember anything from that?

17   **A.**  Can you rephrase the question.  Can you repeat it.

18   **Q.**  Do you remember anything from that course about autism that

19   you could mention to us?

20   **A.**  Do I remember anything in the course from my graduate

21   program about autism?

22   **Q.**  Yeah.

23   **A.**  Sure.  We talk about different developmental disabilities,

24   autism being included, and so that typically means talking

25   about different treatments, different ways to diagnose autism,

1    prevalence, things like that.

2    **Q.**  All right.  What about in your doctoral level at Carlos

3    Albizu?  Did you take any autism courses there?

4    **A.**  It's not typical that courses will be specifically named

5    autism.  Typically, it'll be psychiatric illnesses and

6    developmental disorders or diagnosis overall, and so, yes, we

7    always talk about all of the developmental disorders, including

8    autism.

9    **Q.**  Prior to -- since you completed your education, getting

10   your degree -- by the way, what's the difference between a PsyD

11   degree and a PhD in psychology?

12   **A.**  What's the difference between PhD and PsyD?  Is that what

13   you're asking?

14   **Q.**  Yes.

15   **A.**  A PhD is a doctorate in philosophy, and so many people have

16   different PhDs in various topics.  You can have a PhD in

17   nursing, psychology, education.  PsyD is specific to

18   psychology, so it's a doctorate in psychology.  So that's the

19   difference between a PhD and PsyD.

20       Another difference is PhDs typically have a research

21   component, whereas PsyDs are more clinically related.  So

22   people that get PsyDs tend to have more clinical, hands-on

23   experience with treatment and assessment versus some PhD

24   programs are strictly research and don't have as much hands-on

25   experience with clients.

1    **Q.** Well, are you saying that there are no PhD programs where

2    they have as much clinical experience as you would have had?

3    **A.** No.  I can't speak on every PhD program that exists.  I

4    just know that, generally, PhD programs have a strong research

5    component whereas PsyDs are mostly clinical.

6    **Q.** But you don't think that they're talking about philosophy,

7    do you?

8    **A.** I'm sorry?

9    **Q.** You don't think they're learning about philosophy, do you?

10   **A.** That's the name of the degree.  PhD stands for philosophy.

11   **Q.** Of course.  You know, what -- but the point is do you

12   believe that they're spending part of their time doing

13   philosophy and the other part doing psychology?

14   **A.** To be honest, I don't have a PhD, so I don't know exactly

15   what they do, but I do know people that have PhDs in

16   psychology, of course, learn psychology in different -- take

17   courses on psychology.  But the research, again, is very

18   important to those programs.

19   **Q.** Have you taken any kind of training since you got your

20   degree in autism?

21   **A.** I'm sorry?

22   **Q.** Since you got your degree, have you had any training

23   specifically in autism, either diagnosing people with autism --

24   **A.** I thought you said something different.  Sure.  You're

25   asking if I had any training in autism since graduating?

1    **Q.**   That's right.

2    **A.**   Yes.  We take various courses.  Some of them, again -- a

3    lot of courses will specify developmental disabilities because

4    there's many more developmental disabilities than just autism.

5    But, yes, I've had courses that have taken -- have talked about

6    autism specifically, but a lot of times it's the overarching

7    developmental disabilities or neurodevelopmental disabilities

8    that they focus on, which includes autism.

9    **Q.**   Can you tell us about one of those courses and what it --

10   how it dealt with the issue of autism.

11   **A.**   Sure.  It talks about -- especially specific to working in

12   a correctional facility, there's trainings on how to help

13   individuals or inmates specifically that have developmental

14   disorders, including autism, how they might differ from the

15   other inmate population, what kinds of needs they might have or

16   what kind of difficulties they might have, how to help advocate

17   for them, our staff, like line staff or custody staff that

18   might not have a lot of experience with them, things like that.

19   **Q.**   Did that involve diagnostics, in other words, diagnostic

20   criteria or particular deficits related to autism?

21   **A.**   Most -- most trainings go over initially the diagnostic

22   portion before they jump into whatever is the specificities of

23   the training is.

24   **Q.**   Do you remember anything in particular about that training,

25   about how autism -- autism features affect somebody being in a

1    prison setting, for example, if that's what it was about?

2    **A.**   Sure.  So, for example, some people with autism are very

3    sensitive to noises, and so being that the correctional

4    facility at times can be very loud, that's something to take

5    into account in how you would help one kind of cope with that

6    or at least let other staff be aware that this is something

7    that this person might be sensitive to so that they can

8    understand if that person, for example, is having, you know, an

9    issue or a moment and they're not able to maybe listen to fully

10   what staff is telling them to do.  That's an example.

11   **Q.**   All right.  And in Steven Marks's case, did you investigate

12   the extent of his sensory issues, including sensory

13   sensitivities to sounds?

14   **A.**   We discussed it during the interviews.

15   **Q.**   In the interviews where it was too loud, you talked about

16   it being too loud; right?

17   **A.**   I think during the psychological assessment, I mentioned

18   that it was loud during that assessment.  I acknowledged that.

19   **Q.**   Yes.  But did you ask Steven how that affected him?

20   **A.**   During that specific session, I asked him if he was okay,

21   if he had any trouble paying attention, and he said he was

22   okay.  I think by that time he kind of got used to some of the

23   loud noises in the special housing unit.  But, again, it wasn't

24   consistently loud.  There were just periods of time where you

25   could overhear different commotions or things that were

1    happening.

2    **Q.**  Do you think when Steven says that he's okay and he's okay

3    to continue -- do you think it -- it warrants deeper probing

4    into whether -- what his real feelings are?

5    **A.**  I think it depends, because that would be assuming he's not

6    telling me his real feelings, and I like to give people the

7    benefit of the doubt.  In addition to what he reports, it's

8    also important as a clinician to have observations, and so if

9    he was saying one thing but his body's physiological reaction

10   is something different, then I would, of course, ask more

11   deeper questions or maybe ask him again, but that really wasn't

12   the situation that we dealt with.

13   **Q.**  Are you aware of it being typical or of it being a typical

14   autism feature to mask one's inner feelings and want to be

15   compliant and complacent and get along with whoever they're

16   dealing with and not advocating for their -- what might be

17   their inner feelings?

18   **A.**  I don't think that's typical of everyone with autism.  I

19   think there are some people with developmental disorders that

20   might not fully be able to express how they feel or they might

21   have difficulties expressing how they feel, but I don't think

22   that's typical of everyone with autism, that no one with autism

23   is able to authentically express themselves.  And, in fact, in

24   my experience, that hasn't been the situation with everyone

25   that has had autism that I have worked with.

1    **Q.** All right. I'm sorry. Did you think that was my question,

2    whether everybody with autism had difficulty expressing their

3    inner feelings?

4    **A.** I thought I understood you saying that that was a typical

5    representation, so I just wanted to clarify that there are

6    other representations that might differ from that.

7    **Q.** Is that typical of some people with autism?

8    **A.** Some people, yes.

9    **Q.** All right. And how typical is that of Steven?

10   **A.** Can you ask the question fully.

11   **Q.** Yeah. How typical is it of Steven that he has difficulty

12   letting people know what his real feelings are and he would

13   rather just go along or get along with other people and not

14   advocate for himself?

15   **A.** I don't know how typical that is of Mr. Marks in totality

16   because I didn't experience him that way. He actually did

17   advocate for himself in certain circumstances, and when I asked

18   him how he was feeling, he appeared to be honest, whether it

19   was telling me he was nervous or scared. So that wasn't my

20   experience of him at least during the evaluation.

21   **Q.** What -- what experience did you have that he did advocate

22   for himself?

23   **A.** I talked about him asking to go to SHU despite us

24   discussing the quarantine process and me letting him know he

25   would have more freedoms if he wasn't in SHU, the special

1    housing unit.  He still felt the need to be placed in SHU for

2    his protection, and so he was.

3         Excuse me.

4         He also advocated for himself about when it was time to

5    leave, asking me how many more sessions we had, when I thought

6    I would release him, and then, of course, also talking to unit

7    team staff members to figure out who needed to send what

8    document to whomever to facilitate his release.  He advocated

9    for himself when it was time to get phone privileges.  I

10   explained to him that despite his charges and restrictions he

11   might have with the computer, he's still able to speak to his

12   family, and so we advocated on his behalf by speaking to unit

13   team and getting that set up.

14   **Q.**  All right.  So do you know, for example -- you kept saying

15   the phone privileges.  He's got other inmates around as well;

16   correct?

17   **A.**  Are there other inmates around --

18   **Q.**  Yeah.

19   **A.**  -- in the facility?  Yes.

20   **Q.**  Do you know to what extent they assisted him in figuring

21   this out?

22   **A.**  No.

23   **Q.**  In terms of when he was going to leave, by that time he had

24   finally learned how to engage in phone contact with his

25   parents; correct?

1    **A.**   Yes, that's correct.

2    **Q.**   And weren't there phone calls with the parents talking

3    specifically about "When are you going to get out of there?

4    Aren't they supposed to be done with the evaluation?"  Right?

5    **A.**   Yes, I do remember hearing conversations about when he

6    would be able to leave with his parents.

7    **Q.**   So he's -- he's advocate- -- quote -- you say "advocating."

8    He was being prompted by his parents to find out what's going

9    on; correct?

10   **A.**   No, I don't think that's correct.  In fact, there was one

11   phone call where Mr. Marks was saying he wanted to go talk to,

12   I think, the unit counselor or case manager, and his parents

13   actually told him they didn't think it was necessary, and he

14   actually explained to them, actually, you know, "That person is

15   here, and they are responsible.  They said they would help me

16   with the -- with me leaving, so I do think it's a good idea to

17   speak to them."  So in that situation he actually wasn't

18   prompted by his parents to do it.  He advocated for himself and

19   went and got the information he felt he needed.

20   **Q.**   Well, he actually -- what you just said is that he had been

21   promised by that person they would help him.

22   **A.**   I don't believe that's what I said.

23   **Q.**   I think that you said that Steven said there's somebody who

24   told him that they would help him when it came time for him to

25   be released.

1   **A.**   I believe I testified earlier that I told him that there's

2   a unit team person he could speak to, and I let him know that

3   was, like -- I identified that's a person he could go to for

4   information.   And that's what he did.   He went and spoke to

5   that person.

6   **Q.**   In terms of choosing to go to the SHU, you're calling that

7   advocating for himself.   But from the -- everything you've

8   said, first Steven was afraid when he got into this facility at

9   the outset.   It just was that was something that seemed safe to

10  him; isn't that right?

11          **MS. CHANG:**   Objection, Your Honor.   The attorney

12  appears to be testifying.

13          **THE COURT:**   I agree, Mr. Mahoney.   You need to pose

14  questions, please.

15  **BY MR. MAHONEY:**

16  **Q.**   Steven was -- came into the facility afraid; right?

17  **A.**   He was nervous, yes.

18  **Q.**   To be honest, MCC is a very scary place, isn't it?

19  **A.**   I don't know exactly what you mean by that.

20  **Q.**   Well, just the idea of going to a place like that would be

21  scary to somebody like Steven, isn't that -- do you think

22  that's true?

23  **A.**   I think it would be scary for anyone to go to a federal

24  prison.

25  **Q.**   Was MCC more scary than others?

*JENKINS - CROSS*                                                124

1    **A.**  I don't know if I could answer that.  When you say "more

2    scary than others," what others are you specifically talking

3    about?

4    **Q.**  Well, I'm specifically talking about the conditions at MCC.

5    **A.**  Yeah.  I'm not sure of the question.  Can you rephrase it.

6    **Q.**  MCC was decommissioned because it was basically unlivable;

7    correct?

8              **MS. CHANG:**  Objection, Your Honor.  Relevance.

9              **THE COURT:**  Mr. Mahoney, I believe this goes far

10   afield from the scope of direct.  So ask your next question.

11   **BY MR. MAHONEY:**

12   **Q.**  So, anyway, Steven going to SHU -- you feel he was

13   advocating for himself rather than just trying to protect

14   himself?

15   **A.**  I think it was both.  I think he was advocating for his

16   protection.  I think he believed he would be better protected

17   or more comfortable in SHU, and I think that's why he advocated

18   to be placed in SHU.

19   **Q.**  Well, when you say "advocated," he just asked, and they

20   agreed; correct?

21   **A.**  I believe asking for something that you believe is in your

22   well-being is advocation.

23   **Q.**  But he was told that was a choice he had if he wanted to be

24   safe; isn't that true?

25   **A.**  No.  I never told him that was a choice he had.

1   **Q.**  So he figured out himself to ask about going to SHU?

2   **A.**  I'm not sure how he initially found out what the SHU was,

3   but when I spoke to him, I explained to him the process of

4   quarantining and that he would not be in general population

5   amongst a lot of inmates.  And despite me discussing that with

6   him, letting him know that I would check on him, he would have

7   limited contact with other inmates, by the next morning he was

8   in SHU; and when I spoke to him, he said it's because he felt

9   uncomfortable going to the unit.

10  **Q.**  Are you suggesting that Steven, on his own, sort of

11  researched the issue of whether there's some other kind of

12  placement in MCC than general population?

13  **A.**  No.  What I'm saying is I never offered him the opportunity

14  to go to SHU and that he knew about it.  How he found out about

15  SHU, I don't know, but he made a decision that SHU would be a

16  better placement for him, and he advocated for himself to be

17  placed into SHU.

18  **Q.**  You said you had work experience with people with autism.

19  Could you tell us what that experience was exactly.

20  **A.**  Sure.  During my undergraduate I worked as a one-on-one

21  professional with several people with autism at different

22  points in time.  I also worked at a group home with individuals

23  that had developmental disorders, some of them co-occurring,

24  with some of those developmental disorders being autism.  So I

25  have hands-on experience with line work, if you will, with

1    working with individuals on the spectrum in addition to other

2    developmental disabilities.

3         I was also a Medicaid service coordinator for some time,

4    and the main role of that job is to help parents and people

5    with developmental disorders obtain different resources for

6    their children with developmental disorders, again, including

7    autism.

8    **Q.**  And you said you had diagnosed people with autism?

9    **A.**  Diagnosed and confirmed, yes.

10   **Q.**  Diagnosed and what?  Confirmed?

11   **A.**  Confirmed, yes.

12   **Q.**  And can you tell us where was that?

13   **A.**  That was through some of my graduate school training and

14   then also as a professional within the Bureau of Prisons as a

15   licensed psychologist.

16   **Q.**  Okay.  Can you just give me a general idea of how -- what

17   procedures you had in terms of diagnosing autism.  Did you

18   learn to use diagnostic instruments that were related to

19   autism?

20   **A.**  There was some that we used at the master's level.  We also

21   used background information, of course, parent interviews if

22   they were available, our own observations of the person as

23   well.

24   **Q.**  Was there any particular treatise or reference work that

25   you became familiar with in making that diagnosis?

1    **A.**  I don't think specifically -- you know, as a licensed

2    clinical psychologist, anyone who is a licensed clinical

3    psychologist is able to diagnose a variety of -- should I

4    continue? -- a variety of mental diseases or illnesses,

5    including developmental disorders.  So anyone with my

6    background is able to provide diagnosis without having

7    specialized training, but, of course, if you're going to go

8    into career-wise some type of specialty, then it's assumed you

9    would get specialized training.  For me, that was forensics.

10   **Q.**  All right.  So you can't think of a particular treatise now

11   or reference work that you used to make this diagnosis?

12   **A.**  I'm not sure what you mean by "treatise" and "reference

13   work."  As a licensed clinician, we rely on the DSM for

14   diagnostic criteria, and then in our training we're always

15   taught to get multiple data sources.  So, again, that can be

16   interviews, that's observations, psychological testing as

17   needed, past evaluations, IEPs, things like that.

18   **Q.**  All right.  And is there a particular reason why, in

19   diagnosing autism, it's important to talk to collateral

20   sources?

21   **A.**  Yes, of course.  I think it's important to talk to

22   collateral sources in any illness but specifically with

23   developmental disorders or autism specifically.  You want to

24   understand that -- the developmental history, and so for

25   individuals that have a developmental disorder or autism, for

1    some of them they may not be able to give all of the

2    developmental history.  They may not know of it.

3        For most individuals wit autism, they're diagnosed very

4    young, so you wouldn't ask a three- or four-year-old, you know,

5    how was their gestation or did they meet their milestone.  So

6    there's just some information some individuals won't know, and

7    that's why we rely on the caregiver or the parent or if they're

8    in a residential or whatever the case is any type of collateral

9    information you can get so you have a full picture of that

10   individual's strengths and weaknesses.

11   **Q.**  Now, is it also the case that it is common in cases of

12   autism that the individuals themselves, to have insight into

13   their own deficits?

14   **A.**  That is the case in certain individuals.  Absolutely.

15   **Q.**  Before -- before you did your evaluation of Steven, had you

16   read -- at what point in time did you read Dr. Geller's report?

17   Was it before you saw Steven?

18   **A.**  No.

19   **Q.**  All right.  Had you read the -- there's some memoranda that

20   the defense provided to you.  Had you read those?

21   **A.**  When we start the evaluation, typically, all that we have

22   and review are the court order and if there's any, like, court

23   documents related to the case.  We like to meet the individual

24   first, have a tabula rasa, if you will, which is just a blank

25   slate, and see how we perceive them.  And then, as the

1    evaluation goes on, my practice is to gather collateral data or

2    start to review collateral data because, to me, it's important

3    that I have my opinion of the person before reading what others

4    might have seen because they might have seen something

5    different, and I want to make sure that I am secure with what I

6    see and what I think first.

7    **Q.**   When you -- at what point in time did you read Dr. Geller's

8    report?

9    **A.**   I would say probably the middle to end of the evaluation

10   period.  I don't have, like, a set day, of course, that I

11   reviewed her report or any of the others.  But, again, I wanted

12   to get a good opinion of how Steven was and start getting some

13   information directly from him first before reading what others

14   have written about him.

15   **Q.**   Did you read the defense motion for a competency hearing?

16   **A.**   Yes.  I believe that was one of the documents I received.

17   I received a lot of documents, more than usual, so it's hard to

18   remember all of them.

19   **Q.**   Did you read it?  The whole thing?

20   **A.**   I don't remember.  I reviewed everything that was sent to

21   me.

22   **Q.**   There was a -- well, when you say "reviewed," I'm just

23   asking did you actually read the whole thing?

24   **A.**   Again, I don't know exactly.  I reviewed everything.  Some

25   things in its entirety.  Other things I just reviewed to get

1    the main grasp of what the document was.  I can't tell you

2    right now because I'm not sure.  I'm sorry.

3    **Q.**  What was your -- what was your main grasp of what the

4    thrust was for the defense motion for a competency hearing?

5    **A.**  I believe that was from you, I believe, and you had

6    concerns about you didn't believe Steven was competent.

7    Mr. Marks, I like to call him.  You had concerns about his

8    cognitive abilities, his memory abilities, and you just had

9    major concerns on whether he was competent or not.  The exact

10   details, I don't remember at this time.

