```
 1                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
 2                        ORLANDO DIVISION
                                        :
 3   UNITED STATES OF AMERICA,          :
                                        :        Case No.:
 4          Plaintiff,                  :        6:17-cr-00257-PGB-LRH-1
                                        :
 5   v.                                 :        Orlando, Florida
                                        :        December 16, 2021
 6                                      :        9:35 A.M. - 5:16 P.M.
                                        :
 7   STEVEN MICHAEL MARKS,              :
                                        :
 8          Defendant.                  :
                                        :
 9

10            TRANSCRIPT OF COMPETENCY HEARING (DAY 2)
             BEFORE THE HONORABLE LESLIE R. HOFFMAN
11               UNITED STATES MAGISTRATE JUDGE

12   APPEARANCES:

13   For the Plaintiff:        Emily C.L. Chang
                               U.S. Attorney's Office
14                             400 West Washington Street
                               Suite 3100
15                             Orlando, Florida 32801

16   For the Defendant:        Mark J. Mahoney
                               Harrington & Mahoney
17                             70 Niagara Street
                               Third Floor
18                             Buffalo, New York 14202

19                             Matthieu S. Goddeyne
                               Barnett Kirkwood Koche Long
20                             & Foster, P.A.
                               601 Bayshore Boulevard
21                             Suite 700
                               Tampa, Florida 33606

22   Proceedings recorded by realtime mechanical stenography.
     Transcript produced by computer-aided transcription.
23
                             Reported by:
24               Heather Suarez, RPR, FCRR, CRR
                     U.S. Official Court Reporter
25           (407) 744-1567 | heathersuarez.usocr@gmail.com
     401 West Central Boulevard, Suite 4600, Orlando, Florida 32801
```

1
**T A B L E   O F   C O N T E N T S**

2
**December 16, 2021**

3
WITNESSES CONTINUED FOR THE DEFENDANT:

4
    GRETCHEN BENNETT, MA CCC-SLP (via Zoom)
    Direct Examination (Resumed) By Mr. Mahoney        9
5   Cross-Examination By Ms. Chang                    23
    Redirect Examination By Mr. Mahoney               46

6

7   ROSA E. NEGRÓN-MUÑOZ, MD, DFAPA, DFAACAP
    Direct Examination By Mr. Mahoney                 58
    Cross-Examination By Ms. Chang                   109
8   Redirect Examination By Mr. Mahoney              167

9   ANGELA BAIRD-HEPWORTH, PhD (via Zoom)
    Direct Examination By Mr. Mahoney                182

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2          (Call to order of the court at 9:35 A.M.)

3              **THE COURTROOM DEPUTY:**  Case No. 6:17-cr-257, United

4     States of America v. Steven Michael Marks.

5              Counsel, please state your appearances for the record.

6          **MS. CHANG:**  Good morning, Your Honor.  Emily Chang on

7     behalf of the United States.  With me is Michelle Langer,

8     special agent of the FBI.

9          **THE COURT:**  Good morning.

10         **MR. MAHONEY:**  Good morning, Your Honor.  Mark Mahoney

11    here for Steven Marks.

12         **MR. GODDEYNE:**  And Matthieu Goddeyne for Steven Marks,

13    Your Honor.

14         **THE COURT:**  Good morning.

15             Good morning, Mr. Marks.

16         **THE DEFENDANT:**  Good morning.

17         **THE COURT:**  Okay.  Thank you.  You may be seated.

18             Mr. Mahoney, I think where we last left off, you were

19    in the middle of your direct examination of Ms. Bennett.  Are

20    you ready to proceed?

21         **MR. MAHONEY:**  Yes, Judge, but I have one inquiry of

22    the Court first.

23         **THE COURT:**  Sure.

24         **MR. MAHONEY:**  When -- you may -- you observed

25    yesterday there was some notes that Steven was taking when

1    Dr. Jenkins was testifying, and we have in mind that some of

2    that information would be useful to the Court.  And under the

3    circumstances I was wondering, first of all, whether we could

4    allow Mr. Marks to make an unsworn statement as to those

5    things.

6            Just for reference -- historical reference, it wasn't

7    until 1961 that the Supreme Court, in *Ferguson v. Georgia*,

8    allowed the defendant -- said the defendant has a right to

9    testify under oath.  Originally in our country and most states,

10   for a good period of time, defendants could only make an

11   unsworn statement in their defense.  So it's not without --

12   what I'm asking is not actually outlandish, and it would have

13   been the rule of law in Georgia until 1961.  So --

14           **THE COURT:**  But we're in 2021; correct?

15           **MR. MAHONEY:**  Yeah.  Time flies, Judge.

16           **THE COURT:**  Yes, it sure does.  Your request is

17   denied.  If your client wants to testify, he will testify under

18   oath and be subject to cross-examination.

19           **MR. MAHONEY:**  And, Your Honor, also, would that be

20   limited to the direct?

21           **THE COURT:**  No, it would not be.  If your client

22   testifies, he will be subject to cross-examination.

23           **MR. MAHONEY:**  On everything?  Not --

24           **THE COURT:**  On whatever he testifies to, he'll be

25   subject to cross-examination, if that's what you want to do,

but then we have another issue.  We've discussed, over several

meetings over the last six months, the witnesses that were

going to be testifying.  You have a witness list.  Your client

isn't on it.  So if you're going to want your client to

testify, then I'm going to have to talk to Ms. Chang, see what

her position is, and go from there, and we run into possibly

having to continue this hearing.

     And if that's what you want to do, we can have that

discussion.  But I will make it very clear:  Under no

circumstances will your client testify unless he is sworn under

oath.  He will take the witness stand, and he will be subject

to cross-examination.

     **MR. MAHONEY:**  And, again, to be clear, on the topics

which I question him about?

     **THE COURT:**  That'll be a discussion to have with

Ms. Chang as to how far we're going to go here because my

concern is, sir, you're opening the door, and with -- depending

on what your client says.  And you take that risk, whatever

your client says -- it's not going to be the questions you ask.

It's going to be the answers your client gives that are going

to open that door.

     **MR. MAHONEY:**  I understand that, Judge, but I'm just

saying as long as I know that the Court isn't thinking it would

be just a free-ranging examination on anything the Government

chooses to do.

1        **THE COURT:**  Mr. Mahoney, you take the risk of what

2   your client is going to say if he takes the stand.  That's all

3   I can say.  My understanding is whatever happens here can't be

4   used in any further proceeding, so you're not running the risk

5   of any issues in trial or sentencings or plea agreements or

6   anything that's going to happen before Judge Byron, but if you

7   ask your client a question about what time of day it is and

8   your client goes off on another tangent, Ms. Chang would have

9   every right to question your client about everything else he

10  says.

11       **MR. MAHONEY:**  Okay.  All right.  But that's the limit

12  of it?

13       **THE COURT:**  I'm sorry, Mr. Mahoney --

14       **MR. MAHONEY:**  That would be the limit of it, Judge?

15       **THE COURT:**  Mr. Mahoney, I've given you my ruling.

16       **MR. MAHONEY:**  All right.  All right.  Thanks, Judge.

17       **THE COURT:**  So what I would say is let's proceed, and

18  if you want to call your client to the stand or -- I mean, I

19  have an exhibit list that's done.  I'm not asking to see any of

20  the notes.  I have severe concerns about attorney-client

21  privilege.  I know we talked about that yesterday in your

22  cross-examination with Dr. Jenkins, but I'm also aware that

23  what Dr. Jenkins talked about, you put in prior papers with the

24  Court, so it wasn't anything that was a surprise to me either.

25  But there still is attorney-client privilege.

1          **MR. MAHONEY:**  Sure.

2          **THE COURT:**  And I want to make sure we don't run afoul

3     of that or run into any issues.  And I really am not interested

4     in setting up a 2255 petition for you either.  So I just want

5     to make sure we stay within the boundaries here of why we're

6     here.

7          Ms. Chang, is there anything you want to add?  I think

8     right now it's kind of hypothetical.

9          **MS. CHANG:**  That's right, Your Honor.  I have nothing

10    to add.  Thank you.

11         **THE COURT:**  Okay.  All right.  With that, Mr. Mahoney,

12    are you ready to proceed?

13         **MR. MAHONEY:**  Yes, Judge.

14         **THE COURT:**  Okay.  Ms. Bennett, can you hear me all

15    right?

16         **THE WITNESS:**  Yes, I can.

17         **THE COURT:**  Very good.  I'm going to remind you that

18    you're still under oath, ma'am.

19         **THE WITNESS:**  Yes.

20         **THE COURT:**  All right.  Thank you very much.

21         Go ahead, Mr. Mahoney.

22         And by the way, Mr. Mahoney, if you would do me a

23    favor.  I think we left off on the EQ behavior skill.  Would

24    you mind just going over that one test again and then just pick

25    up from there, however you want to go.

1       **MR. MAHONEY:**  Sure.

2       **THE COURT:**  Thank you so much.

3       **MR. MAHONEY:**  Just a point, Judge, Gretchen Bennett's

4  CV is Exhibit 42.01.

5       **THE COURT:**  Yes.  Yes.  And I believe she also

6  attached it to the report that you filed on the docket, so I do

7  have it.  Thank you so much.

8       **MR. GODDEYNE:**  Your Honor, if I might just inquire,

9  can we just increase the volume?  I couldn't hear Ms. Bennett

10  very well.

11       **THE COURT:**  That's up to Ms. Bennett.  That's not

12  something I can do.

13       So, Ms. Bennett, would you mind making sure your

14  computer is at full volume, please, ma'am.

15       **THE WITNESS:**  Yes.

16       **MR. GODDEYNE:**  Thank you so much.

17       **THE WITNESS:**  Is this better?  Is this volume better?

18       **THE COURT:**  I can hear fine.

19       Ms. Chang, can you hear all right?

20       **MS. CHANG:**  Yes, Your Honor.

21       **THE COURT:**  Mr. Mahoney, can you hear Ms. Bennett all

22  right?

23       **MR. MAHONEY:**  Yes.

24       **THE COURT:**  Mr. Goddeyne?

25       **MR. GODDEYNE:**  I'll make do.

*BENNETT - DIRECT*                                                     9

1           **THE COURT:**  Okay.  Is it all the way up at full -- is

2    it at full max, Ms. Bennett?

3           **THE WITNESS:**  Yes, it is.

4           **THE COURT:**  Okay.  Maybe if you just sit a little bit

5    closer to the computer.  There you go.  That helped a lot.

6    Thank you, ma'am.

7           Go ahead, Mr. Mahoney.

8           **THE WITNESS:**  Oh, good.

9                     **DIRECT EXAMINATION (RESUMED)**

10   **BY MR. MAHONEY:**

11   **Q.**  So returning to the testing, Ms. Bennett, could you

12   summarize what your previous observations were on the Cambridge

13   Behavior Scale.

14   **A.**  Yes.  For the Cambridge Behavior Scale, it has 80 items,

15   and scores less than 30 would indicate that the person is

16   displaying a lack of empathy, which would be common with

17   individuals with autism or Asperger's syndrome.  So Steven and

18   his father, Mr. Marks, completed this assessment separately.

19   Steven scored 17 out of 80, which is below that 30 threshold,

20   and Mr. Marks scored him as 19 out of 80, which also indicates

21   that there's difficulty with that empathy quotient, and they're

22   commensurate with just a few points apart.

23       So this really shows difficulty with allowing him to

24   understand the intention of others, interacting affectively

25   with the social world.  It's actually that -- that sort of -- I

*BENNETT - DIRECT*                                                    10

1    wrote in my report, the glue that holds us together and helps

2    us -- helps us and stops us from hurting other people.

3    **Q.**   Thank you.

4        The next was the conversational analysis form.  Can you

5    give the judge a summary of -- of what that was about and what

6    the results were.

7    **A.**   Yes.  So the conversational analysis is an anecdotal record

8    that I keep about the conversational experience I had with

9    Steven.  So there are about 33 items, but some highlights that

10   I commented on were that throughout the eval I needed to use

11   simple language.  I paused and checked for understanding to

12   make sure he followed along.  We had mainly a concrete --

13   conversations was factual, here and now.

14       Nonverbally -- I sometimes was able to note when he needed

15   clarification and then would provide that clarification because

16   of the way he might have tilted his head, squinted his eyes,

17   looked at me, or I could tell that he seemed confused.

18   Occasionally he sought reassurance.  So he might have said, "So

19   now I should do this?" or "Do you want me to do this one?"

20       He was polite.  He spoke in very simple terms, very short

21   sentences.  And he did have -- showed a high level of mazes,

22   and mazes are nonfluencies or filled pauses using words like

23   "um," "thing," repeating a word multiple times, and these

24   really indicate difficulty organizing his thoughts, difficulty

25   with word finding that all -- and that executive functioning of

*BENNETT - DIRECT*                                                        11

1    organizing himself or his thoughts, I should say.

2    **Q.**   And is that -- is there any kind of scale that we attribute

3    to the 24 percent figure here in terms of severe, mild, or

4    whatever?  Is there any scale that goes along with this form?

5    **A.**   There is not because it's anecdotal, so it just gives me

6    the information that he showed 25 percent of them were

7    inappropriate.  Many of the items were also not observed.  So I

8    may not have had that experience to see all of the items that

9    were listed.

10   **Q.**   The -- the next is a social-emotional skills rating scale,

11   and it -- could you summarize that.  And there's -- there's

12   separate -- three separate tables here, and just explain

13   what -- what the -- how they're organized and what they're

14   designed to illustrate.

15   **A.**   Yeah.  So the social-emotional skills rating scale is

16   designed to receive additional information about how a student

17   is performing from the parent and from the student and/or the

18   child, and so it rates how the child performs on a scale -- how

19   often they appropriately use certain skills.  There's 57 items.

20   Seldom, sometimes, or almost always used appropriately.

21       So I made some notes related to the ones that both Steven

22   and his father indicated were areas of difficulty.  I should

23   state that they did this separately and did not see each

24   other's responses.  So Steven showed difficult -- both

25   commented that he has difficulty with conversing, communicating

*BENNETT - DIRECT*                                            12

1    with other people, interacting, listening, planning what to say

2    with that -- planning what to say is related to that executive

3    functioning skill -- expressing an opinion, what his thoughts

4    are, especially maybe they differ from another person's, and

5    giving information succinctly.

6    **Q.**   Okay.  What's next?

7    **A.**   Then I gave just his father the social and academic

8    competence checklist.  I chose to give this because there's a

9    section on executive functioning, and his father had shared

10   that that was an area of difficulty.  And I was happy that I

11   did that because some of the other testing also indicated

12   issues with that: organization, flexible thinking, looking at

13   the bigger picture.  This checklist assesses whether or not

14   someone exhibits the behavior always, sometimes, or never.

15       Overall Steven showed difficulty assessing when there was a

16   breakdown in a conversation, so showing if there's confusion

17   from the listener, knowing that he needs to revise what he

18   would say or how does he show that person he's communicating

19   with that he is confused.

20       And also -- yes, so monitoring his own understanding, so

21   knowing what he doesn't know.  So if he doesn't follow

22   something, is he able to realize he's not following it?  And

23   then take the next step to let that person know he's not

24   following it.

25   **Q.**   As a -- on that point there's -- we're going to hear some

*BENNETT - DIRECT*                                              13

1    of the interviews of Steven this morning, but -- or at some

2    point in Dr. Negrón's testimony, but does he often -- have you

3    observed where Steven ends -- it sounds like he ends with a

4    question mark on -- in what he says.

5    **A.**   Yes.   That could be -- so there are different functions of

6    statements that we learn as young individuals, and one is,

7    like, a request for a repair or a request for revision.  So you

8    could -- if someone was answering, like, raising inflection at

9    the end, and it's a way to signal "I'm not sure if this is what

10   you were asking" --

11   **Q.**   All right.

12   **A.**   -- and that inflection goes up.

13   **Q.**   But in -- in terms of this self-monitoring, is that -- is

14   that an unconscious process or is it deliberate?  Is he

15   deliberate -- somebody deliberately signaling that there --

16   there -- that there's a breakdown in the communication?

17   **A.**   Well, there's -- there's different levels of being -- being

18   able to assess whether you understand something or not, and if

19   it's a concrete task where "I'd like you to do this," "You'd

20   like me to do this or do this?" and that's right in front of

21   him, that could be easier for him.

22       But when something is a higher-level, abstract decision

23   that maybe has multiple parts to it, in that situation he could

24   not understand what he doesn't understand.

25   **Q.**   All right.  So you're drawing a distinction between

*BENNETT - DIRECT*

14

1    lower-level tasks that are concrete and higher-level

2    functioning?

3    **A.**   Yes.

4    **Q.**   All right.  So your -- you have a short section here about

5    his -- his having, essentially, fluency and his speech being

6    within normal limits; correct?

7    **A.**   Yes.

8    **Q.**   And was that -- is that inconsistent with these other

9    indicators of speech and language deficits?

10   **A.**   I know that he was -- as a child was diagnosed with a

11   fluency disorder, but I wasn't seeing the fluency disorder

12   impacting him now.  The repetitions were more indicative of

13   difficulty with word finding or organizing his thoughts, and I

14   was able to draw that conclusion based on the results of the

15   testing which supported that it's a "processing organization of

16   thoughts" issue more so than a person who stutters.

17   **Q.**   So --

18   **A.**   Because fluency is referring to stuttering.

19   **Q.**   Okay.

20   **A.**   Okay.

21   **Q.**   All right.  So getting back to this elevated inflection

22   thing, does that -- if somebody does that all the time, is it

23   just something that becomes a habit?  So we can say, "Well,

24   it's just what he's saying, so it doesn't really reflect any

25   underlying neurological operations"?

*BENNETT - DIRECT*                                                    15

1    **A.**   So some people might have that inflection as a habit, but

2    based on how Steven performed in the testing, which indicates

3    difficulties in this area, is I can use my professional

4    judgment to say that his use of that was a strategy that he

5    uses to indicate he might need basic support to make sure he

6    knows -- he understands a question correctly.

7    **Q.**   Were you listening or watching yesterday when Dr. Jenkins

8    talked about or was asked questions about Steven being able to

9    keep pace with the police in their questioning?

10   **A.**   Yes.

11   **Q.**   Have you listened to his interview with the police?

12   **A.**   Yes, I have.

13   **Q.**   And what was your impression of -- what's the

14   significance -- to the extent that he -- he was keeping pace

15   with the police in their questioning, what was -- from your

16   speech and language perspective, what was -- how do you

17   evaluate that?  Does that -- does that mean he had a higher

18   level of understanding?

19   **A.**   No, it does not mean he had a higher level of

20   understanding.  I noted that when he was able to keep pace, the

21   types of questions he was being asked were factual, rote

22   memory, straightforward, and he was able to share dates, facts,

23   that type of information, and he was able to keep up with that

24   conversation, which is different than when he's being given

25   more complex information where he would need to use any

BENNETT - DIRECT                                    16

1    reasoning abilities to answer a question.

2    **Q.**  And does -- does anything in your testing that -- that

3    indicates that the fact that Steven might be able to give quick

4    answers to the police on any topic indicates either greater

5    cognitive abilities or greater intelligence or greater

6    understanding?

7    **A.**  Can you repeat the question.

8    **Q.**  I'm asking, like, in -- in the testing situation, were

9    there times when Steven gave quick answers?

10   **A.**  Yes.  Uh-huh.  He -- he -- if he knew the answer and it was

11   factual, straightforward, he was able to give the answer

12   quickly.

13   **Q.**  Was giving the answer quickly always an indicator of him

14   having accurately understood?

15   **A.**  No.  When it was straightforward, he was okay.  But

16   sometimes he also gave quick answers.  He appeared confident

17   that he knew the answer, but he was -- they were off.  He

18   missed something.  He missed the intonation that was used, so

19   he wasn't able to absorb the different aspects of what he was

20   hearing to come up with his answer appropriately.  So they were

21   off.

22   **Q.**  In your report that you -- in your summary and

23   interpretation of findings, you -- you listed the kinds of

24   impairments that -- in Steven's speech and language.  What were

25   they?

*BENNETT - DIRECT*                                                    17

1    **A.**   So I noted impairments in his pragmatic language; his

2    expression, so output; his receptive, which is his

3    understanding; and a higher-level language metacognition, which

4    is his thinking about thinking, which is higher-level ability

5    to reason, predict, induce, infer, problem solve, explain, and

6    justify.   So just sort of absorbing more complex information,

7    processing it, and doing something with it.

8    **Q.**   Were you familiar with the Vineland results that Dr. Geller

9    had achieved in Steven's case?

10   **A.**   I have looked at them, but I have not looked at them most

11   recently.

12   **Q.**   Is your -- is your recollection now -- do you have a

13   recollection now as to whether or not the degree of expressive

14   and receptive language problems that were illustrated in the

15   Vineland is consistent with your -- your findings?

16   **A.**   It's my recollection that they were consistent.

17   **Q.**   And are these deficits that you mention in terms of the

18   speech and language -- are they the consequences of his autism?

19   **A.**   Yes.   The -- the pattern of errors that he demonstrated is

20   consistent with the diagnosis of autism spectrum disorder.

21   **Q.**   With -- looking back on your -- on your findings, with his

22   general language abilities that are poor -- and I think you

23   indicated reflecting severe delay, as in the TOAL test -- and

24   with his measured linguistic skills on the CELF at the level

25   between 9 and 14 years of age, can we say that that is a -- is

1   a -- sort of a -- the limit of his linguistics language

2   abilities?

3   **A.**   Yes.   That was standardized measurement of his language

4   abilities, and that would not be something that would shift day

5   to day.   So that -- that's his level.

6   **Q.**   And so that -- whatever our impressions might be of how he

7   sounds, of any sampling of his speech in any context, we're

8   still, in fact, not getting more than the linguistics skills of

9   a 9- to 14-year-old; is that right?

10   **A.**   Right.   That's -- his skills were commensurate with the

11   average 9- to 14-year-old for that -- for those -- those

12   specific areas reported in the report.

13   **Q.**   And you mentioned this a little bit before, but his -- the

14   fact that he might appear confident in his answers and make

15   somebody feel like he's confident in his answers -- does

16   that -- an indicator that he actually understands the language

17   and words he's using or the concepts he's discussing?

18   **A.**   No.   As I said before, sometimes he -- because of the

19   deficits he has, he doesn't know or understand what he doesn't

20   know.   So he often replied confidently even when he was getting

21   questions incorrect.

22   **Q.**   All right.   So Dr. Jenkins had highlighted or quoted his

23   use of the phrase "paraprofessional" in her report.

24   **A.**   So -- yes.   I would be curious to know if he knows that a

25   synonym for "paraprofessional" is an aide or if he just

*BENNETT - DIRECT*                                                      19

1    memorized that paraprofessional is what his mom did.  So he --

2    he -- he could memorize and use a term that is familiar in his

3    household or he's been exposed to, but he may not have that

4    deeper understanding of that vocabulary word.  So it can appear

5    that he understands more than he does.

6    **Q.**  In your report you say in -- that "In conversation and

7    social interactions, even when he appears to be participating,

8    listening, and comprehending, he is not fully understanding."

9         Now, do you recall --

10   **A.**  Yeah.

11   **Q.**  -- writing that?

12   **A.**  Yes.

13   **Q.**  So why might Dr. Jenkins not have observed --

14   Dr. Jenkins -- do you recall her testifying that she did not

15   observe difficulties in receptive language with Steven?

16   **A.**  If information is straightforward, if it is slowed down, if

17   it is -- if there's checking for understanding and it is more

18   concrete, Steven can perform better.  So in the settings where

19   that is provided and it is more concrete and factual or rote

20   memory, then he can answer more -- not more appropriately, but

21   his answers may be correct, which might give that impression

22   that his overall understanding or comprehension is intact.

23   **Q.**  So it --

24   **A.**  But when --

25   **Q.**  I'm sorry.  Go ahead.

1    **A.**   No.  It's okay.

2    **Q.**   So if Dr. Jenkins -- got beyond rote memory and repeating

3    of phrases to the comprehension of meaning of words and meaning

4    of concepts, she might have seen something more in terms of his

5    difficulties in receptive language?  Is that -- do you believe

6    that to be true?

7    **A.**   Yes, I would expect that.  Correct.

8    **Q.**   Do the -- the things you mentioned such as elevated maze

9    production and nonspecific words like "uh" and pauses and using

10   the word "things" to embrace a number of topics, you say

11   those -- you say in your report, I think, that they're

12   associated with weaknesses in language processing and executive

13   functioning.  Is that right?  Is that in your report?

14   **A.**   Yes, that is correct.  So they're associated with

15   word-finding difficulties, language processing, and that

16   executive functioning.

17   **Q.**   Which specifically of the tests that you've talked about

18   are informative in that -- in that regard?

19   **A.**   So the social and academic competence scale that his dad

20   filled out specifically asks questions directly related to

21   executive functioning.  The self-metalinguistics and several

22   subtests also look at those abilities more specifically, and

23   the social language development test does as well.  So looking

24   at the profile of all of those together indicates that

25   difficulty with that higher-level language and executive

1   functioning skills.

2   **Q.**  Is it easy for somebody to be misled into assuming

3   capabilities on Steven's part from the way he speaks,

4   capabilities that he may not actually have?

5   **A.**  Yes, because he gives head nods; he smiles; he's polite.

6   He -- with simple things, he might ask for -- unconsciously ask

7   for feedback if it's something he needs to act on.  So he does

8   it correctly because he wanted to do things correctly.  But if

9   it's an idea, critical thinking, or where he needs to make that

10  decision where the person asking him actually needs to get

11  something out of him, he has more difficulty in that area.

12  **Q.**  Do the speech and language impairments that you've

13  described in your report significantly affect Steven's

14  decision-making ability and his ability to understand his

15  options in making decisions?

16  **A.**  Yes, they do.

17  **Q.**  Do these results in your -- that you've described suggest

18  difficulty in acquiring, for example, useful understanding of

19  legal advice?

20  **A.**  Legal advice is complex and has multiple layers and

21  implications, and a person who would be listening to that

22  information needs to hold in their mind different options,

23  considerations, and implications and consider, then, another

24  option, make decisions.  And those processes are where Steven

25  has deficits, and so that process of making those decisions

1    would be much more difficult for -- or he may be unable to make

2    some of those decisions --

3    **Q.** Have you watched --

4    **A.** -- effectively.

5    **Q.** I'm sorry.  Were you finished?

6    **A.** I just said "effectively."

7    **Q.** Oh.  Thank you.

8    **A.** Yeah.

9    **Q.** Have you seen the videos of me talking to Steven?

10   **A.** Yes.

11   **Q.** Are -- are the deficits that you've described evident to

12   you in those interactions?

13   **A.** Yes.  I felt that he appeared confused, not sure what to

14   do, overwhelmed, and needed support to know exactly what he

15   needed to do.  And then how he looked in that session, based on

16   the report and the observations and the testing that I did,

17   would indicate that he was struggling to comprehend the

18   information that was being provided as it required him to

19   abstractly think, hold different ideas and thoughts in his

20   head, and evaluate them.

21   **Q.** And was that in you -- in what you observed, was that

22   because the language being given to Steven was too complicated,

23   the words were too complicated, or did it have more to do with

24   the fact that -- the kind of reasoning and higher-level

25   language skills required on the part of Steven?

*BENNETT - DIRECT*                                                    23

1    **A.**  I would say it was the higher-level language skills from

2    Steven, because I felt that the information was slowed down and

3    explained thoroughly, but there was still that struggle to

4    understand.

5    **Q.**  Why might Steven have experienced less difficulty in

6    responding to Mr. Alava, I think his name is, and -- and

7    Dr. Jenkins?

8    **A.**  Why might he have had difficulty?

9    **Q.**  Had less difficulty in responding to them.

10   **A.**  If information is more factual, if it's more concrete, if

11   he's needing to regurgitate something, if he just needed to

12   memorize a word and give it back or a short idea, that would be

13   easier to do than to listen, think about it, understand it, and

14   then make a decision and express it.  It's much more

15   complicated --

16   **Q.**  Thank you.

17   **A.**  -- than -- than -- yeah.

18   **Q.**  All right.  Thank you.

19             **MR. MAHONEY:**  I'm done.

20             **THE COURT:**  Thank you, Mr. Mahoney.

21             Ms. Chang, are you ready for cross?

22             **MS. CHANG:**  Yes, Your Honor.

23             **THE COURT:**  All right.

24                           **CROSS-EXAMINATION**

25   BY MS. CHANG:

*BENNETT - CROSS*

24

1    **Q.**  Good morning, Ms. Bennett.

2    **A.**  Good morning.

3    **Q.**  So you were asked to evaluate the defendant's expressive

4    and receptive language, his higher-level language skills, and

5    the social pragmatics related to his continuing case,

6    sentencing, and assessment of competency; correct?

7    **A.**  Correct.

8    **Q.**  And you state on pages 1 and 2 of your report that you

9    based your assessment on clinical observations, administration

10   of standardized tests, rating scales, and a conversational

11   analysis; correct?

12   **A.**  That is correct.

13   **Q.**  Did you -- and you also did a brief parent interview with

14   the defendant's father and got some of his observations;

15   correct?

16   **A.**  Yes.  Just briefly.  Uh-huh.

17   **Q.**  Uh-huh.  It sounds, from your testimony, however, that you

18   actually reviewed more than that.

19       So you reviewed the police interview; right?

20   **A.**  Yes.  I was sent that information.

21   **Q.**  And you said you reviewed the 30 hours of attorney-client

22   videos; is that right?

23   **A.**  Not the 30 hours, but I observed part of it.

24   **Q.**  Which part?

25   **A.**  The compilation and then parts throughout and the last --

*BENNETT - CROSS*                                            25

1    the last video, which was when Steven needed to make a

2    decision.

3    **Q.**  Okay.  So you didn't review all of the attorney videos, but

4    you reviewed some -- a substantial portion of them; correct?

5    **A.**  Correct.

6    **Q.**  Did you review anything else?  Because the police report

7    and the attorney videos are not listed in your report as things

8    you reviewed.  So what else did you review?

9    **A.**  I also reviewed the police report.

10   **Q.**  What else?

11   **A.**  I reviewed the -- Dr. Jenkins's report.  I reviewed it so

12   long ago.  I reviewed some of the texts that was sent in the

13   binders.

14   **Q.**  When you say you reviewed some of the texts, are you saying

15   you received text threads and you reviewed portions of them or

16   that you reviewed whatever you received?

17   **A.**  I reviewed what -- portions of what I received.

18   **Q.**  Okay.  So you didn't review the text threads as a whole?

19   **A.**  Correct.  I did not read it from beginning to end, every

20   single one.

21   **Q.**  Okay.  What else did you review?

22   **A.**  I reviewed the -- Dr. Negrón's -- the -- the summary of her

23   interview -- I'm sorry -- the text of her interview.

24   **Q.**  What else?

