```
 1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
 2                        ORLANDO DIVISION
                                        :
 3      UNITED STATES OF AMERICA,       :
                                        :        Case No.:
 4           Plaintiff,                 :        6:17-cr-00257-PGB-LRH-1
                                        :
 5      v.                              :        Orlando, Florida
                                        :        December 17, 2021
 6                                      :        10:03 A.M. - 11:12 A.M.
                                        :
 7      STEVEN MICHAEL MARKS,           :
                                        :
 8           Defendant.                 :
                                        :
 9
                    TRANSCRIPT OF COMPETENCY HEARING (DAY 3)
10              BEFORE THE HONORABLE LESLIE R. HOFFMAN
                    UNITED STATES MAGISTRATE JUDGE
11
        APPEARANCES:
12
        For the Plaintiff:          Emily C.L. Chang
13                                  U.S. Attorney's Office
                                    400 West Washington Street
14                                  Suite 3100
                                    Orlando, Florida 32801
15
        For the Defendant:          Mark J. Mahoney
16                                  Harrington & Mahoney
                                    70 Niagara Street
17                                  Third Floor
                                    Buffalo, New York 14202
18
                                    Matthieu S. Goddeyne
19                                  Barnett Kirkwood Koche Long
                                    & Foster, P.A.
20                                  601 Bayshore Boulevard
                                    Suite 700
21                                  Tampa, Florida 33606

22      Proceedings recorded by realtime mechanical stenography.
        Transcript produced by computer-aided transcription.
23
                                 Reported by:
24                     Heather Suarez, RPR, FCRR, CRR
                          U.S. Official Court Reporter
25              (407) 744-1567 | heathersuarez.usocr@gmail.com
        401 West Central Boulevard, Suite 4600, Orlando, Florida 32801
```

**T A B L E   O F   C O N T E N T S**

**December 17, 2021**

WITNESSES CONTINUED FOR THE DEFENDANT:

     ANGELA BAIRD-HEPWORTH, PhD (via Zoom)
     Direct Examination (Resumed) By Mr. Mahoney        6
     Cross-Examination By Ms. Chang                     21
     Redirect Examination By Mr. Mahoney                34

DEFENDANT RESTS                                         48

**E X H I B I T S**

FOR THE DEFENDANT:

Numbers 1 through 43, 45 through 53, and 55           48

1            **P R O C E E D I N G S**

2        (Call to order of the court at 10:03 A.M.)

3            **THE COURTROOM DEPUTY:**  Case No. 6:17-cr-257, United

4    States of America v. Steven Michael Marks.

5            Counsel, please state your appearances for the record.

6            **MS. CHANG:**  Good morning, Your Honor.  Emily Chang on

7    behalf of the United States.

8            **THE COURT:**  Good morning.

9            **MR. MAHONEY:**  Good morning, Judge.  Mark Mahoney for

10   Mr. Marks.

11           **THE COURT:**  Good morning.

12           **MR. GODDEYNE:**  And Matthieu Goddeyne for Mr. Marks.

13   Good morning, Your Honor.

14           **THE COURT:**  Good morning.

15           Good morning, Mr. Marks.

16           You may be seated.

17           Mr. Mahoney, I think, when we last left off, we were

18   in the middle of your direct examination of Ms. Hepworth.  Are

19   you ready to proceed?

20           **MR. MAHONEY:**  Yes, Judge.

21           **THE COURT:**  All right.  Very good.

22           **MR. MAHONEY:**  I want to alert the Court to one thing,

23   Judge.  In Ms. Chang's examination of Dr. Negrón, you may

24   recall that she was asking her some questions about the

25   Vineland test, and Dr. Negrón said she doesn't know enough

about that test to answer some of these questions.  So I, last
night, tried to contact a witness who would be an expert in the
Vineland specifically, one of the authors.  She, unfortunately,
is traveling.  And so I did contact Dr. Geller this morning,
who could Zoom in, to answer specific questions about these
Vineland -- the Vineland test itself and what it actually
measures.  So it would fill in the gap that was left when
questions were put to Dr. Negrón about this, suggesting that
the police encounter, the chats, the discussions with Dr. Otto,
and so on reflect or would reflect a sense of whether or not
those scores were accurate.

So I've got -- Dr. Geller is available when we finish
with this witness to address the Vineland test and what it
actually measures, or, alternatively, Dr. Saulnier, who, as I
said, is one of the authors of the Vineland -- she's traveling
today, and she is just not available, but if we could possibly
at some time in the very near future arrange a Zoom hearing
where she could testify and clear up what the meaning is of
that test -- I think it's very important that the Court have an
accurate understanding of what this test measures, how it
measures it, and what it doesn't measure.

**THE COURT:**  Correct me if I'm wrong, but isn't the
Vineland test dealt with extensively in Dr. Geller's prior
reports?  I believe that's what Ms. Chang was citing to was
part of Dr. Geller's reports on the Vineland.

1      **MR. MAHONEY:**  It's dealt with there, although in that

2    report she doesn't really dig into the individual measures of

3    the individual subscales and what they actually represent.  I

4    mean, it's intersocial personal skills, but one could think,

5    oh, as a matter of common sense, obviously, since he's talking

6    to the police, that represents social skills, and it looks like

7    he's doing better than a three-year-old.  Well, the problem is

8    that's not the Vineland test.  It test -- it looks for tests in

9    conversations and reciprocity -- emotional reciprocity in

10   conversations.  It doesn't have to do with answering questions

11   in a structured format.  So it's -- it's a mistaken impression

12   to think that -- that one's performance in those

13   question-and-answer settings has anything to do with the --

14   what's actually being measured in the Vineland scores.

15      **THE COURT:**  Well, Mr. Mahoney, with respect to

16   Dr. Geller, I previously excluded her as a witness.  That

17   ruling has been affirmed by Judge Byron, so your request to

18   have Dr. Geller testify is denied.

19          With respect to any other witnesses, you've had more

20   than enough time to prepare your case.  You've had more than

21   enough time -- I believe Dr. Negrón has been associated with

22   this case for well over a year.  You were prepared to present

23   your case today.  I've even give you extra time today.  We're

24   not having any further hearings in this case or any further

25   evidence.

1        If there is an issue you want to make argument about,

2   I'm going to allow posthearing briefing, and you can raise it

3   there, but I want to be very clear no new evidence will be

4   added.  Whatever exhibits are in, are in.  Whatever witnesses

5   have testified Wednesday, Thursday, and Friday this week will

6   be all that I consider in addition to the prior materials from

7   the prior hearing.  So to be clear, as I previously stated, I

8   will be taking Dr. Geller's prior reports into consideration,

9   and that is my ruling.

10        So are you ready to proceed, sir?

11        **MR. MAHONEY:**  Sure.

12        **THE COURT:**  Okay.  Good morning, Ms. Hepworth.  I just

13   want to remind you that you're still under oath, ma'am.

14        **THE WITNESS:**  Yes, ma'am.

15        **THE COURT:**  Okay.  Go ahead, Mr. Mahoney.

16        **MR. MAHONEY:**  I'm sorry, Judge.  Could I have just one

17   minute to text Dr. Geller to tell her she -- because she has a

18   doctor appointment.

19        **THE COURT:**  Mr. Goddeyne can text Dr. Geller.  We need

20   to move on, Mr. Mahoney.

21        **MR. MAHONEY:**  All right, Judge.

22                    **DIRECT EXAMINATION  (RESUMED)**

23   BY MR. MAHONEY:

24   **Q.**  Good morning, Angela.

25   **A.**  Good morning.  When we broke off, we were talking about --

1    we were talking about Steven's play and leisure skills.  You

2    had mentioned he played piano.  Could you tell us a bit more

3    about that.

4    **A.**  Yeah.  So he came to us, you know, over four years ago not

5    playing the piano, and out of, you know, having to just be on

6    campus all the time -- and at the time -- now we have an indoor

7    gym.  We have exercise equipment.  You know, we have a lot more

8    here.  But then, you know, we had the house and some -- some

9    leisure activities.  You know, with Steven being -- being

10   pretty simple, if I must say, you know, just in his thinking

11   and everything else, you know, it was "Well, maybe I'll try to

12   play the piano."

