## UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
#### ORLANDO DIVISION

UNITED STATES OF AMERICA

VS.                                        CASE NO: 6:17-cr-257-PGB-LHP

STEVEN MICHAEL MARKS

_____

### REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This case is before the undersigned regarding the competency of Defendant Steven Michael Marks ("Marks").  For the reasons explained below, I find by a preponderance of the evidence that Marks currently possesses a factual and rational understanding of the proceedings against him and a sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding.  I therefore **RESPECTFULLY RECOMMEND** that the Court find that Marks is presently competent to stand trial.

## I.      PROCEDURAL BACKGROUND

On November 8, 2017, a grand jury returned an Indictment charging Marks with three counts of enticing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction in violation of 18 U.S.C. § 2251(a) and (e), one count of receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2) and

(b)(1), and one count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2).   (Doc. 1).[1]   The question of Marks' competency was first raised in early 2018, and I held a two-day competency hearing on April 18-19, 2019, pursuant to 18 U.S.C. §§ 4241 and 4247.   (Docs. 19, 28-29, 36, 39-41, 47, 50, 57, 62-63, 65).   The Court ultimately determined on December 2, 2019 that Marks is competent to stand trial.   (Doc. 95; *see also* Doc. 109).

Since that time, this case has been subject to numerous continuances and delays, some due to issues involving the COVID-19 pandemic, many others due to delays on the part of Marks.   *See, e.g.*, Docs. 101-02, 121, 131, 150-52, 156-57, 159, 161, 163, 172.   The case was ultimately set for jury trial, date certain, for May 3, 2021.   (Doc. 172).   In the meantime, on April 9, 2021 a Superseding Information was filed against Marks, charging him with one count of enticing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction in violation of 18 U.S.C. § 2251(a).   (Doc. 180).[2]   That same day, Marks filed a fully executed plea agreement, in which he stated his intention to plead guilty to the Superseding Information.   (Doc. 183).   However, during an April 13, 2021 hearing, counsel for Marks advised that there may be a question as to Marks'

---

[1]  The procedural history of this case through the first evidentiary hearing in April 2019 has been set forth in great detail in prior filings.   *See, e.g.*, Doc. 76.   That earlier history is incorporated herein.

[2]  Marks filed a waiver of indictment that same day.   (Doc. 182).

competency, and on April 16, 2021, counsel filed a motion pursuant to 18 U.S.C. § 4241(a) requesting a hearing to determine Marks' competency to proceed.   (Docs. 185-87, 191).   The United States filed a response stating that it did not oppose the motion, but requested that Marks be committed to the custody of the Attorney General for examination, in accordance with 18 U.S.C. §§ 4241(b), 4247(b), and (c). (Doc. 193).

The motion (Doc. 186) was referred to the undersigned, and following a hearing with counsel held on April 29, 2021, *see* Docs. 194, 198, I granted the motion, finding that there is reasonable cause to believe that Marks may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.   (Doc. 200; *citing* 18 U.S.C. § 4241(a)).   I also granted the United States' request to commit Marks to the custody of the Attorney General to conduct a psychiatric or psychological examination in accordance with 18 U.S.C. §§ 4241(b) and 4247(b), (c), and permitted Marks to voluntarily report to the designated facility.   (*Id.*).   The Order further authorized Marks to immediately commence proceedings to conduct competency evaluations by any of his own retained experts.   (*Id.*).

The Attorney General designated the Metropolitan Correctional Center ("MCC") in New York, New York, as the facility to conduct Marks' competency

evaluation, and he reported to MCC on or about May 10, 2021.   (Doc. 217-1).   MCC completed its evaluation on or about June 14, 2021, and Marks was released from the custody of the Bureau of Prisons ("BOP"), and returned to Boise, Idaho, on or about June 16, 2021.   (Docs. 217-18, 220).   Dr. Ashley Jenkins, Psy.D., a forensic psychologist employed by the BOP, issued an evaluation report on June 21, 2021, in which she opined, for reasons discussed in more detail below, that Marks is competent to stand trial.   (Doc. 228).[3]

Since Marks' release from BOP custody, I have held several status conferences with counsel concerning the progress of the competency evaluation proceedings.   *See, e.g.*, Docs. 223, 231, 240, 251.[4]   I ultimately established a deadline of September 30, 2021 for Marks to complete and submit all expert reports he wished the Court to consider in evaluating his competency, and a pre-hearing briefing deadline of October 14, 2021.   (Doc. 241).   On request of Marks' counsel, I subsequently extended the expert report disclosure deadline to October 14, 2021

---

[3] Dr. Jenkins submitted three amendments to her report.   (Docs. 229, 237, 277, under seal). The United States admitted into evidence all three versions of the report; however, the parties only relied upon the third amended report during the December 2021 hearing.   (Docs. 277, 284).

[4] One of the issues discussed at several of these status conferences was Marks' counsel's attempts to obtain funding for expert witnesses.   On April 2, 2021, counsel for Marks filed the first of several motions seeking funds under the Criminal Justice Act, 18 U.S.C. § 3006A ("CJA") to engage the services of an additional expert witness.   (Docs. 178, 203, 213, 219, all filed under seal). The Court ultimately authorized CJA funds for the services of a previously identified expert, Dr. Lynda Geller, with respect to competency issues, but denied Marks' motions in all other respects. (Docs. 179, 207, 221, 226-227, all filed under seal).   Marks has filed an interlocutory appeal of the denial of his requests for CJA funds, which remains pending before the Eleventh Circuit.   (Docs. 247, 270, 298).

and the briefing deadline to October 28, 2021.   (Doc. 250).   Marks disclosed two expert reports:   (1) a speech language consultation report from Gretchen A. Bennett, a licensed speech-language pathologist; and (2) a psychiatric competency evaluation report from Dr. Rosa Negron-Munoz, M.D., a board certified psychiatrist in the areas of adult, child and adolescent, and forensic psychiatry.   (Docs. 254-55).[5] Both experts opined that Marks is not competent to stand trial.   (*Id.*)

In accordance with 18 U.S.C. § 4241(a) and 4247(d), I held an evidentiary hearing on the issue of Marks' competency on December 15-17, 2021.   (Docs. 257, 288-90).   Dr. Jenkins, Ms. Bennett, and Dr. Negron-Munoz testified at the hearing, along with Dr. Angela Baird-Hepworth, the clinical executive director of Aloft Transitions ("Aloft"), the residential facility where Marks has resided since 2017 as part of the conditions of his pretrial release.   *See* Docs. 11, 13.   Dr. Jenkins, Ms. Bennett, and Dr. Negron-Munoz testified as expert witnesses without objection, and Dr. Baird-Hepworth testified as a lay witness.   (Docs. 288-90).   Counsel for the parties also submitted numerous exhibits without objection, as well as legal

---

[5] Marks did not submit an expert report from Dr. Lynda Geller, a licensed clinical psychologist who specializes in the diagnosis and treatment of Autism Spectrum Disorder.   Dr. Geller previously submitted two expert reports and testified at the April 2019 competency proceedings.   (Docs. 63, 65, 74-75).   However, Dr. Geller was not authorized to testify at the December 2021 competency hearing.   (Docs. 267, 287).   As discussed in more detail below, I have considered Dr. Geller's prior testimony and reports in reaching the conclusions in this report and recommendation, even if such testimony and reports are not explicitly summarized herein.

authority for the Court's consideration both before and at the conclusion of the hearing.   (Docs. 263, 265, 299-300).[6]   This Report and Recommendation follows.

## II.   LEGAL STANDARD

"A defendant has a due process right not to be tried or convicted while incompetent."   *United States v. Ramirez*, 491 F. App'x 65, 71 (11th Cir. 2012)[7] (citing *Drope v. Missouri*, 420 U.S. 162, 171-72 (1975)).   The federal competency standard is set forth in 18 U.S.C. § 4241, which provides:

> If, after [a] hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General.

18 U.S.C. § 4241(d).

Section 4241 codifies the standard for competency set forth by the United States Supreme Court in *Dusky v. United States*, 362 U.S. 402 (1960): "whether [the

---

[6] On January 27, 2022, nine days after the deadline for filing post-hearing memoranda, Marks' counsel filed a notice of supplemental authority, which references an October 22, 2021 sentencing decision from the District of Kansas.   (Doc. 301).   Although counsel cites Local Rule 3.01(i), the notice does not comply with that rule as (1) the notice does not state whether or not the authority is cumulative; and (2) the notice does not contain a copy of the authority and does not contain a citation to Westlaw or Lexis such that it would be deemed "readily available."   As such, the undersigned has not considered this notice any further.   Moreover, it would seem, based on the summary provided by counsel in the notice, that this decision does not aid the issue of determining competency, but rather relates to sentencing – which ostensibly would not occur unless the defendant had been found legally competent to proceed.

[7] Unpublished opinions of the Eleventh Circuit are cited as persuasive authority.   *See* 11th Cir. R. 36–2.

defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *See also United States v. Bradley*, 644 F.3d 1213, 1268 (11th Cir. 2011) (quoting *United States v. Hogan*, 986 F.2d 1364, 1371 (11th Cir. 1993)).  "The standard for competence to plead guilty is the same as the standard for competence to stand trial." *United States v. Rigsby*, 791 F. App'x 94, 95 (11th Cir. 2019).

Marks previously recognized the *Dusky* standard, (*see* Doc. 64, at 10; *see also* Doc. 95, at 4), but now seeks to apply a different standard, that of "decisional competency." (Doc. 265, at 5-11; Doc. 300, at 4-5).  Relying primarily on a law review article from Professor Richard J. Bonnie,[8] Marks defines "decisional competency" as "rooted in due process," and the theory that "certain decisions regarding the defense or disposition of the case must be made by (or are within the prerogative of) the defendant him or herself," and which "prescribes a norm of client autonomy." (Doc. 265, at 5-7).

The undersigned is unaware of any decision in this Circuit (or anywhere else) that has adopted "decisional competency" in lieu of *Dusky* for purposes of determining whether a represented defendant is competent to stand trial and/or

---

[8] Bonnie, R.J. "The Competence of Criminal Defendants:  A Theoretical Reformulation." BEHAVIORAL SCIENCES AND THE LAW (10), 291-316 (1992).

plead guilty – and Marks does not cite to any such authority.[9]   To the contrary, the

Supreme Court has addressed the theory of "decisional competency," and applied

it only where a defendant seeks to represent himself, a situation that does not exist

in the present case.   *See Indiana v. Edwards*, 554 U.S. 164 (2008).   The Supreme

Court in *Edwards* clearly separated out the *Dusky* standard, which applies in

situations where a defendant is represented by counsel, from the heightened

standard of "decisional competency," which applies in cases where a defendant

seeks to represent him or herself at trial, and thus must be able to make his or her

---

[9] The cases Marks cites do not aid his cause.   In *Godinez v. Moran*, 509 U.S. 389 (1993), the Supreme Court expressly "reject[ed] the notion that competence to plead guilty or to waive the right to counsel must be measured by a standard that is higher than (or even different from) the *Dusky* standard."   509 U.S. at 398.   And in *United States v. Calek*, 48 F. Supp. 2d 919 (D. Neb. 1999), while the Court discusses "decisional competence," the Court defines the term within the confines of the *Dusky* standard – *i.e.*, the "present ability to consult with his lawyer with a reasonable degree of rational understanding."   48 F. Supp. 2d at 922–23.   Several of the other cases Marks points to stand for the proposition that a person can be intelligent, yet still incompetent to stand trial – a doctrine that neither the undersigned nor the United States takes quarrel with.   *See* Doc. 265, at 10 (citing *United States v. Hemsi*, 901 F.2d 293 (2d Cir. 1990); *United States v. Nagy*, No. 96 CR. 601(RWS), 1998 WL 341940 (S.D.N.Y. June 26, 1998); *United States v. Holland*, 921 P.2d 430 (Utah 1996)).   The other cases Marks references not only do not discuss "decisional competency," but are also factually distinguishable from the present case.   *See* Doc. 300, at 5 (citing *United States v. Verdino*, No. 08 CR 653, 2010 WL 1979428 (N.D. Ill. May 14, 2010) (finding defendant incompetent where he did not understand that pleading guilty would require registration as a sex offender, and was not able to understand the arguments that the prosecutor might make or identify any expert witnesses who may testify on his behalf); *United States v. Salley*, 246 F. Supp. 2d 970 (N.D. Ill. 2003) (defendant found incompetent due to evidence of paranoia, delusions, and grandiose ideations, and a refusal to communicate with his attorneys); *Newman v. Harrington*, 726 F.3d 921 (7th Cir. 2013) (granting habeas petition based on ineffective assistance of counsel where attorney failed to seek a competency evaluation where defendant suffered from mental retardation and was unable to comprehend even the most basic legal concepts); *Watts v. Singletary*, 87 F.3d 1282 (11th Cir. 1996) (reversing grant of habeas corpus and finding the defendant's due process rights were not violated even though defense counsel failed to raise question of competency of defendant who slept through 70% of his trial and used crack cocaine on a daily basis throughout trial)).

own decisions with respect to legal strategy, presenting a defense, and the like.   *See id.* at 175-76 ("In certain instances an individual may well be able to satisfy *Dusky's* mental competence standard, for he will be able to work with counsel at trial, yet at the same time he may be unable to carry out the basic tasks needed to present his own defense without the help of counsel." (citing N. Poythress, R. Bonnie, J. Monahan, R. Otto, & S. Hoge, Adjudicative Competence:   The MacArthur Studies 103 (2002) (dividing adjudicative competence into "competence to assist counsel" and "decisional competence"))).   *See also United States v. Saba*, 837 F. Supp. 2d 702, 710 (W.D. Mich. 2011) (noting that the *Edwards* Court "observed that competence to assist counsel differed from decisional competency necessary to undertake trial tasks such as organization of a defense, making motions, arguing points of law, participating in voir dire, questioning witnesses, and addressing the court and jury."); *United States v. Cox*, Criminal Case No. 14-cr-00085-JMH, 2015 WL 1393584, at *1 (E.D. Ken. Mar. 25, 2015) (observing same).   In light of *Edwards*, and absent any binding or persuasive authority to the contrary, the undersigned declines Marks' invitation to create a new competency standard, and will follow the still-binding precedent of *Dusky* and its progeny.

Turning now to the applicable burden of proof, the Court previously held that Marks bore the burden of proving that he is presently not competent to stand trial, a finding that Marks did not challenge.   (*See* Doc. 76, at 5; Doc. 95, at 4).   *See*

*also Bradley*, 644 F.3d at 1268 (stating that a party raising a substantive claim of incompetency must demonstrate his incompetence by a preponderance of the evidence (citing *Medina v. Singletary*, 59 F.3d 1095, 1106 (11th Cir. 1995))). However, in his post-hearing briefing, Marks now claims that the burden actually rests with the United States, arguing that the holding of *Bradley* was merely *dicta*. (Doc. 300, at 7).   Marks cites no legal authority for this proposition, and, to the contrary, the undersigned has identified numerous decisions holding that the burden of proof rests with the party raising a substantive claim of incompetency – in this case Marks.   *See United States v. Johns*, 390 F. App'x 963, 970 n.5 (11th Cir. 2010); *United States v. Chandler*, Case No. 6:19-cr-137-Orl-18LRH, 2020 WL 2735917, at *3 (M.D. Fla. May 5, 2020); *United States v. Garcia*, Case No. 2:18-cr-68-FtM-38MRM, 2019 WL 6349891, at *2 (M.D. Fla. Nov. 10, 2019), *report and recommendation adopted*, 2019 WL 6340991 (M.D. Fla. Nov. 27, 2019); *United States v. Raiola*, No. 2:15-cr-106-FtM-38MRM, 2017 WL 218830, at *2 (M.D. Fla. Jan. 19, 2017); *United States v. FNU LNU*, Nos. 6:15-cr-3-Orl-22TBS, 6:10-cr-238-Orl-22TBS, 2016 WL 158769, at *2-3 (M.D. Fla. Jan. 14, 2016); *United States v. Giraldo*, No. 2:09-cr-85-FtM-36SPC, 2011 WL 7946037, at *2 (M.D. Fla. Oct. 24, 2011).   As such, and as previously held in this case, the burden of proof remains with Marks to demonstrate his incompetency by a preponderance of the evidence.

As the Court previously found, which the parties do not dispute, Marks suffers from at least one mental condition, Autism Spectrum Disorder ("ASD"). Nevertheless, "[n]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges."   *Medina*, 59 F.3d at 1107 (quoting *Card v. Singletary*, 981 F.2d 481, 487–88 (11th Cir. 1992)).   "Similarly, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial."   *Id.* (citing *McCune v. Estelle*, 534 F.2d 611, 612 (5th Cir. 1976)).   "Incompetency to stand trial is not defined in terms of mental illness.   As such, a defendant can be competent to stand trial despite being mentally ill and similarly a defendant can be found incompetent to stand trial without being mentally ill."   *United States v. Williams*, No. 5:06-cr-36-Oc-10GRJ, 2007 WL 1655371, at *5 (M.D. Fla. June 7, 2007) (internal citations, footnote, quotation marks, and alterations omitted).

> The determination of whether a defendant is mentally competent to stand trial is a question left to the sound discretion of the district court, with the advice of psychiatrists [or other mental health professionals]. The medical opinion of experts as to the competency of a defendant to stand trial is not binding on the court, since the law imposes the duty and responsibility for making the ultimate decision of such a legal question on the court and not upon medical experts.

*United States v. Abernathy*, No. 08-20103, 2009 WL 982794, at *3 (E.D. Mich. Apr. 13, 2009) (alteration in original) (quoting Fed. Proc. § 22:549, *Hearing & Determination as*

*to Competency*; *United States v. Davis*, 365 F.2d 251, 256 (6th Cir. 1966)).   Moreover, when "faced with diametrically opposite expert testimony, a district court does not clearly err simply by crediting one opinion over another where other record evidence exists to support the conclusion."   *Battle v. United States*, 419 F.3d 1292, 1299 (11th Cir. 2005) (citations and internal quotations omitted).   "Absent a showing that an evaluation by an expert was professionally inadequate, a court does not err by relying on an expert's report."   *United States v. Deruiter*, 2:14-cr-46-FtM-38MRM, 2017 WL 3308967, at *3 (M.D. Fla. Aug. 3, 2017) (citing *Bradley*, 644 F.3d at 1268).

## III.   SUMMARY OF THE EVIDENCE[10]

### A.   *The 2019 Competency Proceedings (Docs. 76, 95).*[11]

For the first round of competency proceedings, Marks was evaluated by Dr. Randy Otto, a licensed psychologist board certified in the areas of clinical and forensic psychology.   The Court appointed Dr. Otto to conduct an independent psychological evaluation of Marks to determine his competence to stand trial.   Dr.

---

[10] I have considered all of the exhibits admitted into evidence during the December 2021 competency hearing, as well as all testimony presented (including any exhibits filed under seal), regardless of whether I discuss it in detail in this Report and Recommendation.

[11] Because the parties agree that Marks' cognitive and adaptive functioning and ASD diagnosis are static and not degenerative, *see, e.g.,* Doc. 263, at 14; Doc. 265, at 2, and as discussed with counsel for both sides, I find it appropriate to also consider the expert testimony and evidence submitted during the 2019 competency proceedings.   Given the unchanging nature of Marks' mental condition, the test results and other evidence remain relevant today.

Otto reviewed numerous source materials, and conducted a four-hour, in-person clinical interview of Marks, during which Marks did not take any breaks (even though they were offered).   Dr. Otto administered to Marks the Mini Mental State Examination, the Inventory of Legal Knowledge, and the Fitness Interview Test-Revised (Fit-R).   Dr. Otto diagnosed Marks with ASD without accompanying intellectual impairment, but with accompanying language impairment; Specific Learning Disorder with impairment in mathematics; Childhood-Onset Fluency Disorder (Stuttering); and Major Depressive Disorder, single episode, in remission. *See* Doc. 76, at 7-24; Doc. 95, at 6-7.   *See also* Doc. 74-1.

Dr. Otto found Marks' "responses to questions were typically relevant and informative, although his responses were sometimes delayed."   Yet at other times, Mr. Marks responded quickly to a question, and then identified his response as wrong and corrected himself.   He further found Marks to have "significant discomfort" in discussing the allegations of his case, he exhibited anxiety about the legal proceedings, and possessed limited knowledge about some aspects of the legal process, but that these deficits were typically remedied through the presentation of information.   Moreover, Marks was ultimately able to answer questions about the allegations of his case, demonstrated a general understanding of the legal process and the roles of those involved, and understood the seriousness of the charges against him, including the possible penalties.   Marks also knew the difference

between pleading guilty and not guilty, and recognized that he may not be a good witness because he is nervous and has communication difficulties.   *See* Doc. 76, at 9-12, 14-15; Doc. 95, at 6-10.

