United States District Court
Middle District of Florida
Orlando Division

United States of America,

*Plaintiff*

*vs*

Steven Marks,

*Defendant*

---

**Defendant Marks's Objections
to Report & Recommendation (Dkt. #302)**

17-CR-257

---

Dated: May 31, 2022

Todd Foster
Matthieu L. Goddeyne
BARNETT, BOLT, KIRKWOOD,
LONG
KOCHE & FOSTER, P.A.
601 Bayshore Blvd. Suite 700
Tampa, FL 33606
Tel: 813-253-2020
tfoster@barnettbolt.com
mgoddeyne@barnettbolt.com

Mark J. Mahoney
HARRINGTON & MAHONEY
70 Niagara Street, 3rd Floor
Buffalo, NY   14202-3407
Tel: 716-853-3700
mjm@harringtonmahoney.com

*Attorneys for Steven Marks*

# Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    The R&R alternatively denies that the ability to make rational decisions is part of competency, or trivializes it, either way eviscerating it as a Due Process concept.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Defense counsel's failure does not make the accused less incompetent . . . . . . 7

The R&R ignores evidence of Dr. Jenkins' lack of professional skill, thoroughness, neutrality and accuracy . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

The R&R unfairly discounts or disregards the defense evidence of Dr. Negron-Munoz . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

The R&R unfairly discounts or disregards the defense evidence of Dr. Baird-Hepworth . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

The R&R unfairly discounts or disregards the defense evidence of Ms. Bennett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

The R&R unfairly discounts or disregards other defense evidence . . . . . . . . 20

The R&R erroneously gives effect to the adverse credibility finding as to Dr. Geller . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

The R&R discriminates against the accused as an autistic individual by its focus on abilities irrelevant to competency . . . . . . . . . . . . . . . . . . . . . . . 21

The refusal to allow the defense to call an expert on the Vineland Adaptive Behavior Scales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

The R&R erroneously places the burden of proof on the accused . . . . . . . . 24

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## Introduction

The Magistrate Judge recognizes, from her own direct observation of a recording of the event, that, when the time came, Steven was simply incapable of making the decision of whether to accept a plea agreement or proceed to trial. Report and Recommendation ("R&R," Doc. 302, p. 80)  She does so without any expression of doubt about the fact that this inability to decide is the result of Steven Marks' autism related deficits.  She accepts the fact that it was only upon his attorney's bare advice to accept the plea ageeement that Steven was able to make the choice.  She predicted this. Doc. 76 p. 59.

The recommendation that Steven should nevertheless be found competent to proceed rests on a number of errors in the R&R.  Because of page limits imposed on us it is not possible to delineate all the significant errors in facts and analysis.  But the errors we have identified are a representative of the ways in which the R&R selectively emphasizes certain facts and fails to consider others.

We conclude that this case warrants remand to the  Magistrate, with directions not to discount Dr. Geller's evidence or the evidence of Dr. Negron because she relies on that evidence; alternatively a new hearing requires *de novo* review.

Oral argument on his motion is requested owing to the complexity of the issues, and the page limits imposed on fully stating our objections.

Because Dr. Jenkins failed to even view the critical video conference recordings of Steven attempting to decide whether to execute the plea

1

agreement, and never even tested Steven on his abilities to make critical decisions, we also suggest, that Dr. Otto who initially had observed that making rational decisions was the greatest challenge for Steven, be reappointed by the Court to evaluate and report on the intervening evidence regarding Steven's capabilities in this regard.

### The R&R alternatively denies that the ability to make rational decisions is part of competency, or trivializes it, either way eviscerating it as a Due Process concept.

The first approach of the R&R is a classic "straw man" argument. It posits that the defense proposes a standard of "decisional competency" "in lieu of Dusky," a "new competency standard."  Then, since "Marks does not cite to any such authority" for this argument the R&R rejects the concept that rational decision making is part of competency.  (Doc. 302, at 7-8, 9).

The defense never suggested "decisional competency" as an alternative to any prevailing rule. Our Pre-Hearing Memo states. "the ability to rationally make their own decisions, however assisted by counsel" is simply a component of competency. (Doc. 265 at 5) We pointed out that two of the factors repeated in *Giraldo* expressly related to decision making. *Id.*

But the R&R, p.8, insists that "the Supreme Court has addressed the theory of 'decisional competency,' and applied it only where a defendant seeks to represent himself," referrrig to   *Indiana v. Edwards*, 554 U.S. 164, 175-76

2

(2008). *Indiana v. Edwards* did not adopt what the R&R calls a "heightened standard" of competency in self-representation cases. It did not say that the ability to make rational decisions – which was enorsed as part of competency generally – only applied to the decision to proceed to trial without counsel. *Edwards* simply states courts could bar self representation by defendants who are not competent to conduct trial proceedings. Subsequent decisions allow such discretion to federal trial courts. *United States v. Ferguson*, 560 F.3d 1060, 1070 & n.6 (9th Cir. 2009); *United States v. Berry*, 565 F.3d 385, 391 (7th Cir. 2009); *United States v. deShazar*, 554 F.3d 1281, 1290 (10th Cir. 2009).

