## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**UNITED STATES OF AMERICA**

**VS.**                          **CASE NO: 6:17-cr-257-PGB-LHP**

**STEVEN MICHAEL MARKS**

_____/

## ORDER

This cause comes before the Court on the following:

1.  Defendant's Objection to the Report and Recommendation Concerning Defendant's Competency to Stand Trial, filed on May 31, 2022 (Doc. 307);

2.  The Government's Response in Opposition, filed on June 9, 2022 (Doc. 308); and

3.  Defendant's Reply, filed on July 7, 2022 (Doc. 314).[1]

Upon due consideration, the Court overrules the Defendant's objections to the Magistrate Judge's Report and Recommendation and finds the Defendant competent to stand trial.

---

[1] Both parties have incorporated by reference prior briefing, which is improper. The Court has established page limits under its Local Rules to ensure the parties focus their arguments. Incorporating prior pleadings circumvents that rule. The proper procedure is to seek leave to exceed the page limit. In the future, proceeding in this manner will result in the pleading being stricken without leave to refile.

## I.     BACKGROUND

The procedural history of this case as pertains to the Defendant's mental competency is accurately recounted in the Report and Recommendation and is adopted herein. (Doc. 302, pp. 1–6). The Court has carefully reviewed the following materials:

1.     The Defendant's motion pursuant to 18 U.S.C. § 4241(a) requesting a hearing to determine Marks' competency to proceed; (Docs. 185, 186, 187, 191);

2.     The Government's response; (Doc. 193);

3.     Transcripts of the competency hearing; (Docs. 292, 294, 296);

4.     The 2019 competency proceedings; (Docs. 76, 95);

5.     The undersigned's Order regarding the first competency evaluation; (Doc. 95);

6.     The transcript of approximately 30 hours of video and audio recordings wherein defense counsel educates the Defendant on various legal topics and discusses two potential plea agreements; (Gov't Ex. 10);[2]

7.     The reports of Gretchen A. Bennett, licensed speech-language pathologist (Doc. 254); Dr. Rosa Negron-Munoz, board certified psychiatrist (Doc. 255); Dr. Ashley Jenkins, forensic psychologist (Docs. 228, 229, 237, 277);[3]

---

[2]     The Court also listened to portions of the video recordings pertaining to the plea agreements and excerpts of the discussions of legal principles. (Def. Ex. 2).

[3]     Dr. Angela Baird-Hepworth, clinical executive director of Aloft Transitions, testified as a lay witness, and the Court read the testimony provided by Dr. Baird-Hepworth. Moreover, the Magistrate Judge considered, and the Court has reviewed, the expert report and prior testimony of Dr. Geller and all testimony introduced at the first competency hearing. (Docs. 76, 95).

8.      All exhibits introduced by the parties;[4] and

9.      Post-hearing briefing (Docs. 299, 300, 301).[5]

## II.      LEGAL STANDARDS

### A.      Objection to Report and Recommendation

When a magistrate judge has been designated to decide a matter that is dispositive in nature, the magistrate judge must issue a report to the district judge specifying proposed findings of fact and the recommended disposition. FED. R. CIV. P. 72(b)(1). Any party who disagrees with the magistrate judge's decision has fourteen days from the date of the decision to seek the district judge's review by filing objections to those specific portions of the decision with which the party disagrees. FED. R. CIV. P. 72(b)(2). The district judge must then make a *de novo* determination of each issue to which an objection is made. FED. R. CIV. P. 72(b)(3); *see also*, *United States v. Govea-Vazquez*, 962 F.Supp.2d 1325, 1327 (N.D. Ga. 2013) ("Where objections are made, a district judge 'shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.'"). "Frivolous, conclusive, or general objections need not be considered by the district court." *United States v. Schultz*, 565 F.3d 1353, 1361 (11th Cir. 2009) (citation omitted). *De novo* review "require[s]

---

[4]   The Magistrate Judge quotes from the transcription of Dr. Negron's interview of Mr. Marks, and the Court took care to read the record. (Gov't. Exs. 14, 15).

[5]   The Court has also considered prior briefing material when referenced by the parties in their briefs.

independent consideration of factual issues based on the record." *Jeffrey S. v. State Bd. of Educ.*, 896 F.2d 507, 512 (11th Cir. 1990) (per curiam). The district judge may then accept, reject, or modify the magistrate judge's recommendation, receive additional evidence or briefing from the parties, or return the matter to the magistrate judge for further review. FED. R. CIV. P. 72(b)(3).

### B.    Mental Competency

"A defendant has a due process right not to be tried or convicted while incompetent." *United States v. Ramirez*, 491 F. App'x 65, 71 (11th Cir. 2012) (citing *Drope v. Missouri*, 420 U.S. 162, 171–72 (1975)). The federal competency standard is set forth in 18 U.S.C. § 4241, which provides:

> If, after [a] hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General.

18 U.S.C. § 4241(d).

Section 4241 codifies the standard for competency set forth by the United States Supreme Court in *Dusky v. United States*, 362 U.S. 402 (1960): "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *See also United States v. Bradley*, 644 F.3d 1213, 1268 (11th Cir. 2011) (quoting *United States v. Hogan*, 986 F.2d 1364, 1371 (11th Cir. 1993)). "The standard for competence to plead guilty

is the same as the standard for competence to stand trial." *United States v. Rigsby*, 791 F. App'x 94, 95 (11th Cir. 2019).

### 1.    *Burden of Proof*

A Defendant "raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence." *Bradley*, 644 F.3d at 1268 (distinguishing *United States v. Makris*, 535 F.2d 899, 905–06 (5th Cir. 1976)); *see also Cooper v. Oklahoma*, 517 U.S. 348, 362 (1996) ("Congress has directed that the accused in a federal prosecution must prove incompetency by a preponderance of the evidence."). While the Defendant did not object in relation to the first competency hearing to the Magistrate Judge's finding that he had the burden of persuasion on the issue of mental incompetency, (Doc. 76, p. 5; Doc. 85), he now objects that the Magistrate Judge erroneously places the burden on him to prove that he lacks mental competency to stand trial. (Doc. 307, p. 24). That said, the Eleventh Circuit in *Bradley* clearly distinguished *Makris* when it said: "While earlier precedent tends to the contrary, *see United States v. Makris* . . ., we have since decided that" the burden of proof rests with the movant. *Bradley*, 644 F.3d at 1268. The Defendant's attempt to distinguish *Bradley* is unpersuasive.[6]

---

[6]    As the Magistrate Judge noted in the Report and Recommendation, the Eleventh Circuit held in *United States v. Johns*, 390 F. App'x 963, 970 n.5 (11th Cir. 2010), "[w]here the defendant files a motion to determine is mental competency. . ., the burden of proof is on the defendant." (citations omitted).

## III.   DISCUSSION

The Defendant presents legal and factual challenges to the Magistrate Judge's Report and Recommendation. The Court will first address the Defendant's objections to the Report and Recommendation which are based on the premise that the Magistrate Judge improperly rejected "decisional competence" and therefore erred by applying less weight to the testimony of Dr. Negron and Dr. Baird-Hepworth because of their reliance upon the concept of decisional competency. (Doc. 307, pp. 2–4). The Defendant further objects to the Report and Recommendation on the basis that the Magistrate Judge "proceeds to determine competency without regard to [the Defendant's] ability to make rational decisions." (*Id.* at p. 4). Following the review of the Defendant's legal objections, the Court will address the Defendant's objections to the Magistrate Judge's factual findings.

### 1.   *Decisional Competency*

In the defense's pre-hearing memorandum submitted in relation to the instant competency hearing, the Defendant raises the following concern:

> The most prominent legal issue then becomes whether or not it satisfies due process for a person who, as a result of a mental defect is unable to rationally make . . . [the choice to plead guilty or proceed to trial], even with extensive and thorough advice of counsel, and can only decide based simply on what his lawyer suggests he do on such a grave question as to whether to enter a guilty plea.

(Doc. 265, p. 3). The defense contends, in a section of its brief entitled "Decisional competency," that "'[c]ompetency has several components: the ability to rationally

understand the nature of the charges and the proceedings, to assist in his defense, and also the ability to rationally make their own decisions, however assisted by counsel." (*Id.* at p. 5). The defense cites a law review article authored by Professor Richard J. Bonnie entitled "The Competence of Criminal Defendants: A Theoretical Reformulation." 10 BEHAVIORAL SCIENCES & THE LAW 291–316 (1992). And defense counsel contends the Supreme Court "acknowledged the significance of 'decisional' competence" in *Godinez v. Moran*, 509 U.S. 389, 400–01 (1993) by holding that:

> A finding that a defendant is competent to stand trial, however, is not all that is necessary before he may be permitted to plead guilty or waive his right to counsel. In addition to determining that a defendant who seeks to plead guilty or waive counsel is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary. In this sense there is a 'heightened' standard for pleading guilty and for waiving the right to counsel, but it is not a heightened standard of competence.

(*Id.* at pp. 7–8).[7]

Justice Kennedy in his concurring opinion observed, "What is at issue here is whether the defendant has sufficient competence to take part in a criminal proceeding and make the decisions throughout its course." *Id.* at 403 (Kennedy, J., concurring).[8] Defense counsel opines the majority in *Godinez* failed to specify

---

[7]   The defense also cites *Indiana v. Edwards*, 554 U.S. 164 (2008), as another instance where the Supreme Court endorsed "the importance of 'decisional competence' in the framework of 'adjudicative competence." (Doc. 265, p. 9). The issue before the Court in *Edwards* was whether a State may limit a defendant's right to self-representation on the ground that, while possessing sufficient mental competence to stand trial, the defendant lacks the capacity to act as his own counsel. *Id.* at 177–78.

[8]   Stated differently, the standard of competence required to plead guilty is "whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of

which abilities are required for decisional competence and suggests four "essential criteria:"

> (1) the capacity to understand information relevant to the specific decision at issue, (2) the capacity to think rationally about alternative courses of action, (3) the capacity to appreciate one's situation as a defendant confronted with a specific legal decision, and (4) the capacity to express a choice among alternatives.

(Doc. 265, pp. 8–9).