11   **Q.**  There was a memorandum that was submitted along with that

12   motion.  Did you read that memorandum?

13   **A.**  Again, I reviewed everything I received.  I don't remember

14   exactly all of the documents.  I think there were over 60

15   documents.  Some were very lengthy.  But I made sure to review

16   at least by partly everything I received.

17   **Q.**  Okay.  Is there anything more you can tell us about your

18   understanding of what the actual motion or memorandum pointed

19   to as the critical factor in -- or the most critical factor in

20   Mr. Marks's situation?

21   **A.**  Not with a lot of surety because at this point everything

22   is coming together.  I -- I know that you and your team were

23   very concerned about his cognitive abilities, his intellectual

24   abilities.  There were concerns of memory.  You had -- you were

25   concerned about his decision-making.  You were concerned if he

1    is able -- or you didn't believe he was able to provide a

2    narrative.  There were a lot of concerns, but at this point

3    there's been so many documents and videos, I cannot with

4    100 percent certainty say that these were the exact concerns on

5    this document versus this document or this video.  So I

6    apologize.  It's a lot of information.

7    **Q.**  Dr. Geller's report and also our submissions to the Court

8    in our motion for a competency hearing cited a number of

9    articles regarding competency and regarding autism.  Did you

10   read any of those articles?

11   **A.**  Were these the articles that you sent to me last week?

12   **Q.**  I don't -- no, it wasn't last week.  But no, no.  I'm

13   talking about articles that were cited by Dr. Geller in her

14   report or cited in the defense motion related either to autism

15   or the competency determination.  Did you read any of that?

16   **A.**  The only articles that I reviewed were the ones that were

17   sent to me last week as part of your exhibits.

18   **Q.**  All right.  You said there were some benefits to having

19   Steven in custody, and you said that there was some information

20   that -- specifically arising from him being in custody that

21   helped in the determination of his competence.  Can you tell

22   us -- be more specific about what you're talking about.

23   **A.**  Sure.  Overall, I think having any defendant within our

24   care is really -- puts us at an advantage because we get to see

25   a lot more of the individual, whether it's coming from

1    collateral information, again, because being in a facility

2    is -- it's -- there's someone there 24 hours a day, seven days

3    a week.  So at any point in time, I can reach out to an officer

4    at any time and ask, "Hey, how is he doing?  Is there any

5    issues?  Is he eating?  Is he sleeping?  Is he engaging with

6    the other inmates?  Does he come out of his cell?  Is he

7    requesting anything?"

8        And that kind of information you just really don't get if

9    someone is not in custody because, essentially, you meet with

10   them, and then they go home or they go back to wherever they're

11   going, and you don't necessarily know what's going on on the

12   after hours or on the weekends.  So it's really nice to have

13   that information, in addition to e-mails, if they send e-mails,

14   and then we have the phone monitoring system that all inmates

15   are made aware are recorded and can be reviewed by any staff

16   member.  But having that is really helpful because, again,

17   we're getting to see a glimpse of them when they're not with

18   us.  So that in addition to just other behavioral

19   observations -- it's really nice to have that additional

20   information.

21   Q.  Can you point us to any documentation you made of gathering

22   this kind of information?  Did you gather that information in

23   this case with respect to Steven or anything like that?

24   A.  I believe I -- I'm sorry.

25   Q.  Yeah.  Is there any document reflecting this type of

1    information gathering?

2    **A.**   I believe I reported it in -- under behavioral observations

3    and his mental status.  When you say "gathering," I'm not sure

4    what you quite mean, but it's an ongoing process, and so

5    anything gathered that was informative was placed in the

6    report.

7    **Q.**   Right.  So my question is was there any information you

8    got -- for example, did you ask any correction officers about

9    Steven's grooming habits?

10   **A.**   Yes.

11   **Q.**   Is that documented somewhere in your -- in the data that

12   was provided to us?

13   **A.**   In the data provided to you?  I'm not sure.  Again, it's an

14   ongoing process.  It's a constant conversation.  So if I call

15   and I say, "Were there any issues over the weekend?" that's

16   information that I know that I include in my report.  It might

17   not necessarily be written down because it happens all the

18   time.

19   **Q.**   All right.  What was your understanding of the posture of

20   this case at the time Steven came to you?

21   **A.**   Can you rephrase that, please?

22   **Q.**   What was your understanding of what was actually going on

23   in Steven's case at the time that a motion or a competency

24   evaluation was -- was ordered?

25   **A.**   My understanding is that there -- I believe it was a first

*JENKINS - CROSS*                                                    134

1    competency hearing.  What I gathered is that Mr. Marks was

2    deemed not competent, but then I believe Dr. Geller's report

3    was found to be not credible.  I believe -- I think both the

4    prosecution and the defense might have objected or somehow

5    questioned the judge at the time's, I guess, assessment of the

6    situation, and my understanding was that there was a plea that

7    he did sign, but then his competency was brought into question

8    again after he was deemed competent.

9        So it was a little gray, but there was a competency

10   hearing.  At one point he was found not competent.  Another

11   point he was found competent.  There were some experts that

12   were found not credible.  And then there was a plea signed, but

13   then his -- the competency was brought into question again,

14   which I believe led to him going through being evaluated for

15   competency again and ultimately arriving at my facility for a

16   competency evaluation.

17   Q.  All right.  All right.  So I just want to ask you about the

18   Test of Memory Malingering.  First of all, it's not a general

19   test of malingering, is it?

20   A.  No.  It's a Test of Memory Malingering.

21   Q.  And it's -- it was used -- for example, people with

22   traumatic brain injury, whether or not they really did lose

23   their memory and really had a claim or not -- would it be used

24   in that kind of case, for example?

25   A.  Could it be used in that kind of case?  Is that the

*JENKINS - CROSS*

1    question, sir?

2    **Q.**   Yeah, yeah.

3    **A.**   Yeah, it could be used in that case and many others, yes.

4    **Q.**   Now, in your -- first of all, do you think that your --

5    before when I think you testified about this, you said that you

6    mentioned it in your second amended report, the results of it.

7    Are you sure that's the case?  You mentioned the TOMM in that.

8    You mentioned you did it.  Do you think you recorded any kind

9    of result from the TOMM in your second amended report?

10   **A.**   I thought I said that the results were included in my

11   report.

12   **Q.**   Do you know where they are in your report?  In the --

13   **A.**   Well, when I say that, I mean that's why I didn't diagnose

14   him with malingering.  There wasn't enough evidence there, and

15   then that's why I did the third amendment because it was

16   brought to my attention that I didn't explicitly put all of the

17   results, which is why I did the addendum.  But all of the

18   results of all of the testing was utilized when I did my

19   opinion, when I did my diagnosis, when I did my

20   recommendations, and that's one of the reasons why I did not

21   believe he was malingering.  I was able to rule that out, which

22   is why it wasn't a listed diagnosis.

23   **Q.**   All right.  But in the copy of the TOMM protocol or the

24   test itself we got, it was not scored, was it?

25   **A.**   No, it was not fully scored.  We had scored it ourselves,

*JENKINS - CROSS*                                                    136

1  but we never wrote down the number.  That was our error.

2  **Q.**  Don't you score it by writing it down on a page?

3  **A.**  We score it by adding it up.  That's how you do that

4  specific test.  So we were aware of the results, but,

5  unfortunately, we didn't write it down.  So, yeah, the copy

6  that you got did not have the numbers, which is more of a

7  reason why I felt like I needed to do that third addendum.

8  **Q.**  I just want to ask you again when -- in your third report,

9  you call it memory functioning.  You -- you explained why you

10 thought there was some questions about this report, and I -- I

11 just don't understand what you're saying in this.  What -- what

12 is it you think causes concern -- some room for concern in the

13 TOMM as you finally scored it?

14       **THE COURT:**  Mr. Mahoney, can you give me a page number

15 of the report you're --

16       **MR. MAHONEY:**  Page 21 of the third amended report,

17 Judge.

18       **THE COURT:**  Thank you.

19       **MR. MAHONEY:**  Exhibit 16.

20       **THE WITNESS:**  And, Mr. Mahoney, can you rephrase that

21 question.  I don't understand it.

22 **BY MR. MAHONEY:**

23 **Q.**  I just didn't understand what you -- how you described why

24 you thought there was some possible inference of malingering

25 when you scored this TOMM.  Could you explain that.

1   **A.**  Are you asking why I felt the need to give the assessment

2   or why did one of the scores suggest possible malingering?

3   Which are you asking?

4   **Q.**  I'm wondering why one of the scores suggested possible

5   malingering.

6   **A.**  Because the score was three points, which I believe I

7   explained.  The score was three points lower than the cutoff

8   criterium for someone possibly feigning cognitive deficits.

9       Do you see that at the end of the paragraph?

10  **Q.**  Yeah.

11  **A.**  It starts with "of note."

12  **Q.**  Right.  But this in terms of -- you described here that for

13  people without -- this is without -- people without cognitive

14  impairment.

15  **A.**  No.  Of note, Mr. Marks's score only met the criteria for

16  feigning cognitive deficits by three points.  So because of his

17  score on Trial 2, which was a 42 -- that number is lower than

18  what's expected from an individual that would not be feigning

19  cognitive deficit, and so because his score was three points

20  lower than that cutoff, it is a possibility to keep in mind

21  that it's possible that he might have been feigning cognitive

22  deficit.  However, as I continued, conclusions of malingering

23  should be made coupled with supplemental assessment results,

24  symptom reports, and behavioral observations, and all of that

25  additional information that I gathered from Mr. Marks, in my

1   clinical opinion, was that he was not overall malingering,

2   which is why I did not diagnose with him with that.

3   **Q.**  To be malingering, he would have to understand that -- that

4   memory was an issue in the case.

5   **A.**  It's possible, yeah, especially for the TOMM because it is

6   the Test of Memory Malingering.  Most individuals that would

7   malinger on the TOMM would have some indication that their

8   memory is being tested.  And, in fact, when we -- when we

9   administer that, we say that this is the test of memory.  So --

10  so, yes, he would -- he would know that it was about memory,

11  that specific assessment.

12  **Q.**  But did he know how -- how this related to his case, if at

13  all?

14  **A.**  I'm not sure.

15  **Q.**  Did you ever ask him?

16  **A.**  Did I ask him about that?  No.  We don't give a lot more

17  information on some of the assessments we give because we don't

18  want to lead the individual to try to portray someone or not

19  portray someone.  So we don't say we're giving you a Test of

20  Memory Malingering.  We just say it's a test of memory, which

21  is the instructions for the actual assessment.

22  **Q.**  Did Steven understand what the issue was about his

23  competency?

24  **A.**  I think he understood it on a very basic level.  He

25  understood that, you know, the people around him, the

1    attorneys, the parents, thought that he had trouble

2    understanding what was going on.

3    **Q.**  All right.  Didn't he say that he thought the question was

4    about competency was whether he knows stuff?

5    **A.**  That was his very basic initial way of describing it, yes.

6    **Q.**  And wasn't that the way he continued to describe it?

7    **A.**  Well, we gave him more education of what the full

8    definition or a fuller definition of competency would be, and

9    so as we did that and we continued to check in with him, he was

10    able to give us a more detailed definition of what competency

11    was.

12    **Q.**  Okay.  If you would look at -- hold on one second.

13         Before I move on, I want to clear up one thing.  You talked

14    about -- and there was some discussion and you were asked

15    questions about your statement that autism did not appear to

16    impact his daily living skills; correct?

17    **A.**  That's correct.

18    **Q.**  And -- but when you're talking about daily living skills,

19    you're not talking about cognition, reasoning, executive

20    functioning.  You're talking about basic personal hygiene, able

21    to do domestic tasks, and maybe navigating the community;

22    correct?

23    **A.**  No, that's not correct because psychology is not black and

24    white like that.  So, you know, in able -- in doing your ADLs,

25    that is using your executive functioning skills.  I think I

1    discussed earlier that part of executive functioning is

2    planning and organization, and so being able to take care of

3    yourself does take some planning and organization.  You have to

4    know in order to brush your teeth, you're going to need a

5    toothbrush and you're going to need toothpaste, and in most

6    instances you'll need water.  So that's all planning.  It

7    really goes hand in hand.

8    **Q.**  Of course, those are on a very, very simple level; correct?

9    **A.**  Well, I guess it depends on the person because, for some,

10   ADLs are difficult.  For some individuals with developmental

11   disorders, those things that we might find basic are actually

12   more difficult for them.  So I think it depends on, you know,

13   the context and what you're talking about.  To you or I, that

14   might be simple.

15   **Q.**  But deciding how to brush your teeth can't be equated with

16   whether or not to plead guilty in a criminal case, would you

17   agree?

18   **A.**  I think those are two very different things.

19   **Q.**  So there's degrees of mental operation that we're dealing

20   with, and so that when you say that he has -- the daily living

21   skills somehow correspond to executive functioning, if it's a

22   question of somebody just being able to shower and put on clean

23   clothes, that really doesn't necessarily translate into the

24   kinds of competencies that we're talking about that are

25   necessary in a criminal case.  Do you agree?

1    **A.**   Again, I think -- I think it depends, because in competency

2    part of what we're looking at is if the individual has a mental

3    illness or mental defect that is impacting them.  And for

4    someone, for example, with extreme depression that can't get

5    out of bed, that's no longer taking care of themselves, that

6    can affect their competency because they might not have any

7    motivation to live or to take care of themselves or to move

8    forward; and if they don't have motivation for that, they may

9    not be motivated or able to work with their attorney.  So I do

10   thing it's a spectrum, if you will, but I don't think it's

11   black and white.  I think they are correlated.

12   **Q.**   Yes.  Okay.  But being able to get out of bed, being able

13   to brush your teeth doesn't itself demonstrate that the person

14   is going to be able to navigate the kind of choices that are

15   necessary as a criminal defendant?

16   **A.**   Solely, no.

17   **Q.**   When you finally got the progress notes from Aloft, did

18   those notes contain a lot of information indicating he has --

19   that he continued to have problems in daily living skills?

20   problems in hygiene?

21   **A.**   I believe some of the notes did talk about that, yes.

22   **Q.**   Problems with needing to be prompted for everyday tasks?

23   **A.**   I believe that was partially discussed in the notes, yes.

24   **Q.**   Even tasks that he did over and over, day in, week out;

25   correct?

*JENKINS - CROSS*                                                    142

1   **A.**  I believe they did discuss that.

2   **Q.**  All right.  That he in terms of -- they discussed his lack

3   of true friendship with other individuals, problems with

4   reciprocity, and having difficulty in making friends; correct?

5   **A.**  That was discussed also.

6   **Q.**  And Steven himself says he has difficulty making friends;

7   correct?

8   **A.**  He said he had some trouble with, like, understanding

9   sometimes when people were, like, joking or serious, so

10  definitely there were some social concerns there he discussed

11  with me, yes.

12  **Q.**  You have notes from Aloft indicating he had difficulty

13  learning.  He was trained in certain things, and then two days

14  later he totally forgets.

15  **A.**  I believe so.  It was a while ago, and I didn't get them

16  until much later in the evaluation, but I do believe they

17  discussed that.

18  **Q.**  And they also had information that he spoke to them about

19  having a plea deal and not understanding what it was about.

20  **A.**  I don't remember that specifically.

21  **Q.**  Okay.  If we have Exhibit 25 -- do you have Exhibit 25

22  there at page 110?

23  **A.**  Do I need to find it, or is it going to be produced?

24  **Q.**  No.  You've got the exhibits there, I believe.  Defense

25  Exhibit 25.

*JENKINS - CROSS*

1    **A.**  Exhibit 25.  And what page?

2    **Q.**  Page 110.

3    **A.**  I'm sorry.  Page 10?

4    **Q.**  I'm sorry.  No.  110.

5    **A.**  110.  The pages I have are not numbered, so would you like

6    me to count them?

7    **Q.**  I'll try to help you.

8    **A.**  Okay.

9            **THE COURT:**  Yeah, I have the same issue, Mr. Mahoney.

10   Mine are not numbered either.

11           **MR. GODDEYNE:**  Your Honor, may I share screen?  I have

12   the PDF available here.

13           **THE COURT:**  This exhibit was provided to Dr. Jenkins

14   in advance?

15           **MR. GODDEYNE:**  Yes, Your Honor.

16           **THE COURT:**  Then that's fine.  We can try that.

17           **MR. GODDEYNE:**  I apologize, Your Honor.  I -- I am not

18   the host, so I can't screen share it, but we could use the

19   ELMO.

20           **THE COURT:**  No.  We cannot use the ELMO with Zoom.

21           **MR. GODDEYNE:**  Oh.

22           **THE COURT:**  So we will -- we will just carry on.  This

23   was a discussion I had with counsel beforehand.  We mentioned

24   the technology that we have.

25           Go ahead and ask your next question, Mr. Mahoney.

1              **MR. MAHONEY:**  All right.  Do you just have the

2      exhibit, Matt?  The hard copy?

3              I'm sorry, Your Honor.  I just -- I can't figure out

4      the page myself on this.  I have the document, but we

5      couldn't -- Mr. Goddeyne can't display it by Zoom, Judge, to

6      the witness.

7              **THE COURT:**  My understanding -- well, you definitely

8      can't do it via ELMO.

9              Mr. Jackson, do you think we can --

10             **THE COURTROOM DEPUTY:**  Let me see.  Can you try it

11     now, see if it's still saying --

12             **MR. GODDEYNE:**  I'm having a technical issue on my

13     side.  I apologize.

14             **THE COURT:**  All right.  Here's what we're going to do.

15     Mr. Mahoney, this is your one and only opportunity in this

16     entire hearing to get the exhibit straightened out.  We had

17     extensive hearings over the last several months about getting

18     exhibits ready to go.  It is your responsibility to give me an

19     exhibit that had page numbers on it and to give it to

20     Dr. Jenkins, and you did not.  We will take a five-minute

21     break, Mr. Mahoney --

22             **MR. MAHONEY:**  Judge --

23             **THE COURT:**  Mr. Mahoney, please don't interrupt me.

24     I'm going to allow a five-minute break so Mr. Goddeyne can try

25     to get the page up that you wanted to share.  But going

1      forward, the rest of this hearing, if the exhibits are not

2      ready to go, they will not be shared.  And that goes for both

3      sides.  Five-minute recess.

4          (Recess at 2:25 P.M. until 2:34 P.M.)

5              **THE COURT:**  And, Mr. Goddeyne, we have all of our tech

6      issues under control?

7              **MR. GODDEYNE:**  Yes, Your Honor.

8              **THE COURT:**  Very good.  Mr. Mahoney, go ahead.

9      **BY MR. MAHONEY:**

10     **Q.**  So, Doctor, up here we have the notes from Aloft at the top

11     of the page.  This is actually five pages from the end of that

12     document -- the original document.  It indicates that Mr. --

13     Mr. Marks told them that -- at Aloft that he didn't really

14     understand his plea deal.