25   **A.**  I'm trying to think.  Past speech reports, past OT reports,

1  past psychological reports from when he was younger, some of

2  the chats from the holding center, the audios, psychological --

3  the psychological reports, the Aloft report -- or the Aloft

4  information, his previous psychological reports from when he

5  was younger, and then the ones done after the case had started.

6  **Q.**  And at what point did you review -- I mean, you listed at

7  least ten things just now that are not in your report.  So did

8  you review them after you drafted your report or before?

9  **A.**  I reviewed them afterwards.

10 **Q.**  And as a result of -- so is there a reason why you did

11 not --

12 **A.**  I'm thinking of the time -- when I was asked to complete

13 the evaluation, it happened quite quickly.  I believe within a

14 week.  I may -- I apologize.  I may have looked at some of

15 the -- this was in June.  I may have looked at some of the

16 previous psychological reports and prior -- maybe not prior to

17 assessing him but prior to writing my report to hear -- to

18 learn about past experiences and how he was performing as a

19 child, difficulties he had in school, and to have that

20 information to understand.

21      But it was after I talked to Mr. Mahoney.  That was, I

22 believe, within a week or ten days that I did this evaluation.

23 **Q.**  So --

24 **A.**  So I didn't have much time -- I'm sorry.

25 **Q.**  No.  You can finish.  You can finish.

*BENNETT - CROSS*                                                    27

1   **A.**   There wasn't -- prior to sitting down to do the evaluation,

2   there wasn't as much time as after I did the evaluation to

3   review the information.

4   **Q.**   So my question is did you review the materials before or

5   after you drafted this report dated July 19, 2021?

6   **A.**   Some of the information I had reviewed prior to writing the

7   report.  Some of the items I listed, I would have heard or had

8   more experience with after.  And as a speech-language

9   pathologist, we don't always do that historical -- I was

10  straight doing an evaluation of his speech and language skills.

11  I haven't participated in a case prior like this, so I wouldn't

12  have naturally included all of that information in my

13  evaluation.  My evaluation was set up more similar to how I

14  would do it in my clinic.

15  **Q.**   Having reviewed additional materials after the drafting of

16  this July 19 report, are your opinions all still the same?

17  **A.**   My opinions on his functional language, yes, they would be

18  the same based on the testing that I completed.

19  **Q.**   How much time did you spend with the defendant on June 22,

20  2021?

21  **A.**   About four hours.

22  **Q.**   And is that the only time you spent with the defendant

23  face-to-face?

24  **A.**   Yes, it is.

25  **Q.**   How much of that time was spent administering tests to the

*BENNETT - CROSS*                                                    28

1    defendant?

2    **A.**  At least three hours.

3    **Q.**  And --

4    **A.**  Or three and a half, yeah.

5    **Q.**  Okay.  So just to be clear, at page 2 of your report you

6    list nine different assessments or rating scales, and so --

7    **A.**  Correct.

8    **Q.**  -- are these the nine things that would have consumed

9    approximately three hours of your time with the defendant on

10   June 22nd?

11   **A.**  Yeah.  Three to three and a half hours.

12   **Q.**  And how much time was spent actually conversing with the

13   defendant?

14   **A.**  I conversed with him at the start to provide some time to

15   get to know him a bit, asked him about his family, and made

16   some small talk with him.  That was difficult for him to do.

17   And then we got into testing because I knew I only had that day

18   with him, and then I went through the testing and then maybe

19   had small conversation between testing.

20   **Q.**  And so --

21   **A.**  And this is typical for a speech-language evaluation, which

22   is different than a psychological which usually only takes

23   place over this amount of time.

24   **Q.**  And you did a conversational analysis; correct?

25   **A.**  Correct.

1    **Q.**  And was that based only on your face-to-face conversations

2    with the defendant, or was it also based on, you know, other

3    videos that you had seen?

4    **A.**  No.  It was only based on the sample that I had from my

5    interaction with him that day.

6    **Q.**  So your conversational analysis was based only on a

7    conversation you had with the defendant on the very day that

8    you met him for the first time?

9    **A.**  Correct.  And the time in between testing that I spoke to

10   him.

11   **Q.**  And in that conversational analysis, you made some small

12   talk.  You made some introductions.  You kind of got to know

13   him a little bit.  Correct?

14   **A.**  Correct.

15   **Q.**  And you said -- and I apologize.  I think I may have missed

16   this part, so maybe you can help me understand.

17        How does the conversational analysis work?  I mean, you

18   mentioned something about a checklist, I believe.  Can you

19   explain that process, please.

20   **A.**  Of course.  So it is a document that's several pages that

21   has questions.  So did the client -- or did the -- did the

22   individual use verbal mazes?  Did they respond to questions?

23   Did they do this?  And there's a few lines under each one for

24   me to make subjective comments.  So it's not as much that I

25   took the conversation and analyzed it.  It might indicate by

1   that title -- I agree with you.  It's just a standard -- it's a

2   form that you can use to help organize your notes on how you

3   would comment on a conversation that took place and did --

4   specific areas are listed related to language.

5   **Q.**  That makes sense.

6   **A.**  Okay.

7   **Q.**  So you state on page 16 of your report that -- and this is

8   the second full paragraph -- the beginning of the second full

9   paragraph -- "Impressions from his speech and use of language

10  in differing contexts that Steven possesses the" --

11  "Impressions from his speech and use of language in differing

12  contexts that Steven possesses the capacity for" --

13  **A.**  I'm sorry.

14  **Q.**  -- "sustained concentration ... are not well founded in

15  light of these objective testing results."  Do you see that?

16  **A.**  I'm sorry.  I apologize.  I was on page 15.

17  **Q.**  Sure.  No problem.

18  **A.**  So the second --

19  **Q.**  Second full paragraph --

20  **A.**  I have it, yep.

21  **Q.**  -- of page 16.  And I'll just read it again because we're

22  kind of taking the first -- it's a very long sentence.  I'm

23  going to take the first part of the sentence and then the tail

24  end of the sentence and kind of cut out things in between

25  because it's sort of a list.

*BENNETT - CROSS*

1   **A.**   Okay.

2   **Q.**   So you had said, "Impressions from his speech and use of

3   language in differing contexts that Steven possesses the

4   capacity for sustained concentration ... are not well founded

5   in light of these objective testing results."

6        So you concluded that the defendant, based on your tests,

7   does not have capacity for sustained concentration.  Isn't

8   that -- that's what this says; right?

9   **A.**   Yes.  For, like, the long periods.

10  **Q.**   Uh-huh.  And are you aware that the defendant participated

11  in a four-hour clinical interview with Dr. Otto and declined

12  several offers to take a break, except for one bathroom break?

13  **A.**   No, I did not know that.

14  **Q.**   Are you aware that the chat transcripts show that the

15  defendant spent more than eight hours at a time engaging in

16  continuous chats with the minor victims?

17  **A.**   No.

18  **Q.**   If you were aware of those things, would they support a

19  finding that the defendant does possess capacity for sustained

20  concentration notwithstanding your objective testing results?

21  **A.**   The sustained concentration was -- is related -- that I'm

22  talking about is related to his capacity to attend to more

23  complex information and sort through it and make that -- like,

24  using that higher-level language skills and make those

25  decisions different from having a conversation or an

*BENNETT - CROSS*                                                    32

1    interaction.

2    **Q.**  Okay.

3    **A.**  Did -- that helpful?  Is that clear?

4    **Q.**  Yes, Ms. Bennett.

5         And, actually, that's a great point because you talked

6    about how, when it comes to facts, rote memory, things that he

7    himself experienced -- right? -- that the defendant doesn't

8    struggle as much in conveying those things; correct?

9    **A.**  He can keep pace.  He might make some mistakes, but, yeah,

10   he could answer those, it appeared, more easily.

11   **Q.**  And that's because for facts, like he either knows them or

12   he doesn't, and for his personal experience, he lived them, and

13   so it's easier to talk about them; correct?

14   **A.**  Correct.

15   **Q.**  And so you're aware -- are you aware that at a trial,

16   should the defendant be called to testify, he will be called to

17   testify about facts?  Are you aware of that?

18   **A.**  It makes sense.  I never thought of it that way, but that

19   makes sense.

20   **Q.**  At a trial, you're aware that, as you swore to tell the

21   truth --

22   **A.**  Yep.

23   **Q.**  -- yesterday and today, the defendant or any witness would

24   be called upon to tell what they know; correct?

25   **A.**  Correct.

*BENNETT - CROSS*

33

**Q.**  There's no higher-level thinking involved in that.  It's just "Say what happened.  Say what you know"; correct?

**A.**  For factual information, yes.

**Q.**  Okay.  And so is it your opinion that the defendant would not -- he could keep pace, in the event that he were called upon to testify, because he's only going to be called to testify about facts?

**A.**  If he was called to explain something or asked a question that required him to organize his thoughts and produce a narrative, I believe he would have more -- a significant -- he would have a lot more difficulty than if you were asking him specific, brief questions that were more succinct, factual statements.

**Q.**  Okay.  So he would -- he would do the facts more easily, and organizing thoughts or explaining would be more difficult; correct?

**A.**  Yes.

**Q.**  You state on -- in the same paragraph of page 16 that "Impressions from his speech and use of language in differing contexts that Steven" -- now I'm skipping a phrase -- right? -- moving ahead to the next part, "that he can envision future consequences of his actions, that he thinks about or plans for the future, or can recognize the social perspective of others ... are not well founded in light of these objective testing results."

1        Again, you're saying he struggles with these things to a

2    significant enough of degree that you feel the need to comment

3    on it; correct?

4    **A.**  Correct.

5    **Q.**  Are you aware that the defendant told one of his child

6    victims to delete the sexual videos and pictures that she had

7    recorded for him?

8    **A.**  No.

9    **Q.**  Are you aware that that actually happened at least four

10   times?

11   **A.**  No.

12   **Q.**  Are you aware that the defendant told another of his child

13   victims to do the same when she said she was afraid of getting

14   into trouble?

15   **A.**  No.

16   **Q.**  Are you aware that the defendant told a different child

17   victim to convince her younger brother to show his -- his

18   buttocks to the defendant by video by telling him that it was

19   part of a game?

20   **A.**  Yes, I saw that.

21   **Q.**  And are you aware that the defendant instructed that child

22   to tell her younger brother not to tell anyone and to, quote,

23   "just deny it if he does"?

24   **A.**  Yes, I read that.

25   **Q.**  And are you aware that when he was asked about these chats

1   with minors, the defendant lied about it to the police

2   initially?

3   **A.**   Yes.

4   **Q.**   So some of these things you didn't know, and some of them

5   you did, but -- so if you were aware of all of them, would they

6   support a finding that the defendant can envision future

7   consequences of his actions and that he does have ability to

8   think about or plan for the future and can recognize the social

9   perspective of others notwithstanding your objective testing

10   results?

11   **A.**   I would say that he was aware he didn't want -- he knew how

12   to do that without getting -- to avoid immediate consequence.

13   **Q.**   So doing something to avoid an immediate consequence

14   involves envisioning a future consequence, doesn't it?

15   **A.**   Envisioning -- yes, it would make him -- he'd have to say

16   what -- it could be envisioning a consequence or a response to

17   what -- what was said so quick --

18   **Q.**   I'm sorry.  Can you -- I --

19   **A.**   I apologize for my background.  I'm sorry.

20        To avoid getting -- it's a quick -- he offered -- as

21   terrible as the situation was, he was offering a quick

22   solution.  But he was then seeing what that solution could be

23   for that -- a simple -- not simple, for -- for what was

24   happening in front of him.

25   **Q.**   It's probably my fault, Ms. Bennett.  I had a lot of

*BENNETT - CROSS*                                                        36

1    trouble understanding that response, so I'll just try to ask it

2    a different way, and maybe we can try it again.

3    **A.**   Okay.   Yeah.   Sorry.

4    **Q.**   So you said a couple questions -- a couple answers ago that

5    he knew -- he knew what to do to avoid an immediate

6    consequence.   That may not be exactly the words you used, but I

7    believe that's the point you were trying to get across.

8    Correct?

9    **A.**   Correct.

10   **Q.**   Okay.

11   **A.**   Correct.

12   **Q.**   So given that he knew what to do to avoid an immediate

13   consequence in sort of several of these examples that I

14   provided, doesn't that show that he did envision a future

15   consequence?

16   **A.**   I absolutely see where you're going with that, but young

17   children know to do that as well.   So it's not necessarily a

18   higher -- I can't say that I would know what he was thinking at

19   that time, I guess, to know if it was "do this so this happens"

20   or envisioning, like, the bigger picture of what could happen.

21   So I -- I don't know.

22   **Q.**   Well, I'm not asking -- I'm not asking you to get into his

23   brain.   I mean, similar to your entire report, it's your

24   opinion.   I'm asking, in your opinion, based on your training

25   and experience and education -- you're very experienced.   So

1   given that he knew what to do to avoid an immediate

2   consequence, doesn't that show that he could think about and

3   plan for the future?

4   **A.**   He could think about and plan for the immediate future.

5   **Q.**   And it also shows that he could recognize the social

6   perspective of these children on the other end of his chats;

7   correct?

8   **A.**   I don't know if it says that he could understand the social

9   perspective of the other person, so I wouldn't say that.

10  **Q.**   Well, let's use a different example, then.  I'm sorry,

11  Ms. Bennett.

12  **A.**   Yeah.

13  **Q.**   So do you remember in the chats that throughout all of the

14  chats the defendant used very flattering, romantic language to

15  talk to these child victims?  Do you recall that?

16  **A.**   Yes.

17  **Q.**   And there was "Oh, Princess, you're so beautiful.  I cannot

18  imagine my life without you," like that sort of thing; correct?

19  **A.**   Correct.

20  **Q.**   And it's fair to say he was not actually in a real

21  relationship with any of these people; correct?

22  **A.**   No.

23  **Q.**   Okay.  Not correct or that is correct?

24  **A.**   Correct.  He was not in a relationship with any of the

25  people.

*BENNETT - CROSS*                                                        38

1    **Q.**  All right.  And so in the chats he persuades them -- he

2    uses that language to persuade these children to send him

3    sexual pictures; correct?

4    **A.**  He -- yeah, he made statements to try to convince a child

5    to send a picture.

6    **Q.**  Are you aware that he was actually successful in numerous

7    instances, more than 30?

8    **A.**  Yes.

9    **Q.**  Okay.  So given the whole of that context, doesn't that

10   show, in your opinion, that that shows that he can recognize

11   the social perspective of the people he was chatting with?

12   **A.**  So one thing that -- I was not even aware that these types

13   of places or chat rooms existed prior to this case or that

14   people would engage in this -- this type of behavior, and I was

15   just very unfamiliar with it and unfamiliar if these are things

16   that people say in these chat rooms, if it's a typical thing

17   that people speak like this to each other, so how does a person

18   pick up some of the language that was being used or the

19   statements and that type of thing.

20        So -- I'm sorry.  I was just processing that, but can you

21   reask your question?

22   **Q.**  Sure.  My question is if you were aware -- or since you are

23   aware that the defendant used all sorts of flattering, romantic

24   language, pretended to be in a relationship with these kids and

25   successfully did so -- I'm sorry -- successfully persuaded

1   these children to produce these images as a result of his

2   tactics, doesn't that show that he can recognize the social

3   perspective of others?  Isn't that an example of recognizing

4   the social perspective of another -- of several other people?

5   **A.**  Like realizing what he would need to do to have a person

6   act a certain way?

7   **Q.**  Correct.

8   **A.**  Yes.

9   **Q.**  Okay.  You state at the page -- at the top of page 15

10  that --

11      This is the first full sentence at the very top of 15.

12  **A.**  Okay.  Yes.

13  **Q.**  -- that the defendant is significantly impaired in his

14  ability to hold in mind and weigh multiple variables that might

15  bear on a particular decision and that he lacks the capability

16  to understand the implications of his choices.

17      And that, again, is based on your objective testing results

18  and your conversational analysis and the other things you

19  reviewed; correct?

20  **A.**  Correct.  For larger decisions.

21  **Q.**  And you, in your review -- I know you mentioned that you

22  reviewed some of the defense attorney videos but not all of

23  them.  So Defense Exhibit 3 was mailed to you as a huge stack

24  of paper.  It is the hugest stack that you have.  Can you pull

25  that out.

*BENNETT - CROSS*                                              40

1    **A.**   In a binder?

2    **Q.**   It's in what the defense sent you.

3    **A.**   Oh, in what the defense sent me.  Yep.  I have all the

4    files.

5    **Q.**   Great.  Can you pull out Defense Exhibit 3.

6    **A.**   Of course, yeah.  Exhibit 3.  Yes.

7    **Q.**   And these were very well numbered, so as you pull it out,

8    you're going to look for --

9    **A.**   Yeah.  Number 3.  Okay.  I'm at 8.  Okay.  Yep.  I got it.

10   Exhibit 2.  I'm sorry.  Yes.

11   **Q.**   We can actually use the screen.  Mr. Goddeyne is graciously

12   pulling it up for everyone, which I am very grateful for.

13        **MS. CHANG:**  So, Mr. Goddeyne, could you go to

14   Volume 10, page 35.  Thank you.

15        **THE WITNESS:**  May I just use this screen?

16        **MS. CHANG:**  Yes.  It's up to you.  It's for everyone.

17        **THE WITNESS:**  Okay.

18        **MS. CHANG:**  Okay.  Thank you.

19   **BY MS. CHANG:**

20   **Q.**   All right.  So SM is Steven Marks, MJM is Mr. Mahoney, and

21   CCD is Mr. Mahoney's associate.

22        **MS. CHANG:**  So if we could turn to the bottom half of

23   this page where SM says -- yeah.  Okay.  Perfect.  Right there.

24   **BY MS. CHANG:**

25   **Q.**   So read what -- just read to yourself --

*BENNETT - CROSS*                                                    41

1    **A.**  Okay.

2    **Q.**  -- because I'm going to have you read about ten pages'

3    worth of stuff, and then I'm going to ask you questions.  So I

4    just want you to read, and I will direct you where to read.

5        So looking at the Steven Marks paragraph, and then let us

6    know when you're done.

7    **A.**  Okay.

8        Okay.

9    **Q.**  And then the next page, I want you to read the whole of the

10   next page.

11   **A.**  Okay.

12           **MS. CHANG:**  And, Your Honor, just so you know where

13   I'm going, I'm just -- I'm going to have her read about 10 to

14   12 pages, and then I have just a couple questions, and then I'm

15   done.  So this is it.

16           **THE COURT:**  That's fine.  And I'm assuming you're just

17   going to have Ms. Bennett read it to herself?

18           **MS. CHANG:**  Yes, if that's okay, because we all have

19   copies and I figure we can all read along.

20           **THE COURT:**  That's perfect.  Would you mind just

21   telling me one more time, because I probably was pulling the

22   file up when you said what page you're on.

23           **MS. CHANG:**  Oh, yes.  So we're in Defense Exhibit 3,

24   page -- Volume 10, pages 35 and 36, and then we'll skip, but

25   I'll make clear where we are.

1      **THE COURT:**  Thank you very much.  Okay.  Go ahead.

2  **BY MS. CHANG:**

3  **Q.**  All right.  So read this page 36, please, Ms. Bennett.

4  Thank you.

5  **A.**  Yep.

6      **MS. CHANG:**  All right.  And then let's scroll down

7  just a little bit more, Mr. Goddeyne, please, just so she can

8  read the rest of the page.  Thank you.

9      **THE WITNESS:**  Uh-huh.

10      **MS. CHANG:**  Okay.  And then, Mr. Goddeyne, please,

11  Volume 15, page 3.

12  **BY MS. CHANG:**

13  **Q.**  Okay.  And so for this we can just read the whole page.

14  We're going to read pages 3 through 9 in Volume 15.

15  **A.**  Okay.

16  **Q.**  And remember here, because it's sort of backwards, SM --

17  **A.**  Yep.

18  **Q.**  -- Marks is the one talking, and the attorney is asking

19  questions as if he's the defendant who needs help to decide.

20  **A.**  Okay.  Oh, like a role-play.  Yep.  Thank you.

21      Okay.

22      Okay.  Thank you.

23      Okay.

24      Okay.

25      Okay.

*BENNETT - CROSS*                                    43

1          Okay.

2          Okay.

3               **THE COURT:**  How many more pages do we have, Ms. Chang?

4               **MS. CHANG:**  Just one of this section and then three

5     more.

6               **THE COURT:**  Okay.

7               **MS. CHANG:**  It was a total of about 12, I think, but

8     she's reading them in half pages.

9               **THE WITNESS:**  Okay.  You can go a little faster.

10              **MS. CHANG:**  Uh-uh.  I think she needs to read that

11    part.

12              **THE WITNESS:**  Yeah.

13              **MS. CHANG:**  Okay.  And then after -- now we're going

14    to go to 15:11, which is -- and just go to page 13, please.

15    Thank you so much.

16              **MR. GODDEYNE:**  What?  Go to 15 or 11?

17              **MS. CHANG:**  15:11.  You're on the right page.  Thank

18    you.  And we're just going to go to 13 --

19              **THE WITNESS:**  Okay.

20              **MS. CHANG:**  -- after -- you know, from here to 13.

21              **THE WITNESS:**  Okay.

22              **MS. CHANG:**  Okay.  And last page, 15:13, that's the

23    next page, and we'll just read the first half of the page.

24    Thank you.

25    **BY MS. CHANG:**

*BENNETT - CROSS*                                              44

1   **Q.**   Just let us know when you're done.

2   **A.**   Okay.

3        Okay.

4   **Q.**   So that was a lot of material, Ms. Bennett.

5   **A.**   It was, yes.

6   **Q.**   And would you agree with me that those sections -- and I'll

7   read them into the record right now.  It was Defense Exhibit 3

8   at Volumes 10, pages 35 and 36, Volumes 15 -- I'm sorry --

9   Volume 15, pages 3 through 9 and 11 through 13.

10       So would you agree that that involved a lot of Steven Marks

11  talking?

12  **A.**   Yes, it involved a lot.

13  **Q.**   And it involved him offering advice in this sort of

14  role-play situation with his attorney; correct?

15  **A.**   Yes.

16  **Q.**   And in that he was able to articulate various options in

17  this case; correct?

18  **A.**   Yes, he was.

19  **Q.**   He talked about how one plea deal has a floor of 15 and a

20  ceiling of 30; right?

21  **A.**   Yes.  Uh-huh.

22  **Q.**   And then a different plea deal has a lower floor but a

23  higher ceiling; right?

24  **A.**   Correct.

25  **Q.**   And his other option is to go to trial and perhaps lose

*BENNETT - CROSS*                                                45

1   everything.

2   **A.**   Yes.

3   **Q.**   And his other choice is maybe to go to trial and try the --

4   what he called "the insanity thing."  That may or may not work.

5   Correct?

6   **A.**   Correct.

7   **Q.**   And he was able to talk about how there are some bads and

8   some goods to each of these options; correct?

9   **A.**   Yes.

10  **Q.**   Is it still your opinion, having reviewed this, that the

11  defendant is, as you state in your report, significantly

12  impaired in his ability to hold in mind and weigh multiple

13  variables that might bear on a particular decision and that he

14  lacks the capability to understand the implications of his

15  choices?

16  **A.**   If he was presented with this information and asked these

17  questions after one review, yes, I would stand by what I

18  stated.  Taking this apart and going through the document that

19  explained all the things that were discussed -- I reviewed the

20  document, and he did do a good job expressing the different

21  options, details about those options, and the choices he would

22  have; and it showed me this was a good strategy for Mr. Mahoney

23  to use to help his comprehension to make sure he really

24  understood it so that he could make that choice with the

25  guidance that he had.

*BENNETT - CROSS | REDIRECT*                                           46

1   **Q.**  So Mr. Mahoney succeeded in his mission; right?

2   **A.**  It appears that he was -- that Steven was able to restate

3   the information on that document and remember those are --

4   share those details.

5         **MS. CHANG:**  I have nothing further, Your Honor.

6         **THE COURT:**  Thank you, Ms. Chang.

7         Mr. Mahoney, any redirect?

8         **MR. MAHONEY:**  Yes.  Thank you, Judge.

9         **THE COURT:**  All right.

10                        **REDIRECT EXAMINATION**

11  BY MR. MAHONEY:

12  **Q.**  In terms of the examples that Ms. Chang brought to your

13  attention in the chats where Steven tells the child to delete

14  something or -- and you mentioned something about that -- that

15  this -- dealing with somebody that is -- something that even a

16  child could figure out to ask somebody to do.  Could you

17  elaborate on that.

18  **A.**  Yeah.  Well, children -- young children may know to do a

19  basic task to avoid getting in trouble.  Like, you're going

20  to -- you spilled something.  "I'm going to leave the room so

21  no one knows I did it" or that type of quick strategy.  So I

22  don't -- I can't say that it's, like, a higher-level strategy.

23  It's a more basic strategy.  But it doesn't indicate

24  higher-level language.  It just indicates he knew that basic

25  strategy to avoid getting caught or getting in trouble.

1   **Q.** Will that -- it would be -- well, is it fair to say that

2   there are just -- there are degrees and levels of executive

3   functioning?

4   **A.** Yes, because different functions, I guess, would be -- not

5   I guess, would be expected at differing ages or as someone

6   would mature.

7   **Q.** When you were given examples of the language that Steven

8   was using -- first of all, all the participants in these

9   conversations were using different kinds of language that

10  seemed -- that seemed to be characteristic of -- of the

11  environment they were working in.  Is that true?

12  **A.** In the chats?

13  **Q.** Yeah.

14  **A.** I can't attest to that, if it's characteristic of those

15  chats, because I have never been in one of those chats, but if

16  that is what happens in those chats --

17  **Q.** And --

18  **A.** -- then yeah.

19  **Q.** I'm sorry.  I cut you off.  Go ahead.

20  **A.** It seemed like that was the whole topic that was being

21  discussed in those chats.

22  **Q.** And does it seem -- what does the word "scripted" mean?

23  It's a term of art almost, isn't it, in --

24          **MS. CHANG:**  Objection, Your Honor.  This is outside

25  the scope of cross.

*BENNETT - REDIRECT*                                                48

1          And, also, she's already testified that she is

2     unfamiliar with these environments.  It seems now that the

3     defense is feeding her information.

4          **THE COURT:**  Mr. Mahoney, I'm not sure what you mean by

5     the definition of "scripted" either.  I'm going to let you

6     rephrase that question, and we'll see where we go.  But let's

7     stay within the confines of what the cross-examination was.

8     **BY MR. MAHONEY:**

9     **Q.**  You -- you stated that you -- you were wondering how a

10    person picks up this kind of language.

11    **A.**  Yes.  Yes, I said that.

12    **Q.**  And what did you have in mind when you -- when you posed

13    that question?

14    **A.**  I'm a grown adult, and I wouldn't think of writing -- so is

15    that language that he's heard before or read somewhere or that

16    he would, you know, say some of the things that he said --

17    **Q.**  Did it --

18    **A.**  -- is what I meant.

19         And if you're asking about "scripted," when I work with

20    individuals, I will teach them to script in certain situations

21    so that they feel more comfortable and can anticipate how they

22    would need to communicate in a certain setting to make that

23    certain setting more comfortable.  Not talking about this

24    setting, but that might be something that I teach, like, when

25    you're in the cafeteria, these are the things you could do;

1   when you're in this situation, these are some typical

2   questions.

3        And so it might help that person appear more competent and

4   get through that social situation.  But, again, I'm not -- I

5   wouldn't have experience in this situation but in other

6   situations --

7   **Q.**  And so --

8   **A.**  -- if that answers your question.

9   **Q.**  And does it happen that -- that that kind of scripting

10  occurs in, say, a particular milieu?  A person might adopt the

11  phrases and expressions that are -- seemed to be usable and

12  successful in that environment?

13  **A.**  Yes, a person can do that.

14  **Q.**  And did -- when you looked at all -- as many of these chats

15  as you did, did it appear that the participants -- participants

16  were playing roles?

17  **A.**  Yes, sometimes, and sometimes no.  I don't know what they

18  were doing, or I don't know why they were there.

19  **Q.**  Were these naturalistic conversations as far as you -- you

20  would say?

21  **A.**  A natural conversation?  No, it was not a natural

22  conversation.

23  **Q.**  Does that affect -- in terms of analyzing what we conclude

24  as to the meaning or significance of the speech that's being

25  done, does that change things?  Can you analyze it the same way

*BENNETT - REDIRECT*                                                    50

1   you would typical conversations to assess somebody's language

2   and speech skills and how they may or may not correlate to

3   their neurological condition?

4   **A.**   I would not think you could analyze those chats to come up

5   with a language ability because it wasn't a natural setting

6   where you're looking at a variety of vocabulary used or past

7   tense, present progressives, like you really analyze the use of

8   language, and that did not feel like a typical conversation

9   that would be -- if that's answering your question.

10      I'm just -- would not have been something that would be

11  where you could analyze that for determining language ability,

12  especially since the same types of things were discussed over

13  and over.

14  **Q.**   So without investigating further, you wouldn't know -- you

15  would not know whether or not Steven was just simply borrowing

16  types of phrases and approaches that he had seen other people

17  do and was copying that to achieve whatever he was trying to do

18  in that moment?

19  **A.**   Correct.  He wouldn't know where he got that information or

20  saying what he did or responding the way he did from analyzing

21  that.

22  **Q.**   When you looked at the -- Steven's interplay with either

23  myself or Mr. Dougherty in our office, the exhibits -- the

24  defense exhibits, you saw in there that Steven -- and you were

25  correct there was some role-playing going on where I shifted a

1    role to -- to see if Steven could give me advice, pretending I

2    was him.  Right?

3    **A.**  Uh-huh.

4    **Q.**  And one of the things he told me was that the -- there were

5    two plea agreements.  One was to a production charge, and one

6    was to a solicitation charge --

7    **A.**  Uh-huh.

8    **Q.**  -- and, as Ms. Chang said, one with a higher minimum level

9    but lower maximum and another with a lower minimum level and a

10   higher maximum; right?

11   **A.**  Correct.  Yeah.

12   **Q.**  Now, you may not recall -- maybe you recall after I tell

13   you -- that the day before or even possibly maybe two days

14   before, I told Steven that the Government had agreed to remove

15   the second count from their plea offer to solicitation, which

16   is the ten-year count, and that I told Steven that, therefore,

17   he could forget about the production charge if he was going to

18   take a plea.

19   **A.**  Okay.

20   **Q.**  Do you recall that?  I mean, does that ring a bell with

21   you?

22   **A.**  I remember you -- I remember knowing that if he took the

23   plea, one of the charges was being dropped, yes.  And in the

24   document I think it mentions that.

25   **Q.**  You're right.  A little later in this document, it does say

*BENNETT - REDIRECT*                                       52

1    that.  So --

2    **A.**  Yeah.

3    **Q.**  -- but here one day later -- and I -- and that was a

4    significant -- do you recall me telling Steven how significant

5    that was that we dropped the second count from the solicitation

6    charge because now there was no risk that a district court

7    judge could stack the two minimum sentences to make it, in

8    effect, a 20-year minimum?