13       We had a couple of staff that played.  We had one staff

14   that had played and taught piano.  And so, you know, she made

15   him a -- like, a key or a guide that would go over the keys for

16   him to know what notes -- sorry.  I'm not a piano expert -- but

17   what notes he was going to press and so taught him a song,

18   basically, with kind of her telling him what notes to push.

19   And he would memorize, and that's how he'd learn the piano, was

20   memory.

21       And so it was -- it was quite a -- quite an extensive

22   effort to teach him that one song, and we had -- you know, so

23   he would play that one song and for a while, and so staff

24   finally got to the point where they couldn't hear that one song

25   over and over and over and over and over again, and so that

 1    one -- the mentor that had taught him the one song thought
 2    "Okay.  I'll get, like, a very beginning book, four or five
 3    songs, and he can learn those," and so she taught him those.
 4    But it took, you know, a really long time for him to learn
 5    those songs because it wasn't that he was -- I think the
 6    average person probably would play piano or learn piano -- they
 7    learned through sheet music and then played piano, whereas he
 8    was not able to do that.  He was memorizing the songs and
 9    playing them from memory versus learning sheet music and
10    learning all the dynamic things with piano.
11        And so, you know, he played four or five songs over and
12    over and over again as well.  But that's sort of how -- how he
13    played piano, which he -- he loves still, loves and loved
14    playing piano.  And so for him playing the same songs over and
15    over and over again, it was fine, you know, but for -- for
16    others, it wasn't -- it was a bit, you know, irritating, you
17    know, hearing the same -- it was, like, you know, hearing the
18    same song over and over again.  We get tired of it; right?  So
19    same kind of situation with him playing the piano.  But for
20    Steven it was fine, you know.  Him, again, playing it over and
21    over again was acceptable and great for him.  It was something
22    for him to just do and keep busy -- try to keep busy with.
23    So --
24    **Q.**  So has he developed much of a repertoire, then, of songs
25    that he's memorized?

1   **A.**  I think -- I think there's, you know, a few up to this
2   point.  There might be less than ten or -- -ish.  Even eight.
3   But I still think he would rely on the same few that he has
4   memorized very well, you know.  So no.  I would say, no, he
5   doesn't have a huge repertoire of songs that he plays.
6   **Q.**  So have you exhibited -- have you observed behaviors of
7   Steven that relate to his ability to make, like, simple
8   decisions or more complicated decisions?  Let me start with
9   simple decisions.
10  **A.**  I think any decision for Steven is difficult.  I think -- I
11  think it's not even just difficult.  I think he just can't make
12  them.  It's -- it's as simple as, like, what to eat.  He would
13  eat the same thing every day if -- if that was, you know, kind
14  of -- we would just kind of gave him his reins.  He would eat
15  the same thing every single day.  And so, no, I would say, you
16  know, making decisions for Steven of any kind -- simple, large,
17  big, small, whatever -- are very difficult and even not just
18  difficult, but he's just not able to make decisions at times
19  and all the time.  I mean, small decisions maybe at times;
20  right?  Because he will go take a walk and make that decision,
21  but it's more of habit.  He's doing that every single day at
22  the same time.  And so, no, making decisions isn't -- isn't
23  something he really can do.
24  **Q.**  Can you give some examples.
25  **A.**  Yeah.  I mean, like the food one, like cutting his hair.

1    You know, he needs others' input, including his parents, us.

2    And it's -- you know, it's, like, "Well, hey, Steven, do you

3    want a haircut?"

4         "Well, I have to ask my dad" or "I want to ask my dad," and

5    so he'll ask, and then that's what we get as an answer is yes

6    or no based on what his parents will tell him to decide, you

7    know, because it doesn't seem like he really can make a

8    decision as, I think, for an average person, it would be very

9    simple, like, I get a haircut or I grow my hair out or

10   whatever, but for Steven it's not.  It's a very difficult thing

11   and even not even possible.

12   **Q.**  Apart from the haircut, what other examples would there be

13   of this?

14   **A.**  So just anything with taking care of himself, like laundry.

15   You know, he has to be prompted for job training even if, like,

16   we have -- including Steven's schedule, their job training --

17   for job training.  It's -- if -- you know, we still have to

18   prompt and remind, "Hey, you have job training today," and

19   he'll go and then do it.

20        I would say making decisions -- oh, such as -- it's, like,

21   just making choices of, "Hey, go get your clothes" -- or "Go

22   get your laundry basket."  Okay?  If we say that to him, he

23   will literally bring his laundry basket, and that's it.  There

24   won't be clothes.  So it's "Hey, can you bring your dirty

25   clothes and your laundry basket," and then it's staff going

down and helping him collect those dirty clothes, put them in

the basket, and then bring them up, and then helping him with

the steps of doing laundry.

In making decisions, I would say creatively, that, like --

meaning, as I'm thinking, in the metal shop he's doing some

welding in metal work.  He's doing just what he's been told,

like, one direction at a time with constant supervision, with

constant prompting.  You know, he's not making decisions on,

you know, what to weld or what to, you know, work with.  He's

doing what he's being told.  You know, if he's given the

choice, he'll -- I -- I can't -- I don't know.  You know, and

then -- so we'll be making those choices for him.

**Q.**  Have -- have you exhibited him, for example, dealing with

choices regarding clothing?

**A.**  Yeah.  So -- well, yes.  You know, he'll wear clothing --

like, he wears the same thing every day -- sweatpants, the same

shoes and sweatshirts, a hoodie.  And, you know, whether he's

working or doing job training or just feeding the animals or

going to go to a doctor's appointment, he's going to wear the

exact same thing, you know, unless someone tells him something

different.  It's, like, "Hey, put on a pair of jeans," and

he'll go put on a pair of jeans.  There's no decision-making

for him.  It's the same thing.

He'll even wear things that are too big, because he has

lost weight recently just by doing a diet that one of the

1   mentors suggested and kind of gave him the guidelines of

2   keto -- eating keto.  So he ate keto because the mentor helped

3   him with all those choices of what to eat, how to eat, and he

4   was, very, very, like, good at following the directives of that

5   mentor that was helping him eat that way.

6        But sorry.  Back to his clothing, he'll wear them until

7   there's holes in them, not even notice, and so it's mentors

8   having to go in and help him, you know, go through his

9   underwear, his socks, his clothes to make sure they fit;

10  they're not too big, too small; that they're not falling off

11  because they have so many holes that they can't even really be

12  considered underwear worn anymore.  Socks, he'll wear through.

13  His shoes -- the bottoms of his shoes, we have to look or staff

14  has to look in the bottom of his shoes because he'll wear holes

15  in them and not even recognize it.  He'll just keep wearing his

16  shoes the same way with holes.

17  **Q.**  What about --

18       **THE COURT:**  Mr. Mahoney, one second.  Ms. Hepworth,

19  this is Judge Hoffman.  Good morning again.  Would you --

20       **THE WITNESS:**  Good morning.

21       **THE COURT:**  -- do me a favor for the -- for the court

22  reporter's --

23       **THE WITNESS:**  Sorry.

24       **THE COURT:**  -- benefit.  Would you slow down just a

25  little bit.

1      **THE WITNESS:**  Sorry.

2      **THE COURT:**  I talk that fast too.

3      **THE WITNESS:**  Yeah.  I'm sorry.

4      **THE COURT:**  They tell me the same thing.

5      **THE WITNESS:**  I'm sorry.

6      **THE COURT:**  No problem.

7      **THE WITNESS:**  Okay.

8      **THE COURT:**  Go ahead.  Go ahead, Mr. Mahoney.

9   **BY MR. MAHONEY:**

10  **Q.**  What about slightly more complicated decisions?  For

11  example, some may -- of us might struggle deciding what to

12  pack.  Steven's made trips.  Has he had trouble in areas like

13  that?

14  **A.**  Yeah.  So we -- we pack for him or his dad will come early

15  for the trip and make sure to pack his things just because,

16  again, he would wear what he's got, and -- and he would put,

17  you know, holey underwear, holey socks in there, you know, just

18  not -- not be able to be mindful of what to pack and the items

19  to pack.  He'd be, you know, forgetting toiletries and things

20  like that.  And so, yeah, staff and his dad will come and go

21  through his items and things, and then -- then they -- you

22  know, his dad may go out and go get things that he needs

23  because he's not, you know, advocating for himself.  He's not

24  able to do that.  You know, we've seen it now -- every single

25  trip he's taken, he's not able to pack.