Dr. Otto did note that Marks exhibited the greatest limitations in his ability to consult with counsel and make rational case decisions, but that Marks should be able to make important decisions with appropriate counsel and guidance.   In particular, Dr. Otto suggested that Marks would be better able to communicate with his attorneys if they spoke literally, used concrete language, and avoided rapid-fire questions and figures of speech.   Dr. Otto further suggested that "structured questioning" could be used to ameliorate any knowledge deficits, and would allow Marks to reason through and answer questions if he testified, including recalling information.   While acknowledging Marks' language impairments, Dr. Otto did not find such impairments to preclude him from making decisions with the assistance of counsel.   Dr. Otto ultimately opined that Marks was competent to stand trial.   *See* Doc. 76, at 19, 22, 24; Doc. 95, at 7-10.

Marks was also evaluated by two defense experts.   The first was Dr. Lynda Geller, a clinical psychologist specializing in ASD.   Dr. Geller examined Marks in December 2017 and prepared two reports:   an undated report prepared after her evaluation of Marks, and an April 8, 2019 supplemental report prepared as a rebuttal to Dr. Otto's evaluation.   As part of her December 2017 evaluation of

Marks, Dr. Geller administered several psychological tests:   (1) the Vineland Adaptive Behavior Scales-II ("Vineland"); (2) the Adult Asperger Assessment; (3) the Developmental Questionnaire for Parents of Young Adults; (4) the Behavior Rating Inventory of Executive Function Adult Version, Informant Form (BRIEF): (5) the Social Responsiveness Scale, Second Edition (SRS-2); (6) the Adult Self-Report Inventory, Fourth Edition; (7) the PTSD Checklist-Civilian Version (PCL-C); and (8) PROFESOR:   Protective Risk Observations for Eliminating Sexual Offense Recidivism (2017).[12]   *See* Doc. 76, at 24-38; Doc. 95, at 12-18.   *See also* Doc. 75-2; Def. Ex. 7.

Upon review of Marks' test results, Dr. Geller found Marks to exhibit several hallmark characteristics of ASD, including:   (1) difficulties with social interactions and non-verbal communications; (2) poor understanding of inferences and unspoken meanings; (3) engaging in restricted, repetitive, and stereotyped patterns of behavior, interests, and activities; (4) inflexible thinking about complex issues and an inability to deviate from a course of action; (5) an inability to extrapolate future happenings from current fragments; and (6) impaired executive functioning (*i.e.*, higher learning skills).   Dr. Geller also found Marks to demonstrate anxiety

---

[12] In both her reports and her testimony, Dr. Geller presented as an overly partisan witness who had become invested in Marks' future, and her opinions dealt more with exonerating Marks than assessing his competency to stand trial.   As such, the Court gave Dr. Geller's opinions less weight than the other experts who testified.   (Doc. 76, at 50; Doc. 95, at 11-12).

and depression, and that he suffers from moderate Post-Traumatic Stress Disorder ("PTSD").   *See* Doc. 76, at 29-30; Doc. 95, at 12-18.   *See also* Doc. 75-2; Def. Ex. 7.

With respect to executive functioning (assessed by the BRIEF test), Dr. Geller found Marks had significant impairment in the skills of Working Memory, Plan and Organize, Task Monitor, and Organization of Materials (T Scores of 65-74), with his abilities below that of 89% of the general population.   Marks was also significantly impaired in the area of adult social function (as assessed by the SRS-2).   According to Marks' test results from the Vineland Adaptive Behavior Scales – which measures an individual's abilities in social communication, social interaction, and self-management in daily life – Dr. Geller found that Marks exhibited average intelligence; however, his receptive and expressive communication skills were at the level of a 4-year old, his personal daily living skills were at the level of a 6-year old, and his interpersonal socialization skills were at the level of a 3-year old. Marks ranked slightly higher in his written communication (that of a 9-year old), community living (that of an 11-year old), and play and leisure skills (that of an 8-10 year old).   *See* Doc. 76, at 30-31, 34; Doc. 95, at 12-18.   *See also* Doc. 75-2; Def. Ex. 7.

Dr. Geller diagnosed Marks with ASD, PTSD, Nonverbal Learning Disorder, Specific Learning Disorder with Impairment in Mathematics, Generalized Anxiety Disorder, Obsessive-Compulsive Disorder, and Childhood-Onset Fluency Disorder

(Stuttering).   Dr. Geller opined that Marks was not competent to stand trial, as he did not understand the charges against him, had memory deficits (particularly with his "working memory" and "prospective memory"), [13] and was not able to meaningfully assist in his own defense or assist his attorneys in preparing for trial. In particular, Dr. Geller concluded that Marks communicates overall at the level of a 6-year-old, and would not be able to process and follow adult concepts, identify inconsistencies in testimony and questioning and convey that information to his attorneys, generate autonomous thought to meaningfully assist in his own defense, or independently consider alternatives and imagine the consequences of his decisions.   Rather, Marks would simply do whatever his attorneys told him to do. However, Dr. Geller did note that Marks was capable of fact-based learning and could learn the various roles and functions of the legal system.   *See* Doc. 76, at 32, 34, 37-38; Doc. 95, at 14-18.

The second defense expert was Dr. Jeffrey Danziger, M.D., a psychiatrist board certified in the areas of psychiatry, forensic psychiatry, addiction psychiatry and geriatric psychiatry.   Dr. Danziger did not conduct any additional psychological testing, relying instead on the tests already performed by Dr. Geller and others.   Dr. Danziger also conducted an in-person psychiatric evaluation of

---

[13] "Working memory" allows a person to keep facts in his or her mind long enough to manipulate them and form conclusions, whereas "prospective memory" allows a person to remember tasks.

Marks, interviewed Dr. Geller and Marks's attorneys, and interviewed the executive director and clinical director of Aloft.   Upon the conclusion of his evaluation and review, Dr. Danziger diagnosed Marks with ASD with accompanying language impairment.   He opined that while Marks' factual deficits in knowledge could be corrected with education and training, his "deficits in language and comprehension, . . . significantly impact his rational understanding of the legal process, ability to understand the proceedings against him, and ability to consult with counsel with a reasonable degree of rational understanding."   More specifically, Dr. Danziger opined that Marks would be unable to relate events and information to his attorneys in a rational and relevant manner, his memory deficits would negatively impact his ability to testify at trial, he would not be able to meaningfully understand what was going on during the trial, and Marks "would lack the ability to make a rational decision and weigh out the advantages and disadvantages of accepting a plea offer, or meaningfully comprehend what rights he would be giving up by doing so."   Dr. Danziger ultimately concluded that Marks' deficits were permanent, and that he was not competent to proceed to trial. *See* Doc. 75-1.   *See also* Doc. 76, at 38-46; Doc. 95, at 18-22.

In addition to the expert testimony, the Court reviewed several other documents including, among other things, transcripts from the online chats between Marks and his alleged victims, as well as the transcript and audio

recording from Marks' interview with the Lawrence, Kansas police detectives.   The online chats, which consisted of thousands of messages on two applications (Amino and Kik), took place over a nearly four-month period.   The communications were lengthy, some ranging over eight hours in one session.   During these chats, Marks was able to convince a 10-year-old girl, a 9-year-old girl, a 13-year-old girl, and a 14-year-old boy to take and send to Marks numerous pornographic images and/or videos.   Marks employed a combination of flattery, threats, and deception in order to obtain these images.   *See* Doc. 95.   *See also* Docs. 74-5; 74-6; Gov. Exs. 1-4.

On June 9, 2017, Marks agreed to be interviewed by detectives with the Lawrence, Kansas police department, after being advised of his *Miranda* rights. This interview lasted several hours, during which Marks was able to answer all questions and provide details about the online chats.   He also on several occasions lied to the detectives (such as regarding his use of the Amino application) and attempted to minimize his behavior.   *See* Doc. 95.   *See also* Doc. 74-8; Gov. Exs. 5-6.

The Court found that Marks' communications on the online chats demonstrated:   (1) an ability to employ flattery on a child victim to obtain nude pictures; (2) an ability to coach a victim to avoid detection; (3) an ability to anticipate future consequences (such as ensuring that the victim kept her door locked, and instructing the victim not to tell anyone about "us"); (4) an ability to manipulate

and direct a child to engage in the production of child pornography over a prolonged period, evidencing an ability for sustained concentration; and (5) an ability to recognize and respond to the social perspectives of others.   *See* Doc. 95, at 16-18.   *See also* Docs. 74-5; 74-6.

With respect to Marks' interview by the Lawrence, Kansas detectives, the Court found that the recording again demonstrated an ability by Marks to plan for the future, even under stressful conditions.   Marks was able to answer the detectives' questions and keep up with their pace.   Notably, Marks' answers demonstrated "a conscious effort to mislead the investigators, which speaks to an appreciation of future consequences."   More specifically, by providing the detectives with a false narrative, even in the face of additional questions, the Court found that Marks "demonstrates an ability to testify and a rational understanding of the nature of the proceeding – in this instance a police interview."   The Court further found that Marks' ability to minimize his conduct demonstrated "the capacity to appreciate questions, consider the consequences of his answers, and formulate a response in real-time."   *See* Doc. 95, at 30–33.   *See also* Doc. 74-8.[14]

---

[14] The Court also found persuasive the audio recording of Marks' clinical interview with Dr. Otto, which the Court determined evidenced Marks' ability to engage in sustained conversation and questioning without breaks, an ease in recalling historical information, and a basic factual understanding of the criminal proceedings and the charges against him, consistent with an 18-year-old layperson.   (Doc. 95, at 23-29).   The Court further found that Marks demonstrated an understanding of the consequences that could ensue from a guilty plea or conviction, and the capacity to testify in a relevant manner.   (*Id.*).

Upon review of the evidence and testimony, the Court found the opinions and findings of Dr. Otto to be more persuasive than those of the defense experts, and coupled with the other evidence presented, determined that Marks was competent to proceed to trial.   (Doc. 95, at 36).[15]

B.     The Interim

Following the Court's determination that Marks is competent, the case proceeded towards trial, and eventually a plea agreement.   During this period – and to date – Marks' cognitive and functional abilities have not changed, and he has not experienced any traumatic brain injury or other medical issue that would call his mental or intellectual capacities into question.   *See* Doc. 265, at 2.

As discussed above, in finding Marks competent to proceed in 2019, the Court found the opinions of the defense experts (Dr. Geller and Dr. Danziger), to be less than persuasive.   In making this finding, the Court noted that Marks's attorneys had not, at that time, engaged in detailed discussions with Marks about his case, thus the defense experts were without knowledge as to whether Marks could, in fact, be sufficiently educated to have both a factual and rational understanding of

---

[15] Although the undersigned has independently reviewed all evidence presented in the 2021 competency proceedings, it is appropriate to also consider the previous findings of fact, particularly in assessing whether Marks' competency has changed.   *See United States v. Roof*, 10 F.4th 314, 346–47 (4th Cir. 2021) (finding no reversible error where, in second competency hearing, district court considered factual findings from first competency hearing, along with additional new evidence, in assessing whether defendant's competency had changed) (citing *United States v. Adams*, 104 F.3d 1028, 1030 (8th Cir. 1997)).

the proceedings, as well as an ability to assist his counsel.   *See* Doc. 95, at 22 ("Had Mr. Marks received the benefit of detailed discussions with his lawyers – those with actual knowledge of the intricate workings of the criminal justice system – and afterwards was still unable to appreciate the system and his role within it, the expert opinions would be more useful.").

In response to the Court's findings, on fifteen (15) separate dates between September 24, 2020 and April 8, 2021, Marks met with his attorneys (remotely via an online platform) for approximately 30 hours to discuss his case, educate him on various relevant legal topics, and to weigh the options of going to trial versus taking a plea deal.   (Doc. 186, at 5-6; Doc. 186-1).   Marks' attorneys also prepared written guidance, entitled "Advice to Steven," which included information about these topics and which were provided to Marks to review.   (Docs. 186-3, 186-4).   Based on these meetings, and in particular Marks' responses to questions from his attorneys during these sessions, Marks' counsel formed the belief that Marks is not competent to proceed.   (Doc. 186, at 7-13).   In particular, Marks' lead counsel, Mark J. Mahoney, stated that Marks:   (1) had rote memory problems and could not remember the most basic aspects of the charges against him; (2) consistently confused "several critical legal concepts;" (3) could not engage in the decision-making process and could not make autonomous decisions; (4) could not remember

legal advice from one day to the next; and (5) would simply make whatever decision his attorneys advised.   (*Id.*).

Based on these video-recorded sessions, Marks' counsel filed the motion for a second competency hearing.   (Doc. 186).

C.      *The December 2021 Competency Proceedings*[16]

1.      *Dr. Ashley Jenkins*

The first witness to testify was Dr. Ashley Jenkins, Psy.D., a forensic psychologist employed by the BOP.[17]   Dr. Jenkins obtained her license as a psychologist in 2017, and has worked for the BOP as a forensic psychologist since 2018.   She received her Doctorate in Clinical Psychology with a concentration in forensics from Carlos Albizu University in Miami, Florida in 2017.   Dr. Jenkins also has a Masters degree in rehabilitation counseling and psychology from the University of North Carolina, Chapel Hill, and a Masters degree in clinical psychology from Carlos Albizu University.   (Tr. Vol. 1, 7, 9-10).   Dr. Jenkins completed a one-year forensic internship at FMC Lexington in 2016, participated in a six-month practicum at FMC Butner, and completes annual continuing education programs with the BOP.   Dr. Jenkins is currently the co-coordinator and supervisor

---

[16] The transcripts of the December 2021 competency proceedings are available at Docs. 292 (day 1), 294 (day 2), and 296 (day 3), and will be cited as (Tr. Vol. [day], [page #]).

[17] Until October 2021, Dr. Jenkins worked at MCC in New York City.   In October 2021, Dr. Jenkins transferred to the BOP's Metropolitan Detention Center ("MDC") in Brooklyn, New York. (Tr. Vol. 1, 7-8).

of the forensic doctoral program at MDC Brooklyn, and an adjunct professor at John Jay University in the forensic program.   (*Id.* at 10-11).   She has received numerous awards from the BOP for "outstanding evaluations," and has received some training on developmental disorders, including ASD.   (*Id.* at 12, 116-18).   Dr. Jenkins has diagnosed ASD approximately 5-10 times, and has conducted approximately 5-10 forensic evaluations of defendants with ASD.   She has testified as an expert in forensic psychology on approximately five prior occasions, conducted 50-70 competency evaluations of defendants facing trial, all in federal court cases, and found approximately 10% of those defendants incompetent to proceed.   (*Id.* at 13, 15).   Dr. Jenkins was admitted as an expert in the area of forensic psychology without objection.   (*Id.* at 13-14).

Dr. Jenkins first testified as to the process for conducting a competency evaluation at MCC.   When a defendant arrives at the facility, he or she undergoes an intake evaluation within 24 hours of arrival, to ensure the defendant is stable, to identify any medications that require monitoring, to explain the process to the defendant, and to assign a forensic psychologist.   (*Id.* at 15-16).   Throughout the evaluation process, the forensic psychologist meets with and interviews the defendant on several occasions, obtains as much collateral data as possible, speaks with both the prosecution and defense counsel, and talks to family members, if possible.   (*Id.* at 16).   While at MCC, the defendant is also observed 24 hours a day,

7 days a week by various BOP staff who report their observations to the forensic psychologist, and phone calls and e-mails to and from the defendant are reviewed and monitored.   (*Id.* at 16-17, 132-33).

This general procedure was followed in Marks' case.   Upon his arrival at MCC, Marks was given a physical screening and placed into quarantine as part of MCC's COVID-19 precautions.   (Doc. 277, at 19-20).[18]   Dr. Jenkins, along with a doctoral-level student, was assigned to evaluate Marks upon his arrival at MCC. (*Id.*). [19]   As part of her evaluation, Dr. Jenkins reviewed numerous collateral resources including:   (1) the online chat transcripts between Marks and his alleged victims; (2) the audio recording from Marks' interview with the Lawrence, Kansas detectives; (3) progress notes from Marks' stay at Aloft between November 3, 2017 and May 5, 2021; (4) audio recordings of evaluations of Marks by Dr. Paul Montalbano [20] and Dr. Otto; (5) unspecified "multiple video recordings and transcripts" provided by both the United States and the defense; (6) numerous occupational therapy and neuropsychological evaluation reports from 2003, 2004,

---

[18]   The page numbers for all expert reports refer to the CM/ECF pagination.

[19]   While the doctoral student participated in Marks' evaluation process, at all times he was supervised by Dr. Jenkins, who was also present during every meeting and interview.   (Tr. Vol. 1, at 19-20, 148-49).   Although I only name Dr. Jenkins throughout the remainder of this report, I have presumed that the doctoral student either participated in or administered all interviews and psychological tests, under Dr. Jenkins' direct supervision.

[20]   It appears that Dr. Montalbano is a psychologist who was retained at one point by the defense, but he did not testify or provide any expert reports in this case.

and 2007; (7) school records, including Marks' Individualized Educational Program; (8) the expert reports prepared and submitted during the 2019 competency proceedings, including the reports from Drs. Geller, Danziger, and Otto; (9) various Court filings and Orders from both the 2019 competency proceedings and the December 2021 proceedings; (10) Marks' criminal history records and detention report; (11) BOP records; (12) a 2017 polygraph examination report; (13) an August 11, 2020 forensic criminal responsibility evaluation by Dr. Montalbano; and (14) three "Advice to Steven" reports from Marks' counsel, dated in July, September, and October 2020.   (*Id.* at 3-4, 6-8).

Dr. Jenkins interviewed Marks on several occasions, for a total of approximately 10 hours.   (*Id.* at 5; Tr. Vol. 1, at 45).   Dr. Jenkins also administered several psychological tests, including:   (1) the Validity Indicator Profile ("VIP"); (2) the Minnesota Multiphasic Personality Inventory- Second Edition – Restructured Form ("MMPI-2-RF"); (3) the Shipley-2; (4) the Test of Memory Malingering ("TOMM"); and (5) the Wechsler Abbreviated Scale of Intelligence – Second Edition ("WASI-II").   (Doc. 277, at 5-6).   Dr. Jenkins also conducted phone interviews with Marks' lead defense counsel, Mark J. Mahoney, Assistant United States Attorney Emily Chang, and Marks' father, David Marks.   (*Id.* at 6).[21]

---

[21] Dr. Jenkins did not interview anyone at Aloft, due to scheduling issues, although she was able to review Marks' progress notes from Aloft.   (Tr. Vol. 1, at 42-43, 145-48).

Dr. Jenkins noted that prior to initiating any interviews or tests, as well as at other times during his stay at MCC, she informed Marks about the evaluation process and the limits of confidentiality. (*Id.* at 5; Tr. Vol. 1, at 154-55, 178-79). Marks appeared to understand the meaning of competency and that he was able to consult with his attorneys at any point during the evaluation process. (Doc. 277, at 5). Marks also stated that he had been evaluated on several occasions, and was aware of the process. (Tr. Vol. 1, at 25). Dr. Jenkins opined that Marks had a "reasonable understanding and appreciation" of these topics. (Doc 277, at 5).

As part of her evaluation, Dr. Jenkins undertook a detailed review of Marks' social, developmental, educational, marital, employment, criminal, physical, and psychiatric history. (Doc. 277, at 8-19; Tr. Vol. 1, at 27-29, 31-34). A vast majority of this history has previously been summarized by the Court, and that summary is incorporated herein to the extent it has not changed. (*See* Docs. 76, 95). With respect to his stay at Aloft, where he has resided since November 3, 2017, Marks reported that he played the piano, enjoyed feeding and bathing the animals, did not require any supervision to perform these tasks, had a few friends, and enjoyed living at Aloft. (Doc. 277, at 9). Marks further reported that while at Aloft, staff has helped him with "social things" such as pointing out when he would stand too close to others while speaking to them, a behavior Marks has since improved upon. (*Id.*). Pursuant to records from Aloft, Dr. Baird-Hepworth diagnosed Marks with

ASD, Specific Learning Disorder, With Impairment in Mathematics, and Generalized Anxiety Disorder.   (*Id.* at 19).   Dr. Baird-Hepworth noted that Marks was confused with "social cues of others and what they mean," had a "limited ability to generalize," and a "limited ability to understand friendships at a deeper level, as he is shy especially around others."   (*Id.*).