The R&R, in footnote 9, brushes aside our litany of cases (#265 p. 10-11; #300 p. 4-5) which expressly recognize that rational decision making is part of competency. Of course the earlier R&R endorsed the need for rational decision making. Doc 76, p. 58 and n.22.

*In Godinez v. Moran*, 509 U.S. 389 (1993), Justice Thomas enumerated many decisions for which the defendant must have the "capacity for 'reasoned choice' and a 'rational understanding,'" including whether to plead guilty. *Id*. at 398-99. Justice Kennedy, concurring, with Justice Scalia, endorsed "competence to take part in a criminal proceeding and make the decisions throughout its course." *Id*. at 403. These pronouncements were not specific to self representation.

The AAPL "Practice Guideline: Evaluation of Competence to Stand Trial" discusses the ruling in *Godinez*:

3

> In stating that the Dusky definition of competence to stand trial encompasses such decision-making, Godinez suggests that the courts (and therefore the psychiatrist) may have to evaluate at least some of a defendant's decision-making abilities when making judgments about adjudicative competence (footnote omitted).

Indeed, the *Passman* decision, from which *Giraldo* borrowed its "factors," took the language, "ability to consider the wisdom of taking a course other than standing trial on the merits," from *United States v. David*, 511 F.2d 355, 358 (DC Cir 1975, Opinion by Bazelon, CJ). *David* addressed competency of the accused to rationally decide between a jury trial and bench trial. The R&R rejects all this in rejecting the consruct of "decisional competence."

The R&R goes so far as to hold that in arguing that one who is unable to rationally make decisions because of autism related deficits, is seeking "to employ a standard, one specific to those diagnosed with ASD, and one that has not yet been adopted as binding on this Court." p. 106

The R&R carries this negativity  toward the concept of "decisional competence" to the extreme. It discredits  Dr. Negron because she accepts this as a useful framework for considering the ability of the accused to make rational decisions. (Doc. 302, at 102). The R&R rejects the evidence of Dr. Baird-Hepworth who has observed Steven for four years because her testimony "seems geared towards the question of 'decisional competency'." *Id*. at 94.

The R&R distorts the defense position, and Dr. Negron's testimony, to suggest that their argument is that "Marks must be able to make these critical,

life-changing decisions autonomously and *independently*" meaning that he has to be able to *"make decisions without their advice and counsel.*(#302 p. 101-02). At every point he defense, and Dr. Negron, have made it clear, as the R&R admits, we are talking about "the ability to make rational decisions on his own even ***with the advice of counsel***") *Id.* at 57. (#302 p. 101-02).

Nevertheless, the R&R proceeds to determine competency without regard to Steven's ability to make rational decisions.[1] We note that this Court never rejected the requirement of the ability to make rational decisions or, we submit, even discussed Steven's decision making abilities. Doc 95.

The R&R then pivots to endorses the suggestion made by the government, (Doc. 292 p.104) that Steven does not need to make rational decisions himself, he can "decide" to let his attorney decide what he should do, and that would be a"rational decision." This the R&R couches as "deferring to the advice of counsel" (#302 p. 101):

> Thus, Marks clearly understands the seriousness of the decision he must make, ***and defers to the advice of his counsel***. . . . he has the *capability of weighing* the advantages and disadvantages of testifying at trial, and of weighing the risks and benefits of going to trial versus accepting a plea agreement, and then ***deferring to the***

---

[1] This is in stark contrast to the first R&R. "All of the experts agree that Marks suffers from great deficiencies with respect to the fifth factor, the ability to consider the wisdom of taking a course other than standing trial on the merits." Doc. 76 p.58. "The record evidence is undisputed – Marks would not 'look to counsel for advice,' but would rather blindly follow whatever counsel told him to do, without any discussions or objections. There would be no autonomous or rational decision making on the part of Marks himself." *Id.* This prediction was 100% correct

*advice* of his counsel . . .