The Supreme Court in *Godinez* acknowledged that it has "never expressly articulated a standard for competence to plead guilty or to waive the right to assistance of counsel." *Godinez*, 509 U.S. at 397. That said, the Court rejected the Ninth Circuit's finding that competence to plead guilty is measured by a standard that is higher than the *Dusky* standard. *Id*. That is, the Ninth Circuit announced a standard for pleading guilty whereby the defendant must be found to have the "capacity for 'reasoned choice' among the alternatives available to him." *Id*. Upon review, the Supreme Court queried, "[h]ow this standard is different from (much less higher than) the *Dusky* standard — whether the defendant has a 'rational understanding' of the proceedings — is not readily apparent to us." *Id*. And the Court questioned whether there was "some meaningful distinction between the capacity for 'reasoned choice' and a 'rational understanding' of the proceedings." *Id*. The Court concluded that the standard of competence required to plead guilty is the *Dusky* standard; that is, "whether the defendant has sufficient present ability

---

rational understanding" and has "a rational as well as factual understanding of the proceedings against him." *United States v. Rodriguez*, 751 F.3d 1244, 1252 (11th Cir. 2014).

to consult with his lawyer with a reasonable degree of rational understanding" and has a rational and factual understanding of the proceedings. *Id.* at 401. This includes the capacity to waive his constitutional rights knowingly and voluntarily. *Id.* at 400.

Here the defense frames the penultimate issue as whether the Defendant possesses "decisional competency" — rather than simply asking whether he is capable of consulting with his lawyer with a reasonable degree of rational understanding. And now the Defendant objects to the Magistrate Judge's Report and Recommendation on the basis that the Court erred by stating it is "unaware of any decision in this Circuit (or anywhere else) that has adopted 'decisional competency' in lieu of *Dusky* for the purpose of determining whether a represented defendant is competent to plead guilty. (Doc. 307, p. 2 (citing Doc. 302, p. 8)).

The Magistrate Judge's observation, however, is not incorrect. The Eleventh Circuit in *Rodriguez* relies on the *Dusky* competency standard; that is, whether the defendant can consult with his lawyer with a "reasonable degree of rational understanding." And the Supreme Court embraced the *Dusky* standard in *Godinez* and *Edwards*, finding no meaningful difference between "reasoned choice," or as the Defendant puts it "decisional competency," and "rational understanding." Thus, the Magistrate Judge did not err in finding no controlling precedent had embraced "decisional competency" as a new standard for assessing mental competency to stand trial and to plead guilty.

Next, the Defendant argues the Magistrate Judge erred in finding that the Supreme Court separated the *Dusky* standard, "which applies in situations where a defendant is represented by counsel," from the "heightened standard of 'decisional competency,' which applies in cases where a defendant seeks to represent him or herself at trial." (Doc. 307, p. 3 (citing Doc. 302, pp. 8–9)). First, the Court notes the Magistrate Judge does not state anywhere in the Report and Recommendation that the *Dusky* standard does not include a finding that the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" which is one prong of the test for mental competency. Second, the Magistrate Judge is clearly referring to the difference between having the ability to consult with counsel with a reasonable degree of rational understanding and self-representation which implicates different considerations, as the Court discussed in *Edwards*.

In *Edwards* the Supreme Court held that "the competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right*, not the competence to represent himself" and does not implicate a "standard that is higher than (or even different from) the *Dusky* standard. 544 U.S. at 172. However, the Court recognized that mental illness is not a unitary concept and varies in degrees and may vary over time. *Id.* at 175. Moreover, the Court observed that the *Dusky* standard assumes representation by counsel and emphasizes the importance of such representation. *Id.* at 174. The Court noted that "[i]n certain circumstances an individual may well be able to satisfy *Dusky's* mental competence

10

standard, for he will be able to work with counsel at trial, yet at the same time he may be unable to carry out the basic tasks needed to present his own defense without the help of counsel." *Id.* at 175–76. The Court concluded that "given the different capacities needed to proceed to trial without counsel, there is little reason to believe that *Dusky* alone is sufficient." *Id.* at 177. Accordingly, without abandoning *Dusky*, the Court held that "the Constitution permits judges to take realistic account of the particular defendant's mental capacities" and "permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Id.* at 178.

Ultimately, the Supreme Court did not announce in *Edwards* a new mental competency standard focusing on "decisional competence." Rather, the Court adopts a practical approach and recognizes that the *Dusky* standard envisions close cooperation between the accused and counsel. In the absence of that support, the trial judge must take "realistic account" of the defendant's ability to represent himself. To the extent that the "realistic account" analysis is a heightened standard for determining mental competency to appear *pro se*, it is similar to the "heightened standard" announced in *Godinez* wherein a defendant must be both mentally competent and capable of voluntarily and knowingly waiving his Constitutional rights. The Magistrate Judge's reference to "decisional competency" as being implicated when one seeks to proceed *pro se* is the same as the Supreme

Court's emphasis on the trial judge's need to take a "realistic account" of the defendant's capacity to represent himself without the assistance of counsel. Hence, the Magistrate Judge focuses on the *pro se* defendant's ability "to make his or her own decisions [without assistance of counsel] with respect to legal strategy, presenting a defense, and the like." (Doc. 302, pp. 8–9).

The Magistrate Judge does not ignore or discount the need for the Defendant to possess the "present ability to consult with his lawyer with a reasonable degree of rational understanding rational understanding" in discussing the practical, and perhaps heightened, considerations applicable to mental competency and self-representation. Therefore, the Defendant's objection to the Magistrate Judge's observation that "decisional competency" has not been embraced as a standard for determining mental competency is overruled.[9] For the same reason, the Defendant's objection that the Magistrate Judge limits the so-called "decisional competency" only to self-representation is overruled. The Magistrate Judge does not abandon the *Dusky* standard, which includes the Defendant's ability to consult

---

[9]   The Defendant asserts the Magistrate Judge "brushes aside our litany of cases . . . which expressly recognize that rational decision making is part of competency." (Doc. 307, p. 3). Not so, the Magistrate Judge addressed each case cited by the Defendant and illustrated that they do not support "decisional competency" as a new standard for mental competency and instead apply the *Dusky* standard to the unique facts of each case in finding the defendant mentally incompetent due to a lack of rational understanding. (Doc. 302, p. 8 n.9). While it appears from the instant briefing that the defense intends to employ decisional competency as synonymous with rational understanding this was far from clear when viewing the Defendant's pre-hearing brief. The Magistrate Judge distinguished precedent cited by the defense, because those cases did not endorse "decisional competency" as a separate standard. One may not create confusion through imprecise briefing and complain when the Court addresses the arguments crafted by counsel.

with counsel with a "reasonable degree of rational understanding" in determining the Defendant's mental competency.

The Defendant also objects that the Magistrate Judge held the defense is seeking "to employ a standard, one specific to those diagnosed with ASD, and one that has not yet been adopted as binding on this Court. (Doc. 307, p. 4 (citing Doc. 302, 106)). This objection mischaracterizes the Magistrate Judge's analysis of the eight factors announced in *United States v. Giraldo*, No. 2:09-cr-85, 2011 WL 7946037, at *3 (M.D. Fla. Oct. 24, 2011), which are employed to decide whether a defendant has sufficient present ability to consult with counsel. The Magistrate Judge discusses each *Giraldo* factor in the Report and Recommendation.[10] The Magistrate Judge then observed that the parties differ the most over the fifth and sixth factors, the fifth factor being the Defendant's ability to consider the wisdom of taking a course other than standing trial on the merits. (Doc. 302 at 99). The Magistrate Judge concluded that the Defendant "will rely heavily on the advice of his attorneys in deciding both whether to testify and whether to take a plea deal or

---

[10]   The eight (8) factors identified in *United States v. Giraldo* are: "1) the state of the defendant's memory, since he should be able to relate pertinent facts, names and events to his attorneys (although the defendant need not remember every fact that trial might encompass); 2) the extent to which relevant evidence could be reconstructed from communications made by the defendant to his counsel or from independent sources; 3) an adequate ability to review and evaluate documents and other written evidence bearing on the case; 4) an appreciation of the Government's evidence against him; 5) the ability to consider the wisdom of taking a course other than standing trial on the merits; 6) the ability to decide objectively whether to exercise his constitutional right to take the stand, and if he does take the stand, the ability to testify in an intelligent, coherent and relevant manner; 7) the ability to remain sufficiently alert and responsive so as to follow and recognize any discrepancies in the testimony of witnesses; and 8) the ability to discuss the testimony with his attorneys and to postulate questions to the witnesses through counsel." 2011 WL 7946037, at *3.

go to trial." (*Id.*). The Magistrate Judge also found that "relying on the advice of counsel does not equate to incompetency" and found the evidence showed the Defendant "can weight the risks and benefits of making critical case decision before relying on the advice of counsel." (*Id.* at p. 100). To borrow the Defendant's terminology, the Magistrate Judge found the Defendant possessed decisional competency.

That said, the Magistrate Judge perceived the defense as advocating a different standard — one requiring the Defendant to be able to make critical case decisions without the advice of counsel. (*Id.* at p. 102). This is reflected in the Magistrate Judge's observation that:

> defense counsel and Dr. Negron-Munoz are seeking . . . to impose a much higher standard upon Marks — that of "decisional competency." But as discussed throughout this report, that standard simply does not apply here — Marks is represented by able lawyers, and therefore is not required to make decisions **without their advice and counsel**. *See Edwards*, 554 U.S. at 175–76.

(*Id.* (emphasis added)). The Magistrate Judge correctly held that an individual with ASD, such as the Defendant, is not required to make autonomous decisions *without* the advice of his attorneys.[11]

The defense asserts, however, that "[a]t every point he (sic) defense, and Dr. Negron, have made it clear" that "we are talking about "the ability to make rational decision on his own even ***with the advice of counsel***." (Doc. 307, pp. 4–5)

---

[11] "Dr. Otto nowhere demonstrates nor tests that [the Defendant] is capable of an autonomous decision that is the product of his own rationally weighing the choices" as opposed to "simply the willingness to do what your lawyer tells you." (Doc. 73, pp. 9–10).