15     **A.**  Yes, I see that.

16     **Q.**  All right.  And so what -- what these records indicate is

17     that Aloft had significant information that does bear on his

18     daily living skills and his comprehension of what's going on in

19     his case; correct?

20     **A.**  I would say that they had significant information on his

21     functioning at Aloft.

22     **Q.**  And although you've described the process of trying to set

23     up a meeting with them, in principal a meeting was agreed to,

24     and for some reason one day it was not -- where it was

25     scheduled, it wasn't possible; right?

1    **A.**   That's a watered-down version of -- of what I said, but

2    there was an institutional emergency which caused me to call in

3    late -- later than the scheduled time.

4    **Q.**   And why wasn't it rescheduled?  Was it not important to you

5    to talk to these people?

6    **A.**   I wanted to, but I was hitting a lot of resistance from the

7    beginning, and I believe we did discuss rescheduling, and we

8    just never got to set a date and time.  But, again, I was

9    really concerned with speaking to the owner, who my

10   understanding is not a clinician, and wouldn't allow me to

11   speak to another clinician.

12   **Q.**   Did you let, for example, me as Mr. Marks's counsel know

13   that there was some logistical problem like this?

14   **A.**   No, I don't believe I discussed it with you.

15   **Q.**   But eventually you agreed that you would meet with both of

16   them because you saw that this information would be important;

17   right?

18   **A.**   It's not that.  I always thought that it's important

19   information.  It's the fact that there was so much resistance

20   that I felt like let me at least try to meet with them to see

21   what information I could obtain.

22   **Q.**   Right.  And that was -- and so all these problems you

23   initially had, those were over with.  They agreed -- you agreed

24   to meet with them, talk to them both together; right?

25   **A.**   Reluctantly, yes.

1    **Q.**   Okay.  And then one day you were late, and they couldn't do

2    it, so whose job would it be to reschedule that meeting?

3    **A.**   As far as whose job, I am the one that inquired first, but

4    the conversation was so uncomfortable that it did -- I didn't

5    feel like they wanted to talk to me, and so I just was going to

6    settle for the records, and I just asked again that they would

7    send the records over.

8    **Q.**   Well, you got the records, and they pointed out some of

9    these things that we just talked about; right?

10   **A.**   I got the records, and I see on the screen what you were

11   asking me about.

12   **Q.**   All right.  But you also already acknowledged that they

13   pointed out problems to you with daily living difficulties,

14   learning problems; correct?

15   **A.**   Their observations of his time at Aloft, yes.

16   **Q.**   All right.  So they -- he's been there for four years.

17   **A.**   Is that -- is that a question?

18   **Q.**   Were you aware of that?

19   **A.**   I believe he had been there three or four years.  I think

20   that's what he told me, yes.

21   **Q.**   And you thought it was important enough to call them to

22   schedule a meeting, and one had been scheduled.  Was there any

23   barrier to actually having that meeting with them?

24   **A.**   Was there a barrier to having the meeting?

25   **Q.**   Yes.

1   **A.**  Besides the institutional emergency and them not wanting to

2   comply with HIPAA?

3   **Q.**  You already agreed that you would meet them on their terms;

4   right?

5   **A.**  That's correct.

6   **Q.**  All right.  And then it wasn't -- it didn't come off on the

7   one day where you had the institutional emergency; right?

8   **A.**  Say that again, please.

9   **Q.**  The meeting didn't come off on the day of the emergency.

10  You were late.  You didn't call them on that date; right?

11  **A.**  I called them, and Jason said he couldn't speak to me

12  anymore.

13  **Q.**  On that day?

14  **A.**  On that day, yes.

15  **Q.**  The meeting, as far as you know, could have been

16  rescheduled.

17  **A.**  That's correct.

18  **Q.**  And do you not agree it was your responsibility to do that,

19  not their responsibility to reach out to you?

20  **A.**  Yeah.  I think I'm the initial -- I'm the person requesting

21  the information, so, yes, I think it would have been on me to

22  try to set up another meeting.

23  **Q.**  And you didn't do it, did you?

24  **A.**  No, I didn't.  I didn't feel comfortable with doing it.

25  **Q.**  You were asked were there -- first of all, there was

1    testing administered.  In your report you say the testing was

2    administered.  Who administered the tests described in your

3    report?

4    **A.**  Most of the assessments were administered by my student

5    under my supervision and with my observation.

6    **Q.**  And did you -- in terms of your supervision, do you report

7    to anybody on how -- is it Mr. Alava?  Is that his name?

8    **A.**  Mr. Alava.  That's correct.

9    **Q.**  Do you report to anybody on how he's doing or how good a

10   job he did?

11   **A.**  Most of the students, they come from various schools.  A

12   lot of the schools will ask us for an evaluation.  I don't

13   remember if Mr. Alava's school was one of those schools

14   because, again, the students all come from different schools.

15   But we have supervision where I give him feedback on how he's

16   doing and what he can work on.

17   **Q.**  Mr. Alava was an extern; right?  Not an intern; right?

18   **A.**  That's correct.

19   **Q.**  So he was coming there maybe a couple days a week; correct?

20   **A.**  That's correct.

21   **Q.**  Why did you give the MMPI again?  Dr. Montalbano didn't

22   redo it.  It had been redone by Dr. Harvey.

23   **A.**  What's the question?

24   **Q.**  Why did you do the MMPI again?

25   **A.**  I would have to look back and see when it was given and if

1    it was the MMPI-2 versus the MMPI-2-RF to fully answer your

2    question, but that is the assessment that I felt was clinically

3    most relevant at the time, and that's why I gave it to

4    Mr. Marks.

5    **Q.**  You had some questions from Ms. Chang about severe ASD or

6    severe autism; correct?

7    **A.**  Yeah.  I think Ms. Chang asked me about why I felt he was

8    mild, and I think we did talk in some of the discussion about

9    what severe would look like.

10   **Q.**  Right.  Somebody can have Asperger's-type autism that might

11   be clinically described as high-functioning autism and still

12   have severe deficits in certain areas; correct?

13   **A.**  Well, Asperger's doesn't exist anymore, so we're really not

14   supposed to categorize anybody as Asperger's.  It's outdated.

15   But, typically, old-school Asperger's is associated with

16   someone being high-functioning autism.

17   **Q.**  Right.  You're not answering my question.  My question is

18   with somebody who had been formerly diagnosed with Asperger's,

19   who is now diagnosed with ASD, who has cognitive communication

20   abilities and language abilities, and they're cognitively

21   intact, can they, nevertheless, have severe deficits --

22   individual deficits that are related to their autism?

23   **A.**  That's a difficult question for me to answer because,

24   again, Asperger's is usually associated would high-functioning

25   autism and people that are diagnosed with high-functioning

1    autism normally don't have severe deficits, which is why it's

2    categorized as high functioning.  So I'm not really sure how to

3    answer that question because, in the nature of them having

4    deficits, it -- it wouldn't be severe and then also categorized

5    as high functioning.

6    **Q.**  Have you done any research on that?  Is there any

7    literature that you could refer me to that you've looked into

8    on the rate at which people with high-functioning autism don't

9    have -- or have or don't have severe individual deficits, say,

10   in the areas of adaptive functioning?

11   **A.**  No.  I'm not referring to research.  I'm referring to my

12   clinical training and my expertise in observations.  That is

13   how we are trained to evaluate someone.  That's just clinical

14   practice.  That's not research.

15   **Q.**  Well, you saw Mr. Marks's Vineland scores; correct?

16   **A.**  If it was included in -- in one of the various documents,

17   I'm sure I did.

18   **Q.**  Do you know --

19   **A.**  I don't remember them.

20   **Q.**  Do you know the Vineland assessment -- the Vineland scales?

21   Are you familiar with that instrument?

22   **A.**  The Vineland assessment?  Yes, I am.

23   **Q.**  All right.  Have you ever done it?

24   **A.**  Yes, I have.

25   **Q.**  All right.  Is it statistically -- is it a standard test,

1    and is it widely accepted?

2    **A.**   The Vineland?  Yes.

3    **Q.**   All right.  Do you remember what his adaptive functioning

4    scores were, say, in the socialization area or daily living

5    skills area?

6    **A.**   No, I do not.

7    **Q.**   If I suggested to you they are at the level of a small

8    child, would that -- would that surprise you?

9    **A.**   I don't know how to answer that question because there's

10   multiple items on the Vineland.  It also depends when he was

11   administered the Vineland.  So I would need more information.

12   I'm sorry.

13   **Q.**   I want to go through with you a little bit some of the

14   actual forms that were filled out when you did this -- this

15   interviewing of him.  And we're going to be looking at

16   Defendant's Exhibit 53, which is the collection of the

17   materials you provided to us from -- that were prepared in

18   connection with your evaluation of Mr. Marks.

19   **A.**   You said 53?

20   **Q.**   Yes.  But we're looking on the screen because,

21   unfortunately, those pages aren't numbered.

22   **A.**   Okay.  So I don't have to find the physical document?

23   You're going to have it on the screen?

24   **Q.**   No.  At page 120.  Do you recognize -- oh, wait.  I'm

25   sorry.  Yeah, at page 120.  That's at the very end, actually,

*JENKINS - CROSS*                                                 153

1    of the collection of papers, I believe.  Do you have that,

2    Doctor, on May 10th?

3    **A.**  Can I rely on the screen, or do you want me to get the

4    physical copy?

5    **Q.**  You can -- it's at the very end of the package.  If you

6    have it available, it's May 10th, confidential --

7    confidentiality disclosure.

8    **A.**  And you said that's Exhibit 53; is that correct?

9         **THE COURT:**  Dr. Jenkins, this is Judge Hoffman.  You

10   can just use the version that's on the screen.

11        **THE WITNESS:**  Okay.  Thank you.

12        **THE COURT:**  Thank you.

13        Go ahead, Mr. Mahoney.  Ask your question.

14   **BY MR. MAHONEY:**

15   **Q.**  So in that case the -- the statement to Steven in the

16   form -- and was this read to him as it is in the form?

17   **A.**  Yes.  So this is one of our confidentiality disclosures,

18   and so, as you see, it's broken up into four parts.  We read

19   each part.  Then we ask the defendant to tell us back to it --

20   tell the -- what the information back to us in their own --

21   their own words.

22   **Q.**  All right.  So you asked him what it was about, and he

23   said, "I would assume competency"?

24   **A.**  On No. 2, yes.

25   **Q.**  All right.  So he's -- you said, "Competency.  Determine

1    competency," and he said "I would assume competency"; correct?

2    **A.**   No.   I read No. 2 to him, so I read "The purpose of this

3    evaluation is to assist or help," the simplified version, "the

4    Court with determining your competency to stand trial," and

5    then he replied -- or I asked him to rephrase it or to say it

6    back to me.   "Competency.   I would assume competency, ability

7    to understand stuff."

8    **Q.**   Okay.   And what's the little Q thing at the end of that

9    where it says, "Ability to understand stuff"?   What does that

10   little Q --

11   **A.**   The Q stands for query.

12   **Q.**   Okay.   So is that -- is that really what competency is

13   about, is just his ability to understand stuff?

14   **A.**   That's an extremely simplified, basic definition of

15   competency.

16   **Q.**   Right.   But in your report you said he was educated on

17   competency when informed of confidentiality?

18   **A.**   That's correct.

19   **Q.**   All right.   There's nothing here about how he was educated

20   or that he was educated on this form.

21   **A.**   That's correct.

22   **Q.**   So was he educated or not?

23   **A.**   Yes, he was.   That's why the report says he was.

24   **Q.**   Now, when you say "educate," what do you mean?   You just

25   tell him what you think the answer should be; right?

1    **A.**  No, not necessarily.  We provide him information.  So in

2    this case we would have given him additional information on

3    what competency means and how it's relevant to this evaluation,

4    and then we would ask him to again rephrase it, wait some time,

5    ask him again, see if he remembers.  At a later date, do the

6    same thing.  These are just his initial answers to these

7    statements.

8    **Q.**  So are you saying that at this time you tested his

9    understanding?  You just tell him -- what more did you tell him

10   about competency?

11   **A.**  We explained to him that competency is his ability to

12   understand the court proceedings, his ability to work with his

13   attorney.  We want to -- we want to make sure that he

14   understands what he's charged with, possible consequences, that

15   he's able to participate and advocate for himself and assist

16   his attorney in representing him.  We go through all of the

17   aspects of competency in the federal system and make sure that

18   he has an understanding of what it means.

19   **Q.**  And you're satisfied that after that he did understand?

20   **A.**  Yes.  Several times we asked him after that, he was able to

21   retain a more defined definition of competency with us.

22   **Q.**  Now, in terms of confidentiality, he -- he -- his takeaway

23   from confidentiality was that anyone can know what we talked

24   about; correct?

25   **A.**  From No. 3?

1    **Q.**  Yep.

2    **A.**  Number 3; right?

3    **Q.**  Yes.

4    **A.**  Yes.  So, again, we read No. 3 to him, and that was his

5    initial reiteration of what No. 3 meant to him.

6    **Q.**  And it looks like there's "edu" after that.  Does that mean

7    he was educated on some aspect of this?

8    **A.**  That's correct.

9    **Q.**  All right.  Why isn't there an edu after No. 2?

10   **A.**  I just forgot to write it.  I did it but didn't write

11   education.  That's all.

12   **Q.**  If we go now to page 103, which is the May 13th competency

13   interview.  And at this point the question was "What are you

14   here for?"  And he said, "It looks like testing."

15       Did you write this, or this is Mr. Alava's writing?

16   **A.**  Yes, this is Mr. Alava's very poor handwriting.

17   **Q.**  "Testing," and he says, "for competency.  Stuff like this

18   might happen."  Or what else -- do you know what that says

19   there?

20   **A.**  That's what it sounds like to me.  Everything was then

21   typed up, so if there was any additional information, it would

22   be in the competency section in the report.

23   **Q.**  Okay.  But what does that mean?  "Stuff like this might

24   happen"?

25   **A.**  I mean, I don't remember exactly what we were talking

1    about.  This was several months ago --

2    **Q.**  Well, it would have been --

3    **A.**  -- that he's answering -- I'm sorry?

4    **Q.**  No.  I'm sorry.  I didn't mean to interrupt.  I did, but I

5    shouldn't have.

6    **A.**  You know, we asked him what he was here for.  Obviously,

7    what we're looking for is for him to know that he's here for an

8    evaluation.  It's great if they remember, understand that it's

9    court ordered.  He said, "Testing for competency," and then,

10   yeah, it looks like he put stuff like "this might happen."  I

11   always ask my students to clarify when they type it out.  So,

12   again, if there was anything specific to that that needed to be

13   noted, it would be typed out in the report.

14   **Q.**  Well, okay.  But the next question was "What does

15   competency mean to you?" and his answer again was "Ability to

16   understand stuff."

17   **A.**  Oh, you know what?  That's not "stuff."  I'm sorry.  ST is

18   stand trial.  So it's "competency stand trial."  A lot of times

19   when we're doing evaluations, we're trying to look at the

20   person.  We don't want to just have them focus on our notes.

21   And so, one, that leads to poor handwriting, but, two, it leads

22   to short writing.  So the same way you didn't know what Q was,

23   ST is actually to stand -- stand trial, so it's competency to

24   stand trial.

25   **Q.**  Well, no.  He says, "Competent to understand" -- this is

1    what's written down here as his answer by Mr. Alava:

2    "Competent to understand ST."  So you think he said competency

3    to understand stand trial?

4    **A.**   I think he meant guess your ability to understand

5    competency to stand trial, yeah.  That's his shorthand.  You

6    have to write in shorthand a lot.

7    **Q.**   Okay.  And was that -- was that enough of an answer about

8    what competency means to him?

9    **A.**   No.  This is probably one of those questions we had to

10   educate him and ask him various times afterward.

11   **Q.**   All right.  There's no notation here that there's any

12   education at this time, is there?

13   **A.**   No, he did not write education.

14   **Q.**   Now, you said before that he understood the charges;

15   correct?

16   **A.**   Yes.  I believe he did.

17   **Q.**   And he said -- he was asked what the charges are and is

18   asked production -- what production was, and he says, "Like I

19   made" -- "I made the" -- I think it's "pornography."  I think

20   that's what it says.  Right?

21   **A.**   You're talking about No. 3; right?

22   **Q.**   I'm talking about 3a, yes.

23   **A.**   "What are you charged with?"  Like, so the alleged crime,

24   production.  It looks like chase maybe.  He was queried.

25   Possession of child porn, receipt.

*JENKINS - CROSS*                                               159

1           "What do those charges mean?"

2           "Production is," like, "having made the" -- what is

3     that? -- "having made the" -- I'm not sure -- oh,

4     "pornography."  "Having made the pornography."

5           Thank you whoever's making it bigger.

6           And then possession, "that I had it."

7           So he's saying, "Possession means that I had it.  Receipt

8     means that I received it."

9     **Q.**   Okay.  Are you aware of the fact that Mr. Marks did not

10    make any pornography and was not accused of making any

11    pornography?

12    **A.**   No.  I don't focus on the details because that would be a

13    criminal responsibility evaluation.

14    **Q.**   Well, no.  You want to know if he knows the charges; right?

15    **A.**   Yes, and it was my understanding that he did know the

16    charges.

17    **Q.**   But when -- I'm sorry.  When you asked him, "What does

18    production mean?" he's going to obviously give you something

19    about what the allegations are, and he said, "Production means

20    I made it"?

21    **A.**   That's correct.

22    **Q.**   But he's not accused of having made it.

23           **MS. CHANG:**  Your Honor, I object on grounds that we're

24    kind of wading into, like, legal definition territory.  I

25    actually don't know if I agree with that statement.  I'm not

*JENKINS - CROSS*                                                160

1    sure that's an accurate statement of the law that he's not

2    accused of having made it.  There's aiding and abetting.  There

3    is this concept that if I instruct you to do something, I am

4    held responsible as if I am the person who actually did it.

5    So, I mean, I just object on grounds of inaccuracy.

6            **THE COURT:**  The objection is heard, and it's

7    overruled.

8            Go ahead, Mr. Mahoney.  But, Mr. Mahoney, I will say

9    this:  A lot of your questions are statements, so if you could

10   actually pose a question, it would help because sometimes I'm

11   not quite understanding what you're getting at either.

12           **MR. MAHONEY:**  Okay.

13   **BY MR. MAHONEY:**

14   **Q.**  But you did not dig in any further as to whether or not his

15   understanding of what he's accused of was accurate; correct?

16   **A.**  I'm not sure what you mean.  I believe he was charged with

17   these, and that's what he told me, and then those were his

18   definitions of those charges.

19   **Q.**  No.  The question was what is -- what is what was -- what

20   do those charges mean?  So that would be his understanding of

21   what that charge meant.  Doesn't that go to something in the

22   context of his actual accusation?

23   **A.**  Well, he was asked what he was charged with.  That is what

24   he told us he was charged with.  And then we asked him what do

25   those charges mean.