9    **A.**  Uh-huh.

10          **THE COURT:**  Mr. Mahoney, one second.

11          **MR. MAHONEY:**  Yes.

12          **THE COURT:**  Ms. Bennett, I'm sorry to interrupt.

13   Would you please answer "yes" or "no" instead of "uh-huh."  It

14   just makes it easier for our court reporter.

15          **THE WITNESS:**  Yes.

16          **THE COURT:**  Thank you so much, ma'am.

17          Go ahead, Mr. Mahoney.

18   **BY MR. MAHONEY:**

19   **Q.**  So now, but a day later, Steven has forgotten that?

20   **A.**  Yes.

21   **Q.**  So --

22   **A.**  And --

23   **Q.**  I'm sorry.

24   **A.**  -- I'm not surprised he would have forgotten a detail like

25   that because he practiced, I'm sure.  And this is my guessing,

1   so it's not -- but going over that document so much that he

2   would remember the details from that document, but integrating

3   new information that would change what he had gone over so many

4   times would be difficult for him.

5   **Q.**  So the success here that Ms. Chang talks about is that

6   Steven was able to do much more than understand something about

7   what the judge does or what perjury means; right?

8   **A.**  Yeah.

9   **Q.**  He was able to understand that there are minimum and

10  maximum sentences and that there's -- and that there's certain

11  things that might be involved in a trial and certain things

12  that might be variables in a plea.

13  **A.**  Uh-huh.

14  **Q.**  And so he's learned these -- at some level, these facts;

15  correct?

16  **A.**  Correct.

17  **Q.**  Now, at one point I said to Steven, "But wait a minute,

18  Steven.  You haven't mentioned anything about the facts of your

19  case."  Do you recall that?

20  **A.**  That, I read, yes.

21  **Q.**  Yeah.  So, I mean -- and without going on to other things

22  that he's not bringing into it, does that mean that he is

23  having -- knowing that in one way, as in a linear fashion,

24  these different facts -- does that mean that he has the ability

25  to actually have those things in mind at a time to get a sense

*BENNETT - REDIRECT*

1    of -- of what kind of choice he should make?

2              **MS. CHANG:**  Objection, Your Honor.  I feel like that's

3    outside of the scope of her expertise.

4              **THE COURT:**  Mr. Mahoney, would you do me a favor and

5    maybe break it -- for my benefit -- you have this tendency to

6    do these super long questions, and I have trouble following

7    along.  I think that's part of the issue.  If you'd break it

8    down a little bit, I think that will clarify.

9    **BY MR. MAHONEY:**

10   **Q.**  All right.  So Steven has learned a lot more facts about

11   the legal system.

12   **A.**  Yes.

13   **Q.**  But does -- does knowing those facts add anything to or

14   detract at all from your concerns that he cannot manage all

15   these facts and -- and evaluate them and think about the

16   different kinds of variables of one option or another in order

17   to make a rational decision about them?

18   **A.**  I think he can memorize these facts, but putting himself in

19   a position to feel what it would feel like and walk through "If

20   I do this, this is how I will feel.  This is how I will

21   experience it.  This is what will happen," in that process that

22   you or I may go through to figure that out, may not be

23   something that he is able to do even if he can regurgitate or

24   explain the facts that are explained to him.

25   **Q.**  Obviously, this is -- it wouldn't be an easy choice for

*BENNETT - REDIRECT*                                    55

1    anybody.  I mean, is -- is it fair to say, at least from what

2    you read, this may not be an easy choice for anybody?

3    **A.**  Right.  This would -- is -- it's not an easy choice.

4    **Q.**  Right.  But there's different degrees to which individuals,

5    because of their level of executive functioning, might actually

6    be able to either decide this themselves; right?  Yes or --

7              **MS. CHANG:**  Your Honor.

8              **THE WITNESS:**  Yes.  This --

9    **BY MR. MAHONEY:**

10   **Q.**  But also --

11             **THE COURT:**  Mr. Mahoney, one second.

12             Yes, Ms. Chang.

13             **MS. CHANG:**  Objection to, again, outside of the scope

14   of her relevance and the defense attorney testifying now.

15             **THE COURT:**  Yeah, Mr. Mahoney, I'm going to tell you

16   again -- I told you this multiple times over the last two days.

17   You have a tendency to make statements and not questions.  You

18   need to ask a question.

19             And last I checked, Ms. Bennett was tendered as an

20   expert in speech-language pathology, and I think you're getting

21   dangerously close to legal analysis that's going beyond what

22   Ms. Chang asked.  Ms. Chang's questions went back directly to

23   Ms. Bennett's report.  She didn't ask about legal questions in

24   general.

25             So I'm going to ask you to ask short questions and

*BENNETT - REDIRECT*                                          56

1   make them questions and not testify yourself, sir.  Go ahead.

2           **MR. MAHONEY:**  But, Judge, I'd just like to point out

3   Ms. Chang did ask her whether I succeeded in my mission.

4           **THE COURT:**  Yes.  But the questions you're asking,

5   you're testifying yourself.  And, again, if the Court doesn't

6   understand what you're asking -- I want you to think about

7   that.  If I can't understand what you're asking, then we have a

8   problem here.  So go ahead and ask your next question, sir.

9           **MR. MAHONEY:**  Sometimes I don't understand my

10  question.

11          **THE COURT:**  Okay.  Fair enough.

12  **BY MR. MAHONEY:**

13  **Q.**  Seeing that -- that Steven can pull up and have these facts

14  and know these facts, does that change anything about your --

15  your testimony about the limits of his ability to actually

16  rationally apply facts and make a decision?

17  **A.**  In my testing I found that this was a task that he had

18  difficulty with.  With preparation, practice, rehearsal,

19  review, review, review, he did much better in explaining those

20  facts.  I don't think I can give more information about what

21  other implications that has.  As a speech pathologist, to

22  say -- so he was able to report the facts, but he hasn't been

23  able to demonstrate putting himself or being able to show that

24  he can -- or explain that he can put himself in a situation.

25  So the information I have would say that that would be

*BENNETT - REDIRECT*

57

1    difficult for him to do.

2    **Q.**  And you actually watched the video of this; correct?

3    **A.**  Correct.  I did.

4    **Q.**  And in that video did you see -- in the way Steven

5    expressed himself and all the things you observed about his --

6    well, forget about all the "uhs" and "ums" that I said, but did

7    you, both in the transcript and what you recall in the video,

8    see the same kinds of signals or indications of the speech and

9    language difficulties that you've described in your report?

10   **A.**  Yes, I did still see those same difficulties.

11           **MR. MAHONEY:**  All right.  That's all I have.

12           **THE COURT:**  Thank you, Mr. Mahoney.

13           Ms. Bennett, I want to thank you very much for your

14   testimony -- this was extremely informative and helpful -- and

15   for your patience yesterday.

16           Mr. Mahoney, do you have any need for Ms. Bennett to

17   stay on for the remainder of the hearing?

18           **MR. MAHONEY:**  I do not, Judge.

19           **THE COURT:**  Ms. Chang, any reason I can't dismiss or

20   let Ms. Bennett get back to work?

21           **MS. CHANG:**  No, Your Honor.

22           **THE COURT:**  All right.  Well, then, Ms. Bennett, you

23   are free to stay on if you would like to observe.  Otherwise,

24   you're also free to log off and get about your day, and I

25   appreciate, again, your time.

*NEGRÓN-MUÑOZ - DIRECT*                                    58

1           **THE WITNESS:**  Thank you, Your Honor.

2           **THE COURT:**  You're welcome.

3           So I'd like to take a ten-minute break.  I think we

4    probably also could use a little time.  I see you shaking your

5    head, Mr. Goddeyne.  Let's take a ten-minute break, and then,

6    Mr. Mahoney, you'll call your next witness.

7           **MR. MAHONEY:**  Yes, Judge.

8           **THE COURT:**  Thank you.

9        (Recess at 11:15 A.M. until 11:28 A.M.)

10          **THE COURT:**  Mr. Mahoney, call your next witness.

11          **MR. MAHONEY:**  Thank you, Your Honor.  Defense calls

12   Dr. Rosa Negrón-Muñoz.

13          **THE COURT:**  All righty.

14          **THE COURTROOM DEPUTY:**  Please raise your right hand.

15       (Witness sworn.)

16          **THE COURTROOM DEPUTY:**  Please be seated and state your

17   name for the record.

18          **THE WITNESS:**  Thank you.  My name is Rosa with the

19   initial E.  Last name N-e-g-r-ó-n M-u-ñ-o-z, Negrón-Muñoz.

20          **THE COURT:**  Go ahead, sir.

21          **MR. MAHONEY:**  Thank you.

22                          **DIRECT EXAMINATION**

23   BY MR. MAHONEY:

24   **Q.**  Doctor, you -- you've heard -- refer to yourself and other

25   people refer to you as Dr. Negrón, so is that okay to use

*NEGRÓN-MUÑOZ - DIRECT*                                     59

1    today?

2    **A.**   Yes, sir.

3    **Q.**   Could you tell us --

4         **MR. MAHONEY:**   Your Honor, her CV is Exhibit 18.01.

5    **BY MR. MAHONEY:**

6    **Q.**   Dr. Negrón, could you tell us briefly your educational

7    background.

8    **A.**   I am a medical doctor.  I received an associate's and a

9    bachelor's in preparation for medical school.  I graduated

10   medical school from San Juan Batista School of Medicine in

11   Puerto Rico.  I am triple board-certified in adult, child, and

12   adolescent in forensic psychiatry, all of the training which I

13   did in New York at Albert Einstein College of Medicine.

14       I also have received fellowship training in psychoanalysis,

15   psychodynamic psychotherapy, and other specialties like

16   hypnosis and buprenorphine training, which is not relevant to

17   this but it's part of my training.

18   **Q.**   All right.  And your employment, Doctor.  Where have you

19   had both fellowships and then employment postdoctoral?

20   **A.**   As part of my -- while I was doing my fellowship training,

21   I worked in -- as a psychiatrist as well as a child and

22   adolescent psychiatrist.  And also as part of my training, I've

23   worked at jails -- Rikers Island, Sing Sing Correctional

24   Facility -- and the court system.

25       Once I finished all my fellowship training, I've worked in

1   community mental health centers, private hospitals.  I've been

2   the lead psychiatrist at Hillsborough County jail in Tampa.  I

3   have also -- as part -- I own my own private practice, and as

4   part of that, I contract out to services to the Department of

5   Juvenile Justice.

6       I also contract to a school as a consultant for

7   behaviorally challenged children and their behaviors.

8       I also conduct clinical practice.  I do some clinical

9   research and serve as a supervisor as assistant medical

10  director for another community mental health center.

11      I am also involved in the board of directors for the

12  Tri-County Human Services foundation and the Polk County

13  National Alliance on Mental Illness.

14      At a -- not -- but as a professional level as well, I'm

15  involved at the national level with the American Academy of

16  Psychiatry and the Law where I chair the Developmental

17  Disabilities Committee.  I'm also a member of the Child and

18  Adolescent Committee, Corrections Committee, Child Stress

19  Committee, and most recently have been assigned as a counselor

20  for their underrepresented and minorities and very recently

21  have been assigned to the editorial board of the *Journal of the*

22  *American Academy of Psychiatry and the Law*.

23  **Q.**  And the AAPL, the American Academy of Psychiatry and the

24  Law, is actually the organization for forensic psychiatrists in

25  the United States, is it not?

*NEGRÓN-MUÑOZ - DIRECT*                                61

1    **A.**   Correct.

2    **Q.**   And are there a lot of forensic psychiatrists?

3    **A.**   Not many.  I think currently board-certified, that I've

4    looked at, it's a little under 3,000.  There may be more that

5    are not board-certified but roughly about 2,500 that are

6    registered in the American Board of Psychiatry and Neurology.

7    I'm not -- I don't think all of them are practicing at the same

8    time.

9    **Q.**   You do some teaching?

10   **A.**   Yes, I do.  I'm currently an associate professor at the

11   University of South Florida.  I also am a visiting professor

12   for Albert Einstein College of Medicine.  I teach at the Ponce

13   Health Sciences University in Puerto Rico, and I also teach the

14   medical students at my alma mater, San Juan Batista School of

15   Medicine.

16   **Q.**   Are you currently working on a journal article with some

17   other authors?

18   **A.**   Yes.  Currently, we're doing practice parameters for

19   prescribing in juvenile corrections.

20   **Q.**   What is your actual forensic experience?

21   **A.**   I have varied experience through -- since my -- including

22   my fellowship training.  It has included work with competency,

23   guardianship, consultations for autism, consultations for

24   sexual assault, mitigation factors, just different --

25   immigration cases.

*NEGRÓN-MUÑOZ - DIRECT*  62

1    **Q.**  And adult versus juvenile -- what has your practice been?

2    **A.**  Probably around fifty/fifty.  I would like to add that as

3    part of my work with the juvenile justice system, there was

4    "supervisic" work involved that doesn't necessarily involve the

5    court system but does involve doing assessments of the

6    juveniles for developmental disabilities as part of their

7    treatment.

8    **Q.**  Do -- and what percent of the cases you handle are

9    client/patients you have are intellectually or developmentally

10    disabled in the forensic area?

11    **A.**  Probably around 25 percent in general clinical.  Yes.

12    **Q.**  And in terms of your competency evaluations, what

13    percentage of those were you appointed by judges to do those

14    evaluations?

15    **A.**  I would say around 50 percent.  I try to look at that

16    number for my CV.  Around 50 percent court-appointed, and

17    probably 25 and 25 from either the state attorney or the public

18    defender's office, roughly.

19    **Q.**  And are most of these appearances in state court rather

20    than federal court?

21    **A.**  Yes, sir.

22         **MR. MAHONEY:**  Your Honor, I tender Dr. Negrón as an

23    expert witness in psychiatry -- forensic psychiatry.

24         **THE COURT:**  Any objection, Ms. Chang?

25         **MS. CHANG:**  No, Your Honor.

*NEGRÓN-MUÑOZ - DIRECT*

63

1      **THE COURT:**  So tendered.

2  **BY MR. MAHONEY:**

3  **Q.**  What was -- what was the first thing you were asked to do

4  in relation to Steven Marks?  How did you get involved in this

5  originally?

6  **A.**  Initially, I was asked to possibly look at the possibility

7  of an NGRI, so that's why I initially became involved.  When I

8  saw Steven at that time, I had concerns of competency when I

9  start -- first started talking to him.  I was not approved as

10  an expert witness, so that was -- an evaluation didn't move

11  forward.  And then throughout the process -- then, when the

12  competency issue came up again, I revisited with him regarding

13  competency.

14  **Q.**  All right.  And were you aware also, at the time that

15  you -- somewhat after the time that you got involved, that I

16  was in a parallel process, having sessions with Steven to help

17  him attain competency in this case?

18  **A.**  Yes, I was aware of that.

19  **Q.**  Were you -- were you aware of what -- did you read the --

20  were you familiar with the motion that was actually made for a

21  competency hearing and the memorandum that was -- supported

22  that?

23  **A.**  Yes, sir.

24  **Q.**  And so did the -- did you have in mind, when you did your

25  evaluation, that this issue came up as a -- as a consequence of

*NEGRÓN-MUÑOZ - DIRECT*                                              64

1    what we saw in terms of Steven's capabilities at the time he

2    decided to enter a plea?

3    **A.**   Yes.

4    **Q.**   Was that important for you to have in mind during your

5    evaluation?

6    **A.**   Yes.

7    **Q.**   Could you -- and when you first got involved, you had --

8    you had read different reports and prior history in the case

9    and decisions on competency; is that right?

10   **A.**   Correct.

11   **Q.**   And you had -- you had a number of prior evaluations that

12   had been done up to that point?

13   **A.**   Yes.  Several.

14   **Q.**   Was it -- is it typical to have videos of the attorney

15   engaging with the client to educate them and talk to them about

16   their decisions in the case?  Is that something you've seen?

17   **A.**   Actually, in my experience, that is not very typical.

18   **Q.**   Is that something that you found useful in this case?

19   **A.**   It actually was useful.

20   **Q.**   All right.  And how is that -- how does that make it

21   different from the typical case?

22   **A.**   I think it provides us a more broader evaluation of the

23   client.  As has been expressed sometimes, we just have the

24   information of the there and now of what we're seeing.  So

25   being able to see the client in different contexts and aspects

*NEGRÓN-MUÑOZ - DIRECT*                                    65

1    definitely gives us a broader information to be able to do a

2    better assessment.

3    **Q.**  And do you understand that here the issue would actually be

4    whether or not Steven, at the time he executed the agreement --

5    that he was competent -- whether he was competent to do so?

6    **A.**  Correct.

7    **Q.**  In your report you discuss decisional competency.  Were you

8    familiar with this issue before you got this -- saw this

9    defense motion?

10   **A.**  Yes.

11   **Q.**  All right.  And what -- what is decisional competency?

12   **A.**  Decisional competency includes being able to take all the

13   information at hand, manipulate it, be able to make an informed

14   decision, be able to make a decision for yourself, if you are

15   able to stand trial for yourself, make that decision on your

16   own, also be able to assist your defense lawyer with witnesses,

17   and being able to promote questions as testimony is being given

18   and assist counsel.  Those are some of the areas.

19   **Q.**  Is decisional competency part of general adjudicative

20   competency?

21   **A.**  It's adjudicative and decisional competency, two different

22   things, which together make competency.

23   **Q.**  You -- in your report, being at page 7, you talk about --

24   I'm sorry -- page 5, you talk about historical information

25   about Steven.  And, in general, what -- what were your -- what

1    did you find out about Steven's background that was relevant to

2    your investigation?

3    **A.**   I think in general, given the information from birth -- I

4    just want to state that in psychiatry in general, we use a

5    biopsychosocial formulation.  So take biological information,

6    psychological, and social in order to be able to obtain a

7    holistic information, so relating his biological information,

8    his birth data, and how it was relevant in distress and how

9    that may impact his current presentation.

10          **MR. MAHONEY:**  I just want to inquire -- Judge, could

11   Dr. Negrón take her mask off?  Is that --

12          **THE COURT:**  Yes.  Absolutely.  When you're at the

13   witness stand, you absolutely may.

14          **THE WITNESS:**  Thank you.

15          **THE COURT:**  Thank you very much.

16          Thank you, Mr. Mahoney, for reminding me.

17   BY MR. MAHONEY:

18   **Q.**  And so what kind of information in general -- we

19   actually -- we have your report, and so there's no need to read

20   it -- recite all of it, but, in general, how would you state

21   your assessment of his developmental history?

22   **A.**   Well, I think, in general, this was a -- I'm going to say

23   "patient" because that's what I used to call him; right? -- a

24   patient or a client who since birth and possibly since before

25   in utero was exposed to multiple traumas, was in severe

1    respiratory, cardiac distress.  So this is somebody whose

2    neurologic and physical and developmental was -- has been

3    affected since birth.

4    **Q.**  And you -- you agreed with the diagnosis of autism.

5    **A.**  Correct.

6    **Q.**  And was -- was autism present and signs of autism clear, in

7    your view, in Steven's developmental history?

8    **A.**  I think in retrospective, definitely.  That information was

9    obtained from the parents.  If I may add, I think he had a late

10   diagnosis.  In review of records, I -- in general, recent

11   research suggests that it take about five years for any

12   specific diagnosis to be accurate because people may present

13   with specific symptoms.  It appears, from my review of that,

14   that the parents had been seeking out help, but nobody was able

15   to cinch the diagnosis because they were focusing maybe on

16   specific symptoms and not as a cluster or as a general whole

17   symptomatology.

18   **Q.**  You have quite a bit of experience with autism, diagnosing

19   and treating people with autism; is that true?

20   **A.**  Yes, sir.

21   **Q.**  And so is -- how -- how common, in your experience, is it,

22   or in your view, that there is a delayed diagnosis for various

23   reasons that people may not be diagnosed until adulthood?

24   **A.**  There could be various reasons, as you said.  Sometimes, as

25   has been brought up by other witnesses here, there's a higher

1    verbal component or certain areas of their support, which, in

2    Steven's case, it seems his parents were very supportive.

3        Oh, given that he still did have difficulties in school, he

4    had an IEP.  He had developmental delays.  I think it takes a

5    very -- a very acute clinical acumen to be able to take all

6    that information to provide a diagnosis if you're not very

7    familiar with everything that comprises autism.

8    **Q.**  In gathering your developmental history and assessing

9    Steven's features, you talked in your report about the extent

10   to which, in a case like this, you would rely on the

11   self-report of someone like Steven.  Would you --

12   **A.**  Could you repeat that question.

13   **Q.**  You talked about relying on the -- just on the self-report

14   of Steven or the role of his self-reporting in the -- in

15   gathering his background.

16   **A.**  I think when you rely solely on somebody's self-report,

17   depending on what you're looking for, you may miss other

18   aspects because the person may not have full insight into their

19   condition or their limitations.  If I may use an example not

20   related to autism, sometimes a person who is psychotic or maybe

21   very depressed may not acknowledge themselves that they have

22   those symptoms.

23       So, similarly in autism, if you're not in tuned or "akeen"

24   to what your symptoms are, you may not report them and report

25   yourself in a favorable manner and not report the symptoms.

*NEGRÓN-MUÑOZ - DIRECT*                                          69

1      **Q.**  Do people with autism sometimes report, for example, that

2      they have friends or lots of friends when it turns out that

3      they really don't have friends?

4      **A.**  That is common.

5      **Q.**  And, in fact, does the DSM-5, when it talks about the --

6      diagnosing the criteria such as social -- having social --

7      reciprocal social relationships distinguish between people that

8      they are, quote, "friends with" because they have common

9      interests or do things together and people with whom they

10     really have reciprocal emotional exchange?

11              **THE COURT:**  Mr. Mahoney, you need to --

12              **MR. MAHONEY:**  That was a bad question?

13              **THE COURT:**  Yes, please.

14              **MR. MAHONEY:**  All right.  Could you pull up -- I'm

15     sorry, Matt.  I didn't plan to do this at this point, but DSM-5

16     for autism.  I forget which exhibit.  45 or 46.

17              **THE WITNESS:**  If I may, if I understood correctly --

18     and you may need to reask the question -- is that in autism

19     there's -- they may think they have friends, but they don't

20     necessarily have a social-emotional reciprocity.

21     **BY MR. MAHONEY:**

22     **Q.**  That's -- well, that's enough, then.  That's what I was

23     aiming at.

24          So you have made comments in your report that -- that

25     Dr. Jenkins reached conclusions or relied to a great extent on

1    Steven's self-report of aspects of his life, that there was

2    other collateral information in her report, in the materials

3    from the Bureau of Prisons, from Aloft, and so on which

4    contradicted that.

5         MS. CHANG:  Objection.

6         THE COURT:  Mr. Mahoney, I'm going to tell you again.

7    You're making statements.  You're not asking questions, sir.

8         Please would you also tell me what page you're on in

9    the report so I can follow along.  Thank you.

10        MR. MAHONEY:  Yeah.  Looking at page -- at page 16 of

11   her report.

12        THE COURT:  Thank you.

13   BY MR. MAHONEY:

14   Q.  Would you discuss your concerns about the level at which

15   Dr. Jenkins relied on Steven's self-report.

16   A.  Well, I think even yesterday in her testimony she said she

17   didn't find it necessary to seek out collateral information,

18   although she acknowledged that he had an autism spectrum

19   disorder.  She did say that she tried to get collateral

20   information, but she said that it was based, if I recall

21   correctly, on the here and now for her.  And in this type of

22   case for autism or any case in general, we would want to gather

23   collateral information to make sure that the information at

24   hand is factual and correct.

25   Q.  And did you find information in the record, even in her own

*NEGRÓN-MUÑOZ - DIRECT*                                    71

1    reports from the Bureau of Prisons, that conflicted with the

2    conclusions that she was drawing by just talking to Steven?

3    **A.**   There were some -- in trying to interpret her results and

4    her raw data, some of the information was difficult to

5    understand, as was noted yesterday in the report.  It wasn't

6    clear why things were in red or what date.  But there was

7    information relating to symptoms of depression that they

8    collected, and which she later stated was in remission.  That

9    was not clear from the data.  I believe she stated yesterday it

10   was historical, but that wasn't clear from the data she

11   collected.  It appeared that it was from while he was in the

12   Bureau of Prisons.

13       Other concerns was her diagnosis of social anxiety disorder

14   as a distinct diagnosis and not as part of the autism spectrum

15   disorder, which in the criteria clearly states that if the

16   person is diagnosed with autism spectrum disorder, this kind of

17   excludes a social anxiety disorder.

18       I'm trying to remember what other concerns I may have had

19   in my report that I can think of.

20   **Q.**   Well, you -- you -- in your report you refer to collateral

21   information from Aloft that had been provided to -- some of

22   which had been provided to Dr. Jenkins that you -- it's at

23   page 9.  What can -- did you -- was that collateral information

24   consistent with some of the findings of Dr. Jenkins?

25   **A.**   No.  I think from the collateral information obtained from

*NEGRÓN-MUÑOZ - DIRECT*                                                72

1    the notes and from Aloft, where he has been for the past

2    four years, it gave, at least me, more information about his

3    daily functioning, his capacity to function on a regular basis.

4    I think while also being in jail, it is -- or the prison, it is

5    a structured environment.  There was a lot of rich information

6    in those notes that could give us a better understanding of his

7    day-to-day functioning.

8    **Q.**  Dr. Jenkins yesterday referred to Steven being a good

9    historian to the best of his ability.  Do you remember that?

10   **A.**  Yes.

11   **Q.**  Does that -- would that concept of -- and she said, "Well,

12   he's the defendant.  It's his case, and he's an adult," I

13   think.  Do you recall that?

14   **A.**  Yes.

15   **Q.**  All right.  Is that a reason to accept his information at

16   face value when it conflicts with maybe more reliable,

17   collateral information from other sources?

18   **A.**  I think it's important -- this is why it's important to

19   obtain collateral information, because as a defendant you

20   can -- it's your perception of what is happening, and your

21   perception may not be accurate in the context of the case in

22   general.  That's why, in my opinion, it's important to clarify

23   and ensure that the information that you're receiving is

24   correct.

25   **Q.**  Do you recall Dr. Jenkins talking about how proud Steven

*NEGRÓN-MUÑOZ - DIRECT*

1    was that he passed his driving test the first time and that --

2    and that -- being impressed at his ability to drive because

3    it's such a challenge to be out in the world and navigating it

4    in the car?

5    **A.**  She did mention that.

6    **Q.**  Did you -- I'd like you to look at Defense Exhibit 53 at

7    page 93, which Mr. Goddeyne is going to show us.

8           **THE COURT:**  Mr. Mahoney, it would be helpful if you

9    told me the volume because the way you paged this, each volume

10   starts back over on page 1.  So I don't know what page 93 is.

11          **MR. MAHONEY:**  I'm sorry.  It's Exhibit 53, Your Honor.

12          **THE COURT:**  Oh, Exhibit 53.  Okay.  Thank you.

13          **MR. MAHONEY:**  But it still doesn't have a page number

14   on it, but it's near the end.

15          **THE COURT:**  You know what?  I'm just going to follow

16   along with whatever Mr. Goddeyne puts on the screen, and we'll

17   go that way.

18   **BY MR. MAHONEY:**

19   **Q.**  Do you recall information either that you have seen either

20   in the information you collected or in prior reports about

21   Steven and driving?

22   **A.**  In conversation with Steven and trying to understand his

23   functioning while he was in Orlando and his functioning in

24   general, Steven did mention that he was not comfortable

25   driving, that it was hard for him to drive.

*NEGRÓN-MUÑOZ - DIRECT*

74

1    When asking him why, other than mentioning his eyesight, he

2    mentioned it was very difficult for him to kind of maneuver all

3    the information that came at him, kind of understanding the

4    stoplights, the stop signs, when a car was coming, and that was

5    very overwhelming for him.

6    **Q.**  All right.  And so looking at -- if we have it, it's at --

7    are you familiar with this record in -- that we got from Dr. --

8    Dr. Jenkins where Steven made a comment about how he had -- he

9    didn't like driving?

10   **A.**  Yes.  I did review that, yes.

11   **Q.**  It says he has a hard time paying attention to everything;

12   is that right?

13   **A.**  Yes, that's what it says.

14   **Q.**  Is that consistent with your assessment of Steven?

15   **A.**  That's consistent with what he reported.

16   **Q.**  So tell us about your interview process with Steven.

17   **A.**  In general or -- I've met with Steven three times, two of

18   them -- one in November of 2020, one in December 2020.  This is

19   prior to the current evaluation.  At that time, as I said,

20   initially, there was a concern to look for criminal

21   responsibility.  In my discussion with him, it became a little

22   bit about competency because he wasn't even sure why we were

23   meeting, so it was important for me to understand that he knew

24   what was actually going on.

25   When I was appointed to do the competency eval and I retook

*NEGRÓN-MUÑOZ - DIRECT*                                      75

the case, then I met with Steven again.  And at that time, to

ensure there was no discrepancy in the questioning, I used the

same questions that the Bureau of Prisons used to make sure we

had a head-to-head comparison of the answers.

**Q.**   And but was that in the first time you interviewed him?

**A.**   That was not the first time.

     And yesterday Dr. Jenkins mentioned that in my first

interview I had used the same questions she did, and -- and my

first interview was before she interviewed him, and in

competency it is common to use the same questions.  Here, in

the state of Florida, Dr. Otto does the training, so everybody

uses basically the same questions, and even at a national

level.  So I was unclear why she was surprised that I used the

same questions.

     But during my first interview, Dr. Jenkins had not

interviewed him as of that time.

**Q.**   What's the -- and what were your -- what were your general

findings from -- your general conclusions from your interviews

of Steven?

**A.**   In my opinion, Steven has a superficial factual

understanding, but when you go deeper into trying to get the

knowledge of what it means, he lacks that decisional component

or capacity.  He's not able to go further than that.

     In the first two interviews that I did with him, he's able

to retain, at a basic level, what things are said, but when you

1   go further into the meaning of what that really means to him,

2   he's not able to give you -- it's been said here -- like, that

3   executive functioning, to be able to maneuver all that

4   information to make a decision on his own with a factual and

5   rational understanding that he knows what the consequences of

6   his decisions are.

7   **Q.**   And in your interview you went beyond just asking, you

8   know, "What does a judge do?  What does a prosecutor?" and some

9   of those just definitional terms to actually ask questions

10  about his decision-making capabilities.

11  **A.**   Correct.

12  **Q.**   And did -- just to give us some perspective, we saw in the

13  notes that were done with Dr. Jenkins of her interviews, and

14  you asked some of the same questions.  Steven had made a lot of

15  mistakes in talking to Dr. Jenkins.  Did he -- did you see the

16  same mistakes in you asking the same questions?

17  **A.**   Yes, sir.