1      You know, any kind of decision like -- like packing,

2   like -- I mean, as simple as -- like, we have a lane that I

3   talked about him walking.  He struggles -- struggled when the

4   lane was resurfaced.  It was resurfaced, and, you know, while

5   it was being resurfaced, no one could be on it, and that was

6   his exercise lane.  He walked that lane.  Well, it took a

7   few days, couldn't be on it for a few days, and then we

8   recognized after a week and a half or so that he wasn't walking

9   it anymore.

10      And so we asked him, "Hey, not walking the lane anymore?"

11      And he said, "Well, like, I thought we couldn't," not

12   recognizing that, you know, after it was resurfaced and done,

13   that he could resume his normal -- normal activities.

14      But just being told, "Hey, you can't walk on it," was a

15   very, like, "Okay.  Can't walk on it," so he didn't, again,

16   until we made sure that he knew he could, you know, because he

17   wasn't going to, and he was not on it -- not walking anymore.

18   So very interruptive to his -- to his daily habits as well.

19   **Q.**  Has Steven been confronted with having to make decisions

20   about what to buy and trouble with that?

21   **A.**  You know, as he's been on campus, that's, I think, the only

22   decision that he may make, is, like, to get something to eat

23   off campus.  And he -- like, staff will go get it for him.  You

24   know, and I'm pretty sure it's always the same thing, and --

25   and he doesn't even have to tell them what he wants.  It's

just, "Hey, can you get me a drink I like" or "my drink?" you

know, and it's, like, a soda from -- the same one in the same

bottle.  You know, it's not -- rather than a can or from the

machine.  It's in a bottle, you know, for example.  So it's

always the same thing.  There's no, like, "Well, there's other

things there."  It's "Oh, no."  It's "I'll just take the same

one."

So, no, there's no real, like, decision-making that he

really does, you know.  He -- he asks.  He just will do the

same things, wear the same things, eat the same things, do the

same things every day, unless there's a huge effort to help him

do something different or make a different choice.

You know, choosing, you know, even whether -- I think

someone with a decision-making ability would choose to break

rules; right?  Steven doesn't break rules.  He doesn't -- the

compliance, you know, he just -- he doesn't do that.  There's

no decisions like that for him.  You know, he's told a rule.

He -- you know, very simple, black-and-white, he does it.

**Q.**  Does he have choices at times as to what activities to

engage in, like, what to do, and how -- how does he handle

that?

**A.**  Yeah.  So for -- we have the animals.  We have large and

small animals.  So there's a lot to do around -- around the

animals.  We have a ton of activities that we do on campus,

whether that's games in the gym, working out in the gym, doing

1    painting activities, LEGOs, puzzles, board games, musical

2    instruments.  We have a recording studio that's just about

3    finished.  So we have guitar.  We have tons of instruments.  We

4    have computer systems for those instruments and recording.  We

5    have a metal-cutting machine that has a computer system based

6    on it.

7         Steven does the same things, you know, the walking, playing

8    piano, job training in the metal shop, but we also have a wood

9    shop, that a lot of young adults will do both metal shop, wood

10   shop job training.  He does metal shop.

11        You know, there's -- obviously, with cows and horses and

12   goats, the larger -- and pigs now, there's a lot of farmwork to

13   do, you know, and Steven doesn't do those things unless someone

14   says or asks and says, "Hey, can you come help?"

15        "Yes," and then he goes and does, you know, really whatever

16   he's told.

17   Q.  Are there situations where there's a forced choice for him

18   where "Steven, you can do this or this.  Which one do you want

19   to do?"  Are there --

20   A.  I think that's very difficult.  We'll see him get -- sorry.

21   I didn't mean to cut you off.

22   Q.  Yeah.  My question was are there situations where there's a

23   forced choice for him?  So "Steven, you can do this with this

24   group, or do this with this group.  Which do you want to do?"

25   Situations like that?

1    **A.**   Yeah.   That will depend on the mentor, I would say, that is

2    doing those said things.   You know, if it's -- let's say it's

3    two mentors that he just kind of equally has a relationship

4    with, he would ask, "What -- where you want me to go?"   You

5    know, "What do you want me to do?   What's better for you guys?"

6    masking -- I think covering to not have to make the decision.

7    You know, "What's better for you?"

8        If it's a mentor, like, for instance, the mentor that does

9    the metal shop work, you know, he's going to go with him every

10   time just because he works in a metal shop with him and he

11   knows him better, you know.   But, you know, in terms of, like,

12   if there's different young adults in each group, that doesn't

13   seem to ever be a decider or a decision-maker for him.   It's

14   almost always -- like I said, unless there's, like, a mentor

15   that he really has that -- like, spends a lot of time with more

16   so than others, it's "Where do you want me to go?" or "What do

17   you want me to do?"

18   **Q.**   Has Steven -- have you observed any situations that would

19   reflect Steven's -- whether Steven masks his feelings or fears

20   or anxiety and doesn't let people know about it?

21   **A.**   Yes.   So I think at any time he tries to mask his emotions

22   or feelings, you know, and even is confused about emotions and

23   feelings of others and himself.   When he -- years ago, when all

24   of this began and he was, you know, transported and -- I know

25   it took several weeks, and then he was held, you know, he

didn't have any issues -- or didn't have any issues for months.
It took months for him to express that that was scary or that
there was any -- any issues with that at all.

You know, when he got here, he -- it was always "It could
have been worse.  It was fine."  You know, "It was -- there was
nothing to it," you know.  He would explain, like, what
happened and what he went through, but there was no emotion
tied to that at all until months and months later.  Then he
had -- he was, like, "Well, it was -- it was pretty scary," you
know, and there was some fear -- associated anxiety and fear
associated with it.

The last -- this last -- this year previously, when he
spent those weeks at MCC, you know, it took seven weeks to
express the nightmares.  You know, he would sort of say
something, "But it's okay."  He would, you know, kind of
express, you know, about six weeks in, five weeks out -- I
mean -- sorry -- five weeks out, six weeks, and then it was --
it was finally -- I -- I was, like, "Steven, if you are having
nightmares, we need to talk about it.  It's not okay," you
know.  And so it was then going from there, going from my
questioning to help him express those feelings because, no, I
would say he never just comes right out with those feelings
unless he's asked very, very directly.

**Q.**  Could you tell us some more about these nightmares.

**A.**  Yeah.  So the nightmares were happening quite often, if not

1   every night during the week, and so for him they were very

2   scary.  You know, he would -- his -- the biggest thing for him,

3   he expressed, was he would wake up in his bed -- you know, it

4   would -- but it was -- he was in his dream, but he'd be at MCC,

5   and that was the nightmare that he was waking up there again.

6      And so -- and then, also, it was, you know, "How do I -- is

7   there a way I get them to stop?"  And so it was just me asking

8   him what -- what does he think doesn't work for Steven, and so

9   it's giving him some options of things -- not options, but,

10  like, sleep/hygiene things, like no caffeine after 2:00 P.M.,

11  no naps during the day even though, if you're struggling to

12  sleep, typically, we're going to be tired, but to help that,

13  you know.  So then -- and trying to do physical -- more

14  physical activity.  So I suggested, like, walking a couple more

15  times on the lane since I know that's part of his sort of

16  daily, you know, like, try to work up a sweat more so.

17     You know, if you're laying in bed for -- and I had to give

18  him a time.  He's, like, "Well, how -- how long do I lay in bed

19  before I get up?"

20     It's, like, well, if you're laying in bed and not sleeping

21  for more than about 30 to 40 -- 45 minutes, then it's, like,

22  okay.  Get up.  Get a drink of water, even expressed to stop --

23  he's struggling with sleeping.  Maybe talk to him for a minute,

24  maybe write, which he's not -- he doesn't like to do that.  I

25  don't -- you know, write in a journal, just try to get tired,

1   and then lay back down, you know.  And I really had to give him

2   those coping skills.