Dr. Jenkins also reviewed Marks' educational records, and noted that his overall Full Scale Intelligence Quotient ("FSIQ") score in 2006 was 86.   (*Id.* at 11). The school psychologist found Marks' verbal comprehension and verbal abilities were better developed than his nonverbal reasoning and perceptual organizational abilities.   (*Id.*).   Marks scored overall in the average range of cognitive functioning and was not diagnosed with any disabilities warranting special education services. (*Id.*).   However, his novel problem-solving skills, information processing speed, and executive functioning demonstrated mild to moderate levels of impairment, and his auditory-verbal and visual memory skills were weak.   (*Id.* at 11-12).

In reviewing Marks' psychiatric history, Dr. Jenkins noted that Marks was diagnosed with Attention-Deficit-Hyperactivity-Disorder ("ADHD") as a child, and with a specific learning disability in reading comprehension, writing, and math. (*Id.* at 14).   Marks also suffered from anxiety throughout his childhood and had a history of depression.   (*Id.* at 14-15).   Dr. Jenkins also summarized the psychological evaluation reports from Drs. Harvey, Grundy, Geller, Imhof,

Whitney, Danziger, and Otto, each of which have been previously summarized by the Court, and those summaries are again incorporated herein.   (*Id.* at 16-18.   *See* Docs. 76, 95).   Dr. Jenkins also reviewed the forensic criminal responsibility evaluation from Dr. Montalbano, dated August 11, 2020.   (*Id.* at 19).   Dr. Montalbano opined that while Marks "suffer[ed] from a severe mental disease or defect at the time of the alleged offense, namely Autism Spectrum Disorder, he was able to appreciate the nature and quality and wrongfulness of his alleged behavior at the time," and that Marks' ASD did not prevent him "from appreciating the nature and quality of the wrongfulness of his actions."   (*Id.*).

Dr. Jenkins also reviewed 18 hours of interviews between Marks and his attorneys.   (Doc. 277, at 13.   *See also* Tr. Vol. 1, at 58-59).   Dr. Jenkins found that Marks presented as "timid, anxious, and forgetful," displayed "difficulty recalling various details around his case," "repeatedly confused legal terminology and had difficulties recalling what was discussed the day prior with his attorneys," and "appeared to present with memory and cognitive deficits during these interviews." (Doc. 277, at 13).[22]   On the other hand, Dr. Jenkins also reviewed the recording and transcript from Marks' interview with the Lawrence, Kansas detectives, through which Dr. Jenkins found Marks "did not appear to have any memory or cognitive

---

[22] Dr. Jenkins testified that Marks did not appear as nervous in her interactions with him, nor did he present with any memory or cognitive deficits.   (Tr. Vol. 1, at 60).

deficits and seemed to understand the behaviors the officers were discussing with him." (*Id*.). Dr. Jenkins opined that Marks' demeanor presented, at least initially, like he was having a casual conversation with the police, but at some point he began to realize he might be in trouble. (Tr. Vol. 1, at 55-56). Dr. Jenkins also reviewed the online chat transcripts between Marks and his alleged victims, which Dr. Jenkins opined demonstrated Marks' ability to manipulate others, along with an ability to engage in prolonged conversations without any communication deficits. (*Id*. at 79-80).

Dr. Jenkins noted that while at MCC, Marks was capable of managing his personal care needs, did not have any significant interpersonal difficulties with his peers, and was cooperative and respectful. (Doc. 277, at 19). Of note, on his first day at MCC, Marks asked to be placed into Protective Custody, and was sent to the Special Housing Unit ("SHU"). (*Id*.; Tr. Vol. 1, at 39). On May 11, 2021, Marks reported that he asked for protective custody "due to being scarred [sic] of going to general population with a sex offense charge." (Doc. 277, at 20; Tr. Vol. 1, at 53). Dr. Jenkins testified that Marks' request for protective custody demonstrated an ability to advocate for himself. (Tr. Vol. 1, at 39, 124-25).[23]

---

[23] Dr. Jenkins testified to another instance of Marks' advocating for himself, when he talked to his parents and the unit team at the end of his stay at MCC to ensure that all appropriate documentation was in order so that he could leave MCC and return to Aloft. (Tr. Vol. 1, at 40, 121-22). In addition, Dr. Jenkins testified that Marks also advocated for himself to establish phone privileges while at MCC. (*Id*. at 121).

Dr. Jenkins also reviewed Marks' monitored phone calls while at MCC. Marks made several calls to his parents, during which he appeared alert and oriented, did not display any unusual speech or delusional thinking, and appeared comfortable and confident.   (Doc. 277, at 20; Tr. Vol. 1, at 87-88).   Marks was able to communicate to his parents what he was doing at MCC, when his next appointment was with Dr. Jenkins, and complained to his parents about how long it took to facilitate his return to Aloft.   (Tr. Vol. 1, at 88-89).

As noted above, Dr. Jenkins administered several psychological tests to Marks.   The first, the Validity Indicator Profile, measures a person's response style and effort.   (Doc. 277, at 20; Tr. Vol. 1, at 73).   Dr. Jenkins administered the test to Marks on May 13, 2021, but only the verbal portion, due to Marks placement in the SHU.   (Doc. 277, at 20).   Marks' total score was 58, indicating that Marks applied sustained effort for at least some of the items, and intended to answer the questions correctly.   (*Id.* at 20-21).   Marks' word knowledge was estimated to be at least below average or higher.   (*Id.* at 21).   That same day, Dr. Jenkins administered to Marks the Shipley-2 test, which measures cognitive functioning and impairment. (*Id.*; Tr. Vol. 1, at 71).   Marks' crystallized abilities (knowledge gained as a result of education and experience) and fluid abilities (the ability to use logic and other skills to acquire and learn new information) both scored in the Average range, with an overall score of 98.   (Doc. 277, at 21; Tr. Vol. 1, at 71-72).

Dr. Jenkins administered a third test on May 13, 2021, the MMPI-2-RF, which measures personality characteristics, psychological adjustment, and response bias. (Doc. 277, at 21; Tr. Vol. 1, at 73).   His responses and score suggested that he presents himself in a favorable light by denying minor faults and shortcomings, lacks energy, may display symptoms of depression, avoids social situations, is introverted, and has difficulties forming close relationships.   He is also overly trusting of others.   Based on Marks' responses, Dr. Jenkins considered whether Marks suffers from Depression-related disorder and Avoidant Personality Disorder.   (Doc. 277, at 22; Tr. Vol. 1, at 73).

On May 20, 2021, Marks was administered the WASI-II, which estimates a person's general cognitive functioning.   (Doc. 277, at 21; Tr. Vol. 1, at 69).   Marks' overall performance placed him in the Low Average range (FSIQ of 83, 13th percentile).   (Doc. 277, at 22).   His overall Verbal Comprehension Index (acquired knowledge, verbal reasoning, and attention to verbal information) score was 87, placing Marks in the Low Average range.   (*Id*.).   Marks was in the Low Average range in defining words, but in the Average range for determining similarities between target words.   (*Id*.).   On the Perceptional Reasoning Index, which measures fluid reasoning, spatial processing, attentiveness to detail, and visual-motor integration, Marks again scored in the Low Average range.   (*Id*.).   He scored in the Average range on solving spatial problems, and in the Borderline

range for block design.   (*Id.*).   Overall, Dr. Jenkins found Marks' nonverbal intellectual abilities to be in the Low Average range.   (*Id.*).

On May 26, 2021, Dr. Jenkins administered the TOMM, which is used to determine whether a person is feigning cognitive deficits (*i.e.*, malingering).   (*Id.*). The test consists of three trials, each with a maximum score of 50, and persons with no cognitive deficits usually scores between 48 and 50.   (*Id.*).   Marks scored 40 on Trial 1, 42 on Trial 2, and 45 on a third Retention Trial.   (*Id.*; Tr. Vol. 1, at 64-65). While these scores could indicate malingering, Dr. Jenkins found that he only met the criteria for malingering by 3 points, and in the absence of any other evidence throughout the evaluation process to suggest that Marks was attempting to feign memory issues, Dr. Jenkins did not find Marks to be feigning or malingering. (Doc. 277, at 22; Tr. Vol. 1, at 65, 137-38).   Dr. Jenkins also found no clear indications of memory impairment on the part of Marks.   (Tr. Vol. 1, at 68).

Dr. Jenkins further described her observations of Marks' behavior while at MCC.   After he left the SHU, Marks arrived at all of his interviews unescorted, groomed, and dressed adequately.   (Doc. 277, at 23; Tr. Vol. 1, at 22-23).   He was polite, cooperative, and responded to all questions posed, with his best effort. (Doc. 277, at 23; Tr. Vol. 1, at 22-23, 101).   Dr. Jenkins testified that Marks' appearance demonstrated an ability to engage in activities of daily living, as there was no one at MCC who would assist Marks with his grooming or dress, as well as

an ability to follow directions (not get lost en route to Dr. Jenkins).   (Tr. Vol. 1, at 23-24).[24]   Marks typically presented with a neutral mood and congruent affect, with no sign of psychomotor retardation and/or excitation.   (Doc. 277, at 23).   Marks denied appetite or sleep issues, other than describing "weird dreams."   (*Id.*) He maintained moderate eye contact but would often look down or away.   (Tr. Vol. 1, at 50-51).   His speech was coherent, logical, and relevant at a normal volume and pitch, and his thinking appeared organized, rational, and goal oriented.   (Doc. 277, at 23; Tr. Vol. 1, at 47-50).   He denied experiencing any current hallucinations or delusions.   (Doc. 277, at 23).   However, Marks described feeling anxious because of loud noises in the SHU, and that he picked at his hands when stressed – these feelings diminished as he felt more comfortable at MCC, and he became friends with his cellmate.   (*Id.*; Tr. Vol. 1, at 84, 118).   Marks denied any suicidal ideations or self-harming behaviors, was future oriented, as well as fully oriented as to time, place, person, and circumstance, and did not exhibit any trouble with attention and concentration.   (Tr. Vol. 1, at 50, 78, 96).   Dr. Jenkins noted that Mark's "insight and judgment in reference to his case and assisting his attorney is fair. . . ."   (Doc. 277, at 23).   She also noted that Marks' conversational style was pretty similar to that of his prior interview with Dr. Otto.   (Tr. Vol. 1, at 56-57).

---

[24] Dr. Jenkins further testified that Marks was constantly observed while at MCC, and no one ever reported any issues with Marks' ability to care for himself.   (Tr. Vol. 1, at 25, 37).

Based on her evaluation and observations of Marks, Dr. Jenkins diagnosed him with the following conditions:   (1) ASD, Without Accompanying Intellectual Impairment; (2) Social Anxiety Disorder; (3) Major Depressive Disorder, In Full Remission; and (4) Specific Learning Disorder with Impairment in Mathematics, Mild (by history).   (Doc. 277, at 23-24).   Dr. Jenkins based her ASD diagnosis on her review of the records, her testing of Marks, and his low average IQ, and noted that "no cognitive deficits were observed, reported[,] or revealed through testing. (Doc. 277, at 24; Tr. Vol. 1 at 74-75).   However, cognitive deficits were "verified on previous evaluations."   (Doc. 277, at 24; Tr. Vol. 1, at 76).   Dr. Jenkins did note Marks' persistent deficits in social communications and social interactions throughout his lifetime, and that he displayed symptoms of ASD, but was not formally diagnosed until adulthood.   (Doc. 277, at 24-25).   Dr. Jenkins did not find Marks to exhibit any severe deficits in his executive functioning skills, which she based on Marks' ability to make decisions for himself, including the decision to be placed in the SHU.   (Tr. Vol. 1, at 90).

As to his Social Anxiety Disorder, Dr. Jenkins noted that Marks has documented anxiety throughout his life, and almost always felt anxious in groups of more than 4 persons.   (Doc. 277, at 26).   Dr. Jenkins found Marks' Major Depressive Disorder to be in full remission based on Marks' self-report that he has not experienced any symptoms of depression since December 2020.   (*Id.* at 27; Tr.

Vol. 1, at 77-78).    And as to Marks' specific learning disorder, Dr. Jenkins based this diagnosis on a review of Marks' medical, educational, and psychological records, along with Marks' self-report that he had difficulties with math.    (Doc. 277, at 28). Dr. Jenkins "highly recommended" treatment for Marks, in the form of social skills groups, cognitive behavioral therapy, and family therapy.   (*Id.*).   Giving Marks' strong social support and willingness to participate in treatment, Dr. Jenkins found his prognosis to be "good."   (*Id.*).

With respect to the question of Marks' competency to stand trial, Dr. Jenkins first summarized her discussions with defense counsel, Mark J. Mahoney, who reported that Marks has no long-term memory, cannot make any decisions, even with guidance, cannot give a narrative, and does not understand the burden of proof or whether to go to trial.  (*Id.* at 29).   Dr. Jenkins also summarized her discussions with Assistant United States Attorney Emily Chang, who expressed concerns of malingering, and noted that Marks presented very differently in his interviews with counsel versus his interviews with the police.   (*Id.*).

Next, Dr. Jenkins analyzed Marks' understanding of various trial and court concepts.[25]   Marks knew he was at MCC for testing for competency, concepts he was able to recall upon repeat questioning seven days later.  (*Id.*).   Marks knew

---

[25] Dr. Jenkins conducted this analysis during multiple interviews with Marks that lasted between 1-3 hours each, utilizing a standard set of questions that addressed various legal competency issues.

that "competency" meant "your ability to understand something," but did not know what would happen to him if he was found incompetent.   (*Id.*).   Dr. Jenkins educated Marks that if he was found incompetent, Marks could be sent off for competency restoration, and Marks was able to recall this information when asked seven days later.   (*Id.*).   Marks knew the nature of his criminal charges and that they were serious:   "production is like having made the pornography, possession is that I had it, and receipt means I received it."   (*Id.*; Tr. Vol. 1, at 97).   He was able to repeat this answer a week later, as well as acknowledge that he possessed "child pornography, like a photo of a minor, a sexual photo."   (*Id.*).   As to possible penalties, Marks knew he was facing "[a]round 15 to 30 years."   (Doc. 277, at 29; Tr. Vol. 1, at 97-98).   Marks also knew that he was not supposed to use a computer. (Tr. Vol. 1, at 98).   Of note, Marks expressed awareness of the nature of his charges in that he would discuss them in a low voice because he did not want other inmates to know his charges.   (Doc. 277, at 29).   Dr. Jenkins found Marks' responses to suggest a level of awareness that the charges are not favored in prison, and a commitment to his safety.   (*Id.*; *see also* Tr. Vol. 1, at 53, 81-82, 86-87).

Marks knew the difference between a plea of guilty or innocent, and was able to retain that information:   "innocent means you didn't do it and guilty means you have done something wrong."   (Doc. 277, at 29).   Marks did not initially know what an oath meant, but after he was educated on two separate occasions, he was

able to recall and state that an oath was "a promise to tell the truth."   (*Id.* at 29-30).

He also understood the concept of perjury, after being educated, and was able to

recall days later that perjury is "to lie."   (*Id.* at 30).   Marks knew that testimony

was "something you say on the stand," and that he would decide whether to testify

based on the advice of his attorney.   (*Id.*).   Marks also understood the concept of

"evidence," and was able to give examples of such.   (*Id.*).

Marks mistakenly believed a verdict was something issued by a judge, but

knew that a verdict occurred after trial, and that a sentence is "your punishment."

(*Id.* at 30).   He understood and retained basic information about the sentencing

guidelines, and the factors a judge will consider.   (*Id.*).   Marks understood that a

plea agreement was "something to say when you are guilty," and that an advantage

to accepting a plea agreement is that "you might get less time in prison."   (*Id.*).

Marks knew that a person gives up the right to an appeal when accepting a plea

agreement, and after education, knew and retained that a person also gives up the

right to remain silent and to a jury trial.   (*Id.*).

Marks was aware that he was a defendant, and after education, knew that the

judge was neutral and delivers the sentence.   (*Id.* at 30).   He knew that Ms. Chang

is the Assistant United States Attorney assigned to his case, and her role is to prove

guilt through evidence.   (*Id.*).   He also identified his defense counsel by name, and

that their role is to prove Marks is not guilty through evidence.   (*Id.* at 30-31).

Marks also knew that while in a courtroom, he should be respectful and not loud, and that if he displayed inappropriate courtroom behavior, he could be held in contempt.   (*Id.* at 31).   While Marks mistakenly identified the judge as the person who would find him guilty, after education, he understood that the judge maintains order.   (Tr. Vol. 1, at 173-74).

With respect to Marks' ability to work with his attorneys, Marks described his relationship with his counsel as "pretty good.   I talk to them quite a bit, they are nice."   (Doc. 277, at 31; Tr. Vol. 1, at 82-83).   When asked if he was able to work with defense counsel, Marks first stated that "I talk to them, but don't know what they are talking about"; however, upon further discussion Dr. Jenkins found this difficulty to be due to the attorneys' use of sophisticated words and legal jargon. (Doc 277, at 31; Tr. Vol. 1, at 108-09).   Marks was able to explain multiple aspects of his case and relay his attorneys' strategies to defend him.   (Doc. 277, at 31). Marks stated that he would ask his attorneys a lot of questions, such as where he is going to go and "what is going to happen in a month or two down the line," but was unable to articulate how he would help in his defense beyond stating whatever his attorneys ask him to do.   (*Id.*; Tr. Vol. 1, at 176).   He was unable to articulate the best possible outcome for his case, other than to "get it over with," which he acknowledged was probably not realistic.   (Doc. 277, at 31).

As to his ability to make decisions, Dr. Jenkins stated the following in her

report:

> Throughout the evaluation, Mr. Marks discussed leaning on his lawyer
> and parents to assist him with making the best decision regarding his
> legal situation.   He explained he trusts his lawyers and his parents to
> guide him.   Throughout his life, Mr. Marks has had to rely on his
> family, which may have impacted his self-confidence, assertiveness
> and decision-making skills.   Mr. David J. Marks acknowledged his
> family "did everything for him" and "some people say we put up great
> scaffolding."   Based on conversations with Mr. Marks and his father,
> it became apparent Mr. Marks has not had to make decisions on his
> own and regularly looks to his family and attorneys for guidance.
> Mr. Marks is employing the same decision-making tactic he has used
> his whole life – look to others to provide him with guidance on a
> decision; however, he also appears to have a good understand[ing] of
> what his decision means and what may result from it.   Mr. Marks
> reported he already signed a plea agreement because his attorney told
> him it was the "best deal he could get," because going to trial was "too
> much of a risk."   Mr. Marks expressed accepting the plea agreement
> was the "best option" because there was a possibility of him facing "40
> years" in prison.   When asked if he is presented with a different but
> similar decision to make in regards to a plea deal, he stated he would
> consult with his attorney and his parents before signing a plea
> agreement.   When asked what happens if he were to receive different
> advice from his father and attorneys, Mr. Marks stated he would end
> up choosing his attorneys['] advice because "they have a better
> understanding of the law than most people do."   Of note, Mr. Marks
> contended even though he would follow his attorney's advice, he
> ultimately understood it was his decision to make.

(Doc. 277, at 31; *see also* Tr. Vol. 1, at 103-04).   Dr. Jenkins further testified that while

Marks is not comfortable making his own decisions, he can do it when necessary.

(Tr. Vol. 1, at 109-10).   According to Dr. Jenkins, Marks has a basic understanding

of his case, and if issues are explained to him in a simplified way, he can weigh the

merits of various defenses available to him.   (*Id.* at 111-12).

As to Marks' overall competency to proceed, Dr. Jenkins opined as follows:

Mr. Marks is fully oriented, rational, and in good contact with reality. He was able to provide accurate but simplistic definitions of the key concepts and participants of the courtroom.   For concepts with which he was not familiar, he was educated and demonstrated subsequent understanding, even after a short and long-term delay.   He is capable of comprehending the possible outcomes of his case, communicating with counsel, weighing the merits of various defenses, and making decisions regarding numerous constitutional protections such as his right to trial, his right to an attorney, his right to enter into a plea, and his right to call witness, etc.   He is capable of testifying in his own defense and speaking during sentencing proceedings should it be necessary.   Mr. Marks believes his attorneys are trustworthy and have his best interest.   He is not currently experiencing any delusions or other serious psychiatric symptoms that would impair his ability to form a trusting, consultative relationship with an advising attorney.