As an aside – there is nothing in the record demonstrating that Steven was capable of "weighing" anything.  Everything the R&R points to in this regard is mere rote recitations by Steven, often mistakenly, of various rules and considerations that might properly bear on his decision.  Nothing demonstrated a "weighing" process toward deciding except in the most simplistic notion that less jail time would be better. The R&R describes no "weighing." He only "acccepts the plea deal on the advice of his attorney" after he cannot decide himself. (#302 p. 80.) All he wants to know is what is the "right decision." But this is the same concrete answer Dr. Otto found troubling: Steven only wants to know "what's the best decision?" He does not know the process of deciding by himself.

Allow a client to defer (or delegate or whatever) to his attorney the choice to plead or not is disruptive of two fundamental principles.  First, the accused cannot delegate to his counsel certain decisions that are his to make, such as entering a plea or testifying, even a competent defendant.

Second, the rationale utterly trivialized the idea of "competence." To allow one who, by virtue of a developmental disability is unable to decide for himself, to "defer" the decision to plead to his counsel, completely circumvents and undercuts the social and Due Process purposes of requiring competency to begin with. It undercuts the intersts in the reliability and dignity of the process and the autonomy of the individual. When the government first argued that being

able to follow counsel's advice is enough, the Magistrate Judge dispatched with this as being in complete disregard for the notion of competency itself. (Doc. 76 at 59 n.23)  The R&R does not explain why that view is now abandoned.

The long-standing problem of lawyers telling clients to plead, or not take the stand, taking these decisions away from the accused, will be now enabled under the rubric of the accused "deferring" to counsel. There exists a bright line here, that the R&R extinguishes. As soon as we allow lawyers to decide such important things the entire process "loses its character as a reasoned interaction between an individual and his community and becomes an invective against an insensible object." Note, Incompetency to Stand Trial, 81 Harv.L.Rev. 454, 458 (1969).

### Defense counsel's failure does not make the accused less incompetent

The R&R criticizes  defense counsel's efforts to assist Steven to attain competency, making him at times "nervous, confused, forgetful and anxious," R&R, p. 80, and "lengthy discussion, into complex legal arenas," and so on. p. 81. Our written "Advice to Steven" document – in two versions – is panned because of its breadth, and "complex legal terminology," for having citations and that it " is not broken down into small sections."

The thrust of this criticism seems to be that Steven's lack of the intuitive knowledge needed to make rational decisions  is defense counsel's fault for so

imperfectly attempting to educate him. The only reasonable implication of this is that someone else can do a better job to help Steven attain competence.  18 USC §4241 holds the answer to this: the Court should find him incompetent and allow the Attorney General to find a "suitable facility" that can do that job better.

### The R&R ignores evidence of Dr. Jenkins' lack of professional skill, thoroughness, neutrality and accuracy

The R&R found Dr. Jenkins reports and testimony to be more persuasive. It is hard to reconcile this with an objective comparison between the two.  Dr. Jenkins is far less qualified and has far less experience. Her diagnosis of Social Anxiety Disorder is sophomoric. Dr. Negron-Munoz, illustrated that since autism throughly explains Steven's symptoms, the diagnostic criteria for ASD rule SAD out. Doc. 294 at 71. We also demonstrated that the differential diagnosis section for ASD rules out SAD as well. (Doc. 294 at 95, DEx 46 at 207).

Dr. Negron explained why her diagnosis of depression in remission was contrary to her own notes. Doc. 294 at 92-93).

Dr. Negron recorded her interviews and made extensive notes on the attorney client conferences. Dr. Jenkins refused a request to record her interview, knowing the District Court had spoken on this issue, and made no notes of anything at all.

Dr. Jenkins also failed in creating her historical background on Steven, by relying only on statements made by Steven himself and disregarding all the other evidence at hand (See Doc. 300 at 14-15). Although Dr. Jenkins testified that she reviewed this other evidence; i.e. the notes from Aloft, and the videos between Marks and his counsel, she testified that she only takes into consideration Steven's actions in front of her, even when she is faced with evidence that completely contradicts her observations, so really she relies solely on her own observations[2] (Doc. 292 at 18). Furthermore, she argues that because it is Steven's life, he can defer to his attorneys and wait for them to make a decision for him, and by deferring to his attorneys he is in fact making a decision. (Doc. 292 at 206).

Dr. Danziger stated in his report that Marks' ASD and language impairments render him unable to "make a rational decision and weigh out the advantages and disadvantages of accepting a plea offer, or [to] meaningfully comprehend what rights he would be giving up by doing so." Doc. 75-1 at 12. And Dr. Geller's report supports that finding as well. According to the R&R from the first competency hearing in 2019, the Court found Defense expert reports persuasive and in fact adopted their opinions as its own. [3]

---

[2] Dr. Negron-Munoz took issue with this fact (that Dr. Jenkins relied solely on self-reporting from Steven) and the R&R tries to depict Dr. Negron-Munoz as a hypocrite because of this. (Doc. 302 at footnote 35). However, while Dr. Negron-Munoz did also rely on self-reporting from Steven, she took into account other evidence in addition to those statements made by Steven himself (Doc. 294 at 68-70).