(emphasis in original). While this may have been the intention of the defense, the record reveals Dr. Negron-Munoz has taken a contrary position, which the Magistrate Judge correctly rejected. Dr. Negron-Munoz was asked by the defense to define decisional competency, and she testified to the following:

> Decisional competency includes being able to take all the information at hand, manipulate it, be able to make an informed decision, *be able to make a decision for yourself*, if you are able to stand trial for yourself, *make that decision on your own*, also be able to assist your defense lawyer with witnesses, and being able to promote questions as testimony is being given and assist counsel. Those are some of the areas.

(Doc. 294, 65:11–18) (emphasis added).

Dr. Negron-Munoz further emphasized the importance of autonomous decision–making when she explained that the Defendant's request to be placed in the SHU "has to be a team decision" which "has to be evaluated by the team at the jail" and, therefore, is "not an autonomous decision that *you decide just to go to the SHU on your own*." (Doc. 294, 98:1–10) (emphasis added). Dr. Negron-Munoz distinguishes a team decision from an autonomous one, reinforcing her position that decision competency means the Defendant must be able to decide for himself without assistance from the team (i.e., counsel). With this context, the Magistrate Judge equated "decisional competency" with a decision made without reliance on the advice of counsel.

The Magistrate Judge's interpretation of "decisional competence" as encompassing autonomous decision–making without the assistance of counsel thus finds support in Dr. Negron-Munoz's testimony. Nowhere in the direct-

examination does Dr. Negron-Munoz qualify decisional competence as including the ability to make a rational decision with the advice of counsel. And Dr. Negron-Munoz's cross-examination served to reinforce the idea that decisional competence is synonymous with autonomous decision–making.

On cross-examination, Dr. Negron-Munoz agrees that relying upon advice of counsel does not mean one is incapable of deciding, but she adds that "ultimately, with the decisional capacity, they would have the information to make the decision *on their own*, not solely based on the family members or the attorney." (Doc. 294, 153:2–7) (emphasis added). While Dr. Negron-Munoz concedes that the law does not require one to decide without any help, she adds that "at the end of the day, he is the one that is on trial, and it should be his *sole decision*. (*Id.* 154:22–155:8) (emphasis added). Finally, the section of Dr. Negron-Munoz's expert report titled "Decisional Competence" is limited to three paragraphs and does not address autonomous decision–making in the context of advice of counsel. (Doc. 255, p. 20).

If Dr. Negron-Munoz and the defense intended to define decisional competence as the ability to make a critical decision with the advice of counsel, they should have been clearer. The Magistrate Judge fairly interpreted the defense and Dr. Negron-Munoz as advocating a narrower definition of decisional competence — one requiring a defendant to be capable of an autonomous decision without the assistance of counsel — which the law does not support.

From this faulty premise, the defense argues the Magistrate Judge determined mental competence without regard to the Defendant's ability to make

a rational decision. (Doc. 307, p. 5). The Defendant contends that the Magistrate Judge incorrectly found the Defendant "does not need to make a rational decision[] himself, [and] can 'decide' to let his attorney decide what he should do, and that would be a 'rational decision.'" (Doc. 307, p. 5 (citing Doc. 302, p. 101)). The Report and Recommendation does not support the Defendant's position. To the contrary, the Magistrate Judge applied the *Giraldo* analysis in determining — with specific factual support — that: the Defendant is able to retain and recall information; review and evaluate documents and written evidence; appreciate the evidence against him; and consider the wisdom of taking a course other than standing trial. (Doc. 302, pp. 96–100).

The Magistrate Judge also found the Defendant can consider the wisdom of taking a plea versus going to trial in part because he is "well versed in the two plea agreements that were offered to him" as well as the maximum penalties he would face if he went to trial and were convicted. (*Id.* at p. 100). The Magistrate Judge held the Defendant was able to articulate the positives and negatives of each plea agreement, the risk of going to trial, and the chance of being acquitted. (*Id.*). That is, the Magistrate Judge concluded the Defendant had sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding.

The Magistrate Judge's factual findings are corroborated by the transcript of conversations between the Defendant and his counsel regarding plea agreements offered by the Government and the risk of going to trial. Defense counsel engaged in the following colloquy with the Defendant:

MJM:   So, so let's talk about the, uh, uh, the general, the, the choice between, uh, taking a plea and going to trial here. What, what do you have in mind now as the things that you need to, uh, have in mind and consider and decide in order to make that choice?

SM:     Um, uh, which choice won't be as bad.

MJM:   Okay, so, uh, and by be as bad, you mean, uh, what?

SM:     Um, which one won't give me as much time in prison.

...

SM:     Um, uh, well, I mean, you can look at the, at the different, uh, deals and see which one give you less. I mean –

(Gov't Ex. 10, 14:2)

MJM:   Okay. So, can you think of a, another argument to, to go to trial?

SM:     The insanity defense?

MJM:  So ... what would ya take into account in thinking about the insanity defense?

SM:     Well, um, would it work.

MJM:   Okay. How, how do we, what goes into our thinking about, uh, whether it would work or not?

SM:     Um, I just remember you mentioning there was like a 20-something percent chance, I remember.

...

MJM:    ... Does that make you think, oh, ya know, that really might work or is that somethin', is that, uh, somethin' that makes ya think, oh, it's not a very good, a good shot.

SM:     That's what I would think.

MJM:  Which?

SM:     The, it's not a good shot.

MJM:  Okay. What ... makes it ... a worse shot than it might be in other cases?

SM:    Um, well, um, it's … I'm not, uh, like someone who is psychotic.

(Gov't Ex. 10, 14:11)

MJM:   … What, what, is there something about going to trial that's better than, um, than, um, that might make it better than taking a, um, a plea?

SM:    Um, well, I could potentially *** potentially not go to prison.

MJM:  Okay. And how would that happen?

SM:    Uh, if they didn't find me guilty.

…

MJM: Okay. And, and what other, what other result could happen at trial that might make it better than a plea? Any other result?

SM:    The, um, insanity thing.

MJM:   Okay. So, what, uh, and what would, and how would that work? What would, what would happen?

SM:    Well, I know I would go to a hospital after.

(Gov't Ex. 10, 14:22–14:23)

…

MJM: … Is it probable or not probable, um, that they would, that they would find you to be insane?

SM:    I'd say not probable.

(Gov't Ex. 10, 14:31)

…

MJM:  Um, so I want you to think about this, but first wanna know, you know, is there anything in your mind, any question that I can answer for you. . . .[12]

---

[12]  This question is immediately followed by counsel's discussion of the prior sentences handed down by the undersigned, the fact that the Court considers the entire case, and counsel's

> SM:    Honestly, all of the, um, all the questions I have are really unknown really, like, like what I would get. That's the best I can think of 'cause, because, I mean, I already know that if I went to trial and everything went as bad as possible, I mean, it could mean like 40 plus years as my dad has told me a million times. I've, I've, I've heard that.

(Gov't Ex. 10, 14:42–14:43)

Defense counsel also engaged in a role-playing exercise with the Defendant where the Defendant was tasked with pretending to be the attorney who is explaining the choices facing the notional defendant. (Gov't Ex. 10, 15:2). The following ensued:

> SM:    Um, I mean you could be facing upwards of, I think one of them is over 30 years or something.
>
> MJM: Okay.
>
> SM:    Uh, and uh, then you, uh, then the minimum time that you would be facing is not really that great either. Uh, I don't remember that off the top of my head how much that is. Uh, and the other two, there's other, the other charges aren't as bad, but they still would require quite a bit of time in prison. I mean, I guess that's about it for that.
>
> MJM: Okay, so, what else do I need to be thinking about?
>
> SM:    Um, I guess should you take a plea deal, or not for those things?
>
> MJM: Okay.
>
> (Gov't Ex. 10, p. 15:3)
>
> SM:    Um, you, you have uh, uh, then you have two options with those pleas, you could plead to one of them is uh, uh, production and one of them is solicitation, and, uh, if you choose one of those pleas, then you won't go to trial, but if you

---

explanation of mitigation. The dialogue by counsel prior to the Defendant's response consists of 33 lines. (Gov't Ex. 10, 14:42). The Court does not imply or suggest that a discussion of sentencing trends is inappropriate and references this information as indicative of the Defendant's ability to maintain his focus when confronted with a lengthy and technically sophisticated statement.

don't then when, I guess when you go to trial, uh, that's really it, I guess.

MJM:  Well, can you, can you tell me what, what's, what does it mean? What is, tell me what those pleas, what do I need to know about those pleas?

SM:    Um, well, in the, in the production one, um, you could go to prison for as much as 30 years, and you would lose a lot of rights and stuff, and you couldn't really do a whole lot about what they give you. Um, and then, um, in the other one, in the solicitation one, the uh, uh, the mandatory minimum would only be 10 years, but they could give you up to life, and, uh, you'd also lose a bunch of rights too and stuff. You couldn't do, really, a whole lot about what they give you. I guess that would be it for the pleas.

MJM:    Okay, uh, do I have to decide which one of those is better?

SM:    Who has to, uh, I guess you would have to choose that.

MJM: How would I do that?

SM:    Um, by reading it, I guess.

MJM:  Okay, have, have you read, have you read them?

SM:    I've uh, yeah.

MJM: Okay. How, so, how would I, how would I, how would I decide?

SM:    Um, I guess whatever one's more appealing.

MJM: Well, how would I decide that?

SM:    Uh, by uh, um, by uh, I mean, just by reading them, I guess. I mean, you could ask family also to help you too, I guess, also.

(Gov't Ex. 10, p. 15:4)

...

MJM: Okay, now you're just telling me what I need to be thinking about, about a trial. What do I need to know about a trial?

SM:    Um, oh I guess whether or not you should testify. Um, maybe what are your chances at a trial? Who all might the witnesses be? Um, I guess also who, maybe, the judge is also.

MJM:  Well, tell me about those things in this case. How are they, uh, what about those things? What about those things do I need to know?

(Gov't Ex. 10, p. 15:5)

...

MJM: What do I need to know to decide whether I want a trial? In this –

SM:    Um –

MJM: – this case.

SM:    Well, um, who might, who might the witnesses be? Um, and would you maybe get penalized for going to trial over taking a deal? Um, and how bad would your sentence be if you were to get sentenced, maybe. Um, I guess that's all I can really think about.

MJM:  Well, how, so how, how do I decide between these two plea offers and the trial? What, um can you compare, compare them for me? I mean, what, what do I need to do, what do I need to do to make a decision?