1   **Q.**  Okay.  And the question is what -- the meaning he gave, did

2   that correspond to the charges?

3   **A.**  I thought it did, Mr. Mahoney.

4   **Q.**  Well, but you didn't understand exactly what he's -- do you

5   know now exactly by what means it's alleged that he produced

6   child pornography?

7   **A.**  My understanding is that he was charged with production.

8   The way that came about, I do not know.

9   **Q.**  Okay.  Now, hospital penalties, further down -- that's 3c.

10  Here it says, "What are the possible penalties?" and it says

11  something about "I've heard both" -- I think that's "both" --

12  "30 years and 15 years."

13  **A.**  It looks like it says, "A lot of time in prison.  I've

14  heard both 30 and 15 years."  Yes.

15  **Q.**  Okay.  So does that indicate he actually knows what the

16  penalties are?

17  **A.**  I think it indicates he thinks that he could do a lot of

18  time in prison, which I think is accurate, and the timelines as

19  far as the sentences -- I don't know how accurate those are,

20  but that is what he believed the possibilities to be.

21  **Q.**  Right.  But at some other point, you in your testimony said

22  there was other estimates that may be 40 years; correct?

23  **A.**  Yes.  I believe I said that he had said up to 40 and that

24  there was one time he said 15 or 18 to 30.  I believe that's

25  what I testified because that's what I remember it to be.

1   **Q.**  And did you ever check on what actually were the possible

2   penalties in this case?

3   **A.**  No.  That's not something I normally do.

4   **Q.**  Well, if you want to know if he knows the penalties, isn't

5   it important to find out whether he's telling -- whether he's

6   accurate in his understanding or even close to being accurate?

7   **A.**  It could be.  Just from my basic knowledge, sex offenses

8   typically do come with a lot of time.  So for us it sufficed

9   that he believed or understood that he could do a lot of time

10  in prison, and these were the estimates that he believed them

11  to be.

12  **Q.**  But in this case -- I'm sorry.  I'm sorry.

13  **A.**  It's okay.  I was just saying I didn't think he was wrong

14  with these estimates just based off me working in five

15  different federal prisons.  It's not uncommon to hear these

16  kind of amounts.

17  **Q.**  But later there's a question to him as to why somebody

18  might enter into a plea agreement, and his answer was -- was

19  that he might get a lesser sentence.  He could possibly get a

20  lesser sentence.  Correct?

21  **A.**  Are you scrolling to that part?  Because I would like to

22  wait and see it, if it's okay.

23  **Q.**  We could look at that.  That's just lower down.

24       So he was asked in -- the next question is what's the

25  advantage of a plea bargain, and he thought he might get a

1    lesser sentence; correct?

2    **A.** I was waiting for you to finish scrolling.

3    **Q.** This is the bottom of 104 and the top of 105.

4        Yep. Are you waiting for me to ask the question again,

5    Doctor? I'm just --

6    **A.** Oh, I thought the question was about plea bargain. That's

7    not the question that's on the screen. Am I incorrect?

8    **Q.** Oh, yeah. You got to go a page up. Question 5. We're

9    talking about Question 5 now. I'm sorry, Doctor. There we go.

10       So later on isn't it the case he was asked about what

11   advantages there are of accepting a plea bargain, and his

12   answer was "You might get less time"? Right?

13   **A.** "You might get less time in prison."

14   **Q.** Right.

15   **A.** Yes.

16   **Q.** And that means in comparison to something else, which would

17   be what? Going to trial perhaps?

18   **A.** Typically, the decision is to take a plea bargain or go to

19   trial. So, yes, I think that's a correct assumption, that that

20   is what he was comparing it to.

21   **Q.** Okay. So it's relevant to know, for example, when he talks

22   about what he was facing, whether that was on a plea or whether

23   that was after a trial, isn't it?

24   **A.** Are you saying the amounts that he said? You're saying

25   it's important to know whether he was talking about those are

1     the sentence, I guess, guidelines for the plea versus being

2     found guilty in trial?

3     **Q.**  If he's -- if he's making -- if you're -- if, ultimately,

4     his decision is whether to plea or not has to do with comparing

5     the possible sentences at plea or a trial, then you'd want to

6     ask him, wouldn't you, whether the actual -- what kind of

7     reasoning would go into thinking you might get a lower sentence

8     as a result of a plea?  Wouldn't that be true?

9     **A.**  I'm sorry.  I'm sorry.

10          **THE COURT:**  Mr. Mahoney, I didn't understand your

11    question either.  Please try to shorten it and simplify it for

12    me, please.

13    **BY MR. MAHONEY:**

14    **Q.**  Why are you asking him of the possible penalties?

15    **A.**  Why am I asking him the possible penalties of what?

16    **Q.**  In Question 3c, why are you asking that question?

17    **A.**  So the purpose of 3c is to ask -- is to see what the

18    possible penalties are if he is found guilty, so how much time

19    is he looking at for the alleged charges.

20    **Q.**  Found guilty in what way?  By trial or by a plea?

21    **A.**  This is referring to at trial.

22    **Q.**  All right.  Does it say that?

23    **A.**  On this page it does not say that, but it does come up in

24    conversation.  If he was confused, the way you're asking it

25    now, if he needed clarity, we would have given it to him.

1  **Q.**  Well, how would you know if he needed clarity?

2  **A.**  Well, we specify, as you saw two questions later, that

3  we're talking about pleas.  So we're not talking about pleas

4  yet.  We haven't gotten to pleas yet.  We're just talking about

5  his charges and what the possible penalties are if he's found

6  guilty of those charges.  So, again, if that wasn't clear and

7  he was questioning, like you are, "Is this plea?  Is this

8  trial?" we would have clarified it.  But in all the years I've

9  done this, that's not usually something that people get

10 confused about because, when we talk about pleas, we specify

11 that we're talking about plea bargain.

12 **Q.**  Do you know whether in this case there would be any

13 different sentence available on a plea or a trial?

14 **A.**  Are you asking me if I know --

15 **Q.**  Yes.

16 **A.**  -- there's a difference?  Sir?

17 **Q.**  Yes, I'm asking you.

18 **A.**  Typically, one takes a plea in order to get less time,

19 which is how he responded.  So the assumption is if he is

20 thinking -- if he's found guilty by going to trial, that he

21 would receive a lot of time in prison, and then he specified 30

22 and 15 years.  The assumption is to take a plea to get less

23 time.  It would be less than the 30 and the 15 that he stated.

24 **Q.**  Well, first of all, the question was what are the possible

25 penalties?  All right.  So the possible penalty doesn't mean

1    what he might -- he might hope for something less, but how do

2    you know that the possible penalties aren't the same for both a

3    plea and a trial?

4    **A.**   Well, when I spoke to him, he told me that that is what you

5    told him, that you said that those were his possible penalties

6    if found guilty.  So then we asked him what are the benefits of

7    taking a plea because we want to make sure that they understand

8    what a plea bargain is and the advantages and disadvantages,

9    and, in my opinion, he answered correctly by saying you would

10   get less time in prison because that is typically how it works.

11   **Q.**   Statistically perhaps, but --

12            **MS. CHANG:**   Your Honor.

13   **BY MR. MAHONEY:**

14   **Q.**   -- as far as this agreement --

15            **THE COURT:**   Mr. Mahoney, stop for a moment.

16            Yes, Ms. Chang?

17            **MS. CHANG:**   Objection to argument.

18            **THE COURT:**   Yes.  Mr. Mahoney, I think you need to

19   move on from this area.  These questions have been asked and

20   answered many times.

21   **BY MR. MAHONEY:**

22   **Q.**   Was there any question put to him about what the possible

23   advantages might be of going to trial?

24   **A.**   No.  I don't think we normally ask that.

25   **Q.**   Well, if you want to know his ability to make a decision to

1   assist in his defense and making choices in his defense, don't

2   you have to talk about what the alternative is to a plea and

3   see what -- how he can evaluate the two choices?

4   **A.**   We did do that.  I think your question that I responded no

5   to was did we talk about the advantages of going to trial.  And

6   so, typically, in the correctional environment that I work in,

7   the advantage is really the plea because then you get less

8   time, unless, of course, you go to trial and you're found

9   innocent.  So we did discuss what would happen if he goes to

10   trial, what are the possibilities of being found guilty or not

11   guilty.  So if you mean that as an advantage, then sure, but

12   did we pose the question, "What are the advantages to go to

13   trial?" we did not.

14   **Q.**   Did you ever review the document that we provided as advice

15   to Steven?

16   **A.**   Yes.

17   **Q.**   Two different versions of that.  Did you read it?

18   **A.**   Yes.  I reviewed everything that was sent to me.

19   **Q.**   Was there anything in that that anybody could predict that

20   Steven would get less time in jail if he went to trial as

21   opposed to taking one of the two plea agreements that was

22   offered?

23   **A.**   I don't remember.

24   **Q.**   Wouldn't that be important to know?

25   **A.**   I think any information would be helpful, but I don't

1    remember if that was discussed.

2    **Q.**  Can you -- do you have in mind what the actual choice was

3    for Steven that was confronting him at the time he signed the

4    plea agreement, what actually was his choice, what choices were

5    available to him and what -- what were the advantages, one way

6    or another, of making that choice?

7    **A.**  I don't remember that.

8    **Q.**  Did you ever test him on his understanding of that?

9    **A.**  I tested him on his understanding of taking a plea, the

10   advantages and disadvantages of that, and what happens when you

11   go to trial.

12   **Q.**  And you think that's clear from -- from this document?

13   **A.**  I think this is one document that we use.  As I stated, my

14   student has poor handwriting, but I have them type whatever's

15   needed to be explained in the report, which we all have.  But

16   it doesn't show every single conversation that I had with

17   Mr. Marks over his 30-plus days with us.

18   **Q.**  And did you make notes of those conversations?

19   **A.**  No.  Anything that I made notes of was in the file, and

20   that was shared.  There was some discussions that I just had in

21   my head as pure knowledge of being there with him.

22   **Q.**  Well, is there -- in the materials -- well, I'll withdraw

23   that, whatever it was.

24       Question 5, "What is a plea agreement?"  Written in red

25   there -- what's the writing in red?  Do you know what that line

JENKINS - CROSS                                                     169

1   is red and what that means?

2   **A.**   Yes.   Red means it occurred on a different day.   So as I

3   stated previously, we asked competency questions throughout the

4   evaluation.   If there are questions that we feel the defendant

5   did not answer fully correctly or maybe needed education on and

6   we want to just make sure that they really get it, we ask at

7   different points in time.   And so on this specific document, my

8   student made sure to write in a different color the questions

9   that were asked again on a different day.

10  **Q.**   You're sure that writing in red is not the, quote,

11  "education" that he gave him at the time?

12  **A.**   My instruction to my student, which is part of our process,

13  is to write in a different color if you're asking certain

14  questions on a different day and writing it on the same

15  document.

16  **Q.**   Okay.   And there's no -- nothing here to tell us what day

17  that was?

18  **A.**   The dates are listed in the report of the session that we

19  met with him.   I don't know if we have the exact date that the

20  red was written to -- written in versus the blue, but all the

21  dates that we met with him are recorded in the report.

22  **Q.**   All right.   So he was asked, "What is an oath?"

23      And he said, "Like, tell the truth to the judge."   And

24  the -- then in red it's "Promising to tell the truth."   Is that

25  right?

1    **A.**   Yeah.  Yeah, there's a word after promise that's a little

2    bit hard to read, but, yes, overall, "Promise," illegible word,

3    "to tell the truth."

4    **Q.**   Could that be promising to tell someone the truth maybe?

5    **A.**   Could be a few things.  I don't want to say because I'm not

6    sure exactly, but the -- the -- what it's saying is "Promise to

7    tell the truth" overall.

8    **Q.**   All right.  And then later it says -- well, let me just --

9    on oath -- an oath is more than that, isn't it?  It's not just

10   a promise to tell the truth.  It's a promise to tell the truth

11   under penalty of perjury; correct?

12   **A.**   That's correct.  This was his, again, basic, simplified

13   definition.  It was accurate, although it didn't have all those

14   additional details that you -- that you just stated.

15   **Q.**   But you didn't test him for additional, deeper

16   understanding of oath; isn't that right?

17   **A.**   No, that's not correct.  As I said, we've gone over these

18   questions numerous times with him.  Even if we meet with him

19   for something else beyond competency, if I, you know,

20   remembered that "Hey, that oath definition wasn't really

21   that -- that full," it's not uncommon for me to ask him, "Hey,

22   do you know what the oath is?  Tell me what the oath is real

23   quick."  So a lot of those various brief conversations were not

24   always written on these documents, but they happened, and

25   that's where we got our overall opinion from.

1   **Q.**  He was asked, "Why is perjury a problem?"  And what was his

2   answer at 7a?

3   **A.**  It looks like the blue is "Because they don't like you to

4   lie."  It sounds like he was trying to say "Because

5   they don't" -- "do not you to lie" -- "don't like you to lie."

6   And then the red -- it's saying, "You promise to tell the

7   truth."

8   **Q.**  Okay.  But perjury is really a problem because it affects

9   the reliability of the proceedings; correct?

10  **A.**  Yes, because it's essentially lying on the stand.

11  **Q.**  Well, not because it's lying on the stand but because

12  people might rely on what you say; correct?

13  **A.**  Yes.  And if you say something inaccurate, like lying,

14  that's a problem.

15  **Q.**  Well, it's a problem because it affects the integrity of

16  the process; right?  Correct?

17  **A.**  Yes.  I think that's -- that's part of what I'm saying or

18  trying to say.

19  **Q.**  But is that what he was saying?

20  **A.**  Again, Mr. Marks mostly provided very simplified

21  definitions, which is why we went over these several times

22  throughout the evaluation.

23  **Q.**  In fact, you're only looking for very simple answers,

24  aren't you, here?

25  **A.**  I'm not looking for simple answers.  I'm looking for

1    answers that are somewhat correct and that can then be built

2    upon, if needed.  So, essentially, if the person answers

3    correctly in some form, that's a good basis that they have a

4    basic understanding that can be worked on.

5        Excuse me.

6    **Q.**  He was asked what the role is of the judge.  That's on

7    page -- it's Question No. 20.  And he says, "All the judges to

8    say whether you're" -- "whether you're guilty or not."  Right?

9    **A.**  It looks like he had -- there's a few things there.  He

10   mentioned that it was a lady.  So he remembered the -- the

11   judge -- or the judge, and then a guy it looks like.  I don't

12   know.  It looks like maybe he had another judge previously that

13   was a male.  One in -- it looks like ID, maybe Idaho; one in

14   Florida, where I believe you guys are; and one in Oklahoma

15   maybe.

16       And then the role of the judge, it looks like "To say

17   whether or not you" -- let me see.  Thank you.  "To say whether

18   or not you" -- I'm not sure what that word is -- oh, "innocent

19   or guilty."

20   **Q.**  Right.

21   **A.**  It looks like he was queried.

22   **Q.**  Are you aware that's the same answer he gave to

23   Dr. Otto years ago, and Dr. Otto educated him at the time that,

24   no, it wasn't the judge; it's the jury?

25   **A.**  No.  I don't remember exactly what Dr. Otto said to him,

1    but I was going to continue reading.

2        He also put "to maintain order" and it looks like maybe

3    "sanction."

4    **Q.**  All right.  So, anyway, here he thinks that the role of the

5    judge is to find -- is to -- to determine guilt; correct?

6    **A.**  It looks like that was his initial response.

7    **Q.**  Which is -- which is --

8    **A.**  He was queried -- okay.  I'm sorry.

9    **Q.**  Which is not correct, is it?

10        **THE COURT:**  Mr. Mahoney and Dr. Jenkins, because of

11   the Zoom, I ask you both to take a five-second beat before you

12   start talking so you don't talk over each other.  Thank you

13   very much.

14        Go ahead and ask the question again, Mr. Mahoney.

15   **BY MR. MAHONEY:**

16   **Q.**  It was incorrect, his understanding of the role of the

17   judge in this respect; correct?

18   **A.**  I believe it was partially incorrect because then he was

19   queried.  He said, "I don't know," initially, and then he said

20   "to maintain order," which is a correct answer.

21   **Q.**  Well, it didn't correct the understanding of whether the

22   judge finds guilt or not, did it?

23   **A.**  Can you rephrase that question, please?

24   **Q.**  It -- he didn't correct himself or he wasn't corrected on

25   whether or not the judge determines guilt, was he?

1   **A.**   Sorry.  I'm trying to do the five seconds.

2       That's not true.  He did not self-correct himself, but we

3   did, and we gave him information that that is not what the

4   judge does.  We asked him again what he thought the rule was,

5   and then it looks like he provided a, again, simplified but

6   basic correct answer, which was to maintain order.

7   **Q.**   Well, Dr. Jenkins, you're swapping out two completely

8   different functions of a judge.  The fact that he gets it wrong

9   that the judge finds guilt is not made up for by the fact that

10  the judge also maintains order, does it?

11  **A.**   I'm not sure that I fully understand your question.  I

12  agree that he did say the incorrect definition initially, and

13  we told him he was incorrect.  We asked him again, "What do you

14  think the role is?"  And then he did provide a simplified but

15  correct answer that the judge's role is to maintain order,

16  which I believe is correct.

17  **Q.**   Did you see that he gave exactly the same wrong answer to

18  Dr. Negrón?

19  **A.**   No, I don't remember that.

20  **Q.**   All right.  And you -- you're not familiar with -- and do

21  you know -- in one of the parts of the videos of my interviews

22  with Steven, did you see that Steven made that same error --

23  made that exact same error in our interviews with him?

24  **A.**   I don't remember that.

25  **Q.**   But did you feel that you had sufficiently educated him

1    that he then understood that the role of a judge is not to find

2    guilt or innocence?

3    **A.**   I believe we actually told him that answer was incorrect.

4    We asked him again what he thought it was, and then he provided

5    an answer that was basically correct in this instance.

6    **Q.**   But on a different subject, Doctor.

7    **A.**   I'm sorry?

8    **Q.**   Never mind.  I'm going to move on.

9         So one of the questions now at page 6 of this document,

10   26 -- Question No. 26, there's a question to him:  "What kinds

11   of questions do you need to ask your attorney?"  Right?

12   **A.**   Yes.

13   **Q.**   And what's the -- that's -- the purpose of that question is

14   to find out if he knows how to get information out of his

15   lawyer to help him understand his case or make decisions;

16   right?

17   **A.**   Not necessarily.  The purpose of that question is to see

18   what kind of information he still needs or wants to get out of

19   his attorney.

20   **Q.**   All right.  In this case this answer he was -- this

21   information he was seeking had nothing to do with the -- the

22   nature of his case, the way the proceedings would work,

23   assisting his defense, or understanding how to make decisions,

24   did it?

25   **A.**   Are you asking if that was -- the question was asking?