18  **Q.**   And were they also questions that were asked by

19  Dr. Otto years ago?

20  **A.**   I want to say yes, but I don't recall correctly --

21  completely.

22  **Q.**   Was there some consistency in the mistakes that Steven has

23  made?

24  **A.**   Yes.

25  **Q.**   You saw Steven again in October of -- October 3rd of 2020;

1   right?

2   **A.**  '21.

3   **Q.**  '21.  So it was -- okay -- recently.  Why did you see him

4   again?

5   **A.**  It had been almost a year since I saw him, and, like I

6   said, initially, I had seen him for something different,

7   although I assessed competency at that time, and I was aware

8   that you had been educating him.  So a year later, I wanted to

9   ensure that his capacity, since he's been educated, if it had

10  changed, if it was the same, if there had been any improvement

11  in his knowledge.

12  **Q.**  In your -- in your first interview with him, you raised the

13  question of his -- the confidentiality, quote, "warning with

14  him."  Could you tell the judge about that, about you how

15  handled that.

16  **A.**  Yes.  I had concerns with his understanding because,

17  initially, I was not seeing him for competency, and when asking

18  him why I was seeing him, he was not aware of the factual

19  reason I was seeing him.  So I had concerns about his

20  competency.  And based on the practice parameters of the

21  American Academy of Psychiatry and the Law, I could proceed,

22  although he gave a superficial acknowledgement that he agreed

23  to the evaluation.  As long as there's a court order or the

24  defense attorney has given consent, you can proceed with the

25  evaluation even if you consider the client is not competent.

1    **Q.**  What was it he -- do you remember what it was that gave you

2    pause when you first spoke to him about that confidentiality?

3    **A.**  Well, initially, it was that he didn't really even

4    understand the main reason that I was seeing him, that it was

5    not competency, and I -- in establishing some rapport with him,

6    I -- I'm gathering my thoughts here.  I didn't think he

7    understood the true purpose of why I was seeing him.  He

8    explained that he was just being cooperative and this was part

9    of the process that he needed to do.  I didn't think he really

10   understood why he needed to undergo these testing or these

11   consultations or evaluations.

12   **Q.**  Why -- in your report you cite research articles or -- that

13   you looked up and so on.  Why did you -- why did you do that?

14   **A.**  It's important when I come testify in court and even for my

15   own daily to ensure that I have evidence-based information,

16   that it's co-related to peers, and it's not solely my opinion

17   or my -- my subjective opinion.  I want to make sure it's

18   evidence based and there's peer-reviewed articles that support

19   what I'm saying.

20   **Q.**  When you saw Steven again in October of this year, what did

21   you find in terms of his -- how much he had learned, say, from

22   your prior interviews of him and -- and whether his status was

23   any different than what you had previously observed?

24   **A.**  I think in general there was not much of a difference.

25   Maybe there were some additional terms that he learned because

*NEGRÓN-MUÑOZ - DIRECT*                                    79

1    of repetition, but I don't think that it changed his deeper

2    understanding or knowledge of the situation at hand.

3    **Q.**  So what were the basic clinical observations that you made

4    of Steven diagnostically?

5    **A.**  My diagnosis of him?

6    **Q.**  Yeah.  I mean, what were the relevance of things you -- you

7    observed regarding, for example, his intelligence and his

8    learning and memory, those kinds of issues?

9    **A.**  Well, I've diagnosed him with autism with intellectual

10   impairment.  And currently, based on the DSM-5, you -- in order

11   to give intellectual impairment, you just do not base it on the

12   IQ component, which we already know is on the lower average.

13   You also have to take the social adaptability, functionability,

14   and there is a table in DSM-5 that allows you to make this

15   determination.  And given that Steven has been in an

16   assisted-living facility, that would give us with intellectual

17   impairment.

18       And relating to the levels of autism, he does meet criteria

19   for Level 1, but it is with support.  Level 1 is not without

20   support.  It means that he does need some level of support in

21   order to function daily.

22   **Q.**  And from his history, what level of support did Steven

23   require, say, when he was living in Orlando?  What was his --

24   the situation in -- as far as you gathered it in terms of his

25   daily living skills?

1   **A.**  Well, I don't think he was functioning appropriately in

2   Orlando.  His parents had provided him several passwords,

3   detailed instructions on how to do things.  Based on his own --

4   on Steven's own report, he would not eat properly.  He was not

5   showering.  He was not taking care of his apartment.  He would

6   rarely go to class because of his fear of driving.  He was

7   depressed at that time, it was my impression, based on his

8   report.  So he was not functioning adequately.

9   **Q.**  Yeah.  He didn't like to drive.

10      He was -- he -- do you recall that he walked to class at

11   times?

12   **A.**  I believe he did mention that, yes.

13   **Q.**  And what about clothing himself?  Do you recall any

14   particular information about his clothing or footwear?

15   **A.**  From the collateral information obtained from Aloft and

16   even in some of the videos I have watched of him, he mainly has

17   kept the same type of clothing in Aloft, where he has been for

18   the past four years.  They have reported that he needs to be

19   prompted to get new shirts.  Even though they provide them with

20   the opportunity to get shirts, new socks, he needs to be

21   prompted; otherwise, he will wear the same thing over and over

22   again.  He needs to be prompted to take -- take a shower, take

23   a bath.

24   **Q.**  Do you recall anything about Steven's footwear when he was

25   in Orlando and -- and his shoes?

1    **A.**  I have a vague memory of the parents speaking about the

2    shoes, but I don't recall it completely.

3    **Q.**  Okay.  All right.  What aspects of his behaviors fit his

4    autism -- sort of fed into the diagnostic criteria for him in

5    his -- in your clinical observations?

6    **A.**  Well, historically, the developmental history, the

7    developmental delays, he had been diagnosed with a nonverbal

8    learning disorder, which it is all nonverbal learning -- let me

9    see.  It's in my report.  Children with nonverbal learning

10   disorders can sometimes be confused -- children with autism can

11   have nonverbal learning disorders.  I'm sorry.  It's in my

12   report.  I get it confused myself.

13       So having a nonverbal learning disorder can be confused

14   with autism, but that can be a part or symptoms of autism, his

15   lack of social and emotional reciprocity, as described by the

16   parents.  Lack of friends.  He had been bullied in school.  The

17   educational difficulties.  He did not graduate with a regular

18   diploma.  He was exempt from the Keystone exams in Pennsylvania

19   because he had an individualized educational plan.  He needed a

20   lot of support to go through school.

21       And something that is important is -- about his

22   individuation, in a normal developing child, even at two years

23   old, we see what everybody calls the "terrible twos," which is

24   part of the starting individuation, and even in the

25   teenage years you see where people -- where teens try to have

1   their own individuality, and he's been kind of complacent and

2   goes because he doesn't have even the capacity to make those

3   decisions for himself.

4   **Q.**  Does his history shows circumscribed interests or

5   repetitive behaviors?

6   **A.**  Yes.  He actually, I believe, taught himself to play the

7   piano.  He had restricted interest in computers.  I can't

8   recall any other at this time.

9   **Q.**  Sensory issues?  Did Steven have sensory issues?

10  **A.**  The parents reported some sensory issues in childhood.

11  **Q.**  All right.

12  **A.**  And restricted eating patterns as well, if I recall

13  correctly.

14  **Q.**  One of the things you asked him -- you asked him a question

15  when you were interviewing him about a genie?

16  **A.**  Yes.

17  **Q.**  And tell the judge what the -- what the question was and

18  what the point of it was.

19  **A.**  So, normally, I ask my juveniles and sometimes even adults,

20  to kind of gauge where they're at in their imagination, if I

21  was a genie, if I could give you three wishes, what would they

22  be?  And it kind of tells you where the person is at

23  emotionally or in a developmental stage.

24  **Q.**  And do you remember what --

25  **A.**  I do not recall what his three wishes were.

NEGRÓN-MUÑOZ - DIRECT                                        83

1   **Q.**  Okay.

2   **A.**  If they're in my report, I can look at them, but I do not

3   recall off the top of my head.

4   **Q.**  I think it's in the -- in your interviews.

5        Does -- in your professional opinion, does he currently

6   meet the diagnosis for autism spectrum disorder?

7   **A.**  He does.

8   **Q.**  Does autism spectrum disorder significantly affect his

9   daily living?

10  **A.**  In my opinion, it does.

11  **Q.**  And does it affect -- not just daily living, does it affect

12  other aspects of his life?

13  **A.**  Yes, it does.

14  **Q.**  So that would be social.  It would be communication and

15  language --

16  **A.**  Executive functioning, capacity to make decisions, take all

17  the information, yes.

18  **Q.**  Social interaction?

19  **A.**  Social interactions.

20  **Q.**  But this is combined with a -- what is the level of

21  intelligence?

22  **A.**  I think he ranged anywhere from 76 to 80-something.  There

23  is some other ones that place him at a 93.  It's been quite

24  varied.

25  **Q.**  All right.  On his IQ alone -- of course, nobody on --

*NEGRÓN-MUÑOZ - DIRECT*

84

1   on -- on IQ alone does anybody diagnose somebody with

2   intellectual disability.

3   **A.**   Not any longer.

4   **Q.**   All right.  So it's a combination of that and adaptive

5   functioning that's --

6   **A.**   Social, adaptive.

7   **Q.**   All right.  And so it's the combination of the two that led

8   you to conclude also that he has -- his autism is with

9   intellectual impairment?

10   **A.**   Correct.

11   **Q.**   And did you also diagnose him with a moderate -- any kind

12   of -- any kind of intellectual disability?

13   **A.**   Yes.  Mild to moderate, I believe.

14   **Q.**   And so apart from all the talk about autism, that

15   intellectual capacity also plays in to this whole process of

16   his understanding the legal terms and the legal ideas?

17   **A.**   Yes, sir.

18   **Q.**   Understanding the deeper concepts underneath them?

19   **A.**   Yes.

20   **Q.**   And being able to, again, manage actually thinking about

21   those and using those in a practical way?

22   **A.**   Yes.  It affects his ability to manipulate that information

23   in a rational or executive or more executive functioning

24   manner.

25            **THE COURT:**  Mr. Mahoney, just for planning purposes,

*NEGRÓN-MUÑOZ - DIRECT*                                              85

1    I'm going to let you go till 12:30 --

2              **MR. MAHONEY:**  Okay.

3              **THE COURT:**  -- and then we'll take a lunch break.  So

4    I just want to -- I don't want to interrupt your -- if you're

5    at a crucial point.

6              **MR. MAHONEY:**  No.  Great.

7    BY MR. MAHONEY:

8    **Q.**  Is there -- is there a -- we've heard terms like

9    "high-functioning autism" or "mild autism."  Is there -- is

10   there something about autism that relates to different

11   capabilities of individuals in different areas?

12   **A.**  I think in general -- I'm going to use the term

13   "laypeople," will consider somebody who appears more high

14   functioning, but the high functioning doesn't necessarily apply

15   to all the areas.  They may be -- they may have a higher

16   functioning in one area but lower functioning in other areas.

17   So it needs to be taken in the totality of how that person is

18   functioning in order to really assess their total capacity or

19   functioning.

20   **Q.**  So do people have -- with autism, even with Steven's

21   ability to speak and his level of intelligence, can they have

22   deficits that are severe in areas that aren't apparent to us?

23   **A.**  Yes.  And I think that is one of the biggest challenges,

24   because sometimes people with autism or who do not have a very

25   overt outside phenotypical -- give the impression that there's

1     something wrong with them and have good verbal abilities or at

2     least appropriate verbal abilities can give the impression that

3     they can understand, and unless you go to a deeper level or

4     push them a little bit harder to ensure they understand, you

5     can -- it can be misconstrued that they are capable of

6     understanding.

7     **Q.**   So this is -- is this essentially what you interpret

8     Gretchen Bennett as having said earlier?

9     **A.**   Correct.

10    **Q.**   And so, for example, Steven can parrot to some degree.

11    Learned how to use a fairly complicated computer program at

12    this school for animation in Orlando.

13    **A.**   And this is common with different levels of autism.

14    There's not one category of autism that applies to everybody.

15    Each child or adult with autism will present with different

16    strengths, different challenges.  When they have a particular

17    interest, which is part of that restricted interest, they can

18    become hyperfocused, hyperalert, hype- -- they can have

19    excessive knowledge in that area while lacking -- while lacking

20    significant knowledge in other areas that may be considered

21    important as well.

22    **Q.**   In your experience, is there -- are -- do you see patients

23    with autism who are actually pretty good with computers?

24    **A.**   Yes.  I think that's common.

25    **Q.**   And computers are based -- all operate on rigid rules?

*NEGRÓN-MUÑOZ - DIRECT* 87

1   **A.**  They're very concrete operations.

2   **Q.**  If you type in the wrong password, one letter wrong,

3   there's no forgiveness; correct?

4   **A.**  I would say so.

5   **Q.**  Yeah.  So -- so is there -- the kind of learning that --

6   that Steven might be capable of in learning that computer

7   program, does that suggest that he -- he would be able to learn

8   other types of things?

9   **A.**  Not necessarily.

10  **Q.**  Would it mean -- would it predict that he be able to learn

11  abstract concepts?

12  **A.**  No.  When you have concrete learning -- which in my

13  evaluation of him, I did say he has -- he's concrete in his

14  abilities and interpretations.  You don't -- and it relates to

15  the level of -- where the Vineland and where they place him

16  kind of developmentally for the concrete operational thinking.

17  I don't think he's reached that abstract thinking, which kind

18  of happens after the teen years when they start.  They're able

19  to take that information and abstract it at a different level.

20  **Q.**  Does it -- does being able to learn that kind of, like,

21  computer skills translate into or does it mean that that person

22  would -- would be able to understand how to make complex

23  decisions that aren't rule based?

24  **A.**  Not necessarily.

25  **Q.**  Does it point to -- having that kind of learning ability

1   mean that that person would automatically -- would also have

2   the learning ability to understand the advice of an attorney on

3   their legal case?

4   **A.**   Could you reask that, please.

5   **Q.**   Having the ability to learn these computer programs, does

6   that -- would that suggest the person also would have the

7   ability to understand the attorney's legal advice?

8   **A.**   No.

9   **Q.**   Or be able to envision what prison might be like?

10  **A.**   No.

11  **Q.**   Would it suggest that the person's able to learn those

12  computer skills, would also necessarily be able to intuit

13  implicit social norms that aren't explicitly taught?

14  **A.**   No.

15  **Q.**   The -- Dr. Jenkins -- do you recall -- first of all, is it

16  your opinion that Steven has severe autism?

17  **A.**   I think, in my opinion, he has severe deficits in some

18  areas, but I wouldn't classify him overall as severe autism.

19  He has areas that he functions better at, and he has areas that

20  he has more deficits in.

21        **MR. MAHONEY:**   And I'll be looking for Exhibit 45,

22  Matt.   I'm jumping ahead just one step.

23  **BY MR. MAHONEY:**

24  **Q.**   Do you recall Dr. Jenkins saying something to the effect

25  that she didn't think persons who are higher functioning with

1    autism can have severe deficits?

2    **A.**   I recall her saying that, yes, sir.

3    **Q.**   Do you agree with that?

4    **A.**   Not -- no.

5    **Q.**   All right.  Does DSM actually address this issue of -- of

6    people with higher intelligence having severe deficits?

7    **A.**   Yes.

8    **Q.**   All right.  And looking at Defendant's Exhibit 45, which is

9    DSM-5, at page -- which is the DSM-5 for autism, at page 55, is

10   there something specifically that refers to this?  It begins

11   "the gap."

12   **A.**   Yeah.  Even before that it says, "Even those with average

13   or higher intelligence have an uneven profile of abilities."

14       If you could scroll it down a little bit.  I'm sorry.  Up,

15   I guess.  Scroll it up.  I'm sorry.  Right there.

16       "The gap" -- "the gap between intellectual and adaptive

17   functional skills is often large.  Motor deficits are often

18   present, including odd gait, clumsiness, and other abnormal

19   motor signs, self-injury," which is not relevant in this case.

20   And I'm sorry --

21   **Q.**   I think that's -- that's what I need for it, Doctor.

22       So -- so DSM itself says that there are uneven abilities --

23   **A.**   Yes.

24   **Q.**   -- in autism, and some might be hidden to us when we

25   approach an individual.  But, most importantly, intellect

1    doesn't tell you the level of abilities, say, in the areas of

2    social interaction.

3    **A.**  Correct.

4    **Q.**  There's no reason why somebody couldn't be a PhD and have

5    severe deficits in social understanding.

6    **A.**  People with high IQs can still have deficits in social

7    understanding.  And as was stated yesterday, Asperger's is no

8    longer in the DSM.  It becomes part of the autism spectrum.

9    But, actually, in one of the articles that I recently read -- I

10    don't know if it's part of the exhibit -- there's about a

11    3 percent of PhD students who are undiagnosed with autism

12    because of their high IQ, but they still have deficits in their

13    social functioning.

14    **Q.**  They might not know how to properly shake hands or decide

15    how to follow conversational rules and things like that.

16    **A.**  Yes.

17    **Q.**  Now, on the question of -- is there a relationship between

18    autism and the neurological conditions that result in somebody

19    having autism spectrum disorder?  Is there some -- some -- is

20    that related to executive functioning?

21    **A.**  Could you rephrase that question, please.

22    **Q.**  Are the deficits that we see with somebody with autism --

23    are they deficits which can result in or have impact on

24    executive functioning?

25    **A.**  Yes.

*NEGRÓN–MUÑOZ - DIRECT*                                        91

1    **Q.**  All right.  And is that prominent in autism?  Is it

2    considered to be something that is prevalent in autism, that --

3    serious problems with executive functioning?

4    **A.**  That is one of the theories and bases of an autism spectrum

5    disorder, in addition to the theory of mind, the theory of

6    executive functioning.

7    **Q.**  Yeah.  Is one -- one of our exhibits is Exhibit 55, a

8    chapter in a book that was edited by Dr. Fred Volkmar.

9        Are you familiar with who Dr. Volkmar is?

10   **A.**  Yes.  He's a renowned expert in autism.  He's written

11   several chapters, Kaplan and Sadock.  He's edited recently the

12   book for autism and the law.  He's out of Yale.

13   **Q.**  Out of Yale.

14       And are you familiar with the *Encyclopedia of Autism*

15   *Spectrum Disorders*?  He's the editor of that.

16   **A.**  Yes.

17   **Q.**  So he's at the top tier in terms of autism experts in the

18   world, would you say?

19   **A.**  Correct.

20   **Q.**  And so in this chapter does he describe how autism -- the

21   features in autism and the -- the social learning problems in

22   autism result in executive functioning problems?

23   **A.**  Yes, he does describe that.

24   **Q.**  And -- and does he talk about executive functioning several

25   times in that chapter?

NEGRÓN-MUÑOZ - DIRECT

1   **A.**  He does.

2   **Q.**  And then he refers to, you know, people -- is it true that

3   in autism, that people have different formulations of how they

4   understand it?  One is the theory of mind --

5   **A.**  Correct.

6   **Q.**  -- that was discussed before, but another is -- has to do

7   with --

8   **A.**  Executive functioning.

9   **Q.**  All right.  And so there's a -- a lot of scholarship and

10   research that has to do with the association between autism

11   characteristics and executive functioning; is that -- is that

12   accurate?

13   **A.**  Yes.

14   **Q.**  All right.  You -- you diagnosed Steven with PTSD.

15   **A.**  Correct.

16   **Q.**  And you explained that in your report.

17   **A.**  I did.

18   **Q.**  All right.  And depression -- you disagree with Dr. Jenkins

19   in depression.  Tell the -- tell the -- and how -- at least how

20   to express it.  Would you explain that to the judge.

21   **A.**  I was a little confused with her report because, initially,

22   she said in remission, then in partial remission, but her raw

23   data or that collected by her student, because I'm unclear who

24   collected the data or when it was relevant to what time -- I

25   would assume it was at the present.  And she said they

*NEGRÓN-MUÑOZ - DIRECT*                    93

1    collected information at that moment.

2       He did report that he was depressed, and I do not recall

3    all the information, but based on that assessment, he would

4    meet criteria for depression at the time she saw him.   In

5    remission would mean he -- he had no symptoms for more than

6    two months.

7    **Q.**  And, in your view, based on their own records, that was

8    not -- that was not the case; is that right?

9    **A.**  That's what it appeared.

10   **Q.**  All right.  So I just -- you mentioned social anxiety

11   disorder earlier.  I just want to -- to clarify this as to why

12   you've -- you don't -- you don't agree that social anxiety

13   disorder is the proper diagnosis, do you?

14   **A.**  No.

15   **Q.**  All right.  And you're familiar with social anxiety in your

16   practice.

17   **A.**  Correct.

18   **Q.**  You've done research in -- in this area or assisted in

19   somebody who did --

20       **THE COURT:**  Mr. Mahoney, I'm going to interrupt you

21   again.

22       **MR. MAHONEY:**  I'm sorry.

23       **THE COURT:**  Mr. Mahoney, just so you know, I'm only

24   going to give you one more chance, and then Mr. Goddeyne's

25   going to take over the questioning.  You need to ask questions,

1    sir.

2    **BY MR. MAHONEY:**

3    **Q.**   Did you have research familiarity in anxiety?

4    **A.**   I did some research with Michael Liebowitz, who is the

5    developer of the social anxiety disorder questionnaire.  So I

6    trained with him during my residency training.

7    **Q.**   You mentioned that -- that having autism is -- that in

8    diagnosing social anxiety disorder, you have to take into

9    account whether or not somebody has a diagnosis of autism.

10   **A.**   Correct.  Under the criteria for social anxiety disorder,

11   there is a disclaimer that if the symptoms are not better

12   accounted for by autism spectrum disorder -- and it explicitly

13   says that for social anxiety the person has to have normal

14   engagement in social interactions and to be aware that that's

15   part of the anxiety, which in Steven's case his symptoms of

16   autism spectrum disorder account for that.  So he would not

17   meet the criteria for social anxiety disorder.

18   **Q.**   And is there a section in the diagnostic criteria for

19   social anxiety disorder that specifically talks about

20   differential diagnosis?

21   **A.**   Yes.

22            **MR. MAHONEY:**  And is that -- do you have that, Matt?

23   I'm sorry.  This is Exhibit 46, page 200- -- 207.  Search for

24   "differential."

25   **BY MR. MAHONEY:**

1  **Q.**  So -- and there's a deferential diagnosis -- advice there

2  on differential diagnosis for autism.

3        **MR. MAHONEY:**  I think you have to slide down a little

4  bit, Matt, to --

5        **THE WITNESS:**  It's at the bottom.

6        **MR. MAHONEY:**  You have to slide down a little bit,

7  yeah.  A little bit more.  Okay.  Right there.

8  **BY MR. MAHONEY:**

9  **Q.**  And would you read the first line of the -- that paragraph

10  for autism spectrum disorder.

11  **A.**  "Social anxiety and social communication deficits are

12  hallmarks of autism spectrum disorder."

13  **Q.**  So that -- would you say that that sentence there is to let

14  clinicians know, if they're thinking about anxiety, don't

15  forget that autism itself is -- it's a hallmark of autism to

16  have social anxiety?

17  **A.**  Correct.  Particularly if you are -- if you have a

18  diagnosis of autism, you should have this very prevalent or be

19  aware of it so you're not misdiagnosing or writing a diagnosis

20  that's not germane to the patient or client.

21  **Q.**  And the next information is that social anxiety disorder

22  should not be diagnosed for somebody who did not have social

23  skills growing up in development.

24        **MS. CHANG:**  Objection.  Testifying, Your Honor.

25  **BY MR. MAHONEY:**

*NEGRÓN-MUÑOZ - DIRECT*                                                96

1      **Q.**  Is that right?

2             **THE COURT:**  Mr. Mahoney, we're going to take our lunch

3      break now, and what I'm going to suggest you do over the next

4      hour is you talk to Mr. Goddeyne and you figure out how to ask

5      questions.  Dr. Negrón-Muñoz is extremely qualified.  She can

6      answer all of these questions.  You are testifying, sir.  This

7      is your final warning.  You do it one more time, and

8      Mr. Goddeyne is taking over questioning.  Do I make myself

9      clear, sir?

10            **MR. MAHONEY:**  Yes, Judge.

11            **THE COURT:**  Thank you.

12            We'll be in recess for one hour.  See you at 1:30.

13            Thank you, ma'am.  You may step down.  Thank you,

14     Doctor.

15            **THE WITNESS:**  Thank you.

16        (Recess at 12:27 P.M. until 1:32 P.M.)

17            **THE COURT:**  Doctor, I'll remind you that you're still

18     under oath, ma'am.

19            **THE WITNESS:**  Yes, ma'am.

20            **THE COURT:**  Thank you.

21            And, Mr. Mahoney, go ahead.

22            **MR. MAHONEY:**  Thank you, Judge.

23     **BY MR. MAHONEY:**

24     **Q.**  Dr. Negrón, looking, again, at the differential diagnosis

25     section of the DSM definition of social anxiety disorder, what

*NEGRÓN-MUÑOZ - DIRECT*

1  does that tell us about whether or not Stephen could properly

2  be diagnosed with social anxiety disorder?

3  **A.**  Based on his diagnosis of autism spectrum and knowing that

4  social anxiety and social communication deficits are hallmark

5  and would exclude him from having a diagnosis of social anxiety

6  disorder.

7  **Q.**  All right.  And is it relevant that Stephen had social

8  interaction problems as a youth and in his development?  Is

9  that relevant under that category?

10  **A.**  Yes.

11  **Q.**  In what way?

12  **A.**  Because it's pathognomonic in the diagnosis.

13  **Q.**  And is it characteristic of social anxiety disorder?

14  **A.**  No.

15  **Q.**  Okay.  So yesterday Dr. Jenkins referred to Steven as "very

16  smart."  Do you recall that?

17  **A.**  Yes, I do.

18  **Q.**  And do you agree with that?

19  **A.**  I -- I think it's a little conflicting to say somebody is

20  smart and at the same time say they have a low intellectual

21  quotient.  So -- or a low IQ.

22  **Q.**  Dr. Jenkins made a suggestion that Steven's -- do you

23  recall Dr. Jenkins making some sort of suggestion that Steven's

24  desire to be alone in a cell by himself was an example of

25  executive functioning?

*NEGRÓN-MUÑOZ - DIRECT*                                          98

1   **A.**   Yes.  She mentioned that he had made -- he was assertive --

2   if I recall correctly, that he was assertive in saying that he

3   wanted to go to the SHU.  In my experience -- and I think

4   everybody here knows how the prison works -- you don't decide

5   by yourself if you go to the SHU.  It has to be a team

6   decision.  And although somebody can request for their

7   protection, it still has to be evaluated by the team at the

8   jail, whether it be the psychologist, the social worker, and

9   even the prison itself.  So it's not an autonomous decision

10  that you decide just to go to the SHU on your own.

11  **Q.**   What about his decision simply to ask for that and to

12  express his preference to be by himself?  Is that an

13  executive -- what level of executive functioning is that?

14  **A.**   I think it needs to be taken into account that that may

15  also contribute to his autism and his desire to be alone and

16  function better in an arena where he's by himself and not in

17  general population where there may be overstimulation or too

18  many people.

19  **Q.**   Do you remember Dr. Jenkins referring to Steven having

20  ability to recognize a staff member later in the day after

21  having been introduced to them earlier in the day?

22  **A.**   Yes.

23  **Q.**   And was that -- is that an example of working memory?

24  **A.**   No.  It's just an example of recall or recognition.

25  **Q.**   The Test of Memory Malingering came up.  There was an issue

*NEGRÓN-MUÑOZ - DIRECT*                                    99

1    with the scoring of this.  And we can look at Exhibit 53 at

2    page 4.

3        Was there a problem in scoring the TOMM?

4    **A.**  Yes.  When I reviewed the raw data, it was not scored.  In

5    my attempt to at least get some sense of what the results were,

6    I misinterpreted the results of the score.  If you look on

7    Score Sheet 1, I missed the first two because I just looked at

8    what was checked.  And as you can see, the first two boxes are

9    not checked.  They're actually checked to the side.  So I did

10   not count them.  That's why my score came out to 38.

11       But in reviewing her data, when she said it was 40, I then

12   noticed that the check marks were to the side.  So I concurred

13   that it was a 40.  So that was an error on my behalf because I

14   was actually just counting the check boxes that were checked,

15   not really noticing that there were two smaller check boxes to

16   the side.  So that accounts for the two-point discrepancy.

17   **Q.**  Or was it an error on the part of the person filling out

18   the form?

19   **A.**  I'm not sure I can answer that.

20   **Q.**  Now, at the bottom of that form, there's a box for a score.

21   If that had been scored, would there have been a number in

22   there?

23   **A.**  There should -- there normally should -- would have been.

24   **Q.**  All right.  And your interpretation of the -- the results

25   of this?

1    **A.**  I concur in general with Dr. Jenkins that there is no

2    malingering.  I wasn't very sure about her interpretation of

3    the three- -- the three-point in general.  It's a memory of

4    retention and recall, and he actually did progressively better.

5    He obtained a 40, a 42, and a 45.  And in order for it to be

6    considered malingering, the second trial has to be less than

7    90 percent of the first trial, and he actually did better in

8    the second trial.

9        I didn't understand -- and I tried to look, but I don't

10   know what she was referring to about the three-point

11   difference, but the bottom line is that we both agree that

12   there's no malingering.

13   **Q.**  What is rote memory?

14   **A.**  Rote memory is the capacity just to remember something

15   factual for what it is.  You don't have to understand it.  You

16   can just regurgitate what you learned.

17   **Q.**  Does -- and were -- was a lot -- was the information or

18   some of the information being sought in Dr. Jenkins's

19   competency questionnaire information that was basically rote

20   memory?

21   **A.**  Yes.

22   **Q.**  All right.  And, in fact, your evaluation too, you asked

23   questions -- is that true? -- that related to -- where the

24   answer would really be exemplary of rote memory.

25   **A.**  Correct.

1    **Q.**  That's actually -- would you say that's actually typical of

2    competency evaluations?

3    **A.**  One component of it, yes.

4    **Q.**  Yeah.  Okay.  So how does Steven rate in his capabilities

5    even in terms of rote memory?

6    **A.**  Well, he has a basic understanding of the terms, not a

7    deeper understanding of what it may -- may mean.  If you --

8    I'll just say that he has a basic understanding, but if you go

9    any further, he may not be able to give you more elaborate

10   answer on what a specific term or definition may be.

11   **Q.**  Well, I want to ask the question of -- it seems like there

12   were -- were there a number of times when Steven, with previous

13   doctors or the same doctor, failed to remember something from

14   rote memory on several times in a row?

15   **A.**  Yes.  Actually, in comparison, even with his answers to

16   Dr. Jenkins or even Dr. Otto, some of his answers remained the

17   same.  They did not change.

18   **Q.**  And so is that -- does it make sense to talk in terms of

19   impairments in rote memory?