3       It was also, you know, maybe try and talk to -- I had him

4   talk to his parents even though that was a decision he was

5   really able to make about, like, taking maybe, you know,

6   melatonin or L-theanine, which is another relaxant kind of

7   vitamin, all natural.  So he got the okay from his parents, and

8   he did that.  And I'm telling you I could have given him

9   anything to do, and Steven would have done it if he -- you

10  know, as he -- I told him, "This takes away nightmares"; he

11  would do it.  So -- and he did it.

12  **Q.**  Do you recall what he described about -- at MCC that made

13  him so anxious about the idea of waking up there?

14  **A.**  I think there was a couple just different things that was

15  things he would see or hear.  He said a lot of times it was

16  very loud.  There were -- his roommate -- or his cellmate --

17  sorry.  One of them was, he said, much older and kind of

18  seemed -- Steven said he would say things that seemed

19  threatening, you know, like "You'll get beat up" or "You'll

20  get," whatever, "beat up for that."  I'm not using quotes or

21  anything, but, like -- or, you know, "You won't survive for

22  that," or whatever.

23      And I -- and it wasn't -- for Steven, he expressed, like,

24  you know, it wasn't even a big, big thing.  It was just, like,

25  being out of line in Steven's mind, meaning, like, saying

something he shouldn't or looking at someone he shouldn't.  You

know, he said his roommate said, "Don't look that guy in the

eyes," so he -- he said, "Oh, I would have gotten killed for

that."  You know, it was that extreme.

Also, too, he said, like, waking up and he would see one of

his cellmates or seeing or hearing something that was scary for

Steven, loud, being loud, people being loud, or things that

were loud, fights, you know, things like that.  They were very

scary for him.

**MR. MAHONEY:**  Okay.  Thank you very much, Angela.

That's all I have, Judge.

**THE COURT:**  Thank you, Mr. Mahoney.

Ms. Chang.

**CROSS-EXAMINATION**

BY MS. CHANG:

**Q.**  Good morning.  Is it Doctor?  Dr. Baird?

**A.**  Dr. Baird-Hepworth.  Thank you.

**Q.**  So you met the defendant in 2017; correct?

**A.**  Yes.

**Q.**  And so you met him only after he was charged with these

criminal offenses?

**A.**  So I met him when he was charged on the state level.

**Q.**  Okay.  So you met him after he had been charged with

criminal offenses?

**A.**  Yes.

1    **Q.** And you've only interacted with him in the context of your

2    living facility; correct?

3    **A.** Yep.

4    **Q.** You don't have any firsthand knowledge of his life before

5    he went to Aloft?  Firsthand knowledge.

6    **A.** No.

7    **Q.** And you have no firsthand knowledge of how he did in BOP?

8    **A.** Nope.  I wasn't there, so no.

9    **Q.** You talked about the fact that he struggles with changing

10   clothes without being told; correct?

11   **A.** No.

12   **Q.** No?

13   **A.** I didn't say that, no.  He struggles with choosing to wear

14   different clothing than his kind of norm.

15   **Q.** Okay.

16   **A.** He can change his clothes.

17   **Q.** Oh, I see.  I actually meant that too.  So I meant choosing

18   to wear something different.

19   **A.** Got it.  Yep.

20   **Q.** And, in fact, you said, if he could, he would just wear --

21   I mean, if no one stopped him, he would just wear one outfit

22   all the time; correct?

23   **A.** Yeah.  Pretty much.

24   **Q.** So are you aware that when he was at the MCC, he told his

25   parents on a jail call that he actually went through the

1   trouble of applying for extra clothes?  Are you aware of that?

2   **A.**  Okay.  No.

3   **Q.**  Are you aware that he actually filled out a laundry form to

4   get clothes and he actually stated that his reason was so that

5   when he went to the gym he wouldn't have to wear the same,

6   like, dirty clothes after using the gym?  Are you aware of

7   that?

8   **A.**  Okay.

9   **Q.**  Does that surprise you in light of --

10  **A.**  No.

11  **Q.**  -- what you observed at Aloft for four years?

12  **A.**  No.

13  **Q.**  It doesn't surprise you that someone who you think would be

14  willing to wear the same outfit, if not stopped, actually went

15  through the trouble of applying for new clothes?

16  **A.**  No, it doesn't surprise me.

17  **Q.**  Why not?

18  **A.**  Because he met -- he tries to do what others do, and he'll

19  watch and -- you know, not watch, like -- because he's, you

20  know, picking up their every movement, but if he sees someone

21  else filling out a laundry form, he'll fill out a laundry form.

22  For example, if he sees, you know, someone else and thinks kind

23  of that's right or that's the right thing to do and that's the

24  okay thing to do, then he'll do that.

25  **Q.**  So when -- when you-all do laundry at Aloft, does everyone

1    do laundry at the same time?

2    **A.**   No.

3    **Q.**   No.  Is -- is laundry sort of in a secluded place where no

4    one can see how laundry is being done, or is it kind of part of

5    the overall living facility?

6    **A.**   It's in its own room.

7    **Q.**   Okay.

8    **A.**   So unless someone's in there, they don't -- you know,

9    they're not seeing it every second of the day.

10   **Q.**   Do you think, at his four years in your facility, the

11   defendant has ever seen other people do laundry?

12   **A.**   Maybe.  I can't answer that.  I'm sure, like -- right?  I

13   don't know.

14   **Q.**   So you're sure that he at some point must have seen other

15   people do laundry; right?

16   **A.**   I can't -- I can't be sure of that.

17   **Q.**   Do you think it's likely?

18   **A.**   Maybe.

19   **Q.**   All right.  Let's talk about the feeding trough.  So you

20   talked about this idea that you had to tell him repeatedly,

21   over and over and over, how to fill a feeding trough with

22   water.  Do you recall that?

23   **A.**   Yep.

24   **Q.**   Okay.  And are other people filling the feeding troughs as

25   well or just one person can do it and that's it?  So Mr. Marks

1    was by himself every time?

2    **A.**   He was with staff or staff would say, like -- he was told,

3    "Hey, go grab the hose -- grab this, the hose.  Go over here.

4    Put -- you know, fill it up -- fill the trough with water."

5    And then, like, staff at the same time would have been throwing

6    food to horse, goats, cows, whatever, and then checking back

7    with Steven.  But Steven was -- you know, they're in the same

8    vicinity.  It's not like the one water's over there and food is

9    5 acres away.  No.  It's all fairly close.

10   **Q.**   And so in observing the staff show him how to fill the

11   trough, wouldn't he have similarly picked up that behavior,

12   similarly to how you said, "Eh, he probably would have just

13   picked up the behavior of filling out a laundry form because

14   other people did it"?  Why is it so different?

15   **A.**   Because staff didn't show him at first.  They just said --

16   because they, in their head, thought, "Steven can do it, I'm

17   sure.  I'm telling him a very simple task of just go fill up

18   the thing," you know, but they didn't give him, like, how much

19   water, you know, and weren't there showing him at first.  They

20   just said, "Hey, go fill up the water trough," when he first --

21   this is when he first got here.

22   **Q.**   But you testified --

23   **A.**   Or --

24   **Q.**   -- beyond the first time, you said they had to show him

25   many, many times, repeatedly, over and over before he got it.

1    You testified --

2    **A.**   After the first time.  Uh-huh.  Yep.

3    **Q.**   Right.  And so it took repeated times before he learned how

4    to do that; right?  That very simple task; correct?

5    **A.**   Yep.

6    **Q.**   And so, in light of that, does it surprise you that on --

7    being at MCC for a short amount of time, he just observed other

8    people filling out a laundry form and he thought to do so too?

9    **A.**   Yeah.  I mean, I would wonder if that laundry form was

10   filled out perfect and correct and everything -- every single

11   thing was, you know, filled out right.  I think it's totally

12   different to fill out a form than do a physical activity.

13   **Q.**   You think -- do you think it's easier to fill out a form

14   than to fill an animal trough?

15   **A.**   I think it's a totally different -- and I'm not an expert

16   to describe what -- what that means or how the brain works

17   differently in that, but it's different.  So --

18   **Q.**   You talked about how the defendant struggles in making

19   decisions; right?

20   **A.**   Yes.

21   **Q.**   And you said he can't make -- he basically can't make

22   decisions unless someone gives him a forced option or tells him

23   to do something; correct?