Mr. Marks is currently diagnosed with Autism Spectrum Disorder (by history); Social Anxiety Disorder; Specific Learning Disorder with Impairment in Mathematics (by history); and Major Depressive Disorder, Mild, In Full Remission.   Throughout the evaluation process, Mr. Marks was able to appropriately relate to and communicate with this evaluator and staff throughout the institution. He displayed an ability to incorporate information presented to him, follow directions, advocate for himself, and keep himself safe during his time at MCC-NY.   Additionally, he was compliant and well-behaved throughout testing and interviews.   Overall, Mr. Marks is not experiencing any symptoms that would interfere with his ability to understand the nature of his charges, courtroom proceedings, or his ability to consult with his attorney.   He is currently capable of maintaining proper courtroom behavior, as well as appropriately attending to and participating in courtroom proceedings.   Therefore, it is the opinion of this evaluator Mr. Marks has a rational and factual understanding of the proceedings against him and he is capable of assisting counsel with his defense.

(Doc. 277, at 32; *see also* Tr. Vol. 1, at 98-100, 104-05, 120-21, 195-96, 198-99, 205-06).

Dr. Jenkins concluded her report by stating that Marks suffers from a mental defect – ASD – but that he currently possesses a rational and factual understanding of the proceedings against him, has the capacity to assist his counsel, and can rationally make decisions regarding legal strategy.   (Doc. 277, at 32).   Dr. Jenkins recommended that Marks frequently check-in with his attorneys, that information be presented to him in simplified form to ensure he understands, and that he would benefit from periodic breaks during court proceedings.   (*Id.*; Tr. Vol. 1, at 105-06).[26]

### 2.   *Ms. Gretchen Bennett*

The first defense witness to testify was Gretchen Bennett, a licensed speech-language pathologist.   (*See* Doc. 254).   Ms. Bennett received her Bachelors of Science in teaching and speech and hearing handicaps from Ithaca College in 1996, and her Masters of Arts in speech-language pathology from the University of Buffalo in 1999.   (*Id.* at 19; Tr. Vol. 1, at 211-12).   Ms. Bennett worked from 1999-2003 in the Clarence Central School District as a speech-language pathologist in self-contained special education classrooms, where she worked with children with ASD

---

[26] In his post-hearing briefing, Marks seeks to discredit Dr. Jenkins' findings on the basis that she did not record her sessions with Marks.   Doc. 300, at 16.   This same criticism was levied by the United States against Drs. Geller and Danziger in the 2019 competency proceedings.   *See* Doc. 75, at 49, n. 17.   The criticism was rejected then, and it is rejected now, particularly given Marks' current reliance on Dr. Geller's findings.   *See also* Doc. 95, at 13 (noting that recording evaluations is not mandatory).

and various learning disabilities.   (Doc. 254, at 19; Tr. Vol. 1, at 212-14).   Since 2003, Ms. Bennett has worked as a clinical faculty member and associate professor of speech and language at the University of Buffalo.   (Doc. 254, at 19; Tr. Vol. 1, at 212).   She is also the Clinic Director for the University of Buffalo Speech Language and Hearing Clinic.   (Doc. 254, at 19).   Ms. Bennett completed a clinical fellowship, and received the Mary B. Mann Award and a Tindle-Shupe Award for clinical excellence.   (Tr. Vol. 1, at 213).   Ms. Bennett has a Certificate of Clinical Competence from the American Speech, Language, and Hearing Association, and is licensed in New York State.   (Doc. 254, at 19; Tr. Vol. 1, at 214).   She also has served on a local board for autism services, and was co-chair for the state association of speech-language pathologists.   (Tr. Vol. 1, at 214-15).   She is a prolific lecturer and presenter on various speech and language topics, and has received at least four grants in that area.   (Doc. 254, at 20-21).   Ms. Bennett was tendered as an expert in speech and language pathology without objection.   (Tr. Vol. 1, at 220-21).

Ms. Bennett met with Marks on June 22, 2021 for approximately four hours and conducted a speech-language evaluation, for the purpose of evaluating Marks' expressive and receptive language, higher-level language skills, and social pragmatics.   (Doc. 254, at 1; Tr. Vol. 2, at 24, 27).   As part of her evaluation, Ms. Bennett briefly interviewed Marks' father, and administered eight different tests to Marks:   (1) Test of Adolescent and Adult Language, Fourth Edition ("TOAL-4");

(2) Clinical Evaluation of Language Fundamentals Fifth Edition Metalinguistics ("CELF-5"); (3) Social Language Development Test—Adolescent: Normative Update ("SLDT-A"); (4) Theory of Mind Inventory Self Report: Adult; (5) Cambridge Behavior Scale, Empathy Quotient ("EQ"); (6) Social-Emotional Skills Rating Scale; (7) Social and Academic Competence Checklist; and (8) Conversational Analysis Form.   (Doc. 254, at 2).   Ms. Bennett also assessed Marks' voice, fluency, and articulation throughout her evaluation.   (*Id.*).   It appears that Ms. Bennett also reviewed some of the court filings from the 2019 competency proceedings, as well as at least portions of the reports from Drs. Jenkins, Geller, and Negron, the interview with the Lawrence, Kansas police, some of the online chats between Marks and his alleged victims, some of Marks' prior speech and psychological reports, and various information and reports from Aloft.   (Doc. 254, at 15-16; Tr. Vol. 2, at 25-26).[27]

The first test Ms. Bennett administered to Marks was the TOAL-4, which provides an assessment of general language ability, both spoken and written, of adolescents and adults.   (Doc. 254, at 2; Tr. Vol. 1, at 223).   Ms. Bennett found that Marks struggled with understanding words like antonyms, synonyms, and analogies.   (Tr. Vol. 1, at 223).   Marks tested in the average range with respect to

---

[27] It is unclear when Ms. Bennett reviewed this material, but it appears that she reviewed at least some of these documents after she finalized her report.   (Tr. Vol. 2, at 27).

identifying word opposites, but in the low average, below average, or poor range in all other areas – word derivations, spoken analogies, word similarities, sentence combining, and orthographic usage.   (Doc. 254, at 3; Tr. Vol. 1, at 224).   If vocabulary was used that Marks did not understand, he would lose the message and intent of what was being communicated to him.   (Tr. Vol. 1, at 224).   Marks also struggled with higher-level language, such as interpreting sarcasm.   (*Id.* at 224-25).   Ms. Bennett found that Marks had significant impairment in his overall language functioning, which he would mask with head nods, polite behavior, and non-verbal feedback.   (Doc. 254, at 4).

Next, Ms. Bennett administered the CELF-5, which measures a person's ability to think about and use language to make inferences, manipulate conversational speech given a context, use words in multiple ways, and use language in a non-literal manner.   (*Id.*; Tr. Vol. 1, at 226).   Part of this test was administered by Dr. Baird-Hepworth while Marks was at Aloft.   (Tr. Vol. 1, at 226).   Marks' scores were in the normal range for making inferences, but in the impairment range for conversational skills, multiple meanings, and figurative language.   (Doc. 254, at 4-7).   He was significantly impaired on his metalinguistics profile (the awareness of multiple and implied meanings, including sarcasm and irony) with a scaled score in the bottom 1%.   (*Id.* at 4-5; Tr. Vol. 1, at 226-27).   Ms.

Bennett found Marks' abilities in these areas to range between those of a 9 to 14-year-old.   (Doc. 254, at 5; Tr. Vol. 2, at 18).

Ms. Bennett also administered the SLDT-A Test, which assesses the ability to make inferences, interpret and respond to social interactions, problem solve, and interpret ironic or sarcastic remarks.   (Doc. 254, at 7; Tr. Vol. 1, at 228).   Marks scored in the average range on social interactions, but in the impaired range in the areas of making inferences, interpreting social language, problem solving, and interpreting ironic statements.   (Doc. 254, at 7-9).   He demonstrated concrete thinking and an inability to give more descriptive answers, and his problem-solving skills were quite simple.   (Tr. Vol. 1, at 229, 231).   However, Marks did respond appropriately and politely when asked how he would respond in various social situations, but Ms. Bennett did not interpret his answers to mean that Marks would actually be able to follow through and perform in the same way that he responded. (*Id.* at 230-31).

Marks also completed the Theory of Mind Inventory, which assessed his ability to recognize and understand other people's perspectives.   (Doc. 254, at 9; Tr. Vol. 1, at 232-33).   Marks' responses correlated to a percentile rank of 23% when compared to other males with ASD, but his percentile dropped to below 1% when compared to typically developing males.   (Doc. 254, at 9; Tr. Vol. 1, at 233).   In particular, Marks had difficulty in affective empathy, episodic memory, nonliteral

language, complex social judgment, detecting lies versus jokes, cognitive empathy, emotion recognition, social awareness, and social perception.   (Doc. 254, at 9; Tr. Vol. 1, at 234).

Ms. Bennett next administered the EQ, which assess a person's ability to empathize with others.   (Doc. 254, at 10).   Marks scored 17 out of 80 on the empathy scale – a score of 30 or less indicates a lack of empathy.   (*Id.*; Tr. Vol. 1, at 235; Tr. Vol. 2, at 9-10).   In other words, Marks had difficulty in perceiving the feelings and intentions of others.   (Tr. Vol. 1, at 235-36).   With respect to the Conversational Analysis Form, Ms. Bennett found that 24% of Marks' conversational behaviors were inappropriate.   (Doc. 254, at 10; Tr. Vol. 2, at 11).

Ms. Bennett also had both Marks and his father complete the Social-Emotional Skills Rating Scale, which rates different social behaviors based on how frequently Marks engages in them.   (Doc. 254, at 10-11).   Ms. Bennett found the answers to further support the challenges Marks faces in interacting with and understanding others.   (*Id.* at 10-12).   In particular, Marks showed difficulty with conversing, communicating with others, interacting, listening, planning what to say, expressing opinions, and providing information succinctly.   (Tr. Vol. 2, at 11-12).   Last, Ms. Bennett administered the Social and Academic Checklist to Marks' father, which again assessed various past and present social functioning skills. (Doc. 254, at 12).   Of note, Marks' father reported that Marks cannot tell or re-tell a

story or explain a process in detail, is unable to organize, categorize, or complete tasks in an efficient manner, struggles to maintain focus on a topic or issue until it is resolved, is inflexible in this thinking, and has difficulty thinking beyond a single topic or changing his routine.   (*Id.* at 12-13).

Overall, Ms. Bennett found Marks presented with a receptive and expressive language disorder, with social pragmatic language impairments associated with ASD.   (Doc. 254, at 13; Tr. Vol. 2, at 17).   He has a lack of understanding of cultural norms, conventions, and rules of behavior that are obvious to his socially appropriate peer group.   (Doc. 254, at 13).   He is a concrete thinker and quite simplistic in his reasoning abilities.   (*Id.* at 14; Tr. Vol. 2, at 10).   He understands much less than someone of his age.   (Doc. 254, at 14).   His inability to understand another's perspective significantly impairs his decision-making and understanding options.   (*Id.*).   In particular, Marks "is significantly impaired in his ability to hold in mind and weigh multiple variables that might bear on a particular decision and lacks the capability to understand the implications of his choices."   (*Id.* at 15).

On the question of Marks' competency to proceed, Ms. Bennett stated that very inaccurate conclusions can be drawn about the mental operations of a person with ASD and speech and language difficulties.   (*Id.*).   Ms. Bennett opined that the Court's prior interpretations of Marks' conversations with the Lawrence, Kansas detectives, and the online chats, could be subject to bias, and that a more accurate

assessment of Marks' language skills can be found via her test results.   (*Id.* at 16). She also opined that Marks was able to answer the detectives' questions because they were "factual, rote memory, straightforward."   (Tr. Vol. 2, at 15).   Based on the test results, Ms. Bennett also disagreed with the Court's previous findings that Marks possessed the capacity for sustained concentration, could plan for the future, recognize the social perspectives of others, or that he has the capacity to testify in a relevant manner.   (Doc. 254, at 16-17).   Ms. Bennett took note that Marks would use the same answers during his psychological evaluations, and was really just repeating "terms of art" or "scripts" without any real understanding, which did not support any inferences of competency.   (Doc. 254, at 17; *see also* Tr. Vol. 2, at 19-20).

Ms. Bennett also reviewed some of the videos of Marks talking with his attorneys.   (Tr. Vol. 2, at 22, 24).   Ms. Bennett interpreted Marks' responses in those videos as demonstrating his struggles to comprehend and his confusion, as well as feelings of being overwhelmed.   (*Id.* at 22).   She did not give any opinion on the ultimate question of whether Marks is competent to proceed.   Rather, Ms. Bennett opined that further evaluation of Marks' speech and language behavior by a speech and language pathologist would be necessary "in order to reliably interpret the speech and language behavior of Steven Marks on a question of such consequence as the present determination of competency[.]"   (Doc. 254, at 17).

During cross-examination, Ms. Bennett testified that she completed all of the tests, and based all of her conclusions, on her single, four-hour meeting with Marks. (Tr. Vol. 2, at 27-30).   And while Ms. Bennett opined that Marks did not possess the capacity for sustained concentration, Ms. Bennett rendered that opinion while admittedly lacking the knowledge that Marks had previously participated in a four-hour clinical interview with Dr. Otto with only one short bathroom break, and that Marks' online chats with his alleged victims at times lasted for eight continuous hours.   (*Id.* at 31).   She also qualified her opinion on Marks' ability to testify to state that Marks would be able to repeat facts, but would not be able to organize his thoughts or provide a narrative.   (*Id.* at 33).   Further, Ms. Bennett testified that Marks' online chats demonstrated an ability to avoid future consequences (which Ms. Bennett qualified as "immediate"), as well as an ability to recognize the social perceptions of others (through flattery) contrary to her report findings.   (*Id.* at 35-39; 46).   Last, and perhaps most notable, Ms. Bennett reviewed several pages of transcript of conversations between Marks and his counsel, during which counsel engaged in role play with Marks to explain various options in defense strategy, including a plea offer, and Marks was able to weigh the different options and explain them.   (*Id.* at 44-45 (reviewing Def. Ex. 3, Vol. 10:35-36; Vol. 15:3-9, 11-13)). Ms. Bennett found Marks' counsel to be successful in educating Marks "to make sure he really understood it so that he could make that choice with the guidance

that he had," and that Marks "was able to restate the information . . . and . . . share those details."   (*Id.* at 45-46; *see also id.* at 56 ("With preparation, practice rehearsal, review, review, review, he did much better in explaining those facts.")).

> 3.    *Dr. Rosa E. Negron-Munoz*

The second defense witness to testify was Dr. Rosa E. Negron-Munoz, a triple board-certified psychiatrist in the areas of adult, child and adolescent, and forensic psychiatry.  (Tr. Vol. 2, at 58).   Dr. Negron-Munoz received her medical degree from the San Juan Batista School of Medicine in Puerto Rico, and received fellowship training in various specialties, including psychoanalysis and psychodynamic psychotherapy.   *Id.* at 59).   Her professional history includes employment as a psychiatrist in various state jails and prisons, including the Hillsborough County Jail in Tampa, Florida, in various court systems, and in private hospitals.  (*Id.* at 59-60).   Dr. Negron-Munoz currently owns her own private practice in Lakeland, Florida, and contracts her services to the Florida Department of Juvenile Justice and to a school for behaviorally challenged children. (*Id.* at 60; Doc. 255, at 1).   She is the assistant medical director for a community mental health center, and is on the board of directors for the Tri-County Human Services Foundation and the Polk County National Alliance on Mental Illness.   (Tr. Vol. 2, at 60).   Dr. Negron-Munoz chairs the Developmental Disabilities Committee for the American Academy of Psychiatry and the Law, and is a member of the Child

and Adolescent Committee, Corrections Committee, and Child Stress Committee. (*Id.*).   She is also on the editorial board of the Journal of the American Academy of Psychiatry and the Law.   (*Id.*).   She is currently an associate professor at the University of South Florida, and a visiting professor at Albert Einstein College of Medicine; she also teaches courses in Puerto Rico.   (*Id.* at 61).   Dr. Negron-Munoz has varied experience in competency cases, although the number of competency evaluations she has performed in criminal cases was not provided.   (*Id.* at 61-62). The majority of her competency evaluations occur in state court, and she is appointed by the court to conduct those evaluations about 50% of the time.   (*Id.* at 62).   Dr. Negron-Munoz was tendered as an expert in the areas of psychiatry and forensic psychiatry without objection.   (*Id.* at 62-63).

Dr. Negron-Munoz met with Marks over three sessions on November 23, 2020, December 12, 2020, and September 30, 2021, each of which were completed remotely via an online platform.   (Doc. 255, at 1, 29).[28]   During these sessions, Dr. Negron-Munoz administered two tests to Marks:   the PTSD Checklist for DSM-5 ("PCL-5") and the Adult ADHD Self-Report Scale ("ASRS-v1.1").   (*Id.* at 31-35). Because Marks had already been subjected to a multitude of other psychological

---

[28] Dr. Negron-Munoz was initially retained by defense counsel as a potential trial witness on the question of Marks' criminal responsibility, and her first two sessions with Marks related solely to that issue.   The final session related to her assessment of Marks' competency.   (Doc. 255; Tr. Vol. 2, at 63, 74-75).

tests, Dr. Negron-Munoz chose to engage only in limited testing herself, and instead relied on prior test results from the previous evaluations.   (*Id.* at 31; *see also* Tr. Vol. 2, at 110 (opining that Marks' mental condition at the time of his offense is the same as now because autism is consistent and does not change), and Doc. 255, at 4 (noting that Marks' symptoms of autism and intellectual disabilities are static, his underlying conditions have not changed over the last three years, and the interpretations of his behaviors and methodology for assessing his condition and deficits remain the same)).   However, other than a discussion of the Vineland scores, Dr. Negron-Munoz limited her discussion of any previously administered tests to those performed by Dr. Jenkins.   (Doc. 255, at 15-29).

Dr. Negron-Munoz reviewed numerous collateral sources, including:   (1) Dr. Jenkins' report, notes, and raw data; (2) 2021 notes from Aloft and various emails and notes from Dr. Baird-Hepworth; (3) the online chat transcripts; (4) the April 2019 competency hearing transcript, and related Court orders; (5) the motions and related filings for the 2021 competency proceedings; (6) Marks' interview with Dr. Otto; (7) Marks' interview with the Lawrence, Kansas police detectives; (8) various psychological reports from Marks' childhood; (9) the expert reports from Drs. Geller, Quinten, and Grundy which were admitted in the April 2019 hearing; (10) the transcripts and 30 hours of videos from Marks' meetings with his defense counsel; and (11) a neuropsychological document review from Dr. Elizabeth

Roberts.   (Doc. 255, at 57-62).[29]   However, aside from her own evaluation of

Marks, it appears that the most relevant collateral source Dr. Negron-Munoz relied

upon in formulating her opinions was the transcript of 30 hours of video interviews

between Marks and his attorneys.   (*Id.* at 5, 52-53; Tr. Vol. 2, at 64-65).[30]

---

[29]  The version of Dr. Negron-Munoz's report admitted into evidence at the December 2021 hearing is 56 pages in length and consists solely of her report, without any addenda.   (Def. Ex. 18; *see also* Doc. 284).   However, the version of Dr. Negron-Munoz's report previously provided to the Court, and which was filed (under seal) on the docket, contains an additional 26 pages of material – including the doctor's curriculum vitae, a list of all materials she reviewed, and a copy of a neuropsychological document review authored by Dr. Elizabeth Roberts, Psy. D.   (Doc. 255).   The list of materials and curriculum vitae were not otherwise admitted into evidence at the hearing, thus I would be well within my authority to disregard them.   However, I find that these documents were discussed during the hearing, without objection from the United States, and I will therefore consider them here as well.   (*See, e.g.*, Tr. Vol. 2, at 59-64).

The neuropsychological document review from Dr. Roberts, dated October 3, 2021, was admitted as a separate exhibit, without objection (Def. Ex. 43; *see* also Doc. 284; Tr. Vol. 3, at 43-46). However, upon review of this report, it is clear that it is nothing more than an impermissible attempt to bolster and rehabilitate Dr. Geller's prior reports, and in particular to address the findings this Court made as to Dr. Geller.   (Def. Ex. 43, at 1-2 ("I have been asked to evaluate, . . . concerns raised about the evaluation of Steven Marks by Lynda Geller, PhD . . . ."); *id.* at 3-4 (section entitled "Judicial concerns about Dr. Geller's Reports"); *id.* at 9-10 (section entitled "Conclusion" which states that Dr. Geller's prior findings as to Dr. Geller's reports were "unfounded.")).   As defense counsel is well aware, on June 21, 2021, the Court authorized CJA funds for Dr. Geller so that she could testify at the December 2021 competency hearing (and the fact that she did not testify has nothing to do with this ruling).   (Doc. 227, filed under seal).   In that June 21, 2021 Order, the Court advised counsel that Dr. Geller "may not use the pending competency hearing as an opportunity to rebut the Court's finding as to deficiencies in her report or testimony concerning the Defendant's competence to stand trial in April 2019."   (*Id.* at 1-2).   If Dr. Geller herself would not have been permitted to testify on these issues, defense counsel cannot evade this prohibition via an outside third party.   I therefore have not considered this report or the portions of Dr. Negron-Munoz's report that recite some of Dr. Roberts' findings.   (Doc. 255, at 50-51).