[3] The undersigned is also persuaded by the fact that Marks is unable to make basic living decisions on his own. The one time he lived away from his parents while attending the technical

Dr. Jenkins sat through the two or three interviews of Steven actually addressing competency without making any notes of her own (Doc. 292 at 168), yet she repeatedly relies on unrecorded claims of elaborate discourses with Steven, and jail staff for her conclusions. *(Id.* at 36-37,84,139,168-172). Yet, without notes the R&R found that Dr. Jenkins opinions were more persuasive, even though there was no written, or recorded record to support her opinions. Whereas, Defense witnesses provided written records and recorded evaluations illustrating their points depicting just how incompetent Steven is, and their opinions were overlooked or completely ignored. Even more telling, the R&R states, "Marks' own words and demeanor - surely is more persuasive than the impressions and interpretations made by his own counsel" (Doc. 302 at footnote 48). But again, this logic applies only to the Defense, and even without any real recorded evidence of Dr. Jenkins meetings with Marks, the Court found Dr. Jenkins to be more persuasive? Dr. Jenkins provided no concrete evidence for the Court to examine beside her own impressions and interpretations.

The "testing" done by Dr. Jenkins did not actually test for competence or understanding. It was not really pertinent to competency in general, and was especially impertinent to whether Steven is competent. When compared to Def.

---

school, Marks did not eat properly, did not engage in the most basic of personal hygiene, and wore his shoes to the point that the soles disintegrated and he developed sores on his feet. Even in his current living situation, if he is not explicitly instructed to take a shower or to wash his clothes, he will not do so. There is no dispute that he will never be able to live autonomously again. If Marks is unable to make basic day-to-day living decisions, it stands to reason that he is also unable to make more weighty autonomous decisions such as whether to accept a plea deal or to testify at trial.

Ex. 4 and 5, the BOP questionnaires are practically meaningless. Dr. Jenkins discounts the video record of Steven's inability to attain competence and rationally decide for himself because "It's how Mr. Marks is in front of me, what I'm observing" (Doc. 292 at 59). Of course she was able to observe it had she chosen to do so. More fundamentally, she could have replicated what we did, and actually test Steven's competence herself, but she never did, and instead relied on Steven's half-baked responses to her questions which tested his superficial understanding of the legal world. Additionally, Dr. Jenkins did not test for Steven's understanding of what conduct he was charged with, only the statutory rubric, and never followed up to test whether he had a further understanding of what he was talking about (Def. Ex. 53 at 103).[4] And a plea of "not guilty," does not mean that one is not guilty, but that one is putting the government to its proof.[5]

Finally, any relevant questioning done by Dr. Jenkins was wasted as she testified and illustrated just how partial she was. When asking about specific legal concepts in relation to Steven's case, she herself, was not even aware of the right answer to the questions.[6] So, how was she to properly judge whether Steven knew the correct answers to these questions, when even she, the alleged

___

[4]  "Production - I made it" when Steven did not "make" anything (Doc. 292 at 159).

[5]  *Id*.

[6]  "Q: Well, if you want to know the penalties, isn't it important to find out...whether he's accurate in his understanding or even close to being accurate.
A. ...Just from my basic knowledge, sex offenses typically do come with a lot of time. So for us it sufficed that he believed or understood that he could do a lot of time in prison..." (*Id*. at 162).

expert, didn't know the answers. She also asked Steven about his childhood when developing his background and Steven told her that he went to a Jewish sleep-away camp starting as a young child until he was in high school (Doc. 292 at 32). However, it was proven after conversations with Steven's mom, that this was not true (*Id*. at 35). But, when asked about how Steven getting this fact extremely wrong affected her opinion of Steven's memory, she stated that "it's hard for anybody to remember their childhood exact and that mistakes do happen" (*Id*. at 36). So, she found Steven's lapse in memory to be a mistake, but anytime he remembered absolutely anything it was extremely telling that he had no memory issues.

We are familiar with the appellate rubric that "faced with diametrically opposite expert testimony, a district court does not clearly err simply by crediting one opinion over another where other record evidence exists to support the conclusion." *Battle v. United States*, 419 F.3d 1292, 1299 (11th Cir. 2005).

Whatever guidance this might really provide to a trial court, here we hardly have "diametrically opposite" expert evidence. "Diametrical," given its ordinary meaning, denotes not just to an opposite conclusion, but some kind of parity in quality and scope as in the mirror halves of a circle split at the diameter. Here here is no such diametric parity.