SM:    Like, you know, I think you should look over both deals and see if either one of them appeals to you or, or if you think if they don't then you should choose trial, I guess. If one of them, one of them isn't, isn't good, or if both aren't probably good then you shouldn't choose them.

MJM:  Oh, so you're saying a trial is good.

SM:    Not necessarily. I mean, it could be better, but it could also be worse, but at least at a trial you would have a chance, I guess, right?

(Gov't Ex. 10, 15:6).

The role-playing exercise included a discussion concerning how one decides

between pleading guilty and proceeding to trial:

SM:    Um, well, um, uh, I mean, I, I guess at the time you would make a decision you would read over the different ones, and um, uh, I guess also maybe talk to your attorney, too, about what they think you should do as well.

MJM:  Well, my attorney says that I have to decide.

SM:    I, I mean, then I guess that you should just read over everything and see what the odds could be of either choice, I guess.

MJM: But how, how do I do that?

SM:    By, by reading them, I guess, carefully. I mean, I don't, I wouldn't know what else to say, I guess. I mean, you, you could, you could ask of some family or friends I guess. You could do that.

(Gov't Ex 10, 15:7)

...

MJM: Well, which of the two agreements is better?

SM:    Uh, I guess really neither of them. I mean, one offers, one doesn't offer, um, one has a lower minimum, but, but one has, but that same one also has, um, no maximum sentence, and then the other one has a higher minimum, but it does have a maximum, so, I guess, really neither of them, but it possibly could be better than going to trial.

MJM: Well, what makes one better than the other? Cause, I guess I'd have to choose between them, right? If I wanna consider a plea, I gotta have something to compare to the trial, so which one's the better one?

SM:    I, I, I guess it would be up to you because, I mean, I mean, whatever one you think you think you'd have a better shot at, I guess. I mean –

MJM:  What do you think? What do you think?

SM:  Uh, well, if you, I mean, if you chose the production one you would have to go to prison for 15 years minimum, but they could also give you up to 30 years. Um, then the other one, they could be giving you 10 years minimum, but then they could go all the way up to however long they really wanted to, I guess, so, I honestly, I don't know which one. I, I mean, you

maybe could get a better deal on the, on the, on the 10-year one, but, but, but it could also be worse, so I don't really know. Um, I guess you could have a better shot with the 10-year one. I guess.

(Gov't Ex. 10, 15:9)

...

MJM: What would you say based on what you know about this whole case, what would you say, um, if, if, to, to, to make me think that that was the best choice based on what you know about your case, about this case?

 SM:   I don't know. You, uh, you could, um, well I mean, so the, the **** plea, um, has, um, a 15-year minimum, um, as a, I'm pretty sure a 30-year maximum, um, almost positive that's what that is, um, and so although you might get 30 years, I mean if you were to, if you would choose, uh, you could choose the other, I mean it would be less, a lesser mandatory minimum thing, but, but it could possibly go up to life. So you could be worse off there. I guess that's how I could convince you, I guess. I mean you, you still lose a lot of rights and everything and that's all still the same, so but I guess that's how I would convince you.

(Gov't Ex. 10, 15:11)

...

MJM: Okay. What about deciding to take any one of these pleas as opposed to going to trial? Can you, what can you tell me anything that we discussed or anything, you know, everything you've read that might be helpful in deciding one over the other of those?

SM:    Um, well, I guess the only real thing I could think of is to why you would want to take a plea. It could be that you might get a lot more, um, time at trial, um, than if you were to take the plea, but, um, you also might not. So I don't, I don't know, uh, um, you, uh, also wouldn't have to, to worry about, um, uh, worry about some of the things that might happen at trial. I guess also if you were take a plea, that's another thing. Other than that, I –

MJM: What does, what does that mean? What does that mean?

> SM:    Um, well, uh, I mean like if you were to, um, if you were to, uh, go to trial, um, that the judge might not like the fact that you wasted his time in doing it, so he might just give you a bunch of time if you were to be found guilty. He would just give you a bunch of time because he's upset at you. So that can be a thing.

(Gov't Ex. 10 at 15:12).

In a separate conversation, defense counsel asked the Defendant how he "would . . . be able to decide [on whether to plead guilty] without me telling you what I think you should do." (Gov't Ex. 10, 15:17). That is, counsel asked the Defendant to make an autonomous decision without the benefit of his advice. In response, the Defendant responded "I, I might. I don't know." (*Id.*). When the Defendant said he would discuss the decision with family member, counsel asked "but how would you decide by yourself?" (*Id.*). Unsurprisingly, the Defendant replied that he did not think he could make this decision by himself. (*Id.*).

The Magistrate Judge determined the Defendant "clearly understands the seriousness of the decision he must make and defers to the advice of his counsel." (Doc. 302, p. 101). The Magistrate Judge correctly rejected defense counsel's argument that the Defendant must be able to make an autonomous decision without the benefit of his lawyer's advice. The standard for mental competency does not require a defendant to forfeit the advice of counsel in making critical decisions such as pleading guilty. What is required is a factual and rational understanding of the case and the present ability to consult with counsel with a reasonable degree of rational understanding—that is, the ability to consider the wisdom of taking a course of action other than trial.

When defense counsel did advise his client against going to trial and recommended accepting the plea agreement, the Defendant stated: "I mean, if, if that's what you think I should do. I mean, ***, but I thought it was, it wasn't that great [of a deal], but, I mean, if it's, if you think it's the best thing for me to do, then I guess I'll do it." (Gov't Ex. 10, 15:18). The Magistrate Judge did not suggest that the Defendant need not make a rational decision for himself after considering the advice of counsel, or that he should let his lawyer decide for him. Rather, the Magistrate Judge correctly determined that by "seeking out the advice of his attorneys, and by *considering and following* this advice, Marks *is* making an autonomous decision — the same decision that competent defendants make every day." (Doc. 302, p. 101) (emphasis added). The disconnect here is defense counsel's premise that to be mentally competent a defendant must make critical decisions autonomously and without input from his counsel. The Defendant's objection that the Magistrate Judge determined competency without regard to the Defendant's ability to make a rational decision and erred by allowing the Defendant to let his lawyer decide whether he should plead guilty is, therefore, overruled.

### 2.   *Defendant's Ability to Weigh Considerations*

As discussed above, the defense contends the Magistrate Judge erred by excluding the ability to make rational decisions from mental competence. (Doc. 307, p. 2). The defense adds to this argument "as an aside" the following:

> [T]here is nothing in the record demonstrating that [the Defendant] was capable of "weighing" anything. Everything in the R&R points to in this regard is mere rote recitations by [the Defendant], often mistakenly, of various rules and

> considerations that might properly bear on his decision. Nothing demonstrates a "weighing" process towards deciding except in the most simplistic notion that less jail time would be better. The R&R describes no "weighing." He only "accepts the plea deal on the advice of his attorney" after he cannot decide [for] himself.

(*Id.* at p. 6). It is unclear whether counsel's observation is an objection or simply an opinion. Counsel must "specifically identify those findings" to which he objects, and "conclusive or general objections need not be considered by the district court." *Schultz*, 565 F.3d at 1361. Here, the defense merely posits that nothing in the records demonstrates the Defendant can weigh anything, without specifying testimony or exhibits introduced during the competency hearing. Similarly, counsel's conclusion or opinion that the Defendant merely engages in rote recitation, often mistaken, of rules and considerations that may bear on his decision is not supported by citation to specific evidence, testimony, or findings contained in the Report and Recommendation. Counsel's observation that "nothing in the record demonstrating that [the Defendant] was capable of 'weighing' anything" is precisely the type of conclusive or general objection the Court should not entertain.[13]

---

[13] Even a cursory review of the "record" undermines defense counsel's observation. For example, the Magistrate Judge summarized the Defendant's online chats and correctly observed that the Defendant had the ability to weigh consequences of his actions by coaching a victim to lock her door and instructing the victim not to tell anyone about "us." (Doc. 302, p. 19). The Magistrate Judge also found the Defendant "demonstrated 'a conscious effort to mislead investigators, which speaks to an appreciation of future consequences'" and, the undersigned finds, the ability to weigh options. (*Id.* at p. 20). The Defendant was also able to weigh the risk of being placed in general population at MCC and asked for protective custody. (*Id.* at p. 30). And, as discussed above, the Defendant was able to weigh the risk of going to trial, the potential success of the insanity defense, and the positive and negative aspects of each plea agreement. (Gov't Ex. 10). A finding of competency does not require that defendants "fully

### 3.   *Defense Counsel's Attempt to Educate the Defendant*

The defense next contends that the Magistrate Judge observed there were "several times throughout the [nearly 30 hours of] videos where [the Defendant] appears to be nervous, confused, forgetful, and anxious." (Doc. 307, p. 7 (citing Doc. 302, p. 80)). The Magistrate Judge attributed, at least in part, the Defendant's apparent confusion on counsel's use of "lengthy discussions that travel into complex legal arenas, without taking breaks, and without parsing the topics into smaller 'bite-sized pieces,' [with] the majority of time failing to ensure that [the Defendant] understands." (Doc. 302, p. 80). The context in which the Magistrate Judge makes this observation is important. The Magistrate Judge discusses in the Report and Recommendation the Defendant's ability to "weigh the risks and benefits with respect to the critical decision of deciding whether to go to trial or accept a plea offer (and which plea offer to accept). (*Id.* at p. 78). After addressing the Defendant's ability to appreciate the risk of a higher sentence at trial and the minimum and maximum sentences provided for in each plea offer, the Magistrate Judge discusses the Defendant's apparent confusion in the video over legal concepts. (*Id.* at pp. 78–80).

The defense argues that "[t]he thrust of this criticism seems to be that [the Defendant's] lack of the intuitive knowledge needed to make rational decisions is defense counsel's fault for so imperfectly attempting to educate him." (Doc. 307,

---

comprehend the intricacies of some of the defensive theories offered by their lawyers." *Hogan*, 986 F.2d at 1373.

pp. 7–8). Thus, counsel argues, the "only reasonable implication of this is that someone else can do a better job to help [the Defendant] attain competence." (*Id.*). To the extent defense counsel's observation is an objection to a finding by the Magistrate Judge, counsel has grossly mischaracterized the record. As discussed in the preceding section, the Magistrate Judge does not identify counsel's often lengthy, compound, and complex statements of the law contained in the video recordings (and transcripts) of his conversations with the Defendant prior to the aborted plea agreement as evidence of the Defendant's mental incompetence. The Magistrate Judge merely explains that notwithstanding some evidence of nervousness, confusion, forgetfulness, or anxiety — which is attributed to the nature of counsel's questioning — the Defendant possesses mental competence to enter a guilty plea. The objection is, accordingly, overruled.