1   **Q.**   No.   I'm asking whether his answer related to the

2   understanding of the nature of the charges or the proceedings

3   or assisting his defense or making decisions in his case.

4   **A.**   Let's see.   He put a lot of questions, and then I'm

5   assuming we asked him, "Can you give us one?   Is there one on

6   the top of your head?"

7         And he said, "Where am I going to go?   I don't know what's

8   going to happen in" -- I'm not sure what that word is -- "the

9   line."   Oh, "down the line" -- "what's going to happen down the

10  line."

11        So my opinion of this answer is that he wanted to know when

12  he would be able to leave the facility, which -- meaning once

13  the evaluation's over, he can leave, and he was unsure of

14  what's going to happen in his future.   Those are, I guess, some

15  of the concerns he had at this time.

16  **Q.**   When asked, "How do you plan to assist in your defense?"

17  that question is designed to see if he has a conception, an

18  idea, of what things he can do to assist his defense attorneys

19  in his case; right?

20  **A.**   Yeah, that's definitely one of the main things it gets at.

21  **Q.**   Right.   But all he answers is he'll do whatever he's asked

22  to do.

23  **A.**   That's the first part, yes.   And then "whatever they ask."

24  So, yes, he's basically saying he'll do whatever he has to do,

25  whatever he's asked to do.

1    **Q.** It doesn't really show any concept on his part of what he

2    can do or might be able to do to assist in his defense, does

3    it?

4    **A.** He definitely didn't provide any details on how he planned

5    to -- how he planned to assist in his defense. He's just

6    showing that he's willing to do whatever -- I assume you guide

7    him or suggest to him.

8    **Q.** Are you suggesting that he has detailed information about

9    what he would do to assist in his defense?

10   **A.** I'm just saying that he didn't share that.

11   **Q.** Did you ask him --

12   **A.** That's not what the answer says.

13   **Q.** Did anybody ask him for more?

14   **A.** When it comes to his defense, we are very cautious about

15   that, just like with the strategies question earlier, because

16   we acknowledge that that's, you know, client-attorney

17   privilege. So we try not to ask them for strategic

18   information. Some choose to give it and some don't. So, no,

19   in that question we typically don't -- don't ask a lot of

20   questions asking for more information because they don't really

21   have to share that with us, and it's -- it's not our business

22   how you guys plan to move forward in your defense.

23   **Q.** Well, in the first instance, he could have answered that

24   question and revealed the entire defense theory; right?

25   **A.** That's correct.

*JENKINS - CROSS*                                                              178

1    **Q.**  All right.  And, in fact, you had a document from us laying

2    out in detail our entire defense theory; isn't that true?

3    **A.**  That may have been in the packets I received.  I don't

4    remember.

5    **Q.**  Okay.  Let's go to the next -- this, Dr. Jenkins, the

6    document we just looked at, was at least dated May 10, and

7    you're saying that there was some maybe date after May 10 that

8    some follow-up discussions were -- occurred, and that's why

9    things were in red ink.  I gather that's what you were saying.

10   **A.**  That's correct.

11   **Q.**  All right.  So let's look at May 20th.  I'm sorry.

12   Page 96.  So it's just the next document up.  So here,

13   Question 2, "What does competency mean to you?" the same

14   question we had before where he said it was "whether you know

15   stuff," and then you said he was educated; right?

16   **A.**  That's correct.

17   **Q.**  Was he educated?

18   **A.**  Are you asking me if I educated him after I said he was

19   educated?

20   **Q.**  No.  By educated, did he learn anything?

21   **A.**  So you're asking if he was able to retain information?

22   **Q.**  Does this question -- this answer to this question indicate

23   that he learned what you told him?

24   **A.**  The answer to this question, he said, "It is just doing

25   what I've been told, that I am going to prison," and it says he

1    was educated.  So I believe what you're asking me is does this

2    answer show that he retained the information that we gave him

3    on the other document, and my answer to that would be, no, it

4    does not show that; and it says he was educated, so he was

5    reeducated again on what competency means.

6    **Q.**  But this may be a third time he was educated on that issue;

7    correct?

8    **A.**  I'm not sure what number this would be because, again, we

9    talk about it ongoing, but it has definitely happened before.

10   **Q.**  He's asked, "What will happen if you were found not

11   competent to proceed?"  And he's now relating something he did

12   learn before, that he would go to a place for a -- four months

13   or a few months, in which case he's referring to some

14   restoration process; right?  That's 2a.

15   **A.**  That's what I understand it to be, yes.

16   **Q.**  Did you ever -- do you recall you got an e-mail from me

17   after Steven left of reporting to you that Steven told his

18   family that you had said to him that it was not a good choice

19   to be seeking to be found not competent because you could go to

20   a hospital for a long time?  Did you ever talk to him about --

21   that this is a problem with seeking -- with your attorneys

22   raising the issue of competence?

23   **A.**  Can you rephrase that question, please?

24   **Q.**  Steven told his family, and I reported it to you, that --

25   that you had said to him that it was -- that it was problematic

1   or a problem for him and not advisable for him to be seeking to

2   be found not competent because he could end up going to a

3   hospital for a long time.  Did you say anything like that to

4   him?

5   **A.**  So, number one, I responded to your e-mail and told you

6   that because I am not a lawyer, I never give advice to my

7   clients.  So I definitely did not advise him on anything.

8        Within the discussion of competency, we talk about what

9   happens when one is found competent versus when one is found

10  not competent.  So in that education and in that discussion, we

11  did share with Mr. Marks that if he is found not competent in a

12  federal court, typically what happens is that he or anyone else

13  goes to a medical center, which is also a part of the Bureau of

14  Prisons, for competency restoration, and that that -- that

15  stint of time is usually a few months, three to four, to be

16  specific.

17  **Q.**  Well, but the fact -- okay.  On that same document, the

18  question is "What are the possible penalties?"  That's left

19  blank.  Do you know why?

20  **A.**  Because, again, when we ask questions again, we typically

21  ask them questions that we want to make sure they understand or

22  we thought maybe they didn't give a full answer to or it was

23  questionable if they fully understood, and the previous

24  document -- his answer to what are the possible penalties

25  pretty much sufficed for us by him saying "a lot of time in

1    jail" and even giving quantifiers of 30 or 15 years.  So it

2    appeared he had a good understanding of what his consequences

3    would be, and I didn't feel the need to ask him that again.

4    **Q.**  Again, there wasn't any clarification about whether the

5    questions about after a plea, after a trial; right?

6    **A.**  Well, the question that relates to plea specifically says

7    "plea."

8    **Q.**  But -- okay.  In this case was Mr. Marks, in any event,

9    facing a trial?

10   **A.**  My understanding is that he was here for competency and

11   then base- -- you have to -- you have to go forward with the

12   competency hearing first before you even get to a trial.  So I

13   don't know if he was going to eventually go to trial or not.

14   There was discussion of him previously signing a plea

15   agreement.  I don't know if his trajectory was to be found

16   competent and then sign a plea or if he's found not competent

17   by the Court and then goes to restoration and then comes back

18   for competency.  I don't know his trajectory.  I just know he

19   was here for competency and that a competency hearing would be

20   the next step for him.

21   **Q.**  Well, did he understand -- but the two options you just

22   said, being found incompetent and going for a, quote,

23   "restoration" or being found competent and going forward with

24   the plea -- they don't involve going to a trial, do they?

25   **A.**  I believe I said if he's found not competent, he typically

1   will go to restoration; and if he's found competent, he would

2   proceed, whether that's going to trial or a plea.

3   **Q.**  Well, he had signed a plea agreement.

4   **A.**  That was also my understanding, is that he had signed a

5   plea before, but then he was found -- or the question of his

6   competency arose, and so -- because I am not a lawyer, I don't

7   know if what he previously signed is still valid or not.

8   That's out of my realm.  I don't know how that works.

9   **Q.**  Well, did you figure out what he thought about that?

10  **A.**  About what specifically, sir?

11  **Q.**  About what his posture was, whether he -- if he was found

12  competent, what would happen?

13  **A.**  Well, we talked about if he was found competent that,

14  usually, then it's plea or trial.  He discussed that he had

15  previously signed a plea, and he also discussed possibly

16  signing another plea.  That was something he discussed.  But he

17  understood that competency was the first step, and that's kind

18  of where we left it.

19  **Q.**  Who brought up the subject of a possibly different plea?

20  **A.**  I don't believe I said a different plea.  I was just saying

21  that if he's found competent, he would then proceed with either

22  going to trial or signing a plea if that is what he decided to

23  do.

24  **Q.**  He already did sign the plea, though.

25          **MS. CHANG:**  Objection, Your Honor.  This is getting

*JENKINS - CROSS*                                                   183

1    argumentative again.

2              **THE COURT:**  Yes, Mr. Mahoney.  You need to ask your

3    questions and move on, please.

4    **BY MR. MAHONEY:**

5    **Q.**  He was asked -- well, let me --

6              **MR. MAHONEY:**  I'm going to move on, Judge.

7              **THE COURT:**  And just for reference, Mr. Mahoney,

8    you've been cross-examining this witness for two solid hours

9    with just one five-minute break.  We only have all day

10   tomorrow, and I believe you have at least six witnesses.  So

11   I'll give you as long as you want, but it's going to eat into

12   your time tomorrow.

13             Go ahead, Mr. Goddeyne.

14             **MR. GODDEYNE:**  Oh, with that in mind, I was wondering

15   if we could take a quick bio break or a comfort break.

16             **THE COURT:**  We can take a ten-minute break, but,

17   again, I'm just letting you-all know that we're going to be

18   eating into your time to present your case; and, again, the

19   United States is going to have an opportunity for rebuttal at

20   the end as well.  So let's take a ten-minute break, and we can

21   move forward from there.

22        (Recess at 3:34 P.M. until 3:48 P.M.)

23             **THE COURT:**  Go ahead with your next question,

24   Mr. Mahoney.

25             **MR. MAHONEY:**  Thank you.

1   **BY MR. MAHONEY:**

2   **Q.**  Going to the bottom of page 7 -- top of page 7 in that same

3   exhibit, so that's page 101 and 102, the handwriting -- do you

4   see, Dr. Jenkins, this is at the bottom of the competency

5   interview that occurred on May 20th?  And there's handwriting

6   there, which is better.  "Honestly, I think" -- "honestly, I

7   don't know.  If I tried to" -- "just trying to go along with

8   whatever" -- "whatever it is."

9   **A.**  I see that.

10  **Q.**  All right.  Was that in response to a question of whether

11  it's better to plea or not?

12  **A.**  I'm not sure.  That information would have been explained

13  in the competency section of the report.

14  **Q.**  Well --

15  **A.**  So just looking at it, I don't have the context right now

16  to tell you exactly what it was pertaining to.

17  **Q.**  Do you think you referred to this statement "that

18  whatever" -- "whatever it is, just trying to go along" -- is

19  that in your report?

20  **A.**  Anything that it was relevant to but was relevant to a

21  question above or anything else, it would have been explained

22  in the report.  Just looking at this without additional

23  context, I'm not sure exactly what it was pertaining to.

24  **Q.**  Well, if we look on May 26th, this would be now at page --

25  page 87 -- I'm sorry -- page 88.  And this would be the

*JENKINS - CROSS*                                        185

1   May 26th depression evaluation.  And if you look at the

2   second -- going to the second page.

3   **A.**   I'm sorry.  Did you ask me a question?

4   **Q.**   I'm -- no.  I'm sorry.  I'm trying to get my location here.

5            **THE COURT:**  Mr. Mahoney, I'm going to need you to ask

6   a question, sir.

7            **MR. MAHONEY:**  I understand, Judge.

8            **THE COURT:**  Mr. Mahoney, you need to ask a question or

9   move on.

10  **BY MR. MAHONEY:**

11  **Q.**   Do you recall Mr. Marks saying to you, "It's ultimately my

12  choice"?

13  **A.**   That is the last sentence that you're showing me on the

14  page --

15  **Q.**   Oh, where is it on this one?  Yeah.  "It's ultimately my

16  choice.  It's too much for me."

17  **A.**   I see that.

18  **Q.**   And he's talking about taking the plea; right?  Or deciding

19  what to do?

20  **A.**   Yeah.  I don't know if this is specifically taking the

21  plea, but I do believe this discussion was just about how to

22  move forward and what he was going to decide to do.

23  **Q.**   And he said, "It's too much for me."

24  **A.**   Yes.

25  **Q.**   Okay.  So, Doctor, did you -- did you make any notes of

1    what video -- which of my interviews with Steven you looked at?

2    **A.**   I looked at a portion of every video that was sent to me.

3    **Q.**   And do you recall what portion?  Like, just at the

4    beginning or what?

5    **A.**   No.  It varied.  I tried to look at the beginning, skip

6    through it, and look at the end so I was hopefully getting a

7    good idea of what the video contained.  So I tried to do that

8    for each section or each video.

9    **Q.**   All right.  What -- what was the -- what was the last video

10   you looked at?

11   **A.**   Oh, I don't remember, Mr. Mahoney.  There was so many

12   videos, and this was a long time ago.

13   **Q.**   Nothing stands out at the very end of all the recordings?

14   **A.**   I don't remember, sir.

15   **Q.**   Do you remember watching Mr. Marks sign the plea agreement?

16   **A.**   I don't remember that.

17   **Q.**   Do you understand that there's a video of -- at the last

18   day, the day before Steven had to decide whether to -- or had

19   to accept the plea agreement or not, that he actually signed

20   the plea agreement that was on the video?

21   **A.**   Again, I don't remember that.  I was told that he signed a

22   plea, and he told me that.  And I'm not sure.  You might have

23   told me that when I interviewed you, but I don't remember

24   seeing that on the video.

25   **Q.**   Okay.  So you don't recall a day where, finally, it was

1    time for Steven to make a choice as to what to do and that at

2    the end of it, he signed a plea agreement?  Is that right?

3            **MS. CHANG:**  This is asked and answered, Your Honor.

4            **THE COURT:**  It is.  You've asked it three times,

5    Mr. Mahoney.  Move on.

6    **BY MR. MAHONEY:**

7    **Q.**  Did you understand that that was in the video?

8    **A.**  I don't remember, Mr. Mahoney.

9    **Q.**  You don't discuss it in your report, do you?

10   **A.**  I discussed reviewing your videos.  I don't discuss all of

11   the details, and I don't believe I discussed him signing a plea

12   on video in the report.

13   **Q.**  If the question is Mr. Marks's ability to make a rational

14   decision, wouldn't it be extremely critical to watch him

15   actually go through the process of making that choice?

16   **A.**  I think it would be helpful data, but, again, my opinion --

17   my competency evaluation was based on what he was doing during

18   the time of the evaluation period with me, so not what he did

19   previously with anyone else.

20   **Q.**  You read the motion for a competency hearing, you said.

21   **A.**  That's correct.  I read the motion for a competency

22   hearing.

23   **Q.**  Do you remember that that motion was based on the point

24   that defense counsel did not think that when Mr. Marks signed

25   the plea agreement, he was competent to do so at that time?

1    **A.**   I believe I testified to some of that earlier today,

2    that -- your main concerns about his competency and that that

3    is why the previous plea -- I was unsure if that would still be

4    valid or not because now his competency is being questioned

5    again.

6    **Q.**   For him to decide to take a plea here or go to trial

7    required him -- if he answered all these questions -- all these

8    questions you asked him exactly correctly in the simple terms

9    that -- that seem to be acceptable, is that something that

10   would establish him as being competent, in your view?

11   **A.**   Can you please reask the question?

12   **Q.**   If he answered all those questions accurately in your form,

13   accurately to your satisfaction, would that establish that he

14   was competent to make his choice whether to plea or not?

15   **A.**   Not solely.  As I've described, I come up with my opinion

16   through various data.  So, of course, the competency interview

17   is very significant in my opinion, but it's also additional

18   things, like how he relates to me and if he can communicate,

19   because besides answering correctly, he has to be able to

20   rationally have a conversation and discuss his charges and his

21   decision-making and other things that we all know.  So this is

22   very important, and if he answered all correctly, that would

23   definitely help and be very indicative of, you know, whether he

24   should be competent or not, but it's not the sole, only thing

25   that I look at.  It's not the only thing that I weigh.

*JENKINS - CROSS*

1    **Q.**  The only question in those questionnaires that went to the

2    process of making a decision was asking why somebody might want

3    to enter a guilty plea; correct?

4    **A.**  No, I don't agree with that.

5    **Q.**  What question was asked that -- that seeks to determine his

6    ability to make decisions regarding his case?

7    **A.**  I would have to go through all the questions to tell you

8    which ones I think do and don't, but off the top of my head,

9    the question about whether he would testify, that is a decision

10   that he would have to make, and that would be indicative of

11   decision-making.

12   **Q.**  In that instance, he said he would do what his attorney

13   told him to do.

14       **THE COURT:**  Mr. Mahoney, ask a question.  Don't --

15       **MR. MAHONEY:**  I will.

16       **THE COURT:**  -- make a statement.

17       **MR. MAHONEY:**  Yeah.

18       **THE COURT:**  And, Mr. Mahoney, don't interrupt me

19   again.

20       **MR. MAHONEY:**  I'm sorry, Judge.

21       **THE COURT:**  Thank you.

22   **BY MR. MAHONEY:**

23   **Q.**  When -- you testified that, in your mind, you compare how

24   Mr. Marks behaved in your interviewing of him on these -- these

25   questionnaires and me interviewing him; correct?

1  **A.**  I think you're asking me if I was asked to compare his --

2  my observation of him with me versus the observations I saw in

3  the videos with you.  Is that what you're asking me?

4  **Q.**  That's right.

5  **A.**  Yes.  I believe AUSA Chang asked me questions about that.

6  **Q.**  And you saw what -- a difference in his -- how he seemed?

7  **A.**  Yes.

8  **Q.**  In fact, you also said that at one point that Steven said

9  he didn't understand what his lawyers were saying and that you

10  concluded it was because we had used sophisticated language or

11  legal jargon he didn't understand.

12  **A.**  I believe what my report says and what I testified was that

13  Mr. Marks himself explained to me that there were words and

14  phrases that you used with him that he had difficulty

15  understanding, which he believed led to some of his confusion.

16  **Q.**  Did you find out what those words were?

17  **A.**  We talked about it.  I don't remember all of the words, but

18  it appeared to be the legal terms.  The -- you know, that's why

19  in my questionnaire, for example, "assist" -- I have in

20  parentheses "help."  So we just try to simplify things that we

21  could, but just in a general sense, it appeared to be more of

22  the sophisticated legal term that's not necessary --

23  necessarily used in everyday conversations of -- of nonlegal

24  people.

25  **Q.**  Is the difference -- is one difference between what you

1    were asking him and what I was asking him was that you were

2    asking his understanding of simple terms or simple issues like

3    what the judge does, what the prosecutor does, what an oath is,

4    and what perjury is; whereas in my interview of Steven, we were

5    educating him as to not just these terms but factors that would

6    actually bear on making a decision about what to do in his

7    case?