20   **A.**  Yes.  He does have some impairment in rote memory because

21   sometimes, particularly given that he had been given this

22   information over and over at times, he was not even able to

23   give it back as it was taught to him.

24   **Q.**  Even if Steven had answered correctly and repeatedly

25   answered correctly all of the questions that were on the

1    competency questionnaire that was used by the Bureau of

2    Prisons, would that, in your view, result in -- or justify a

3    finding that he was competent?

4    **A.**   No.  We would have to take into account the decisional

5    component of it as well.

6    **Q.**   And did you actually -- I think I asked you this before,

7    but I'll ask you again, to lead into the next exhibit.  Did you

8    actually, in your evaluation of him, take in mind this question

9    of decisional competence and gear your questioning in

10   significant respects to decisional competency?

11   **A.**   Yes, sir.

12            **MR. MAHONEY:**  Your Honor, I would like to play at this

13   point a series of clips that are excerpts from Dr. Negrón's

14   interviews of Steven.  They're -- it goes, I think, for

15   maybe --

16            Do we have a number, Matt?  I don't remember how long

17   it is.

18            **MR. GODDEYNE:**  Twenty-five minutes.  Oh, Negrón's.

19            **MR. MAHONEY:**  It's not that long, but it's for

20   illustration purposes, Judge.

21            **THE COURT:**  Ms. Chang, any objection?

22            **MS. CHANG:**  No, Your Honor.

23            **THE COURT:**  All right.  With the caveat if we can't

24   get it up and running, then we won't be able to do it.  But I

25   have complete faith in Mr. Goddeyne.  You've been doing great

1   so far.

2          **MR. GODDEYNE:**  Thank you, Your Honor.  Edward was very

3   helpful this morning.  So we got it.

4          **THE COURT:**  All right.  Excellent.  Thank you, Edward.

5          And, Doctor, if I don't look at you, it's because I

6   have a little screen.  I'm going to be watching the videos

7   there.

8          **THE WITNESS:**  Thank you.

9      (Video playing from 1:42 P.M. to 1:57 P.M.)

10  **BY MR. MAHONEY:**

11  **Q.**  I'm not sure what my question -- I'm not sure what my

12  question is, but do you recall those individual --

13  **A.**  Yes.

14  **Q.**  -- vignettes?

15     A lot of these were out of context, apparently, but did

16  you -- was it -- was there consistent presentation of Steven

17  throughout your several interviews?

18  **A.**  Yes.  As you can see, some of them were November 2020,

19  December 2020, and October 2021, and he kind of similarly

20  presents throughout.

21  **Q.**  Is Steven's difficulty here a tactic?

22  **A.**  No.

23  **Q.**  How do you know that?

24  **A.**  Well, I would have to ask you to define what you mean by

25  "tactic."  I know in the general sense but --

1   **Q.**  You know -- I'm referring in the sense that Dr. Jenkins had

2   suggested that his difficulty with making decisions was a

3   tactic.

4   **A.**  I don't think he intentionally is not making a decision

5   or -- I think that would have been ruled out by malingering;

6   right?  He's not purposefully doing this to portray that he's

7   not capable of making a decision.  So it's not a tactic on his

8   behalf.  It's part of his regular functioning.

9   **Q.**  Is the -- does the phrase "learned helplessness" have a

10  definite meaning in psychology?

11  **A.**  It is a term that is used.  It's -- I would say it can

12  relate to trauma when people feel they're hopeless and they

13  feel they have no way out of a situation, so they learn to be

14  helpless.

15  **Q.**  Is this something that would be true, say, of battered

16  women?

17  **A.**  It can be truthful of trauma; or people who have poor

18  attachments, there's learned helplessness.  Or when they feel

19  they -- depression, there can be some learned helplessness.  It

20  can be applied to different areas and trauma being one of them.

21  **Q.**  As you understand the term, as you have heard it in your

22  clinical practice, is the -- does the concept of learned

23  helplessness have anything to do with Steven Marks?

24  **A.**  No, sir.

25  **Q.**  In your opinion, does Steven's difficulty in making this

*NEGRÓN–MUÑOZ - DIRECT*                                              105

1    decision have anything to do with the support his parents have

2    provided to him over the years?

3    **A.**   No.

4         **MR. MAHONEY:**   Judge, we'd like to play now the -- this

5    is going to be 25 minutes, Judge.  This is an excerpt from the

6    final day with Steven executing the plea agreement.

7         **THE COURT:**   Any objection, Ms. Chang?

8         **MS. CHANG:**   No, Your Honor.

9         **THE COURT:**   All right.  Go ahead.

10        **MR. MAHONEY:**   So I don't -- Matt, the exhibit number,

11   I'm not sure, but it's beginning at 25 minutes into that video.

12   And maybe, Matt, for the record -- I'm not sure what the -- our

13   designation of that particular track is.

14        **MR. GODDEYNE:**   For the record, this is a demonstrative

15   labeled "D Inability to Make Autonomous Decisions Marks."  It's

16   part of Exhibit 2.

17        **THE COURT:**   Thank you, Mr. Goddeyne.

18        **MR. MAHONEY:**   Thank you, Matt.

19        **MR. GODDEYNE:**   I apologize.  I'm just having a problem

20   with sound now.

21        **THE COURT:**   Why don't we do this, Mr. Goddeyne.

22        **MR. GODDEYNE:**   Yes, ma'am.

23        **THE COURT:**   Mr. Mahoney, could you move on to another

24   area of questioning, and then we're going to take a break

25   probably within the hour.  During that break, maybe you can

1    play with it a little bit, see if the video will come back up

2    with the audio --

3             **MR. GODDEYNE:**  Yes.  I apologize.

4             **THE COURT:**  -- and we can always come back to this.

5             **MR. GODDEYNE:**  I don't know what happened here.

6             **THE COURT:**  Believe me.  This happens all the time.

7    We'll get it sorted out.

8             Go ahead, Mr. Mahoney.

9             **MR. MAHONEY:**  Just so you know, Judge, this is

10   basically -- like, two questions after this, this is done.  So

11   I won't have much more after this.

12            **THE COURT:**  Oh, well, so are the two questions related

13   to the video?

14            **MR. MAHONEY:**  Yeah.

15            **THE COURT:**  Oh, wait.

16            **MR. GODDEYNE:**  It might be --

17            **THE COURT:**  All right.  Mr. Goddeyne, hold up for one

18   second.  Why don't we do this, everybody.  Let's take a

19   five-minute break.  Mr. Goddeyne, get it all set up.  Then my

20   understanding, Mr. Mahoney, is you're saying you're going to

21   play about a 25-minute excerpt, ask Dr. Negrón-Muñoz two

22   questions, and then we're going to go on to cross.  Is that

23   correct?

24            **MR. MAHONEY:**  Yes, Judge.

25            **THE COURT:**  All right.  Based on that representation,

*NEGRÓN-MUÑOZ - DIRECT*                                      107

1    we'll take a five-minute break and get it all set up.  Thank

2    you.

3         (Recess at 2:04 P.M. until 2:12 P.M.)

4              **THE COURT:**  Mr. Goddeyne, are we all set?

5              **MR. GODDEYNE:**  Yes, Your Honor.

6              **THE COURT:**  All right.  Excellent.

7              **MR. MAHONEY:**  Your Honor, I just -- the format starts

8    at -- there is a section -- I don't know how it got in there --

9    of Dr. Negrón mixed in with this for a short period of time

10   but -- and there may be some slight repetition as a result,

11   but, otherwise, it's about 25 minutes long.

12             **THE COURT:**  Okay.

13             **MR. MAHONEY:**  And it does have the day of my series of

14   meetings with Steven.  Day 15 is the last day.  And the time

15   stamps are -- it's the -- the first whatever video that day but

16   it would be 31 -- one hour and 31 minutes into that day and up

17   to two hours and 31 minutes, but excerpts.

18             **THE COURT:**  Okay.

19             **MR. MAHONEY:**  Thank you.

20             **THE COURT:**  Thank you, Mr. Mahoney.  Go ahead.

21        (Video playing from 2:13 P.M. to 2:30 P.M.)

22             **THE COURT:**  Mr. Mahoney, Mr. Goddeyne, will you stop

23   the video.  Is it just a typo?  This is still part of your

24   Day 15.  This is not from October 3rd; is that correct?

25             **MR. MAHONEY:**  Right.  Yeah.  That's interesting.

1    Thank you, Judge.  No.  This is absolutely just going over the

2    plea agreement.

3           **THE COURT:**  Okay.  So this is all still Day 15.  All

4    right.  Thank you very much.

5           Thank you, Mr. Goddeyne.  You can start it back up.

6        (Video resumed playing from 2:32 P.M. to 2:42 P.M.)

7    **BY MR. MAHONEY:**

8    **Q.**  Dr. Negrón, do you remember -- first of all, from what you

9    see there and -- in these videos and what you recall of the --

10   on all the videos that you saw of my interactions with Steven

11   and from your own interactions with Steven, what is your

12   opinion about his competence to have executed that plea

13   agreement?

14   **A.**  He continued to lack that decisional competence because he

15   wasn't able to take all the information and make an informed

16   decision with all the data that was available to him.

17   **Q.**  Do you -- in your report you made reference to the earlier

18   examination of Dr. Otto.  I saw a question that Dr. Otto had

19   Steve -- had asked Steven.  Do you recall that question?

20   **A.**  I know what you're referring to, but I don't remember

21   verbatim at this time.

22   **Q.**  Can I suggest that -- that he asked him what more he wanted

23   to know?

24   **A.**  I don't know if you're referring to this, but Dr. Otto, in

25   one of his training videos, talks about -- no, that's not what

*NEGRÓN-MUÑOZ - DIRECT | CROSS*

1    you're referring to?

2    **Q.**  Anyway, the question of -- do you recall Steven at some

3    point asking, "What's the best decision?"

4    **A.**  Yes.  And Dr. Otto I think said he did not further ask him

5    about that.

6    **Q.**  Yeah.  And what was the question that Steven was asking

7    today when -- after I recommended a certain plea to him?

8    **A.**  If that was the best decision.

9    **Q.**  Has Steven changed or progressed in any respect since the

10   time Dr. Otto initially asked him that question?

11   **A.**  It has not changed.

12           **MR. MAHONEY:**  That's all, Judge.

13           **THE COURT:**  Thank you, Mr. Mahoney.

14           Dr. Negrón, do you require a break, or are you okay to

15   continue on?

16           **THE WITNESS:**  I can continue.  Thank you for asking.

17           **THE COURT:**  Absolutely.

18           Ms. Chang, are you ready for cross?

19           **MS. CHANG:**  Yes, ma'am.

20           **THE COURT:**  Okay.

21                         **CROSS-EXAMINATION**

22   BY MS. CHANG:

23   **Q.**  Good afternoon, Doctor.

24   **A.**  Good afternoon.

25   **Q.**  So at page 4 of your report, which is Defense Exhibit 18,

1    which -- okay.  I'll show it to you.  Well, actually, I'm going

2    to just cite it.

3        So you state at page 4 -- do you recall stating that the

4    defendant's condition hasn't deteriorated since 2017?

5    **A.**  If my report says that, yes.

6    **Q.**  Okay.  And in your -- well, so, in your opinion, his mental

7    condition at the time of his offense is the same as now;

8    correct?

9    **A.**  Do you mind if I --

10   **Q.**  No.  I'm not -- I'm just asking you.

11   **A.**  Oh, okay.  Could you repeat it?  I'm sorry.

12   **Q.**  Sure.  In your opinion, is his mental condition now the

13   same as it was at the time of his offense?

14   **A.**  I would have to say yes because his autism is consistent,

15   and that doesn't change.

16   **Q.**  ASD does not wax and wane, does it?

17   **A.**  No, it does not.

18   **Q.**  So you agree that historical data points about his ability

19   or lack of ability are relevant; right?

20   **A.**  Could you repeat that again?

21   **Q.**  So do you agree that historical data points about his

22   mental abilities or inabilities are all relevant, whether

23   they're from today or from --

24   **A.**  Correct.

25   **Q.**  -- a couple years ago?

1    **A.** Yes.

2    **Q.** And so the defendant's chats from 2017 are also relevant?

3    **A.** Correct.

4    **Q.** And his police interview from 2017 is also relevant?

5    **A.** Correct.

6    **Q.** At page 2 of your report, you state that at the beginning

7    of your examination, you explained the purpose of your

8    examination, and the defendant missed the implicit message

9    that -- that the mediary to the Court was his attorney whose

10   role it would be to determine whether it was appropriate for

11   your report to be used.  Do you remember that?

12   **A.** Yes.

13   **Q.** Did you attempt to educate the defendant about that?  I

14   mean, you're saying he didn't understand, so did you attempt to

15   educate him?

16   **A.** I think that is something that is of -- I don't want to say

17   contemptuous, but when I was educated in this, it's not our

18   role necessarily to educate about competency or what's going

19   on.  It's to obtain the information at that time.  If there's

20   to be a competency restoration, that's where the education

21   takes place.  I know some -- like, Dr. Jenkins yesterday

22   informed she educated.  I know that's also used, but that is

23   not my normal style.

24   **Q.** So --

25   **A.** I will give them more information, like "This is what we're

1    doing," but I don't think my role as the evaluator is to

2    educate.

3    **Q.**  I see.

4        To your knowledge, before that point had anyone attempted

5    to educate the defendant about this nuance that the attorney is

6    really the mediary who is going to decide whether to use your

7    report?

8    **A.**  It is my understanding from Mr. Mahoney that they had

9    attempted to explain to him not only that but other aspects

10   pertaining to competency and his pleas and everything else.

11   **Q.**  Was that in the 30 hours of video that you saw?

12   **A.**  Yes.

13   **Q.**  Do you recall where it was?

14   **A.**  No.

15   **Q.**  Let's move on.

16       Page 7 of your report, you state that the parent -- so you

17   talked to the parents --

18   **A.**  I did.

19   **Q.**  -- in connection with this evaluation; correct?

20   **A.**  Yes, ma'am.

21   **Q.**  And is it fair to say that you cited certain things that

22   they told you where you felt it was relevant to add to your

23   report?

24   **A.**  That is correct.

25   **Q.**  Okay.  So along those lines, at page 7 -- I'll just read

1    from your report.  This is the second full paragraph.  "Steven

2    started preschool at age two years old, where his parents

3    describe that he displayed odd behaviors, such as wearing

4    clothes backwards, mimicking behaviors, and posturing."

5        Why was that notable to you?

6    **A.**  Because that's part of the things that you look for for an

7    autism diagnosis early on.  The odd behaviors, the oddities,

8    not -- did you say mimicking?  Yes.  Those are pathognomonic

9    things that you look for historically.  Particularly when his

10   diagnosis was given at a later age, it was important to go back

11   and know how far back these symptoms were present.

12   **Q.**  So you agree the reason -- is it fair to say you included

13   this statement in your report because you agree that they're

14   odd behaviors?

15   **A.**  Yes.

16   **Q.**  So you think it's an odd behavior for a two-year-old to

17   wear clothes backwards?

18   **A.**  If it's consistent, yes.

19   **Q.**  And you think it's an odd behavior for a two-year-old to

20   mimic the behavior of others?

21   **A.**  Not necessarily.  I would have to go back and read my notes

22   in what context that was said.

23   **Q.**  Because isn't mimicking -- and you're -- you're a trained

24   psychiatrist.

25   **A.**  Yes.

1    **Q.**  Isn't mimicking actually a milestone signifying growth and

2    development in a toddler?

3    **A.**  It is part of it.

4    **Q.**  And isn't mimicking part of just how children learn?

5    **A.**  At times, yes.

6    **Q.**  At page 9, paragraph 4, of your report --

7              **THE COURT:**  Ms. Chang, I'm going to interrupt you for

8    one second.

9              Mr. Mahoney, can you put your mask back on, please.

10             **MR. MAHONEY:**  Oh, I'm so sorry, Judge.

11             **THE COURT:**  Thank you very much, sir.

12             I apologize, Ms. Chang.  Keep going.

13             **MS. CHANG:**  Not at all, Your Honor.  Thank you.

14             **THE COURT:**  Thank you, Mr. Mahoney.

15             **MR. MAHONEY:**  No problem, Judge.

16   **BY MS. CHANG:**

17   **Q.**  So along the lines with information you got from the

18   parents, at page 16 of your report --

19   **A.**  May I add something?

20   **Q.**  Well, no.  I'm --

21   **A.**  Sure.

22   **Q.**  So page 16, second full paragraph of your report, you're

23   taking issue with Dr. Jenkins's report, and you state, "In

24   Dr. Jenkins's report, there's conflicting information," and you

25   give several examples about surgeries, whereas he says, "I

*NEGRÓN-MUÑOZ - CROSS*                                      115

1    don't have medical issues."

2    **A.**   Uh-huh.

3    **Q.**   You said, "Other examples of this are Steven's mother is

4    identified as having autism when this is not an accurate

5    statement.  Steven is adopted, and historical information from

6    his biological mother is not available."

7        And then, at the tail end of that same paragraph, you say,

8    "Based on this, how can Steven be identified as a 'good' or

9    reliable historian?"

10       Do you recall that?

11   **A.**   Yes.

12   **Q.**   Okay.  So in Dr. Jenkins's report at page 16, which is

13   Government Exhibit 16 as well -- I'm sorry -- page 9 --

14           **MS. CHANG:**   May I turn on the ELMO, Mr. Jackson?

15           **THE COURT:**   We can't use -- oh, we don't have anybody

16   on Zoom.  Go ahead.  Never mind.

17           **MS. CHANG:**   The document camera; right, Mr. Jackson?

18   Thank you.

19   **BY MS. CHANG:**

20   **Q.**   So I'll show this to you.  Perfect.  I think it's working.

21       So this is Dr. Jenkins's report, page 9.  And it says --

22   can you see that, Dr. Negrón?

23   **A.**   Yes, ma'am.

24   **Q.**   Okay.  Just making sure you were able to see.

25   **A.**   Sorry.  Yes.

1   **Q.**  An interview with Mr. David J. Marks, Mr. Marks's father --

2   he starts reporting things, and he mentioned Mr. Marks's

3   biological mother may have been autistic.  So that information

4   about the defendant's biological mother being autistic -- that

5   didn't come from the defendant, did it?

6   **A.**  Not as per that, yes.

7   **Q.**  And so to the extent that you drew that as a criticism

8   against Dr. Jenkins for calling the defendant a good historian

9   when, in fact, that particular fact came from his father, that

10  would -- that portion was misplaced; correct?

11  **A.**  I would say that, but that was not the only portion, yes.

12  But I could -- I could see that now, yes.

13  **Q.**  And in your direct examination, I believe you took issue

14  with Dr. Jenkins for not seeking collateral information;

15  correct?

16  **A.**  Correct.

17  **Q.**  That's along the same lines as -- I think it -- I'm not

18  going to quote you exactly, but the idea was that she took too

19  much of his self-report and did not seek collateral

20  information.  Is that still your opinion?

21  **A.**  Yes.

22  **Q.**  Okay.  But you recall yesterday, and also from her report,

23  she received Aloft records; correct?

24  **A.**  Yes, but she said she did not review all of them.

25  **Q.**  But she said that she reviewed -- well, do you recall she

1    said she actually did review everything that she got?

2    **A.**   I do not recall her saying that she reviewed everything.

3    **Q.**   Do you recall she said that she interviewed the defendant's

4    father?

5    **A.**   She said she spoke with him, yes.

6    **Q.**   Do you recall she said she spoke with Mr. Mahoney?

7    **A.**   Yes.

8    **Q.**   Do you recall she said she spoke with me?

9    **A.**   Yes.

10   **Q.**   And do you recall she consulted a host of educational

11   records from the defendant's childhood?

12   **A.**   That, I don't recall.

13   **Q.**   Do you recall she said that she recalled -- I'm sorry --

14   she consulted the police report?

15   **A.**   I believe so.

16   **Q.**   I'm sorry.  Not the police report.  Police interview.  I'm

17   sorry.

18   **A.**   Yes.

19   **Q.**   And also the chats?

20   **A.**   I believe she did, yes.

21   **Q.**   So those are all collateral sources, are they not?

22   **A.**   Yes.

23   **Q.**   So isn't it a bit of an overstatement, then, to say that

24   Dr. Jenkins did not seek out collateral sources?

25   **A.**   I'll clarify.  I think in relation to his historical and

1    developmental probably as well and current functioning, not

2    only in relation to this case but in general.

3    **Q.**   Turning to page 9 of your report, paragraph 4, you note

4    that collateral information from Aloft staff indicated that in

5    April 2018 the staff started to educate the defendant on ASD,

6    and it was noted that he had no recall of his own material from

7    three days back.  Why did you feel that was important to note

8    in your report?

9    **A.**   Because his memory has been an issue of -- a concern, so

10   this is another external source that is making note of his

11   memory issues.

12   **Q.**   In your interviews with the defendant, did you find that

13   his memory was similarly impaired?

14   **A.**   Yes.

15   **Q.**   Do you recall interviewing the defendant in October of

16   2021?

17   **A.**   Yes.  October 3rd.  Yes.

18   **Q.**   And I'm showing you Government Exhibit 13, which is a

19   transcript of your interview on that date.  Does this kind of

20   look familiar?  RN is you.

21   **A.**   Yes.

22   **Q.**   SM is the defendant.

23   **A.**   Uh-huh.

24   **Q.**   Okay.  So looking at lines 9 through 14, you are asking

25   him, "What do you think will happen if you were not found

1    competent to proceed?"

2        And the defendant says, "Well, from what I was told, I

3    would have to go to a hospital."

4        You say, "Okay.  Well, who told you this?"

5        And he says, "Um, Dr. Jenkins."

6        So who had he learned that from, according to him?

7    **A.**   Who he learned it from?  Dr. Jenkins.

8    **Q.**   And who is she?  When did the defendant meet her?

9    **A.**   According to him, he met her while he was at BOP.

10   **Q.**   And are you aware he was released from BOP in June of 2021?

11   **A.**   I'm not aware of the specific date, but, yes, I knew he was

12   there for about a month.

13   **Q.**   So the defendant relayed to you in October of 2021

14   something he had learned from Dr. Jenkins months before; is

15   that correct?

16   **A.**   Yes.

17   **Q.**   Does that show retention of information from more than

18   three days back?

19   **A.**   Yes.

20   **Q.**   Turning to the same exhibit, Government Exhibit 13, at

21   page 10, lines 2 through 7, the defendant's here talking

22   about -- well, you're asking about perjury, and he says, "I was

23   told that you would possibly get another charge for it."

24       And you say -- you say, "A lot, I've been told -- I've been

25   told.  So who has told you this information?"

1            And who does he say told him that information?

2       **A.**   Dr. Jenkins.

3       **Q.**   And, again, is this something that the defendant conveyed

4       to you that he recalled learning from Dr. Jenkins more than

5       three months before?

6       **A.**   I'm going to reply yes.

7       **Q.**   At page 15 of your report, the first paragraph, you state

8       that "Despite the" -- and this is a quote.  "Despite the

9       continued approach of rote learning with Steven, he has not

10      been able to crystallize the information provided to him."  I

11      skip a sentence, and then "In Steven's case this is evidenced

12      by the continuous teaching and repetition for the past

13      four years with no crystallization."

14           Does that sound familiar?

15      **A.**   Yes.

16      **Q.**   So define "continuous" since you're saying this is four

17      continuous teaching and repetition for four years.

18      **A.**   Yes.  So -- I'm sorry.  So even using those same examples

19      that you used, he can rephrase -- retell you what he has

20      learned, but if you go into a deeper decisional competency of

21      what it really means, he doesn't have that capacity to do it.

22      **Q.**   Define "continuous."

23      **A.**   Sustained.

24      **Q.**   Okay.  Sustained.  Would that mean -- so when you say

25      continuous teaching and repetition over four years, you mean

*NEGRÓN-MUÑOZ - CROSS*

121

1   perpetual?  Would that be fair?

2   **A.**  I think that would be fair.  As evidenced by the videos we

3   just saw, he has been taught over and over but yet he doesn't

4   have that capacity to take all that information and sustain it.

5   **Q.**  And so when you say "continuous over four years," you mean

6   a sustained basis over and over, over four years' time;

7   correct?

8   **A.**  I would say a lot of time, yes.

9   **Q.**  Okay.  And that's since late 2017 when the defendant was

10   indicted.  That's the four-year mark?

11   **A.**  Well, I would say since I've saw -- I've seen him, yes.

12   **Q.**  Well, hold on.  Your -- your report -- and I'll just show

13   it to you because I know it's hard sometimes to reference

14   something you're not looking at, so let me help.

15      So right here, in Steven's case -- right? -- you're saying

16   he -- despite --

17   **A.**  Yes.

18   **Q.**  -- rote learning -- right? -- he can't crystallize or he

19   has not been able to crystallize any information.  "In Steven's

20   case this is evidenced by the continuous teaching and

21   repetition over the past four years."

22   **A.**  Yes.  Correct.

23   **Q.**  Okay.  So that's since late 2017 when --

24   **A.**  Since the case started, yes.

25   **Q.**  Are you aware that as of December 2019, so two years into

1   this four-year period, Judge Byron found that the defendant's

2   attorneys had not actually spent much time educating him about

3   the legal proceedings?  Are you aware of that?

4   **A.**  Yes.

5   **Q.**  Are you aware that Judge Byron also found that the

6   defendant had consulted with his lawyers only briefly and over

7   a year before the clinical interviews that Drs. Geller and

8   Danziger conducted in 2019?

9   **A.**  That, I cannot say I recall to the T, but I --

10  **Q.**  So even with the first answer that you gave that you -- you

11  are aware that in -- that Judge Byron found that two years into

12  the four-year period, his attorneys had not spent much time

13  with him, do you still characterize it as continuous teaching

14  and repetition over four years, or should it be more like

15  two years now?

16  **A.**  I could say two years, but there's still some teaching

17  and -- and learning in the process.

18  **Q.**  And when you say the teaching and learning over the last

19  two years, you're basing that on these recorded interviews

20  between the defendant and his attorney; right?

21  **A.**  Correct.

22  **Q.**  And you're aware that that's approximately 30 hours of

23  time?

24  **A.**  Yes.

25  **Q.**  And are you aware that that's basically over an eight-day

1    period in late September and early October of 2020 and then one

2    day in late October 2020, then it skips five months into March,

3    and then there's a five-day span in April 2021?  Are you aware

4    of that?

5    **A.**  Yes.

6    **Q.**  And is that what you consider continuous even though

7    there's huge gaps in between and they're really concentrated in

8    two small periods of time?

9    **A.**  Well, I think if we're going to talk about the learning and

10   the memory, it doesn't matter how long of a period of time you

11   spend.  If you're going to learn it, it could take you one day;

12   it could take you a couple of days.  In his case, even given

13   that they had these specific periods, he still had difficulty

14   crystallizing the information.

15   **Q.**  Sure.  My -- my question is, when you characterize it

16   originally as four years of continuous teaching and now you're

17   saying, "No.  Okay.  Maybe it's more like two years," do you

18   still count it as two years of continuous teaching even though

19   it's two periods of very concentrated time in a two-year

20   period?

21   **A.**  I think my understanding is that also along that time he

22   had been given pamphlets or educational material.  So he

23   also -- as he said, "I've read this over and over.  I had this

24   information."  So it was not, in my understanding, not only

25   limited to the video education.  He was also provided with

1    paper education and materials that he had the ability to read,

2    and he was also being educated at Aloft as -- as per their

3    records.  So I would say it was over -- maybe not the

4    four years, but a longer extended period of time.

5    **Q.**  Okay.  On page 15, the second-to-last paragraph of your

6    report, you state, "Even if Steven had the capacity for rote

7    memorization, this does not mean he has a higher level of

8    thinking or critical thinking," which is I think what you were

9    saying before.

10   **A.**  Correct.

11   **Q.**  In your opinion, does the defendant have capacity for rote

12   memorization or not?

13   **A.**  That's a tricky question.  In -- because there are -- and

14   this is what I spoke to about earlier.  There's different areas

15   that he may be able to execute and have rote memory and have it

16   crystallized better and other areas of his functioning where it

17   may not.  But in relation to this case, no.  To what -- not to

18   this case, to the learning.  Let me clarify that.

19   **Q.**  So would it maybe have been a more accurate statement for

20   you to write, "Even though Steven does have capacity -- some

21   capacity for rote memorization, he doesn't have the higher

22   level"?  I mean, you just wrote "even if he had it," which

23   suggests that he does not have any capacity for rote

24   memorization.

25   **A.**  I can concede to that.

1    **Q.**  Okay.  At page 2 of your report, going back a little bit,

2    you state that you had to -- you said, "I had to adjust my

3    interview style to that of interviewing a child."

4        So were there any parts of your interview that you felt you

5    could not conduct at all because of the change in interview

6    style?

7    **A.**  I would not say that was the case.  I'm a child

8    psychiatrist, and my youngest patient is three years old.  So

9    it wasn't out of character for me that I needed to make any

10   difference at least because of my training.  Probably if I was

11   not used to it, it might have been a little bit more difficult.

12   **Q.**  And when you say you had to adjust your interview style to

13   that of interviewing a child, what age child?

14   **A.**  He was probably -- and I think I mention in my report

15   somewhere -- eight, nine years old.

16   **Q.**  And in what way did you have to adjust to make it

17   comprehensible to him, in your view?

18   **A.**  I would have to concur with Dr. Jenkins in what she said

19   yesterday, kind of simplify, make sure they were not compound

20   questions, making sure he said back and understood, and many

21   times had to explain what the words meant.

22   **Q.**  And you did a competency interview in October 2021; right?

23   **A.**  Yes.

24   **Q.**  And you used the same -- a lot of the same -- very same

25   questions that Dr. Jenkins used; correct?

1    **A.**  I did.

2    **Q.**  As you said, that's not uncommon in the practice of

3    forensic psychology; correct?

4    **A.**  Psychiatry, yes.  Or psychology, in her case.

5    **Q.**  I apologize.

6        So given that, you didn't adjust that part of your

7    interview to that of interviewing an eight- or nine-year-old

8    child; correct?

9    **A.**  Well, even within that, in asking the same questions, I

10   ensured he was asking and understanding at his level, much the

11   same when she said she did.

12   **Q.**  And you were still able to cover all that you wanted to

13   cover in that; correct?

14   **A.**  Correct.

15   **Q.**  Okay.  When you reviewed the police interview --

16   **A.**  Uh-huh.

17   **Q.**  -- in your opinion, did the police adjust their questioning

18   style as if they were talking to a nine-year-old child?

19   **A.**  They were very jovial with him and very relaxed.  And not

20   being there and not knowing what they were thinking, I'm not

21   sure.  I did find their interview style to be quite relaxed

22   to -- and I can only assume it was to engage him to get the

23   information that they needed.  So I know they made a lot of

24   comments in making him at ease, like "oh, when I was in

25   college" or "when I did that."  So that can be a way of just

1    easing him into it, but I cannot respond for them if they

2    adjusted to a -- a younger child.