24   **A.**   It depends on the -- I mean, he can go to the bathroom.  He

25   can, you know -- and I think too, like, like, just going to,

27

1    you know, something, like, playing a piano or, like, being able

2    to memorize some songs, you know, there are, like -- it does

3    seem like, you know, he would be able or capable of other

4    things when he can do those things, but it's just that's not

5    what you see, and that's not what you see in autism either.

6    You know, you see, like, autistic individuals being able to do

7    certain things very, very well, but it's because they're doing

8    it in a way that they're able to do it in their brain, but then

9    other tasks are very difficult, near impossible to figure out

10   to do correctly.  That does not mean he couldn't do laundry.

11   He would just do it incorrectly; right?

12   **Q.**  I'm talking about --

13   **A.**  Or he --

14   **Q.**  Go ahead.

15   **A.**  Go ahead.

16   **Q.**  I'm talking about making decisions.  So you had testified

17   on direct that he can't make decisions without being told what

18   to do or unless it's a forced option.  Do you recall that?

19   **A.**  Yeah.

20   **Q.**  Do you agree with that?

21   **A.**  Yeah.

22   **Q.**  Okay.  So are you aware that when he was at BOP, a doctor

23   offered to address his glaucoma issue, and as he reported it to

24   his parents on a call, he said no specifically because he knew

25   that he already has an eye doctor and that doctor is more

1    qualified to care for him?  Are you aware of that?

2    **A.**  Okay.

3    **Q.**  Are you --

4    **A.**  No but --

5    **Q.**  Are you surprised that he made that decision to stick with

6    his own doctor versus the one just being offered to him right

7    then and there?

8    **A.**  No.

9    **Q.**  Why not?

10   **A.**  He knew he had a doctor.  I mean, he knew he already had

11   one.  Why would he use a different one?  That's very

12   black-and-white.  "I have a doctor.  Why do I need another

13   doctor?"

14       Now, if Mom and Dad said, "Go ahead," or, you know, "We

15   really want you to use that doctor" or something to the effect

16   of, like, forcing him to go -- like, he would have did it.  I

17   believe that.  But he told them that because he already had a

18   doctor.  Why would he need -- I don't know.  That seems very

19   simple when you know Steven.  Like, he had a doctor.  Why would

20   he have another one?  He has one.  It's, like, he has a pair of

21   sweatpants.  Why would he have another one?

22   **Q.**  Okay.  So along those lines, though, you would agree he's

23   not one to take initiative; correct?

24   **A.**  Correct.

25   **Q.**  And, similarly --

1  **A.**  I would say he doesn't advocate for himself.

2  **Q.**  Okay.  That's actually -- that was going to be my next

3  question, so you beat me to it.

4       Are you aware that when he was at BOP, he told his parents,

5  at the end when he was trying to leave the facility --

6  evaluation was over.  He's trying to leave.  Are you aware that

7  he called his parents and said, "Well, I need to make sure I

8  keep asking questions because I need to make sure I'm not just

9  sitting here when there's someone I could have talked to"?  Are

10  you surprised -- are you aware of that, that --

11  **A.**  What does that mean?

12  **Q.**  I'm sorry.  Are you aware that he said that to his parents?

13  **A.**  No.

14  **Q.**  And are you surprised that he took active steps and took

15  initiative to talk to people to facilitate his exit from BOP?

16  **A.**  He was -- I mean, as far as what he said when he got back,

17  he wanted to leave.  But, again, that's not making a decision

18  to leave.  It's just wanting to get out of a situation he

19  didn't want to be in, you know.

20  **Q.**  Sure.  And I'm asking you something different, though.  I'm

21  asking whether you're aware that he advocated for himself to

22  leave.

23  **A.**  If it was around the 45 days, he knew he was going to be

24  there 30 to 45 days.  He was there 30 to 45 days; he's, like,

25  "Okay.  It's time to go.  I'm supposed to go."

1    **Q.**   Okay.  So you're just not aware of that conversation?

2    **A.**   No, I wouldn't have been aware of that conversation.

3    **Q.**   You talked about his piano playing.  He taught -- you said

4    there was a mentor who came in; correct?

5    **A.**   Yeah.  We have several mentors, but yes.

6    **Q.**   And so a mentor came in.  You talked about how the

7    defendant's very simple in his thinking; correct?

8    **A.**   In a lot of ways, but I'm not speaking on his thinking --

9    **Q.**   And in connection --

10   **A.**   -- in that way.

11   **Q.**   In connection with the piano learning, you said it took

12   extensive effort to teach even that first song; right?

13   **A.**   Uh-huh.

14   **Q.**   And it took a really long time to teach him that one song?

15   **A.**   Define "really long time."

16   **Q.**   I don't know.  Those were your words.  Did you testify that

17   he took a really long time to learn that one song?

18   **A.**   Yeah.

19   **Q.**   Okay.  So you -- you were asked whether he has an extensive

20   repertoire; correct?

21   **A.**   Of songs he plays?  Correct.  Yeah.

22   **Q.**   And you said he has, like, maybe eight to ten.  You said it

23   was less than ten, maybe eight, so a handful of songs; correct?

24   **A.**   Yeah.  Yep.

25   **Q.**   And they're simple songs; right?

1    **A.**  I don't know about piano.  Sorry.  I don't -- I am not a --

2    like, I know that the book that they had gotten was, like, a

3    beginner book, but in terms of, like, my knowledge of piano is

4    about that much.

5    **Q.**  But he --

6    **A.**  So I have no knowledge of piano.

7    **Q.**  He has struggled, in your observation, to learn to play

8    even those few songs; correct?

9    **A.**  Yeah.

10   **Q.**  And --

11   **A.**  I mean, yeah.

12   **Q.**  And he's only been playing for four years because he didn't

13   play before he went to Aloft; right?

14   **A.**  Correct.

15         **MS. CHANG:**  Okay.  Mr. Goddeyne, would you please do

16   me a favor and pull up Defense Exhibit 2, and pull it to

17   minute 44, second 21, please.

18   **BY MS. CHANG:**

19   **Q.**  I'm just going to play -- or Mr. Goddeyne, rather, is going

20   to play just a short something for you to see.

21         **MS. CHANG:**  Is there video?

22         **MR. GODDEYNE:**  Yes, there is.  One moment.

23      (Video playing from 10:43 A.M. to 10:46 A.M.)

24         **MS. CHANG:**  Okay.  You can stop there, Mr. Goddeyne.

25   Thank you.

1    BY MS. CHANG:

2    **Q.**  So, Dr. Hepworth, do you recognize that song as Beethoven's

3    "Für Elise"?

4    **A.**  I can't hear anything.

5    **Q.**  Oh, you didn't hear it?  Did you hear the video?

6              **MR. GODDEYNE:**  Oh, I think we're muted.

7              **THE WITNESS:**  It looks like -- Judge Hoffman, it looks

8    like you're muted.  There you go.  I can hear now.

9              **THE COURT:**  Why don't we try showing it one more time.

10   I think it was only about a two-minute excerpt.

11             **THE WITNESS:**  Sure.  Yeah.  I couldn't hear it at all

12   either.

13             **THE COURT:**  Okay.  Mr. Goddeyne, just a minute.  Go

14   ahead, sir.

15             **MR. GODDEYNE:**  Nothing.  If she couldn't hear it, then

16   we can play it again.

17             **THE COURT:**  Yeah.  Please.  Thank you.

18             **MS. CHANG:**  Thank you.

19             **THE COURT:**  And, Dr. Baird-Hepworth, if you don't hear

20   anything, just wave your hand --

21             **THE WITNESS:**  Okay.

22             **THE COURT:**  -- and I'll work on it.  I apologize for

23   that, ma'am.  Thank you.

24             **THE WITNESS:**  Uh-huh.

25        (Video playing from 10:47 A.M. to 10:48 A.M.)

1      **THE COURT:**  All right.  Ms. Chang, I'm sorry, but our

2  technology is not going to let this work.

3      **MS. CHANG:**  Okay.

4      **THE COURT:**  I think Dr. Baird-Hepworth hopefully got

5  the gist of it.

6      **THE WITNESS:**  Uh-huh.

7  BY MS. CHANG:

8  **Q.**  Dr. Baird-Hepworth, do you recognize -- well, it was hard

9  to hear the song.  Is that one of the songs that Mr. Marks

10  learned to play at Aloft?

11  **A.**  I believe so.