[30]  Dr. Negron-Munoz also reviewed various progress notes from Aloft, which she found to reveal the following traits about Marks:  (1) he is compliant with rules and structure, and has rigidity about rule breaking; (2) he socializes at a 3rd or 4th grade level; (3) he has limited social reciprocity and an inability to make friends; (4) he is a slow learner, and has memory issues when suffering from anxiety; (5) he has difficulties being assertive and confrontational; (6) he relies heavily on staff for communication, with no insight into self-care and needs to be prompted for activities of daily living; (7) he repeats what others say without understanding the meaning; (8) he has a low level of understanding of the court process; and (9) he did not know what would happen

At the beginning of the evaluation, Dr. Negron-Munoz explained to Marks the purpose of the examination, and that her findings would not be confidential. (Doc. 255, at 2).   Marks expressed an understanding that a copy of the report would go to the Court, although Dr. Negron-Munoz does not believe that Marks understood what consent really means, he simply consents because he believes it is the right thing to do.  (*Id.*; Tr. Vol. 2, at 77-78).   However, Dr. Negron-Munoz admitted that she did not attempt to fully educate Marks on these concepts.   (Tr. Vol. 2, at 111-12).   Dr. Negron-Munoz also summarized several of the collateral sources she reviewed, starting with a summary of Marks' developmental history, and noted that it was consistent with "Dr. Geller's more exhaustive discussion." (Doc. 255, at 5-8).

During her evaluations of Marks, Dr. Negron-Munoz observed him to make limited eye contact, his speech was overall at a normal rate and rhythm, he put forth full effort and was cooperative, but he did need to have questions rephrased at times into simpler terms, and exhibited blunted affect and concrete thinking.   (*Id.* at 29-31).   Dr. Negron-Munoz noted that Marks "can concentrate and sustain appropriate attention, although he needs things repeated to him at times."   (*Id.* at

---

to him after he accepted his plea deal.   (Doc. 255, at 9-10).

29).   She also agrees with Ms. Bennett's observations that Marks has challenges in understanding others and possesses poor language skills.   (*Id.* at 30).

Dr. Negron-Munoz first administered to Marks the PCL-5, which is a self-report test that assesses the 20 DSM-5 symptoms of PTSD.   (*Id.* at 31).   Dr. Negron-Munoz had to re-read and explain to Marks many of the items on the questionnaire, and at times provides examples.   (*Id.*).   The score range is 0-80, and Marks scored a 58, which suggested "a more definitive diagnosis of PTSD" resulting from Marks' stay at MCC.   (*Id.* at 31-32).   Dr. Negron-Munoz found this score to correlate with her own observations of Marks, as well as a prior diagnosis of PTSD by the psychologist at Aloft.   (*Id.*).   The second test Dr. Negron-Munoz administered to Marks was the ASRS-v1.1, which is another self-report test to determine whether a person suffers from ADHD.   (*Id.* at 33).   Marks scored 4 out of a possible 6 on Part A of the test, and 8 out of a possible 12 on Part B – these scores are indicative of symptoms consistent with ADHD in adults.   (*Id.* at 34).   According to Dr. Negron-Munoz, persons suffering from ADHD can have difficulties with focusing, paying attention, learning, and executive learning.   (*Id.*).

Dr. Negron-Munoz diagnosed Marks with the following conditions:   (1) ASD; (2) Intellectual Disability with Language Disorder; (3) Specific Learning Disability with Impairment in Mathematics, Moderate; (4) Major Depressive Disorder, Recurrent, Moderate; (5) ADHD, combined presentation; and (6) PTSD.

(Doc. 255, at 35-48; Tr. Vol. 2, at 79, 92-93).   She also diagnosed Marks with significant speech and language deficits, concurring in full with Ms. Bennett's evaluation and assessment of Marks.   (Doc. 255, at 48-50).   In particular, Dr. Negron-Munoz agreed that "very inaccurate conclusions can be drawn about the mental operations of a person with speech and language difficulties," and critiqued others' conclusions that Marks' executive functioning was not impaired.   (*Id.* at 49). She further opined that there is "no correlation" between Marks' ability to engage in fluid conversations in varied situations and his ability to assess his legal situation, make rational decisions, or understand his attorney's advice or strategy.   (*Id.* at 50).

Upon review of the various collateral sources, and her own clinical evaluation of Marks, Dr. Negron-Munoz opined that Marks suffers from a mental defect (ASD) "which renders him unable to rationally understand the nature and consequences of the proceedings against him or to assist properly in his defense, including the ability to make rational decisions on his own even with the advice of counsel, and mentally incompetent to proceed."   (*Id.* at 51).   Dr. Negron-Munoz further opined that "there is no foreseeable manner in which any available treatment can assist Steven to attain this competence."   (*Id.*).   In particular, Marks lacks:   (1) any genuine understanding or experience of the process of making complex decisions; (2) the capacity to understand factual information and legal principles relevant to the specific decision at issue; (3) the capacity to bring to mind and hold in working

memory information that is relevant to make a complex decision; (4) the capacity to think rationally about and compare alternative courses of action and envision the consequences of each; (5) the capacity to evaluate legal advice from his attorneys; (6) the capacity to even envision information that might assist him in making decisions; (7) the capacity to appreciate his situation and comprehend the need to take a role in making choices that will have life altering consequences; and (8) the capacity to make rational decisions in his best interest and assist in his defense.   (*Id.* at 51-52).

In support of these opinions, Dr. Negron-Munoz discussed some of her observations of Marks during her three interviews with him.  She found him to have a basic understanding of what is asked of him, but upon further questioning, responds "I don't know," or "that is what I was told."   (*Id.* at 11).   He also confused his father with his lawyer – mistakenly asserting that his father advised him to take a plea deal, when in fact he did not consult with his father on this issue. (*Id.*).   Marks was unable to identify any questions he would ask his attorneys in order to decide whether to accept a plea offer; instead, Marks would simply rely on his attorneys to tell him what to do "because I have a hard time making choices." (*Id.*; *see also* Gov. Ex. 13, at 20-21).[31]   Marks was also unable to explain how he

---

[31] On this same point, Dr. Negro-Munoz referenced her videotaped interviews with Marks, which she contends demonstrates his inability to make decisions.   (Tr. Vol. 2, at 103-04).

would assist his attorneys with his defense, beyond simply doing whatever they needed him to do.   (Doc. 255, at 12).   Dr. Negron-Munoz opined that Marks simply parrots back facts that are told to him, without any understanding, and exhibits difficulties with rote memory, although on cross-examination she clarified that Marks has the capacity for some rote memorization but does not have "higher-level" capacity.   (*Id.* at 13-15; Tr. Vol. 2, at 124).[32]   Dr. Negron-Munoz noted that Marks' answers to questions about trial and legal matters were the same during his evaluations with Drs. Otto, Jenkins, and herself.   (Tr. Vol. 2, at 76-77, 79). Nevertheless, Dr. Negron-Munoz acknowledged that she was able to complete her competency evaluation of Marks – using many of the same questions Dr. Jenkins utilized in her evaluation – by simplifying the questions.   (*Id.* at 125-26).[33]

Turning to the 30 hours of discussions between Marks and his attorneys, Dr. Negron-Munoz interpreted those videos to show "Steven's utter inability to bring to mind any of the factors which might bear on his choice and his utter inability to decide himself what to do," despite "the effort of the attorney to educate the client

---

[32] As to Dr. Negron-Munoz's contention that Marks was unable to retain information, she admitted in her testimony that during her October 2021 competency evaluation of Marks, he was able to recall information that Dr. Jenkins provided to him in June 2021, some 3-4 months prior. (Tr. Vol. 2, at 118-20).   Notably, her own interview notes demonstrate that Marks was able to provide detailed information about his educational history, dating back to elementary school, and was able to discuss his offense conduct.   (*Id.* at 142-44).

[33] Dr. Negron-Munoz also acknowledged that the Lawrence, Kansas detectives were able to complete their interview with Marks, who responded with relevant and informative answers, by engaging in a "relaxed" interview style.   (Tr. Vol. 2, at 126-27).

and coach the client to be prepared to make the decisions which he alone can make." (Doc. 255, at 53).   According to Dr. Negron-Munoz, "anyone viewing what actually happened would have to conclude that Steven's signing the plea agreement was not the product of his own rational deliberation.   Rather, unable to make a decision, he relied entirely on his attorney's recommendation, without even inquiring as to the reasons for this recommendation."   (*Id.*).[34]

Dr. Negron-Munoz also spent an extensive portion of her report and hearing testimony critiquing Dr. Jenkins' opinions.   (*Id.* at 15-29).   In short, Dr. Negron-Munoz took issue with nearly every aspect of Dr. Jenkins' report – starting with an assumption that the majority of time Dr. Jenkins spent with Marks "likely [was] mostly" dedicated solely to testing, and that Dr. Jenkins merely took Marks' information at "face value," to include a claim that Dr. Jenkins did not take any of the collateral evidence into account, and that Dr. Jenkins' historical summary was incorrect.   (Doc. 255, at 15-16; Tr. Vol. 2, at 69-72).   Dr. Negron-Munoz also appeared critical of the fact that a doctoral student was present and participated in Marks' evaluation.   (Doc. 255, at 16).   Dr. Negron-Munoz opined that Dr. Jenkins

---

[34] Dr. Negron-Munoz testified that Marks received "continuous" and "perpetual" education on various legal topics related to his case for four years (since his indictment). However, on cross-examination, she acknowledged that the "continuous and perpetual education" really consisted of an eight-day period in late September and early October 2020, one day in late October 2020, and five days in April 2021.   (Tr. Vol. 2, at 122-24).   She also claimed that Marks was given legal education while at Aloft, but the progress notes from Aloft do not reflect any such education.   (Tr. Vol. 2, at 123-24; Def. Ex. 25).

erred by merely relying on Marks' answers, instead of focusing on the videos of Marks talking with his attorneys, which Dr. Negron-Munoz contended disproved all of Dr. Jenkins' opinions as to Marks' competency, in particular his decision-making skills.   (*Id.* at 19).[35]   Dr. Negron-Munoz also took issue with Dr. Jenkins' failure to consider whether Marks possesses "decisional competency," a legal standard that does not apply to this case.   (Doc. 255, at 20; *see also* Tr. Vol. 2, at 102 (testifying that Dr Negron-Munoz geared her questioning of Marks in significant respects to decisional competency); Tr. Vol. 2, at 150 (testifying that she based her competency evaluation on both adjudicative and decisional competency)).

While agreeing that Marks suffers from ASD, Dr. Negron-Munoz disagreed with Dr. Jenkins' opinion that Marks' ASD did not impact his activities of daily living, arguing that Dr. Jenkins failed to account for the structured environment at MCC, the fact that Marks' hair was matted when he left MCC, the progress notes from Aloft, and that Marks had difficulty caring for himself when he lived in Orlando years prior.   (Doc. 255, at 21; Tr. Vol. 2, at 80-81).

Dr. Negron-Munoz further disagreed that Marks does not have an accompanying intellectual impairment.   (Doc. 255, at 22).   Rather than focusing on

---

[35] Dr. Negron-Munoz's opinions on this point are somewhat contradictory – on the one hand she criticized Dr. Jenkins' reliance on Marks' own self-reporting of his behavior and limitations, yet on the other hand, the only tests she administered to Marks were both self-report assessments, and she agreed completely with Ms. Bennett's test results, the vast majority of which are based on Marks' self-report answers.   (Tr. Vol. 2, at 68-70, 145-46; Doc. 255, at 31-34).

Marks' FSIQ, which ranged between 79-88 (above the threshold for mental retardation), Dr. Negron-Munoz focused on Marks' Vineland scores, which she contended demonstrated impairment in Marks' adaptive functioning.   (Doc. 255, at 22; Tr. Vol. 2, at 84, 170).   According to Marks' Vineland scores – which were assessed during testing with Dr. Geller – his social skills average those of a three-year-old child, his coping skills average those of a five-year old, and his play and leisure skills average those of a child eight years and 10 months old.   (Doc. 255, at 23; Tr. Vol. 2, at 127-32).[36]   According to Dr. Negron-Munoz, these scores equate to a finding, under the DSM-5, of a moderate intellectual disability.   (Doc. 255, at 23). And Dr. Negron-Munoz also challenged Dr. Jenkins' diagnosis of social anxiety disorder, arguing that Marks' anxiety is subsumed within his ASD symptoms. (Doc. 255, at 24-25; Tr. Vol. 2, at 71, 94-97).   Last, Dr. Negron-Munoz opined that Dr. Jenkins' own treatment notes belied her diagnosis that Marks' depression is in remission; rather Dr. Negron-Munoz found Marks to meet the criteria of Major Depressive Disorder, Recurrent, Moderate to Severe.   (Doc. 255, at 25-28; Tr. Vol. 2, at 92-93).

---

[36] Dr. Negron-Munoz discussed the Vineland scores in detail during cross-examination, however when pressed, she was unable to precisely identify what behaviors Marks demonstrated that equated to the level of a three-year-old child.   For example, Dr. Negron-Munoz identified Marks' limited eye contact and closing a bedroom door, but also acknowledged that such behavior can be found in persons with social skills of varying ages.   (Tr. Vol. 2, at 128-31).   Dr. Negron-Munoz also retracted to some extent her claim that Marks exhibited the coping skills of a five-year old, particularly in the context of his interviews with his attorneys.   (*Id.* at 131-32).

However, as explored during her hearing testimony, many of Dr. Negron-Munoz's criticisms of Dr. Jenkins' report are themselves flawed.   For example, Dr. Negron-Munoz contended that Dr. Jenkins never addressed the issue of malingering in her report.   (Doc. 255, at 17).   That is simply untrue.   (Doc. 277, at 22; Tr. Vol. 1 at 65, 137-38).   And while criticizing Dr. Jenkins' failure to initially include Marks' TOMM scores, Dr. Negron-Munoz herself miscalculated the scores. (Tr. Vol. 2, at 98-100).[37]   Dr. Negron-Munoz critiqued Dr. Jenkins for relying on Marks' self-report that his mother may have been autistic, yet that information came from Marks' father.   (Doc. 255, at 16; Tr. Vol. 2, at 115-16).   Dr. Negron-Munoz also repeatedly criticized Dr. Jenkins for not analyzing collateral and historical data, yet a cursory review of Dr. Jenkins report proves that false.   (Tr. Vol. 2, at 116-18).[38] She further criticized Dr. Jenkins' finding that Marks signed a plea agreement after counsel advised it was the "best deal he could get," stating that no such advice was given.   (Doc. 255, at 20).   However, the videos between Marks and his counsel clearly demonstrate that such advice was given over multiple occasions.   (Tr. Vol. 2, at 148-50; Def. Ex. 3, Vol. 1:21, 1:55; Vol. 3:11, Vol. 15:35-36).   And Dr. Negron-

---

[37] It appears that the prior versions of Dr. Jenkins' reports did not include the TOMM scores, however the third addendum – which Dr. Negron-Munoz did not have at the time she rendered her report – includes Dr. Jenkins' calculations. (Doc. 277, at 22).

[38] On cross-examination, Dr. Negron-Munoz clarified that she only was critical of Dr. Jenkins' purported failure to consider historical and developmental records.   (Tr. Vol. 2, at 117-18).

Munoz interpreted Dr. Jenkins' use of the term "tactic" to mean either a learned condition, parenting failures, or a strategy. (Doc. 255, at 18, 52). Indeed, Dr. Negron-Munoz went so far as to accuse Dr. Jenkins of insinuating that Marks' parents "caused his autism symptoms." (*Id.* at 18). Again, this is not what Dr. Jenkins opined. (Doc. 277, at 31).[39]

Rather, it is clear that Dr. Negron-Munoz evaluated Marks' competency (and critiqued Dr. Jenkins' findings) through the lens of the theory of "decisional competency." *See, e.g.*, Doc. 255, at 2-4, 53-54 (discussing decisional competency and autonomy); Tr. Vol. 2, at 108 (testifying that the videos between Marks and his counsel demonstrate that Marks lacks decisional competence); Tr. Vol. 2, at 163-64 (testifying that the transcripts of Marks' conversations with his attorney demonstrate a superficial level of understanding, but that he does not fully understand under a decisional competency standard); Tr. Vol. 2, at 154-55 (recognizing that decisions on whether to take a plea deal and weighing sentencing options are difficult, and competent persons will seek legal advice, "[b]ut you have to be able, for decisional competence, to take all the information that's provided to

---

[39] On the third day of the competency hearing, after Dr. Negron-Munoz completed her testimony, counsel for Marks requested to permit Dr. Geller to testify via Zoom as to the Vineland test scores. (Tr. Vol. 3, at 3-4). That request was denied for the reasons stated in the Court's prior rulings. (Tr. Vol. 3, at 5; *see also* Docs. 267, 287). I also denied counsel's request to continue the competency hearing to allow an additional witness not previously disclosed to testify on this issue. (Tr. Vol. 3, at 5-6). However, I did permit Marks' Vineland scoring sheet to be admitted as a late-identified exhibit. (Tr. Vol. 3, at 42-43; *see also* Doc. 257, at 3).

you to make an informed decision for yourself."); Tr. Vol. 2, at 179 (testifying that while not uncommon for a competent person to seek advice of their lawyer, if you cannot make the decision autonomously then the person is "still lacking that decisional competency."). However, as previously noted, "decisional competency" is not part of the *Dusky* standard, and does not apply in cases where a defendant is represented by counsel.

### 4. *Dr. Angela Baird-Hepworth*

The third and final witness to testify for the defense was Dr. Angela Baird-Hepworth, the clinical executive director at Aloft Transitions, a residential young adult transition program where young adults live and learn work ethics, daily living skills, executive functioning, and problem solving. (Tr. Vol. 2, at 182). Dr. Baird-Hepworth has worked at Aloft since 2015, and Marks has resided at Aloft since 2017. (*Id.* at 182, 184). Although Dr. Baird-Hepworth has a doctorate degree in psychology, she did not testify as an expert witness, but rather solely as a lay witness with respect to her observations of Marks. (*Id.* at 183).

During Marks' more than four-year stay at Aloft, Dr. Baird-Hepworth observed him on a daily basis, and would also see Marks for his therapy sessions. (*Id.* at 184). She received daily and weekly reports from staff about the behavior of Aloft residents, including Marks. (*Id.* at 185). Dr. Baird-Hepworth testified that Marks required prompting and reminders to shower and to do his laundry, but that

over time the reminders have been less, given that Marks has a set routine (*i.e.*, he uses the same bathroom and the same washer and dryer).  (*Id.* at 186).  Marks wears the same clothes and shoes each day, and staff have to inspect his shoes, socks, and underwear for holes as Marks would not notify anyone that they required repair or replacement.  (*Id.* at 187–88).[40]  He also needs prompting to get a haircut, and can only remember directions one step at a time.  (*Id.*).  Marks is able to cook for himself, but will need prompting to clean the cooking pans before using them.  (*Id.* at 188-89).  In short, Marks can learn tasks if he is taught them over and over again, but if something changes in the routine, Marks becomes confused and unable to understand.  (*Id.* at 189).

At Aloft, Marks helps feed and water the animals.  (*Id.* at 189-90).  However, Marks requires explicit instructions – simply saying "fill up the water trough" is not sufficient.  (*Id.* at 190).  Marks is also able to work in the metal shop, again with supervision and instructions provided one step at a time, including safety precautions.  (*Id.* at 191-92).  Marks likes to play the piano and can eventually read simple sheet music with instruction, and he likes to take walks for exercise and as a coping skill.  (Tr. Vol. 2, at 196; Tr. Vol. 3, at 7-9).

---

[40] On cross examination, Dr. Baird-Hepworth testified that she was unaware that while at MCC, Marks applied for extra clothing so that he could change his clothes after going to the gym. (Tr. Vol. 3, at 22-23).  Nevertheless, Dr. Baird-Hepworth did not find this behavior to contradict her observations of Marks, and speculated that he was simply copying the behavior of other detainees, or receiving help from others.  (*Id.* at 23-24, 35).