### The R&R unfairly discounts or disregards the
### defense evidence of Dr. Negron-Munoz

To begin with, R&R suggests that only one of Dr. Negrón-Muñoz's interviews with Steven was devoted to the issue of competence. R&R p. 52. This arises from the fact that she was initially retained as a potential trial witness on the question of criminal responsibility. But, all of the interviews were devoted to the issue of competence, as is evident from reviewing them. Def. Ex. 19, 20. Dr. Negron had seen Steven's interviews with counsel and determined that competency needed to be addressed before sanity.

The R&R discounts Dr. Negrón-Muñoz's assertion that Steven has significant memory deficiencies by describing "lengthy discussions" and "extensive details" he provided November 23, 2020.  R&R p. 72.  The first "details" she references turn out to be trivial – the names of two apps that he used, and some minor details about those apps. Def. Ex. 14. p. 9-12.  Though, later Steven does provide some details about the offense. *Id*. at 24-27. But this is all overshadowed by about 40 instances of problems that Steven had with memory, guessing, or confusion during this interview. *See generally* Def. Ex. 14.

The R&R uses the aforementioned strategy again by stating that "Marks was able to recall information that Dr. Jenkins provided to him several months prior" during an interview with Dr. Negron Munoz in October 2021. R&R p. 72. The only information that the R&R cites in support of this assertion is that Steven remembered that he would go to a hospital if found not competent. Gov.

13

Ex. 13 p. 3. Notably however, immediately after Steven remembered this information, he stated that he didn't know what would happen if he's found not competent to proceed. *Id*. Throughout this interview, Steven could not remember pertinent information regarding his case about 14 different times. *See generally* Gov. Ex. 13.

Dr. Negrón-Muñoz, is a psychiatrist triple board-certified in the areas of Adult, Child and Adolescent, and Forensic Psychiatry. Def. With the American Academy of Psychiatry and the Law (AAPL) she chairs the Developmental Disabilities Committee. Her forensic work includes adults and juveniles, approximately 25% of which have intellectual or developmental disabilities. Dr. Negrón-Muñoz took thorough notes on defense counsel's extensive interviews with Steven; Dr. Jenkins did not. Furthermore, Dr. Negrón-Muñoz watched all 30 hours of defense counsel's interviews with Steven; Dr. Jenkins only claimed to watch 15 hours. Dr. Negrón-Muñoz also recorded the meetings that she had with Steven. Nevertheless, the R&R concluded that, Dr. Negron Munoz is partisan. R&R p. 92.

The R&R discredits defense witnesses as "partisan" for adhering to their beliefs, but not Dr. Jenkins who refused even to acknowledge the relevance of viewing Steven struggle to decide his course of action.  In terms of clinicians, one has to be more circumspect before making accusations of being "partisan." There is nothing wrong with an expert who is zealous or "partisan"in support of their opinion.

> Neither being an emotional advocate for one's opinion nor providing requested legal advice is unethical. Being a partisan or legal advocate for an examinee (as opposed to one's opinion) is a departure from striving for objectivity and may, depending on degree, be unethical. Identification with a cause and even bias are not necessarily unethical in and of themselves and, as humans, some emotionality and bias may be inevitable. However, bias must be openly acknowledged and not lead to distortion, dishonesty or failure to strive to reach an objective opinion.[7]

Drs. Geller, Negron, and Baird–Hepworth, as well as Gretchen Bennett had the challenge of edifying the tribunal about a widely understood disability, with facts that are often counterintuitive, under skeptical questioning by government counsel.  What they were confronting mostly is disbelief about facts involving empirical testing and autism itself. Dr. Geller came in to this case not to testify about autism but to help educate prosecutors to facts about Steven, and his diminished capacity, which seems to have been very misunderstood.

### The R&R unfairly discounts or disregards the defense evidence of Dr. Baird-Hepworth

The R&R unreasonably chooses to give no weight to the testimony from Dr. Baird-Hepworth who observed Steven on a daily basis beginning upon his arrival at Aloft in 2017, until 2021 when Steven was taken to MCC for his competency evaluation. She has observed Steven over that time both directly

---

[7] AAPL, Ethics Questions and Answers Opinions of the AAPL Committee on Ethics, Adopted by AAPL Council May 19, 2013

and indirectly, via her own interactions with him, reports from other employees, and meetings (Doc. 294 at 185). Over these past four years, she has observed Steven up close more than any other expert or person. And her testimony, consistent with the Aloft records provided to Dr. Jenkins, but mostly ignored by her, squarely disestablishes the factual assumptions and the ultimate conclusions of Dr. Jenkins.