4.   *The R&R Ignores Evidence of Dr. Jenkins's Lack of Professional Skill, Thoroughness, Neutrality and Accuracy*

The defense objects to the Magistrate Judge's finding that Dr. Jenkins is more persuasive than Dr. Negron-Munoz. (Doc. 307, p. 8).

a.   *Dr. Jenkins is less Qualified than Dr. Negron-Munoz*

The defense rests on the opinion that Dr. Jenkins is "far less qualified and has far less experience" than Dr. Negron-Munoz by citing support in the record for this proposition. As already discussed, the Court need not entertain conclusive or general objections. Based on this one-sentence objection, the Court is unable to discern whether the defense is referring to the relative degrees possessed by the

experts, the sheer years of practice, or experience in a specified area of expertise. Moreover, the objection does not state whether the amount of time spent interviewing the Defendant and the type of tests employed should be factored into the analysis of which expert is less experienced and less qualified. The defense posits the Magistrate Judge "ignored" evidence of the disparity in experience and qualifications without elaboration and without citation to the Magistrate Judge's findings, and the Court will not presume to guess which factors are considered in the analysis and — more importantly — which factors the Magistrate Judge considered in assessing persuasiveness. The opaque objection is not made clearer by counsel's characterization of Dr. Jenkins diagnosis of Social Anxiety Disorder as "sophomoric." Accordingly, the objection is conclusory and generalized; therefore, it is denied.

### b.    *Thoroughness and Accuracy*

The defense argues that Dr. Negron-Munoz was more thorough and accurate than Dr. Jenkins and lists the following considerations: (1) Dr. Negron-Munoz opines the diagnostic criteria for ASD rules out Social Anxiety Disorder (SAD); (2) Dr. Jenkin's diagnosis of depression in remission is incorrect; (3) Dr. Jenkins did not record her interview with the Defendant while Dr. Negron-Munoz did; (4) Dr. Jenkins relied only on statements made by the Defendant in creating her historical background; (5) Dr. Jenkins opines the Defendant can defer to his attorneys in making decisions; (6) unspecified "defense witnesses" provided unspecified "written records and recorded evaluations illustrating their [unspecified] points

depicting just how incompetent [the Defendant] is, and their [unspecified] opinions were overlooked or completely ignored;" (7) the testing performed by Dr. Jenkins did not probe for competence or understanding; (8) when compared to Defense Exhibits 4 and 5, the BOP questionnaires are practically meaningless; and (9) Dr. Jenkins did not probe for the Defendant's understanding of what conduct he was charged with, only using the statutory rubric. (Doc. 302, pp. 8–11).

This shot-gun approach to objecting is unhelpful, particularly where, as here, the defense does not demonstrate a causal connection between the alleged errors committed by the expert and the Magistrate Judge's factual findings. While not mentioned by the Defendant in his analysis, the Magistrate Judge wrote the following on the persuasiveness of Dr. Jenkins's opinions:

> Although Dr. Negron-Munoz opined that Marks lacks a rational understanding, I find her opinions less persuasive than Dr. Jenkins. Dr. Jenkins evaluated and observed Marks over the course of approximately 30 consecutive days; her evaluations were conducted in-person, during which Dr. Jenkins could observe Marks' demeanor and non-verbal communication; and Marks was also observed 24/7 by MCC staff, who would have reported any issues with Marks to Dr. Jenkins (there were none to report). Dr. Jenkins also administered several psychological tests, including those geared to the precise issues at hand, and her findings correlated with those of Dr. Otto. In contrast, Dr. Negron-Munoz only evaluated Marks via an online platform for a total of approximately four (4) hours and two of her three meetings with Marks were for the purpose of assessing the viability of an insanity defense, not to determine competency. Moreover, Dr. Negron-Munoz only administered two (2) tests to Marks – one related to PTSD and the other to ADHD. In all other respects she relied on the test results from Dr. Geller (an expert whose opinions the Court previously discounted). (Doc. 255).

(Doc. 302, pp. 91–92). It is not enough that counsel believes one expert is better, more credible, or more persuasive than another. To demonstrate error in the Magistrate Judge's Report and Recommendation, counsel must specify how the expert's alleged deficiencies were erroneously relied upon by the Magistrate Judge to facilitate the Court's *de novo* review.

Dr. Negron-Munoz testified that when considering social anxiety disorder the Diagnostic and Statistical Manual of Mental Disorders ("DSM" or "DSM-5-TR") cautions the practitioner to consider whether the symptoms are not "better accounted for by autism spectrum disorder." (Doc. 294, 94:10–12). Dr. Negron-Munoz explained that "[s]ocial anxiety and social communication deficits are hallmarks of autism spectrum disorder." (*Id.* 95:11–12; 96:24—97:6). Dr. Negron-Munoz concludes that Dr. Jenkins diagnosed the Defendant with Social Anxiety Disorder "[p]erhaps to find some other reason than autism to explain the myriad of social deficits exhibited by [the Defendant] in adulthood." (Doc. 255, p. 24).

However, Dr. Jenkins did diagnose the Defendant with Autism Spectrum Disorder, along with Social Anxiety Disorder. (Doc. 228, p. 18; Doc. 237, p. 22). In the second addendum to her expert report, Dr. Jenkins provides a detailed discussion of the Defendant's autism. (Doc. 237, pp. 22–24). She finds the Defendant's Autism Spectrum Disorder symptoms were present in his early developmental period, but they do not appear to have adversely impacted activities

of daily living.[14] (*Id.* at p. 24). Dr. Negron-Munoz agrees with Dr. Jenkins that the Defendant has social anxiety and only differs on whether the Defendant's autism symptoms more accurately account for the symptoms of Social Anxiety Disorder ("SAD") such that the additional diagnosis of SAD is incorrect. At best, the experts disagree on whether SAD warrants a stand alone diagnosis which depends on one's interpretation of certain behaviors demonstrated by the Defendant. However, the experts agree that the Defendant suffers from ASD and social anxiety. Defense counsel's description of Dr. Jenkins's diagnosis of SAD as sophomoric is a gross simplification of a complex diagnostic process.

Dr. Negron-Munoz also took issue with Dr. Jenkins's determination that the Defendant's depression was in remission. (Doc. 294, 92:18—93:9). Dr. Negron-Munoz quoted the DSM-5 definition of "In Full Remission" as requiring no significant signs or symptoms of depression for the past 2 months. (Doc. 255, p. 25). Dr. Jenkins described the Defendant's depression alternatively as "Major Depressive Disorder, In Full Remission" and "Major Depressive Disorder, Mild, In Full Remission." (Doc. 294, 92:18—93:9). Dr. Negron-Munoz reviewed "what appears to be a depression questionnaire" and answers to 11 questions written in handwriting that is not the Defendant's. (Doc. 255, pp. 26—27). Based on the

---

[14] Dr. Negron-Munoz points to contrary evidence, including Mr. Marks' description of the Defendant's hair being matted when he left MCC. (Doc. 255, p. 21). And Dr. Negron-Munoz argues that one's ability to dress oneself, maintain hygiene and navigate the community "would not rule out the many other ways that autism can *severely* affect daily living . . . and did in fact affect Steven." (*Id.* at pp. 21—22). That said, the mere fact that experts disagree does not preclude the Court from finding one expert more persuasive.

partial answers and, at time indiscernible writing, Dr. Negron-Munoz concludes that the Defendant met criteria for Major Depressive Disorder, Recurrent, Moderate to Severe. (*Id.* at p. 27).

In her expert report, Dr. Jenkins agrees that "in full remission" is "used to indicate during the past two months, no significant signs or symptoms of the disturbance were present." (Doc. 229, p. 24). Dr. Jenkins identified several criteria that were present from 2018 to December 2020, including the responses to the questionnaire cited by Dr. Negron-Munoz, and found his MMPI-2-RF profile resulted in a diagnosis of "Depression-related disorder." (*Id.*). However, when asked if he is currently experiencing any of the previous depressive symptoms, Mr. Marks stated he was not. He expressed the only time he has felt depressed was during (he could not specify a month) 2018 to December 2020. (*Id.* at pp. 24–25). Where Dr. Jenkins interprets the data as relating to the 2018 to December 2020 timeframe, Dr. Negron-Munoz interprets the data as addressing the prior two weeks.[15]

That said, Dr. Jenkins was asked at the competency hearing why she determined the depression was in full remission, and she explained:

> So when Mr. Marks was telling us his depressive symptoms, he was speaking of past depressive symptoms. He denied any current depressive symptoms. He denied having issues with eating or sleeping, any discrepancies there, any concerns with memory. He didn't appear to have any attentional issues. He

---

[15] Assuming Dr. Negron-Munoz correctly quotes the questionnaire in her report, the first question uses the qualifier "[i]n the past two weeks." (Doc. 255, p. 26).

wasn't suicidal. He was future oriented. He was ready to go home, ready to go forward with his legal process.

He did not report any feelings of depression to us. They were not reported to us by staff who observed him. When we listened to the monitored phone calls, he was happy. He appeared happy.

. . .

And so although he had this history of depression, he did not currently appear or present as depressed. So that is why I gave him major depressive disorder, or MDD, in full remission, so meaning he fit criteria for MDD, major depressive disorder, in the past, but currently he was not experiencing any symptoms, thus in remission.

(Doc. 292, 77:24—78:17). The defense did not question Dr. Jenkins on this topic during the competency hearing, and the Court finds Dr. Jenkins's testimony that the Defendant related information concerning past depression and denied current symptoms of depression is credible. Dr. Negron-Munoz acknowledges that the handwritten entries on the questionnaire were not made by the Defendant. As such, there is no evidence to suggest the defendant was aware that one of the questions on the questionnaire refers to symptoms of depression in the past two weeks. Dr. Jenkins's diagnosis of Major Depressive Disorder In Full Remission therefore is not contradicted by the data.