8    **A.**  Can you rephrase that question?

9    **Q.**  Do you recall -- no.  I'm going to ask a different

10   question.

11        In my -- in my advice to Steven that you saw, did that

12   advice relate to what does the judge do, what does the

13   prosecutor do, what is perjury, and what's a lie -- what's an

14   oath?  Is that in there at all?

15   **A.**  I don't remember it in its entirety, and I don't have it in

16   front of me, but I do believe that you spent time in educating

17   him on the different major players of the courtroom, similar to

18   the questions that we asked him.

19   **Q.**  But that advice -- our advice went to the question of what

20   the issues were at trial.  Do you know what the trial issues

21   would have been for Mr. Marks had he gone to trial?

22   **A.**  No, I don't think so.

23   **Q.**  Does he know?

24   **A.**  We didn't talk about them because it was a competency

25   evaluation.

1   **Q.**  Well, but in deciding whether to go to trial or not, is it
2   one of the choices that somebody has to think about the chances
3   of winning at trial?
4   **A.**  If you're asking me in his decision of whether taking a
5   plea or going to trial, part of that decision is weighing what
6   would happen at trial, I do think that's related; however, our
7   evaluation was competency based.  It wasn't criminal
8   responsibility based.  So we did not talk about what it would
9   be like to go to trial because he didn't make it to that point
10  yet.  We're just trying to see if he's competent or not to even
11  stand trial.
12  **Q.**  Competency also includes competency to make a decision
13  about whether to go to trial, doesn't it?
14  **A.**  Partly, yes.
15  **Q.**  Can you assess somebody's ability to make that kind of
16  decision without testing out their ability to weigh the
17  different factors that might apply in that situation?
18  **A.**  I think we partially did when we asked him what were the
19  advantages of taking a plea; if he would take a plea, why would
20  he take a plea; what are some of the advantages and
21  disadvantages; what are the possible consequences of going to
22  trial.  I think we covered some of that in our evaluation.
23  **Q.**  Did you check whether or not the reasons Mr. -- you report
24  in your report that Mr. Marks gave you for taking a plea,
25  whether those actually were accurate or not?

1    **A.**  I think I stated already that, typically, people take pleas

2    because they expect to receive less time, less prison time, and

3    that is what Mr. Marks relayed to us; and in my experience

4    working in five federal prisons, that is typically what inmates

5    weigh in how they decide to take a plea or not.  So I do

6    believe we discussed it partially with Mr. Marks.

7    **Q.**  You said that Mr. Marks made his decision based on certain

8    things that I told him.

9    **A.**  Is that a question?

10   **Q.**  Is that true?

11       In your report you said, "Mr. Marks expressed accepting a

12   plea agreement was the best option because there was a

13   possibility of him facing 40 years in prison."  All right.  Is

14   that what you wrote?

15   **A.**  Did I write -- if you're reading from my report, then, yes,

16   that's what I wrote.

17   **Q.**  Did he say that was his decision-making process?

18   **A.**  Did Mr. Marks say that part of his decision to take a plea

19   was because you, as his attorney, told him that was his best

20   option and that he was facing up to 40 years?  That is what he

21   explained to us, and that appeared to be the basis on him

22   deciding ultimately to sign that initial plea.

23   **Q.**  And you never observed the process of him signing the plea;

24   correct?

25   **A.**  As I stated, I don't recall watching that part of the

1    video.

2    **Q.**  Do you agree that if all Mr. Marks was able to do to make

3    that decision was to simply accept my advice, that he would

4    still be -- that would be enough for him to be found competent?

5    **A.**  Can you rephrase that question, please?

6    **Q.**  If all Mr. Marks was able to do to decide to make that

7    decision to sign the plea agreement was to hear my advice as to

8    what to do, in your view, would that mean he was competent, if

9    he could do no more than that?

10   **A.**  I'm not sure exactly what you're asking me because him,

11   Mr. Marks, accepting his lawyers' advice and deciding to sign a

12   plea does not necessarily equate to competency.  I think it's

13   part of competency because it's talking -- it's showing his

14   trust and able to form a trusting relationship with his

15   attorney.  It's showing him able to communicate with his

16   attorney to understand that this is what his attorney feels is

17   his best option.  So I feel like it's related, but I don't -- I

18   don't feel comfortable saying that because he was going to take

19   a plea because that's how you guided him, that means he's

20   competent.  I think I, hopefully, explained the process of

21   competency and how we evaluate for it, and there's a lot more

22   things that go into it than that example of a decision you just

23   gave.

24   **Q.**  What was it in your report -- you said, "He's capable of

25   comprehending the possible outcome of his case, communicating

1   with counsel, weighing the merits of various defenses, and

2   making decisions regarding numerous constitutional

3   protections."  What's the basis for saying he is capable of

4   comprehending those things?

5   **A.**  The basis would be our interviews with him and our

6   overall -- the entire evaluation process that we did with him.

7   **Q.**  What in that process had anything to do with weighing the

8   merits of various defenses?

9   **A.**  The fact that he discussed whether to take the plea or not,

10  the fact that he discussed -- and, again, I didn't review the

11  strategies that he believed you were working on with him for

12  his defense.  Things like that is what I believe is associated

13  with him able to weigh the merits of his defense.

14  **Q.**  All right.  Doctor, you have my permission on behalf of

15  Steven to reveal the strategies that he told you.  What were

16  the strategies -- the defense strategies he told you about?

17  **A.**  Is it okay to talk about this?  Are you sure?

18  **Q.**  I'm sure.

19          **THE COURT:**  Dr. Jenkins, just for the record,

20  Mr. Mahoney has just waived attorney-client privilege on this

21  issue.  So go ahead.

22          **THE WITNESS:**  Okay.  Mr. Marks basically discussed

23  that these evaluations were supposed to show how disabled he

24  was and how he had issues with understanding things, and he

25  believed that that was at least going to be a mitigating

1    factor.  Mitigating, of course, is not the word he used.

2    That's mine.  But he basically discussed that if he was found

3    to be disabled, it would help him when it came to his -- the

4    outcome of the case.

5    **BY MR. MAHONEY:**

6    **Q.**  Well, that's not -- that's not a question of weighing

7    merit -- different defenses inside the plea, is it?

8    **A.**  I believe that's a strategy that could be used by the

9    defense.  That's how it was explained to me, and that's how I

10   perceived it to be, and that would be a defense to say, "I'm so

11   disabled, I don't understand what's going on to have all of

12   these evaluations," basically show or try to prove that he's so

13   disabled, that he doesn't understand.  And in my knowledge of

14   the court system, that could lead to -- to one maybe being

15   found not competent, maybe ultimately trying to be found not

16   responsible, and so that is what the perception was, is that he

17   was under the understanding that he was doing all of these

18   evaluations and that was the expected outcome, is that he

19   was -- he would be so disabled he would not be able to either

20   be held accountable or that, at the very least, it would help

21   his case.

22   **Q.**  All right.  So he understood that the mental health

23   evaluations related to these issues of competency and

24   potentially criminal responsibility.  That's what you're

25   telling us?

1    **A.**   That was my understanding.

2    **Q.**   All right.  But weighing the merits of various defenses --

3    are you suggesting that Mr. Marks, at the time that he entered

4    his plea, thought that that somehow related to the question of

5    competency?

6    **A.**   Can you rephrase that question?

7    **Q.**   Do you have any -- any basis at all to think that in

8    weighing his choice of whether or not to enter a plea or go to

9    trial, Mr. Marks had in mind and was calculating -- somehow, in

10   his calculation, had to do with some strategy regarding his

11   mental health except -- I'll stop it right there.

12        Are you thinking -- are you thinking that Mr. Marks -- the

13   issue of his competency bore in his decision on whether or not

14   to take a plea or go to trial?

15   **A.**   I'm really trying hard to -- to follow you, Mr. Mahoney,

16   but I really don't understand the question.  I'm sorry.

17   **Q.**   Are you -- do you believe that Steven Marks, at the time he

18   decided to take the plea, because I advised him to do that,

19   that he had in mind the issue of competency?

20   **A.**   That is not what I'm saying, and I don't believe that's

21   what I said.  You asked me -- you gave me permission to reveal

22   some of the strategies that he told me was part of his defense,

23   and I didn't associate that or say that had to do with him

24   signing the original plea.  I was just simply answering the

25   question that you asked me on what the defense strategies he

*JENKINS - CROSS*

1    revealed to me.

2    **Q.**  Okay.  So getting back to your report, saying he's capable

3    of weighing the merits of various defenses, what defenses was

4    he weighing the merits of in deciding to take the plea?

5    **A.**  I guess the part that's confusing is in deciding to take

6    the plea because I don't know if I specified that that's what I

7    was talking about.  I said, in general, he is able to weigh the

8    merits of various defenses.  I don't believe in my report I

9    specifically said it's in relation to a plea that he already

10   signed.  And that's what I'm getting confused with your

11   question.

12   **Q.**  Well, what -- okay.  So what are the merits -- the various

13   defenses you had in mind in thinking that he was capable of

14   weighing them?

15   **A.**  Well, one of the defenses I already explained is that he

16   believed that if he was found to be so disabled, it would help

17   him in court.  Another defense would be, I believe, to take a

18   plea, which he also was considering and said that you told him

19   was his best -- his best example or best option.  And so,

20   again, that part of my report is saying that I believe he is

21   able to weigh options, which I think he is.  He did not explain

22   to me all of those options, and I did not ask.  But I'm saying

23   that he has the capability of weighing those merits, and I

24   think the fact that he understood that part of the defense

25   strategy was that he go to all of these evaluations, be found

1   to be severely disabled would help him shows that he understood

2   the process and could be why he was so cooperative in doing all

3   of these evaluations.

4   **Q.**   Dr. Jenkins, do you think that it was Mr. Marks's choice to

5   have the issue of competency raised?

6   **A.**   Do I think that it was his choice?  I don't know.

7   Typically, the question of competency, in my understanding, is

8   it's typically brought up by anyone within the courtroom that

9   has concerns, which is typically the defense, the prosecution,

10  or the judge, him or herself, him bring up the question of

11  competency.

12  **Q.**   Do you think in this instance that Steven had anything to

13  do with our decision to make a competency motion?

14  **A.**   I don't know.

15  **Q.**   All right.  Do you have any reason to believe that Steven

16  would have thought of that?

17  **A.**   That he would have thought of what, sir?

18  **Q.**   Of raising the competency motion.

19  **A.**   I don't think I said that he did.

20  **Q.**   So I get back to -- so it wasn't his choice -- if you think

21  it was his choice to raise competency, let us know.

22      Do you think it was his choice --

23  **A.**   I don't believe I said that it was his choice.

24      **THE COURT:**  Mr. Mahoney, the question's been asked and

25  answered.  Please move on.

1    **BY MR. MAHONEY:**

2    **Q.**  So I get back to what were the merits of various defenses

3    that you tested him on?

4           **MS. CHANG:**  Your Honor, I object.  This has also

5    been --

6           **THE COURT:**  Yes, it has.  Your objection is sustained.

7           Mr. Mahoney, move on, please.

8    **BY MR. MAHONEY:**

9    **Q.**  Dr. Jenkins, you -- do you recall that Dr. Otto said, that

10   decision-making was the biggest challenge for Steven?  Do you

11   recall reading that in his report?

12   **A.**  I think that I remember someone -- again, there was a lot

13   of evaluations, but I remember someone discussing that that was

14   a problem for Mr. Marks.

15   **Q.**  Do you disagree with that?

16   **A.**  Do I disagree that decision-making is one of his -- what

17   exactly is the question?

18   **Q.**  That Dr. Otto said decision-making was the most challenging

19   thing for Steven.  Do you agree with that or not?

20   **A.**  Again, I don't recall if it was Dr. Otto.  If you're saying

21   it is, I will take what you're saying as truthful.  I agree

22   that decision-making is a weakness of his.  I don't know if

23   it's his greatest weakness, but I do agree it is a weakness of

24   Mr. Marks.

25   **Q.**  You've told us two things.  One is that you described this

1    as a tactic of his, since childhood, apparently -- is that

2    right? -- to let his parents make decisions for him?

3    **A.**   I don't think that's how I described it in my report.

4    **Q.**   What did you mean by "tactic," then?

5    **A.**   Again, without reading the full sentence, to have the full

6    context, when I referred to "tactic," it was more so this is

7    something he has learned to do.  This is something that he

8    relies on, which is always having support, because he's been

9    extremely supported throughout his life and continues to be.

10   And I've said that in the context of I believe that led to him

11   having a limited ability to be independent because he hasn't

12   had a lot of experience in having to do so.

13   **Q.**   In your report you say, "Mr. Marks is employing the same

14   decision-making tactic he has used his whole life -- look to

15   others to provide him guidance on a decision."  So by "tactic"

16   are you suggesting that he -- Mr. Marks made a decision that

17   "I'm going to go through life letting other people decide my

18   fate"?

19   **A.**   No, that's not what I'm saying.

20   **Q.**   Do you agree that executive functioning and difficulties of

21   executive functioning are central in autism?

22   **A.**   I would not say central.  I would say that executive

23   functioning can be associated with some of the deficits that

24   individuals on the spectrum have as well as anyone with a

25   developmental disability.

1  **Q.**  Did you read the article -- the chapter by Dr. Volkmar that

2  was marked as an exhibit?

3  **A.**  I reviewed -- all of the exhibits, I reviewed.  I did not

4  review them in their entirety.  I received three boxes of

5  exhibits last week, and it was just impossible to read

6  everything.  Do you have any more context so that I can see if

7  I recall anything specific?

8  **Q.**  Well, first of all, do you agree that decision-making is an

9  important part of executive functioning?

10 **A.**  Yes, I do.

11 **Q.**  And do you know how -- exactly why executive functioning

12 problems arise in autism?

13 **A.**  Can you rephrase that or ask it again?

14 **Q.**  Yeah.  Do you know why people with autism have problems

15 with executive functioning?

16 **A.**  That's a difficult question because people with autism --

17 it's a spectrum for a reason.  So people differ on that

18 spectrum.  Some might have issues with decision-making, and

19 some might not.  In fact, a lot are very rigid and would easily

20 make a decision that they're comfortable with.  So it's a

21 really difficult question to answer.  Psychology is not black

22 and white.

23 **Q.**  My question to you is are you aware -- when people do have

24 problems with executive functioning in autism, are you aware of

25 why that is?

1    **A.**  I think it could be for a lot of different reasons.  It

2    feels like maybe there's one in particular that you're talking

3    about in my report.

4    **Q.**  Yes.  Did you read Dr. Volkmar's explanation and

5    description of why executive functioning comes about in autism?

6    **A.**  As I said, I reviewed all the exhibits.  I wasn't able to

7    read them in their entirety.  I got them less than a week ago.

8    If you have more context about the article, I might be able to

9    recall, but right now, with no additional context, I don't

10   remember.

11   **Q.**  In context, he discussed how autism has to do at its core

12   with lack of social visual engagement with the world around

13   them; and lacking that social engagement with their peers, they

14   grow up lacking and not having any imaginative play and not

15   having the kind of interaction with other people where they

16   learn how they feel and think; that this is a prelude -- it

17   leads up to problems with executive functioning, which have to

18   do with, in part, predicting how the world works.  Does that

19   ring a bell with you?

20   **A.**  Thank you for that context.  I still don't remember the

21   article, but I can understand that philosophy of individuals

22   that have issues with executive functioning and are on the

23   spectrum.

24   **Q.**  So, in any event, you feel that Mr. Marks's decision-making

25   problems are not the result of his autism but the fact that his

*JENKINS - CROSS*                                                204

1    parents did things for him.

2            **THE COURT:**  Is that a question, Mr. Mahoney?

3    **BY MR. MAHONEY:**

4    **Q.**  Is that your view?

5    **A.**  No.

6    **Q.**  Or is it your view that he decided, as a tactic, that he

7    would relieve himself of the obligations of having to make

8    choices about his fate by letting other people tell him what to

9    do?

10   **A.**  No.

11   **Q.**  Is there any childhood development theory or theoretical

12   framework you have in mind in suggesting that Mr. Marks's

13   difficulties in making decisions now are because his parents

14   found it necessary to make decisions for him in the past?

15   **A.**  Are you asking me if there's any theories that say that?

16   **Q.**  Yes.

17   **A.**  What I would say to that is that's not exactly what I said,

18   first of all.  And in going with what you said, there are

19   theories about learned helplessness and things like that that

20   are in psychology.  But, again, I didn't say tactic as having a

21   negative connotation, which it sounds like you received it as.

22   What I was trying to explain, which I tried earlier, was that

23   Mr. Marks has had a lot of support throughout his life, and

24   because he's had a lot of support, he leans on people he trusts

25   to help guide him, which I think is accurate.

*JENKINS - CROSS*

1   And I think as it relates to competency and what we're

2 doing here, he trusts you, Mr. Mahoney, and so you being his

3 lawyer and someone he trusts and knows pretty well, I guess,

4 for the last few years, he leans on your guidance, and I do

5 think that is part of his decision-making, is to rely on people

6 he trusts to help guide him.

7   And I don't necessarily think that's a bad thing.  I think

8 a lot of defendants do that.  That's why we have lawyers and

9 people we trust in our lives, so that we can have guidance when

10 we may not have the information or the confidence about certain

11 situations.

12 **Q.**  Do you not agree, Doctor, however, that however smart I am

13 or good a lawyer or however accurate my advice might be, it has

14 to be Steven's own decision?  He has to be able to rationally

15 evaluate the advice I'm giving him and make his own decision;

16 isn't that true?

17 **A.**  Is that the question?

18 **Q.**  Yes.

19 **A.**  Yes, I do agree with you, and I think Mr. Marks does too.

20 In fact, the page that you still have up on the screen, the

21 last line -- he says, "Ultimately, it is my choice," which I

22 think also shows that he understands that regardless of how

23 smart and trustworthy you are, it is still his choice at the

24 end of the day.

25 **Q.**  Well, it's his choice because he's the one who has to put

*JENKINS - CROSS*                                                              206

1    his pen to the paper to sign it.  He has to agree to do that;

2    right?

3    **A.**  It's his choice because it's his life and it's his

4    decision, and signing the piece of paper, as you describe it,

5    if that's what he chooses to do, would be part of him, I guess,

6    utilizing his choice.  That's the physical part of him showing

7    his choice.

8    **Q.**  But does that show that it's rationally achieved?

9           **THE COURT:**  Mr. Mahoney, I don't understand what you

10   just asked.

11   **BY MR. MAHONEY:**

12   **Q.**  The fact that he signs and makes the choice to sign, does

13   that answer the question about whether he rationally arrived at

14   that choice through a deliberative process of his own that he

15   was capable of?