3    **Q.** I guess what I mean is, given that you reviewed it, when

4    you reviewed it, in your view, just your opinion from your

5    observation, did you observe them adjusting their interview

6    style to that of interviewing a nine- -- eight- or

7    nine-year-old child?

8    **A.** I would say, in my opinion, they were not talking as they

9    would to a regular adult.

10   **Q.** Did the defendant answer their questions?

11   **A.** He did.

12   **Q.** Were his responses relevant, that you recall?

13   **A.** That I recall, yes.

14   **Q.** Were his responses informative that you recall?

15   **A.** To what he thought he was answering, yes.

16   **Q.** Turning to page 22 of your report, first full paragraph,

17   you disagree with Dr. Jenkins's finding that the defendant's

18   ASD is without accompanying intellectual impairment; right?

19   **A.** Correct.

20   **Q.** And you base this at least in part on Dr. Geller's

21   administration of the Vineland Adaptive Behavior Scales, which

22   place the defendant, in terms of adaptive functioning, below

23   99 percent of the population; correct?

24   **A.** Correct.

25   **Q.** On the next page, so page 23, you point out that according

1    to the Vineland, the defendant's social skills are average to

2    that -- to those of what a typically developing three-year-old

3    would be expected to master.  Is that consistent with what you

4    observed in your three clinical interviews of the defendant,

5    that his social skills were akin to that of a three-year-old?

6    **A.**   At times he was not displaying appropriate --

7    age-appropriate behaviors and interactions, and I think some of

8    his behaviors relating to, like, a two-year-old, like I said,

9    the individuation earlier in my -- in my testimony, even some

10   of the behaviors that I can attribute to maybe not knowing the

11   full capacity of -- of the wrongfulness, just knowing it's

12   wrong, are some of -- social behaviors known to a

13   three-year-old.

14   **Q.**   So my question is, in your three clinical interviews of the

15   defendant, which aspects of your interviews showed that his

16   social skills, in your presence, were akin to that of a

17   three-year-old?  Like, give us an example.

18   **A.**   Poor eye contact or limited eye contact.  His limited

19   vocabulary.  I'm trying to think what else I can think -- not

20   really understanding even what was being said at times.

21   **Q.**   Well, so does that make him akin to a three-year-old, or is

22   it also fair that, like, an eleven-year-old would not have

23   understood some of the things you were discussing as well?  I

24   mean, I'm trying to get at --

25   **A.**   Yeah.  I think -- I think in my report I used in general

1    that he was in a range.  I don't think I pinned him down to

2    three-year-old.  I did make a reference to that, but I think

3    his whole Vineland was somewhere between 3 and 11, if I recall

4    properly.

5    **Q.**  I'm just citing from what you had, but we'll keep going.

6        So you reviewed the chats.  In your opinion, are the

7    defendant's interactions in the chats consistent with the

8    social skills of a three-year-old?

9    **A.**  I would say somewhat, but they're akin to the Vineland,

10   which would be anywhere of the 9 -- 3 to 11, that broad range,

11   yeah.

12   **Q.**  So even though you cited Dr. Geller's Vineland finding

13   about the social skills of a three-year-old, is it fair to say,

14   based on your testimony here, that you don't necessarily

15   agree -- I mean, that may have been that finding, but in your

16   observation, you don't agree that his social skills as a whole

17   are that of a three-year-old.  Is that fair to say?

18   **A.**  No, I don't think so.  I think there are some aspects of

19   his behavior that can be akin to a three-year-old that would be

20   much more complex.

21   **Q.**  Can you give us examples.  So I know the poor eye contact,

22   which -- why is that different from, like, a seven-year-old or

23   a ten-year-old who is anxious?

24   **A.**  Well, we've established that his -- his anxiety -- or,

25   quote, "anxiety" is related to his autism.  It's not because

1    he's anxious.  It's because of his poor social skills.

2    **Q.**  Uh-huh.  But what I'm getting at is aren't there children

3    of other ages who would struggle with eye contact who are above

4    three years old?  Or is three years old the benchmark if you

5    have poor eye contact?  It's, like, "Okay.  Then your social

6    level is at that of a three-year-old."

7    **A.**  Actually, eye contact can be dated back to even infancy

8    in -- in months.  So, like, six, two, three months old.  And

9    parents who are very "akeen" to that can start identifying that

10   as a factor of not having appropriate eye contact and

11   development and everything else.

12   **Q.**  And so other than eye contact, what other social skills

13   does he display that are akin to a three-year-old?

14   **A.**  Let me think about this for a minute so I can -- if I can

15   use the example of the chats, because I've heard it here in

16   testimony -- right? -- of him asking to close the door, when a

17   three-year-old is doing something wrong, they don't necessarily

18   need to understand that what they're doing is wrong, but they

19   may ask to close the door because there is a perception that

20   it's wrong with not necessarily understanding the consequences

21   of what they're doing is wrong.

22   **Q.**  So following along those lines, I want to ask a follow-up

23   question.  So if an adult -- if an adult is doing something

24   wrong -- a neurotypical adult is doing something wrong and

25   tells someone else -- doing something wrong across the

1    Internet, just like the defendant's situation, and he tells the

2    other person, "Close the door," does that mean that he is

3    showing -- demonstrating the social skills of a three-year-old

4    simply because he told the person to close the door because the

5    solution was simple?

6    **A.**   I think it -- we need to see the bigger context of what's

7    happening.

8    **Q.**   Okay.  But -- but would you opine that a neurotypical adult

9    who tells someone else to use a simple solution is

10   demonstrating social skills of a three-year-old?

11   **A.**   It can be a basic level of functioning.  Depends.  Like I

12   said, it depends on the bigger context.  I don't want to commit

13   myself to something.

14   **Q.**   At page 23, top paragraph, you note that Dr. Geller --

15   again, talking about the Vineland -- also stated that the

16   defendant displayed the coping skills of a five-year,

17   one-month-old.

18       Is that consistent with what you observed in the attorney

19   videos, that he displayed the coping skills of a five-year-old?

20   **A.**   I think his coping skills were limited compared to his age.

21   **Q.**   Do you think -- well, but he's 23, and we're talking about

22   a five-year-old.  There's 18 years in between there -- 18 years

23   in between there.

24       So my question is, is what you observed in the attorney

25   videos consistent with the social -- the coping skills of a

1    five-year-old?  Even if it wasn't 23, was it five?

2    **A.**  I think that's a -- a more complex question that would

3    require more evaluation to assess other areas that were not

4    just limited to competency at that time.

5    **Q.**  So it's fair to say that you're not comfortable agreeing or

6    disagreeing with that.  You're not comfortable agreeing with

7    the statement that he displayed in the attorney videos the

8    coping skills of a five-year-old.

9    **A.**  I would have to say I don't agree nor disagree, but

10   definitely there were some discomfort noted by him that it was

11   not typical for his age.

12   **Q.**  And, again, you recognize there's 18 years between 5 years

13   old and 23?

14   **A.**  Yes.

15   **Q.**  And in the police interview, high-pressure situation, is it

16   your opinion that there he demonstrated the coping skills of a

17   five-year-old?  Granted, he was 19 at the time, not 23.

18   **A.**  Yes.  I think -- my opinion to those recordings is that he

19   was trying to be complacent and compliant, maybe like a

20   five-year-old.  I was not there present.  These were only

21   audios, so it's very hard to see the demeanor, what was

22   happening, but he was definitely being compliant.  And through

23   the videos it's not till later on that you hear that he kind of

24   has any maliciousness that any -- that something is wrong.  So

25   he was being compliant, and that can be related to a

*NEGRÓN-MUÑOZ - CROSS*                                        133

1    five-year-old trying to follow the rules.

2    **Q.**  Do you believe that it also could be indicative of a --

3    when a normal neurotypical person is picked off in the middle

4    of their school day by the police and put in a room and asked a

5    bunch of questions -- incriminating questions, when they are

6    compliant, are you saying that they also are demonstrating the

7    coping skills of a five-year-old?

8    **A.**  A normal, neurotypically developed youth usually -- in my

9    experience, they have a little bit more savviness and they

10   don't answer.  I work with juvenile -- juveniles in detention

11   and regular schools, and they're a little bit more savvy.  They

12   don't tend to just answer most of the time even when they're

13   compliant.

14   **Q.**  So you've also worked with adults; right?

15   **A.**  Correct.

16   **Q.**  And have you worked with adults who have chosen to speak

17   with the police?

18   **A.**  Yes.

19   **Q.**  And have you -- would you conclude that for all of them who

20   have chosen to speak to the police, that they are demonstrating

21   the coping skills of a five-year-old?

22   **A.**  No, I'm not saying that.

23   **Q.**  Okay.  At page 23, second paragraph, you state that the

24   defendant meets the criteria for a moderate intellectual

25   disability, and this I want to show you because it might just

*NEGRÓN-MUÑOZ - CROSS*                                                    134

1   be easier.

2       So we're at page 23 of your report.  "Steven meets criteria

3   for a moderate intellectual disability."

4       And then is it -- am I correct that conceptual domain and

5   social domain -- and then the next page is practical domain.

6   Am I correct that these are from the DSM-5?  It's, like, the

7   criteria for moderate intellectual disability.

8   **A.**  Correct.

9   **Q.**  Okay.  I just wanted to make sure I understood.

10      So given that, you note under conceptual domain, again,

11  from the DSM, "For adults, academic skill development is

12  typically at an elementary level."

13      That's for adults.  The defendant is an adult; correct?

14  **A.**  Correct.

15  **Q.**  And you're aware that he graduated from high school?

16  **A.**  Well, he graduated with a special diploma.  He didn't

17  graduate in general education.  As noted in my report, he

18  didn't take the Keystone exams because he had an individualized

19  educational plan.  So he didn't receive a normal academic high

20  school diploma.

21  **Q.**  You're aware that he graduated from high school, though;

22  right?

23  **A.**  In my professional opinion, there's -- you can graduate

24  from high school and have a special diploma.  That doesn't mean

25  you have a general academic degree.  There's two different

1    types of high school diplomas you can obtain.

2    **Q.**  And he graduated from high school on time.  He completed on

3    time; correct?

4    **A.**  My understanding is yes.

5    **Q.**  Would you expect that the standards of academic achievement

6    of graduating high school are much higher than the academic

7    development at an elementary level?

8    **A.**  I'm going to go back to say that based on the information I

9    obtained, he did not graduate a regular high school curriculum.

10    **Q.**  And would you -- is it your understanding that however

11    different that graduation version diploma was, is it your

12    understanding that whatever he had to achieve to get that would

13    have had to be higher than the academic achievement that is

14    expected of an elementary school student?

15    **A.**  I disagree with that because in students with special

16    education, accommodations are made, and they're made to their

17    level.  So they can graduate high school and still be

18    functioning at an elementary level.

19    **Q.**  At page 23, last paragraph, you set forth the criteria from

20    the DSM in the social domain.  So we were talking about

21    conceptual before.  Let's talk about social now.  "Spoken

22    language" -- for people with this moderate intellectual

23    disability, "Spoken language is typically a primary tool for

24    social communication but is much less complex than that of

25    peers"; correct?

1   **A.**  Correct.

2   **Q.**  And do you agree that speaking is a less-advanced behavior

3   than writing?

4   **A.**  I'm going to make sure I understood this.  That speaking is

5   a less-advanced --

6   **Q.**  Behavior than writing.

7       I can rephrase it a different way.

8   **A.**  Please.

9   **Q.**  Babies learn to speak before they write; correct?

10  **A.**  Correct.

11  **Q.**  Children advance in the spoken language long before they

12  advance in writing; correct?

13  **A.**  I would have to say that with newer studies, there are

14  children who are using sign language and are actually reading

15  before they even speak, and these are newer modalities that I

16  don't think are germane to this, but this is something that's

17  out in the field right now.

18  **Q.**  Right.  So sign language is not written language.  I'm

19  talking about written language.

20  **A.**  No.  So --

21  **Q.**  So children learn to speak before they learn to write;

22  correct?

23  **A.**  Normally, yes.

24  **Q.**  And you -- well, okay.  There's no indication that this --

25  forget about other children in the world.  This defendant --

*NEGRÓN-MUÑOZ - CROSS*                                        137

1    there's no indication that he learned to write before he could

2    speak; right?

3    **A.**   Yes.

4    **Q.**   Okay.  And you've reviewed the defendant's chats in this

5    case; right?

6    **A.**   The defendant's --

7    **Q.**   I'm sorry.  His, like, text messages.

8    **A.**   Chats, yes.

9    **Q.**   Okay.  And they are extensive, are they not?

10   **A.**   Yes.

11   **Q.**   And in the chats do you recall that the defendant

12   manipulated other children?

13        If you don't recall, I can show you.

14   **A.**   No.  I read them.  I want to be respectful.  I wouldn't say

15   they were manipulated.  I think there was a mutual interchange.

16   **Q.**   All right.  I'm showing you Government Exhibit 2, lines 41

17   through 46.  Can you see that?  Orange is the defendant.

18   **A.**   Yes.

19   **Q.**   All right.  So we're going to read from lines 41 to 66, and

20   I will not read it out loud.  I'm just going to let you read

21   it.  Let me know when you're down to 50, and I'll turn the

22   page.

23   **A.**   Yes.  Done.

24   **Q.**   And continue reading to 66 or past 66.

25   **A.**   Up to 60 or --

*NEGRÓN-MUÑOZ - CROSS*                                        138

1    **Q.**  66, please.

2         And when you're done, you can let me know.

3    **A.**  I read up to 66.

4    **Q.**  Okay.  I'm going to also direct your attention -- this is

5    the same victim.  We're going to read from line 305 to 373.

6    305 is right here.

7    **A.**  305 to --

8    **Q.**  I'll turn the page.  Let me know when you're at the end of

9    the page.

10   **A.**  Okay.

11        Okay.

12   **Q.**  Read to the end of the page, and let me know.

13   **A.**  Okay.

14        Okay.

15   **Q.**  And I'll also show you parts of Government Exhibit 4, which

16   is a different victim.  Again, the defendant's chats are in

17   yellow.  We're looking at Government Exhibit 4, lines 92

18   through -- actually, no.  I'm going to skip this part.

19        All right.  We'll just go off of the one I showed you.

20   **A.**  Okay.

21   **Q.**  So in that he manipulated that child, didn't he?

22   **A.**  There was a mutual engagement.  I'm not sure where the

23   manipulation --

24   **Q.**  Did he persuade her to create these pornographic images?

25   **A.**  He asked her.

1   **Q.**  Did he -- well, are you aware that he actually succeeded?

2   **A.**  According to the chats, it looks like pictures were sent,

3   yes.

4   **Q.**  No, but are you aware from your work on this case --

5   **A.**  Yes.

6   **Q.**  -- that he did actually succeed?

7   **A.**  Yes.

8   **Q.**  Okay.  So he persuaded these children to create these

9   images; correct?

10  **A.**  Yes.

11  **Q.**  And did he pretend to form in this case, just -- just the

12  little excerpt you read -- did he pretend to form an emotional

13  bond with this child?

14  **A.**  I wouldn't say that from the texts you can say there's an

15  emotional bond.  In being aware and dealing with different

16  cases with these chats, juveniles and different children of

17  different ages, they engage in these conversations not really

18  understanding -- not -- and I'm not just relating to him, just

19  in general over the past couple of years in this generation

20  where they really don't even understand -- you know, they use

21  all these pet names and emotional bonding -- and in personal

22  experience, asking -- not relating to this case, I don't think

23  they even fully understand.  So I don't -- I don't think I can

24  opine fully on that based on the texts because we don't -- you

25  can't convey the emotionality that was really meant via just a

1    text.

2    **Q.**  So you're not willing -- you don't agree that those texts

3    show that he was trying to show an emotional -- trying to help

4    the other child believe that he was emotionally invested in

5    her?  You wouldn't agree with that?

6    **A.**  I think where -- where I have a hard time is based on the

7    knowledge that I have in these types of cases.  It doesn't

8    necessarily mean that there's an emotional investment.  I

9    understand what you're saying, that he's trying to obtain

10   something from the child in this case, which, in my evaluation

11   of Steven, it was his understanding that they were role-playing

12   and that the chats were for people over the age of 18.

13   **Q.**  Your understanding -- all right.  Let's show you Government

14   Exhibit 4, and just read this page.  Again, he's yellow.  I'm

15   going to have you read to line 310.  So we have a couple more

16   to go.

17   **A.**  Okay.

18   **Q.**  I'll try to make this bigger.

19   **A.**  Okay.

20       Okay.

21   **Q.**  Last page.  Just down to 310.

22   **A.**  Okay.

23   **Q.**  Okay.  So, again, you see the defendant engaging in

24   persuasive language; correct?

25   **A.**  Yes.

*NEGRÓN-MUÑOZ - CROSS*                                        141

1   **Q.**  And he even persuades this child, in Government Exhibit 4,

2   to make videos using her younger brother; right?

3   **A.**  Correct.

4   **Q.**  And it's your opinion that someone with moderate

5   intellectual disability was capable of writing these chats?

6   **A.**  That can happen.  I have seen it.

7   **Q.**  And it's your -- it's still your testimony that he has a

8   moderate intellectual disability?

9   **A.**  Yes.

10  **Q.**  Okay.  At page 36 of your report, you diagnosed the

11  defendant with a language disorder, and then on page 37 here, I

12  believe, if I'm understanding this correctly, you've put forth

13  the criteria for that disorder; is that correct?

14  **A.**  Yes.

15  **Q.**  Okay.  And so that includes No. 2, which is, "Limited

16  sentence structure (ability to put words and word endings

17  together to form sentences based on the rules of grammar and

18  morphology)"?

19  **A.**  Uh-huh.

20  **Q.**  In your interviews with the defendant, he was able to

21  communicate with you with appropriate grammar, wasn't he?

22  **A.**  Overall, although a lot of his answers were "I don't know,"

23  "I don't remember."  So, also, there was not a lot of

24  sophisticated language.

25  **Q.**  He was able to form sentences?

1    **A.**  Yes, overall.

2    **Q.**  Okay.  And in No. 3 of the criteria -- oops.  Number 3 of

3    the criteria is "Impairments in discourse (ability to use

4    vocabulary and connect sentences to explain or describe a topic

5    or a series of events or have a conversation)."

6        So in your interviews with the defendant, he was able to

7    converse with you on a variety of topics, wasn't he?

8    **A.**  Overall, in general.

9    **Q.**  He was able, for example, to explain to you various aspects

10   of his academic experience all the way back to kindergarten;

11   right?

12   **A.**  I believe I obtained that information from his parents.

13   **Q.**  You don't recall him telling that to you?

14   **A.**  I have to say I don't recall at this time.  I probably

15   asked him as well, but I don't recall.

16   **Q.**  Okay.  So I'm showing you page 31 of Government Exhibit 14,

17   which is your -- which is your --

18   **A.**  Yes.

19   **Q.**  -- November 23rd interview.

20   **A.**  Thank you for showing me that.  Yes.

21   **Q.**  Of course.  So here is page 31.  And I want to direct your

22   attention, just skimming, starting at line 4.  He's talking

23   about "Kindergarten, liked my teacher a lot.  First grade, I

24   liked my teacher.  Don't really remember much about there,

25   about my grades.  Second grade wasn't the best because my

1    teacher didn't like me."

2         You asked, "Why didn't she like you?"

3         And defendant says, "Well, I was different.  I know she

4    called my mom a few times.  She didn't like me.  I know that."

5         And then he later says, "I was awkward in elementary

6    school.  I didn't have a lot of friends.  And she told" -- she,

7    I think the teacher -- "told my mom she only taught gifted

8    people and I wasn't.  So I remember one of my teachers said

9    that."

10        So he talks about fourth grade and fifth grade.

11        Moving along to page 32, he continues and talks about

12   friends that he had or didn't have.

13        And then at page 34 he talks about middle school; right?

14   So he was able to talk to you about various aspects of his

15   academic experience all the way back to kindergarten; correct?

16   **A.**  At a very basic level, not in depth.

17   **Q.**  He was able to explain some of his offense conduct to you;

18   correct?

19   **A.**  Some of his --

20   **Q.**  Offense conduct.

21   **A.**  Can you tell me --

22   **Q.**  So at page 24 of the same exhibit, Government Exhibit 14,

23   do you recall you asked him about his offense conduct?

24   **A.**  Yes.

25   **Q.**  And he explained to you it was random.  "I didn't choose

1    anyone in particular.  There was someone older than me."

2        Do you recall you asked, "Okay.  So you were randomly

3    playing and asking for funny faces?"  And he gave you an

4    example.

5        Do you recall that -- that continued, actually, for

6    several --

7    **A.**   Yes.

8    **Q.**   Okay.  So you recall that he was even able, at pages 24

9    through 27 -- he was able to discuss his offense conduct with

10   you; right?

11   **A.**   Correct.

12   **Q.**   And you've reviewed the police interview?

13   **A.**   Yes.

14   **Q.**   And the defendant was able to converse with the police for

15   three hours that day -- three hours that day; correct?

16   **A.**   Yes.

17   **Q.**   At page 49 and 50 of your report, top paragraph -- I'm

18   going back to your report.  So page 49 and 50, you concur with

19   the findings of Ms. Bennett; correct?

20   **A.**   Yes.

21   **Q.**   All right.  So it's not hiding the ball.  Page 50, "I

22   concur in this assessment" --

23   **A.**   Yes.

24   **Q.**   -- "and the other findings in her," Ms. Bennett's,

25   "report."

*NEGRÓN-MUÑOZ - CROSS*                                                  145

1          You specifically cite tests that she conducted that showed

2     that the defendant's language skills are below that of a

3     typical nine-year-old.  Do you recall that?

4     **A.**  Yes.

5     **Q.**  At page 16 of her report, which you quote here at

6     page 49 -- so here you talk about Ms. Bennett, and then you

7     quote her report.  And you say at page 49 -- you say her

8     testing analysis is a "much stronger and accurate indicator of

9     Steven's language ability than a sample of conversation or a

10    set of text messages could possibly indicate."  Do you remember

11    that?

12    **A.**  Yes.

13    **Q.**  In this case you have multiple recorded conversations with

14    Dr. Otto.  You have defense attorney videos.  He spent, like,

15    five hours with you; right?

16    **A.**  Correct.

17    **Q.**  And you have these multiple lengthy text messages.

18         In your opinion, is Ms. Bennett's testing analysis much

19    stronger and a more accurate measure of the defendant's

20    language ability than all of that?

21    **A.**  Actually, it is because we only -- we get that

22    perception -- right? -- that he is speaking appropriately and

23    the testing is more of an objective measure.

24    **Q.**  But her testing, as we recall -- her testing -- and I'm

25    just turning to her report here, because I'm going to show you

1   page 2 of her report.  It's three standardized tests, and then

2   who -- who -- who does the inputs for the standardized

3   assessment?  Who is it based on?

4   **A.**  The patient.

5   **Q.**  On the defendant.  Okay.

6       And these -- then you have three self and parent ratings;

7   right?  And so the inputs for that are either the defendant or

8   his parents; right?

9   **A.**  Correct.

10  **Q.**  And then you have a parent rating scale; correct?

11  **A.**  Correct.

12  **Q.**  And so all of the testing -- the empirical testing that

13  Ms. Bennett did was all based on inputs from the defendant or

14  his parents; right?

15  **A.**  Not all of it.

16  **Q.**  Not all of it.  Where did the rest come from?

17  **A.**  Could you rephrase the question to make sure I understood.

18  **Q.**  Sure.  Yeah.  Absolutely.

19      So these tests that you say are actually more valid than,

20  like, 35 hours of videos --

21  **A.**  Uh-huh.

22  **Q.**  -- all that came from inputs from the defendant who is

23  facing prison time and his parents; correct?

24  **A.**  Correct.

25  **Q.**  Okay.  You also concurred with Ms. Bennett's conclusion

1    that impressions from his speech and use of language in

2    differing contexts that he possesses capacity for sustained

3    concentration are not well founded in light of these objective

4    testing results.   Remember that?

5    **A.**   Uh-huh.

6    **Q.**   And do you recall that you concurred with that?

7    **A.**   Yes.

8    **Q.**   So Ms. Bennett concluded that the defendant does not have

9    capacity for sustained concentration; right?

10   **A.**   Correct.

11   **Q.**   But at page 30 of your report, you actually conclude that

12   the defendant -- sorry -- page 29 of your report, you state

13   that "He can concentrate and sustain appropriate attention,

14   although he needs things repeated to him at times."

15       So which is it?   Can he sustain concentration or can he

16   not?

17   **A.**   Well, that can be a combination.   You can sustain

18   concentration and need to be redirected or refocused or things

19   rerembered of things or people back.

20   **Q.**   But do you still maintain your conclusion that he can

21   concentrate and sustain appropriate attention although he needs

22   things repeated to him at times?

23   **A.**   Yes.

24   **Q.**   At page 20, first paragraph -- page 20, first paragraph,

25   you state that "Dr. Jenkins's report states that the defendant

1    signed a plea agreement because his attorney told him it was

2    the 'best deal he could get,'" but then you say that you didn't

3    see in the attorney-client videos -- you didn't see that in the

4    attorney-client videos, and defense counsel assured you that he

5    didn't give any such advice.  Do you recall that?

6    **A.**   Yes.

7    **Q.**   I'm going to show you Defense Exhibit 3, Volume 1:21.  Here

8    Mr. Mahoney tells the defendant, "She," meaning me, "has a

9    boss, who is the U.S. Attorney, who's appointed by the

10   President.  We sent her boss a letter.  We sent her boss a

11   letter asking to still offer us a better deal."

12       Do you see that?  And I'm going to -- I'm going to show you

13   four pages of stuff, so let's go do what's next.

14   **A.**   Okay.

15   **Q.**   Same volume, page 55.  Okay.  "The agreement to a specific

16   sentence, 11(c)(1)(C)" -- that's a type of plea -- "I've asked

17   the Government to do that, but they've refused to do it.

18   Ms. Chang had said no.  Now, that's one of the things that her

19   boss might come back and say yes."

20       Page -- Volume 3:11 now.  So this is a different day,

21   obviously, because we're Volume 3; right?  "So I told you" --

22   okay.  "So the judge doesn't have to go along with it, but we

23   asked the Government to agree to that.  But do you know what

24   their answer was when I asked them to do that?"

25       Marks says, "No."

*NEGRÓN-MUÑOZ - CROSS*                                        149

1           Mahoney says, "So I told you on Thursday that the

2    Government said no, they wouldn't.  They weren't going to do

3    that.  The sentencing would be completely up to the judge."

4           Okay.  So the 11(c)(1)(C) had been rejected.

5           And now let's move to page -- Volume 15, page 36.  That's

6    what I'm showing you right now.  And Mr. Mahoney says, "I think

7    this is your best choice."

8           We actually just saw this and --

9    **A.**  Yes.

10   **Q.**  So isn't it true that, actually, the defendant -- the

11   defendant's attorney did tell him that he had tried to get a

12   better deal?  Right?

13   **A.**  Yes.

14   **Q.**  And then Mr. Mahoney later told him, "Sorry.  The

15   Government said no to that."  Do you recall that?

16   **A.**  Yes.

17   **Q.**  And, ultimately, defense counsel advised that he thought

18   the ten-year deal was the best choice; correct?

19   **A.**  Yes.

20   **Q.**  And so isn't it fair to say that the defendant inferred

21   that this was the best deal he could get?

22   **A.**  I think we saw on the video that he was still questioning

23   if that was the best choice.  I don't think there was an

24   inference because he still had questions if that was the best

25   choice.

1  **Q.**  But your issue with Dr. Jenkins's report -- and I'll just

2  go back to page 20.  Wasn't it -- wasn't your issue with her

3  report that -- that Marks reported he signed the plea agreement

4  because his attorney told him it was the best deal he could

5  get?  But then later you say, "Well, but the conferences don't

6  show that.  Mahoney doesn't say that that happened."  But now

7  that I've shown you the conferences, that did happen; right?

8  **A.**  Uh-huh.

9  **Q.**  Okay.  All right.  Your opinion about the defendant's

10 competence -- is that based on the Dusky standard?

11 **A.**  Yes, ma'am.

12 **Q.**  And so it's not based on a higher standard of decisional

13 competence?

14 **A.**  Well, decisional competence is also taken into

15 consideration, so I take that back.

16 **Q.**  Say that again.  I'm sorry.

17 **A.**  I think I confused myself, so I apologize.

18 **Q.**  Please state what you based your competency evaluation on.

19 **A.**  I based my competency evaluation on all the information

20 obtained, taking into consideration not only the adjudicative

21 competency but also the decisional competency.

22 **Q.**  Are you aware of the Dusky standard?

23 **A.**  Yes.

24 **Q.**  Okay.  And the Dusky standard -- are you aware that the

25 Supreme Court -- are you aware that the Supreme Court has the

*NEGRÓN-MUÑOZ - CROSS*                                    151

1    Dusky standard, and then above that is decisional competence

2    for people who want to represent themselves?  Are you aware of

3    that?

4           **MR. MAHONEY:**  Your Honor, I object.

5           **THE COURT:**  On what basis, sir?

6           **MR. MAHONEY:**  Because, first of all, I don't think

7    that that's true.

8           **THE COURT:**  Okay.

9           **MR. MAHONEY:**  So asking are you aware of something

10   that's -- I don't think it's accurate.  It's a legal argument.

11   I just don't think it's accurate.

12          **THE COURT:**  I think the objection is sustained.

13          Ms. Chang, go ahead and move on.

14          **MS. CHANG:**  I'll move on, Your Honor, and I'll address

15   it in posthearing briefing.

16          **THE COURT:**  Exactly.

17   **BY MS. CHANG:**

18   **Q.**  Do you agree that gathering information about the

19   consequences of a decision shows rational understanding?

20   **A.**  Gathering information -- could you repeat again?

21   **Q.**  Sure.  Do you agree that gathering information about the

22   consequences of a decision shows rational understanding?

23   **A.**  Gathering information about the consequences shows a

24   rational understanding?  Not all the time.  It depends.  You

25   can gather information, but it does not mean you have a

*NEGRÓN-MUÑOZ - CROSS*                                    152

1   rational understanding.

2   **Q.**  If one seeks to gather information about consequences, does

3   that reflect rational understanding?

4   **A.**  Not all the time.  People can gather information and not

5   necessarily rationally understand it.

6   **Q.**  Do you agree that seeking advice from loving family

7   members, when making an important decision, does not mean that

8   you're incompetent?

9   **A.**  Seeking information from loving family members does not

10  mean that you're incompetent?

11  **Q.**  Do you agree that seeking advice from loving family

12  members, when you're about to make an important decision -- do

13  you agree that that -- that doesn't mean that you're

14  incompetent?

15  **A.**  Not necessarily.

16  **Q.**  You don't necessarily agree with that?

17  **A.**  No.  Seeking information or advice from loving family

18  members does not necessarily mean you're competent or

19  incompetent.