12  **Q.**  And does that sound like a simple song to learn to you?

13  **A.**  I didn't -- no.  I -- I don't know.  Like I said, I don't

14  know, but, you know, with his being able to memorize, as you

15  saw, he was not reading the music in front of him.  He

16  memorizes, and it's a laborious effort to help him memorize

17  these songs.

18  **Q.**  And you understand that video is from when he was

19  three years into Aloft, not even four; right?

20  **A.**  Yeah.

21      **MS. CHANG:**  Okay.  I have nothing further.

22      **THE COURT:**  Thank you, Ms. Chang.

23      Mr. Mahoney, any redirect?

24      **MR. MAHONEY:**  Yes.  Thank you, Judge.

25                    **REDIRECT EXAMINATION**

1    BY MR. MAHONEY:

2    **Q.**  You were asked the question about filling the trough --

3    comparing the task of filling the trough with the task of

4    filling out instructions for the laundry at the Bureau of

5    Prisons.  Assuming that's in these records, can you -- first of

6    all, did you get -- have any information about Mr. Marks's

7    interaction with other inmates at the Bureau of Prisons?  For

8    example, did you -- are you aware of anything regarding other

9    inmates assisting him with various tasks?

10   **A.**  Yeah.  No, I don't -- I mean, anything that I know of was

11   from him -- his, like, recollection.  So, no, I don't know.

12   **Q.**  No, not firsthand.  What did you learn from him about -- if

13   anything about --

14   **A.**  Oh, got it.  Sorry.  Sorry.  Well, just learning from him,

15   it was, you know, in any kind of form, whether it's a laundry

16   form or -- at all of any he doesn't, you know, fill it all out.

17   We've had him do things here, and he's just -- if he's just

18   given it, he'll do, like, name, you know, maybe a few other

19   things, and then it comes back, you know, without most of the

20   information.  And if he has help, then, obviously, the

21   information will be filled out.

22   **Q.**  My question was did you learn anything from Steven about

23   whether or not, when he was at MCC, he had assistance from

24   other inmates in any regard to -- to --

25   **A.**  Oh, got you.  I'm sorry.  Yes.  Yeah.  I mean, he talked

1    about just doing different things and different inmates kind of

2    helping him learn the ropes.  And, you know, he said filling

3    out laundry form or doing laundry, they would help.  Or

4    doing -- "I would get extra clothes" or trying to get -- you

5    know, Steven just kind of asking for inmates, like, "What do

6    you do to get medicine?  What do you do to get Tylenol?"  But I

7    think it was also he expressed more of, like, "They would kind

8    of tell me how everything went and help me," and he said that

9    there were some that helped him, and he said that there were

10   others that were pretty scary, you know, that didn't help

11   him --

12   **Q.**  Did he tell you --

13   **A.**  -- that he didn't even try to talk to.  Sorry.

14   **Q.**  Did he tell you anything about other inmates telling him to

15   shower or get clean laundry because he smelled?

16   **A.**  From Steven?  I don't think he expressed it was because he

17   smelled, but I think he -- he expressed that people would tell

18   him what kind of to do and where to go for sure.

19   **Q.**  All right.  So you were asked to compare -- or a comparison

20   was presented to you between Steven being able to fill out

21   these forms for laundry and his --

22   **A.**  Uh-huh.

23   **Q.**  -- performance of the task of filling the troughs; correct?

24   **A.**  Correct.

25   **Q.**  All right.  So as -- as you described, that he was given

1    instructions -- am I correct that he was given instructions --

2    verbal instructions to fill the trough?  Correct?

3    **A.**   Correct.

4    **Q.**   And is there something different between following verbal

5    instructions and verbal commands and interpreting them and

6    processing what the person is asking you means by those

7    instructions and filling out a laundry form?

8    **A.**   Absolutely.  It's a huge difference.  They say that, like,

9    people -- and, in my experience, people with, you know,

10   different challenges, struggles, can't fill out forms.  You

11   know, it's impossible.  Even with someone with depression, with

12   autism, with anything, it's very different filling out a form

13   than filling out -- filling up a water trough, which is not

14   writing.  You know, it's not your -- it's not verbal

15   instructions to writing.

16       It's verbal instructions to -- of him going and doing and

17   then having to remember those verbal instructions every single

18   step because, you know, it could be several if someone were to

19   give you and say, "Hey, go fill up the water trough, and this

20   means this, and that means this, and then do this," you know,

21   because by the first or second water trough, there's back to

22   being this much water in it rather than filled up unless

23   someone was there with him to say, "Keep going.  Keep going."

24   You know, "Leave the hose in there."  You know, there wasn't --

25   yeah, it's extremely different.  It's -- it's honestly not

1   comparable.

2   **Q.** And did -- and did you say that that -- even though he had

3   those verbal instructions, this was a problem for him on an

4   ongoing basis?

5   **A.** Yeah. For a while -- right? -- until it's become a habit

6   and repetitive or more so repetitive of "Okay. Leave it in

7   there for so long, and then I can take it out, move to the next

8   one." But I would still say there's times where, if staff's

9   not there, he'll still, like, miss it, you know, meaning won't

10  fill one up all the way or, you know, go to the next without

11  doing -- or miss one completely.

12  **Q.** You were asked about -- when you were asked about

13  decisions, Ms. Chang asked you a question about forced options.

14  **A.** Sure.

15  **Q.** Was it -- by a "forced option," what do you understand that

16  to mean? A "forced option"?

17  **A.** Not really an option. It seems to me that doesn't -- you

18  know, "force" and "option" doesn't really -- so meaning, like,

19  given a choice, like one -- this is your only, and you do it.

20  There's not a -- an option in there is what I take "forced

21  option" to mean.

22  **Q.** Okay. So what about a forced choice where he's told he can

23  do A or B? Did he have problems with that?

24  **A.** Yeah. Yeah. He -- he does. He did and does have problems

25  with that. You know, "Hey, you can do this or that."

38

1    "Well, where do you want me to go?  What do you want me to

2    do?"  You know, that's what he will say every time.  Or "I

3    don't know" or "I'm not sure."

4      I would say, if there was a threat to his physical safety,

5    like someone was, you know -- okay.  If you don't choose one,

6    he will make the choice; right?  But other than that, he'll

7    just ask what to do.

8    **Q.**  Regarding the piano playing, you -- what's your experience

9    with individuals with autism?

10   **A.**  So it's my experience --

11        **MS. CHANG:**  Objection, Your Honor.

12        **THE WITNESS:**  -- that, you know, they can do --

13        **THE COURT:**  Dr. Hepworth, just one moment.

14        Yes, Ms. Chang?

15        **MS. CHANG:**  Objection, Your Honor.  I mean, I haven't

16   objected before, but she's not an expert.  She is here to

17   testify about, factually, what she has observed in this

18   defendant, not of people of autism in general.  This defendant.

19   And this is -- I mean, I should have objected before, but this

20   is running afield into something else.

21        **THE COURT:**  I agree, Mr. Mahoney.  You've not tendered

22   her as an expert.  She can testify as to Mr. Marks, but that's

23   it.  So please rephrase your question.

24        **MR. MAHONEY:**  Your Honor, I'm not asking for expert

25   opinion.

1    **THE COURT:**  You asked about her experience in general

2    with autism.  So if you want to ask it in terms of factual lay

3    testimony, I'd ask you to rephrase your question, then.

4    **MR. MAHONEY:**  Okay.

5    **BY MR. MAHONEY:**

6    **Q.**  Do you have experience with the extent to which people with

7    autism you've come into contact with can -- can manage --

8    master a skill, like playing piano, notwithstanding their other

9    deficits?

10   **MS. CHANG:**  Objection, Your Honor.  Again, it's the

11   same objection.  We are here to testify about this defendant,

12   not people in general.

13   **THE COURT:**  I agree, Mr. Mahoney.  Move on.

14   **MR. MAHONEY:**  Judge, may I just say that the question

15   posed to the witness was that there would be something

16   remarkable about Steven being able to play the piano well, and

17   that appeals to the question that, well, somebody with these

18   characteristics must not be able to master a skill like that.

19   **THE COURT:**  And that's expert-level testimony.  So for

20   the third time, Mr. Mahoney, move on, please.