Dr. Baird-Hepworth testified that Marks struggles in social situations, and does not know what to say or how to approach others.   (Tr. Vol. 2, at 194).   He will engage in group activities in an attempt to fit in, but does not really understand what he is doing.   (*Id.* at 194-95).   He does not have any "true" friends.   (*Id.* at 195).   Dr. Baird-Hepworth further testified that Marks cannot make any decisions of any kind, no matter how simple or complex, and that any activities he undertakes are either out of habit and routine, or after prompting or assistance from someone at Aloft or from his parents.   (Tr. Vol. 3, at 9-14).[41]   Marks is very rule-based, and his thinking is very black and white; he will do what he is told.   (*Id.* at 15-16).   He also has great difficulty in expressing his emotions, and did not report that he was suffering nightmares as a result of his stay at MCC until he had been back at Aloft for several weeks.   (*Id.* at 17-21).

5. *Other Evidence*

In addition to witness testimony, numerous exhibits were admitted into evidence without objection.   On behalf of the United States, these exhibits included the following:   (1) the online chat transcripts between Marks and his alleged victims; (2) the audio recording and transcript from Marks' interview with the

---

[41] Dr. Baird-Hepworth also did not vary from this broad statement even when questioned during cross-examination about:   (1) Marks' decision not to see a doctor at MCC about his glaucoma because he is already seeing a doctor for that issue; and (2) Marks' attempts to advocate for leaving MCC after his evaluation had concluded.   (Tr. Vol. 3, at 27-29).

Lawrence, Kansas detectives; (3) Dr. Jenkins' reports (original and all amended versions); (4) audio recordings of Marks' phone calls while at MCC; (5) transcripts from Marks' meetings with his attorneys; (6) "Advice to Steven" materials prepared by Marks' counsel; and (7) transcripts of Dr. Negron-Munoz's meetings with Marks. (Doc. 282, Gov. Exs. 1-7, 8.1-8.20, 10-16; *see also* Tr. Vol. 1, at 210).

Marks also submitted several exhibits into evidence, without objection, including: (1) Marks' April 16, 2021 motion for competency and all exhibits thereto; (2) the competency reports from Drs. Danziger, Harvey, Grundy, Negron-Munoz, and Otto; (3) Dr. Geller's April 8, 2019 supplemental report; (4) Marks' counsel's July 18, 2018 memorandum to the United States Attorney's Office and all exhibits thereto; (5) various research articles, book chapters, and slide presentations on ASD and criminal competency; (6) videos of Dr. Negron-Munoz's interviews with Marks; (7) Dr. Negron-Munoz's notes from those interviews; (8) various progress notes, treatment notes, and therapy notes from Aloft; (9) a summary, status letter, and email from Dr. Baird-Hepworth; (10) the audio file from Dr. Otto's 2019 evaluation of Marks; (11) various occupational therapy, psychological, medical, and educational records for Marks; (12) Ms. Bennett's speech language report; (13) the neuropsychological document review from Dr. Roberts; (14) various excerpts from the DSM-5; and (15) Marks' Vineland score sheets. (Doc. 284, Def. Exs. 1-43, 45-53,

55; *see also* Tr. Vol. 3, at 43-46, 48).[42]   I have considered all of these exhibits, including those previously admitted during the 2019 competency proceedings, and the Court's prior analysis has been incorporated as relevant herein.[43]   However, there are several exhibits that require additional discussion.

### i.   *Marks' phone conversations*

First, I have listened to all of the recorded phone conversations between Marks and his parents made during his stay at MCC.   (Gov. Exs. 8.1-8.20).   These conversations present a very different picture than that presented when Marks converses with his attorneys.   Specifically, Marks appears upbeat, relaxed, and very aware of his circumstances.   He knows his calls are being recorded and therefore is careful to limit the topics of conversation, repeatedly stating that he will

---

[42]   Defense counsel sought to admit several other exhibits, which they acknowledged were not included on their previously filed exhibit list due to "an oversight."   Those exhibits were not admitted into evidence, in accordance with my October 21, 2021 Order.   (Doc. 257, at 3; Tr. Vol. 3, at 46-48).   Moreover, at the conclusion of the hearing, it became apparent that defense counsel had inserted numerous exhibits into the official exhibits copy which were not admitted into evidence. I therefore permitted defense counsel, in consultation with my courtroom deputy, to review the exhibits and remove all non-admitted documents.   Thus, it cannot be disputed that defense counsel has had multiple opportunities to ensure the completeness and accuracy of its exhibits.

[43]   Attached to Marks' post-hearing brief are two exhibits, entitled "Steven Marks Excerpts of Video Meetings (Def Ex. 59)," and "Dr. Negron-Munoz's Video Excerpts – Meetings with Steven (Master)."   (Docs. 300-1, 300-2).   These documents appear to have been created by Marks' counsel and contain excerpts of transcripts from the 30 hours of recorded conversations between Marks and his attorneys, as well as from Marks' meetings with Dr. Negron-Munoz.   (*Id.*).   To the extent Marks seeks to admit these documents as evidentiary exhibits, they plainly violate both my October 21, 2021 Order, as well as my admonitions at the end of the hearing that all post-hearing briefs would be limited *solely* to argument of counsel.   (Doc. 257, at 3; Tr. Vol. 3, at 46-47, 50). Thus, they will not be admitted into evidence.   However, to the extent these documents are merely intended as demonstrative aides to guide the Court to relevant sections of the video transcripts, I will consider the documents in that limited capacity.

disclose additional information to his parents when he is no longer at MCC.   *See, e.g.*, Gov. Exs. 8.5, 8.7.   This shows an ability to understand the concepts of confidentiality and future consequences.   Marks also demonstrates an ability to take care of himself – *i.e.*, engage in activities of daily living.   For example, he discusses going to the gym, obtaining extra clothing, taking showers, scheduling phone calls to his parents, attending appointments with Dr. Jenkins and others, and reading books (he even asks his mother for recommendations as to a specific author).   *See, e.g.*, Gov. Exs. 8.1, 8.2, 8.4, 8.12.   Much of this information is provided unprompted, during the course of normal conversation.

These recorded conversations also demonstrate Marks' ability to make decisions and advocate for himself.   He explains to his parents that there is a gym at MCC, but that he will not start exercising there until he gets more clothes, so that he can change after he showers.   (Gov. Ex. 8.2).   He also describes the process for filling out a laundry slip so he can obtain these extra clothes.   (*Id.*)   In another conversation, Marks makes clear to his parents that he had the option of going outside for recreation, but he declined.   (Gov. Ex. 8.16).   He also declined an appointment with an MCC eye doctor for his glaucoma, noting that he already has a doctor, and will schedule an appointment upon his return to Aloft.   (Gov. Ex. 8.7).   Marks also repeatedly advocated for his release from MCC – he called his parents to notify them that his evaluation was over, he contacted several counselors

to find out when and how he will be released and provided this information to his parents, and he expressed concern to his parents that the paperwork they have (the Court order) will not be sufficient for his release.   (Gov. Exs. 8.9, 8.11, 8.13-8.19).

And contrary to other evidence presented, Marks' recorded conversations demonstrate an ability to recognize and understand sarcasm, and to make jokes. On one occasion he suggested thanking the judge for letting him leave and laughed at his mother's response, on another he nicknamed a mouse "Jerry" (referencing the cartoon "Tom and Jerry"), and when he explained to his mother that he would leave MCC in his issued uniform, he stated that he would look like "a B list rap star." (Gov. Exs. 8.12, 8.14, 8.16; *see also* Gov. Ex. 8.4).   In addition, Marks was able to recognize and respond appropriately to the social perspectives of others – he responded with concern when learning of a friend/relative's cancer diagnosis, he responded with pride and congratulations upon learning his sister made straight A's, and again with concern upon learning his sister was upset when he left for MCC.   (Gov. Exs. 8.4, 8.7, 8.13, 8.15).

### ii.   *Dr. Negron-Munoz Interviews*

I have also reviewed the videos and transcripts from Dr. Negron-Munoz's meetings with Marks, and find that they too paint Marks in a somewhat different light than that presented in Dr. Negron-Munoz's report and testimony.   For example, while Dr. Negron-Munoz opines that Marks has significant memory

deficiencies, during his November 23, 2020 meeting, Marks was able to engage in lengthy discussions and provide extensive details about the facts surrounding his alleged offenses (including what he did and why he did it).   (Gov. Ex. 14, at 9-12, 24-27).   Marks was also able to provide details surrounding the procedural history of his case dating back to 2017, including his first police interactions and interviews, his extradition and transport to this District, and his placement in a mental health unit at the local detention facility.   (*Id.* at 44-54, 55-58, 68-72).   Marks was able to provide this information over a more than 2-hour session with Dr. Negron-Munoz, without any breaks.   (*Id.* at 69-70).

Similarly, during his October 2021 session, Marks was able to recall information that Dr. Jenkins provided to him several months prior.   (Gov. Ex. 13, at 3).   During that same session, Marks was able to explain (albeit in somewhat generalized terms), the concepts of competency (and the prior competency proceedings), witnesses, and evidence; he identified his charges and that they are serious in nature; he knew that he would have to register as a sex offender if convicted; he explained the difference between innocent and guilty as well as the consequences of committing perjury; and he detailed some of the advantages of taking a plea deal versus going to trial.   (*Id.* at 2-8, 10, 13).   Marks also knew that federal sentences were calculated using a "chart thing," but could not provide specifics.   (*Id.* at 14).   Marks stated that he would rely on his attorney's advice

because counsel "would know better than I would which [plea deal] would be better . . . he knows the -- the law and stuff, I guess.   I -- better than I do."   (*Id.* at 7).   However, Marks was unclear on some concepts, such as whether a judge or jury rendered the final decision (although he knew that a jury determined guilt or innocence).   (*Id.* at 17).   And Marks explained that he has a hard time making decisions, and will ask his father or others for help.   (*Id.* at 20).[44]

*iii.*     *Videos and Transcripts of Marks' Meetings with Counsel*

Perhaps the evidence most heavily relied upon by the defense is the approximately 30 hours of video-recorded online meetings between Marks and his attorneys in September-October 2020 and March-April 2021.[45]   The videos and transcripts, which I have reviewed, consist of fifteen (15) separate meetings between Marks and his attorneys.   The first eight (8) took place between September 24, 2020 and October 4, 2020, and primarily involved Marks' attorneys attempting to educate Marks on various legal and trial concepts, including the charges and penalties he

---

[44] During Marks' December 12, 2020 session with Dr. Negron-Munoz, he was able to provide much of this same information, including his statements that he would look to others to assist him in making decisions.   (Gov. Ex. 15, at 2-12, 20-21, 28-29).   He also remembered undergoing testing years prior to determine if he would be a danger to the community.   (*Id.* at 30).

[45] These videos clearly constitute almost in their entirety privileged attorney-client communications, and they were originally filed under seal.   *See* Doc. 186, Exs. A and B.   However, Marks utilized these videos and transcripts extensively during the December 2021 competency hearing which was open to the public, did not seek to have these exhibits filed under seal at the hearing, and discusses them in detail in his post-hearing briefing.   (Doc. 300).   Thus, the undersigned will also discuss them in detail herein.

may be facing, the risks of going to trial versus taking a plea deal, the pros and cons of testifying at trial, and the weight of the United States' evidence against the strength of Marks' potential defenses.   (Def. Ex. 3, Vols. 1-8).   The next session took place on October 23, 2020, and consisted of a series of questions posed by counsel to ascertain what, if any, information Marks had retained from the prior eight (8) meetings.   (*Id.*, Vol. 9).   The final six (6) sessions took place between March 26, 2021 and April 8, 2021, and primarily involved attempts by Marks' attorneys to determine what information Marks retained from the 2020 meetings, discussions about the (now) two plea offers from the United States, and analysis of whether Marks should accept a plea deal or proceed to trial.   (*Id.*, Vols. 10-15). These final sessions culminated with a recommendation from counsel that Marks accept the plea offer to a charge of enticement of a minor, and with Marks executing the plea agreement.   (*Id.*, Vol. 15).

As argued extensively in pre-and-post-hearing briefing (*see* Docs. 186, 265, 300), Marks' counsel contends that these videos clearly demonstrate that Marks lacks a present ability to consult with his attorneys with a reasonable degree of rational understanding, as well as the absence of a rational or factual understanding of the proceedings against him.   More specifically, Marks' counsel argues that these videos show that Marks:   (1) could not remember the applicable burdens of proof, the nature and consequences of the charges against him, or the nature of any

defenses he may assert; (2) was confused about the roles of the judge, jury, and other court personnel; (3) had only a superficial understanding of the topics at issue; (4) could not remember the elements of the offenses or the range of penalties he may be subject to; (5) could not remember the facts of his case, such as details about his online chats; and (6) most importantly, demonstrated a complete inability to make autonomous decisions.   *See* Doc. 186, at 6-10; Doc. 300, at 3, 7-11.

My review of these videos and transcripts does not demonstrate the same level of deficiency described by counsel.   Marks is able to recite the charges against him, as well as the elements of the charges, albeit in a very basic fashion, and he retains this information throughout the fifteen (15) different sessions.   *See, e.g.*, Def. Ex. 3, Vols. 1:20; 2:4-8; 4:3; 5:2-5; 9:1-7; 10:1-5, 11-12; 11:3-4; 12:5, 10-11; 15:1-10. Marks also demonstrates throughout these sessions a basic understanding of the evidence against him, including the online chats, his cellphone, the police interview, and any potential victims who might be called as witnesses, and that this evidence is not "good" for him.   (*Id.*, Vols. 3:35-45; 4:3; 5:6-9; 8:7-11; 14:19-20).

Marks also is able to recall the potential penalties he may be facing, including any mandatory minimums and maximum terms of incarceration, and is aware that the production charge (from the original indictment) carries the highest penalties. (*Id.*, Vols. 1:20; 5:2-5, 12-14; 7:15-17; 13:4-5).   And on the few occasions where he confuses the sentences, after education he is able to recall and retain the

information.   *See, e.g., id.*, Vols. 5:2-5; 15:1-10.   Marks also has a basic understanding of what it means to register as a sex offender and the concept of supervised release, equating it to his current pretrial release.   (*Id.*, Vols. 1:51; 11:11; 12:6, 18-20).   He also consistently and correctly recalls the concept of a unanimous jury verdict, and appears to understand the concept of a hung jury.   (*Id.*, Vols. 8:35; 9:32-33).

Marks is also able to remember events from the 2019 competency proceedings, including the experts who testified at the evidentiary hearing, that he was found competent, and that competency will not be decided at any future trial. (*Id.*, Vols. 1:21-24; 9:9-10).   Marks also understands that his autism will play a role in any insanity defense that may be asserted at trial, and that Dr. Negron-Munoz would testify as part of his defense.   *See, e.g., id.*, Vols. 9:8-9; 11:9, 14:14.

With respect to the plea agreement itself, Marks understands, again in basic fashion, the concepts of forfeiture, and that his cellphone and computer will not be returned to him, as well as the concept of restitution.   (*Id.*, Vols. 12:17, 24-25; 13:14). He understands that if he admits to an offense, he will receive a two-level downward departure, but not an additional third level due to the length of time the case has been litigated.   (*Id.*, Vols. 12:13, 16-17; 13:12-13).   Marks also remembers that he can appeal his sentence if the judge sentences him above the applicable

guideline range, although he cannot recall the complete scope of his waiver of appeal rights in the plea agreement.   (*Id.*, Vols. 12:26-30; 13:18).

On the other hand, Marks exhibits some difficulty remembering certain legal concepts.   For example, he repeatedly confuses the burdens of proof for establishing guilt (beyond a reasonable doubt) and the insanity defense (clear and convincing evidence) and has trouble remembering the elements of the insanity defense.   (*Id.*, Vols. 2:24-27, 35; 3:23-27; 4:5-10; 9:11-12, 34; 10:13-15; 14:16-17). Marks also at times lists the judge as the person who decides guilt or innocence, although he corrects himself and identifies the jury on other occasions.   (*Id.*, Vols. 3:33-35; 10:8-10).   Marks also exhibits difficulties with remembering some of the details of the online chats; however, he is able to remember some facts, such as the usernames of persons he communicated with online and details of what he told the Lawrence, Kansas detectives, and he repeatedly states that he was just playing a "selfie game" and never looked at any of the photos he received.   (*Id.*, Vols. 6:1-24; 7:1-11, 26-32).   It is clear from the videos that when discussing the chats, Marks becomes very upset, admitting that he feels terrible and wishes he could apologize. (*Id.*, Vol. 7:26-32).

On the ability to make autonomous decisions, while it is clear that Marks will rely heavily on his attorneys' advice to make decisions related to his case, it is equally clear that Marks is able to weigh the risks and benefits before relying on

that advice.   In particular, Marks is aware of the various factors that go into deciding whether or not to testify at trial, including that:   (1) a jury may view a defendant as guilty if he or she does not testify; (2) a jury may not understand that Marks thinks differently from "normal" people due to his autism; (3) if he testifies there is a chance the Assistant United States Attorney will make Marks say something "stupid;" and (4) he has memory issues.   (*Id.*, Vols. 1:41, 43-44; 9:28-30; 10:19-21).   Moreover, Marks articulates that he would take his attorneys' advice over his father's advice, because his father is not a lawyer.   (*Id.*, Vol. 10:22). Further, during the April 7, 2021 session, Marks appears to express a desire not to testify at trial, but states he will defer to his attorney's advice.   (*Id.*, Vol. 14:21-22).

Marks exhibits this same ability to weigh the risks and benefits with respect to the critical decision of deciding whether to go to trial or accept a plea offer (and which plea offer to accept).   He understands that the original plea offer was to a charge of production, and the most recent plea offer is to a charge of child enticement.   *E.g., id.*, Vol. 13:1-3.   He further understands that the enticement charge carries a mandatory minimum sentence of 10 years, which is lower than the mandatory minimum offered in the prior plea agreement, although the maximum sentence is life imprisonment, and he understands he could receive a far higher sentence if he is convicted after a trial.   (*Id.*, Vols. 2:29-32; 3:1-8, 27-35; 5:14; 8:41; 9:36-38; 10:5-6; 12:1; 13:1-6).   Marks is also aware of the risk that if he goes to trial,

the judge might impose a higher sentence for "wasting the court's time," and that it would be helpful to know whether the judge typically imposes harsh or lenient sentences.   (*Id.*, Vols. 2:30-31, 33; 3:27-35; 14:4).   He is further aware that a jury may not understand his autism and may also be biased against him because the alleged offenses involve minor children.   (*Id.*, Vols. 4:13-15; 8:24; 9:20-28; 31).   Marks also understands that the insanity defense does not have a high success rate.   (*Id.*, Vols. 10:26; 14:10-11, 25).

On the other hand, Marks is equally aware that he could go to trial and win – either on his lack of criminal responsibility defense, his defense (to some of the charges) that he was unaware that he was chatting with minors, or the insanity defense – and receive no prison time at all.   (*Id.*, Vols. 7:16; 9:18-20; 10:6-7; 14:22-23).   Notably, Marks explains in detail during both his March 26, 2021 session and his April 7, 2021 session the various risks of taking the plea deal versus going to trial, and expresses an understanding of the difficulty in making this decision.   (*Id.*, Vols. 10:35-36; 14:34).   And during his final April 8, 2021 session, Marks engages in a role playing scenario with his attorneys, during which he is able to articulate (again in relatively simplistic terms), the charges against him, the potential penalties, the risks of going to trial versus a plea deal, and the factors to consider in deciding whether to testify.   (*Id.*, Vol. 15:1-16).   Although Marks reiterates that he will rely on his attorney's and family's advice in deciding which course to take, he

states that he wants to make the "better deal," and the "right decision," which would provide the lowest term of incarceration (or none at all).   (*Id.*, Vols. 9:38-40; 15:1-10).

When Marks finally decides to accept the plea deal on the enticement charge, he does so after expressing the risks and benefits of each option and stating that he is unable to decide which is the best choice.   (*Id.*, Vol. 15:15-18).   Marks then accepts the plea deal on the advice of his attorney, although initially expressing some hesitancy as to whether it is "that great" of a deal.   (*Id.*, Vol. 15:18).   And upon execution of the plea agreement, Marks again asks his attorney "is this the best choice?" to which his attorney responds in the affirmative.   (*Id.*, Vol. 15:36).