Dr. Baird-Hepworth was asked if she was "aware" of Steven filling out a laundry slip while at MCC (Doc. 296 at 23). There is nothing in the BOP records about this, or in Jenkins' report or in the evidence about it to support such a question. Nevertheless, Dr. Baird-Hepworth admitted she was not aware of this but demonstrated the mistaken premise of the question in pointing out that Steven routinely had other inmates telling him what to do (*Id*. at 23, 34-35). This included telling him to take showers or get clean clothes, things which Dr. Jenkins was happy to attribute to Steven's own initiative and self-advocacy

When Steven spoke on the phone to his parents while at MCC, he admitted to his mother that he was scared to death and did not deny his mother's impression that he was traumatized. (Gov. Ex. 8.10, 8.15). This dispelled Dr. Jenkins suggestions that Steven was happy and feeling safe. But, Dr. Baird-Hepworth's testimony about Steven's return to Aloft and the nightmares he experienced reveals Dr. Jenkins' lack of insight.

Dr. Baird-Hepworth testified regarding the great degree to which Steven needs prompts to do even the most basic daily living tasks, such as: showering

and showering properly, seeking haircuts, brushing his teeth, and doing his laundry. Steven wore the same outfit all the time, and had holes in his shoes, socks, and underwear (Doc. 294 at 187-88; Doc. 296 at 12).  These observations support those same observations that were made by Dr. Geller years prior, and the Magistrate Judge, Doc. 76 p.58.  But none of this surfaces in Dr. Jenkins' analysis.

Had Dr. Jenkins  interviewed Dr. Baird-Hepworth as she should have done, she never could have honestly written the report she did.  She would have found that Steven struggles tremendously with the most basic decisions: whether to cut his hair, whether to do one activity or another, and so on (Doc. 294 at 187; Doc. 296 at 9-10). He cannot decide what to pack for a trip (Doc. 296 at 13). He could not figure out for himself that he could resume walking on the road after it was resurfaced. (*Id*. at 14). Seeing that his cooking pan is in need of cleaning is a conundrum to Steven. (Doc. 294 at188-190).

Stark evidence of the insights of Dr. Baird-Hepworth come from the discovery in the R&R, n.41, after the hearing, that Steven told his parents that he did not want to see a doctor at MCC because he had a doctor. That is exactly what Dr. Baird-Hepworth suspected when this was put to her as being an act of decision making and executive functioning. (Doc. 296 at 28).

The idea that Dr. Baird-Hepworth should be discounted because she stuck to her view that learning a beginning level piano piece by memory – over months of repetition is not, to her, playing the piano, that Steven cannot make decisions,

even after denying a doctor at MCC to treat his glaucoma because he already had one back at Aloft, and for asking when he would be leaving MCC after his evaluation was complete. (Doc. 302 at footnotes 41 and 52).

Dr. Baird-Hepworth's evidence was important, entirely consistent with the history and diagnosis, and it completely undercut the report and evidence of Dr. Jenkins which was more notable for what it chose not to consider. If there is anything to the argument that a lengthy time of observation is important,[8] it applied to the value of Dr. Baird-Hepworth's evidence far more than that of Dr. Jenkins. It was unreasonable error for the R&R to discount Dr. Baird-Hepworth's testimony. Contrary to the argument utilized in the R&R, for giving more weight to Dr. Jenkins testimony as opposed to Dr. Negron-Munoz, the Court seemingly disregards this argument when discussing the testimony provided by Dr. Baird-Hepworth. Dr. Jenkins and her staff observed Steven for 30 days, whereas, Dr. Baird-Hepworth and her staff observed Steven for nearly 4 years, and according to the case law cited by the Court, this means that Dr. Baird-Hepworth's testimony should be given more weight.

### The R&R unfairly discounts or disregards the defense evidence of Ms. Bennett

The R&R gives very little attention to the evidence of Ms. Bennet. Her tests confirmed the impairment in Marks' executive functioning, and demnstrated the that very inaccurate conclusions can be drawn about the

---

[8] Doc. 302 at 92.

mental operations of a person with ASD and speech and language difficulties.

The R&R so frequently refers to Steven's capacity for "sustained concentration" as if it were a talisman of competence. This hs reference to the chats, theclinical interviews and the police interviews. But Gretchen Bennet draws the important  distinction between preseverative activities, such as him extensive online pursuits and chats, and "focused concentration. Repetitive behavior, for autism   is not indicative of competence. Structured forced interviews are not "sustained concentration."