The defense next argues Dr. Jenkins lacks greater credibility than Dr. Negron-Munoz, because Dr. Jenkins did not record her interviews with the Defendant.[16] (Doc. 307, p. 8). The defense further contends Dr. Jenkins "failed in

---

[16] The defense emphasizes that the Court previously commented on the preference for recorded interviews. (Doc. 307 at 8). This is only partially correct. The Court observed that Dr. Geller's "clinical interview was not recorded—which is not mandatory—and the Court is left to rely upon Dr. Geller's interpretation of the interview. This is troubling *in view of* the credibility

creating her historical background on [the Defendant], by relying on statements made by [the Defendant] himself and disregarding all the other evidence at hand." (*Id.* at p. 9). The defense cites to its post-hearing briefing in support of this contention and to a single page from Dr. Jenkins's direct-examination. (*Id.*).

The citation to Dr. Jenkins's direct-examination does not support the Defendant's argument that Dr. Jenkins's relied only on the Defendant's statements. On direct-examination counsel for the Government questioned Dr. Jenkins about what she considers in selecting psychological tests to administer on the Defendant. (Doc. 292, 18:8–10). Dr. Jenkins explained the fact that a defendant has gone through a prior competency evaluation does not alter her approach in selecting the appropriate tests. (*Id.* at pp. 11–19). The full context of Dr. Jenkins's testimony is as follows:

> Because competency is here and now when the individual is in front of us, we perform our evaluation the way we would normally do if we had no other assessments or no other evaluations. The evaluations that were previously done are considered collateral information. So we will, of course, review them for anything pertinent; but, ultimately, we have to make our opinion based on how the individual is presenting at the time when they are in front of us.

(*Id.*)

Dr. Jenkins's testimony thus has nothing to do with the "historical background" of the Defendant. Moreover, a cursory review of Dr. Jenkins's expert

---

shortcomings noted by the Magistrate Judge and adopted by this Court." (Doc. 95 at 13) [emphasis added]. Thus, the Court did not condemn as unreliable the testimony of an expert who relies upon memory, test results, and notes over recordings. The Court merely observed that Dr. Geller's credibility was not unassailable, and the absence of a recording made the it more difficult to assess the weight to be afforded her opinions.

report reveals the section recounting the Defendant's "historical background" is based on a wide variety of source documents and not merely on the Defendant's recollection. (Docs. 228, 229, 237). Defense counsel acknowledges that Dr. Jenkins reviewed a variety of records, but then dismisses this process by taking Dr. Jenkins's testimony regarding the selection of diagnostic testing out of context. The objection is therefore without merit.

The defense also dedicates a single sentence to criticizing Dr. Jenkins's opinion that the Defendant is making a decision when he "defers to his attorneys and wait[s] for them to make a decision for him." (Doc. 307, p. 9). Again, the defense has taken Dr. Jenkins's testimony out of context and oversimplifies her opinion regarding the Defendant's mental competence.[17] Dr. Jenkins was asked on cross-examination whether the Defendant "has to be able to rationally evaluate the advice I'm giving him and make his own decision" about whether to plead guilty. (Doc. 292, 205:14–16). Dr. Jenkins explained that in making the decision to plead guilty, the Defendant "acknowledged that he did it because he believed he would receive less time, less prison time. So, to me, that is a rational decision that is making a decision despite your guidance. I think it's with the help of your guidance because . . . you told him how much time he could be facing if he went to trial versus taking a plea." (*Id.* 208:4–9). Dr. Jenkins testified that the Defendant "was able to rationally say, 'I also took it because it's less time,' and that's what a lot of people

---

[17]   Defense counsel fails to cite to the line and page of a witness's testimony, opting to identify a page or series of pages and leaving the Court to guess at the operative exchange.

in his situation do. They — they make a decision that they believe will give them less time in prison." (*Id.* 208:10–13).  Accordingly, Dr. Jenkins testified that the Defendant "is making a rational active decision to trust you and to use your guidance, and if your guidance leads him one way and that's what he decides to do, it's ultimately his decision, but I do think he is going about it in a rational way." (*Id.* 206:21–25). This is not the same as the Defendant simply waiting for counsel to decide for him.[18]

Next, the Defendant repeats his criticism of Dr. Jenkins for not "making any notes of her own." (Doc. 307, p. 10). The defense submits that "[y]et, without notes the R&R found that Dr. Jenkins['s] opinions were more persuasive, even though there was no written, or recorded record to support her opinions." (*Id.*). In contrast, the defense argues that its witnesses provided written records and recorded evaluations "illustrating their points depicting just how incompetent [the Defendant] is, and their opinions were overlooked or completely ignored." (*Id.*). The defense further claims that "Dr. Jenkins provided no concrete evidence of the Court to examine beside her own impressions and interpretations." (*Id.*).

There are several problems with the Defendant's argument. First, it lacks specificity and is unsupported by pinpoint citation to Dr. Jenkins's expert report and three addenda, her testimony, or to the defense witness's reports and opinions.

---

[18] Dr. Jenkins further testified on cross-examination that the Defendant explained to her some of the advantages of disadvantages of pleading guilty. (Doc. 292, 192:18–22). The Defendant explained that he was advised by counsel he faced up to 40 years incarceration "and that appeared to be the basis on him deciding ultimately to sign the initial plea." (*Id.* 193:18–22).

Second, the assertion that the opinions of defense witnesses are being "overlooked or completely ignored" by the Magistrate Judge is uncorroborated. Thirdly, the argument that Dr. Jenkins "provided no concrete evidence for the Court to examine beside her own impressions and interpretations" ignores the battery of tests Dr. Jenkins administered, her conclusions based on the test scores, and her consideration of prior psychological testing administered on the Defendant.[19] (Doc. 228, pp. 5–14, 16–18). While the defense claims Dr. Jenkins offered no "concrete evidence" to support her opinions, the interpretation of psychological tests (current and past) combined with impressions from interviews is precisely how psychologists reach opinions on diagnoses and prognosis. (*Id.* at pp. 18, 23). Dr. Jenkins provided for the Court's consideration concrete evidence, contrary to defense counsel's opinion.

---

[19] Dr. Jenkins considered the following: Defendant's Neuropsychological Evaluation, dated October 27, 2017; Individual Education Program, dated December 11, 2015, including the results of the WISC-IV, WIAT-II, WJ-III tests administered by School Psychologist, Shawn M. Dolan; a Neuropsychological Evaluation dated October 20, 2017 and the result of the following tests: WISC-IV, WJ-III, Halstead Reitan Neuropsychological Battery, continuous Performance Test, Test of Language Development-1:2, Developmental Test of Visual-Motor Integration, Attention Deficit Disorders Evaluation Scales, and BASC-II; Occupational Therapy Evaluation, dated February 12, 2004; Psychological Evaluation by Dr. Harvey, dated September 22, 2017; Psychological Evaluation by Dr. Grundy, dated November 19, 2017; Psychological Evaluation by Dr. Geller, dated December 17, 2017; Psychological Evaluation and Risk Assessment by Dr. Imhof, dated March 21, 2018; undated Diagnostic Report by Dr. Whitney; Psychological Consultation by Dr. Grundy, dated December 6, 2018; Psychiatric Evaluation by Dr. Danziger, dated February 5, 2019; Forensic Psychological Evaluation by Dr. Otto, dated February 21, 2019; Supplemental Report by Dr. Geller, dated April 8, 2019; Forensic Criminal Responsibility Evaluation by Dr. Montalbano, dated August 11, 2020. (Doc. 228, pp. 5–15). Dr. Jenkins also administered the Validity Indicator Profile, Shipley-2, WASI-II, MMPI-2-RF, and interpreted the scores for each diagnostic test. (*Id.* at pp. 16–22). Dr. Jenkins interviewed the Defendant for approximately 10 hours. (Doc. 277, pp. 5–6).

The Defendant's next argument—that Dr. Jenkins's opinions are less persuasive than the defense witnesses because she did not take "notes of her own"—also misses the mark. Dr. Jenkins's student took notes of some interviews, and Dr. Jenkins relies on her recollection of other interviews. (Doc. 292, 168:13–21, 169:12–15). While neither party identifies the volume of notes taken as Dr. Jenkins's direction, it is obvious from her testimony that note-taking was routine. (*Id.* 169:18–21). Dr. Jenkins frequently quotes directly from the Defendant's responses to questions concerning how the criminal justice system operates. (Doc. 228, pp. 23–26). In summary, the Defendant's objection that Dr. Jenkins's opinions are less persuasive because she used a student to document interviews is not compelling. There is nothing inappropriate about using a note-taker as opposed to recording interviews, and the objection minimizes Dr. Jenkins's copious analysis of psychological testing conducted both by her and by the Defendant's previous treating and expert witnesses. This is precisely why generalized objections are of little value to the Court.

The Defendant's seventh objection to Dr. Jenkins's thoroughness is that the "'testing' done by Dr. Jenkins did not actually test for competence or understanding—it was not really pertinent to competency in general and was especially impertinent to whether [the Defendant] is competent." (Doc. 307, p. 10). The Court is again confronted with a conclusive and generalized objection. The defense attacks the utility of "tests" without any basis, such as citing the cross-examination of Dr. Jenkins or countervailing testimony from a defense expert. The

defense asserts — again without support in the record — that "compared to Def. Ex. 4 and 5, the BOP questionnaires are practically meaningless." (Doc. 307, p. 11). Yet, defense counsel offers no analysis showing how Defense Exhibits 4 and 5 relate to the unspecified BOP questionnaires, why the Court should agree that those exhibits render the questionnaires "practically meaningless," or how a finding of practically meaningless relates to the objection or the Magistrate Judge's finding. The Court declines to guess at the foundation, assuming one exists, of defense counsel's opinion.

Defense counsel further claims that the Magistrate Judge should not have found Dr. Jenkins to be more persuasive than the defense witnesses, because Dr. Jenkins discounts the video interviews of the Defendant conducted by defense counsel. (Doc. 307, p. 11). The defense contends the video interview (Gov't. Ex. 10) demonstrates the Defendant's "inability to attain competence and rationally decide for himself." (*Id.*). This statement is uncorroborated by expert testimony and, as such, is merely defense counsel's opinion. The Court has read the transcript of the interviews and has reviewed portions of the video recording where legal principles are discussed with the Defendant and does not share counsel's opinion that the recordings show the Defendant is incapable of attaining competence or of consulting with his lawyer with a reasonable degree of rational understanding. To be sure, the Defendant does not possess the same level of knowledge as one trained in the law, but that is not required for mental competence.