16   **A.**  Yeah.  I discussed that in my clinical opinion.  Making the

17   decision to trust his lawyer is a decision in itself, and so I

18   do believe it's a rational decision to trust his lawyer.  I

19   have many defendants, some I'm evaluating right now, that do

20   not trust their lawyer and could care less what their lawyer

21   says.  So I think he is making a rational active decision to

22   trust you and to use your guidance, and if your guidance leads

23   him one way and that's what he decides to do, it's ultimately

24   his decision, but I do think he is going about it in a rational

25   way.

**Q.**  Is that -- if he still is unable himself to make that
choice on his own with advice of an attorney but decides "Well,
I trust my lawyer, so I'll just let him decide," is that the
rational choice that you think is adequate to find somebody
competent?

**A.**  That question is somewhat confusing to me because, again, I
still think it's his choice to decide to take a plea.  It's his
choice to decide to go to trial.  It's all his choice.  So how
he comes about his choice is his prerogative, and in this case
it appears that he leans on your guidance, even above his own
father's, he actually said.  But it's still his choice, and
it's still a decision.  He's still making a decision to go one
way or the other with your guidance, and he's making a decision
to even utilize your guidance.

**Q.**  Did you test out in any way Steven's actual decision in
this case to sign the plea agreement as to whether it was
simply because he could not decide and could only rely on my
advice?

**A.**  Did I test his -- can you -- can you rephrase that?

**Q.**  Did you test out in any empirical way or in any fashion
whether Steven was able to do -- able to decide on his own
rather than just taking my advice because he couldn't make a
decision himself?

**A.**  I'm not sure what type of empirical testing you're talking
about.  There's not, like -- this is a very specific situation,

1    which Mr. Marks himself discussed with me, that, yes, initially

2    he decided to sign that original plea because that is what

3    you -- that's the guidance or advice you gave him, but he also

4    acknowledged that he did it because he believed he would

5    receive less time, less prison time.  So, to me, that is a

6    rational decision that is making a decision despite your

7    guidance.  I think it's with the help of your guidance because

8    it's my understanding you told him how much time he could be

9    facing if he went to trial versus taking the plea, and so he

10   was able to rationally say, "I also took it because it's less

11   time," and that's what a lot of people in his situation do.

12   They -- they make a decision that they believe will give them

13   less time in prison.

14   **Q.**   That's what he told you afterward; right?

15   **A.**   After- -- afterward?

16   **Q.**   After he signed the agreement.

17   **A.**   I'm sorry?

18   **Q.**   That's what he told you after having signed the agreement.

19   **A.**   My understanding is when Mr. Marks came to us for an

20   evaluation, that there was a plea that he had signed and that

21   his competency came into question, and I testified that I

22   wasn't sure if that plea would still be valid or not.  So if

23   you're asking if this discussion happened after he signed that

24   original plea, then yes, because it was the question of

25   competency that led him to even come to us for a competency

1    evaluation.  So the entire evaluation happened after he signed

2    this original plea.

3              **MR. MAHONEY:**  All right.  That's all I have.

4              **THE COURT:**  Thank you, Mr. Mahoney.

5              Ms. Chang, do you have redirect?

6              **MS. CHANG:**  No, Your Honor.

7              **THE COURT:**  Thank you very much.

8              Dr. Jenkins, thank you very much.  This concludes your

9    testimony.

10             Ms. Chang, is Dr. Jenkins going to be your rebuttal

11   witness, if any?

12             **MS. CHANG:**  If any, yes, Your Honor.

13             **THE COURT:**  So then Dr. Jenkins is going to stay on

14   for the remainder of the hearing?

15             **MS. CHANG:**  Your Honor, my plan was to update her

16   tomorrow as the hearing proceeds.

17             **THE COURT:**  That's perfectly fine.  So, in other

18   words, it's fine for Dr. Jenkins to log off?

19             **MS. CHANG:**  Yes, Your Honor.

20             **THE COURT:**  And, Mr. Mahoney, any objection to that?

21             **MR. MAHONEY:**  No, Judge.

22             **THE COURT:**  Okay.  Dr. Jenkins, thank you very much

23   for your testimony.  It's been very informative.  You are free

24   to log off, and I may or may not see you again for the

25   remainder of the hearing.  So thank you very much for your

1    time.

2          **THE WITNESS:**  Thank you, ma'am.  Thank you,

3    Your Honor.

4          **THE COURT:**  Thank you.

5          So, Ms. Chang, what other evidence do you have?  And I

6    do note that no government exhibits have yet been admitted into

7    evidence.

8          **MS. CHANG:**  And that's what I was going to remind

9    myself to do, Your Honor.

10         **THE COURT:**  Okay.  Very good.

11         **MS. CHANG:**  At this time the United States seeks to

12   admit all of the exhibits that we made available to the Court.

13   So that's 1 through 7, 8.1 through 8.20, 10 through 16.

14   Number 9 has been deliberately omitted.

15         **THE COURT:**  Okay.  So, Mr. Mahoney, let me ask you:

16   Do you have any objections to the exhibits listed on the

17   Government's exhibit list, which, again, is 1 through 7, 8.1

18   through 8.20, and Exhibit 9 has been omitted, and then it's 10

19   through 16?  Any objections to those, sir?

20         **MR. MAHONEY:**  No, Judge.

21         **THE COURT:**  All right.  They will all be admitted

22   without objection.

23      (Government's Exhibit Nos. 1 through 7, 8.1 through 8.20,

24   and 10 through 16 were admitted into evidence.)

25         **THE COURT:**  Any other evidence on behalf of the

*BENNETT - DIRECT*                                              211

1    United States?

2            **MS. CHANG:**  No, Your Honor.

3            **THE COURT:**  All right.  Mr. Mahoney, is the defense

4    prepared to proceed?

5            **MR. MAHONEY:**  I was intending to put -- have a witness

6    appear remotely.  I need to call and make arrangements so they

7    can -- well, we have --

8            **THE COURT:**  You have -- I think you have six witnesses

9    on your list, and I see two people in the back, and I see

10   Ms. Bennett on the screen.

11           **MR. MAHONEY:**  I can call Gretchen Bennett, and I can

12   proceed with Gretchen Bennett, Your Honor.

13           **THE COURT:**  All right.  Very good.

14      (Witness sworn.)

15           **THE COURTROOM DEPUTY:**  Please state your name for the

16   record.

17           **THE WITNESS:**  Gretchen Ann Bennett.

18                          **DIRECT EXAMINATION**

19   BY MR. MAHONEY:

20   **Q.**  Ms. Bennett, can you tell us a little bit about your

21   education.

22   **A.**  Yes.  For my undergraduate degree, I attended Ithaca

23   College, which is a college in New York State.  My

24   undergraduate degree was in teacher and speech and hearing

25   handicap.  I received my bachelor's there, and then I went on

1    to receive my master's degree at the University of Buffalo in

2    speech-language pathology.

3    **Q.**   And what -- can you tell me what your current job is.

4    **A.**   Yes.  So following graduate school, I worked in the school

5    district and worked in three self-contained special ed

6    classrooms and had multiple children with autism or Asperger's

7    syndrome or significant learning disabilities or cerebral

8    palsy, different complex communication needs.

9         After being there for approximately four years, I was

10   recruited to go back to my alma mater, which was the University

11   of Buffalo, to teach as a clinical faculty member.  So I've

12   been there since 2003 in a full-time capacity.  I am a clinical

13   associate professor, which just means that I have demonstrated

14   success and have been promoted to that level.

15   **Q.**   I just want to back up for a second.  You have a master's

16   degree, and how long did it take to get that degree?

17   **A.**   So the master's program is approximately a two-year

18   program.  It has a fall semester, spring semester, full summer,

19   fall semester, and then a spring semester, which is in the

20   community, and then students graduate that May.  So it's just

21   under two years, but it's five semesters.

22   **Q.**   And so in the community, was that a fellowship?

23   **A.**   Yeah.  Following -- so your last semester, you complete an

24   externship in the community or two of them, and then before you

25   earn your national certification or state license, you do need

*BENNETT - DIRECT*

1  to complete a clinical fellowship year, or CFY, and then you do

2  that in the community, and you are supervised by a seasoned

3  speech-language pathologist, who then meets with you,

4  supervises you, and records that data about working with you

5  and submits that to our national accrediting body and New York

6  State Office of the Professions.

7  **Q.**  Did you get any awards or recognition when you were at UB,

8  University of Buffalo?

9  **A.**  I did.  I did.  I received the Mary B. Mann Award and a

10  Tindle-Shupe Award.  Both were for clinical excellence.

11  **Q.**  Now, in your fellowship year, did you work with autistic

12  children?

13  **A.**  Yes, I did.

14  **Q.**  Can you tell us just a little bit about that.

15  **A.**  So I was in three different classrooms --

16  kindergarten/first grade, second/three grade classroom, and

17  fourth/fifth grade classroom, and then I also worked with

18  individuals in the middle school or high school as needed.  And

19  so I was responsible -- as the students who were assigned to

20  that classroom already had been evaluated and their goals had

21  already been set by the evaluating therapist, I followed

22  through with the recommendations and worked to develop their

23  vocabulary, their listening comprehension, their ability to

24  tell stories, their ability to converse, their ability to

25  problem solve, to interact with other people, to ask other kids

1    to play, to, you know, learn how to tell someone that they did

2    not like something or preferred to do something different, join

3    in playing with other children.  So it was a pretty large

4    breadth.

5         I also worked with individuals of cerebral palsy who would

6    have used maybe a nonmediative system to communicate but also

7    had some significant social interaction concerns just because

8    of the limited exposure.

9    **Q.**  You -- you are certified now?

10   **A.**  Yes.  Uh-huh.

11   **Q.**  And what kind of certification do you have?

12   **A.**  So I have a Certificate of Clinical Competence, which is

13   from our national accrediting body, which is ASHA.  It's the

14   American Speech, Language, and Hearing Association, and I'm

15   also licensed through the New York State Office of the

16   Professions.  For both of those, I need to complete 30

17   continuing education hours every three years, and I pay typical

18   fees for membership to them.

19   **Q.**  Have you been professionally involved with different

20   organizations that focus on autism?

21   **A.**  Yes.  In the past I was on the board for autism services,

22   which is a local agency that works with mainly children with

23   autism from birth until they would finish school at 21.  And so

24   I was on that board for about four or five years.

25        Then I also was asked to be -- I was the cochair

*BENNETT - DIRECT*

1    originally.  So New York State has an association of

2    speech-language pathologists just as there is a national

3    association of speech-language pathologists.  There's ones in

4    most states as well.

5        And so every year they put on a conference for continuing

6    ed for people in New York State to pay and attend and to

7    continue their education, and they have multiple tracks that

8    are available for practitioners to attend because people have

9    different interests.  Speech pathologists work from birth all

10   the way up to till old age.  So there's a variety of tracks.

11       There was typically around four or five tracks.  One of

12   them is autism.  So several years ago, I was the cochair for

13   the autism track and then -- then I also, the year before

14   COVID, was the chair for the autism track for -- for the New

15   York State association.

16   **Q.**  So what is -- and when you speak about speech and language,

17   is it useful to ask what is speech?  I think it is useful.  Can

18   you tell us what is speech in your environment.

19   **A.**  Yeah.  Absolutely.  I think that's a very common question

20   because I often have people say, "Oh, you work with individuals

21   with autism.  With speech, I didn't realize that they had" --

22   and they merely think just of articulation.  So when you think

23   of a speech-language pathologist, we work with individuals who

24   have structural concerns that impact their communication or

25   they might have cognitive concerns that impact their

1    communication.

2        So if they have, for example, structural concerns, you

3    might have someone that maybe is articulating incorrectly, so

4    they maybe have some issues in the way that they're speaking.

5    You might have someone that stutters.  You might have someone

6    that has difficulty swallowing.  So it's more of a structural

7    issue after someone's had a stroke or a traumatic brain injury.

8        But you also want to look at that cognitive side.  So you

9    might have someone that has had a stroke or traumatic brain

10   injury; and they, therefore, have aphasia, which might have

11   difficulty in speaking or them understanding.  You also -- I

12   mentioned traumatic brain injury, so someone could have that

13   condition and then have difficulty with executive functioning,

14   in that area.

15       You also -- we also work in the area of pragmatics.  So you

16   could have someone, for example, with autism and having

17   difficulties with social pragmatic communications as well as

18   executive functioning scales, delays in language.  So we work

19   on the -- any communication disorders that would be structural

20   or cognitive, and we work from birth until old age.  And our

21   job is really to know how to screen individuals, so first to

22   say could a problem possibly exist with this person, so if

23   that's in the school district or that's in a hospital setting,

24   to just know and have a firm basis in communication to know

25   what problems could there be because of what's happening with

1   this child or what might have happened in the hospital --

2   **Q.**  Okay.

3   **A.**  -- and then to assess that child or adult, determine if

4   there's a diagnosis, create a plan, so a treatment plan to say,

5   "I see where this person is, and I need them to get from here

6   to here.  So what am I going to do to effectively support and

7   help them move through this process?"

8       And then I need to actually provide that treatment and

9   those steps, and then I also need to provide training and

10  support to the families because a speech pathologist might see

11  a client twice a week but the family or the teacher with them

12  more often.  So we also have to be capable of providing those

13  tools to other people to support that person in their

14  environment.

15  **Q.**  In your report you say something to the effect that

16  patterns of deficits in speech and language can point to

17  possible developmental or neurological conditions.  What --

18  what does that -- what does that mean?

19  **A.**  So there's -- so when we would evaluate a child -- I should

20  preface this.  I mainly see children and young adults, so I may

21  often answer you in that term, but a speech pathologist could

22  see birth and old age.  So I would evaluate a child, maybe hear

23  their history, what's going on with someone, and I might have a

24  couple of ideas of what might be going on, but then I would

25  want to choose testing instruments that would -- would further

*BENNETT - DIRECT*                                                    218

1      investigate what my thoughts might be.  So I need empirical

2      data to support what my assumptions might be from that

3      interaction, and then I would look for specific patterns in

4      where that child is having difficulty, and I would also do a

5      pretty thorough background history with the school and with the

6      parents to see where they're having trouble with that child at

7      home because how that child performs for me might be slightly

8      different than what they're doing at home or how they're

9      performing in school.  So it's important that I get a full

10     picture, but to see those different patterns to indicate this

11     is a child that would struggle within the classroom and

12     listening or synthesizing information or this is a child that

13     would do well in that environment, but this other cast might be

14     more difficult.

15          Did that answer your question?  I apologize if it was --

16     **Q.**  I think my -- are you saying that evaluating speech and

17     language can help in uncovering or dealing with developmental

18     or neurological problems?

19     **A.**  Yes.  Yes.

20     **Q.**  Is this just -- isn't it just common sense that the way

21     somebody talks is a window into their mental operations?

22     **A.**  I would not agree with that.  I've had a lot of experience

23     assessing children and young adults, and sometimes a person may

24     come across initially as more proficient than they are, but

25     once you spend more time with them or gather additional

*BENNETT - DIRECT*                                                219

1    information or complete testing where you're specifically

2    assessing a certain skill, you can see where that person may

3    have more deficits than you would expect.

4    **Q.**   I forgot to ask -- forgot to ask you one thing also.   Are

5    there PhD-level degrees in speech and language pathology?

6    **A.**   Yes, there are, but for treating and the work that I do

7    with working with patients, the master's degree is the end

8    degree needed for that work.

9    **Q.**   And the speech and language pathology is science.   Is it

10   supported by --

11   **A.**   Yes.

12   **Q.**   -- peer review and empirical study and the collection of

13   and reporting of data and --

14   **A.**   Yes.   We have many journals -- peer-reviewed journals.

15   *American Journal of Speech, Language, and Hearing*.   There is

16   school journals.   There's journals that are just on specific

17   disorders.

18   **Q.**   Does every major university have a department devoted to

19   speech and language pathology?

20   **A.**   Many do.   I can't answer that all do, but many do.

21   **Q.**   What is -- why is it especially important to understand --

22   why is speech and language pathology science especially

23   important in understanding people with autism?

24   **A.**   One area of significant deficit for individuals with autism

25   is that social pragmatic communication and how they fit into

*BENNETT - DIRECT*                                                    220

1    that social world, how they might perceive other people, how

2    they maybe adjust how they are acting for the different

3    situations, the different social situations.  That is very

4    impaired with individuals with autism, and so the study of

5    speech-language where we help with -- so when I'm working with

6    individuals with autism, I would work on any traditional

7    language areas, for example, vocabulary, listening,

8    comprehension, following directions that are more traditional

9    language areas.

10       But with an individual with autism, you also have these

11   higher-level language areas that are -- can be affected, and

12   some of those areas would include, you know, multiple meaning

13   words, understanding perspective taking, being able to be

14   flexible in your thinking, negotiating, explaining yourself.

15   So all of those are more higher level because they're more

16   complex and complicated than just being able to look at a

17   picture and know what that vocabulary word is.

18       So pragmatics is one of the main areas of focus that speech

19   pathologists may need to be aware of.  It's in our scope of

20   practice.  But some speech pathologists might focus on that, as

21   I have.

22   **Q.**  You used some terminology in your report --

23           **THE COURT:**  Mr. Mahoney, wait a second.  Are you

24   planning on tendering Ms. Bennett as an expert?

25           **MR. MAHONEY:**  Yes, Judge.

*BENNETT - DIRECT*                                                221

1          **THE COURT:**  Would you like to do that at this time?

2          **MR. MAHONEY:**  Yeah, I believe I will do that at this

3    point, Judge.

4          **THE COURT:**  Sure.

5          Any objection, Ms. Chang?

6          **MS. CHANG:**  No, Your Honor.

7          **THE COURT:**  And what area are we tendering Ms. Bennett

8    in, please?

9          **MR. MAHONEY:**  In speech and language pathology.

10          **THE COURT:**  All right.  She is so tendered.

11          Go ahead, Mr. Mahoney.  I apologize for interrupting.

12          **MR. MAHONEY:**  No.  I --

13          **THE COURT:**  It's late in the day for all of us.

14          **MR. MAHONEY:**  Thank you.

15          **THE COURT:**  And, Ms. Bennett, thank you for your

16    patience all day.  I know it was a long day for you too.

17          **THE WITNESS:**  It's no problem.

18          **THE COURT:**  Go ahead.

19          And just for reference, I'd like to go to about 5:15.

20    So you have about 25 more minutes to get questioning in.  So if

21    you can get to a good stopping around there, that would be

22    great.

23    **BY MR. MAHONEY:**

24    **Q.**  If a question of a word -- meaning of a word comes up, we

25    can address that.  Let me go to the testing.

1        What do you hope to learn from testing and why can't you

2    just listen to somebody talk and figure out their level of

3    understanding and -- and so on?

4    **A.**   Yeah.  Well, language is complex, and that's one of the

5    reasons that when we refer to individuals with autism -- you

6    might see it's a complex communication impairment is because

7    there's many levels to it.  It's not straightforward, and so

8    someone could change their -- or it could have a more acquired

9    temperament or could have a louder temperament, but depending

10   on their temperament, they may be able to go under the radar.