20  **Q.**  Right.  And do you agree that seeking advice from trusted

21  attorneys, when making an important decision, doesn't mean that

22  you're unable to make a decision?

23  **A.**  Yes.

24  **Q.**  And, in fact, that's something that many competent

25  defendants do.

1    **A.**   Mostly, yes.

2    **Q.**   And so the fact that they seek advice from their attorneys

3    and may rely on what their attorneys say doesn't mean that

4    they're incapable of making a decision; right?

5    **A.**   No.   But, ultimately, with the decisional capacity, they

6    would have the information to make the decision on their own,

7    not solely based on the family members or the attorney.

8    **Q.**   At Defense Exhibit 3, page 10 -- I'm sorry -- Volume 10,

9    page 22, Mr. Mahoney asks, "What's your feeling about whether

10   you would want to testify?"

11       And defendant says, "I don't know.   I wouldn't know if I

12   should do it or not."

13       Mahoney says, "Well, what if I thought you should and your

14   dad thought you shouldn't.   How would you decide?"

15       And the defendant says, "Well, I would take your advice."

16       And, also, Government Exhibit 16, do you recall in

17   Dr. Jenkins's report she said that she talked to the defendant

18   about this, and when asked what happens if he were to receive

19   different advice from his father and his attorneys, Mr. Marks

20   said he would end up choosing his attorneys' advice because

21   they have a better understanding of the law than most people

22   do?   Do you recall that?

23   **A.**   Yes.

24   **Q.**   Do you agree that choosing to follow someone's attorney

25   versus their father, who is not an attorney, that is a

1    decision, like choosing to follow one versus the other is a

2    decision in itself?

3    **A.**   Yes.  And I even further asked Steven at one point if he

4    didn't have his father or his lawyer, how he -- I think we saw

5    this in the videos -- how he would make the decision, trying to

6    see if he could come up with himself, and he still said, "I

7    would go to Angela.  I would go to Jason."  He would always

8    look to seek to somebody.  I was looking for him to say that he

9    could make an autonomous decision on his own without relying on

10   anybody else.

11   **Q.**   So this decision that the defendant faces, he basically has

12   four options; right?  He could take a plea that has a 15 to 30,

13   he could take a plea that's 10 to life, he could go to trial

14   and win completely and walk away, or he could be found guilty

15   of one or more charges; correct?

16   **A.**   That's correct.

17   **Q.**   Right.  Isn't that a difficult decision for anyone to

18   make --

19   **A.**   I agree.

20   **Q.**   -- competent or incompetent?

21   **A.**   I agree.

22   **Q.**   Okay.  And so the law in competency does not require

23   someone to be able to make a decision without any help; right?

24   **A.**   No.  But you have to be able, for decisional competence, to

25   take all the information that's provided to you to make an

1   informed decision for yourself.

2   **Q.**   And on what basis are you concluding that he can't?

3   **A.**   Well, over and over he has said that he cannot make a

4   decision on his own.  He does rely on somebody else, and I can

5   agree and concur that sometimes we seek to others for advice,

6   particularly in complicated situations.  But at the end of the

7   day, he is the one that is on trial, and it should be his sole

8   decision.

9   **Q.**   So I'm showing you Government Exhibit 13, which is your

10  October 2021 interview with the defendant.

11  **A.**   Okay.

12  **Q.**   Yes, it's from that date.

13      So directing your attention to lines 4 through 22, you

14  asked, "What were the advantages of signing this plea

15  agreement" -- "plea bargain?"  I'm sorry.

16      He says, "I don't have to go to trial," and then he talks

17  about -- he asks for help with his dad and which one would be

18  the best choice.

19      And you ask, "Well, why didn't you feel you knew what the

20  right answer was?"

21      And he says, "Well, on one hand, if I went to trial,

22  there's the chance -- there's the whole insanity thing, and

23  that could happen, but then with the plea deal, I could get

24  potentially less time than if I went to trial.  And then, if

25  anything, if things went as bad as possible, then, you know,

*NEGRÓN-MUÑOZ - CROSS*

1      there's just a lot of bad things on both sides and not a whole

2      lot of good on the other."

3           Okay.  Does that, in your opinion, show that the defendant

4      was weighing pros and cons of each option?

5      **A.**  I think they're very vague for this type of decision, and

6      when I talk about his capacity to not fully understand, these

7      are very vague concepts.  It can be good; it can be bad.  But

8      what does it necessarily mean?  There's no deeper connection.

9           And Dr. Otto, in one of his training videos, says that we

10     just can't leave it to that superficial knowledge.  They have

11     to really understand the factual and decisional basis of this

12     when making a decision, not just "Well, I think it's good."  "I

13     think it's bad."  What does that really mean?

14     **Q.**  Okay.  And you talked about -- I think on direct about the

15     defendant's ability and the fact that he can develop

16     significant knowledge when he's interested in something.  Do

17     you remember that?

18     **A.**  I think that that's common in general for autism, yes.

19     **Q.**  But is it common -- is it the case for him, since we're

20     here for him --

21     **A.**  Yes.

22     **Q.**  -- is that the case for him as well?

23          So you -- you cited, I think, the example of computers --

24     **A.**  Computers.

25     **Q.**  -- the fact that he knows how to -- he knows his way around

*NEGRÓN–MUÑOZ - CROSS*                                              157

1    a computer; correct?

2    **A.**   Correct.

3    **Q.**   All right.  And do you recall he also taught himself piano?

4    **A.**   Yes.

5    **Q.**   Okay.  And all of that requires, like, a higher level of

6    cognition, wouldn't you agree?

7    **A.**   At different levels, yes.

8    **Q.**   And so you mentioned the genie -- someone mentioned the

9    genie question.

10   **A.**   Yes.  That's one of my classical questions that I ask --

11   **Q.**   I found it.

12   **A.**   -- to see where they're at.  Thank you.

13   **Q.**   So here it is --

14          **THE COURT:**  Both of you, real quickly, I know it's

15   getting late in the day, and I'm going to take a break shortly.

16   Both of you are starting to talk extremely quickly, and you're

17   talking over each other.  I'm having a hard time following.  I

18   can only imagine what the court reporter is going through.  I

19   ask you both just to slow it down for my benefit.  Thank you

20   very much.

21          **MS. CHANG:**  Yes, Your Honor.

22          **THE COURT:**  Go ahead, Ms. Chang.

23   **BY MS. CHANG:**

24   **Q.**   So page 39 of Government Exhibit 13, which is your

25   October 2021 interview -- so you ask the genie question here

1    and "Do you know what a genie is?"

2    **A.**   Uh-huh.

3    **Q.**   Question, "Like the guy in the bottle?"

4        "Yeah, exactly.  So if I were a genie and could magically

5    say, 'Steven, right now you can leave Aloft.  You're free to

6    go.  Your case, everything, is gone,' what would you do?"

7        What did the defendant say?  What -- what's the first thing

8    he would do?

9    **A.**   Try to get back with his family.

10   **Q.**   Okay.  So is it fair to say he's interested in getting back

11   to his family?

12   **A.**   I think that's a fair statement.

13   **Q.**   And so for someone who, when he's interested in things, can

14   develop significant knowledge, do you agree that he's motivated

15   to develop knowledge that he needs to get out of the situation

16   and reunite with his family?

17   **A.**   I think I would interpret that a little bit differently and

18   say that that is his safe zone.  So his best desire would be to

19   get back to his family.  For somebody his age and given his

20   circumstances, saying he wants to go back to his family is

21   normal.  But if we equate this to another 23-year-old, it may

22   be "I want to get my own apartment"; "I want to get back to a

23   job"; "I want to get back to work."

24       So given his level of capacity, I think that was an

25   appropriate answer for him.

1    **Q.**  The last thing I want to do is show you the same pages that

2    I showed Dr. Bennett.  By any chance, was there any way you had

3    been able to read on the screen as well so we don't have to do

4    it here?

5    **A.**  No.  I was too far away, to be honest.  I'm sorry.

6    **Q.**  No.  It's not --

7         **THE COURT:**  That's okay.  Here's what we'll do.  I

8    should have done this earlier today to save some time.  Why

9    don't we take a ten-minute break, and during that time,

10   Dr. Negrón, is it all right -- if you need a comfort break, we

11   can take 15 -- you could read those pages, and then we can go

12   ahead and ask the questions, and that'll just speed this along

13   a little bit.  And I think all of us could use a little break.

14        Go ahead, Mr. Goddeyne.

15        **MR. GODDEYNE:**  The --

16        **THE COURT:**  Sir, would you mind sitting down, please.

17   We're almost done.  Sorry.

18        **MR. GODDEYNE:**  The witness exhibits, they're --

19   Exhibit 3 is printed out, so the pages are available for the

20   witness in the box.

21        **THE COURT:**  That's perfect.  If you wouldn't mind

22   giving a printed --

23        Ms. Chang, you were going to say something?

24        **MS. CHANG:**  Yes, Your Honor.  I was just going to

25   state the pages on the record so it's clear for the record what

*NEGRÓN-MUÑOZ - CROSS*                                            160

1    I'm asking her to read, and then she can go ahead and read

2    them.

3            **THE COURT:**  Why don't you go ahead and do that.

4            **MS. CHANG:**  Yes, Your Honor.

5            So if you could please read Defense Exhibit 3,

6    Volume 10, pages 35 and 36.  And, you know, I have the stack

7    here, so I'll just hand them to you during the break, and then

8    we can go about it that way.

9            **THE WITNESS:**  Okay.  Thank you.

10           **MS. CHANG:**  I will also give you Volume 15, pages 3

11   through 9, and Volume 15, 11 through 13 and page 15.  So I will

12   give you those, and we can talk about it after.

13           **THE WITNESS:**  Okay.

14           **THE COURT:**  All right.  And you said, Ms. Chang,

15   that'll be the end of your cross-examination pretty much after

16   that?

17           **MS. CHANG:**  Pretty much.  Just a few questions based

18   on that, and then we're done.

19           **THE COURT:**  Perfect.

20           And then, Mr. Mahoney, I'm assuming you want to do

21   some redirect?

22           **MR. MAHONEY:**  Yes.

23           **THE COURT:**  Okay.  What we'll try to do -- you think

24   we can get through your redirect by 5:15 today?

25           **MR. MAHONEY:**  I hope, yes, Judge.

*NEGRÓN-MUÑOZ - CROSS*

1        **THE COURT:**  Okay.  Very good.  Then what we'll do,

2   when we finish redirect and let Dr. Negrón take a break for the

3   rest of the day, because I'm sure you're exhausted, we'll talk

4   about scheduling for tomorrow, because I need to get with IT

5   and the court reporter to make sure we have -- what time we

6   have for tomorrow.

7        **MR. MAHONEY:**  Judge, for your information, I would

8   expect only one by Zoom for tomorrow, one person from Aloft.

9        **THE COURT:**  Okay.

10        **MR. MAHONEY:**  And then the one question I had raised,

11   we haven't decided that.  But -- and then possibly Mr. Marks's

12   father.

13        **THE COURT:**  Okay.  I'm just going to advise you again,

14   Mr. Mahoney, if Mr. Marks testifies, it will be under oath, and

15   I cannot guarantee that the question's going to be limited to

16   only what you ask.  It's going to be completely dependent on

17   Mr. Marks's answers, because, again, nothing here can go into

18   trial or sentencing.  So you do take that risk.

19        **MR. MAHONEY:**  Sure.

20        **THE COURT:**  All right.  Mr. Goddeyne, you had

21   something you want to add?

22        **MR. GODDEYNE:**  Yes, Your Honor.  Just briefly, while

23   we're on scheduling, I -- based on our prior communication --

24   maybe I was misunderstanding what the Court had said.  I was

25   under the impression the hearing was going to be limited to

1    just two days, yesterday and today.  And based on that, I

2    scheduled a proffer session with the Government.  It's over

3    Zoom tomorrow at 9:00 A.M.

4         **THE COURT:**  You're going to have to reschedule it,

5    sir, because you may not have been on one of the status

6    conferences, but I clearly stated in prior status conferences

7    to counsel that I would, if necessary, have Wednesday available

8    because we needed to get this done.  So I suggest during the

9    break you call the United States and maybe ask the attorney

10   that you're working with and get it rescheduled.  Otherwise, we

11   won't have any exhibits or any Zoom sharing or anything like

12   that tomorrow if you're not here.

13        **MR. GODDEYNE:**  Understood, Your Honor.  Thank you.

14        **MR. MAHONEY:**  Judge, I might be able to manage the

15   sharing myself.  I mean, I'm just offering.  I might be able to

16   manage the sharing and so on myself.  I don't really expect

17   exhibits.  So --

18        **THE COURT:**  Here's what I'll say.  And I just want

19   to -- and I'm not trying to say anything out of place, but you

20   run the risk, Mr. Mahoney, given all the admonitions I gave you

21   over the last two days about how you make questioning, if

22   Mr. Goddeyne is not here and you continue to question in the

23   way I advised you about before, this hearing will be over and

24   there will be no other attorney here to continue the

25   questioning.

1          Conversely, if we need to use Zoom or we need to share

2     screens or use exhibits and Mr. Goddeyne is not here, you run

3     the risk of not being able to have those exhibits admitted

4     during the hearing because I'm not going to do your job for

5     you.  You-all have been aware of this hearing for an extensive

6     period of time.  I've given numerous warnings about how it's

7     going to go.

8          So you proceed at your own risk how you want to do it,

9     and whatever consequences come from that, come from that.  I

10    just want to put that on the record so that if there's an issue

11    tomorrow, you've been made well aware of it.  Proceed however

12    you choose.  Work your case however you want to work it.

13          All right.  We'll take a ten-minute recess, and I'll

14    see you back.

15      (Recess at 3:56 P.M. until 4:11 P.M.)

16        **THE COURT:**  Dr. Negrón-Muñoz, have you had enough time

17    to read the pages?

18        **THE WITNESS:**  Yes, ma'am.

19        **THE COURT:**  Okay.  Go ahead.

20    **BY MS. CHANG:**

21    **Q.**  Dr. Negrón, having reviewed those excerpts, do you believe

22    that those excerpts show that the defendant is capable of

23    weighing options?

24    **A.**  That's a -- in my opinion, a complicated question because I

25    think he can superficially do it, but if you go to a deeper

*NEGRÓN-MUÑOZ - CROSS*

1   level of understanding, as we were talking about the decisional

2   competency, I don't think he fully understands.  And the

3   example that came to my mind, as I was reading it, is a very

4   simple, concrete example of when we were talking about three-

5   or five-year-olds where they just focus on numbers.  You can

6   give them a dollar bill and give them five pennies, but they'll

7   take the five pennies because it's more.

8       So I think that's part of what's happening with Steven.

9   He'll focus on the numbers, maybe ten -- and I'm just using

10  this as an example.  I'm not saying this is -- this is an

11  accurate statement.  You know, maybe he'll say, well, ten may

12  seem like less, not really understanding the consequences of

13  what that may mean.

14  **Q.**  Is it still your opinion that he lacks the capacity to

15  understand the factual information and legal principles

16  relevant to the specific decision?

17  **A.**  Yes.

18  **Q.**  Is it still your opinion that he lacks capacity to bring to

19  mind and hold in working memory the information that is

20  relevant to making a complex decision?

21  **A.**  Yes.

22  **Q.**  And is it still your opinion that he lacks capacity to

23  think rationally about and compare alternative courses of

24  action and envisioning the consequences of each?

25  **A.**  Yes.

1   **Q.**  And is it still your opinion that he lacks capacity to even

2   envision information that might assist him in making a

3   decision, such as consulting with his attorney?

4   **A.**  Can you repeat that last one again?  I'm sorry.

5   **Q.**  Is it still your opinion that he lacks capacity to even

6   envision information that might assist him in making a

7   decision, such as his attorney's opinion?

8   **A.**  Yes.

9   **Q.**  Is it still your opinion that he lacks capacity to make

10  rational decisions that are in his best interest?

11  **A.**  Yes.

12  **Q.**  Do you believe that a defendant exhibits this ability only

13  if he can make that decision without input from anyone,

14  including his attorneys?

15  **A.**  Could you repeat that one again?  I'm sorry.

16  **Q.**  It was long.  I'm sorry.

17      Do you believe -- I'll just say it slower, not shorter.

18  Slower.  Do you believe that a defendant exhibits these

19  abilities only if they can make these decisions without input

20  from anyone, including their attorneys?

21  **A.**  Let me rephrase it to make sure I understood.  If he can

22  make the decision without any input from his attorney?

23  **Q.**  Do you believe that a defendant exhibits what you're

24  calling the higher-level decision-making ability -- do you

25  believe that they demonstrate that only if they can make a

1    decision without any help, including from their attorneys?

2    **A.**   I feel I'm a little confused myself.  I feel like I want to

3    say -- I don't think he can make a decision by himself even

4    with the information provided by his attorney.

5    **Q.**   Why?

6    **A.**   He's demonstrated he doesn't have the capacity to

7    manipulate all that information on his own.

8    **Q.**   And so the excerpts that you just read don't show that he

9    can learn information, use the information, and apply the

10   information?

11   **A.**   He regurgitated the information.  It doesn't mean he has a

12   further, deeper knowledge of what it means.

13   **Q.**   So in the excerpts that you read, it's your view that he's

14   regurgitating all of that?

15   **A.**   Yes.

16              **MS. CHANG:**  Okay.  Nothing further.

17              **THE COURT:**  Thank you, Ms. Chang.

18              Mr. Mahoney, redirect?

19              **MR. MAHONEY:**  Thank you, Judge.

20              **THE COURT:**  Yep.

21              Let me just ask you, Dr. Negrón, do you need a break

22   or anything?  Because I know you were reading documents during

23   that break.  Are you doing okay?

24              **THE WITNESS:**  So far, yes.

25              **THE COURT:**  Okay.  If you need to take a break or you

1    need more water, you just let me know.

2              **THE WITNESS:**  Thank you.

3              **THE COURT:**  Thank you.

4                    **REDIRECT EXAMINATION**

5    **BY MR. MAHONEY:**

6    **Q.**  So, Dr. Negrón, you were asked questions about problems

7    with retention, and can -- is it possible to predict what kinds

8    of information or facts somebody might retain over a long

9    period of time and -- and -- and which kind of information they

10   won't?

11   **A.**  That's not predictable.

12   **Q.**  And does -- is -- does -- in Steven's case is there some --

13   did you observe -- have you observed in your evaluations and

14   looking at other evaluations that there's some facts he just

15   can't retain from examination to examination?

16   **A.**  I would say that's correct.  There's some things that he

17   can recall easier and others that he cannot.

18   **Q.**  Some he remembers, but, like, is this right?  That

19   sometimes he remembers things incorrectly more than once?

20   **A.**  Correct.

21   **Q.**  So would -- there was an example about what the function of

22   the judge was.  Was that an example of something where -- like

23   that?

24   **A.**  Yes.  That would be an example.

25   **Q.**  Ms. Chang asked you several questions about, I guess,

*NEGRÓN-MUÑOZ - REDIRECT*                                              168

1    that -- relation to the amount of time that was spent, you

2    know, working on Steven in the 30 hours of time that I spent.

3    Do you recall those questions?

4    **A.**  Yes.

5    **Q.**  Do you think that any amount of time is going to improve

6    his ability to actually evaluate the facts that he might learn?

7    **A.**  Given his cognitive abilities, not necessarily.

8    **Q.**  Now, you were asked several questions about the -- the

9    Vineland scores.  And just to go back, if we could -- if you

10   have Defendant's Exhibit 8 in the exhibits there -- do you have

11   a hard copy of the defendant's exhibits there?

12   **A.**  I do not have any of the hard copies with me right now.

13   **Q.**  All right.

14   **A.**  Are they here?

15        **THE COURT:**  Our tech expert, Mr. Goddeyne, has got it

16   up on the screen, Dr. Negrón.

17        **THE WITNESS:**  Okay.  Perfect.  Thank you.

18        **THE COURT:**  Thank you very much, Mr. Goddeyne.

19        **MR. MAHONEY:**  Thank you, Matt.

20   **BY MR. MAHONEY:**

21   **Q.**  So these -- this is not -- this is Dr. Geller's report, if

22   you recognize that.  Do you --

23   **A.**  Yes, I do.

24   **Q.**  Okay.  And so tell us what the -- first of all, what kind

25   of scoring does -- is reported on the Vineland?

1    **A.**  It's an adaptive functioning scale, and it has the

2    communication and daily living skills, as we can see here,

3    socialization, and it takes all of that into an adaptive

4    composite.

5    **Q.**  Okay.  So the numbers for -- it's like -- there's domain --

6    there's communication domain and then daily living skills,

7    socialization.  They each have a standard score to the right of

8    them; right?  What do those standard scores mean?

9    **A.**  They're in comparison to the population that they were

10    standardized against.

11    **Q.**  Do you -- do you know if there's a mean standard to which

12    those are compared?

13    **A.**  I'm going to say I don't -- I'm not very versatile in that.

14    I know how to interpret it, but I don't know the intricacies of

15    it.  So --

16    **Q.**  Okay.  So you've -- you administered the Vineland yourself

17    in the past?

18    **A.**  In the past, I have.

19    **Q.**  Okay.  So the -- the social -- interpersonal social skills,

20    interpersonal here -- that's under socialization.  What

21    actually is the Vineland measuring in terms of interpersonal

22    social skills?

23    **A.**  How a person relates to another one.

24    **Q.**  All right.  And you mentioned before in terms of the DSM

25    reciprocity in terms of friendship, I believe.

*NEGRÓN-MUÑOZ - REDIRECT*                                        170

1    **A.**  Correct.

2    **Q.**  All right.  So is there anything else -- what -- you know,

3    what is it looking for -- so what are the parts of those

4    emotional interactions that you have in mind?  What are the

5    kind of indicia of that that -- that the Vineland might be

6    collecting from the people who are responding?

7    **A.**  Well, like I said, the Vineland -- it's looking for the

8    adaptive functioning of that person.  I think in Steven's

9    particular case, we see -- and this is what I tried to tell

10   Ms. Chang, but I couldn't remember the numbers.  It was a very

11   wide range, ranging from interpersonal at an age equivalent of

12   three years old to daily living skills in the community or

13   adaptability in the community to that of an 11-year-old and

14   3-month-old.  So he has a very varied range of adaptability.

15   **Q.**  Right.  Well, compared to his chronological age, it's

16   actually -- you know, it's much lower; right?

17   **A.**  Definitely.  Compared to his chronological age, which would

18   be 23, definitely he's functioning at less than the

19   1 percentile for all of the domains.

20   **Q.**  So what are -- but in terms of the Vineland itself, what

21   are the actual interpersonal social skills that it is

22   collecting information on from, like, the parents in this

23   instance?

24   **A.**  I don't recall off the top of my head, to be honest with

25   you.

1   **Q.**  Is the -- are those -- are they the kind of skills that

2   would evidence themselves in a police interview?

3   **A.**  Could you repeat that?

4   **Q.**  Well, does a police interview involve reciprocal emotional

5   interplay between the defendant and police officers?

6   **A.**  Does it display reciprocal emotional interplay?  I would

7   assume so.

8   **Q.**  Well, so -- well, would a skill -- what kind of

9   reciprocal -- what kind of -- what would display?  What would

10  evidence that there was a reciprocal exchange in the -- however

11  that would be called, a social contact with the police officer?

12  What kind of evidence would be that there was some reciprocal

13  exchange going on?

14  **A.**  Well, Steven was responding to their questions

15  appropriately, and I think something to make note of, Steven --

16  that has been heard consistently is that he is polite, he is

17  compliant, and that is something that could be learned,

18  familiar, cultural, not necessarily just relating to that.

19  **Q.**  Well, but it was said by -- I believe it was said by even

20  Dr. Jenkins that -- and I think it was in Dr. Geller's report

21  too.  Did you hear her say that it was, like, halfway -- only

22  halfway through the interview when he sort of caught on to what

23  the police were --

24  **A.**  Yes, and I agree with that.

25  **Q.**  Okay.  So is it -- is it your understanding that -- what do

1  you understand about whether or not a typically developed

2  person -- how quickly they may have caught on to this?

3  **A.**  I think I mentioned that earlier in my testimony that

4  probably -- even with the juveniles that I work with, there's

5  some more -- more adapting, would have probably caught on and

6  not given as much information and would have required a lawyer.

7  I think he was more trusting.

8  **Q.**  And does that have anything to do with their ability to

9  perceive the intention -- the intention of the police officer?

10  **A.**  Possibly.  I don't think Steven realized -- based on the

11  audio that I heard, I don't think he realized until way into

12  the conversation that he was in some type of trouble.  And he

13  started asking, "Am I in trouble?"  And he was very willing to

14  be compliant and give the information requested.  I don't think

15  he realized he was in trouble.  It wasn't till later, I think

16  an hour into it, that he realized "I'm in" -- "Am I in

17  trouble?" or that he asked.

18  **Q.**  Was the fact that Steven took that long to realize what the

19  police were about -- is that somehow reflective of problems

20  with interpersonal social skills?

21  **A.**  I want to be cautious how I answer this because depending

22  on how we're -- the interpersonal relationship per se versus

23  the social interaction of being able to interpret what was

24  going on are two different things.  So I think he does have

25  that deficit in being able to recognize that that was not --

*NEGRÓN-MUÑOZ - REDIRECT*                                    173

1    the way the social interaction was occurring was not probably

2    how he interpreted it to be, that he was in trouble.

3    **Q.**   There are other aspects are the -- the skills of perceptive

4    and expressive language.  Are those things that come into play

5    in a police interview?

6    **A.**   Oh, definitely.  In general, for communication in general,

7    not only with the police but even in the court and being able

8    to understand the matter at hand here, the information being

9    provided to him.

10   **Q.**   The -- the Vineland -- what can you tell us about the --

11   how the Vineland test is regarded in the world of psychology

12   and measuring these adaptive skills for people with

13   disabilities, intellectual and developmental?

14   **A.**   Because I am not a psychologist, I do not feel I'm properly

15   prepared to answer that.  I just know to interpret it to my

16   capacity as a psychiatrist and how to incorporate it into my

17   diagnoses and evaluation.

18   **Q.**   All right.  But it's a standardized test, is it?

19   **A.**   It is.

20   **Q.**   What is -- what is being measured in terms of coping skills

21   on the Vineland?

22   **A.**   I don't necessarily know the answer to that.

23   **Q.**   All right.  So is it fair to say, then, you really wouldn't

24   be in a position to address whether or not coping skills would

25   have been evident or not as far as they're measured by the

*NEGRÓN-MUÑOZ - REDIRECT*

1    Vineland in Steven's interplay with the police?

2    **A.**  Well, just based on the results of the Vineland, we see

3    that his coping skills are that of a five-year-old --

4    five-year-old, one-month-old, actually.  To say how that

5    related to his police interview, I think I can go back and say

6    what I have said consistently.  I don't think he really

7    understood what was going on, considering his chronological

8    age.  Somebody with his chronological age probably would have

9    been more -- would have caught on sooner, maybe would not have

10   provided so much information, or would have had different

11   questions.  I think he was somewhat trusting.

12   **Q.**  Does the -- does the -- these scales of age equivalencies

13   on the Vineland, do they mean that -- if he has the

14   interpersonal social skills of a -- in their -- of an average

15   three-year-old, does that mean he's going to act like a

16   three-year-old?

17   **A.**  Not necessarily.  All these -- you can average them all

18   out.  It doesn't mean that necessarily for interpersonal you're

19   going to see a three-year-old.  All these come into play

20   together and kind of average out one or the other.

21   **Q.**  Are you able to say that there's anything inconsistent

22   between the Vineland score for these individual skills and

23   however he exhibited himself in the police interviews or

24   talking to Dr. Otto or in the chats?

25   **A.**  Could you repeat that question again.  I'm sorry.

1  **Q.**  Are you able to say that there's anything inconsistent

2  between the Vineland scores and however he appeared in these

3  different scenarios?

4  **A.**  No.

5  **Q.**  You were asked a question of whether speaking is a

6  less-advanced behavior than writing.  Do you recall that?

7  **A.**  Yes.

8  **Q.**  Does the fact that children may speak before they learn to

9  write actually even bear on the question of whether speaking is

10  more advanced than writing?

11  **A.**  Well, that is a developmental process; right?  That's how

12  we're developmentally established.  But, like I said, in newer

13  tendencies in the developmental field, we're having where

14  children are even expressing themselves writing or reading

15  words even before they're speaking.  So that's a very broad

16  topic right now.

17  **Q.**  Right.  We heard -- was there anything in

18  Gretchen Bennett's evidence today to suggest that writing was

19  more advanced than speaking?

20  **A.**  I don't recall.

21  **Q.**  Does -- does writing -- are you familiar with the terms,

22  like, "prosody" and "intonation" and "modulation"?

23  **A.**  What I recall is that his verbal abilities are definitely

24  more advanced than any of his other abilities.

25  **Q.**  You were asked a question of whether Gretchen Bennett's

1   scores were -- could possibly be a better measure -- a better

2   measure than just listening and looking at the -- his

3   performance in these videos and other scenarios; right?  Do you

4   remember being asked that?

5   **A.**   Correct.

6   **Q.**   Is looking at a video of somebody talking or watching them

7   talk -- is that a measure of their ability?

8   **A.**   No.  And I think I addressed that.  But that there's some

9   subjective observations versus objective values, and there's

10  always a -- you know, we all have our perception, and what we

11  perceive is not necessarily the reality.  Somebody may appear

12  to be -- I'm going to use the word like Dr. Jenkins said --

13  very smart, but yet when we do objective testing, we'll get

14  more information that's not necessarily the case.

15  **Q.**   You were asked questions -- I don't recall whether

16  Gretchen Bennett was or not, but you were asked questions about

17  her testing that -- as far as the standardized tests.  Do you

18  recall the questions you were just asked by Ms. Chang?

19  **A.**   I know she asked me some questions relating to that.

20  **Q.**   Does the -- when tests are standardized tests, are there

21  things done in that standardization process to avoid bias

22  coming in from the people that are performing those tests or

23  being provided the information?

24  **A.**   Yes.

25  **Q.**   And is there -- do you have any -- first, do you have

1    any -- is it your opinion that Steven would be capable of

2    comprehending how to affect in any way the results of any of

3    the tests that he was being given?

4    **A.**   Well, I would preface that with that's why they're

5    standardized, so you can see if anybody is changing these

6    results.   And he wasn't -- not for Dr. Bennett, but he was

7    administered the MMPI, which has a component that tells you if

8    people are feigning or malingering or manipulating the results,

9    and that has not been brought up.   So I'm going to say no.

10   **Q.**   Gretchen Bennett gave her definition of what she meant by

11   sustained -- sustained attention, I think the term was.

12   **A.**   Concentration, I believe.

13   **Q.**   Sustained concentration.   Was her definition of that -- and

14   I have to say I don't recall it exactly.   Was she -- did she

15   define that in a way that differs from the way you intended it

16   when you used that language in your report?