21   **MR. MAHONEY:**  All right.

22   **BY MR. MAHONEY:**

23   **Q.**  Does it surprise you, knowing Steven, that he would be able

24   to -- through whatever efforts it took, that he would be able

25   to play that song that nicely and still have all of the other

1   deficits that you've described?

2   **A.**   No, it doesn't surprise me at all.  You know, it -- I think

3   part of him being able to play the piano that well or those

4   songs that well is also to a compliance thing.  You know, it's

5   "Play this.  Do this.  Do that."  He does it.  He memorizes it,

6   and he just can repeat it.

7       And we've seen other students do that with maps.  We have a

8   very autistic, meaning, you know, not mild or moderate but

9   fairly, you know, autistic, individual here that memorizes maps

10  but honestly can't choose to take and remember to take showers,

11  you know, eats the same things, you know, struggles with a

12  myriad of things, social interactions, can't -- I've known this

13  individual now for five years, and --

14          **MS. CHANG:**  Objection, Your Honor.

15          **THE WITNESS:**  -- he can't look you in the eyes.  You

16  know, he can't --

17          **THE COURT:**  Dr. Baird-Hepworth.

18          **THE WITNESS:**  -- do those types of things.  So --

19          **THE COURT:**  Dr. Baird-Hepworth, I'm going to ask you

20  to stop.

21          Yes, Ms. Chang?

22          **MS. CHANG:**  It's the same objection because she's

23  running, again, outside of this defendant.

24          **THE COURT:**  Thank you, Ms. Chang.  That objection is

25  sustained.

1          I'm going to let that question stay, but, Mr. Mahoney,
2     let's limit our questioning.
3          And, Dr. Baird-Hepworth, let's limit our answers to --
4     with respect to Mr. Marks and your experiences with him.
5          Go ahead, Mr. Mahoney.
6          **MR. MAHONEY:**  All right.  No.  I think I'm done,
7     Judge.
8          **THE COURT:**  All right.  Thank you very much,
9     Mr. Mahoney.
10         Dr. Baird-Hepworth, I apologize for continuously
11    interrupting.  That's the dangers of doing Zoom, but I very
12    much --
13         **THE WITNESS:**  That's okay.
14         **THE COURT:**  I appreciate you being here, ma'am -- or
15    Dr. Hepworth, and I thank you for your testimony.
16         And, Mr. Mahoney, is there any reason why I cannot
17    excuse Dr. Baird-Hepworth and have her log off of Zoom?
18         **MR. MAHONEY:**  No, Judge.
19         **THE COURT:**  Ms. Chang, same question to you.
20         **MS. CHANG:**  No, Your Honor.
21         **THE COURT:**  All right.  Then, Dr. Baird-Hepworth, you
22    may log off of Zoom.  I thank you very much for your time
23    again.
24         **THE WITNESS:**  Thank you, Your Honor.
25         **THE COURT:**  Thank you.

1          Mr. Mahoney, your next witness, sir.

2          **MR. MAHONEY:**  No other witnesses, Judge.

3          **THE COURT:**  Okay.  Any other evidence?

4          **MR. MAHONEY:**  Yes, Judge.  We -- I'd like to -- we

5     didn't have on our -- I didn't think it would be necessary, but

6     Mr. Marks's Vineland scoring sheet by Dr. Geller -- Your Honor,

7     the Government has had that for a long time.  It was disclosed

8     to Dr. Montalbano and I think Dr. Otto, and it's just the

9     actual scoring sheet for the Vineland tests.  And Dr. Negrón

10    was asked about his Vineland report, and this is the actual

11    scoring instrument.  It's the basis for -- it was in

12    Dr. Geller's data that had been provided to the Government

13    and -- to the Government, which is -- before, but we didn't

14    mark it as an exhibit here.  But it's very pertinent when the

15    Court has to determine what the relevance is of his Vineland

16    score, as suggested by the Government, to these interactions

17    with the police and others.

18         **THE COURT:**  Was that scoring sheet -- wasn't it

19    submitted with Dr. Geller's report in the prior competency

20    proceedings?

21         **MR. MAHONEY:**  It was, but I don't think it was made an

22    exhibit, Judge.  So it was part of the metadata -- or the

23    backup data at the time, but that's -- it was -- her report was

24    based on that.

25         **THE COURT:**  So, Ms. Chang, what do you have to say to

 1    that?

 2              **MS. CHANG:**  I don't object, Your Honor.

 3              **THE COURT:**  Okay.  I know my prior rulings, which I

 4    made on numerous occasions, if it's not on the exhibit list,

 5    I'm not letting it in.  But due to the fact that it was at

 6    least referenced to some extent -- and I remember it in the

 7    prior competency proceedings -- and Ms. Chang's lack of

 8    objection, I will allow that exhibit to be admitted.  And it

 9    looks like that would be Exhibit --

10              **MR. MAHONEY:**  61, we've marked it as, Judge.

11              **THE COURT:**  Okay.  Let me just check my list here.

12    It'll be Exhibit 61.

13              What else, Mr. Mahoney?

14              **MR. MAHONEY:**  Judge, the two additional papers --

15    sorry.  Excuse me, Judge.

16              **THE COURT:**  Sure.

17              And, Mr. Mahoney, I think you're wrong on 61.  The

18    exhibit list I have goes to 56.08.  So I don't know where we're

19    getting 61 from, sir.

20              **MR. MAHONEY:**  There were -- there were two other -- 58

21    and 59 were, I think, collections of videos.

22              **THE COURT:**  Are they listed on your exhibit list?

23    Because that's what I'm going off of.

24              **MR. MAHONEY:**  I think so.  I'll let Mr. Goddeyne

25    address it, Judge.

1    **THE COURT:**  All right.  Mr. Goddeyne -- first of all,

2    let's back up a second.  You haven't admitted a single exhibit

3    in this case yet.  So why don't we start with Exhibit 1 and go

4    through your exhibit list, and then we'll get to the additions

5    that are not on the exhibit list.

6    **MR. MAHONEY:**  Judge, I've talked to Ms. Chang, and I

7    think the Government has no objection to all of our exhibits

8    except what -- we've agreed to withdraw some from that list.

9    **THE COURT:**  Okay.  Which ones are you withdrawing?

10   **MR. MAHONEY:**  Withdrawing the catalogs, Judge, the

11   academic catalogs.

12   **THE COURT:**  Can you please give me the numbers.

13   **MR. GODDEYNE:**  Yes, Your Honor.  It's Exhibit 56

14   through 56.08.

15   **THE COURT:**  Okay.  56 through 56 -- so academic course

16   books and then the various catalogs from Elon University and

17   UNC Chapel Hill and Carlos Albizu University.  All of those

18   exhibits are being withdrawn?

19   **MR. MAHONEY:**  Yes, Judge.  And then there were --

20   there was a file or two with -- it was Exhibit 44, which were

21   some notations of Dr. -- of the parents on Dr. Jenkins's

22   report, which had been provided to Dr. Negrón, but I agree that

23   there's no need for them as exhibits.

24   **THE JURY:**  All right.  So Exhibit 44 is withdrawn.

25   Any other exhibits withdrawn?

1      **MR. MAHONEY:**  No, Judge.

2      **MS. CHANG:**  Yes.

3      **THE COURT:**  Yes, Ms. Chang?

4      **MS. CHANG:**  Yes, Judge.  54 should also come out.

5  Those are e-mail communications between Mr. Mahoney and

6  Dr. Jenkins.  This was the subject of a prior hearing.

7      **THE COURT:**  I remember that.  That's Exhibit 54,

8  Mr. Mahoney.  Is that your understanding as well?  That one had

9  been withdrawn?

10     **MR. MAHONEY:**  Sure, Judge.

11     **THE COURT:**  Okay.  So, to recap, we have Exhibits 1

12  through 55 now, and Exhibits 44 and 54 have been withdrawn.  So

13  we have all other exhibits -- is the defense making a motion to

14  have those exhibits admitted?

15     **MR. MAHONEY:**  Yes, Judge.

16     **THE COURT:**  And any objection, Ms. Chang?

17     **MS. CHANG:**  I would like to know specifically what

18  they are because I think there are multiple references to

19  things at this point I'm not even sure what they are.

20     **THE COURT:**  Do you have a copy of the exhibit list?