There are several times throughout the videos where Marks appears to be nervous, confused, forgetful, and anxious.   This is in contrast to his conversational style and demeanor during his interview with the Lawrence, Kansas detectives, and during his evaluations with Dr. Otto, Dr. Jenkins, and Dr. Negron-Munoz. Moreover, throughout the sessions between Marks and his attorneys, his lawyers repeatedly use complex legal terminology, and discuss advanced concepts that seem to confuse Marks.   *See, e.g.*, *id.*, Vol. 2:1-20.   In particular, on numerous occasions lead counsel Mark J. Mahoney embarks on lengthy discussions that travel into complex legal arenas, without taking breaks, and without parsing the topics into smaller "bite-sized pieces," the majority of the time failing to ensure that Marks

understands.   *See, e.g, id.*, Vols. 1:53-60; 5:15-20; 8:16-22, 25-46; 11:18-29; 13:4-22.

There are also several occasions where Marks' attorneys themselves seem confused

about various aspects of the case, such as the maximum and minimum penalties,

the terms of the various plea agreements, and the success rate of the insanity

defense.   (*Id.*, Vols. 6:27-28; 10:31-34; 14:8-10, 12-13).     Indeed, co-counsel

acknowledges on at least one occasion that Mr. Mahoney's question to Marks was

confusing.   (*Id.*, Vol. 14:16).[46]

## IV.   ANALYSIS

A defendant is incompetent if (1) he is presently suffering from a mental

disease or defect that results in his (2) inability to understand the nature and

consequences of the proceedings against him or (3) to assist properly in his defense.

---

[46] This same confusing and overly complex conversational style carries through to the two "Advice to Steven" documents that Marks' counsel prepared for him, and which were utilized during several of Marks' videotaped meetings with his attorneys.   (Def. Exs. 4-5; Gov. Exs. 11-12). These documents, which are 73 pages in combined length, read in large part like a practitioner's legal textbook, and set forth in detail a variety of topics, including the charges alleged against Marks, the penalties he may be facing (including calculations under the United States Sentencing Guidelines), various potential trial strategies and defenses, criticisms of the Court and the prosecution, an analysis of the legal doctrine of competency and the history of those proceedings in this case, analysis of the pros and cons of pleading guilty versus going to trial, and the manner in which sentences are calculated in "other jurisdictions."   These documents often use complex legal terminology, and cite to various court decisions, research articles, statutes, and rules of criminal procedure.   The analysis at times is confusing and disjointed, and appears to consist of sections copied from other sources (a fact Marks' counsel acknowledges in his post-hearing brief, *see* Doc. 300, at 7, n.3).   It is not broken down into smaller sections, nor do the documents utilize more simplistic language, as has been suggested by various experts when communicating with Marks.   While there are small sections addressed directly to Marks (usually in text boxes), the bulk of these documents read as a textbook that presumes a level of understanding far beyond that required to establish competency of a lay person represented by counsel.

18 U.S.C. § 4241(d).   Stated differently, the question is whether, due to a mental disease or defect, "the defendant had 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and whether he had 'a rational as well as factual understanding of the proceedings against him.'"   *United States v. Cruz*, 805 F.2d 1464, 1479 (11th Cir. 1986) (quoting *Dusky*, 362 U.S. at 402).

As the Court previously found, and to which there is no dispute, Marks is presently suffering from a mental disease or defect - ASD.[47]   But that is where the parties' agreement ends.   While the United States contends that Marks is competent under the *Dusky* standard, Marks argues that he lacks both a factual and rational understanding of the proceedings against him, and does not possess a sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding.   I will address each element in turn.

A.    *Factual and Rational Understanding of the Proceedings*

1.    *Factual Understanding*

Upon a review of the evidence and arguments presented, I find that Marks has a factual understanding of the proceedings against him.   He knows the charges against him and their elements.   He knows the potential penalties, including

---

[47] The experts differed on Marks' secondary diagnoses, such as Social Anxiety Disorder (Dr. Jenkins' assessment) and whether he continues to suffer from PTSD and/or depression (Dr. Negron-Munoz's assessment).   Even assuming that Dr. Negron-Munoz's diagnoses are correct, I do not find them dispositive, as all sides agree that it is Marks' ASD and accompanying language impairments which govern the competency analysis here.

mandatory minimums and maximums, as well as his various plea offers.   He knows the roles of the prosecution and defense.   He knows the concept of "perjury," and has a general understanding of competency.   He is able to identify various defenses that may be asserted if he goes to trial.   He can also identify the evidence that may be used against him.   He is aware that the jury would decide any insanity defense and that the judge will impose any sentence.   He understands the concepts of supervised release and sex offender registration.   He knows that the charges alleged against him are serious, and he knows how to behave properly in a courtroom.   *See* Doc. 277, at 29-31; Tr. Vol. 1, at 97-98, 173-74; Gov. Ex. 13, at 2-8, 10, 13-14, 17; Def. Ex. 3, Vols. 1:20; 2:5-8; 3:35-45; 4:3; 5:2-9; 7:15-17; 8:7-11; 9:1-7, 18-20; 10:1-7, 11-12; 11:3-4; 12:5, 10-11; 13:4-5.; 14:19-20, 22-23; 15:1-10.   *See United States v. Merriweather*, No. 2:07-CR-243-RDP-JEO, 2014 WL 5770213, at *62 (N.D. Ala. Nov. 5, 2014) (defendant had factual understanding of the proceedings against him where he, among other things, was able to recall the facts of the offense, identified the roles of the judge, prosecutor, and defense, was aware of the insanity defense, understood the meaning of a guilty plea, and that any plea deals should be discussed with his counsel); *United States v. Verdino*, No. 08 CR 853, 2010 WL 1979428, at *1, 6 (N.D. Ill. May 14, 2010) (finding defendant, who was diagnosed as "a low-functioning, special-needs adult with limited cognitive abilities," had a basic factual understanding of the proceedings where he was able to learn "the roles of

the judge, the prosecutor and the defense attorney.   He clearly kn[ew] both the crime with which he [wa]s charged and the wrongfulness of his alleged conduct. . . .   He [wa]s able to behave properly in a public forum."); *United States v. Salley*, 246 F. Supp. 2d 970, 976 (N.D. Ill. 2003) (finding defendant with delusional disorder had a factual understanding of the legal process when he knew the roles of the courtroom personnel, the purpose and process of a trial, and available plea options).

Although Marks' attorneys argue that he cannot remember these concepts, the evidence does not support this assertion.   *See, e.g.*, Doc. 277, at 29-31; Tr. Vol. 1, at 97-98, 173-74; Gov. Ex. 13, at 2-8, 10, 13-14, 17; Def. Ex. 3, Vols. 1:20; 2:5-8; 3:35-45; 4:3; 5:2-9; 7:15-17; 8:7-11; 9:1-7, 18-20; 10:1-7, 11-12; 11:3-4; 12:5, 10-11; 13:4-5.; 14:19-20, 22-23; 15:1-10.[48]   Moreover, when he does become confused or forgetful, such

---

[48] One of the pieces of evidence Marks has submitted is a copy of the motion for competency hearing, through which it appears that Marks' attorney Mr. Mahoney attempts to provide testimony about his own impressions of Marks' competency.   *See* Doc. 186, at 1, 2, 5-13 (motion for competency hearing, which contains an affirmation under "penalty of perjury" by Mr. Mahoney and contains pages of his interpretations and legal conclusions from the video recordings); Doc. 300, at 9 ("Counsel's views are essential to consider, as providing the 'best-informed view' of their client's ability to rationally assist in his defense.").   I have considered this evidence, and counsel's arguments – indeed they are the very basis for these competency proceedings.   *See United States v. Flores-Vasquez*, 651 F. App'x 861, 864 (11th Cir. 2016) ("[A] lawyer's representations concerning the competence of his client . . . is unquestionably a factor which should be considered in deciding whether a defendant's competence requires examination." (citations and quotations omitted)).   *Cf. United States v. Mason*, 52 F.3d 1286, 1292 (4th Cir. 1995) (holding that the "[o]utright rejection" of counsel's observations in a competency determination was unwarranted).   While defense counsel clearly is in a unique position to observe Marks and can provide insight, his opinions are not determinative.   *See United States v. Merriweather*, 921 F. Supp. 2d 1265, 1303 (N.D. Ala. 2013) ("[T]he court is not obligated to accept without question the assertions of the lawyers concerning the competence of a defendant." (citing *Drope*, 420 U.S. at 178 n.13)); *see also Flores-Vasquez*, 651 F. App'x at 864.   And while Marks references several decisions that discuss the importance of a defense attorney's impressions of his or her client, (*see* Doc. 300, at 9), this case is different.   For here, the undersigned has the benefit of dozens of hours of video and

as when he confuses the judge and the jury as the entity that renders a verdict, Marks either later corrects himself or is able to be educated on the matter.[49]   *See, e.g.*, Doc. 277, at 29-31, Tr. Vol. 1, at 173-74; Def. Ex. 3, Vols. 3:33-35; 5:2-5; 10:8-10; 15:1-10.    To be sure, Marks' factual understanding of these concepts is at a basic level, but that is all that is required to satisfy *Dusky*.   *See United States v. Glover*, 596 F.2d 857, 867 (9th Cir. 1979) (noting, in affirming a finding of competency, "[t]he fact that a defendant might not understand the proceedings unless they are explained to him in simple language would put an additional burden upon counsel, but certainly does not establish that the defendant is incompetent to stand trial. Here, the defendant displayed a good knowledge of the facts surrounding his arrest and had an understanding of the charge against him.").

The expert testimony supports my findings.   Dr. Jenkins conducted multiple interviews with Marks during his stay at MCC, and asked him a standardized set

---

audio recorded evaluations, interviews, and meetings with Marks.   This evidence – Marks' own words and demeanor – surely is more persuasive than the impressions and interpretations made by his counsel – who is not an expert in forensic psychology or psychiatry, and undisputedly is a zealous advocate for his client.

[49]  The only concept where Marks continually struggled even after education was on the burdens of proof applicable to guilt/innocence and the insanity defense.   However, these difficulties were observed only during his sessions with his attorneys, which the undersigned believes is in large part due to his attorneys' overly complex and at times confusing communication style.   And Marks' difficulty with this one concept is not dispositive, as "the standard for mental competence does not require that a defendant have a clear understanding of legal terminology, or that he be able to read and understand a legal document without assistance."   *United States v. Greene*, 767 Fed. App'x 793, 797 (11th Cir. 2019).

of questions addressing these legal concepts.   Dr. Jenkins found Marks was either able to explain these concepts without education, or was able to retain the information upon education.   (Doc. 277, at 29-31).   And it does not appear that Dr. Negron-Munoz takes quarrel with this point – her opinions appear to be limited to whether Marks has a rational understanding, as well as an ability to assist counsel and make autonomous decisions.   *See* Doc. 255, at 51-52.   Moreover, Dr. Negron-Munoz testified that Marks was able to answer a series of standardized questions concerning various trial and legal matters, and the video recordings from her sessions with Marks further show his factual understanding of the proceedings against him.   *See* Tr. Vol. 2, at 125-26; Gov. Ex. 13, at 2-8, 10, 13-14, 17.

### 2. *Rational Understanding*

I further find that Marks has a rational understanding of the proceedings against him.   While the concept of "rational understanding" is difficult to define, it means more than simply being oriented to time and place and having some recollection of events.   *Dusky*, 362 U.S. at 402; *see also Panetti v. Quartermain*, 551 U.S. 930, 959 (2007).   Rather, "rationality under the *Dusky* standard requires that a defendant have *some ability* to confer intelligently, to testify coherently, to follow and evaluate the evidence presented, and have *some awareness* of the significance of the proceeding and *some ability* to understand the charges against him, the defenses available to him, and the basic elements of a criminal trial."   *Merriweather*, 2014 WL

5770213, at *59 (citation omitted) (emphasis supplied).   *Cf. Lafferty v. Cook*, 949 F.2d 1546, 1551 (10th Cir. 1992) ("A defendant lacks the requisite rational understanding if his mental condition precludes him from perceiving accurately, interpreting, and/or responding appropriately to the world around him.").

Again, the evidence supports a finding that Marks has "some ability" to confer intelligently and testify coherently, to follow the evidence presented and have "some awareness" of the significance of the proceedings, the charges and defenses, and the basic elements of a criminal trial.   As discussed above, *see infra* pp. 83-86, Marks has an understanding of the charges against him, including the possible penalties, and is aware of which charges carry the highest and lowest penalties.   He also has a basic understanding of the elements of each charge, as well as of the defenses available to him, including the insanity defense.   He also has a basic understanding of the elements of a criminal trial – he knows he already went through competency proceedings and they cannot be relitigated at a trial, he understands the difference between pleading guilty and going to trial, and he understands that the judge will impose sentence.

Marks has also demonstrated an appreciation for the significance of the proceedings – he knows he faces lengthy prison terms, as well as the potential for an extended term of supervised release and registration as a sex offender.   *Cf. Verdino*, 2010 WL 1979428, at *6 (finding defendant incompetent in part due to a

complete inability to understand that pleading guilty to receipt of child pornography would require sex offender registration).   When he discusses the chats, Marks becomes embarrassed and uncomfortable, and feels terrible, demonstrating an appreciation for the wrongfulness of his actions.   He also has demonstrated an understanding of the evidence and an ability to follow it – he is able to repeatedly identify the key pieces of evidence that the United States will use against him, and he recognizes that the evidence is "bad."   He is aware of the chats, that they involve minors, and that the jury could exhibit bias against him as a result. Marks also identifies, again in simplistic form, the evidence that will be in his favor – namely his lack of knowledge of the age of the persons he chatted with, and the expert witnesses who will testify to his lack of criminal responsibility and/or an insanity defense.

Last, the evidence shows that Marks has at least "some ability" to confer intelligently and testify coherently.   The online chats demonstrate a clear ability from Marks to engage in lengthy conversations with the end result of manipulating children to engage in certain behaviors.   These chats also demonstrate Marks' ability to respond appropriately to the feelings and social perspectives of others, and they belie the assertions that Marks can only think and converse in concrete terms.[50]   *See United States v. Rodriguez*, Case No. 14-20877-CR-UNGARO/OTAZO-

---

[50] Both Ms. Bennett and Dr. Negron-Munoz attempt to minimize these chats by testifying

REYES, 2015 WL 6964671, at *14 (S.D. Fla. Nov. 11, 2015) (finding defendant diagnosed with ASD and borderline intellectual function, and charged with various child pornography offenses, to be competent in part because Skype messages between defendant and others belied the experts' assessment that defendant could only think in concrete terms without the capacity for extrapolation, inferences, or generalizations).

The interview between Marks and the Lawrence, Kansas detectives further establishes Marks' ability to cogently communicate.   Over the course of several hours, Marks is able to provide an extensive narrative with no memory lapses, answer questions, and most notably, lie to the investigators in an attempt to avoid future consequences.   As the Court previously found, Marks' conversations with the detectives "demonstrates an ability to testify and a rational understanding of the nature of the proceeding."   (Doc. 95, at 30-33).   And while Marks seeks to minimize this evidence, its importance cannot be underestimated.   As Marks himself acknowledges, his cognitive and functional abilities have not changed over time, and therefore Marks' ability to engage in extensive coherent conversations about the facts of this case would remain the same today as it did in 2017.   *See Merriweather*, 2014 WL 5770213, at *63 (finding defendant possessed ability to confer

---

that they used their own unique language, which Marks was simply mimicking.   *See* Tr. Vol. 2, at 38, 139-40.   The chat transcripts themselves, which show a prolonged ability to manipulate others, contradict these assertions.

intelligently and testify coherently in part because the defendant "had no difficulty communicating intelligently and coherently with investigators on the day after the robbery").   *See also United States v. Mitchell*, No. 2:08-cr-125-DAK, 2009 WL 3181938, at *2 (D. Utah Sept. 28, 2009) ("[I]t is well-established that evidence of Defendant's prior conduct can give the court a better understanding of Defendant's current condition.   In addition, the United States has presented persuasive arguments that certain aspects of the crime itself can be relevant to the competency determination.").

But this is not all of the evidence that supports a finding that Marks possesses a rational understanding.   Marks' phone conversations with his parents while at MCC further establish his ability to engage in coherent and intelligent conversations, and to recite information in a logical fashion (in particular the events surrounding his release from MCC).   (Gov. Exs. 8.1-8.20).   Marks' repeated assertions that he will disclose further information to his parents when his conversations are not being recorded also shows an ability to comprehend future consequences and an awareness of his surroundings.   In addition, Dr. Jenkins found Marks' speech to be coherent, logical, and relevant, and his thinking appeared organized, rational, and goal oriented.   (Doc. 277, at 23; Tr. Vol. 1, at 47-50).   He was able to answer all questions posed to him, and gave his best effort. (Doc. 277, at 23; Tr. Vol. 1, at 22-23).   And throughout his stay at MCC, there were

no reports that Marks had any difficulties following instructions or communicating with others, he took care of his hygiene, and arrived at appointments on time.   *See United States v. Carter*, No. 1:12-CR-29, 2013 WL 6668715, at *3 (E.D. Tenn. Dec. 18, 2013) (finding defendant's objective behavior, such as following BOP rules, caring for hygiene, and arriving to appointments on time demonstrated an adequate level of understanding).   Dr. Jenkins opined that Marks was able to appropriately relate to and communicate with her and MCC staff, he was able to incorporate information, follow instructions, is capable of comprehending the possible outcomes of his case and is capable of communicating with his counsel.   (Doc. 277, at 32).

Although Dr. Negron-Munoz opined that Marks lacks a rational understanding, I find her opinions less persuasive than Dr. Jenkins.   Dr. Jenkins evaluated and observed Marks over the course of approximately 30 consecutive days; her evaluations were conducted in-person, during which Dr. Jenkins could observe Marks' demeanor and non-verbal communication; and Marks was also observed 24/7 by MCC staff, who would have reported any issues with Marks to Dr. Jenkins (there were none to report).   Dr. Jenkins also administered several psychological tests, including those geared to the precise issues at hand, and her findings correlated with those of Dr. Otto.   In contrast, Dr. Negron-Munoz only evaluated Marks via an online platform for a total of approximately four (4) hours

and two of her three meetings with Marks were for the purpose of assessing the viability of an insanity defense, not to determine competency.   Moreover, Dr. Negron-Munoz only administered two (2) tests to Marks – one related to PTSD and the other to ADHD.   In all other respects she relied on the test results from Dr. Geller (an expert whose opinions the Court previously discounted).   (Doc. 255). *See Merriweather*, 2014 WL 5770213, at *43 (finding more credible the opinions of the government experts because they had the greatest ability to observe and monitor the defendant in his daily life over the course of more than one year, and those observations were supported by the continuous observation of defendant by other medical and correctional staff); *United States v. Scott*, No. 06-00410-04-CR-W-DW, 2009 WL 648880, at *11 (W.D. Mo. Mar. 11, 2009) (crediting BOP expert who met with defendant on multiple occasions and was able to obtain information from nursing and correctional staff over defense experts who only met with defendant twice for a total of three hours); *United States v. Hoyt*, 200 F. Supp. 2d 790, 794 (N.D. Ohio 2002) (crediting expert in competency proceeding who "was able to observe and treat Defendant . . . for a significantly longer period of time than that which [the defense expert] treated Defendant," and who could "supplement his own observations with those of other members of the nursing and correctional staff").[51]

---

[51]   There is no doubt that Dr. Negron-Munoz is highly credentialed and expressed sincere opinions within her areas of expertise.   However, I overall find her testimony and opinions to be partisan in nature, and geared more towards a finding that Marks lacked criminal intent or an

I further find Dr. Negron-Munoz's opinions less persuasive because they are inconsistent with the other evidence of record.   For example, during his interviews with Dr. Negron-Munoz, Marks was able to answer all questions posed, recite details from events that occurred years prior, and gave his best effort.   (Gov. Exs. 13-14).   This was the same communication style exhibited during his evaluations with Dr. Jenkins.   And as discussed above, the online chat transcripts and police interview belie a finding that Marks cannot engage in coherent, rational conversation or present a relevant narrative.   Further, the video recordings between Marks and his counsel that Dr. Negron-Munoz relies upon do not support a finding that Marks lacks rational understanding.   Despite Marks exhibiting anxiety, confusion, and some memory lapses on occasion, he is overall able to engage in conversations with his attorneys, and answer their questions.   His responses are not tangential or delusional, but rather relevant and logical.   He is capable of being educated, it is only when his counsel engages in lengthy and complex analysis that Marks appears to become confused.   It is notable that when Marks is engaged in a more relaxed style of conversation – even with detectives or a BOP forensic psychologist – his level of anxiety, confusion, and memory issues

---

appreciation of the wrongfulness of his actions.   Her criticisms of Dr. Jenkins were in many respects incorrect, and where Dr. Negron-Munoz addressed competency, she applied a standard that does not govern this case.

subside.[52]   *See Bradley*, 644 F.3d at 1268 ("[F]aced with diametrically opposite expert testimony, a district court does not clearly err by simply crediting one opinion over another where other record evidence exists to support the conclusion." (alteration in original) (quoting *Battle*, 419 F.3d at 1299)); *see also Giraldo*, 2011 WL 7946037, at *17 (citations omitted) (noting that in determining a defendant's competency to stand trial, the court may rely on one of two competing opinions given by qualified experts)).