The R&R misses the point of Ms. Bennett, that was echoed by Dr. Negron, that there is a vast difference between low level executive functioning, and the challenges of navigating a novel socal challenge such as making decisions in your defense. Marks might understand the consequences of his actions, such as if he knocked over a glass of water and left the room. (2020 Transcript, Pgs. 46-47) However, in more complicated social situations, as Ms. Bennett's evaluative tests showed, Marks fails to understand consequences and how to affect them. .

Ms. Bennett further rebuffed government counsel's mistaken assumption that anything in the online chats, demonstrates reciprocal social skills or, in the government's made up phrase,  to recognize the "social perceptions of others." Ms. Bennet states, "I don't know if it says that he could understand the social perspective of the other person, so I wouldn't say that." (2021 Transcripts, Pg. 37) Every instance were it was suggested that Steven ndestood the perspectives of others was one where he was explicitly told how the felt or what they thought.

Ms. Bennet gave remarkably insightful testimony, with no familiarity with "chat rooms" or sexual role play, that these chat rooms must have their own set of language for Steven to mimic because she could see the language was not original to Mr. Marks.

R&R states that the conversations/role-play between Marks and his counsel showed that "Marks was able to weigh the different options and explain them." (Doc. 302, Pgs. 50-51) Ms. Bennett refuted this idea of "weighing": "It appears that he was – that Steven was able to restate the information on the document and remember those are – share those details.".

### The R&R erroneously gives effect to the adverse credibility finding as to Dr. Geller

As we have suggested, the adverse credibility finding as to Dr. Geller conflicts with the principles of *United States v. Raddatz*, 447 U.S. 667, at 681 n. 7. (1980). See, *United States v. Marshall*, 609 F.2d 152, 155 (5th Cir. 1980); *Louis v. Blackburn,* 630 F.2d 1105, 1110 (5th Cir. 1980); *Cullen v. United States*, 194 F.3d 401, 407 (2d Cir.1999); *Hill v. Beyer*, 62 F.3d 474, 482 (3d Cir.1995)(*implicit* credibility determination by the Magistrate Judge); *United States . Bermudez*, 238 F.3d 424 (6th Cir. 2000);

The R&R gives cascading effect to this constitutional error by (1) giving effect to what the Magistrate Judge perceives this Court's intention to exclude evidence that would call into question this Court's criticisms of Dr. Geller, which

she was not confronted with because she did not testify before the district court, Doc. 302, n. 29, and (2) discounting the testimony of Dr. Negron because she relied no Dr. Geller's report which is Court . *Id.* 92. This taints the R&R, such that the matter should be remanded to the Magistrate Judge to reconsider, without giving any effect to the earlier adverse credibility ruling or this Court's efforts to limit the scope of Dr. Geller's evidence.  Alternatively, as we request generally, there should be a new hearing before this Court as part of its *de novo* review.

### The R&R discriminates against the accused as an autistic individual by its focus on abilities irrelevant to competency

The R&R pervasively focuses on basic abilities that Steven has that have nothing really to do with his ability to rationally understand the legal proceedings and principles, or make rational decision in his case. These may be abilities from which in a typically developed individual, we might think correlate to skills relevant to competency.  This we might use the ability to drive a car or attend college as proxies for he ability to have a rational understanding of the proceedings and properly assisting in their defense.

However, autism is typified by an "uneven profile of abilities," DEx 45, DSM-5 p. 55, and observable abilities and average intellect camouflage severe autism related deficits that truly render one incompetent. Steven's deficits, for example, in the area of intelligence, working memory and executive functioning are just as severe as the deficits that may make those with serious intellectual

disability or mental illness or hallucinations incompetent. This is the significance of his adaptive functioning scores which, despite his intelligence point to great difficulties in social competence and executive functioning. Drs. Geller, Negron and Gretchen Bennett reported on this and testified about this. See also, DEx. 55, 62, 63. But an autistic person like Steven is more likely than these individuals to have strengths in other areas and be cognitively intact. Here, the R&R uses these relative strengths and cognitive abilities as an excuse to disregard the actual severe deficits at issue. This poses an irrational and discriminatory barrier to finding incompetence for Steven as an autistic individual, compared to the intellectually disabled and mentally ill who are more likely to have a broad profile of deficits with fewer strengths.

These references are throughout the R&R, involving such things as Steven being able to engage in conversation, or not get lost walking to a meeting with Dr. Jenkins, or playing the piano, or getting into a shower, asking for clean clothes,.