Dr. Jenkins testified that she watched portions of each session of conversations between the Defendant and his attorneys recorded on video. (Doc. 292, 58:13–20). Dr. Jenkins explained that although it is helpful to consider "a lot of information," the "competency evaluation is based on the here and now. It's how [the Defendant] is in front of me, what I'm observing, and that's what's really paramount to me, because competency can be fluid . . . so I cannot base my competency evaluation or come up with my opinion based on someone else's research or work or one single form of data." (*Id.* 59:2–12). The defense characterizes Dr. Jenkins's testimony as discounting the video record, but that is not the case. Dr. Jenkins considered all relevant information, including the video recording, but her opinions are based on the total mix of information available to her, including her evaluation of the Defendant at that moment in time. The defense offers no empirical information showing Dr. Jenkins's approach is contrary to established norms or standards for assessing mental competence. And recognizing that Dr. Jenkins had examined the Defendant to gauge his understanding of the legal system, the defense dismisses her efforts as relying on the Defendant's "half-baked responses to [Dr. Jenkins's] question which tested his superficial understanding of the legal world." (Doc. 307, p. 11). Again, the defense is offering an opinion unsupported by citation to evidence.[20]

---

[20] Dr. Jenkins discusses in her expert report the Defendant's understanding of the charges and the proceedings against him and his ability to assist counsel. (Doc. 228, pp. 23–26). The defense takes issue with the Defendant's understanding of the law because the Defendant defined production of child pornography as, "production is like having made the pornography," (*Id.* at p. 23), and the defense notes that the Defendant "did not make

Here, the Defendant reported to Dr. Jenkins that he could be sentenced to up to 40 years and mentioned 15 or 18 to 30 years imprisonment. (Doc. 292, 161:23–24). The defense attacks Dr. Jenkins's impartiality and claims that since she did not know the specific penalties associated with the charged offenses and could not confirm whether the Defendant was accurate in his understanding of the penalties, Dr. Jenkins must not be impartial. (Doc. 307, p. 11). This argument makes no sense particularly where Dr. Jenkins testified "for us it sufficed that he believed or understood that he could do a lot of time in prison, and these were the estimates that he believed them to be." (Doc. 292, 162:8–11). Dr. Jenkins further testified that she did not believe the Defendant was wrong based on her experience. (*Id.* 162:13–16). And, as it turns out, the Defendant was not mistaken in his understanding of the possible sentences.

The Court has considered the Defendant's objections to the Magistrate Judge finding Dr. Jenkins to be more persuasive than the Defendant's witnesses and agrees with the Magistrate Judge. The objection, and it's nine (9) subparts, is overruled.

> 5.   *The R&R unfairly discounts or disregards the defense evidence of Dr. Negron-Munoz*

The Defendant observes that the Magistrate Judge, in summarizing Dr. Negron-Munoz's qualifications, noted that Dr. Negron-Munoz was initially retained by the defense to offer an opinion on the Defendant's criminal

---

anything." (Doc. 307, p. 11 n.4). As previously noted, the Defendant need not possess expert knowledge of the law to be found competent.

responsibility and that her first two sessions with the Defendant related to that issue. (Doc. 307, p. 12 (citing Doc. 302, p. 52 n.28)). The defense argues all three of Dr. Negron-Munoz's sessions related to competency and claims this is evident from Defense Exhibits 19 and 20 without further elaboration or record citation.[21] (Doc. 307, p. 12). Defense Exhibit 19 is a video recording that is two hours and twenty-one minutes in length, and Defense Exhibit 20 is a video recording lasting one hour and twenty-five minutes.

As previously addressed, the Court is not bound to consider conclusory and generalized objections. Directing the Court to nearly four hours of video recordings without citation to pertinent sections of the interview conducted by Dr. Negron-Munoz is a generalized objection. That said, the Court watched the video recordings and does not agree that it is evident from them that the interviews pertained to mental competence. For example, in Defense Exhibit 19 Dr. Negron-Munoz conducts a detailed discussion of the Defendant's intent when chatting with minors and requesting sexually explicit videos and photographs. The Defendant explained to Dr. Negron-Munoz that he was playing a game and tried to get the victims to block him, that he did not believe they were children even when one victim identified herself as being ten-years old, that he never looked at the images, and that he could not discern the age of the victims by looking at their face. (Gov't. Ex. 14, 20:15—30:7).

---

[21]   Government Exhibits 13 is a transcript of Defense Exhibits 20, and Government Exhibit 14 is a transcript of Defense Exhibits 19. Accordingly, the Defendant could have directed the court to page and line citations in support of its objection.

Defense Exhibit 20 focuses more on the Defendant's understanding of the court process, the charges and penalties, and the pros and cons of pleading guilty versus proceeding trial. (Gov't. Ex. 13, pp. 1–24). The balance of the interview is a discussion of personal and medical history. (*Id.* at pp. 25–41). Accordingly, the information elicited from the Defendant in Defense Exhibit 20 is relevant to mental competence, but it is not evident that the purpose of the video was to evaluate competence as opposed to determining if the insanity defense was factually supported. Therefore, the Court does not agree with the defense that the Magistrate Judge erred in finding the first two interviews to be related to the insanity defense.

The Defendant argues the Magistrate Judge discounts Dr. Negron-Munoz's assertion that the Defendant has significant memory deficiencies. (Doc. 307, p. 13). The defense cites the Magistrate Judge's observation that the Defendant engaged in "lengthy discussions" and the "extensive details" he provided on November 23, 2020. (*Id.*).  The defense acknowledges that the Defendant "does provide some details about the offense," but the defense argues the Defendant recalled merely "trivial" details concerning apps he used. (*Id.*).

In Defense Exhibit 19, Dr. Negron-Munoz asks the Defendant to explain how he came to be charged with the offenses. (Gov't. Ex. 14, 7:12–15). The Defendant explains that he used two apps, Amino and Kik, which are "like a forum messaging board kind of thing," and he explained that a user must be 18 years of age. (*Id.* 10:8–10; 11:18–22). The Defendant stated that a detective interviewed him in June

for several hours, and he was not arrested until July 25th. (*Id.* 13:6–18). He was held in the Orange County Jail in protective custody, then general population, and then a mental health ward. (*Id.* 13:20–23). The Defendant explained he was extradited from Florida to Oklahoma, and it took 15 days to reach Oklahoma where he was released on bond. (*Id.* 13:24—14:3). After three months, his parents took him to look for residential programs, and they visited Atlanta, a facility in Utah called TLSU, and ultimately chose Aloft. (*Id.* 14:6–11). In December, the case became federal. (*Id.* 14:12–15). The Defendant also explained how the "selfie game" was played, as discussed above. (*Id.* 20:18—30:7). Dr. Negron-Munoz also inquired about the Defendant's sexual history, and he recounted first being sexually active at age 15. (*Id.* 27:15–21). Another example of the Defendant's ability to recall remote events is seen when Dr. Negron-Munoz elicited information from the Defendant regarding his Middle School teachers. The Defendant recalled an eight-grade math teacher who did not like having a student with an individualized education plan. (*Id.* 34:1–16).

The defense directs the Court to Defense Exhibit 14 as evidence of the Defendant's confusion and guesswork when questioned by Dr. Negron-Munoz, again without pinpoint citation. (Doc. 307, p. 13). The Court reviewed Defense Exhibit 14, the psychological assessment prepared by Dr. Harvey, and does not find it supports the Defendant's contention. The Court, upon *de novo* review, agrees with the Magistrate Judge that the Defendant was "able to engage in lengthy

discussions and provide extensive details about the facts surrounding his alleged offenses." (Doc. 302, p. 72).

Finally, the defense submits the Magistrate Judge erred in concluding that Dr. Negron-Munoz is partisan. (Doc. 307, p. 14 (citing Doc. 302, p. 92)). The Magistrate Judge observed that Dr. Negron-Munoz's testimony and opinions are "geared more towards a finding that Marks lacked criminal intent or an appreciation of the wrongfulness of his actions." (Doc. 302, p. 93 n.51). The defense points to Dr. Negron-Munoz's impressive resume, her recorded interviews of the Defendant, and her review of defense counsel's interviews of the Defendant as evidence of her impartiality. (Doc. 302, p. 14).

The Defendant's criticism of the Magistrate Judge's observation misses the point. The Magistrate Judge found Dr. Jenkins's opinions to be more persuasive for a host of reasons, only one of which was the finding that Dr. Negron-Munoz is partisan. The Magistrate Judge considered that Dr. Jenkins evaluated and observed the Defendant over 30 consecutive days, evaluated him in-person, and administered several psychological tests, "including those geared to the precise issues at hand." (Doc. 302, p. 91). In comparison, the Magistrate Judge correctly noted that Dr. Negron-Munoz only evaluated the Defendant for four (4) hours and only administered two (2) tests — one for PTSD and the other for ADHD. The Magistrate Judge commented that "[i]n all other respects [Dr. Negron-Munoz] relied on the test results from Dr. Geller" whose credibility was discussed in the prior Report and Recommendation. (*Id.* at p. 92). Thus, the Magistrate Judge's

determination that Dr. Jenkins's opinions are more persuasive is not limited to a finding that Dr. Negron-Munoz is partisan. Upon review, the Court agrees that Dr. Jenkins's opinions are more persuasive.

   6.   *The R&R unfairly discounts or disregards the defense evidence of Dr. Baird-Hepworth*

Next, the Defendant objects that the Magistrate Judge "unreasonably chooses to give no weight to the testimony from Dr. Baird-Hepworth." (Doc. 307, p. 15). The objection is frankly confusing, because the defense points to testimony by Dr. Baird-Hepworth concerning her analysis of the Defendant at Aloft and then criticizes Dr. Jenkins for failing to account for these observations in her expert report. (Doc. 307, pp. 15–17). The defense concludes that "[h]ad Dr. Jenkins interviewed Dr. Baird-Hepworth as she should have done, she never could have honestly written the report she did." (*Id.* at p. 17). Assuming for the sake of argument Dr. Jenkins did not consider some of Dr. Baird-Hepworth's testimony concerning the Defendant's inability to engage in self-care without direction, the defense fails to relate this to the Magistrate Judge having discounted or disregarded evidence given by Dr. Baird-Hepworth. The objection includes a single reference to the Report and Recommendation — footnotes 41 and 52.