11       I know there's a book -- I'm not sure if everyone would be

12   familiar with it, but there's a book called *Pretending to Be*

13   *Normal* where some people talk about some of these skills that

14   we address in speech and language that is called the "hidden

15   curriculum."  So there are skills that an individual might have

16   or actually may not have but others might assume that they do

17   because it is something that's not taught.  It's not something

18   taught in school, and so most kids just absorb it, learn it,

19   and go on with their life; and so people don't realize that if

20   a child with autism has some issues of concern, it could be

21   because they're some of these areas that weren't explicitly

22   taught or are more vague.

23   **Q.**   All right.  So it's not obvious, in other words?

24   **A.**   It's not obvious.  Correct.

25   **Q.**   So could you briefly go through the tests that you gave.

1   Tell us a little bit about the tests and --

2   **A.**   Yep.

3   **Q.**   -- if it's a standardized test and what the result was in

4   each one.

5   **A.**   Oh, of course.  So the first test that I gave was the Test

6   of Adolescent and Adult Language.  It's a Fourth Edition.  It's

7   a standardized assessment.  And I chose this evaluation because

8   it is normed on Mr. Marks's age, and it gives an assessment of

9   general language ability for the purposes of how adults tend to

10  use their language.  And it looked at both spoken and written

11  language.

12      Mr. Mahoney, are you asking me to go through the results or

13  just go through the test?

14  **Q.**   If you could just briefly summarize what the results were.

15  **A.**   Of course.  Yeah.  So -- so when looking at this area, this

16  looked at Steven's understanding of vocabulary, so

17  understanding words like antonyms, synonyms, being able to put

18  analogies together, and he -- he struggled.  He really -- he --

19  he -- the -- the way that the test is set up, it starts off

20  easier, and it gets more difficult as you keep going, and once

21  he hit the point that the words were too complex, he would

22  either not know the answer or he would guess and be pretty far

23  off with what the word would actually mean.  But he came -- he

24  understood what the task was, and he did well with words that

25  were easier.

1          And then it has a written portion where he needed to

2     combine sentences, put them together with language.  But,

3     overall, it showed that he has below-average scores in his

4     language ability and his ability to use and understand

5     vocabulary that would be expected for someone of his age.  So

6     what implications would I see is that when he is listening or

7     participating in conversations and vocabulary is being used

8     that he's not familiar with, he would lose the message or the

9     intent of what is being communicated to him.

10    **Q.**  And is the -- I see results like severe delays.

11    **A.**  Yep.  Uh-huh.  He performed poorly on several of the areas

12    and below average.  So, overall, it gave him a general language

13    composite, which is a view of how his overall language is based

14    on how most typical adults use language, and he came out in

15    that poor-severe range.

16    **Q.**  What about --

17    **A.**  That's not looking at higher-level language.  That's just

18    looking at his typical language.

19    **Q.**  What's the difference between higher-level language and --

20    **A.**  So higher-level language is when language would become more

21    complex.  So when you would use, like, metacognitive skills --

22    so that would be inferential thinking, like I say something to

23    you and then I jump to another part, and I'm expecting you to

24    kind of infer what happened in the middle.  That was

25    significantly difficult for Steven.  He was able to, through

1   multiple choice, maybe pick a few options, but when he needed

2   to generate that himself, that was really difficult.

3        Also, it's maybe looking at -- because with that

4   metacognitive, it's thinking about thinking.  It's also having

5   him be able to realize "Hey, I'm not sure, or I don't

6   understand this, so maybe I need to ask a question about it or

7   maybe I need to ask for clarification or maybe I need to do

8   something to try to help myself understand this better."  So

9   that's thinking about thinking.  That's self-awareness of where

10  you might be struggling.  So it has that inferential thinking.

11       Also, for the metacognitive stuff, it's also looking at

12  literal versus nonliteral or more concrete versus less

13  concrete, less flexible thinking.  So an individual that would

14  be more concrete in their thinking is a little more black and

15  white or just very literal with their interpretation.  So if

16  you were to use sarcasm or to, you know, say something like

17  "That was a piece of cake" and mean, like, that was easy or

18  that was a piece of cake, that means that I'm being sarcastic,

19  that wasn't.  So those are all higher-level things because the

20  language is there, but the intent of the speaker might be very

21  different.  So the individual needs to understand that language

22  can be impacted by the way it is communicated.

23       So that is an area that is often difficult for individuals

24  with autism, and so in my practice I often have individuals',

25  that are any year in school, families come to see me for

1    another opinion, or school districts actually will pay for an

2    evaluation with me because I specifically look at that

3    higher-level language skills and then give recommendations to

4    the schools on what the therapist there could work on to help

5    those issues.

6    **Q.**   Okay.   The next test was the clinical evaluation of

7    language fundamentals.

8    **A.**   Yep.   The clinical evaluation of language fundamentals is

9    my gold standard of assessments.   There is a clinical

10   evaluation of language fundamentals.   There is a traditional

11   language assessment.   This is a supplement to that, which is

12   the one that I gave, and that looks at metacognitive skills and

13   higher-level language skills.   It looks at -- let me go to my

14   chart here.

15       So in looking at Steven's performance, certain areas were

16   more difficult than others.   So the metalinguistics profile was

17   actually completed by Angela and Mr. Wood from Aloft.

18   **Q.**   Yeah.

19   **A.**   And there are questions asking about the executive

20   functioning, about the cognitive skills, and I would give

21   descriptions, and then they would share how Steven performed,

22   and then I entered it on a rating scale with them.

23       Making inferences, for this section, because -- because

24   Steven had a multiple-choice option, that was easier for him,

25   but when he was asked to be independent with it, he had more

*BENNETT - DIRECT*                                                227

1    difficulty.

2         Looking at conversational skills, this was his ability to

3    look at a situation that could be happening, make sure he was

4    looking at it from a global perspective, taking in all aspects

5    of what was happening in a scene, and share what -- what one

6    participant could be saying to another, and that was quite

7    difficult for him.

8         Also, looking at multiple-meaning words, understanding that

9    flexibility, he often would be able to talk about one meaning

10   of a word but couldn't think of that other meaning of a word

11   and that figurative language to say, like, what -- what does

12   this mean?  What is this implying?

13        And so when you take this -- all of these different

14   subtests together, you get a profile of where someone is

15   performing for their higher-level language skills, and it

16   showed that Steven has impairments in that area, which I am not

17   surprised in.  Often families, when I give this assessment,

18   say, "Wow.  This is the first assessment that really captures

19   the areas that my child is having difficulty."

20   **Q.**  So you end up with an overall discussion here on page 6 of

21   your report, which also reports the range of age equivalencies

22   for these different subtests; is that right?

23   **A.**  I have the age equivalencies as well.  So that is saying

24   that is where a child -- so on his performance was similar to

25   the average performance of a child that was that age.

1   **Q.**  All right.  So -- and, by the way, the metalinguistic

2   profile, you have -- all the other tests were based on what

3   Steven did -- right? -- in the metalinguistic part?

4   **A.**  Correct.

5   **Q.**  Or reporters in this case, the people who have been

6   supervising him for all this time?

7   **A.**  Yes.

8   **Q.**  This is a standardized instrument; right?

9   **A.**  Yes, it is.

10  **Q.**  And so the way it's -- it's -- the questions are being put

11  and so on are designed to be objective and not subject so much

12  to subjective intentions of the people that are being

13  questioned?

14  **A.**  Oh, yeah.  It's not subjective.  There is a very specific

15  manual of what is acceptable, what is not acceptable.  There is

16  no room for my interpretation.  My interpretation of the

17  results were not for scoring it one way or the other.

18  **Q.**  Right.  So the -- moving quickly along, the Social Language

19  Development Test.

20  **A.**  Yes.  So the Social Language -- the Social Language

21  Development Test is specifically -- this is for adolescents.

22  So this looked at Steven's ability with making inferences,

23  interpreting social language, problem solving, social

24  interaction with others, and interpreting ironic or sarcastic

25  remarks.  This was -- this is a little bit different.  This

1    making inferences subtest, then, was on a previous test where

2    this is a visual picture, so looking at how he was able to look

3    at a picture of someone and determine "What do you think they

4    could be thinking?" And some of them were pretty obvious. His

5    answers were quite simplistic where he would be, like, "Oh,

6    they look happy" or "Oh, they look mad," instead of annoyed or

7    frustrated. So richer vocabulary words were not words that he

8    was able to come up with.

9         For interpreting -- interpreting social language, it's

10   abilities -- so we look at -- it asks -- it describes

11   something, and it says, "Why would a person act this way, or

12   why would they do this?" It just showed how concrete he was

13   because he was not able to think more globally or give more

14   descriptive answers. They were just quite simple.

15        For his problem-solving area, he also was very simple in

16   his responses. So even if it asked him, you know, "Your friend

17   really wants to do this, and they want you to do it too. The

18   problem is you don't want to do it. What would you do?" and he

19   said, "Well, I would probably do it because maybe I would like

20   it." So he -- he -- he wasn't able to talk about if there's an

21   issue and you have a problem, how would you address that

22   simple, simple teenage young adult problem: What could you say

23   and why would that be a good idea?

24        So that -- and he would seem to be unaware that this was

25   difficult for him. He appeared to believe he was doing a good

*BENNETT - DIRECT*                                          230

1   job.

2   **Q.**  In looking at these scores, I just want to ask, why does he

3   appear better in social interaction where his percentile rank

4   is in the single digits in terms of --

5   **A.**  Oh, sure.  So the social interaction piece, it describes a

6   situation that are, like, common experiences, but Steven is

7   very polite and very -- he gave supportive responses.  So if --

8   it might describe that you did something wrong.  What can you

9   do?  And he said, "Well, I would say that I was very sorry."

10  Or if this person offered this to you and you didn't want it,

11  he said, "I would say, 'No.  Thank you.'"  So it's him saying

12  what he would do in those social situations.  It doesn't mean

13  that if he was in that social situation, he would be able to

14  follow through and perform that way.  But he would be able to

15  tell me what he should do, and because he was -- he does know

16  those social, like, ways to act appropriately, he did not have

17  an issue with that social interaction piece.

18  **Q.**  So, overall, that shows he's what?

19  **A.**  Yeah.  It -- it showed that he knew how to act polite,

20  be -- say thank you.

21  **Q.**  I mean, overall, in terms of this test.

22  **A.**  Oh, overall, in terms of this test, he had a scaled score

23  of 70, which indicates that he is impaired.  So this overall

24  social language piece is really difficult.  He has a difficult

25  time looking at other people and kind of assessing what could

1    be going on, what they're feeling, because you do need to know

2    "If I'm going to approach someone, I need to be able to read

3    the situation and know is this a good time, is this not a good

4    time and what should I do," because how we interact socially,

5    we always are assessing what other people are doing or what --

6    what we might need in assessing our needs and "Is it

7    appropriate that I ask this person or not?"  And so that area

8    for him -- which is, you know, reading a social situation,

9    interpreting what might be happening, if there is a problem,

10   how do I interact with this person to figure out what to do

11   differently.

12       And this last section, which is on ironic statements, he --

13   Steven had a really hard time.  I don't think he actually got

14   any of them correct.  He felt that he was -- this is where it's

15   a video -- not a videotape, an audiotape recording of a person

16   using an idiom or a sarcastic remark, but they're using it to

17   express the opposite meaning.  So instead of, for example,

18   piece of cake or another piece of cake or don't knock yourself

19   out, the person says it in a way that it means the opposite.

20   And every single time he gave me the literal meaning -- so a

21   piece of cake -- that means it was easy.  Don't back yourself

22   out -- oh, that means don't work too hard.  And very -- it was

23   easy to work with, and he showed this.  I'm not surprised by

24   this profile of scores, as most of the kids that I work with,

25   these are the areas that they have difficulty.

1    **Q.**  Just a quick question.  Because -- just because somebody

2    who has autism looks at you, does that mean that they are

3    gathering the same kind of social information that typically

4    that all people get when they look at the other people?

5    **A.**  From just looking?

6    **Q.**  Yeah.

7    **A.**  Are you talking about eye contact --

8    **Q.**  Eye contact, yeah.

9    **A.**  -- or just looking?

10       Well, no.  I mean, a person -- just because a person is

11   looking would not mean that they are able to gather that same

12   social information from their environment and make the same

13   inferences that others would be able to make.

14   **Q.**  Okay.  You got the theory of mind.  The theory of mind --

15   now, were these all standardized tests that we've mentioned so

16   far?

17   **A.**  Some of them are -- were more questionnaires, but they do

18   have research papers on it.  So the -- or have research behind

19   them.  So Simon Baron-Cohen -- his -- that's his -- his

20   product.

21   **Q.**  Which one?

22   **A.**  Oh, for the Theory of Mind Inventory.

23   **Q.**  Yeah.

24   **A.**  It was a self-report that Steven completed.

25   **Q.**  Briefly, theory of mind is a term that's -- it started

*BENNETT - DIRECT*

233

1    uniquely to describe the problem that people with autism have;

2    is that right?

3    **A.**  Correct.  Yes.

4    **Q.**  And could you -- in doing that, what did you find out with

5    this -- briefly describe what theory of mind is and how does he

6    rate in having theory of mind.

7    **A.**  Yeah.  It's the ability to really understand that other

8    people may have other perspectives, and the big part is not

9    just that other people have other perspectives but the fact

10   that other people have other perspectives is okay.  And many

11   times, when people describe it, they leave that second part

12   out.  It's -- and it -- it also connects to that flexibility in

13   thinking.  So it's not just my way.  It's "I could have my

14   opinion and want to do something one way, another person could

15   have their opinion, and both are okay."

16   **Q.**  All right.  And how does he fare in terms of his rank on

17   this one?

18   **A.**  Well, his -- from the assessment that was completed, it

19   showed that he had significant difficulty in comparing him to

20   other students with autism.  He was in the 23rd percentile, but

21   when comparing him to typical developing males, his percentile

22   dropped to below 1 percent.  That means only 1 percent of

23   individuals performed had more difficulty than he did in the

24   task.

25   **Q.**  And -- okay.  So then there's some more.  I'm trying to get

*BENNETT - DIRECT*

1   through this quickly.

2   **A.**   Yes.  I know.

3   **Q.**   Can you tell -- briefly review this, the file -- that ones

4   that you have remaining.

5   **A.**   Yeah.  So from -- so for this assessment, you analyze every

6   single answer that he actually gives, and the areas that Steven

7   showed difficulty with were affective empathy, episodic memory,

8   nonliteral language, complex social judgment, detecting lies

9   versus jokes, so, like, being -- so when I'm reading this list,

10  some of the things that I've already just talked about, this

11  sort of confirms that the areas I saw in my standardized

12  testing also are showing up in this area to sort of solidify

13  that this is an area of difficulty for him.

14       Empathy, cognitive and affective; emotion recognition, so

15  understanding how other people are feeling; situation-based

16  emotion; social awareness; social perception of body -- like,

17  reading body language but also being aware of the body language

18  he's using, voices, reading eyes, figuring out the mood of

19  somebody else; being able to tell if someone is lying to him;

20  that emotional intelligence; future thinking, so to be able to

21  project, like, "I am looking at this information.  What does

22  this mean for the future?" and that expressive pragmatics,

23  which is just in conversation, in talking to other people, and

24  having that social -- social ability to have those smooth

25  interactions.  So that information that I gathered from him

*BENNETT - DIRECT*                                                    235

1  supported the standardized tests that I had already given him.

2  **Q.**  All right.  So where are we?

3  **A.**  So then we have the empathy quotient.  So that is

4  Simon Baron-Cohen and Wheelwright, and that is a behavior

5  scale.  And so both Steven and his father filled out the -- the

6  empathy quotient separately, and then I was able to look at

7  their results.  And so a score of 30 or less indicate a lack of

8  empathy, which is common for individuals with autism and

9  Asperger's.  And it's referring -- this test is referring to

10 what we consider as cognitive empathy.  Steven scored 17 out of

11 80, which is farther -- pretty significantly below that 30

12 mark, which is pretty commensurate with what his dad reported,

13 which was 19 out of the 80.

14     So both scores confirm his lack of cognitive empathy, as

15 would be expected.  None of this didn't surprise me that he

16 would have had -- it was more difficult for him to kind of tune

17 in to how other people are feeling and realize what he should

18 do differently or how he should behave differently in -- so we

19 can -- so just, like, knowing what to do in situations would be

20 difficult.

21 **Q.**  You pointed out that this is -- this empathy is not caring

22 about somebody.  It's about perceiving the feelings and

23 intentions of other people.

24 **A.**  Yeah.  So the cognitive empathy is more taking other

25 people's perspective, putting yourself in somebody else's

*BENNETT - DIRECT*

1    shoes, where the emotional empathy is, like, sharing "I

2    understand.  I feel how you're feeling."  That.  So he actually

3    showed difficulties in both in the ratings scale, but the

4    Cambridge Behavior Scale is specifically looking at cognitive

5    empathy.

6          **THE COURT:**  Mr. Mahoney, are we at a good stopping

7    point?

8          **MR. MAHONEY:**  We are at the stopping point, Judge.

9          **THE COURT:**  Well, I mean, how many questions do you

10   have?

11         **MR. MAHONEY:**  Obviously, I'm trying to get through

12   this quickly.  So we're -- it would take us -- yeah, we need to

13   take a break, I guess.

14         **THE COURT:**  Okay.  Not a problem.  So we're going to

15   start tomorrow at 9:30 in the morning.  We'll go again until

16   about 5:15, and we'll take breaks as needed, including lunch.

17         This is for both sides.  Make sure your witnesses are

18   available, including any rebuttal, because if they're not

19   available, they're not going to testify.  So I just want to

20   make sure they're available and ready to go because we're going

21   to go for as long as we possibly can.

22         I will say this, Mr. Mahoney:  I'm going to let you

23   bring in all the evidence you need, and I'm not going to

24   deprive your client of his right to present evidence, but we

25   will -- I'm going to try to keep it at a very tight ship

*BENNETT - DIRECT*                                                      237

1    tomorrow.

2           Anything else to take up on behalf of the

3    United States before we recess?

4           **MS. CHANG:**  No, Your Honor.  Thank you.

5           **THE COURT:**  Mr. Mahoney, anything we need to address

6    before we recess for the day?

7           **MR. MAHONEY:**  No, Judge.  Thank you.

8           **THE COURT:**  All right.  Thank you all very much.

9           Ms. Bennett, thank you very much.  We'll see you in

10   the morning at 9:30.  We're in recess.

11      (Proceedings recessed at 5:15 P.M. to be resumed Thursday,

12   December 16, 2021.)

13                        -      -      -

14                   **CERTIFICATE OF REPORTER**

15   I certify that the foregoing is a correct transcript of the
     record of proceedings in the above-titled matter.

16

17   s/Heather Suarez                          12/20/2021
     Heather Suarez, RPR, FCRR, CRR            Date
18   U.S. Official Court Reporter

19

20

21

22

23

24

25