17   **A.**   If I recall correctly, I don't -- I don't think it

18   differed.

19   **Q.**   But is there a conflict between your interpretation and her

20   interpretation of Steven's abilities in terms of sustained -- I

21   can't -- I forget --

22   **A.**   Concentration.   I think it depends on how you interpret

23   what -- what that means in the bigger aspect.   Sustained

24   concentration for five minutes is the same concentration for a

25   lecture.

1           In all honesty, my own sustained concentration is starting

2      to fade here a little bit, with all due respect.  So --

3      **Q.**  Well, for example, is there -- in the world of -- in your

4      experience with individuals with autism, is there a term for

5      separation that's applicable?

6      **A.**  In children with autism, yes.

7      **Q.**  Is it -- are children with autism able to go for a long

8      time engaging in repetitive, same activities maybe to the

9      extent that typically developed people would never do?

10     **A.**  Yes.

11     **Q.**  And would that be an example of the kind of sustained --

12     why am I blocking on this?

13     **A.**  Concentration.

14     **Q.**  Thank you very much.  I'm not concentrating.  Thank you.

15          Would that be -- would that fall within sustained

16     concentration as either you defined it or as Gretchen Bennett

17     defined it as far as you interpret it?

18     **A.**  I think that can be a little tricky because you can

19     perseverate on something and not necessarily be concentrating,

20     because you can be doing something repeatedly without having

21     concentration, just not purposefully -- not having the

22     intention.  You just go on and on and on and on.  It doesn't

23     mean you're concentrating.  Or you can perseverate.  I'm not

24     sure if that makes sense but --

25     **Q.**  The -- you were asked the question about Steven's decision

1    to sign a plea agreement based upon my recommendation.  Do you

2    recall that?

3    **A.**   Yes.

4    **Q.**   That decision -- is that a decision -- first of all, it may

5    be rational.  Would it be rational for him to agree to do what

6    I told him to do?

7    **A.**   I think, as it was asked before, it's not uncommon for even

8    people who are competent or rational or smart to ask for the

9    advice of their lawyer.

10   **Q.**   But if somebody is unable to autonomously make a decision

11   with full advice and so on, is the decision to instead do what

12   your lawyer recommends -- is that a competent decision?

13   **A.**   It is not because he's still lacking that decisional

14   competency.  An example that came to mind is when you have a

15   psychotic person who's lacking competency.  Even though their

16   decision may not be rational, sometimes they choose and make a

17   decision, and they'll give you a wild reason as to why, but

18   Steven hasn't demonstrated that he can make a decision and

19   sustain it based on his own recollection of the information

20   gathered.

21   **Q.**   The fact that Steven -- well, do you have any idea how long

22   Steven will actually retain all the information that he's able

23   to talk about on the video about the 30 years and the 10 years

24   and things like that?

25   **A.**   Could you repeat that again.

*NEGRÓN-MUÑOZ - REDIRECT*                                                180

1   **Q.**  Do you have -- do you have an estimate as to how long he

2   might be able to retain the information that he talked about in

3   the conversations with -- on the video today about the 30 years

4   and 10 years and those details?

5   **A.**  No, I wouldn't be able to estimate that.

6   **Q.**  It's anybody's guess; right?

7   **A.**  Correct.

8   **Q.**  But no matter how well he understood that information, how

9   good he was at stating all these options, is that a substitute

10  for being able to actually -- having those options in mind and

11  also in mind consequences of different choices he might make in

12  order to autonomously make a decision?

13  **A.**  Are you asking me, with all that information, he can still

14  make an autonomous decision?

15  **Q.**  No.  I'm asking you does having -- knowing all those

16  options and being able to state them, is that the same as being

17  able to weigh those options and consider them in order to

18  decide what to do?

19  **A.**  No.

20          **MR. MAHONEY:**  That's all I have.

21          **THE COURT:**  Thank you, Mr. Mahoney.

22          Dr. Negrón, this was extremely informative and

23  helpful, and you are done, and you may step down.  Thank you so

24  much for your time.

25          **THE WITNESS:**  Thank you.

*NEGRÓN-MUÑOZ - REDIRECT*                                    181

1      **THE COURT:**  Mr. Mahoney, are you ready to call your

2 next witness?

3      **MR. MAHONEY:**  Judge -- oh, we have -- our next witness

4 would be by Zoom, but I didn't know whether to -- I'm sorry.

5      **THE COURT:**  Mr. Mahoney, I sent out the invitations

6 first thing this morning.  Your witness needs to be ready, or

7 your witness isn't going to testify.  You have somebody sitting

8 back that it looks like he might be a witness as well.  Do you

9 want to call that gentleman instead?

10      **MR. MAHONEY:**  Could we have five minutes, Judge?

11      **THE COURT:**  You have five minutes.

12      **MR. MAHONEY:**  If I -- I feel confident that the

13 witness from Aloft that I called -- I don't think we'll get

14 them done before the time that you want to terminate for the

15 day.  I don't know.

16      **THE COURT:**  That's fine, but, Mr. Mahoney, as

17 Mr. Goddeyne himself said, he thought we only had two days for

18 the hearing.

19      **MR. MAHONEY:**  Yeah.  No.

20      **THE COURT:**  I'm giving you as much leeway as I can.

21 We can end the hearing right now if that's what you want.

22 Otherwise, I said we're going to 5:15, and we need you to

23 continue.

24      **MR. MAHONEY:**  I can have the witness on Zoom in

25 five minutes.

*BAIRD-HEPWORTH - DIRECT*                                              182

1              **THE COURT:**  All right.  We'll take a five-minute

2       break.

3            (Recess at 4:39 P.M. until 4:47 P.M.)

4              **THE COURT:**  Mr. Mahoney, call your next witness.

5            **MR. MAHONEY:**  Thank you, Your Honor.  The defense

6       calls Angela Baird-Hepworth, who is on Zoom.

7            (Witness sworn.)

8                        **DIRECT EXAMINATION**

9       BY MR. MAHONEY:

10      **Q.**  Angela, could you tell -- tell the judge, please, what it

11      is that you do.  What is your job at the present time?

12      **A.**  I am the clinical executive director of Aloft Transitions,

13      where Steven currently resides, in Idaho.

14      **Q.**  All right.  And what -- just how long have you been at

15      that -- at Aloft?

16      **A.**  I've been at Aloft since May of 2015.

17      **Q.**  All right.  And what kind of a facility is Aloft?

18      **A.**  Aloft is a residential young adult transition program for

19      those 18 to 30.  It's on 10 acres.  It's a large home where

20      young adults live and learn work ethic, learn daily living

21      skills, executive functioning, problem solving, all of those

22      things.

23      **Q.**  What's the -- is there an average length of stay for

24      individuals there?

25      **A.**  Not particularly.  We've had individuals stay anywhere

*BAIRD-HEPWORTH - DIRECT*                                          183

1   from, you know, a year to two years to five or six.  It just

2   really depends on their specific needs and their specific

3   struggles, and some of our young adults will be with us long

4   term, meaning -- it's hard to say, like, forever; right?  But

5   pretty -- fairly, you know, set up to help them and help, you

6   know -- kind of help them make decisions, help them live their

7   lives in a reasonable and safe way for their lifetime, as they

8   have been with us for several years; and there's been a need

9   that has been, you know, seen as they've gotten older and, you

10  know, whereas most young adults will mature as they're just

11  not -- and/or developed.  They're just not able to because of

12  cognitive things -- autism, attachment issues, just

13  different -- different things --

14  **Q.**  All right.

15  **A.**  -- like that.

16  **Q.**  And what is your educational background?

17  **A.**  Yeah.  So I have a bachelor's degree from Hofstra

18  University.  I have a master's degree from Capella University

19  in mental health counseling, and I have a doctorate from

20  Capella University also in psychology.

21  **Q.**  Okay.  And I'm not going to ask you questions as a

22  psychology expert but about your observations of Steven.  Is

23  that okay?

24  **A.**  Yes.  Absolutely.

25  **Q.**  What kind -- first of all, what kind of observation have

1    you personally had of Steven over the time that he's been

2    there, which is -- I'm sorry -- how long now?

3    **A.**  It was four years two months ago or a month and a half ago.

4    **Q.**  All right.  And what is --

5    **A.**  So a little over four years.

6    **Q.**  What is the nature and frequency of your interaction with

7    Steven on a typical day?

8    **A.**  So a typical day, I will see him, you know, just in the

9    milieu or doing job training, which could mean he's working and

10   doing things in the metal shop, doing things -- different

11   random things on campus, as we have 10 acres, so there's

12   practical things he's doing to help feed large animals.  He's

13   also doing his sort of -- his daily things, if you will.  He

14   take walks every day.

15       And then I also meet with him for therapy, you know, up to

16   multiple times a week.  It just depends on how he's doing and

17   what's going on with him, and sometimes I meet with him, you

18   know, once a week for traditional -- more traditional ways;

19   right?  But I see him almost five days a week, if not more.

20   Sometimes I'm there on the weekends as well.  It just depends

21   on -- on what's going on.  So I see him for therapy, and then I

22   see him in the milieu as well.  So quite often.

23   **Q.**  And do you also get information from other sources about

24   Steven's functioning or activities, other staff that create

25   reports or observations or records?

*BAIRD-HEPWORTH - DIRECT*                                      185

1    **A.**  Yes.  Yep.  Yeah.  So for sure.  So every day there's a

2    text stream that our current -- our day -- that day staff

3    creates and is on.  So I'm on that with all the staff, and so

4    they're reporting on him in the moment during the day, multiple

5    times a day.  I'm also, obviously, in contact with them as I'm

6    on campus 40 to 45 hours a week, like I said, to see Steven but

7    also to report and talk with our mentor team, our executive

8    team.  We have team meetings every single Thursday to staff.

9    All of our young adults, including Steven, is included in that.

10       And then, also, we have a -- what's called our -- we have

11   Slack.  I don't know if that's -- it's an app that they can use

12   to report -- our mentors can use to report on in the moment,

13   and so that's kind of, like, a running history, just kind of a

14   pass down, if you will, for more so, like, on important

15   information but -- but -- also important information.  For

16   instance, a lot of our students will take meds, so that will be

17   reported in there.  Like, if they don't take their meds, then

18   we know.  For -- Steven has eye drops, for instance.  We know

19   if, for some reason, he wasn't able to get his eye drops or he

20   wasn't able to take a med he was supposed to take, like an

21   antibiotic, for instance, for Steven as he doesn't take other

22   medications.

23   **Q.**  All right.  So I'd like to ask you about Steven's daily

24   living skills starting with his own personal care.  What have

25   you observed over the time that he's been there as far as

1   Steven's ability to take care of himself in terms of his

2   grooming and hygiene and clothing?

3   **A.**   So on grooming and hygiene, Steven will need prompts and

4   reminders to shower, to do his laundry, for instance.  Every

5   student has a laundry day once -- about once a week.

6   Obviously, there's more if needed.  And so he needs prompting,

7   help with that sometimes, and a lot of times, especially at

8   first, needed a lot of help in those areas.

9        And I'm sorry.  You had asked something towards the end,

10   and I wanted to make sure I'm being, like, thorough in

11   answering.

12   **Q.**   That was clothing.  But if we could stick to personal --

13   stick to the personal hygiene.

14   **A.**   Sure.

15   **Q.**   How -- has he progressed in that area or not over the

16   four years?

17   **A.**   So I think that there's progression only because it can be

18   the same, if that makes sense, meaning if he had -- so he has

19   the same, say, bathroom.  He has the same washer and dryer.  He

20   can navigate those, for the most part, on his own.  For

21   instance, like the washer and dryer, when he first arrived, he

22   was not able to really figure out the wash and dryer at Aloft

23   because it was different than the washer and dryer that he was

24   used to and had learned, and so it took -- I don't know.

25   Jeez -- months for him to really kind of learn that system.

1    You know, it may have been even longer.  I'm trying to think.

2    You know, because for Steven, he can take directions and

3    directives maybe one at a time.  Otherwise, he forgets.  He

4    forgets, like, Steps 2, 3, and 4; or he'll do Step 1, 4, 2, and

5    then get kind of confused himself and not really understand.

6    So -- so that's definitely been observed.

7        Personal care -- you know, if -- if he's not being

8    prompted, reminded, he won't know to get a haircut.  And so

9    it's -- it's kind of, like, "Hey, your hair -- you know, it

10   might be getting long.  Are you liking it that way?  Are you

11   wanting it shorter?" you know, kind of talking through those

12   things that really, for his age, shouldn't be an issue.  But

13   he's not able and capable to make those decisions and say,

14   "Hey, I want my haircut," unless we prompt, ask, and it's

15   usually several times too because he'll be unsure.  "Oh, I

16   don't -- I don't know," you know.  So he really needs help

17   making those decisions as simple as a haircut.

18   **Q.**  What about clothing and Steven's approach to keeping

19   himself properly clothed?

20   **A.**  He wears pretty much the same thing -- sweatpants, a

21   sweatshirt, and the same shoes -- and so we have to go

22   literally in and look at the bottom of his shoes, inside them,

23   when he has them off.  But to ask him and say, "Hey, are there

24   holes?" -- there's been times he's, like, "No, I don't think

25   so," and then we look, and there's -- he's wearing holes in the

1    bottom of his shoes.

2        He does that with socks, underwear.  You know, we've had

3    several times where he's had holes in his socks or underwear,

4    but staff has to go in and -- we've gotten to know and built

5    that relationship with Steven where he's okay with that, where

6    we go in and say, "Hey, how many underwear do you have?  What

7    do they look like?"  Because if you just say, "How many

8    underwear do you have?" he'll be, like, "Oh, I'm good.  I

9    have" -- even four for him, you would think, would be fine.  I

10   think one would be fine for him because he's been to that point

11   where the underwear has so many holes they're kind of falling

12   off, and we're, like, "Hey, that's not appropriate."

13       And so helping him with all those things -- like I said,

14   he's been with us over four years, and that's something that

15   he -- we still have to remind him, have to prompt him, have to

16   help him with.

17   **Q.**  What -- what about domestic tasks around there?  Does he

18   have -- does he do any cooking, for example?

19   **A.**  Yeah, I mean, definitely likes to -- not so much maybe

20   likes to cook, but I think for him he wants to be, like,

21   reliant on himself or, like, cook for himself because he

22   needs -- he feels ashamed or a burden if others have to do a

23   lot for him.  And so he'll go to cook something, and if it's

24   not -- you know, if it's a pan, for instance, that he knows to

25   use isn't clean, he will be confused on then how to make said

1    thing.  Even, like, an egg or something, he'll be confused and

2    go to staff and say, "My pan is dirty."

3         And so staff will be, like, "Okay.  Well, what do you think

4    you can do?  Can you use another pan?"

5         "Oh, I don't know."

6         Okay.  Well, then, you know, he doesn't -- he doesn't know,

7    and then they will either just kind of prompt him to wash the

8    pan and say, "Hey, then you can use it," or they will help him

9    use another pan or different -- different dish or whatever --

10   right? -- the circumstance, meaning -- so, like, he can learn

11   something or it seems like he's been able to learn something if

12   it's taught to him over and over and over again in, you know, a

13   very, very repetitive fashion, just like the laundry.  But then

14   if something changes in that whole system, he gets confused and

15   then doesn't really understand or is not capable of

16   understanding, like, that he can do it different, and it'll

17   still turn out -- can turn out the same.

18   **Q.**  Which I -- brings up another question, but -- well, what

19   about other -- does he have jobs around the area or -- or work

20   that he does or --

21   **A.**  Yeah.  So on campus, as he's had to stay on campus, there's

22   a lot of things that he can participate in.  So he'll do --

23   feed large animals.  We've had him go out, and we're, like,

24   "Hey" -- at first, when we didn't know him as well, it's, like,

25   "Hey, go up -- go fill the water troughs."  I mean, there's

*BAIRD-HEPWORTH - DIRECT*                                                190

1    cows, horses.  They need a lot of water.  And "Go fill the

2    water troughs."

3         And we'll go to look, and if someone -- and this happened.

4    People didn't check because they're, like, "I told him to fill

5    it up."  Well, his definition of "filling it up" isn't -- he

6    doesn't really understand what "fill it up" means, and so he'll

7    put the hose in it for 30 seconds and think, "Oh, that's good,"

8    and move on to the other one because he's feeling like he's got

9    to get done and doesn't really understand the whole, like,

10   concept of "fill it up" means really, literally, fill it up;

11   right?

12        And so it's, like, you have to show with your fingers.

13   Like, "Oh, it's" -- if you want it 4 inches from the top,

14   "Okay.  This much from the top," and then you also have to

15   check because he may do that the first time, but if he's not

16   used to that and done it, honestly, dozens and dozens of times

17   with a mentor, he will then go to the next one, and he's done,

18   not filled it up like the first one.  It was just that, like, I

19   guess, not capable of remembering, getting confused about the

20   task, just all those things.

21             **THE COURT REPORTER:**  Your Honor, do you mind if I ask

22   her just to slow down a little bit.

23             **THE COURT:**  Yes, yes.  Thank you very much.

24             Ma'am, would you please slow down just a little bit.

25   We have a court reporter here who's having a hard time

*BAIRD-HEPWORTH - DIRECT*                                    191

1    following along.

2           MR. MAHONEY:  Did you -- did you catch that, Angela?

3           THE WITNESS:  I -- I did not.  I'm sorry.

4           MR. MAHONEY:  The request is for you to slow down a

5    little bit so that the court reporter can get accurately what

6    you're saying.

7           THE WITNESS:  Okay.

8    BY MR. MAHONEY:

9    Q.  Are there --

10   A.  Sorry.

11   Q.  That's okay.

12       What other -- are there jobs -- other jobs he's done?  You

13   mentioned a metal shop.  What -- does Steven do activities

14   there, and is he able to do them unsupervised, or are there

15   jobs that he does regularly and can do?

16   A.  I would say not unsupervised, but he's able to go out in

17   the metal shop with -- we have a mentor that used to be a

18   welder.  He also spent several years being a police officer

19   had retired from that, and so he spends a lot of time with our

20   animals and works with us as a mentor.  So Steven can go there,

21   and there's welding in there.  They do -- they make metal

22   projects, and then, also, they'll do practical welding.  We

23   have an iron fence for the -- for the cows that are there, and

24   so he can weld on that, or trailers and such.

25       And so, you know, he's able to do those things, again, with

*BAIRD-HEPWORTH - DIRECT*                                      192

1    prompting, with supervision, with someone there to say, "Hey,

2    this is Step 2, Step 3, Step 4, Step 5," because if he's

3    only -- if he is able to just do, like, a one-step thing, you

4    know, if I show him how in the moment, then he can -- he can do

5    that.  But if it's, you know, multiple steps, no way.  You

6    know, he has to have someone there.  And we're very, very, very

7    cautious because it --

8    **Q.**  Angela, you're back?

9    **A.**  Yeah.  I guess I lost you guys for a minute.

10   **Q.**  You left -- I'm sorry.

11   **A.**  I don't know where --

12   **Q.**  I'm sorry.  You left off saying you had to be very, very

13   cautious.

14   **A.**  Yeah.  We just have to be very, very cautious because,

15   obviously, as it is a metal shop, there's a lot of dangerous

16   things that can happen, and so there's always supervision.  You

17   know, like, as Steven's been working in there or doing job

18   training, as we call it, in there for a long time on a

19   consistent basis, meaning, you know, two, three, four hours a

20   few times a week, he still can't be trusted to, you know, make

21   sure he takes every safety precaution because he needs

22   prompting for them.  You know, even if he's welding and forgets

23   to put on these long, you know, leather gloves, because you can

24   get burnt, he'll forget, you know, and not -- not remember all

25   the steps needed to protect himself.

1    **Q.**  What other areas are there within -- in terms of tasks

2    around the community or jobs that he might do that might

3    provide information about how he functions on a daily basis?

4    **A.**  I mean, he does things around the house, same kind of

5    situation, needing, you know, either a one-direction kind of

6    thing or, you know, has to have constant supervision.  Even if

7    he does have -- like I said, even if he does have, like, a

8    one-direction thing that he's doing, he still needs someone to

9    check on him because he may still get confused or not be able

10   to do it all.

11        I know he does things, like, around the house just

12   because -- you know, not for really, like, job or job training

13   purposes, but I'm not -- I can't think of -- other than, like,

14   feeding the animals, you know, doing things in the metal shop

15   that he's been able to do.  You know, we have a tractor, a John

16   Deer tractor.  We have another tractor that's a stick shift.

17   You know, Steven's not been -- not able to learn those things.

18   You know, he can't -- he's not able to.  You know, it's not

19   that Steven's -- Steven's -- yeah, he's just -- he's not

20   capable, from what we've seen.

21   **Q.**  Are you aware of whether Steven applied for a driver's

22   license in Idaho?

23   **A.**  Oh, goodness.  I can't remember right now.

24   **Q.**  Okay.

25   **A.**  Sorry.

*BAIRD-HEPWORTH - DIRECT*                                    194

1    **Q.**  No.  That's fine.

2         What about -- is one of the things that your program works

3    on social skills?

4    **A.**  Uh-huh.

5    **Q.**  And --

6    **A.**  Yes.

7    **Q.**  -- what can you tell us about Steven's interpersonal social

8    skills?

9    **A.**  So Steven struggles in social situations, especially --

10   well, I'd say any social situations, we've seen him struggle.

11   He just doesn't know what to say.  He doesn't know how to

12   approach others.  I've made, like, question -- questions to

13   where they could pick a question, say, out of a hat to try and

14   help other young adults and him get to know each other on a

15   more deeper level other than "We all live here" or "We're all

16   doing this" or "We're all at Aloft" because he just doesn't

17   know how to be social.

18        You know, he -- he will just kind of, for instance, like,

19   laugh -- if everybody else is laughing, he may start laughing

20   and not really understand what everyone's laughing at.  You

21   know, he will do activities and things on campus if he believes

22   that everybody else is doing them and they're okay to do,

23   regardless of what it is.  So, you know, obviously, we're --

24   you know, our mentors are helping with all those activities.

25   And so from, you know, board games and -- I don't know.  We do

1   movie nights.  They do a lot of arts and crafts stuff.  We have

2   a gym on campus now where they can work out.  Steven takes

3   walks.

4        There's plenty that he does, but he's not really doing it

5   because -- or to be social.  I think he tries to think that he

6   is doing it sometimes to, like, fit in, if you will, but,

7   again, it's not because he knows how really.  I mean, he's kind

8   of winging it and kind of trying to follow what everybody's

9   kind of doing.

10  **Q.**  Has he -- over this time has he had people that could be

11  characterized as true friends with whom he had a sort of close

12  personal relationship with reciprocal emotional interaction?

13  **A.**  Close personal relationships, true friends is what I heard.

14  So true friends in any of an adult's definition, no.  True

15  friends to Steven, with his level of -- you know, his maturity

16  and mentality, yes.  I mean, you know, because they room

17  together and they're kind to him, that would be his definition

18  of a true friend.  To him, that's a friend, because they're

19  kind to him, but, no, he doesn't -- he's not capable of having

20  anything, like, deeper than -- than "Just because they're nice

21  to me" or -- or, you know, "We're nice to each other."

22  **Q.**  Does he -- daily living skills also include areas of play

23  and leisure?  Is that right, in your view?

24  **A.**  Oh, yeah.  For sure.  Yep.

25  **Q.**  And how does he fit in there?  Is that part of your

1    program, to work on that?

2    **A.**  Yeah.  Absolutely.  You know, he struggled finding, like,

3    what he's supposed to do, so he's kind of -- we've helped him

4    develop -- like, he plays the piano.  He also, like I said,

5    takes -- I mentioned he takes walks to -- for a coping skill,

6    exercise.  You know, he'll take a walk.  He walks up and down

7    our lane.  It's about three-eighths of a mile or so.

8        And then also plays the piano.  To learn the piano, you

9    know, he has a very -- he's very good at it, but he's learned

10   only a small number -- or small selection of songs.  We have a

11   mentor that knew how and knows how to play the piano, so she

12   created kind of a guide for Steven, meaning she kind of, like,

13   put something on the keys so he'd know what key was what.  And

14   then, also, he would follow very simple sheet music, which, you

15   know, took a long time for him to learn, I think, for the few

16   songs -- the limited number of songs he took a year or more to

17   learn.

18       And then, you know, I also want to mention with his kind of

19   walking up and down the lane, you know, he -- he walks.  He --

20   the owner of the property had resurfaced that lane.  Well,

21   during that resurfacing time, no one was allowed to drive on

22   it -- right? -- walk on it, any of that, and so about a week

23   later, after it was done and everything was back to normal,

24   the --

25       (Witness disconnected from Zoom.)

1          **THE COURT:**  Well, we're close enough to 5:15,

2    Mr. Mahoney.  I think what we might just go ahead and do is

3    pick up with Ms. Hepworth in the morning, and I will -- I have

4    full confidence you'll get in touch with Ms. Hepworth and make

5    sure that --

6       (Witness connected to Zoom.)

7          **THE COURT:**  Ms. Hepworth, we're going to go ahead and

8    adjourn for the day because I know we're having issues with

9    your connection, and there's some background noise, and we're

10   going to pick up tomorrow morning.

11         **THE WITNESS:**  Yeah.  Sorry.

12         **THE COURT:**  No, not a problem, ma'am.

13         **THE WITNESS:**  Okay.

14         **THE COURT:**  I appreciate that.  So you can go ahead --

15   you'll still be under oath, and we'll see you again in the

16   morning, and Mr. Mahoney will tell you what time.

17         Either Mr. Jackson or Mr. Goddeyne, can you disconnect

18   the Zoom, please, now.

19         Thank you, ma'am.

20      (Witness disconnected from Zoom.)

21         **THE COURT:**  Okay.  So before we adjourn for the day,

22   Mr. Mahoney, what's your anticipated evidence or testimony that

23   you still have to present in this hearing?

24         **MR. MAHONEY:**  With -- when she is done, we are -- we

25   may call David Marks.  I have not decided that finally.  I can

1    tell you I don't think we're going to call Steven Marks, so I

2    think we're relatively confined in terms of the scope of what

3    we're going to do.

4        THE COURT:  Okay.  And approximately how much more do

5    you have with Ms. Hepworth do you think?

6        MR. MAHONEY:  I would say I was halfway through.

7        THE COURT:  That's fine.  I'm not going to hold you to

8    anything.  Take as long as you need.

9        So let me turn to you, Ms. Chang.  I know you're going

10   to cross-examine Ms. Hepworth, and then Mr. Marks --

11   Mr. David Marks may or may not testify, and you'll want to

12   cross him if he does.  What about Dr. Jenkins?  Are you going

13   to be calling her for any rebuttal?

14       MS. CHANG:  Probably not, Your Honor.

15       THE COURT:  Okay.  I'm not going to hold you to that.

16   You can make your final decision in the morning.  I'm sure you

17   both -- both sides have a lot to discuss and strategize about

18   tonight.

19       Mr. Marks -- I mean, Mr. Mahoney, in case I forget,

20   I'm just going to remind you now.  To date there's been no

21   defense exhibits that have been admitted into the record.  I

22   just want to give you a reminder.  We can do that tomorrow --

23       MR. MAHONEY:  Yes.

24       THE COURT:  -- with whatever you want to do.

25       And is there anything else we need to take up today,

1   Mr. Mahoney, other -- well, actually, let me stop.  Time for

2   tomorrow.  So it sounds like we have about one and a half

3   witnesses, possibly some rebuttal.

4          Mr. Goddeyne --

5          **MR. GODDEYNE:**  Yes, Your Honor.

6          **THE COURT:**  -- did you reschedule your proffer, or are

7   you not planning on being here tomorrow?

8          **MR. GODDEYNE:**  I reached out, and I just said I can't

9   do it.

10         **THE COURT:**  Okay.

11         **MR. GODDEYNE:**  And -- or what I offered was that I

12  could maybe do it from 9:00 to 9:20 and then start the hearing.

13  So I don't want anything rescheduled because of me.

14         **THE COURT:**  And I appreciate that, sir.  What do we

15  say about we start tomorrow at 10:00 A.M. that way you can get

16  your proffer done since we only have about one and a half

17  witnesses left.

18         I will just say, for everybody's scheduling purposes,

19  we will take a lunch break somewhere in that 12:00 time period,

20  but I only have till 3:00 P.M. tomorrow.  So at 3:00 P.M. we're

21  going to be done, and what that does mean is, Ms. Chang, if you

22  come in in the morning and decide you do want to call

23  Dr. Jenkins, that means I will be cutting you off at some

24  point, Mr. Mahoney, to give the United States an opportunity to

25  do their rebuttal, but I'm hoping if we go till 3:00 -- if we

1    start from 10:00 to 3:00, let me ask you, Mr. Mahoney, do you

2    think that's going to be enough time?

3           **MR. MAHONEY:**  Yes.

4           **THE COURT:**  Okay.  Ms. Chang, do you think that'll be

5    enough time?

6           **MS. CHANG:**  Yes, Your Honor.

7           **THE COURT:**  Okay.  Let me just say this:  10:00,

8    Mr. Mahoney?  Or do you want to stick with 9:30 to be safe?

9    It's totally your call, sir.

10          **MR. MAHONEY:**  I think we're comfortable with that,

11    Judge.

12          **THE COURT:**  With 10:00?

13          **MR. MAHONEY:**  Yeah, I think so.

14          **THE COURT:**  Ms. Chang, is that all right with you?

15          **MS. CHANG:**  Yes, Your Honor.

16          **THE COURT:**  All right.  Then we'll start at

17    10:00 tomorrow morning, Mr. Goddeyne.  Hopefully you'll be here

18    to -- because you're our tech guru, so I'm relying on you as

19    well.

20          **MR. GODDEYNE:**  I will be here, Your Honor.

21          **THE COURT:**  All right.  Very good.

22          Ms. Chang, is there anything else we need to take up

23    on behalf of the United States, then?

24          **MS. CHANG:**  No, Your Honor.  Thank you.

25          **THE COURT:**  Mr. Mahoney, anything else on behalf of

1   Mr. Marks?

2           **MR. MAHONEY:**  No.  Thank you, Judge.

3           **THE COURT:**  Thank you all very much.  It's been a long

4   day but a productive one, and I'll see you-all in the morning

5   at 10:00.

6           **MR. GODDEYNE:**  Thank you, Judge.  I appreciate it.

7           **THE COURT:**  Thank you, sir.  And I appreciate you

8   getting all this up and running.  I wouldn't have been able to

9   do it.

10      (Proceedings recessed at 5:16 P.M. to be resumed Friday,

11  December 16, 2021.)

12                          -    -    -

13                   **CERTIFICATE OF REPORTER**

14  I certify that the foregoing is a correct transcript of the
    record of proceedings in the above-titled matter.

15

16  s/Heather Suarez_____          12/22/2021
    Heather Suarez, RPR, FCRR, CRR        Date

17  U.S. Official Court Reporter

18

19

20

21

22

23

24

25