21     **MS. CHANG:**  I have a copy of one that goes to 55.  I

22  am aware of the one that goes to 56.08.  But he's now talking

23  about things past 56.08.

24     **THE COURT:**  And I'm only talking about up to 56.08 at

25  this point.

1          **MS. CHANG:**  Oh, I apologize, Your Honor.

2          **THE COURT:**  Not a problem.

3          **MS. CHANG:**  No objection.

4          **THE COURT:**  And for a reference to everybody, the

5     exhibit list I'm looking at is Document 284.  It was filed on

6     December 6th.  It is six pages in length.  That is the exhibit

7     list I'm utilizing.

8          Mr. Goddeyne, you're shaking your head in the

9     affirmative.  Is that the same exhibit list you were reading

10    off of as well?

11         **MR. GODDEYNE:**  I have that exhibit list, Your Honor.

12         **THE COURT:**  Uh-huh.

13         **MR. GODDEYNE:**  But what I would like to address next,

14    if Your Honor is willing, is that there -- after the submission

15    of Document 284, there were a few exhibits that we added to a

16    new list, which was provided to the Court and the Government in

17    the boxes.  It's in hard copy.  And there were a few exhibits

18    that were added, which are contained in these boxes.  So we

19    would move that those exhibits be admitted as well.

20         In particular, there would be an Exhibit 18.01,

21    which --

22         **THE COURT:**  Mr. Goddeyne, let's take it one step at a

23    time.  Why are these exhibits not on your December 6th list?

24    Because I have an order that I entered on October 21st clearly

25    giving a December 6th deadline, and my order said on page 3,

1    "All parties are advised they should err on the side of

2    overinclusion versus underinclusion as to their exhibit lists.

3    During the hearing, if a party seeks to admit an exhibit and

4    that exhibit is not clearly and specifically identified on that

5    party's list, the exhibit will not be admitted, and the Court

6    will not hear further argument on the matter."

7              So, Mr. Goddeyne, since you started the argument on

8    this, you're going to finish it.  What's your position on that?

9              **MR. GODDEYNE:**  Well, the position, Your Honor, is

10   that --

11             **THE COURT:**  Mr. Mahoney, I'm talking to Mr. Goddeyne.

12             **MR. MAHONEY:**  Okay.

13             **THE COURT:**  Mr. Goddeyne.

14             **MR. GODDEYNE:**  There is no justification for having --

15   I think it was just an oversight, Your Honor.

16             **THE COURT:**  Those exhibits are not admitted pursuant

17   to my order, and I clearly said will not hear further argument

18   on the matter.  So we're only dealing with up to 56.08 with the

19   exhibits that have been withdrawn.  Is there anything else we

20   need to take up, Mr. Goddeyne, with respect to exhibits?

21             **MR. GODDEYNE:**  No, Your Honor.

22             **THE COURT:**  Thank you very much.

23             So just to summarize, then, so I make sure we're clear

24   here, we have had -- we have concluded testimony from the

25   defense.

1    I'm going to get to you in a minute, Ms. Chang.

2    On the exhibit list, which, again, is Document 284,

3    all exhibits have been admitted without objection by the

4    United States with the exception of Document 44 -- excuse me --

5    Exhibit 44, Exhibit 54, and Exhibits 56 through 56.08, as those

6    have been withdrawn.  Did I get that correct, Mr. Goddeyne?

7         **MR. GODDEYNE:**  Yes, Your Honor.

8         **THE COURT:**  Thank you very much.

9    Ms. Chang, did I get it correct?

10        **MS. CHANG:**  Yes, Your Honor.

11    (Defendant's Exhibit Nos. 1 through 43, 45 through 53, and

12    55 were admitted into evidence.)

13        **THE COURT:**  All right.  So, with that, is there any

14    other evidence we need to discuss, Mr. Goddeyne, before I turn

15    to Ms. Chang?

16        **MR. GODDEYNE:**  Can I confer with Mr. Mahoney?

17        **THE COURT:**  Yes, you may.

18        **MR. GODDEYNE:**  No, Your Honor.

19        **THE COURT:**  Thank you very much, Mr. Goddeyne.

20    So, Ms. Chang, I turn to you.  Were you intending on

21    presenting any rebuttal evidence?

22        **MS. CHANG:**  No, Your Honor.

23        **THE COURT:**  All right.  So the United States is also

24    resting, then?

25        **MS. CHANG:**  We rest.

1    **THE COURT:**  All right.  Well, then, I think the last

2    thing to take up is further proceedings in this case.

3    I have a feeling that some of you may think I'm a

4    little grinchy, but I'm not really going to be the grinch who

5    stole Christmas.  I know you're going to want to get a copy of

6    the transcript from this hearing and do posthearing briefing.

7    So I'm inclined, so not to ruin everybody's holidays, 30 days

8    for briefing.  Each side may have 30 pages because of the new

9    font requirements.

10    Ms. Chang, will that be sufficient time and pages for

11    the United States?

12    **MS. CHANG:**  Yes, Your Honor.  Thank you.

13    **THE COURT:**  Mr. Mahoney, will that be sufficient time

14    and pages for Mr. Marks?

15    **MR. MAHONEY:**  I think so, Judge.

16    **THE COURT:**  All right.  Very good.

17    I will say, because of the length of time this case

18    has been going on, I will not be inclined to give -- and it's

19    going to be both filed at the same time.  I believe 30 days

20    from today is January 18th because the 17th is Martin Luther

21    King Day.  If I'm off on that, I'll say as much in my order.

22    But given the length of time that this case has been pending,

23    absent truly emergency circumstances, I will not be extending

24    this deadline.

25    So, with that, is there anything else we need to take

1    up today on behalf of the United States?

2        **MS. CHANG:**  I had just -- I had a question, and I just

3    forgot it, Your Honor.  Oh, I know what it was.

4        So in our prehearing briefing the United States cited

5    to a lot of things in the record, and now they're in the record

6    in some form or fashion.  I mean, I'm sure this -- I think I

7    know the answer to this question, but will the Court be

8    considering the prehearing briefing as well as the posthearing

9    briefing in rendering the final decision?

10       **THE COURT:**  Yes.  To be clear, I'll be considering the

11   prehearing briefing from both sides, the posthearing briefing

12   that you provide, and also, to be clear, it is to be limited to

13   argument of counsel.  The evidentiary submissions for this

14   matter are closed.  And I will also be considering, as I've

15   said in prior hearings and prior rulings, the materials that

16   were submitted and the arguments that were submitted in the

17   prior competency proceeding, which means I will skim through --

18   and I do say skim -- the pre and posthearing briefing from

19   2019, but I'm going to, as far as argument, focus on the pre

20   and posthearing briefing today in 2021.  But I will look at all

21   evidence that was submitted, specifically Dr. Geller's reports

22   and any testing and data that was submitted at that time as

23   well as the testimony that was given over that hearing, which I

24   think also lasted almost three days.  So I will consider all of

25   that as well.  Does that clarify your question?

1          **MS. CHANG:**  It does, Your Honor.  Thank you.

2          **THE COURT:**  Okay.  Mr. Mahoney, then, is there

3     anything else we can take up on behalf of your client?

4          **MR. MAHONEY:**  No, Judge.  Thank you.

5          **THE COURT:**  All right.  I want to thank you.  I know

6     it's been a very long couple of days, and both sides have been

7     zealously advocating for their positions.  We've had a lot of

8     technical intricacies.  And I just want to say for the record,

9     I thank counsel for both sides for working cooperatively to get

10    this done.  Mr. Marks, I thank you for your attention in this

11    matter.  I thank the witnesses for being here.  And I want to

12    give a particular thank you to my courtroom deputy,

13    Mr. Jackson; to our court reporter that's here today; and to

14    our IT department for making sure this all moved along

15    smoothly.

16          And, with that, we'll be in recess.  Happy holidays,

17    everybody.

18       (Proceedings concluded at 11:12 A.M.)

19                    -     -     -

20                **CERTIFICATE OF REPORTER**

21    I certify that the foregoing is a correct transcript of the
      record of proceedings in the above-titled matter.

22

23    s/Heather Suarez                          12/22/2021
      Heather Suarez, RPR, FCRR, CRR            Date
24    U.S. Official Court Reporter

25