In sum, I find that the evidence and expert testimony establish that Marks possesses both a factual and rational understanding of the proceedings against him.

---

[52]   With regard to Ms. Bennett, although her testimony was truthful, sincere, and helpful, she is not a forensic psychologist or psychiatrist, she did not conduct an evaluation as to Marks' competency, nor did she offer an opinion on same, instead recommending further testing.   I therefore have not given her opinions much weight on the ultimate issues of Marks' competency, although I have considered her test results concerning Marks' speech and language issues.   *See, e.g., Carter*, 2013 WL 6668715, at *3 (giving less weight to expert who was not a forensic psychologist, due to the "specialized nature of competency evaluations.")   Moreover, during her testimony, she acknowledged that Marks was able to retain and recite various legal concepts and was able to rationalize key issues during a role-playing session with his attorneys.   Thus, if anything, Ms. Bennett's testimony appears to weigh more in favor of the United States.

I have also considered the lay testimony and evidence presented by Dr. Baird-Hepworth, which provides insight into Marks' behavior at Aloft.   However, I do not find Dr. Baird-Hepworth's testimony persuasive on the ultimate issue of competency for several reasons.   First, the evidence contradicts that presented by Dr. Jenkins, whose findings and opinions I find persuasive for the reasons stated herein.   Second, Dr. Baird-Hepworth's testimony seems geared towards the question of "decisional competency," which is not the correct standard.   *See generally*, Tr. Vol. 2, at 187-90, Tr. Vol. 3, at 9-15 (discussing Marks' inability to make *any* autonomous decisions).   Third, I found Dr. Baird-Hepworth to be a partisan witness, she was argumentative at times, and she would engage in speculation when faced with evidence that contradicted her testimony.   *See* Tr. Vol. 3, at 23-24, 30-33 (refusing to characterize Marks' piano playing as anything other than "simplistic," and refusing to acknowledge that Marks could make decisions while at MCC).

*See United States v. Fuenmayor-Arevalo*, 490 F. App'x 217, 222, 225 (11th Cir. 2012) (affirming finding of competency and upholding guilty plea where defendant was "mildly to moderately mentally retarded since childhood," had an IQ in the low 50s, and suffered from possible dementia, where expert opined that defendant, among other things, expressed "rational responses and understanding of the roles of the judge, prosecutor, and defense attorney in his criminal case.").

B.      *Ability to Consult With Counsel*

The last prong of the *Dusky* standard to address is whether Marks is able to properly assist in his defense, or stated differently, whether Marks possesses a sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding.   *See Cruz*, 805 F.2d at 1479.

> In determining whether the defendant has sufficient present ability to consult with [his] lawyer, courts have considered the following factors: 1) the state of the defendant's memory, since he should be able to relate pertinent facts, names and events to his attorneys (although the defendant need not remember every fact that trial might encompass); 2) the extent to which relevant evidence could be reconstructed from communications made by the defendant to his counsel or from independent sources; 3) an adequate ability to review and evaluate documents and other written evidence bearing on the case; 4) an appreciation of the Government's evidence against him; 5) the ability to consider the wisdom of taking a course other than standing trial on the merits; 6) the ability to decide objectively whether to exercise his constitutional right to take the stand, and if he does take the stand, the ability to testify in an intelligent, coherent and relevant manner; 7) the ability to remain sufficiently alert and responsive so as to follow and recognize any discrepancies in the testimony of witnesses; and 8) the ability to discuss the testimony with his attorneys and to postulate questions to the witnesses through counsel.

*Giraldo*, 2011 WL 7946037, at *3 (citing *United States v. Derisma*, No. 2:09-cr-64-FtM-36SPC, 2011 WL 3878367, at *3 (M.D. Fla. June 27, 2011)) (hereinafter referred to as the *Giraldo* factors).   I address each factor below.

The first factor, the state of Marks' memory, supports a finding of competency.   Contrary to the assertions of Marks' counsel and Dr. Negron-Munoz, Marks is able to retain and recall information.   He was able to recall information on various legal concepts in discussions with Dr. Jenkins, Dr. Negron-Munoz, and his attorneys.   In particular, in his conversations with Dr. Negron-Munoz, Marks was able to recall information he received from Dr. Jenkins months prior, as well as recall events surrounding his initial arrest and transport to this District that occurred four years prior.   He was also able to provide information concerning the facts of his case, albeit reluctantly and with discomfort, as well as recall details from his police interview.   (Gov. Ex. 14, at 15-16, 20-30).   He also recalled extensive details about his case during his interview with the Lawrence, Kansas police. (Gov. Ex. 6).   And during his conversations with his attorneys, Marks was able to recall and explain numerous legal concepts, even when questioned about them over extensive periods of time.   (Def. Ex. 3, Vols. 1:20; 2:4-8; 4:3; 5:2-5; 9:1-7; 10:1-5, 11-12; 11:3-4; 12:5, 10-11; 15:1-10).   While Marks did not recite every single fact of his case, that is not required in order to find him competent.   *Giraldo*, 2011 WL 7946037, at *3 ("[T]he defendant need not remember every fact that trial might encompass.").

*See also United States v. Rinchack*, 820 F.2d 1557, 1569 (11th Cir. 1987) (citations omitted) ("Amnesia does not render a defendant automatically incompetent to stand trial."); *United States v. Dewhart*, No. 2:06-cr-94-WKW, 2009 WL 1850181, at *3 (M.D. Ala. June 26, 2009) ("Mr. Dewhart's lack of memory does not necessarily negate his ability to assist counsel and understand the proceedings.   Amnesia does not *per se* render a defendant incompetent to stand trial." (citing *Rinchack*, 820 F.2d at 1569)).[53]

The second factor – the extent to which relevant evidence could be reconstructed from communications made by the defendant to his counsel or from independent sources – also weighs in favor of competency.   The online chats memorialize the entirety of the conduct at issue, and the United States is also in possession of Marks' cellphone and computer.   The Lawrence, Kansas police interview also memorializes many of Marks' statements and the facts surrounding his conduct.   Moreover, as discussed above, when questioned in a relaxed manner, Marks is able to discuss the offense conduct, as he did with Dr. Negon-Munoz and with the police detectives.   *See* Gov. Ex. 14, at 15-16, 20-30.   And there exists a wealth of expert and other evidence and testimony, including Dr. Negron-Munoz herself, that will be utilized at trial in Marks' defense.   *Cf. Rinchack*, 820 F.2d at 1569

---

[53] There was much discussion by the defense experts about Marks' impairments in his "working memory" (*i.e.*, problem solving memory).   However, the first *Giraldo* factor does not relate to problem solving, but rather to the ability to recall facts, of which Marks has no impairment.

(noting that in determining the impact a defendant's poor memory has on the question of competency, the court should evaluate, among other things, "[w]hether the crime and the defendant's whereabouts can be properly reconstructed without the defendant's testimony, including any facts giving rise to a defense").

The third factor – an ability to review and evaluate documents and written evidence – also weighs in favor of competency.   The video and transcripts from Marks' meetings with his attorneys establish that he can review and evaluate written material.   When he is made to read his online chats, he understands their graphic nature and becomes very upset, questioning why he would engage in such behavior – this demonstrates an understanding of the nature of the written material and an ability to evaluate it.   Marks' attorneys prepared 73 pages of written material (the "Advice to Steven" documents), which they provided to Marks as an aid in his legal education.   (Def. Exs. 4, 5).   The video and transcripts show that Marks was able to read and review these materials.   *See generally* Def. Ex. 3. Moreover, Marks was able to read his entire plea agreement, and reviewed it with his counsel.   *See id.*   And there has been no expert testimony or evidence suggesting that Marks has any deficiencies in reading comprehension.   To the contrary he appears to be a voracious reader (as evidenced by his phone calls with his parents).

The evidence also supports a finding that Marks has an appreciation of the United States' evidence against him (the fourth factor).   Throughout his evaluations with Dr. Otto and Dr. Jenkins, Marks is able to identify the evidence against him.   He identifies this same evidence during his sessions with his attorneys, and also expresses an understanding that this evidence is "bad" for him, and that a jury may be biased against him because the case involves minors.   He also previously expressed to Dr. Otto that he wished he had not spoken with the Lawrence, Kansas police detectives.

The next two factors:   the ability to consider the wisdom of taking a course other than standing trial on the merits and the ability to decide objectively whether to take the stand, and if so, the ability to testify in an intelligent, coherent, and relevant manner, are where the parties and experts most differ.   Marks, through the argument of his counsel and Dr. Negron-Munoz, and pointing to the 30 hours of video-recorded attorney sessions, strenuously asserts that he is unable to consider the factors relevant to either of these crucial decisions, and that he is unable to make any autonomous decisions on these points.   However, as discussed in detail above, I do not find the evidence to support these assertions.

To be sure, Marks will rely heavily on the advice of his attorneys in deciding both whether to testify and whether to take a plea deal or go to trial.   But relying on the advice of counsel does not equate to incompetency.   As discussed above, the

evidence shows that Marks can weigh the risks and benefits of making critical case decisions before relying on the advice of counsel.   As to the decision on whether to testify, Marks repeatedly was able to identify the various risks and benefits that come with that decision.   *See* Def. Ex. 3, Vols. 1:41, 43-44, 9:28-30; 10:19-21.   He also stated that he will rely on his attorney's advice, because his attorney is more knowledgeable on legal issues.   And on at least one occasion, Marks appeared to express a desire not to testify, but then deferred to his attorney's advice.   This evidence – Marks' own words – demonstrates a clear ability to consider whether to testify.   And as previously discussed, the evidence further shows that Marks has the ability to answer questions in a relevant and coherent manner, and therefore will be able to testify (particularly if the questions posed are structured, literal, and straight-forward).

The evidence also shows that Marks is able to consider the wisdom of taking a plea deal versus going to trial.   Marks is well versed in the two plea agreements that were offered to him, as well as the maximum penalties he would face if he went to trial and were convicted.   He is also able to articulate his opinions on the plea deals, recognizing the positives and negatives of each.   And he is also able to explain the risks of going to trial, and the chances of being acquitted.   Moreover, when discussing his plea deal with Dr. Jenkins, Marks states that it was the "best deal he could get," that going to trial was "too much of a risk," and that the plea

agreement was the "best option" because he was facing up to 40 years in prison. (Doc. 277, at 31; Tr. Vol. 1, at 103-04).   Thus, Marks clearly understands the seriousness of the decision he must make, and defers to the advice of his counsel.

Nevertheless, Marks' attorneys and Dr. Negron-Munoz argue that this not enough.   Rather, they contend that Marks must be able to make these critical, life-changing decisions autonomously and independently.   This contention misses the mark, as it ignores the fact that by seeking out the advice of his attorneys, and by considering and following this advice, Marks *is* making an autonomous decision – the same decision that competent defendants make every day.[54]   Simply put, the evidence, via Marks' own words and the opinions of Dr. Jenkins, which I find persuasive, shows that he has the capability of weighing the advantages and disadvantages of testifying at trial, and of weighing the risks and benefits of going to trial versus accepting a plea agreement, and then deferring to the advice of his counsel – advice that Marks says he will follow even if his parents suggest a different course – because his attorneys are more knowledgeable in the law.   *See* Def. Ex. 3, Vols. 2:29-32; 3:1-8, 27-35; 5:14; 8:41; 9:36-40; 10:5-6; 12:1; 13:1-6; 14:4; 15:1; Doc. 277, at 31 ("Mr. Marks . . . look[s] to others to provide him with guidance on a decision; however, he also appears to have a good understand[ing] of what his

---

[54] Even Dr. Negron-Munoz acknowledges that decisions concerning whether to accept a plea offer are difficult, and that it is not uncommon for competent persons to seek advice of their lawyers on such decisions.   (Tr. Vol. 2, at 154-55, 179).

decision means and what may result from it. . . .   Of note, Mr. Marks contended that even though he would follow his attorney's advice, he ultimately understood it was his decision to make."); *see also* Tr. Vol. 1, at 103-04.

What defense counsel and Dr. Negron-Munoz are seeking is to impose a much higher standard upon Marks – that of "decisional competency."   But as discussed throughout this report, that standard simply does not apply here – Marks is represented by able lawyers, and therefore is not required to make decisions without their advice and counsel.  *See Edwards*, 554 U.S. at 175–76.[55]   Moreover, the other evidence of record establishes that Marks is able to make decisions for himself, and can (and will) advocate for his best interests.   *See* Doc. 277, at 19; Tr. Vol. 1, at 39, 40, 121–22 (evidence that Marks asked to be placed in protective custody at MCC, that Marks advocated for phone privileges at MCC, and that he advocated for his release from MCC).

It further appears that Marks' attorneys believe that in order to be competent, a defendant must possess the same level of legal acumen as a practitioner in the field.  *See, e.g.,* Tr. Vol. 1, at 170-71 (counsel's cross-examination of Dr. Jenkins where counsel questioned Marks' awareness of the concept of perjury, stating, in essence, that "telling a lie" is an insufficient definition; rather a competent

---

[55] Because Dr. Negron-Munoz's report and opinions focus on the inapplicable "decisional competency" standard, her opinions on these two *Giraldo* factors are unpersuasive.

defendant should instead be able to answer "perjury is a problem because it affects the integrity of the process"). This is evidenced by counsels' use of sophisticated and complex legal terminology, and the writings in the "Advice to Steven" documents.[56] But again, this is not the proper standard for competency. *United States v. Merriweather*, 921 F. Supp. 2d 1265, 1307 n.62 (N.D. Ala. 2013) (citation omitted) ("The *Dusky* standard, as commentators have noted, does not require that a defendant have a high level of ability or performance. After all, a defendant surely does not have to be as intelligent and reasonable as his lawyers to be competent to stand trial."); *Hogan*, 986 F.2d at 1373 (a finding of competency does not require that defendants "fully comprehend the intricacies of some of the defensive theories offered by their lawyers").

Thus, on balance, the evidence presented supports a finding of competency as to the fifth and sixth factors.

The seventh factor, the ability to remain sufficiently alert and responsive so as to follow and recognize discrepancies in witness testimony, also supports a finding that Marks is competent to proceed. The evidence shows that Marks is able to engage in sustained concentration for lengthy periods of time – his online chat conversations at times lasted up to eight (8) continuous hours, his interviews with

---

[56] I note that Dr. Jenkins also found the attorneys' use of sophisticated words and legal jargon to be a cause of Marks' difficulties in understanding what his attorneys say. (Doc. 277, at 31; Tr. Vol. 1, at 108-09).

the police and with Dr. Otto lasted several hours with minimal breaks – even Marks'
sessions with his attorneys would last for hours at a time without breaks.
Throughout these lengthy sessions Marks was able to remain alert and responded
appropriately to questions.   My own observations of Marks' behavior at the most
recent December 2021 competency hearing support this finding.   While Marks did
not often make eye contact (although his eye contact increased on day three of the
hearing), he was able to remain alert throughout a three-day hearing, did not
request any breaks, and was frequently observed passing notes to his counsel.[57]
Moreover, any concerns about Marks' ability to follow along can be ameliorated if
counsel engages in relaxed, focused, and structured questioning, a technique that
Dr. Otto, Dr. Jenkins, and others have used with success when conversing with
Marks.

The eighth, and final, factor – whether Marks lacks the ability to discuss the
testimony with his attorneys and pose questions to witnesses through counsel – is
a closer call but also weighs in favor of competency.   Marks is clearly able to
converse with and answer questions from his attorneys – the 30 hours of video
recorded sessions establish this fact.   He is also able to discuss the facts of his case
at least to a limited extent, and is even more successful in this task when subjected

---

[57] I am, of course, not privy to the contents of those notes and do not speak to them further.

to relaxed and structured questioning.   And Marks is aware of the evidence and can identify potential witnesses who might testify.   While the evidence shows that Marks possesses some language limitations, those limitations do not equate to a finding of incompetency under *Dusky*.   Further, I believe that any difficulties Marks may experience can be ameliorated to some extent by allowing him additional time to discuss the evidence and testimony with his counsel.[58]

In sum, there can be no dispute that Marks suffers from ASD with some degree of accompanying language impairments.   But there also can be no dispute that Marks' condition – in particular his cognitive and adaptive functioning – has not, and will not, change.   Based on the evidence presented in 2019, the Court found Marks to be competent.   The only new evidence since that time consists of the 30 hours of video recordings between Marks and his attorneys, which have been reviewed and interpreted by three different experts.   Marks argues that this new evidence conclusively establishes that he is incapable of making any autonomous

---

[58] On this point, Dr. Jenkins' findings are persuasive.   She administered to Marks the WASI-II, a cognitive functioning assessment, and found that his overall verbal comprehension was in the low average range.   (Doc. 277, at 21-22).   And Marks' scores on the Shipley-2 test, showed that his crystalized cognitive abilities (knowledge gained from education and experience), and his fluid abilities (using logic and other skills to acquire and learn new information) were both in the average range.   (*Id.* at 21; Tr. Vol. 1, at 71-72).   These test results further support Marks' ability to converse with his attorneys and discuss his case with them.   Marks does not attack these findings, other than to say that they are "not really pertinent to competency in general."   (Doc. 300, at 17). In addition, Dr. Otto also determined that Marks' language impairments would not preclude him from communicating with counsel and making decisions.   Even Dr. Baird-Hepworth testified that when Marks is given step-by-step instructions, he is able to follow along and engage in activities of daily living.

decisions, in addition to suffering from severe memory deficits and deficits in adaptive functioning, and therefore he is incompetent to proceed.   In making this argument, Marks seeks to employ a standard, one specific to those diagnosed with ASD, and one that has not yet been adopted as binding on this Court.   *See* Doc. 300, at 1.

Having reviewed those video recordings, as well as the wealth of other evidence and testimony submitted over a three-day evidentiary hearing, crediting the opinions of Dr. Jenkins over those of Ms. Bennett and Dr. Negron-Munoz, and applying the correct legal standards, the undersigned disagrees.   Rather, the evidence establishes that Marks has a sufficient present ability to consult with his attorneys with a reasonable degree of rational understanding, as well as a rational and factual understanding of the proceedings against him.   An analysis of the *Giraldo* factors supports this finding, and I therefore find by a preponderance of the evidence that Marks is competent to proceed (both to trial or to a guilty plea) pursuant to *Dusky*.   *See Rodriguez*, 2015 WL 6964671, at *14–15 (finding defendant diagnosed with ASD and accompanying intellectual and language impairments and charged with receipt, access, and possession of child pornography to be competent; BOP expert found the defendant's answers to questions about a variety of legal topics to be relevant, coherent, and correct, and transcripts of online chats

demonstrated an ability to testify coherently and to extrapolate, infer, and make generalizations).   *See also Fuenmayor-Arevalo*, 490 F. App'x at 222, 225.[59]

## V.   RECOMMENDATION

For these reasons, I **RESPECTFULLY RECOMMEND** that the Court find that Steven Michael Marks is presently competent to stand trial and/or to enter a plea of guilty.[60]

### NOTICE TO PARTIES

A party has fourteen days from the date the Report and Recommendation is served to serve and file written objections to the Report and Recommendation's factual findings and legal conclusions.   Failure to serve written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.   11th Cir. R. 3-1.

---

[59] It is highly probable that one of the objections Marks will raise to this report is the fact that in my 2019 Report and Recommendation, I reached opposite conclusions, and found Marks incapable of making autonomous decisions and thus incompetent.   However, the *sine qua non* of the present competency proceedings is Marks' argument that the evidence presented in 2019 and conclusions derived therefrom were purely speculative and forward thinking, and it is only now, after attempts to educate Marks, that there is sufficient evidence to determine competency.   Even assuming Marks' argument is correct, I have considered this very evidence and find that it conclusively establishes that Marks is presently competent pursuant to *Dusky*.

[60] Should the Court conclude that Marks is not presently competent to stand trial, the Court must commit Marks to the custody of the Attorney General for treatment for hospitalization for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable further he will attain the capacity to permit the proceedings to go forward.   18 U.S.C. § 4241.

Recommended in Orlando, Florida on April 15, 2022.

LESLIE HOFFMAN PRICE
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record