It could be said in each of these instances that these "abilities" – which are at a very basic level in any event – are clearly incomparable and irrelevant to decision to choose a particular guilty plea over a trial. That is, they should not be persuasive. Yet the framework of the argument tracks exactly the most fundamental social discrimination working against those with Asperger's type autism, expressed in the phase, "he doesn't look autistic." It is expressed in Dr. Jenkins supposition, against the evidence and developmental history, that

Steven does not seem affected by his autism anymore, because he appears to function in a jail, or claims to have friends. See, Doc 67, n.22 and accompanying text.  So this view, focusing on evident abilities but disregarding the hidden and severe deficits that are most pertinent, though a weak argument, is a truly discriminatory one and disadvantages the tose who are autistic in the competency determination. See, § 504 of the Rehabilitation Act of 1973 (29 U.S.C. §794) ; Alexander v. Choate, 469 U.S. 287, 295-96, 105 S.Ct. 712 (1985).

Indeed, our argument that those with autism can have just a severe deficits as those defendants with other intellectual or mental health problems, and therefore be just as incompetent, seems to be met with resistance in the R&R, p. 106. The R&R characterizes thsi as seeking "to employ a standard, one specific to those diagnosed with ASD, and one that has not yet been adopted as binding on this Court."

### The refusal to allow the defense to call an expert on the Vineland Adaptive Behavior Scales

The Magistrate Judge refused to allow defense to call an expert on he Vineland instrument to clear up confusion arising from the uncertainty of Dr. Negron in handling questions about the test itself and the meaning of the scores. R&R n. 36 and 39.  Dr. Geller had administered the Vineland and was available to testify about the test itself and the meaning of he results, by videoconference, which had been used for both Dr. Jenkins and Gretchen Bennett. The refusal of this request was error and prejudicial given how Dr. Negron is treated in the

R&R over this issue.

The reasons for the decision excluding Dr. Geller as a direct witness had no bearing on this. Moreover, there was no urgency that prevented the later calling of another expert on the Vineland at a late time to address the question. The error was compounded by the failure of the R&R to take any note of how our Post Hearing Memo addressed the government's confusion about what the test measures. Doc. 300, p. 16.

### The R&R erroneously places the burden of proof on the accused

The Fifth Circuit's decision in *United States v. Makris*, 535 F.2d 899 (5th Cir. 1976) held that the burden of proof was on the government. This is still role in that circuit and other circuits, including the 11th Circuit. *United States v. Izquierdo*, 448 F.3d 1269 (11th Cir. 2006) carved out an exception "only in the particular circumstances" of one bringing a motion to withdraw his guilty plea based on incompetency." Id. at 1278.

Prior to *Izquierdo*, *Medina v. California*, 505 U.S. 2572 (1992) held that a *state statute* could constitutionally put the burden of proof on the accused. *Cooper v. Oklahoma*, 517 U.S. 348 (1996), then held that a state could not do this using a clear and convincing evidence standard. Unfortunately, Justice Stevens commented in passing that "Congress has directed that the accused in a federal prosecution must prove incompetence by a preponderance of the evidence." 18 U.S.C. § 4241.

Recognizing that § 4241 had not stated this, the 11th Circuit, in *Izquierdo*, dismissed this statement in *Cooper* as *dicta,* and recognized that *Makris* was still binding, as did lower courts.; *United States v. Williams*, 2007 U.S. Dist. LEXIS 103889 (M.D. Fla. 2007)

However, *United States v. Bradley*, 644 F. 3d 1213 (2011), stated that the burden was on the accused, relying soley on *Medina v. Singletary*, 59 F.3d 1095, 1106 (11th Cir. 1995). This made no snse because *Medina* invovled a state prisoner seeking postconviction relief and had to do with the federal rule. The burden of proof was not an issue in *Bradley*. The case did not turn on it.  So it is clearly *dicta*, relying on an inapplicable case. Thus *Makris*, is still binding on the Eleventh Circuit, as stated in *United States v. Merriweather*, 921 F. Supp. 2d 1265 (N.D. Ala. 2013).

## Conclusion

.

Dated:  May 31, 2022

Respectfully submitted,
/s/ Mark J. Mahoney

Todd Foster
Matthieu L. Goddeyne
BARNETT, BOLT,
KIRKWOOD, LONG
KOCHE & FOSTER, P.A.
601 Bayshore Blvd. Suite 700
Tampa, FL 33606
Tel: 813-253-2020
tfoster@barnettbolt.com
mgoddeyne@barnettbolt.com

Mark J. Mahoney
HARRINGTON & MAHONEY
70 Niagara Street, 3rd Floor
Buffalo, NY  14202-3093
(716) 853-3710 (*facsimile*)
(716) 853-3700 (*voice*)
mjm@harringtonmahoney.com

25

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I filed the foregoing with the Clerk of the United States District Court, using the CM/ECF system on May 31, 2022, which will send electronic notice to AUSA Emily Chang.

/s/ Mark J. Mahoney

Mark J. Mahoney