The Magistrate Judge cites Dr. Baird-Hepworth's testimony that the Defendant "cannot make any decision of any kind, no matter how simple or complex." (Doc. 302, p. 67). Then the Magistrate Judge observes that Dr. Baird-Hepworth did not vary from this "broad statement" even when questioned on

cross-examination about either the Defendant's decision not to see a doctor at MCC for his glaucoma because he is already seeing a doctor, or the Defendant's attempts to advocate for leaving MCC after his evaluation was completed. (*Id.* at p. 67 n.41). It is undisputed that the Defendant made this statement, but Dr. Baird-Hepworth testified the Defendant's choice not to see a doctor at MCC was not a real decision, because the Defendant knew he already had a doctor. (Doc. 296, 28:10–13). She volunteered that if the Defendant's parents told him to use the MCC doctor, the Defendant would have done so. (*Id.* 28:14–18).

Dr. Baird-Hepworth did not testify as an expert witness and did not conduct psychological testing. While the defense values Dr. Baird-Hepworth's observations and interpretation of the Defendant's behavior while at Aloft, the Magistrate Judge found the testimony unpersuasive. The Magistrate Judge observed Dr. Baird-Hepworth's testimony contradicts Dr. Jenkins' findings, which the Magistrate Judge and this Court find persuasive, and found Dr. Baird-Hepworth's testimony to be relevant to "decisional competency;" that is, autonomous decision-making without advice of counsel, which is not the standard for mental competence. (Doc. 302, p. 94, n.52). Finally, the Magistrate Judge found Dr. Baird-Hepworth to be a partisan witness who was argumentative at time and who engaged in speculation when faced with evidence that contradicted her testimony. (*Id.*). Upon *de novo* review, this Court agrees with the Magistrate Judge's findings.

7.      *The R&R unfairly discounts or discredits the testimony of Ms. Bennett*

The Defendant argues the Magistrate Judge "gave very little attention to the evidence [presented by] Ms. Bennet." (Doc. 307, p. 18). The Court notes, however, eight (8) pages of the Report and Recommendation are dedicated to Ms. Bennett's testimony and opinions. (Doc. 302, pp. 42–50). Regardless, the defense contends Ms. Bennett's testing confirmed the impairment in the Defendant's executive functioning and argues that Ms. Bennett distinguishes perseverative activities like online chats from "focused concentration." (Doc. 307, p. 19). The defense suggests that Ms. Bennett's opinions rebut the Magistrate Judge's conclusion that the Defendant has capacity for sustained concentration; (*Id.*); yet the defense fails to cite record evidence in support of this proposition, such as Ms. Bennett's testimony or her expert report. The defense further avers that the Report and Recommendation "misses the point of Ms. Bennett . . . that there is a vast difference between low level executive functioning, and the challenges of navigating a novel social challenge such as making decision in your defense." (*Id.*). Once again, the defense does not cite the record to support this proposition, leaving the Court to either hazard a guess or scour the record for possible evidence supporting defense counsel's assertion.

Ms. Bennett is a licensed speech-language pathologist who has worked with children with ASD. (Doc. 254, p. 19; Doc. 292, 212:4–14). It is beyond dispute that Ms. Bennett has an impressive resume, and she was permitted to express opinions as an expert in speech and language pathology — not psychology or psychiatry.

(Doc. 292, 221:7–9). Ms. Bennett spent four (4) hours with the Defendant to evaluate his expressive and repetitive language, higher-level language skills, and social pragmatics. (Doc. 302, p. 43). Ms. Bennett administered eight (8) tests, and the Magistrate Judge discussed the results of each. (*Id.* at pp. 44–48). The Magistrate Judge noted that Ms. Bennett found the Defendant "presents with a receptive and expressive language disorder, with social pragmatic language impairments associated with ASD." (*Id.* at p. 48).

Contrary to the Defendant's objection, the Magistrate Judge considered Ms. Bennett's testimony and opinion regarding the Defendant's ability to make decisions. The Magistrate Judge found that Ms. Bennett opined the Defendant "is significantly impaired in his ability to hold in mind and weigh multiple variable that might bear on a particular decision and lacks the capability to understand the implications of his choices." (Doc. 302, p. 48 (*citing* Doc. 254, p. 14)). Ms. Bennett explained the Defendant could respond to the Detectives' questions because it involved factual, rote memory, and was straightforward. (Doc. 302, p. 49). The Magistrate Judge also noted Ms. Bennett disagreed with the Court's finding that the Defendant possessed the capacity for sustained concentration, could plan for the future, recognize the social perspectives of others, or has the capacity to testify. (*Id.* (citing Doc. 254, pp. 16–17)). Ms. Bennett did not, however, offer an opinion on whether the Defendant was competent to proceed. (Doc. 302, p. 49).

The Magistrate Judge also observed that while Ms. Bennett opined the Defendant lacked the capacity for sustained concentration, she acknowledged on

cross-examination that all eight (8) tests were completed during their four (4) hour meeting.[22] (*Id.* at p. 50). And Ms. Bennett was not aware that the Defendant completed a four (4) hour interview with Dr. Otto with only one shore bathroom break, or that his online chats lasted up to eight (8) continuous hours. (*Id.*; Doc. 292, 31:6–117). Ms. Bennett was also unaware that the Defendant instructed four children to delete the videos and pictures, but she was aware that the Defendant told another to deny having sent images if her younger brother told on her and initially lied to the police. (Doc. 292, 34:5—35:3). Based on this exchange, Ms. Bennett agreed the Defendant "could be envisioning a consequence" and wanted to avoid it. (*Id.* 35:13—36:9). Finally, the Magistrate Judge noted that Ms. Bennett testified in his conversations with defense counsel the Defendant "did a good job of expressing the different options, details about those options, and the choices he would have." (Doc. 302, p. 50 (citing Doc. 294, pp. 16–22)). Ms. Bennett concluded that defense counsel was successful in helping the Defendant make a choice with guidance. (Doc. 302, p. 51 (citing Doc. 294, 45:22—46:4)).

Contrary to the Defendant's objection, the Magistrate Judge did not discount or discredit Ms. Bennett's opinions. The Court carefully considered Ms. Bennett's testing and her opinions, as has the undersigned, and found that the evidence in its entirety supports a finding of mental competency to stand trial. This Court agrees with the Magistrate Judge's interpretation of the evidence.

---

[22]   Ms. Bennett testified the assessment tests were performed in three (3) to three and one-half (3.5) hours. (Doc. 294, 28:2–11).

8.  *The R&R erroneously give effect to the adverse credibility finding as to Dr. Geller*

The Defendant objects to the Magistrate Judge and the undersigned having given less weight to Dr. Geller's testimony and reports in the first competency hearing than was afforded to the opinions of Dr. Otto. (Doc. 307, p. 20). The defense characterizes the Court's adverse credibility finding as constitutionally infirm. (*Id.*). The Magistrate Judge, and the undersigned, found Dr. Geller's opinions to be "generally informative" but less persuasive than Dr. Otto, for three reasons: (1) Dr. Geller is not an expert in forensic psychology and did not offer evidence of prior experience evaluating defendants or testifying in competency proceedings; (2) Dr. Geller appeared to have become invested in the outcome of the case and the Defendant and was argumentative on cross-examination; and (3) her opinions and testimony related to criminal intent and not competence to stand trial with only 3 paragraphs of a 43-page report dedicated to competency. (Doc. 76, p. 50). The Court's credibility determination is not constitutionally infirm. To the extent that Dr. Negron-Munoz elected to rely on Dr. Geller's report, the Magistrate Judge properly considered the Court's prior pronouncements regarding the efficacy of the report. Accordingly, the Defendant's objection is overruled.

9.  *The Magistrate Judge Discriminated against the Accused as an autistic individual by focusing on abilities irrelevant to competency*

The Defendant argues the Magistrate Judge focused on the Defendant's abilities — such as playing piano, self-care, or engaging in conversation — and

disregarded his deficits, resulting in discrimination against a defendant with autism. (Doc. 307, pp. 22–23). This objection is spurious. The Magistrate Judge's observation that the defense "seeks to employ a standard, one specific to those diagnosed with ASD, and one that has not yet been adopted as binding on this Court" refers to the notion of decisional competency, meaning the ability to make an autonomous decision on whether to plead guilty without advice and assistance of counsel. (Doc. 302, pp. 102, 105–06). The Magistrate Judge did not disregard the Defendant's deficits. To the contrary, the Magistrate Judge finds "there can be no dispute that Marks suffers from ASD with some degree of accompanying language impairments." (*Id.* at p. 105). Accordingly, the objection is overruled.

> 10.   *The Magistrate Judge erred by not allowing Dr. Geller to testify about the Vineland Adaptive Behavior Scales*

Dr. Negron-Munoz expressed difficulty explaining how the Vineland Adaptive Behavior Scale measures adaptive skills for people with disabilities, because she is not a psychologist. (Doc. 294, 173:10–17). The defense asked the Court for permission to call Dr. Geller as a witness to address the Vineland test. (Doc. 296, 3:22—4:21). The Magistrate Judge correctly observed that the Court had previously excluded Dr. Geller as a witness and that decision had been affirmed by the district court. (*Id.* 5:15–18; Docs. 267, 287). The Court denied the defense motion to add Dr. Geller as a witness in the second competency evaluation, because the defense failed to disclose the witness and the required expert report in accordance with the scheduling order. (Doc. 287, pp. 3, 9–10). The Magistrate

Judge did not err by enforcing the scheduling order and this Court's Order excluding Dr. Geller.

## IV.   CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1.    The Defendant's Objections to the Report and Recommendation (Doc. 307) are **OVERRULED**;

2.    Defendant Steven Marks is found to be **COMPETENT TO STAND TRIAL**; and

3.    By separate notice the Court will schedule a status conference to select a trial date.

**DONE AND ORDERED** in Orlando, Florida on September 12, 2022.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties